IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

EQUAL EMPLOYMENT OPPORTUNITY )
COMMISSION,                  )
                             )
                   Plaintiff, )
                             )    C.A. No.04-CV-425 SLR
          v.                 )
                             )
MBNA AMERICA BANK, N.A.,     )
                             )
                   Defendant. )


## DEFENDANT MBNA'S OPENING BRIEF IN
## SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT


YOUNG CONAWAY STARGATT & TAYLOR, LLP


Sheldon N. Sandler, Esquire (No. 245)
Margaret M. DiBianca, Esquire (No. 4539)
The Brandywine Building, 17th Floor
1000 West Street
P.O. Box 391
Wilmington, Delaware 19899-0391
Telephone: (302) 571-6673, 571-5008
Facsimile: (302) 576-3330, 576-3476
Email: ssandler@ycst.com, mdibianca@ycst.com
Attorneys for Defendant


DATED: November 15, 2005

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................. iv

NATURE AND STAGE OF THE PROCEEDINGS ......................................... 1

SUMMARY OF ARGUMENT ........................................................................... 2

STATEMENT OF FACTS ................................................................................... 3

    A.    Eapen's Job History ......................................................................... 3

    B.    Eapen's Performance Begins to Decline........................................ 4

    C.    Eapen's Outside Business Was a Conflict of Interest
          in Violation of MBNA Policy .......................................................... 5

          1.    Eapen Was Aware of and Bound by
                MBNA's Conflict of Interest Policy ...................................... 5

          2.    Eapen's Outside Business Interests Violated
                MBNA's Conflict of Interest Policy ...................................... 6

          3.    Personnel Conducts an Investigation Into the
                Conflict of Interest and Other Performance
                Issues ........................................................................................ 8

    D.    Eapen's Password Sharing Violated MBNA's
          Security Policy ................................................................................. 10

          1.    Eapen Was Aware of and Bound by
                MBNA's Information Security Guidelines ......................... 10

          2.    Eapen Violated the Security Guidelines by
                Using a Co-Worker's Password ........................................... 11

          3.    Eapen Refuses to Admit Wrongdoing
                During Personnel's Investigation....................................... 13

    E.    Based on Eapen's Clear Violations of MBNA's
          Conflict of Interest and Information Security
          Policies, the Decision Was Made to Terminate
          Eapen's Employment ...................................................................... 13

DB01:1781673 1

009626 1038

ARGUMENT ...................................................................................................15

I.    MBNA DID NOT ENGAGE IN UNLAWFUL
      HARASSMENT OR RETALIATION AGAINST JUSTUS
      EAPEN AND THEREFORE, SUMMARY JUDGMENT
      SHOULD BE GRANTED TO MBNA ..........................................................15

      A.    Summary Judgment Standard .......................................................15

      B.    Title VII Analytical Framework ...................................................15

II.   MBNA IS ENTITLED TO SUMMARY JUDGMENT
      BECAUSE PLAINTIFF HAS FAILED TO ESTABLISH
      EVIDENCE OF A HOSTILE ENVIRONMENT ........................................16

      A.    Plaintiff's Burden of Proof ..........................................................16

      B.    Plaintiff Has Failed to Establish a *Prima Facie* Case
            of National Origin Harassment ....................................................17

            1.    Eapen's Lone Allegation of a Severe
                  Comment Was an Isolated Incident that
                  Occurred Nearly Four Years Prior to the
                  Filing of the Charge ..........................................................18

            2.    Even If Accepted as True, Plaintiff's
                  Additional, Unsupported Allegations Do
                  Not Rise to the Level of Pervasive and
                  Regular Harassment ..........................................................19

            3.    Eapen's Allegations that Mr. Dell Used
                  Derogatory Language Is Unsupported by
                  His Co-Workers and Contradicted by His
                  Own Testimony ..................................................................21

      C.    Eapen's Other Allegations, Such as Lack of Work,
            Do Not Constitute A Hostile Environment ...................................22

III.  MBNA IS ENTITLED TO SUMMARY JUDGMENT ON
      PLAINTIFF'S RETALIATION CLAIM BECAUSE
      PLAINTIFF HAS NOT ESTABLISHED A *PRIMA FACIE*
      CASE NOR SHOWN THAT MBNA'S LEGITIMATE,
      NONDISCRIMINATORY REASONS FOR ITS
      ACTIONS ARE PRETEXTUAL. ..............................................................24

      A.    Plaintiff Cannot Establish a *Prima Facie* Case of
            Retaliation ....................................................................................25

DB01:1781673 1                                                                    009626 1038

        1.     Eapen Did Not Complain of Discrimination
Until After the Decision to Terminate Him
Had Already Been Made ........................................................26

        2.     No Causal Connection Exists Between the
Protected Activity and Any Alleged Adverse
Action ....................................................................................29

  B.    MBNA Had Several Legitimate, Nondiscriminatory
Reasons To Terminate Eapen ......................................................30

        1.     Standard of Law ..................................................................31

        2.     Eapen's Serious Violations of MBNA
Policy Constituted Legitimate
Nondiscriminatory Reasons for His
Termination ........................................................................32

  C.    Plaintiff Cannot Establish Pretext .............................................34

        1.     Similarly Situated Employees Were Treated
the Same for Similar Violations of MBNA
Policy ...................................................................................34

        2.     Plaintiff Has Failed to Allege that the
Relevant Decisionmakers Harbored Any
Discriminatory Animus Towards Eapen ...........................36

CONCLUSION ..................................................................................................38

## TABLE OF AUTHORITIES

Page

Cases

Aman v. Cort Furniture Rental Corp.,
   85 F.3d 1074 (3d Cir. 1996) .................................................................................. 16

Anderson v. Liberty Lobby, Inc.,
   477 U.S. 242 (1986)............................................................................................. 15

Arasteh v. MBNA America Bank, N.A.,
   146 F. Supp. 2d 476 (D. Del. 2001)..................................................................... 22

Boyle v. County of Allegheny, Pa.,
   139 F.3d 386 (3d Cir. 1998) ................................................................................ 15

Burton v. MBNA Amer. Bank, N.A.,
   2005 U.S. Dist. LEXIS 12154 (D. Del. June 22, 2005)............................... 36, 37

Celotex Corp. v. Catrett,
   477 U.S. 317 (1986)............................................................................................. 15

Childress v. Dover Downs, Inc.,
   2000 U.S. Dist. LEXIS 4881 (D. Del. March 31, 2000)..................................... 22

Clark County Sch. Dist. v. Breeden,
   532 U.S. 268 (2001)............................................................................................. 25

DiBiase v. SmithKline Beecham Corp.,
   48 F.3d 719 (3d Cir. 1995) .................................................................................. 16

Doyle v. U.S. Sec'y of Labor,
   285 F.3d 242 (3d Cir. 2002) ................................................................................ 15

EEOC v. Metal Serv. Co.,
   892 F.2d 341 (3d Cir. 1990) ................................................................................ 15

Ezold v. Wolf, Block, Schorr & Solis-Cohen,
   983 F.2d 509 (3d Cir. 1992) ................................................................................ 31

Ferguson v. E .I. DuPont de Nemours & Co.,
   560 F. Supp. 1172 (D. Del. 1983)........................................................................ 24

Fuentes v. Perskie,
   32 F.3d 759 (3d Cir. 1994) ........................................................................... 17, 31

DB01:1781673 1                                                                                     009626 1038

Griffiths v. CIGNA Corp.,
    988 F.2d 457 (3d Cir. 1993), cert. denied, 510 U.S. 865 (1993) .................................. 25

Harris v. Forklift Sys., Inc.,
    510 U.S. 17 (1993) .................................................................................................... 16, 17

Hazen v. Modern Food Servs., Inc.,
    2004 U.S. App. LEXIS 21467 (3d Cir. Oct. 15, 2004) ................................................ 25

Jones v. Am. Travelers Corp.,
    896 F. Supp. 463 (E.D. Pa. 1995), aff'd, 85 F.3d 62 (3d Cir. 1996) ........................... 31

Kachmar v. SunGuard Data Sys., Inc.,
    109 F.3d 173 (3d Cir. 1997) .......................................................................................... 30

Kautz v. Met-Pro Corp.,
    412 F.3d 463 (3d Cir. 2005) .......................................................................................... 32

Kearney v. Town of Wareham,
    316 F.3d 18 (1st Cir. 2002) ..................................................................................... 33, 37

Keller v. Orix Credit Alliance, Inc.,
    130 F.3d 1101 (3d Cir. 1997) ........................................................................................ 31

Kelly v. Caldera,
    2000 U.S. Dist. LEXIS 3015 (S.D. Ala. Feb. 28, 2000) .............................................. 26

Kovoor v. Sch. Dist. of Phila.,
    2004 U.S. App. LEXIS 3792, (3d Cir. Feb. 26, 2004) ................................................. 16

Krouse v. Am. Sterilizer Co.,
    126 F.3d 494 (3d Cir. 1997) .................................................................................... 15, 29

Massarsky v. GM Corp.,
    706 F.2d 111 (3d Cir. 1983) .......................................................................................... 31

Maull v. Div. of State Police,
    141 F. Supp. 2d 463 (D. Del. 2001) .............................................................................. 32

Mauro v. S. New Eng. Telecomms.,
    208 F.3d 384 (2d Cir. 2000) .......................................................................................... 31

McDonnell-Douglas Corporation v. Green,
    411 U.S. 792 (1973) ....................................................................................................... 15

McPhaul v. Bd. of Comm'rs,
    226 F.3d 558 (7th Cir. 2000) ......................................................................................... 19

DB01:1781673 1                                                                                                    009626 1038

Meritor Savs. Bank FSB v. Vinson,
    477 U.S. 57 (1986) .......................................................................................... 17

Oncale v. Sundowner Offshore Servs.,
    523 U.S. 75 (1998) .......................................................................................... 17

Peace v. Shellhorn & Hill,
    2005 U.S. Dist. LEXIS 2533 (D. Del. Feb. 18, 2005) ............................... 26, 34

Richards v. City of Wilm.,
    2004 U.S. Dist. LEXIS 4987 (D. Del. Mar. 24, 2004) .............................. 24, 30

Shaner v. Synthes (USA),
    204 F.3d 494 (3d Cir. 2000) ............................................................................ 25

Smith v. Allen Health Sys.,
    302 F.3d 827 (8th Cir. 2002) ........................................................................... 29

Soliman v. Deutsche Bank AG,
    2004 U.S. Dist. LEXIS 9087 (S.D.N.Y. May 20, 2004) .................................. 18

Taj v. Safeway, Inc.,
    2003 U.S. Dist. LEXIS 14550 (D. Kan. May 22, 2003) .................................. 18

Urey v. Grove City College,
    2004 U.S. App. LEXIS 7188 (3d Cir. April 13, 2004) .................................... 30

Walls v. Turano Baking Co.,
    221 F. Supp. 2d 924 (N.D. Ill. 2002) .............................................................. 18

Weston v. Pa.,
    251 F.3d 420 (3d Cir. 2001) ............................................................................ 17

Woods v. Bentsen,
    889 F. Supp. 179 (E.D. Pa. 2000) ................................................................... 30

Woodson v. Scott Paper,
    109 F.3d 913 (3d Cir. 1997) ....................................................................... 24, 25

Other Authorities

29 C.F.R. §1604.11(a)(3) .................................................................................... 17

Fed. R. Civ. P. 56(c) ........................................................................................... 15

## NATURE AND STAGE OF THE PROCEEDINGS

Plaintiff, Justus Eapen, was hired by Defendant, MBNA America Bank, N.A. ("MBNA"), on February 28, 2000, as a Senior PC Specialist. Plaintiff initiated the present case by filing a Charge of Discrimination with the Equal Employment Opportunity Commission (the "EEOC") on March 6, 2003, alleging national origin discrimination. Subsequently, Plaintiff amended his Charge to include a claim of retaliation. On June 23, 2004, the EEOC filed a Complaint on behalf of Eapen and a class of "black or Indian workers." (D.I. 1). The EEOC subsequently dropped the class charge and now pursues the claim on behalf of Eapen only. The parties have completed discovery, and MBNA has filed for Summary Judgment. This is its Opening Brief in support thereof.

1

## SUMMARY OF ARGUMENT

MBNA is entitled to Summary Judgment because there is no genuine issue of material fact with respect to Plaintiff's claims of national origin discrimination and retaliation that must be resolved by a jury.

1.      Plaintiff has failed to establish a *prima facie* case of national origin discrimination through either direct or circumstantial evidence.

2.      Assuming, *arguendo*, that Plaintiff has made out a *prima facie* case of national origin discrimination by direct or circumstantial evidence, Plaintiff has failed to prove that Defendant's legitimate, nondiscriminatory reason for his termination is unworthy of credence, such that it is a mere pretext for national origin discrimination, or that national origin discrimination was more likely than not a determinative cause of his termination.

3.      Plaintiff has failed to establish a *prima facie* case of retaliation. Plaintiff has insufficient evidence to demonstrate the presence of a causal connection between his allegations and his termination.

4.      Assuming, *arguendo*, that Plaintiff has made out a *prima facie* case of retaliation, Plaintiff has failed to prove that Defendant's legitimate, nondiscriminatory reason for his termination is unworthy of credence, such that it is a mere pretext for retaliation, or that retaliation was more likely than not a determinative cause of his termination.

DB01:1781673 1    009626 1038

## STATEMENT OF FACTS

### A. Eapen's Job History

Eapen first came to MBNA as a contractor with On-Site Technologies, Inc. in 1997. (A157-58). Eapen worked both day and evening shifts during this time. (A165). In February, 2000, Eapen was hired by MBNA as a Senior PC Specialist in MBNA's Desktop Computing Services Department ("DTC"). (A2-3; 159). Eapen became an MBNA employee on February 28, 2000. (A159).

Eapen worked a weekday day shift. He handled issues that arose with the Microsoft Exchange servers[1] and was responsible for ensuring that the servers were functioning properly and had the most up-to-date software. (A160; 243).

During his first year of employment with MBNA, Eapen had four different supervisors.[2] Each of his supervisors, in turn, reported to Bellverie Ross. (A160-63). In March of 2001, Jim Dell became Eapen's supervisor and remained in that role for the duration of Eapen's employment. (A163). Eapen testified that he and Mr. Dell had a "very amiable relationship," though this relationship later deteriorated. (A176-77).

When Ms. Ross was reassigned in mid-2002, James Micek became the DTC supervisor. (A164). In August 2002, Ernesto Marra was hired as the DTC Server Operations Manager. (A259). Mr. Dell reported to Mr. Marra who, in turn, reported to Mr. Micek. (A164).

After Dell became Eapen's supervisor in 2001, the group experienced substantial growth and, for the first time, required 24 hour coverage. (A231). At a team meeting, Dell explained the need for additional coverage and requested two volunteers to work the night shift. (A232-33). Eapen agreed to work the night shift, (A233), and began working Fridays, Saturdays and Sundays from 6 pm to 7 am. (A167). Jason Campbell accepted a

---

[1] Exchange is a Microsoft program that supports e-mail functions. (A160).
[2] His first four supervisors were Janet Dempsey, Ray Brady, Neela Chacko and Richard Wegner. (A160-163).

position working the night shift the rest of the week. (A233). Eapen was paid a 15%
shift differential for working the night shift. (A8).

In May, 2004, Dell recommended Eapen for a promotion. Eapen was promoted to
the position of Systems Engineer with a rank of Personal Banking Officer in June 2002
and received a 10% salary increase. (A13-15).

**B. Eapen's Performance Begins to Decline**

In mid-2002, Mr. Dell observed Eapen sleeping on the job. (A239). Dell entered
the test laboratory and found Eapen sleeping between two chairs. (A239). Dell
counseled Eapen about the incident and then discussed his concerns with Bellverie Ross.
(A240-41).

Ms. Ross confronted Eapen about the sleeping incident. (A199). Eapen claimed
he was not asleep but, instead, on his allotted break period. (A197-98). Eapen's
nickname in DTC was "Sleepin' Eapen," which, he testified, "never bothered [him]."
(A200). Eapen subsequently told Dell that he felt that Dell had betrayed him by reporting
the incident to Ms. Ross. (A242).

At this point, Eapen and Dell's relationship began to deteriorate and Dell began to
notice increased problems with Eapen's job performance. For example, Eapen was not
completing his assignments. (A234). Eapen, however, claimed that he did not have
enough work. (A166). By way of counseling, Dell created a checklist for Eapen, noting
the various tasks that Eapen was expected to complete during his shift. (A171).

Instead of responding with improved performance, Eapen mocked the importance
of completing the assigned tasks. In a display of total disregard for management, Eapen
testified that, as a way "to express his frustration," he simply would not check the list
because "it really is meaningless." (A171-72). Eapen complained that he was not given
more significant responsibility. Yet, Eapen also testified that Dell did not want to assign
Eapen more work because he was unable to complete the small checklist he had already

4

been given. (A172). Ironically, Eapen admits that Dell was completely justified in his concerns.

Dell also became concerned about Eapen's use of the phones for personal business during working time. Eapen admitted that Dell counseled him "multiple times" that he should not use MBNA phones for personal use. (A192). Eapen, however, "did not give any significance to [Dell's] comments." (A192). And, to add insult to injury, Eapen later admitted that he had been using MBNA phones for personal business. First, he admitted that he used the phones for non-work related calls, "but nothing that could have been considered abusive." (A194). Then, when confronted with evidence that he had called various technical vendors who did no business with MBNA, Eapen admitted that he had, in fact, made those calls and that they were related to his outside business. (A194).

Nevertheless, Dell gave Eapen a moderately favorable review in October 2002. Mr. Dell ranked Eapen's overall performance as "Excellent."[3] (A201). Eapen was surprised to get such a positive evaluation because he was expecting to be ranked as "Unsatisfactory." (A201). He testified that such a positive review was "more than [he] could ask for." (A201-02).

## C. Eapen's Outside Business Was a Conflict of Interest in Violation of MBNA Policy

### 1. Eapen Was Aware of and Bound by MBNA's Conflict of Interest Policy

Eapen was aware of and understood MBNA's policy on Conflicts of Interest. At the start of his employment, Eapen was given an employee handbook and certain MBNA policies to review and sign. (A168; 174-75). Attached to Eapen's job application was a list of specific statements to which Eapen agreed. (A4). Included was the following statement relating to Conflicts of Interest: "MBNA policy restricts activities and

---

[3] "Superior" is the highest rating and "Excellent" is the second highest rating.

relationships that create an actual or perceived conflict of interest with MBNA's business." (A4).

Eapen also reviewed and signed MBNA's Conflict of Interest Policy, which states that "MBNA people are expected to conduct their business and outside activities in a manner that avoids *actual or perceived* conflicts with interests of MBNA or its Customers." (A4). It specifically states that the following activities should be avoided:

> Being employed as a broker, dealer or agent in the field of. . . consumer finance transactions, home equity/second mortgage transactions, or any other field in which MBNA conducts business.

It further states:

> [i]t may appear to be a conflict of interest if you share a home . . . with an individual who is employed by or provides core services to a competitor of MBNA. . .
>                         *        *        *
> You are obligated to report situations that could constitute or appear to constitute conflicts of interest to your manager or the Ethics Office. MBNA people involved in conflicts of interest could face immediate dismissal and possible criminal prosecution.

(A6-7). Eapen admits that he was aware of MBNA's policies relating to Conflicts of Interest. (A168; 174-75).

### 2. Eapen's Outside Business Interests Violated MBNA's Conflict of Interest Policy

Despite his knowledge of MBNA's conflicts of interest policies, Eapen engaged in several activities that constituted violations of the policy. As early as the start of his employment, Eapen was in violation of the policy. Eapen's wife, Tracey Eapen, was a mortgage broker for Wells Fargo when Eapen began working for MBNA. (A56; 186). Yet, Eapen did not report the possible conflict on his application for employment or, subsequently, to his manager or the Ethics Office. Instead, Eapen claimed that because he had worked at MBNA previously as a contractor, "everybody at MBNA knew" that his wife was a mortgage broker. (A186).

6

In fact, at an annual MBNA corporate picnic held on MBNA property Eapen's wife handed out her business cards to MBNA employees. (A255-56). As a result of this solicitation, Neela Chacko, Eapen's DTC co-worker, obtained several mortgages through Tracey Eapen and Wells Fargo. (A257; 188-89). Eapen admitted that he gave out his wife's business cards at MBNA functions to help her solicit business. (A277). Such solicitation of MBNA employees by Eapen in furtherance of his wife's mortgage business was in direct violation of the MBNA Policy on Conflict of Interest.

Eapen's conflict involving his wife constituted only one violation of the Conflict of Interest Policy. Eapen's own activities violated the policy even more directly. Just nine months after Eapen became employed by MBNA, Eapen started his own business, Eapen Corporation ("Eapen Corp").[4] (A11). On December 17, 2001, Eapen signed and filed the Articles of Incorporation for Eapen Corp, registering himself as the incorporator. (A11). Eapen was also the President and only officer of Eapen Corp. (A195). Eapen admitted that he never asked anyone at MBNA if operating Eapen Corp would constitute a conflict of interest. (A186-87).

Eapen also established a website, Eapen.net, to support Eapen Corp. Eapen envisioned his website as a search engine specializing in financial, real estate and insurance matters. (A178). Eapen set up the website so it would be updated daily. (A191). As part of a press package, Eapen hired a ghost writer to produce publications and press releases that would link back to Eapen.net. (A179-80).

Eapen obtained a mailbox to be used as an address where Eapen Corp correspondence could be sent. (A181-82). Additionally, Eapen set up and still maintains several email addresses through the Eapen.net website for communications relating to his

---

[4] Eapen obtained his real estate license in 2001. (A182). He requested and was given off time from work to attend the classes. (A183). Eapen remains affiliated with Long & Foster Realtors. (A184-85). Prior to working at MBNA, Mr. Eapen also took classes and trained for other careers including financial planner and truckdriver. (A207).

7

outside business. (A195-96). Eapen.net is still an actively registered domain.[5] (A190; 194). At no time did Eapen notify MBNA of these conflicts, nor did he ask the Ethics Office whether any of his finance, real estate, and insurance activities constituted an actual or perceived conflict of interest.

### 3. Personnel Conducts an Investigation Into the Conflict of Interest and Other Performance Issues

On December 17, 2002, Dell spoke with Richard Kilmon of Personnel about his continued concerns regarding Eapen's performance. (A143-44). Specifically, Dell identified four issues. (A143-44). First, Eapen was not completing work as assigned. (A143-44). Second, Eapen had been observed sleeping during work hours. Third, Eapen had "some tardiness issues." (A143-44). Finally, Dell reported that there was a potential conflict of interest violation. He informed Mr. Kilmon that it had come to his attention that Eapen may have been soliciting his co-workers for his real estate and mortgage businesses during working hours. (A143-44). Kilmon immediately initiated an investigation into these concerns. (A143-44).

As part of the investigation, Kilmon and other Personnel staff conducted confidential interviews with Eapen's DTC co-workers. (A145-48). Some of Eapen's co-workers indicated that Eapen had, to varying degrees, solicited them for his mortgage and real estate businesses. Glenn Ford, for example, told Mr. Kilmon that when he was buying a house, Eapen had offered to try to get him a better mortgage rate. (A145). John Hartnett stated that he had heard Eapen discuss mortgages at work and that Eapen had referred to his wife's mortgage business as his own. (A146). Neela Chacko told Mr. Kilmon that Eapen's wife had assisted her with a total of seven mortgages between March 2000 and June 2001, though she also said that Eapen was not directly involved in the transactions. (A147). Brian McKeon stated that Eapen had informed him that Eapen

---

[5] Eapen registered the website through a company called GoDaddy.com. (A190; 194).

was in the mortgage business and helped his wife, who was a mortgage broker. (A148).
McKeon testified that he understood these discussions to mean that Eapen and his wife
were in business together. (A148). McKeon stated that Eapen had offered to help him
obtain a mortgage in November 2002. (A148).

Eapen suggested to Sung Byun that he could refinance his mortgage by accessing
the Eapen.net website and completing an application. (A222-23). Eapen showed Byun
the Eapen.net website. Byun understood that the website supported Eapen's mortgage
business. (A227-28). The website also contained financial data, including stock prices.
(A227-28).

Thomas Liddle testified that Eapen had shown him the Eapen.net website "three
or four times." (A289). Bridget Williams testified that, during her employment with the
DTC group, she knew that Eapen had a mortgage business and that Eapen.net had hosted
her church's website. (A295-96). Richard Wresneski testified that he was aware that
Eapen had an outside business while he worked at MBNA and that Eapen conducted his
real estate and insurance business through Eapen.net. (A313; 192-93).

As part of his investigation, Kilmon did a generic online search and found the
Eapen.net website. (A269-70; 22-139). The website focused on real estate and posted
information about mortgages and mortgage rates. (A270). The website listed Eapen's
name and address as the contact person. (A270). Kilmon also did a web search for
Eapen's name. The results included a testimonial from Eapen, identified as the CEO of
Eapen Corp, endorsing a software company. (A270). Kilmon then contacted Alfred
Scarpitti in MBNA's Ethics Office, turned over this information, and asked Scarpitti to
determine whether this was a conflict of interest in violation of MBNA policy. (A271).

Due to the December holidays, the investigation continued in January, at which
time Kilmon and another HR Generalist, Renee Cuffee-Williams, switched
responsibilities. Kilmon and Cuffee-Williams met with Eapen on January 21, 2003 to
discuss their concerns along with another issue that arose in January. Eapen first denied

9

that Eapen Corp was his business and denied having a web site. (A272; 143-44). In Eapen's presence, Kilmon did a generic online search for "Eapen" and Eapen.net was produced as a result. (A272; 143-44). At this point, Eapen admitted that the website was his and that he was the listed contact person. (A273). Eapen then stated that he did not have a role in the business, that it was his wife's business and that he used the website to generate leads for her business. (A273-74). Eapen went on to explain that he also used MBNA social events to give out his wife's business cards and to help her build her business. (A274).

After meeting with Eapen, Kilmon was contacted by Scarpitti from the Ethics Office. Scarpitti informed Kilmon that he had concluded that Eapen's outside activities violated MBNA's Conflict of Interest Policy. (A275-76).

### D.  Eapen's Password Sharing Violated MBNA's Security Policy

On January 9, 2002, while the first investigation was still ongoing, Mr. Micek contacted Kilmon. He advised Kilmon that Eapen had been identified as violating Information Security Guidelines.

### 1.  Eapen Was Aware of and Bound by MBNA's Information Security Guidelines

In addition to the MBNA Conflict of Interest Policy, Eapen was also required to read and sign MBNA's Information Security Guidelines on his first day of work. The Guidelines prohibit the use of MBNA's computer, electronic, and telephone systems for non-job-related purposes and "misuse of the systems may result in disciplinary action, up to and including dismissal." (A5). It also states that all actions performed are the full responsibility of the person who has been assigned that user ID. Employees were bound to "not share their personal user ID or password or use their user ID or password to log in to MBNA computer systems for another person." (A5). "Passwords must remain confidential." (A5). Eapen was "required to notify Information Security immediately if

unauthorized use of user IDs or passwords is detected." (A5). Eapen reviewed and signed this Guideline on February 28, 2000. (A5).

### 2. Eapen Violated the Security Guidelines by Using a Co-Worker's Password

On January 7, 2003, during his night shift, Eapen violated MBNA's Information Security Guidelines. Eapen found that he was unable to log on to the UAT and DMZ servers in the Newark facility.[6] After trying to access the servers through his personal account and a default administrator account, he called his co-worker, Jason Campbell, at home. (A140).

Eapen told Campbell that he was not able to log on to the system. He asked Campbell to give him his password so that Eapen could log on as Campbell. (A140). Using Campbell's password and administrative rights to access the system, Eapen then reset his own account. (A140; 152-53). A security policy on the servers, however, prevented him from gaining administrative access. (A140; 152-53). Eapen then proceeded to delete his account and recreate a new one in an attempt to bypass the security policy that was preventing his access. (A140). This attempt also failed. (A140).

At this point, Eapen called Dell at home and told him that there was a problem with the access rights granted to his account. (A140). Eapen failed, however, to tell Mr. Dell that he had used Jason Campbell's password and ID to gain access to the system. (A140).

David Schulz and John O'Neill in Information Security learned of Eapen's activity. At 11:11 pm, they began to receive alerts from the DMZ servers stating that administrative changes were being made in the system. (A141). When O'Neill dialed into the system, it appeared that Campell and Eapen were making changes in an administrative capacity. (A141). Mr. Shulz and Mr. O'Neill called the facility and spoke

---

[6] UAT refers to the "User Acceptance Testing" server. DMZ is an acronym for "demilitarized zone."

with Eapen. (A141). The two Security officers informed Eapen that a senior manager
was in the room and on the conference call with them. (A140).

When they asked Eapen what actions he had taken in the DMZ environment,
Eapen stated that his account was not functional so he had deleted it and recreated his ID.
(A140). Eapen then responded that he would have to talk to Mr. Dell before engaging in
any further discussions with them about the matter. Eapen later stated that he did not
want to admit that he had used Campbell's ID and password while a senior manager was
present. (A140). O'Neill and Schulz instructed Eapen to refrain from accessing the
servers for the rest of the night. (A140).

Eapen then called Mr. Dell for the second time. He notified Dell that he had been
contacted by Information Security after using Campbell's password. (A140). Mr. Dell
told Eapen to document the incident and to cooperate with Information Security. (A235).

After his conversation with Mr. Dell, Eapen sent an email to Mr. O'Neill and Mr.
Schulz, Mr. Dell, and Jason Campbell. (A140). In his email, Eapen stated that he had
used Campbell's password to access the server, delete his account and recreate a new
account "hoping the [security] policy will not be applied to the new account." (A140).
Eapen stated that he had "overlooked" this information when he first spoke with Mr. Dell
because he did not think it was "significant." (A140).

The next morning, upon arriving at work, Mr. Dell discussed the violation with
Mr. Marra and Mr. Micek. (A237). Mr. Dell also met with Jason Campbell and
reminded him of the policies prohibiting sharing of passwords. (A238). Mr. Dell did not
meet with Eapen to discuss the incident because Eapen was not at the facility. (A236).
On January 8, on the morning after the password sharing incident, the investigation was
turned over to Information Security and the DTC supervisors were no longer involved.

3.    **Eapen Refuses to Admit Wrongdoing During Personnel's Investigation**

After being alerted to the security violation, Personnel immediately began an investigation. Mr. Kilmon met with Jason Campbell first, on January 14, 2003. (A142). Campbell admitted that he had verbally communicated his password to Eapen. (A142). He responded that "it was bad judgment on my part." (A142). He explained that he had not thought to notify Mr. Dell about the situation because Eapen had woken him during the middle of the night and he was not alert after being asleep. (A142). Because this was Campbell's first discipline problem and because he admitted wrongdoing, he was given a First Warning Corrective Action, which was to remain active for six months. (A142).

Eapen, however, was not as cooperative or forthcoming when questioned about the password sharing violation. Mr. Kilmon and Ms. Cuffee-Williams met with Eapen on January 21, 2003 to address the issues originally identified by Mr. Dell in December, including the conflict of interest, as well as the recent security violation. When questioned about the security violation, Eapen initially responded, "I do understand that what I did was wrong and I should not have asked Jason for his password because I am more experienced." (A143-44). Eapen stated that he had not advised Mr. Dell of the issue because he felt that he was under pressure to get his assignment completed and did not want Mr. Dell to think that he was incompetent. (A143-44).

E.    **Based on Eapen's Clear Violations of MBNA's Conflict of Interest and Information Security Policies, the Decision Was Made to Terminate Eapen's Employment**

Eapen was in clear violation of MBNA policies. The Ethics Office had concluded that Eapen's outside activities violated MBNA's Conflict of Interest Policy. When questioned about his activities, Eapen denied any possibility of a conflict until confronted with unequivocal evidence of his involvement in a real estate and consumer finance business. While under investigation for misconduct relating to the Conflict of Interest Policy and various performance related issues, Eapen violated MBNA's Information

13

Security Guidelines. The violation was reported by Information Security to Personnel and Eapen was questioned about the password sharing incident. Eapen acknowledged that he had violated the policy. (A144; 152-53).

Based on Eapen's repeated violations of clear MBNA policies, the Personnel department including Mr. Kilmon, Ms. Cuffee-Williams, and their supervisor Tamika Sainten, recommended Eapen's dismissal. (A278-79). This recommendation was discussed with senior management during a conference call. (A280). The recommendation was then reviewed by Patricia Bescript, who reviews all final corrective actions for consistency purposes, Patricia McKeown, Director of People Relations, Brian Gimlett, Director of Personnel, and a member of the Law Department.

The termination was approved and the dismissal became official on March 10, 2003. Eapen's last day of work, however, was January 21, 2003, the day he met with Mr. Kilmon and Ms. Cuffee-Willams. Eapen did not return to work after this meeting, and applied for short term disability ("STD") benefits. Eapen's STD benefits expired on March 21, 2003. Eapen was officially terminated on March 26, 2003.

DB01:1781673 1

009626 1038

**ARGUMENT**

I.  **MBNA DID NOT ENGAGE IN UNLAWFUL HARASSMENT OR
    RETALIATION AGAINST JUSTUS EAPEN AND THEREFORE,
    SUMMARY JUDGMENT SHOULD BE GRANTED TO MBNA.**

Plaintiff cannot establish the essential elements of his harassment and retaliation claims under the <u>McDonnell-Douglas Corporation v. Green</u> analysis. 411 U.S. 792 (1973) (detailing the burden-shifting framework to be used in Title VII discrimination claims); <u>see</u> <u>Krouse v. Am. Sterilizer Co.</u>, 126 F.3d 494, 500 (3d Cir. 1997) (holding that the analytical framework for a retaliation claim is the same as that for the underlying discrimination charge). Because Mr. Eapen can not satisfy the required elements, the claim is unmeritorious and must be dismissed.

A.  **Summary Judgment Standard**

Summary judgment is appropriate where there are no genuine issues of material fact that would permit a reasonable jury to find for the non-moving party. Fed. R. Civ. P. 56(c); <u>Boyle v. County of Allegheny, Pa.</u>, 139 F.3d 386, 392 (3d Cir. 1998). <u>See also</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986). A fact is material if it might affect the outcome of the suit. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986) An issue is genuine if a reasonable jury could possibly find in favor of the non-moving party with regard to that issue. <u>Id.</u>

B.  **Title VII Analytical Framework**

This action is a disparate treatment case. Disparate treatment cases involve claims of outright discrimination or retaliation based on a statutorily-prohibited characteristic. <u>See</u> <u>Doyle v. U.S. Sec'y of Labor</u>, 285 F.3d 242, 253 (3d Cir. 2002). In a disparate treatment claim, the plaintiff must establish that he was in fact treated less favorably, or discriminated against, based on a prohibited characteristic. <u>See</u> <u>EEOC v. Metal Serv. Co.</u>, 892 F.2d 341, 347 (3d Cir. 1990) (a disparate treatment violation is made out only where plaintiff is shown to have been singled out and treated less

15

favorably than others similarly situated, on the basis of an impermissible criterion.) In other words, a plaintiff must prove that the decisionmakers were subjectively motivated by animus against a protected characteristic when the decision in question was made. DiBiase v. SmithKline Beecham Corp., 48 F.3d 719, 726 (3d. Cir. 1995). In the present case, Mr. Eapen's various allegations fall far short of satisfying the required standard.

## II.   MBNA IS ENTITLED TO SUMMARY JUDGMENT BECAUSE PLAINTIFF HAS FAILED TO ESTABLISH EVIDENCE OF A HOSTILE ENVIRONMENT.

Plaintiff's Complaint alleges that he suffered a hostile or abusive work environment based on his national origin. (D.I. 1 at ¶7). Without evidence of "severe" or "pervasive" conduct attributable to the defendant employer, Plaintiff's hostile environment claim under Title VII must be dismissed. See Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993) (establishing the criteria for defining a "hostile" environment).

### A.  Plaintiff's Burden of Proof

"In order to establish a claim for employment discrimination due to an intimidating or offensive work environment, a plaintiff must establish, by the totality of the circumstances, the existence of a hostile or abusive environment which is severe enough to affect the psychological stability of a minority employee." Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1081 (3d Cir. 1996) (internal citations omitted).

To succeed in its claim of unlawful hostile environment harassment, the EEOC must prove by a preponderance of the evidence that: (1) Eapen suffered intentional discrimination because of his national origin; (2) the discrimination was severe or pervasive and regular; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same national origin in that position; and (5) the existence of respondeat superior liability. See Kovoor v. Sch. Dist. of Phila., 2004 U.S. App. LEXIS 3792, *5 (3d Cir. Feb. 26, 2004). The burden is on the EEOC to establish that Eapen's national origin was, more likely than not, the

16

determinative cause of the adverse employment action. <u>Fuentes v. Perskie</u>, 32 F.3d 759, 762 (3d Cir. 1994).

The United States Supreme Court has noted that it is not Title VII's purpose to create a "general civility code for the American workplace" enforceable by the courts. <u>Oncale v. Sundowner Offshore Servs.</u>, 523 U.S. 75, 78 (1998). To prevent this outcome, the Court has written: "We have emphasized . . . that the objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.'" <u>Id.</u> at 81 (citing <u>Harris</u>, 510 U.S. at 23). Courts and juries are to use "common sense" in evaluating the "surrounding circumstances, expectations, and relationships" <u>Oncale</u>, 523 U.S. at 81-82. The Supreme Court has emphasized the following factors in this determination: "(1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating or a mere offensive utterance; and (4) whether it unreasonably interferes with an employee's work performance." <u>Harris</u>, 510 U.S. at 23.

## B.  Plaintiff Has Failed to Establish a *Prima Facie* Case of National Origin Harassment

Hostile environment harassment occurs when unwelcome conduct "unreasonably interferes with a person's performance or creates an intimidating, hostile, or offensive working environment." <u>Meritor Savs. Bank FSB v. Vinson</u>, 477 U.S. 57, 65 (1986) (quoting 29 C.F.R. §1604.11(a)(3)). In order to be actionable, the harassment must be so severe or pervasive that it alters the conditions of the victim's employment and creates an abusive environment. <u>See Weston v. Pa.</u>, 251 F.3d 420, 426 (3d Cir. 2001). Plaintiff has failed to establish that any alleged comments rose to the level of "severe" or "pervasive."

1.  **Eapen's Lone Allegation of a Severe Comment Was an Isolated Incident that Occurred Nearly Four Years Prior to the Filing of the Charge.**

In support of his claim that he was subject to a hostile environment severe enough to rise to the level of national origin harassment, Eapen claims that he was called a "sand nigger" by a co-worker, Richard Todd. (A206). Richard Todd left MBNA on May 23, 1999, eight months before Eapen became an employee of MBNA. During Mr. Todd's employment, Eapen was working as a subcontractor.

Of all the co-workers interviewed and deposed, only Sung Byun testified that he believed the term "sand nigger" had been used by another employee. Mr. Byun testified that this term may have been used "once or twice," but was not a phrase that was used jokingly at any time. (A215-16). None of Mr. Eapen's other co-workers ever heard the term used in DTC. (A254; 282; 312; 287; 297; 300-01; 308).

The isolated use of this derogatory term is insufficient to support a claim of a severely hostile environment. See Soliman v. Deutsche Bank AG, 2004 U.S. Dist. LEXIS 9087 (S.D.N.Y. May 20, 2004) (holding that isolated remarks such as "sand nigger," that plaintiff was like an "Arab selling in a bazaar," and that "all blacks are good for is dancing" were insufficient to raise an inference of racial discrimination at the *prima facie* stage); Taj v. Safeway, Inc., 2003 U.S. Dist. LEXIS 14550, *11-12 (D. Kan. May 22, 2003) (finding that plaintiff's proffered evidence that he was called a "nigger" or "sand nigger" by four co-workers and subjected to the term "nigger-rigged" and a joke regarding a blonde woman and a "nigger" was not sufficiently severe or pervasive to alter the conditions of his employment); Walls v. Turano Baking Co., 221 F. Supp. 2d 924, 930-31 (N.D. Ill. 2002) (holding that plaintiff's allegations that co-workers referred to black neighborhoods as "ghettos," and used such terms as "nigger," "sand-nigger," "dot-head" and "porch monkey," absent additional evidence of racial animus, does not create a hostile environment) (citing McPhaul v. Bd. of Comm'rs, 226 F.3d 558, 567 (7th Cir.

18

2000) (finding no hostile environment where coworker used the word "nigger" on a weekly basis because of her own immaturity and insensitivity, not racial animus)).

Eapen has made no claim that this isolated incident was related to some form of discriminatory animus by Mr. Todd. Indeed, he did not even report the comment to management. A single offensive comment, made by an employee who left defendant's employment more than four years before Eapen filed his Charge of Discrimination with the EEOC, and which Eapen never reported to any management personnel, is insufficiently severe or pervasive to support a claim of hostile environment.

### 2. Even If Accepted as True, Plaintiff's Additional, Unsupported Allegations Do Not Rise to the Level of Pervasive and Regular Harassment

As evidence of his hostile environment claim, Plaintiff alleges that he was called offensive names by his co-workers. (D.I. 1 at ¶7(b)). In fact, Plaintiff's co-workers were mostly young males who regularly engaged in playful banter and one-upmanship. This casual teasing did not rise to the level of harassment, as evidenced by the uniform testimony of Eapen's co-workers. Additionally, because Plaintiff moved to a shift where he had virtually no interaction with these co-workers, any comments that may have been made cannot be said to have been pervasive and regular.

Sung Byun, a South Korean, testified to the atmosphere that existed among the DTC employees. He explained that the comments made among the co-workers were "more of an inside joke amongst a few friends." (A212-13). He stated that the environment was a very "joking" and "playful" atmosphere. (A213). Further, Mr. Byun testified he never felt that the joking atmosphere in DTC rose to the level of harassment. (A214).

Byun explained that the "kinds of back and forth comments" that were exchanged in DTC were welcomed, or not unwanted. (A220-21). Byun explained that, had he sensed that the comments were "unwanted or sensitive . . . [he] would have immediately

19

stopped" them because he is "very sensitive towards those things." (A220-21). He also
stated that had he felt there was hostility behind a comment, he would have been very
upset by it. (A220-21). "The joking was not based on hostility or based on aggression or
based on thinking less of [co-workers]." (A225-26).

Instead, he explained, the DTC group had a good "camaraderie . . . of younger
men" who were just "kidding each other." (A221). The members of DTC wanted the
nature of their working relationships to be very informal, (A226-27), like a "brother and
teamwork kind of relationship." (A227).

Byun even admitted to making his share of jokes. (A217; 218; 219-20). He
explained that ethnicity played a very "minor role" in his career at MBNA. (A217). He
testified that "if there was any prejudice, the prejudice was based on performance rather
than race." (A217).

Even if it is assumed, *arguendo*, that Eapen's allegations are true and that
inappropriate or offensive language was used in DTC in a way that Eapen did not
understand to be in proportion to the joking camaraderie of the department, Eapen still
cannot establish a *prima facie* case of hostile environment harassment. In October, 2001,
Eapen switched to the night shift, where he was scheduled to work from 6:00 pm to 7:00
am on Fridays, Saturdays and Sundays. Jason Campbell, another member of the DTC
group, was scheduled for the additional night shifts. The rest of the DTC group worked
Monday through Friday from 8:00 am to 5:00 pm.

Eapen's interactions with his co-workers were limited to times when he passed
others as he left and they arrived. For example, Thomas Liddle testified that he usually
arrived at work early, by 7:00 am, allowing for an hour of overlap between the day and
night shifts. (A290-91). William Kennedy testified that there was no overlap between
his arrival and Eapen's departure and that the only time the two had contact was on the
rare occasion that he was called in during the night to assist in rebooting the networks
after an outage. (A302; 303; 304).

While working the night shift, Eapen was not even exposed to the joking or banter that occurred in DTC. In fact, the only direct exposure Eapen had to the rest of the DTC group was during Monday morning team meetings, which Mr. Dell requested he attend. Eapen has never alleged that any harassing behavior occurred during these supervised meetings. Therefore, the limited exposure Eapen had to the co-workers he accuses of harassment demonstrates that any perceived hostility was not severe or pervasive or regular enough to constitute a hostile environment.

### 3. Eapen's Allegations that Mr. Dell Used Derogatory Language Is Unsupported by His Co-Workers and Contradicted by His Own Testimony

In his Complaint, Eapen alleges that his co-workers used offensive language, but makes no mention of similar behavior by his supervisors. During his deposition, however, Eapen alleged for the first time that Jim Dell also used derogatory and offensive language. (A203). This allegation is belied by Eapen's own testimony and by the testimony of his co-workers.

Eapen's co-workers said they never heard Mr. Dell use derogatory language. (A283-84; 288; 213). None of Eapen's co-workers remembered Dell being present when jokes were told in DTC. In fact, Neela Chacko, in whom Eapen claims he confided, testified that Eapen never told her Dell was singling him out based on his race or national origin. (A253). Similarly, Eapen complained to Sung Byun that Dell was not giving him enough work and that their relationship had soured. (A211). However, at no time did Eapen indicate to Byun that he felt he was being harassed because of his national origin. (A211). Mr. Dell testified that he never heard ethnic jokes of any kind being told in DTC and, specifically, that he never heard an ethnic slur used towards Eapen.

Eapen's testimony is replete with contradictions. In the first instance, he testified that Dell called him various offensive and derogatory names. (A203). He also testified, however, that he never told Dell that these epithets were offensive to him and, in fact,

21

Eapen stated that he acted like the comments did not bother him at all. (A204). He admitted to saying that Dell was a "great guy but a bad manager." (A176). Eapen went on to describe Dell in positive terms:

> He's – he has certain skill set, you know, that if he wasn't my manager, for instance and he – like before he was managing me, he was a very amiable guy. And he was –you know, we had conversations and, you know, we had lunch together. You know, we had a very amiable relationship.

(A176-77). It seems inconceivable that Eapen would use such positive language to describe a person who used offensive epithets. Either Dell never directed such language towards Eapen or if he did, Eapen was unaffected by its use.

The EEOC's case consists virtually entirely of unsupported assertions by Eapen, all of which are denied by the persons charged with the conduct, and none of which are corroborated by persons in a position to have witnessed such events. As this Court concluded in Childress v. Dover Downs, Inc., C.A. No. 98-206-SLR, 2000 U.S. Dist. LEXIS 4881, at *44 (D. Del. March 31, 2000), there is no evidence in the record supporting the harassment claim "aside from [Eapen's] conclusory allegations." Under these circumstances, it is submitted that the Court should "not engage in the kind of speculation necessary to overcome the significant factual gaps in the record" and should grant Defendant's motion for summary judgment on that basis. Arasteh v. MBNA America Bank, N.A., 146 F. Supp. 2d 476, 495 (D. Del. 2001).

### C. Eapen's Other Allegations, Such as Lack of Work, Do Not Constitute A Hostile Environment

Eapen also levels various claims about his dissatisfaction with his job. For example, he claimed he did not receive sufficient work on the night shift. He testified that this lack of work led to his low job satisfaction. In fact, Eapen was not satisfactorily performing the work he was given, and admitted as much. He could not be assigned more challenging or complicated projects while he was not satisfactorily fulfilling his

current assignments. In fact, Eapen's claim that he was dissatisfied in his employment with MBNA strongly indicates that it was the type of work he was given and not the attitudes of his co-workers, that led to his unhappiness.

Eapen has testified to his displeasure with Mr. Dell's management abilities. Mr. Byun testified that Eapen complained that he was frustrated with Dell and did not interact well with him. However, Mr. Byun also said that Eapen never displayed any displeasure with the joking in DTC. Instead, Byun testified that Eapen's frustrations were with his manager, Mr. Dell. (A224).

In fact, it was Eapen who showed repeated disregard for management and disrespect for MBNA's policies, such as not checking the list Dell gave him because "it really is meaningless." (A171-72). Eapen testified that Dell did not want to assign him more work because he was unable to complete the small checklist he had been given. (A172). Eapen also testified that Dell counseled him "multiple times" that he should not use MBNA phones for Eapen Corp's business. (A192). Eapen openly admitted that he did "not give any significance" to his supervisor's directives.

And, to add insult to injury, Eapen later admitted that he had, in fact, been using MBNA phones for personal business. First, he admitted that he used the phones for non-work related calls, "but nothing that could have been considered abusive." (A194). Then, when asked whether Eapen had called a company called GoDaddy.com while on duty at MBNA, Eapen admitted that he had. (A194). Eapen admitted that this had been a call related to Eapen Corp business. (A194). On one hand, Eapen dismissed the directives received from his superiors as trivial while on the other hand, Eapen flagrantly disregarded their orders. Eapen's obvious violations of MBNA policies demonstrates his lack of respect for Dell, not Dell's lack of respect for Eapen.

A similar example occurred during Eapen's 2002 review. In the area designed for "Opportunities for Improvement," Mr. Dell indicated that Eapen "needs to ensure that all issues are reported to management in a timely manner and to improve communications..."

(A18; 173). Even faced with this performance issue, Eapen testified that he never followed up. He stated that his review was better than he had expected and "more than [he] could ask for." (A201-02). This is somehow supposed to justify not following up on the performance issues raised by his supervisor in his annual review.

Eapen alleges that he was subject to a hostile work environment that constituted unlawful harassment. The evidence, however, does not support this claim. Instead, the record is replete with examples of Eapen's blatant refusal to follow the established policies of his employer and the direct orders of his superiors. Eapen worked the weekend night shift, and was not even present during the workdays of the DTC group. Eapen's harassment claim is unfounded and should be dismissed as a matter of law.

## III. MBNA IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S RETALIATION CLAIM BECAUSE PLAINTIFF HAS NOT ESTABLISHED A *PRIMA FACIE* CASE NOR SHOWN THAT MBNA'S LEGITIMATE, NONDISCRIMINATORY REASONS FOR ITS ACTIONS ARE PRETEXTUAL.

To establish a *prima facie* case of retaliation, Plaintiff must prove: "(1) that he engaged in a protected activity; (2) that his employer took adverse action against him either after, or contemporaneously with, his protected activity; and (3) that there is a causal connection between the protected activity and the employer's adverse action." Richards v. City of Wilm., No. 03-106-SLR, 2004 U.S. Dist. LEXIS 4987, *15 (D. Del. Mar. 24, 2004) (citing Woodson v. Scott Paper, 109 F.3d 913, 920 (3d Cir. 1997)). "To show the requisite causal link, the plaintiff must present evidence sufficient to raise the inference that [his] protected activity was the likely reason for the adverse action." Richards, 2004 U.S. Dist. LEXIS 4987 at *15 (quoting Ferguson v. E.I. DuPont de Nemours & Co., 560 F. Supp. 1172, 1200 (D. Del. 1983)).

Once the plaintiff has established a *prima facie* case, the familiar McDonnell Douglas burden shifting framework is utilized. The "relatively light" burden is satisfied if the employer articulates any legitimate reason for the adverse action. Hazen v. Modern

Food Servs., Inc., No. 03-4014, 2004 U.S. App. LEXIS 21467, *3 (3d Cir. Oct. 15, 2004). The employer need not prove that the articulated reason actually motivated the adverse action. Id. (citing Woodson, 109 F.3d at 920 n.2). If the employer provides a legitimate, non-retaliatory reason for the action, the employee must then convince the factfinder both that the "employer's proffered explanation is false, and that the employer's action was actually motivated by a retaliatory animus. Woodson, 109 F.3d at 920 n.2; see also, Shaner v. Synthes (USA), 204 F.3d 494, 501 (3d Cir. 2000).

MBNA is entitled to summary judgment because the EEOC cannot establish the second or third prongs of its *prima facie* case. Plaintiff cannot establish that MBNA took adverse action after Eapen complained of national origin discrimination or harassment. The decision to terminate Eapen had already been made prior to his complaints of discrimination. And even if the EEOC could establish a *prima facie* case, Plaintiff is unable to demonstrate any causal connection between Eapen's complaint and his termination. Further, MBNA had demonstrated a legitimate business reason for the termination. Finally, Plaintiff has not provided any evidence that the legitimate business reason was merely a pretext for retaliatory motivation. Therefore, Plaintiff has not met its burden of proof and its claim for retaliation must be dismissed.

## A. Plaintiff Cannot Establish a *Prima Facie* Case of Retaliation.

MBNA is entitled to summary judgment on Plaintiff's retaliation claim because it cannot establish a *prima facie* case. See Griffiths v. CIGNA Corp., 988 F.2d 457, 468 (3d Cir. 1993), cert. denied, 510 U.S. 865 (1993). Eapen was engaging in protected activity when he complained of harassment by Mr. Dell on February 21, 2003 and when he subsequently filed his Charge of Discrimination with the EEOC on March 6, 2003.[7] See Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 271 (2001). But, Plaintiff has failed to establish the second and third prongs required for a *prima facie* showing. Eapen

---

[7] Defendant MBNA does not admit any wrongdoing by Mr. Dell and maintains that no harassment occurred.

failed to complain about the alleged harassment until after the decision had already been made to terminate his employment. Further, the EEOC cannot show a causal connection between any alleged action and the protected activity.

### 1. Eapen Did Not Complain of Discrimination Until After the Decision to Terminate Him Had Already Been Made.

Eapen claims that he was terminated in retaliation for complaining to his superiors about his allegedly hostile work environment. (D.I. 1 at ¶8). The record, however, is devoid of any such complaints. Unsupported allegations are "insufficient to withstand summary disposition." Peace v. Shellhorn & Hill, C.A. No. 03-1007-GMS, 2005 U.S. Dist. LEXIS 2533, *17 (D. Del. Feb. 18, 2005). Regardless of the many opportunities and resources MBNA made available to its employees to report a complaint of harassment, Eapen chose not to report any such allegation. Instead, it was not until after he was caught violating MBNA policies and his termination was imminent, that Eapen lodged a complaint. Stated differently, Eapen did not engage in any protected activity until *after* the decision to terminate him had been made. Therefore, Plaintiff fails to carry its burden to establish the second prong of its *prima facie* case. See Kelly v. Caldera, No. 98-0753-CB-M, 2000 U.S. Dist. LEXIS 3015, *13 (S.D. Ala. Feb. 28, 2000) (granting summary judgment to employer where there was "a short interval between the protected activity and the job termination," because such evidence "does not overcome evidence that the decision to terminate had been made prior to the filing of the grievance.").

In support of this claim, Eapen testified that Mr. Dell used derogatory language to refer to him. As previously discussed, Eapen's testimony is wholly uncorroborated by his co-workers and vigorously denied by Mr. Dell. No one, other than Eapen, testified to ever hearing Mr. Dell use any type of inappropriate language. Uncorroborated allegations cannot serve as the basis for a *prima facie* claim. Peace, 2005 U.S. Dist. LEXIS 2533, *17. Not only is the record devoid of any evidence supporting Eapen's

claim that he complained of harassment to his supervisors, the evidence actually demonstrates that the opposite is true.

Despite allegedly having been called offensive names, Eapen admits that he never reported such behavior. In fact, Eapen testified that he never even asked Mr. Dell to stop using the alleged language. (A202-03). Eapen testified that when Mr. Dell used derogatory language, Eapen acted like "it was a pleasure" to be called such names. (A203-04). Eapen admits that he never reported his concerns that Mr. Dell was "out to get him" until his February 21, 2003 email. Because Eapen did not complain about the alleged harassment by Mr. Dell, he did not engage in the requisite protected activity needed to establish a viable retaliation claim.

Eapen also claims that his co-workers harassed him and created a hostile environment. Yet, Eapen admits that he didn't complain about the serious incidents he claimed occurred. For example, he never reported the alleged incident involving the mailroom clerk. (A205a). Eapen claims that his white co-workers incited a learning-disabled mailroom clerk by stating that Eapen was "Osama Bin Laden's brother." (D.I. 1 at ¶7(c)). He claims the clerk was incited to the point that he attempted to physically attack Eapen. (D.I. 1 at ¶7(c)).

Eapen admitted that he never reported the incident to his superiors or anyone else. (A205). Eapen also admits that, although he was familiar with the Affirmative Action Office, he chose not to utilize the specialized services of that Office to help him address the situation. (A169; 206).

Eapen also chose not to report his claims of harassment or discrimination to his supervisors. Dell testified that the first time Eapen complained of discrimination or harassment was in Eapen's February 21, 2003 email. (A244-45; 248). In accordance with his MBNA training, Dell turned the email over to his supervisor, Ernesto Marra, immediately. (A246-47).

Mr. Marra testified that Eapen spoke to him in confidence shortly after the password sharing incident in January 2003. (A260). Eapen approached Marra and asked if they could have an impromptu sit-down so that Eapen "could just vent." (A260-61). Eapen stated that he felt discriminated against, but told Marra that the information was to remain strictly in Marra's confidence.[8] (A264-65; 267). Marra replied that MBNA had a zero tolerance policy against discrimination and that, if Eapen believed he was being discriminated against, he should identify the perpetrator so that the situation could be addressed immediately. (A261).

Again, Eapen refused to provide any details, explaining that he just wanted to vent his frustrations. (A262). Without more substantive information, Marra felt that he was unable to take any additional investigatory steps. (A266). It was important to Marra that he not violate Eapen's trust. (A264). During the meeting, Eapen also discussed the password sharing incident. (A263). He stated that he did not think the policy was necessary to alleviate security risks. (A263). Based on Eapen's repeated insistence on the need for privacy and his refusal to provide any details about his feelings of "discrimination," Marra believed that he should not report the discussion to Jim Micek or the Personnel Department. (A264-65; 267).

Finally, Micek also testified that Eapen never complained to him of being discriminated against or harassed based on his national origin or race. (A250-51). He did complain that he had low job satisfaction and a poor working relationship with Mr. Dell.

The first time Eapen made any complaint of discrimination was in his February 21, 2003 email, entitled "My Employment at MBNA." (A151). Personnel's investigation into Eapen's conduct violations began on December 17, 2003. Eapen violated the security policy against password sharing on January 8, 2003. On January 21,

---

[8] Eapen did not state that he felt his race or national origin was the basis for the alleged discrimination, only that he was being "discriminated against." (A262).

2003, Eapen met with Mr. Kilmon and Ms. Cuffee-Williams. (A143). During this meeting, Kilmon and Cuffee-Williams identified numerous violations of MBNA policy by Eapen. (A143-44). The day after the meeting, January 23, 2003, Eapen went on short-term disability leave. (A149; 150).

Eapen's February 21, 2003 email was sent nearly a month after the decision had been made to terminate him and while Defendant was simply waiting for Eapen to return from disability leave to effectuate the dismissal. Eapen's subsequent filing of the Charge of Discrimination on March 6, 2003, was also filed too late to satisfy the elements of a *prima facie* case of retaliation. Because Eapen's first complaint of discrimination came after the decision to terminate him had been made, and months after Personnel had first begun its investigation into his conduct, Plaintiff cannot establish its *prima facie* case. See Smith v. Allen Health Sys., 302 F.3d 827, 834 (8th Cir. 2002) ("evidence that the employer had been concerned about a problem before the employee engaged in the protected activity undercuts the significance of the temporal proximity.").

### 2. No Causal Connection Exists Between the Protected Activity and Any Alleged Adverse Action.

Even assuming, *arguendo*, that Eapen engaged in the requisite protected activity prior to any adverse action taken against him, Plaintiff still fails to carry its *prima facie* burden because it cannot establish the existence of a causal connection between the protected activity and the termination. If Eapen's uncorroborated and unsupported allegations are to be believed, that he had been complaining about "discriminatory and harassing conduct based on his national origin to James Dell, Belverie Ross, . . . Ernie Marra, . . . and Jim Micek." (D.I. 1 at ¶8(b)).

The Third Circuit has taken the approach that temporal proximity alone is insufficient to establish the necessary causal connection when the temporal relationship is not "unusually suggestive." Krouse, 126 F.3d at 503. The Third Circuit has stated that "if at least four months pass after the protected action without employer reprisal, no

inference of causation is created." <u>Urey v. Grove City College</u>, No. 03-2753, 2004 U.S. App. LEXIS 7188, *5 (3d Cir. April 13, 2004) (citing <u>Woods v. Bentsen</u>, 889 F. Supp. 179, 187 (E.D. Pa. 2000)). If Plaintiff's allegations are to be taken at face value, Eapen had been complaining of discrimination for at least two years prior to his termination. In that case, Plaintiff is required to produce additional evidence sufficient to establish a causal nexus. <u>See generally</u>, <u>Kachmar v. SunGuard Data Sys., Inc.</u>, 109 F.3d 173, 177 (3d Cir. 1997) (collecting cases).

Plaintiff cannot produce any such evidence. In fact, the uncontroverted evidence supports the opposite finding. Eapen was allowed to work the night shift, where he was paid an additional 15% shift differential. Then, in June, 2002, Eapen was promoted to Systems Engineer. (A170). This promotion was recommended by Mr. Dell, the same person Eapen now claims discriminated against him. In October 2002, Dell completed Eapen's annual review. (A16-21). Dell rated Eapen as "Excellent," which, Eapen testified, "was more than [I] could ask for." (A201-02).

The record demonstrates that Dell had given him positive feedback and corresponding rewards during the course of his employment. Eapen cannot now claim that this evidence supports a causal connection between his complaints of discrimination and his termination. Plaintiff, therefore, has failed to carry its burden to prove a *prima facie* case of retaliation.

### B.    MBNA Had Several Legitimate, Nondiscriminatory Reasons To Terminate Eapen.

Even if the EEOC were able to persuade the Court that it has established a sufficient *prima facie* case, its claim must still be dismissed because MBNA is able to provide a legitimate, non-retaliatory reason for Eapen's termination, and Plaintiff is unable to rebut that reason. <u>See Richards</u>, 2004 U.S. Dist. LEXIS 4987, *15-16 (describing the burden-shifting analysis). The Court's role "is not to second-guess employment decisions, but is instead to determine whether those decisions were

motivated by [unlawful] bias." Jones v. Am. Travelers Corp., 896 F. Supp. 463, 467 (E.D. Pa. 1995), aff'd, 85 F.3d 62 (3d Cir. 1996). Plaintiff must show that the decisionmaker had an actual discriminatory motive, which requires more than just showing that his national origin was different from some of his coworkers. 48 F.3d at 728.

### 1. Standard of Law

The EEOC bears the burden of demonstrating that MBNA's decisionmakers were, in fact, motivated by bias against Eapen based on a protected category (here, national origin), in reaching their decision to terminate him. See e.g., Massarsky v. GM Corp., 706 F.2d 111, 117 (3d Cir. 1983). If Plaintiff is able to establish a *prima facie* case of discrimination, the burden then shifts to the employer to articulate a legitimate reason for the adverse employment action. After doing so, the burden shifts back to the employee to prove by a preponderance of the evidence that the legitimate reasons offered by the employer were not the true reasons, but were a pretext for retaliation. Summary judgment for the defendant is appropriate where the plaintiff cannot raise genuine questions about the legitimacy of the employer's articulated reason. See Mauro v. S. New Eng. Telecomms., 208 F.3d 384, 388 (2d Cir. 2000)

Plaintiff cannot meet its burden of establishing pretext by simply disagreeing with Defendant's action. Fuentes, 32 F.3d at 765; Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 533 (3d Cir. 1992). Plaintiff also cannot establish pretext by asking the Court to sit as a "super-personnel department," second-guessing an employer's employment decisions. Keller v. Orix Credit Alliance, Inc., 130 F.3d 1101, 1109 (3d Cir. 1997) (en banc). Instead, Plaintiff must show that the decisionmakers subjectively harbored discriminatory or retaliatory bias against Eapen.

Because MBNA is able to demonstrate several legitimate, nondiscriminatory reasons for Eapen's termination, the presumption of discrimination drops from the case

31

and the burden rests on Plaintiff to produce some evidence of pretext. <u>Maull v. Div. of State Police</u>, 141 F. Supp. 2d 463, 470 (D. Del. 2001). Plaintiff is unable to point to any evidence that the decisionmakers were in fact subjectively motivated by discriminatory or retaliatory animus toward Eapen based on any protected characteristic, nor any evidence that would support a reasonable inference of pretext. <u>Kautz v. Met-Pro Corp.</u>, 412 F.3d 463, 467 (3d Cir. 2005) (holding that the burden is on the plaintiff to present evidence "contradicting the core facts put forward by the employer as the legitimate reason for its decision"). Therefore, under the <u>McDonnell Douglas</u> test, Defendant is entitled to summary judgment.

### 2. Eapen's Serious Violations of MBNA Policy Constituted Legitimate Nondiscriminatory Reasons for His Termination

Eapen had been violating MBNA's Conflict of Interest Policy since his first day of employment at MBNA when he failed to report his wife's mortgage business to the Ethics Office for clearance. Eapen continued to violate the policy throughout the period of his employment by conducting business in real estate, mortgage, and consumer finance matters through Eapen Corp and Eapen.net. His solicitation of MBNA employees for this business was in direct violation of the Conflict of Interest Policy. Eapen was publicly associated with his consumer finance business and maintained a website, several email accounts and a mailing address where correspondence could be directed.

While Eapen was being investigated for his violations of the Conflict of Interest Policy, he breached MBNA's Information Security Guidelines by requesting and using the confidential password of a co-worker. The policy that prohibited password sharing was unequivocal—passwords were to remain absolutely confidential at all times. Yet, Eapen called his co-worker in the middle of the night and asked him to share his password. Once he had Campbell's password, Eapen made various changes in the administrative accounts, attempting to avoid the security measures that prevented him from accessing the system. Only after he was caught using Campbell's password did

Eapen alert his supervisor of the situation. Eapen admitted that he avoided notifying his supervisor because he was worried that he would appear "incompetent."

Eapen's violations were investigated by decisionmakers totally independent from the DTC group. MBNA HR Generalists conducted the initial investigation into Eapen's conflict of interest violation. After concluding that there was a potential violation of the Conflict of Interest Policy, the matter was referred to the Ethics Office, another independent agency. The Ethics Office determined that Eapen's activities were, in fact, in violation of established MBNA policy and reported its findings to the Personnel department.

The Information Security department was the first to be alerted to Eapen's breach of the security guidelines. The Security officers consulted with Eapen immediately. Upon determining that a violation had occurred, the matter was referred to Personnel for corrective action. Personnel evaluated the referred matters and, in turn, recommended his dismissal based on the repeated and serious nature of the violations. The termination recommendation was reviewed by the People Issues group, which consisted of an entirely different set of decisionmakers, including senior management from Personnel, the Law Department, and People Relations. The People Issues group approved the recommendation and decided to terminate Eapen's employment. Because the decision to terminate Eapen was made by an independent group of decisionmakers, distinct from the alleged harassers, Eapen must somehow discredit the independent process in order to withstand summary judgment. See Kearney v. Town of Wareham, 316 F.3d 18, 23 (1st Cir. 2002) (FLSA retaliation claim, final decision to terminate officer was made by independent decisionmaker, thereby providing procedural safeguards against retaliation, plaintiff must present evidence to discredit the independent process in order to survive summary judgment).

Eapen now argues that sharing passwords is not as serious a violation as the Policy makes it out to be. This contention is insufficient to withstand summary

judgment. Eapen violated the Policy, regardless of how prudent or effective he now claims the policy to be. Eapen cannot "simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." <u>Peace</u>, 2005 U.S. Dist. LEXIS 2533, at *11 (internal quotations omitted).

The final decision to terminate Mr. Eapen was based on Defendant's conclusion that he had violated important MBNA policies. Such serious violations are legitimate, non-discriminatory and non-retaliatory reasons for dismissal.

### C. Plaintiff Cannot Establish Pretext

#### 1. Similarly Situated Employees Were Treated the Same for Similar Violations of MBNA Policy

Plaintiff cannot point to disparate treatment of Eapen compared to similarly situated employees. Employees who were identified as having violated the Conflict of Interest Policy and the Information Security Guidelines received comparable treatment.

Employees who engaged in an outside business that is in direct conflict with their roles at MBNA were terminated for violation of the Conflict of Interest Policy. For example, Mark, People ID 51342[9], a Caucasian male, was dismissed for misconduct according to the Conflict of Interest Policy. (A12). Mark was identified as being employed as a mortgage broker while working at MBNA. (A12). After an investigation by the Ethics Office, Mark was interviewed as to his secondary employment. He confirmed that he was also employed as a mortgage broker and was subsequently terminated. (A12). Mark's dismissal demonstrates that an employee's participation in a mortgage business warrants dismissal.

Similarly, Patrick, People ID 1586, a Caucasian male, was terminated for violation of the Conflict of Interest Policy. (A154). During a standard listening session,

---

[9] Names are redacted for purposes of confidentiality. Comparators will be referred to by their employee ID numbers and first names only.

Patrick had been taped taking two phone calls from external business associates. (A154). It was determined that Patrick had engaged in a side business dealing with collections. (A154). Despite Patrick's denial that he had an outside business interest, he was terminated for violation of the Conflict of Interest Policy. (A154). Patrick's dismissal exemplifies the serious consequences that attach to use of MBNA phones for a personal business interest, especially when that business is in conflict with MBNA's interests.

Another example of MBNA's even-handed application of the Conflicts of Interest policy involved Nancy, People ID 00379. (A1). Nancy was terminated when her husband was investigated for theft of MBNA customer information. Although there was no evidence that Nancy was directly involved with the alleged theft, it was determined that she had a conflict of interest due solely to the investigation of her husband and she was terminated. (A1).

Breaches of the Information Security Guidelines were also addressed with serious repercussions. For example, William Kennedy, a Caucasian male DTC employee, received a Final Warning, which remained active for two years, and reeducation for violating the Information Security Guidelines. (A10). Kennedy maintained unauthorized, inappropriate and non-business related files on an MBNA computer's shared drive. (A10). Richard Wresneski, also a Caucasian male DTC employee was also given a Final Warning, which remained active for two years, for violating the Information Security Guidelines. (A9). Wresneski had shared inappropriate files with Kennedy and was given an equally appropriate corrective action.

Eapen's DTC co-workers testified that they were aware of the prohibition on password sharing and that they recognized the seriousness of violating this policy. Mr. Wresneski testified that it was "absolutely not" the practice of DTC employees to share passwords and that, other than the violation by Eapen, he was unaware of any other password sharing incident. (A310-11). Mr. Wegner testified that sharing your password was "completely prohibited." (A306-07). Mr. Kennedy and Mr. Liddle also testified that

35

they had never heard of anyone sharing their personal passwords prior to the Eapen incident. (A299; 286).

In fact, only two employees, Sung Byun and Bridget Williams testified that they had ever shared their password. They also testified that besides themselves and the incident with Eapen, they had never heard of another employee sharing passwords. Both employees testified that they did not believe that MBNA management had been alerted to the fact that they had shared their passwords. (A209-10; 293-94). Ms. Chacko testified that she had never heard of DTC employees sharing their passwords and no such incident had ever been reported to her during her time with the group. (A253).

### 2. Plaintiff Has Failed to Allege that the Relevant Decisionmakers Harbored Any Discriminatory Animus Towards Eapen

The EEOC has failed to proffer any evidence that any of the decisionmakers involved in Eapen's termination harbored any discriminatory animus toward Eapen because of his national origin. Eapen cannot "'cherry pick' the best evidence in an effort to distort the record." Burton v. MBNA Amer. Bank, N.A., C.A. No. 03-915-GMS, 2005 U.S. Dist. LEXIS 12154, *24 (D. Del. June 22, 2005) .

The evidence demonstrates that Dell and Eapen enjoyed an "amiable relationship" until Dell reported Eapen for sleeping on the job. Afterwards, Eapen trivialized Dell's assignments and ignored instructions about personal use of MBNA phones during working hours. Nevertheless, Dell gave Eapen a favorable review and had recommended Eapen for a promotion in 2002. A review of the complete record does not support Eapen's claims of harassment and retaliation. See id. at *24-25 (granting summary judgment to employer and reasoning that it would not ignore "crucial undisputed evidence" that the plaintiff was promoted, was given permission to participate in a special educational program by the person she alleged retaliated against her, and was only terminated after she ran out of leave time).

36

Eapen's dissatisfaction with his responsibilities on the night shift are also insufficient to withstand summary judgment. That an employee experiences feelings of isolation does not rise to the level of antagonism as is required for a showing of hostile environment. See Burton, 2005 U.S. Dist. LEXIS 12154, at *27-28 (finding that evidence that plaintiff's work was reduced and given to another employee, which led to plaintiff's feelings of isolation, was insufficient to establish retaliation).

Eapen's subjective personal belief that he was the target of retaliation, entirely unsupported by the record, is insufficient to establish a viable claim. See Bauer v. Albemarle Corp., 169 F.3d 962, 967 (5th Cir. 1999) (employee's subjective belief of discrimination is not sufficient to warrant judicial relief). In the present case, there are numerous objective reasons for Eapen's termination that withstand an allegation of retaliation. The incidents that served as the basis for the decision to terminate Eapen were observed by independent, objective parties. The Ethics Office investigated and determined that Eapen had a conflict of interest. Information Security officers caught Eapen violating MBNA's password-sharing policy. Finally, independent agents in Personnel recommended his termination, which was approved only after review by the senior management members of the People Issues group. Eapen has never alleged that any of these objective, independent agencies or persons held any discriminatory animus towards him or his protected class generally. Because the allegedly retaliatory decisions were based on objective observations and decisions made by persons who held no discriminatory animus towards Eapen, the retaliation claim must be dismissed. See Kearney, 316 F.3d at 23-24 (concluding that the objective justifications for the employee's discharge, namely a failed polygraph test, findings of an independent hearing officer, and a recommendation for dismissal, "broke the causal link . . . between the defendants' animus and his ouster.")

DB01:1781673 1                                                        009626 1038

## CONCLUSION

For the reasons outlined herein, Plaintiff is unable to establish a *prima facie* case of national origin discrimination or retaliation via direct or indirect evidence. Even assuming, *arguendo*, that Plaintiff can establish a *prima facie* case, Defendant has articulated legitimate, nondiscriminatory reasons for Plaintiff's termination such that Plaintiff must prove that Defendant's proffered reason is a mere pretext. Plaintiff is unable to carry its burden by a preponderance of the evidence and, accordingly, Defendant is entitled to summary judgment on all of Plaintiff's claims.

Respectfully submitted,

YOUNG CONAWAY STARGATT & TAYLOR, LLP

Sheldon N. Sandler, Esquire (No. 245)
Margaret M. DiBianca, Esquire (No. 4539)
The Brandywine Building, 17th Floor
1000 West Street
P.O. Box 391
Wilmington, Delaware 19899-0391
Telephone: (302) 571-6673, 571-5008
Facsimile: (302) 576-3330, 576-3476
Email: ssandler@ycst.com, mdibianca@ycst.com
Attorneys for Defendant

DATED: November 15, 2005