LEXSEE

**ALBERTA BURTON, Plaintiff, v. MBNA AMERICA BANK, N.A. Defendant.**

**C.A. No. 03-915 (GMS)**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

**2005 U.S. Dist. LEXIS 12154**

**June 22, 2005, Decided**

**LexisNexis(R) Headnotes**

**COUNSEL:** [*1] For Alberta Burton, Plaintiff, Pro se, Newark, DE; John M. LaRosa, Law Office of John M. LaRosa, Wilmington, DE.

For MBNA America Bank NA, Defendant: Sheldon N. Sandler, Young, Conaway, Stargatt & Taylor, Wilmington, DE.

**JUDGES:** Gregory M. Sleet, UNITED STATES DISTRICT JUDGE.

**OPINIONBY:** Gregory M. Sleet

**OPINION:**

**MEMORANDUM**

**I. INTRODUCTION**

Presently before the court is a motion for summary judgment (D.I. 27) filed by Defendant MBNA America Bank, N.A. ("MBNA") in the above-captioned action, in which Plaintiff Alberta Burton alleges that she was the victim of unlawful *quid pro quo* sexual harassment, hostile work environment, and retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § § 2000e, *et seq.* After reviewing the record in its entirety, the court has determined that there is no genuine issue as to any material fact Fed. R. Civ. P. 56(c). Therefore, the court will grant summary judgment in favor of MBNA and dismiss all counts of the complaint.

**II. JURISDICTION**

The court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 (1993).

**III.** [*2] **STANDARD OF REVIEW**

Summary judgment is appropriate when there are no genuine issues of material fact. See Fed. R. Civ. P 56(c). A fact is material if it might affect the outcome of the case, and an issue is genuine if the evidence is such that a reasonable factfinder could return a verdict in favor of the nonmovant See In re Headquarters Dodge, Inc., 13 F.3d 674, 679 (3d Cir. 1993) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)). When deciding a motion for summary judgment, the court must evaluate the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. See Pacitti v. Macy's, 193 F.3d 766, 772 (3d Cir. 1999). The nonmoving party, however, must demonstrate the existence of a material fact supplying sufficient evidence - not mere allegations - for a reasonable jury to find for the nonmovant. See Olson v. GE Astrospace, 101 F.3d 947, 951 (3d Cir. 1996) (citation omitted). To raise a genuine issue of material fact, the nonmovant "need not match, item for item, each piece of evidence [*3] proffered by the movant but simply must exceed the 'mere scintilla' [of evidence] standard." Petruzzi's IGA Supermarkets, Inc. v Darling-Delaware Co., 998 F.2d 1224, 1230 (3d Cir. 1993) (citations omitted). The nonmovant's evidence, however, must be sufficient for a reasonable jury to find in favor of the party, given the applicable burden of proof. See Anderson, 477 U.S. at 249-50, 91 L. Ed. 2d 202, 106 S. Ct. 2505.

**IV. BACKGROUND**

Alberta Burton was originally hired by MBNA on October 28, 1996, as a Credit Analyst in the Unsecured Lending Department of MBNA's Customer Finance Division. (D.I. 29 at A10; Burton Dep. at 20:18-24.) On March 1, 1998, Burton was promoted to Loan Specialist (D.I. 29 at A10), and toward the end of 2000, she successfully applied for the position of Community Relations Specialist in the Community Relations Department of the MBNA Foundation. (Id. at A11.) At her new position in the Foundation, Burton worked under the supervi-

sion of Craig Marvel, Director of Community Relations (Id.) From March 2001 through January 2002, Marvel engaged in a pattern of inappropriate conduct toward Burton (e.g., striking her in the buttocks with his knee, writing [*4] on her hand with an ink pen, touching the neckline of her blouse in such a way that she felt the need to cover her breasts with her arms, tripping her, etc.). (Id. at A11-A12.) On one occasion in November 2001, Marvel asked Burton which of a few African-American, female, upper-management MBNA employees she wanted to be like. (D.I. 41 at B5.) He further suggested that in order for Burton to achieve similar success, she would need to "learn to do things the MBNA way." (Id.) Burton believes this was a proposition for sexual favors in exchange for favorable job opportunities. (D.I. 31 at 12-13.) Marvel's inappropriate behavior was not limited to Burton,either. In February 2002, he struck another female employee, which resulted in a Corrective Action Report and a "final warning." (D.I. 29 at A1.) As a further consequence of his actions. Marvel was reassigned to another department on March 6, 2002. (D.I. 41 at B9.) Within two weeks he was replaced by Karen Yanick, who then became Burton's direct supervisor. (Id.)

As of that time, Burton had not yet reported the harassment she suffered at the hands of Marvel. However, during a March 19 discussion between Burton and Teresa Mason, MBNA's Affirmative [*5] Action Officer, Burton mentioned that she "was so glad that Craig [Marvel] was in a new department because [she] was tired of him hitting [her] and talking so abusively to [her]." (Id. at B10.) Although Burton initially discouraged Mason from taking any action, she was eventually persuaded that filing a complaint against Marvel was the right thing to do. (Id. at B10-B11.) Yanick learned about Marvel's harassment of Burton on March 20. (Id. at B10.) Burton's complaint resulted in an addendum to Marvel's Corrective Action Report on May 13, 2002. (Id. at B35.)

In May and June 2002, Burton was promoted to a higher job grade level and she received a 13.5% raise. (Burton Dep. at 65:3-13.) However, by August 2002, Burton felt "isolated" and she believed her work was being "streamlined" because Yanick was spending more time developing the career of one of Burton's co-workers, Maureen Flynn-Wildt. (Id. at 118:23-119:19.) Since Burton felt "out of the loop," she "decided to go back to school and obtain [her] M.B.A." (D.I. 41 at B13.) In September 2002, with Yanick's approval, Burton became one of seven people chosen to participate in MBNA's pilot education program. MBNA agreed to [*6] pay $ 15,000 of Burton's tuition, and she was responsible for the remaining balance of $ 3,000. (Id.) Around the same time, an MBNA employee named Chris Dollard

was transferred from another department into the Foundation. (Id. at B13.) MBNA says he was brought in to automate the Foundation's processes. (D.I. 37 at C6-C7.) However, Burton suspects he was brought in to replace her because she had to train him on her projects. n1 (D.I. 41 at B13.)

> n1 Regarding counsel's uncited assertion that Dollard was not "technologically savvy" (D.I. 31 at 19), see infra, note 2.

Then, in January 2003, Yanick informed Burton of an opportunity for her to transfer to the Foundation's Special Services division and assume a supervisory role managing MBNA's disabled employees. (Id. at B14-B15.) But because Burton had previous personal experiences that she felt would make it difficult for her to work with the mentally and physically challenged, she turned down the opportunity. (Id. at B15.) In further explaining her decision to [*7] Yanick, she said, "you are not treating me fairly because you are not allowing me to move on my right career path and you are setting me up to fail." (Burton Dep. at 75:4-6.) Although MBNA employees generally "do not have a choice about accepting [a] position or not," an exception was made in Burton's case because of a concern "that an unwilling manager would not do well in Support Services." (D.I. 29 at A45.)

Shortly thereafter, MBNA began to "refocus attention on its operations areas," which caused "a need for additional people to be transferred to the customer contact areas." (Id.) Along these lines, Burton recalls that on January 28, 2003, Craig Schroeder, one of the Foundation's supervisors, called a meeting and "explained how the bank's delinquencies were high and outstandings were low." (D.I. 41 at B16.) She also recalls Schroeder saying that "various people will be moved around the bank to assist with MBNA's new goal. He said if you are asked to transfer you must; there are no options." (Id.) In February 2003, a position opened up in Business Development for Colleges & Universities. (Id.) Although Burton was qualified, she was not given an opportunity to express interest [*8] in the position. (D.I. 41 at B16-B17.) Instead, the less-qualified Flynn-Wildt was given the position, and Burton was involuntarily reassigned as a Credit Analyst in the Credit Department. (Id. at B16-B18.) Although the job of Credit Analyst involved entry-level work and a less-desirable schedule (id. at B18), Burton's pay was not decreased (Burton Dep. at 81:16-82:19). n2

> n2 In her Answering Brief, Burton asserts that she "lost her exempt status and was required

to sign in and out" as a result of this reassignment. She further asserts that if she "missed work or was late, she was docked," and that she "lost her bonuses and was required to meet incentive based quotas." (D.I. 31 at 20.) This is but one example in her brief where she makes a factual representation, but fails to cite to the record. In its effort to insure a fair result, the court searched the record for evidence to support these assertions and found only vague references to the job status known as "exempt," and to Burton becoming "an hourly employee." As far as the court can tell, no record evidence specifically explains what it means to be "exempt." Even if such an explanation exists and the court simply missed it, it is unreasonable for a party represented by counsel to expect the court to expend its scarce resources scouring the record in an effort to determine the existence of facts to support that party's contentions. Therefore, the court will disregard these assertions.

[*9]

On March 13, 2003, Burton filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), more or less alleging the facts stated thus far. (D.I. 29 at A22.) Burton commenced the present action in this court on September 29, 2003. (D.I. 1.) Subsequently, in November 2003, Burton was once again involuntarily reassigned to the Portfolio Risk Management/Credit Bureau Disputes Department as a Credit Dispute Representative. (D.I. 41 at B 19.) n3 Leading up to this reassignment, Burton had been suffering from mild depression. (Burton Dep. at 95:4-5.) By November 26, her depression was so severe that her physician told her he was "taking [her] out on disability." (Id. at 95:14-20.) Upon receiving her doctor's orders not to return to work, Burton took time off under the Family Medical Leave Act ("FMLA"). (Id. at 96:9-12.) She informed MBNA that her estimated return-to-work date would be sometime in December. (Id.) However, pursuant to her doctor's orders, Burton pushed back her return-to-work date on more than one occasion. (Id. at 96:12-16.) On February 20, 2004, Burton was informed that her leave time, both FMLA time and Personal Time Off, would expire on March [*10] 22. (D.I. 41 at B27.) Thus, MBNA scheduled Burton to return to work by March 23. n4 (Id.) As of April 8, n5 Burton had not returned to work and she was terminated. (Id.)

n3 It is unclear from the record whether this transfer was in June or November of 2003. (See D.I. 41 at B19.) In her Answering Brief, Burton asserts that the transfer was in November 2003.

(D.I. 31 at 20.) Thus, the court will assume that is the correct date.

n4 In support of her opposition to MBNA's motion for summary judgment, Burton submitted the letter she received informing her that she had been terminated for failing to return to work by March 23, 2004. (D.I. 41 at B27.) The court notes that this document is fraught with hearsay, particularly with regard to dates and leave time. However, the letter is one of Burton's proposed trial exhibits, and MBNA has no objection to its use at trial. (Schedule (c) of the Pretrial Order, Plaintiff's Exhibit 6.) Therefore, the court assumes the matters asserted therein are uncontested.

n5 Burton's Answering Brief asserts on page 9 that she was terminated on April 8, 2004. (D.I. 31 at 9.) However, the very same brief asserts on page 18 that she was terminated on February 23, 2004. (Id. at 18.) The court assumes the latter date is merely an oversight by counsel since the termination letter submitted by Burton is dated April 8, 2004. (D.I. 41 at B27.)

[*11]

# V. DISCUSSION

## A. *Quid Pro Quo* Sexual Harassment and Hostile Work Environment

Pursuant to statute, a victim of sexual harassment has at most three hundred days "after the alleged unlawful employment practice occurred" to file a charge of discrimination with the EEOC. 42 U.S.C. § 2000e-5(e)(1). In this case, Burton's *quid pro quo* sexual harassment is based on the actions of Marvel alone (Tr. at 5:1-5), n6 and both parties "are in agreement that the last issue of harassment with respect to Craig Marvel was in January of 2002." (Tr. at 4:13-15.) It is similarly undisputed that Burton did not file a charge of discrimination until March 13, 2003. Thus, since more than three-hundred days elapsed between January 2002 and March 2003, Burton's *quid pro quo* claim must be dismissed.

n6 "Tr." refers to the transcript of a pre-trial conference held before the court on June 2, 2005.

The same time limitation applies to Burton's hostile work environment claim. *Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 116-17, 153 L. Ed. 2d 106, 122 S. Ct. 2061 (2002). [*12] However, at the pre-trial conference held before the court on June 2, 2005, counsel

for Burton advanced the following theory in an attempt to save her hostile work environment claim from the same fate as her *quid pro quo* claim:

> Our belief is that although we are in agreement that the last issue of harassment with respect to Craig Marvel was in January of 2002, that the hostile work environment continued on based on how she was treated by the other supervisors, in particular Karen Yanick, within the department. And based upon that, that although Craig Marvel had been removed from the department -- again, we don't dispute that -- but as a result of her reporting these things to MBNA, that then there was a course of action that continued on, which still is the hostile work environment.
>
> Merely because it is not sexual in nature by Craig Marvel, it's still a hostile work environment in and of itself by how she is being treated within the department.

(Tr. 4:13-25.)

The court declines to address the merits of Burton's new theory because it is an unbriefed departure from her previously-articulated theory of hostile work environment. The section of Burton's brief which discusses [*13] this claim addresses only Marvel's behavior. (D.I. 31 at 13-16.) Nary a word can be found regarding the actions of Yanick in the context of hostile work environment. (See id.) It was not until the pre-trial conference -- a mere three-and-a-half weeks before trial -- that counsel announced Burton's new theory. With trial looming, it is simply too late in the process to set forth a new theory of liability. Thus, the court holds that Burton cannot save her contentions of exposure to a hostile workplace on this basis. Therefore, Burton's hostile work environment claim, which is based only upon Marvel's actions, is also time barred and must be dismissed.

**B. Retaliation**

The statutory prohibition against retaliation reads as follows:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because [the employee] has made a charge, testified, assisted, or participated in any man-

ner in an investigation, proceeding, or hearing under this subchapter

42 U.S.C. § 2000e-3(a). The proper mode of analysis for a claim of retaliation under this provision is the familiar burden-shifting framework [*14] of *McDonnell Douglas Corp. v. Green,* in which the plaintiff bears the initial burden of establishing a prima facie case of retaliation, the defendant bears the subsequent burden of proffering a non-discriminatory reason for its actions, and the plaintiff bears the final burden of undermining the defendant's proffered reason. 411 U.S. 792, 802-04, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973). At stage one, the plaintiff's prima facie case of retaliation consists of three elements: "(1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action." *Krouse v. Am. Sterilizer Co.* 126 F.3d 494, 500 (3d Cir. 1997) n7 If the plaintiff is unable to raise a genuine issue of material fact as to each element of the prima facie case, summary judgment must be granted in favor of the defendant. *Krouse,* 126 F.2d at 501.

n7 Although *Krouse* involved the retaliation provision of the American's with Disabilities Act (ADA), the court explicitly noted that the analysis is identical under the retaliation provision of Title VII. 126 F.3d at 500.

[*15]

In adducing evidence of causation, the plaintiff may not rely "merely on a post hoc, ergo propter hoc inference from the fact that the restriction was imposed after [she] filed her complaint." *Robinson v. City of Pittsburgh,* 120 F.3d 1286, 1302 (3d Cir. 1997). "If timing alone could ever be sufficient to establish a causal link, . . . the timing of the alleged retaliatory action must be 'unusually suggestive' of retaliatory motive before a causal link will be inferred. *Robinson,* 120 F.3d at 1302; *see, e.g., Jalil [v. Avdel Corp.,* 873 F.2d 701, 708 (3d Cir. 1989)] (causal link established where 'discharge followed rapidly, only two days later, upon Avdel's receipt of notice of Jalil's EEOC claim')." *Krouse.* 126 F.3d at 503. On the other hand, "when temporal proximity between protected activity and allegedly retaliatory conduct is missing, courts may look to the intervening period for other evidence of retaliatory animus." *Id* at 503-04. Evidence of retaliatory animus may be either direct, *Kachmar v. Sungard Data Sys., Inc.,* 109 F.3d 173, 178-79 (3d Cir. 1997), or indirect, *Robinson v. S.E. Pa. Transp. Auth.,* 982 F.2d 892 (3d Cir. 1993) [*16]

("SEPTA"); *Farrell v. Planters Lifesavers Co.* 206 F.3d 271 (3d Cir. 2000).

Direct evidence of retaliatory animus, though perhaps rare, permits a direct inference that the defendant "placed 'substantial negative reliance on an illegitimate criterion in reaching [his] decision.'" *Kachmar,* 109 F.3d at 179 (quoting *Starceski v. Westinghouse Elec. Corp.,* 54 F.3d 1089, 1096 (3d Cir. 1995)). For example, in *Kachmar,* the plaintiff's supervisor told her that "she was not on the management track because of her complaints concerning her salary, her 'campaigning on women's issues,' and her handling of [a] female employee matter, which [the manager] cited as an additional example of feminist campaigning." 109 F.3d at 178. Since these statements "would permit a factfinder to infer that [the plaintiff] was being taken off the management track because of her opposition to the manner in which [the defendant] was treating her and other women in the organization, and that her final dismissal was just a matter of time," the Third Circuit held that the plaintiff had "alleged enough direct evidence of a retaliatory animus" [*17] to survive summary judgment on the issue of causation. *Id.*

In the absence of direct evidence, the plaintiff may nevertheless prove retaliatory animus with indirect evidence. Two evidentiary scenarios are common: (1) evidence of an intervening pattern of antagonism by the defendant, *SEPTA,* 982 F.2d at 895, or (2) evidence of the defendant's inconsistent explanation of its actions, i.e., that its explanation is pretextual, *Farrell,* 206 F.3d at 286. In *SEPTA,* although two years had elapsed between the protected conduct and the adverse action, the plaintiff successfully demonstrated an intervening pattern of antagonism by adducing evidence that his supervisors "repeatedly disciplined him for minor matters, miscalculated his points for absences from work, and generally tried to provoke [him] to insubordination." 982 F.2d at 895. Likewise, in *Woodson v. Scott Paper Co.,* where there was a similar two-year gap, the Third Circuit upheld the district court's finding of a causal link where the defendant (1) set the plaintiff up to fail "by hiring him as a product system leader in [a] poorly performing . . . division and then refusing [*18] to provide him with adequate resources," (2) failed "to respond appropriately to racist graffiti in its plant" that was directed at the plaintiff, and (3) terminated the plaintiff "pursuant to a 'sham' ranking process performed by individuals who were not familiar with his employment record, but only with his charges of discrimination." 109 F.3d 913, 921 (3d Cir. 1997). Characterizing that as a "very close" question, *id.* at 924, the *Woodson* court reasoned that "while each piece of evidence alone is not sufficient to support an inference of a pattern of antagonistic behavior, taken together the evidence is sufficient," *id.* at 921.

In contrast, in *Weston v. Pennsylvania,* 251 F.3d 420 (3d Cir. 2001), the Third Circuit upheld the district court's dismissal of a plaintiff's retaliation claim, in part due to the absence of an intervening pattern of antagonism. In *Weston,* the plaintiff, a prison employee, was subjected to inappropriate physical touching, leading to "comments, jokes and jibes made by employees [including managers] and inmates who had learned of the incidents." 251 F.3d at 423. The [*19] plaintiff alleged that these comments, jokes, and jibes were made partially in retaliation for his filing of a grievance against his supervisor. *Id.* at 428. The plaintiff also suffered two written reprimands, and he was eventually suspended on two occasions for attendance problems. *Id.* at 430. The court held that there was no clear evidence of a pattern of antagonism because the alleged pattern "did not portend any future retaliation [i.e., suspension]." *Id.* at 432. "Instead," the court wrote, "the adverse employment actions were discrete responses to particular occurrences." *Id.*

Other cases look to inconsistencies in the defendant's explanation of its actions in deciding the sufficiency of the plaintiff's causation evidence. In *Farrell,* for example, the plaintiff challenged the defendant's assertion that she had been terminated due to a position elimination resulting from economic concerns. 206 F.3d at 285. She adduced evidence that only a few weeks prior to her termination the defendant had purchased her house in Maryland, and moved all of her possessions to her new home in North Carolina. *Id.* The plaintiff [*20] also pointed to a memo written by the very supervisor who had harassed her, in which he purported to have terminated her solely for her lack of interpersonal skills, rather than for economic reasons. *Id.* Moreover, the memo was written just a few weeks after its author had praised the plaintiff and asked her if she would be interested in a promotion. *Id.* The plaintiff adduced further evidence that at least one of her managers commented that she was helpful, not that she lacked interpersonal skills. *Id.* at 286. The Third Circuit held that these inconsistencies, together with evidence that her supervisor changed his demeanor (as well as his flight plans) after she rebuffed his sexual advances, were sufficient for the plaintiff to demonstrate causation. n8

n8 In *Farrell,* the Third Circuit explicitly recognized that by permitting evidence of inconsistencies to prove retaliatory animus, it was running the risk of "conflating the test for causation under the prima facie case with that for pretext." *Farrell,* 206 F.3d at 286. Nevertheless, because such a danger is inherent in the similarity of the inquiries at those distinct stages of the *McDonnell Douglas* analysis, the court essentially concluded

that the potential for overlap is unavoidable and must be tolerated. *Id.*

[*21]

In the present case, MBNA must prevail on its motion for summary judgment because Burton is unable to raise a genuine issue of material fact as to causation. The relevant time frame over which Burton must show causation is the period beginning with her March 2002 internal complaint about Marvel, and ending with her April 2004 termination. Since Burton presents no direct evidence of retaliatory animus, she must prove it with indirect evidence. As previously mentioned, however, she may not rely "merely on a post hoc, ergo propter hoc inference." *Robinson,* 120 F.3d at 1302. Rather, in the absence of unusually suggestive timing, n9 Burton must adduce other evidence from which to infer causation. Indeed, it is Burton's contention that the evidence in the record supports both a finding of an intervening pattern of antagonism, and a finding that MBNA's explanation of its actions is pretextual. n10

> n9 Burton concedes that there was a "lack of temporal proximity" between her protected activity and her termination. (D.I. 31 at 21.)

> n10 In her Answering Brief, Burton only explicitly argues pretext in the context of the final stage of the *McDonnell Douglas* analysis. However, the "Causal Link" section of her brief includes reference to Dollard's transfer to the Foundation, which -- as the court's discussion of Dollard, *infra,* should make clear -- only makes sense if Burton is implicitly arguing that pretext proves causation. Therefore, the court will address pretext as it relates to causation.

[*22]

Burton's argument is summarized as follows: In August 2002, five months after she complained about Marvel, Burton began to feel that she was isolated and that her work was being streamlined because Yanick was spending more time developing Flynn-Wildt's career. Then, in September 2002, Dollard was transferred to the Foundation, ostensibly to automate certain projects. However, because Burton had to train him on her projects, she argues it would be reasonable to infer that the real reason for his transfer was to replace her. Yanick's first attempt to reassign Burton was in January 2003, when she pressured Burton to assume a supervisory role as an assistant manager in Support Services within the Foundation. Burton declined the reassignment, but in February 2003, after failing to offer Burton the desirable position given to the less-qualified Flynn-Wildt, Yanick

informed Burton that she was being involuntarily reassigned as a Credit Analyst in the Credit Department. Burton's pay remained unchanged after the reassignment, but her new position was a functional demotion because it involved entry-level duties.

Although Burton was told in the meeting with Schroeder in January 2003 that the [*23] upcoming transfers were part of an attempt by MBNA to solve its financial problems, she argues that MBNA's "economic downturn" explanation is pretextual. In particular, she questions whether a company experiencing an economic downturn would promote Marvel to a $205,000 salary (D.I. 29 at A50); she questions why she would be transferred out of the Foundation in the name of an economic downturn, only to be replaced by Dollard; and she questions whether a company experiencing an economic downturn would promote the under-qualified Flynn-Wildt. Presumably, Burton's argument is that, assuming these rhetorically-phrased questions sufficiently undermine MBNA's "economic downturn" explanation, it would be reasonable to infer that retaliation was the true motivation for her being involuntarily reassigned and passed over for the position given to Flynn-Wildt.

Subsequently, eight months after Burton filed her EEOC complaint and two months after she instituted the present action, she was once again involuntarily reassigned to the Portfolio Risk Management/Credit Bureau Disputes Department as a Credit Dispute Representative. MBNA's final act of retaliation was terminating Burton in April 2004, [*24] in spite of her doctor's order that she remain out of work. n11 Taken together, Burton asserts that this evidence is sufficient to infer that her termination was causally related to her complaints in March 2002, March 2003, and September 2003. (D.I. 31 at 19-22.)

> n11 Plaintiff's tenth Contested Issue of Fact in the Pretrial Order.

The court disagrees. One major problem with Burton's argument is that she implicitly asks the court to ignore crucial undisputed evidence. Although the court is obliged to view the evidence in the light most favorable to Burton, and to draw all reasonable inferences in her favor, the court also has a duty to prevent Burton from "cherry picking" the best evidence in an effort to distort the record. Indeed, that is what Burton has attempted to do in opposing MBNA's motion. For example, her argument omits the fact that shortly after her initial internal complaint against Marvel, she was promoted and her pay was increased by 13.5%. She also fails to mention that beginning in September 2002, [*25] contemporaneous with Dollard's transfer to the Foundation, she began the

M.B.A. program at Wilmington College. Of the total tuition, Burton was responsible for $ 3,000, whereas MBNA agreed to pay the remaining $ 15,000. Moreover, Burton's participation in this pilot program required the approval of Yanick -- the very person at the center of Burton's retaliation claim. And perhaps most important, Burton leaves out the undisputed fact that she was terminated after she ran out of leave time.

Thus, the full record reflects that although Burton was passed up for one job opportunity and forced into a demotion (in function only), she was also promoted, offered a supervisory position, and sent to business school during the alleged retaliation period. Furthermore, all of these positive employment actions n12 occurred in the eleven months *before* the first arguable acts of antagonism. n13 Furthermore, even after Burton filed an EEOC charge in March 2003 and the present lawsuit in September 2003, her second involuntary transfer was not until November 2003. In the interim, Burton does not allege that any antagonism occurred. In the end, Burton was terminated after an absence of over four months. [*26] While Burton does not appear to dispute that she was out of leave time at the time of her termination, she contends that MBNA's decision to override her doctor's orders not to return to work was retaliatory. Yet, the court is aware of no rule of law that requires an employer to indefinitely retain an ill employee as long as she is following her doctor's orders. More to the point, aside from her involuntary transfer in November 2003, Burton has not adduced any evidence of retaliatory animus in the time between her September 2003 complaint in this court, and her April 2004 termination. Given this progression, it would be unreasonable to conclude that any of those events "portend any future retaliation." *Weston,* 251 F.3d at 432.

n12 Burton may not agree with the court's characterization of the offer of a supervisory position in Support Services as a positive employment action because it was not on her "right career path." But at her deposition, Burton denied that the new position was not a good one. Instead, she simply said it "was not the opportunity for" *her.* (Id. at 73:5-6.) At worst, then, it is a neutral employment action.

[*27]

n13 The court notes that these acts -- the February 2003 involuntary reassignment and the promotion of Flynn-Wildt -- might also be fairly characterized as adverse employment actions. However, they were not briefed as such. Thus,

the court has only considered them as evidence of retaliatory animus.

Even if the court were to view the record through the prism urged by Burton, the evidence she sets forth to prove retaliatory animus is insufficient. Her feeling that she was isolated and that her work was being streamlined is only half supported by the record. Burton explained in her deposition that she began feeling isolated in August 2002 because Yanick was spending more time developing the career of Burton's co-worker, Flynn-Wildt. That testimony certainly supports her feeling of isolation, but as far as the court can discern, the record contains no specific evidence of any changes in Button's workload to support her claim that her work was being streamlined. Even if the record did contain such evidence, neither a feeling of isolation, nor a streamlining of work rise to the level of antagonism. [*28] *See, e.g., Weston,* 251 F.3d at 432 ("comments, jokes, and jibes" made partially in retaliation for the plaintiff's filing of a grievance against his supervisor was insufficient to establish causation); *Woodson,* 109 F.3d at 921 (standing alone, setting the plaintiff up to fail by putting him in a poorly performing division and then withholding adequate resources was "not sufficient to support an inference of a pattern of antagonistic behavior").

As to Dollard's transfer into the Foundation, the record does not support Burton's assertion that MBNA's proffered reason for his transfer is pretextual. The fact that Burton had to train him on her projects is perfectly consistent with MBNA's explanation that Dollard was brought in to automate the Foundation's projects. It is axiomatic that he would need to gain a familiarity with the projects before he could set about automating them. Therefore, there is no evidentiary reason to doubt MBNA's explanation.

Likewise, there is no evidentiary reason to believe that Yanick's pressuring of Burton to take the position in Support Services was antagonistic. Burton characterizes this as Yanick "setting [her] up to [*29] fail" (Burton Dep. at 75:4-6), which is similar to the language used in *Woodson.* However, in *Woodson,* the plaintiff was "set up to fail" because he was hired into a poorly-performing division and subsequently denied the resources necessary to succeed. 109 F.3d at 921. Burton, on the other hand, was "set up to fail" because she was not allowed to pursue her "right career path." The following excerpt from Burton's deposition is particularly enlightening in this regard:

Q. Would it be fair to say that this, the job that was offered to you was regarded as a

good job by at least some people at MBNA?

A. I never said it wasn't a good job, Mr. Sandler. I said it was not the opportunity for Alberta [Burton].

(Id. at 73:5-6.) Thus, any similarity to *Woodson* is only skin deep. Importantly, even if Burton had been set up to fail in a similar fashion, the *Woodson* court held that such evidence is insufficient standing alone to support an inference of antagonism. 109 F.3d at 921. Consequently, it was not antagonistic for Yanick to pressure Burton to accept a supervisory position that did not suit her preferences.

Finally, the court [*30] disagrees with Burton's argument that an inference of retaliatory animus can reasonably be drawn from the allegedly pretextual nature of MBNA's "economic downturn" explanation. Marvel's promotion does not undermine MBNA's explanation because his promotion was approximately one year before the January 2003 meeting in which Schroeder announced MBNA's need to make changes due to economic concerns. n14 Business fortunes can change radically in that amount of time, so Marvel's early 2002 promotion is not probative as to MBNA's financial condition in early 2003. Dollard's transfer to the Foundation in September 2002 suffers a similar temporal flaw. Additionally, Burton has adduced no evidence that Dollard was not in fact brought in to automate the Foundation's projects. Certainly, automation is consistent with reducing costs. As to Flynn-Wildt's promotion, no evidence adduced thus far indicates that the position was newly created for her. Such evidence, if it existed, might belie MBNA's explanation because it would demonstrate expansion in a time of alleged financial straits. However, the only record evidence apparent to the court indicates that Flynn-Wildt was promoted to fill a newly-vacant [*31] position, not a newly-created position. (D.I. 29 at A45.) Therefore, Burton has failed to demonstrate that MBNA's explanation is pretextual.

n14 The record is unclear as to precisely when Marvel was promoted. According to MBNA's responses to Burton's written interrogatories, however, it appears that Marvel had a $ 205,000 salary at least as early as March 2002. (D.I. 29 at A49-A50.)

Thus, after careful consideration of the entire summary judgment record, the court holds that it would be unreasonable to infer that Burton's termination was anything but a discrete response to the fact that she did not return to work after running out of leave time. Consequently, Burton cannot bear her burden of establishing a prima facie case of retaliation, and summary judgment in favor of MBNA is appropriate.

## IV. CONCLUSION

For the foregoing reasons, the court will grant summary judgment in favor of MBNA and dismiss Burton's complaint in its entirety.

Dated: June 22, 2005

/s/ Gregory M. Sleet

UNITED STATES [*32] DISTRICT JUDGE

**ORDER**

IT IS HEREBY ORDERED THAT:

1. The defendant's motion for summary judgment (D.I. 27) be GRANTED; and

2. The plaintiff's complaint be DISMISSED on all counts.

Dated: June 22, 2005

/s/ Gregory M. Sleet

UNITED STATES DISTRICT JUDGE

LEXSEE 2000 U.S. DIST. LEXIS 4881

**DONNA CHILDRESS, Plaintiff, v. DOVER DOWNS, INC., Defendant.**

**C.A. No. 98-206-SLR**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*2000 U.S. Dist. LEXIS 4881*

**March 31, 2000, Decided**

**NOTICE:** [*1]  FOR ELECTRONIC PUBLICATION ONLY

**DISPOSITION:** Defendant's motion for summary judgment granted.

**LexisNexis(R) Headnotes**

**COUNSEL:** Stephen A. Hampton, Esquire, Grady & Hampton, P.A., Dover, Delaware, for plaintiff.

James J. Sullivan, Jr., Esquire, and Katherine R. Witherspoon, Esquire, Klett, Lieber, Rooney & Schorling, Wilmington, Delaware, for defendant.

**JUDGES:** Sue L. Robinson, District Judge.

**OPINIONBY:** Sue L. Robinson

**OPINION:**

### MEMORANDUM OPINION

Dated March 31, 2000
Wilmington, Delaware

Sue L. Robinson
**District Judge**

### I. INTRODUCTION

Plaintiff Donna Childress filed this action on April 23, 1998 against defendant Dover Downs, Inc. asserting injuries under the Civil Rights Act of 1964, *42 U.S.C. § 2000*(e) et seq.. (D.I. 1) This court has jurisdiction pursuant to *28 U.S.C. § 1343* and *42 U.S.C. § 2000e-5*(f). Before this court is defendant's motion for summary judgment. (D.I. 38)

For the reasons stated below, defendant's motion for summary judgment shall be granted. n1

n1 The court's decision in this case has rendered defendant's argument for summary judgment as to punitive damages moot and, therefore, such will not be discussed in this memorandum opinion.

[*2]

### II. BACKGROUND n2

n2 The record reviewed for purposes of this summary judgment proceeding includes defendant's opening brief and appendix, plaintiff's answering brief, and defendant's reply brief and appendix. Plaintiff's appendix to her answering brief was excluded from the record by the prior judicial officer for failure to comply with time limitations. The background section, therefore, is mainly comprised of plaintiff's allegations taken from her complaint and various deposition excerpts.

Plaintiff is a white female who is married with two children. (D.I. 40 at A-31) On September 9, 1995 plaintiff submitted an "application for employment" to work for defendant as a mutuel teller. (D.I. 40 at A-1-3) In order to become a mutuel teller, an applicant has to take a teller training class and pass an examination. (D.I. 45, P 2) An applicant would "learn to use the teller computers to properly place bets and pay winning ticket holders" during these training sessions. (D.I. 45, P 2) Plaintiff attended a [*3] training course in November of 1995. (D.I. 40 at A-75) On December 17, 1995 she began working for defendant as a part-time mutuel teller, primarily on the night shift. (D.I. 1, PP 7,8) As a mutuel teller, plaintiff's job was to "sell tickets to customers who placed bets on horse races, either held at Dover Downs'

racetrack or 'simulcast' via television from other race-tracks." (D.I. 45, P 2) Adam Wise ("AW") was the mutuel manager who supervised the tellers at the time plaintiff began her job. (D.I. 1, P 9)

### A. Alleged Incidents During Plaintiff's Training Session

On the first night of her training session in November 1995, AW greeted plaintiff "by looking her up and down from head to toe in a way that she found rude and disconcerting." (D.I. 1, P 10) On the second night of training, AW allegedly lingered around plaintiff all night and kept trying to talk to her. (D.I. 1, P 11) That same night AW allegedly kicked the back of plaintiff's boots and asked her if she had spurs on them. (D.I. 1, P 12; D.I. 40 at A-45) Also that night, AW "started to massage her back and run his hands down her back." (D.I. 1, P 12; D.I. 40 at A-41) Plaintiff claims she shrugged AW's hands off her back [*4] and he replied, "What, am I making you melt?" (D.I. 1, P 12; D.I. 40 at A-41) Plaintiff's reply was "No, call me crazy but I'm one of those people who doesn't like to be touched." (D.I. 1, P 12; D.I. 40 at A-41) During the rest of the training session AW displayed a "bad attitude" toward plaintiff and and belittled her when she posed questions to him regarding her training. (D.I. 1 at P13)

### B. Alleged Incidents During Plaintiff's Employment

Plaintiff alleges that the problems did not stop after she began working for defendant as a mutuel teller on the night shift in December of 1995.

#### 1. December 1995 to April 1996

Plaintiff's allegations during this time period continue to involve AW and the way he treated her and other female tellers. From January to April 1996, AW attempted on numerous occasions to hold plaintiff's hand. (D.I. 1, P 14; D.I. 40 at A-42) He would attempt to reach over the counter to touch plaintiff's hand. (D.I. 40 at A-42) Plaintiff would pull her hand away, saying nothing at all. (D.I. 40 at A-42) AW would become irritated with plaintiff, ask her why she was so miserable, and comment that she always had an "attitude." (D.I. 1 at P17) AW also would [*5] hold other tellers' hands while talking to them. (D.I. 40 at A-42) AW never tried to touch plaintiff after April 1996. (D.I. 40 at A-43)

On one occasion, AW asked plaintiff and another teller, Rebecca Thomas ("RT"), what color bras they were wearing. (D.I. 1, P 18; D.I. 40 at 45-46) Plaintiff did not respond, but RT answered his question. (D.I. 1, P 19; D.I. 40 at A-46) AW again told plaintiff that she was "always so miserable." (D.I. 1, P 19) AW also would "off-color sexual jokes" and jokes about minorities, especially blacks, around plaintiff and other female tellers.

(D.I. 1, P 27; D.I. 40 at A-46) Plaintiff approximated that this happened between five to ten times. (D.I. 40 at A-46)

On other occasions, AW allegedly would make derogatory comments to the female tellers. (D.I. 1, P 28; D.I. 40 at A-46) For example, plaintiff claims AW would critique her attire or hairstyle. (D.I. 40 at A-46) Plaintiff alleges that some of AW's comments had a double meaning and that it was obvious he wanted female tellers to take a sexual meaning from what he said. (D.I. 1, P 28; D.I. 40 at A-46)

During this time period, plaintiff claims that AW tried to touch many of the female tellers and [*6] give them "special attention." (D.I. 1, P 20; D.I. 43 at B-10-19, 761, 770, 778, 785) The female tellers who went along with his behavior were treated with favoritism and were treated favorably. (D.I. 1, P 21; D.I. 43 at B-10-19, 770, 774, 775, 778, 798) For example, AW frequently would come up behind RT while she was working to rub her shoulders or put his chin on her shoulder. (D.I. 1, P 23; D.I. 40 at A-111) He told RT that he wished he were the father of her baby. (D.I. 1, P 24; D.I. 40 at A-117) Plaintiff asserts that RT acquiesced in such treatment and, as a result, she received special privileges. (D.I. 1, P 25; D.I. 43 at B-10-19) RT was "permitted to leave her work station and spend time upstairs in the office area even though she was supposed to be working on the line." (D.I. 1, P 25; D.I. 43 at B-10-19) Plaintiff claims that AW did not treat the male tellers in the same manner that he treated the female tellers. (D.I. 1, P 29; D.I. 43 at B-770)

#### 2. April 1996 to July 1996

Plaintiff was laid off in April 1996 at the end of the live season and returned to work at the end of July 1996. (D.I. 40 at A-61) In June 1996 ten female tellers from the day shift had a meeting [*7] with Denis McGlynn ("DMcG") (President of Dover Downs) and Frank Wise ("FW") (a general manager and also AW's father) to voice their complaints about the work environment. (D.I. 43 at B-10-19) The tellers present at the meeting included a teller named Susan Keeler ("SK"). (D.I. 43 at B-10)

Many of the complaints made at the meeting involved AW's conduct. (D.I. 43 at B-10-19) Many of the women complained about the AW's favorable treatment of RT. (D.I. 43 at B-10, B-12-16) They objected to AW's repeated threats to fire them for different reasons, e.g., if they had too many cancellations. (D.I. 43 at B-11) They complained that AW would yell at tellers in front of customers and allow customers to call the tellers vulgar names. (D.I. 43 at B-14-15) They also expressed dissatisfaction with the supervisors' attitudes since RT had quit, asserting that the supervisors had been rude and nasty to

2000 U.S. Dist. LEXIS 4881, *

the tellers. (D.I. 43 at B-15, B-18-19) DMcG delegated the resolution of this situation to FW. (D.I. 43 at B-625)

In July 1996, FW implemented new mutuel employee guidelines. (D.I. 43 at B-31-39) Changes included, but were not limited to, n3 the modification of the dress code, the installment of a [*8] time clock, the addition of head tellers for the night and weekend shifts, and the disallowance of mutuel employees in the Casino and Simulcast Area while in uniform. (D.I. 43 at B-30-39) Employees were "required to treat all others, (patrons, co-workers), in a courteous manner." (D.I. 43 at B-31) In a memorandum dated July 9, 1996, FW informed the tellers of the new chain of command, i.e., head teller, supervisors, general manager harness, and president. (D.I. 43 at B-37) If any of the tellers on the line had a problem, they were to report it to the head teller; if the head teller could not help, he or she would notify a supervisor. (D.I. 43 at B-33)

   n3 Plaintiff, in her complaint, lists the following changes:

        (a) tellers were told that now they [had] to keep their canceled tickets separate from the paid tickets, and that if they had too many cancellations, they could be fired. This, despite the fact that cancellations were generally because the customer changed [his] mind and decided to cancel the ticket.

        (b) tellers were told that management was watching their ticket sales and that if they [did] not sell as many tickets as the other tellers, they [could] be fired. However, every window is not equally busy and the number of tickets sold depends on the location of the ticket window.

        (c) the tellers now [had] to punch a time clock and[,] in fact, were the only department at Dover Downs that had one.

        (d) tellers [were] no longer allowed to eat behind the line.

        (e) tellers who smoke had been able to split up their fifteen minute break so they could smoke a cigarette, now they had to take the entire fifteen minutes at one time.

        (f) the tellers were told that they [had] to button their shirts one button down from the top and their shirts had to be tucked in.

        (g) the pregnant tellers were told they had to wear the uniform with black maternity pants, but female employees who worked on the line [and] handled money [were] allowed to wear maternity clothes.

        (h) the tellers [were] told they could no longer read behind the line, even on the days when there [were] no tracks running and they [were] not busy. The other people in the line such as program sellers and the people who handled money [were] allowed to read on the line.

        (i) the reading material in the tellers break room was taken away and they were only permitted to read racing forms.

        (j) tellers were told that they [were] not allowed to fraternize with customers . . . .

        (k) tellers were told that if they did not use the employee parking they could be fired.

        (l) tellers were told they could have no chewing gum or hard candy.

        (m) the night shift tellers had their hours changed and had to work more shifts to maintain full[-]time hours.

        (n) the tellers were told that they [could] not leave their terminal without signing in and out

   (D.I. 1, P 35(a)-(n))

[*9]

   Plaintiff returned to work in late July 1996. (D.I. 1, P 31; D.I. 40 at A-61) On July 31, 1996, plaintiff signed the new mutuel department regulations put into effect by FW. (D.I. 40 at A-60, A-12) Plaintiff and other tellers were told that the rule changes and the installation of head tellers were a result of the meeting the day shift

women had had with management in June 1996. (D.I. 1, P 33; D.I. 43 at B-761) This information created some hostility on the part of the night and weekend shift tellers towards the day shift tellers. (D.I. 43 at B-761) Shortly thereafter, SK, one of the day shift women who had met with management, had her hours changed from day shift to night shift. (D.I. 43 at B-772) Plaintiff was the only night shift teller who would associate with her; no other tellers would speak to her because of the hostility. (D.I. 43 at B-772)

### 3. August 1996 to December 1996

Plaintiff worked with SK intermittently throughout the time period from July 1996 to November 1996, when SK was fired. (D.I. 1, P 49) While they worked together, SK shared with plaintiff many of her complaints about defendant. n4 SK had similar complaints to those made by plaintiff and, on occasion, [*10] she brought them to the attention of management. (D.I. 43 at B-770-776) According to SK, management did not make any effort to address the problems and in October of 1996, she informed management she was going to file a complaint with the Labor Board. (D.I. 43 at B-772) On November 22, 1996, SK was fired, allegedly because she was not doing a good job and because of absenteeism. (D.I. 43 at B-772) Shortly before SK's termination, SK and plaintiff had lunch together. (D.I. 43 at B-772) The friendly relationship plaintiff and SK shared was closely watched by management. (D.I. 43 at B-772)

n4 SK told plaintiff:

(a) From the time she began working at Dover Downs, she became the object of unwanted attention from AW.

(b) On one occasion, AW grabbed SK's hair and said "you mean to tell me you actually got your hair cut like that."

(c) On another occasion AW grabbed SK's finger and bent it back causing her severe pain.

(d) AW would swear at SK.

(e) That the stress at work had caused her health problems resulting in a leave of absence from work.

(D.I. 1, P 49(a)-(e))

[*11]

In October of 1996 a co-worker, Kristy Tyler ("KT"), became angry with plaintiff over a change in the work schedule. (D.I. 1, P 55; D.I. 40 at A-21) Plaintiff alleges that later in the month, KT's boyfriend "keyed" her car while it was parked in the parking lot. (D.I. 40 at A-56) On the night plaintiff noticed her car had been keyed, KT's boyfriend came in to where they worked, looked at plaintiff, looked at KT, nodded in a "yes" motion, and walked back out. (D.I. 40 at A-21, 56) No words were spoken between KT and her boyfriend. (D.I. 40 at A-21, 56) After her boyfriend had left, KT announced to everyone that they had better watch their cars because she heard "cars are getting tore up in the parking lot." (D.I. 1, P 56; D.I. 40 at A-21, 56)

Plaintiff reported this incident to FW on October 28, 1996. (D.I. 1, P 57; D.I. 40 at A-21, 56) Management was supportive of plaintiff, and FW even offered to allow her to park in a space that was monitored by a video camera. (D.I. 1, P 57; D.I. 40 at A-21) A few days later, plaintiff and KT passed each other on the main line and KT said to plaintiff, "you asshole." (D.I. 40 at A-21) Plaintiff reported this incident to Jean Rawlings ("JR"), one [*12] of the supervisors. (D.I. 40 at A-21) JR never said another word to plaintiff about this incident, so plaintiff called FW about it two weeks later. (D.I. 40 at A-21) FW knew nothing about the incident when plaintiff called (D.I. 40 at A-21)

Sometime in late November 1996, Carl Anderson ("CA"), a supervisor, asked plaintiff to write a letter about a male teller who CA thought was gay. (D.I. 43 at B-790) CA told plaintiff what he wanted her to say in the letter, but plaintiff had never seen or heard the teller do any of the things CA had mentioned (D.I. 43 at B-790) CA became angry with plaintiff when she refused to write the letter he had requested. (D.I. 43 at B-790-791)

After SK was fired, she wrote a letter dated December 6, 1996 to defendant's president, DMcG. (D.I. 1, P 53; D.I. 40 at A-5-7; D.I. 43 at B-773) In her letter, not only did SK express her own complaints, she let DMcG know that other female tellers had similar complaints. (D.I. 40 at A-5-7) SK did not name plaintiff in her letter, but she did make reference to situations that involved plaintiff. (D.I. 40 at A-5-7; D.I. 43 at B-773) For example, she wrote about a teller who recently had had her car "keyed." (D.I. [*13] 40 at A-7; D.I. 43 at B-773) Plaintiff is the only teller who had had this happen to her. (D.I. 43 at B-773) SK was referring to plaintiff when she wrote about a teller who "told [AW] she didn't like to be touched and that she didn't want him to hold her hand." (D.I. 40 at A-7; D.I. 43 at B-773) Plaintiff was not aware that SK had written this letter until after she had left defendant's employ. (D.I. 1, P 54; D.I. 40 at A-25)

In early to mid-December 1996, plaintiff's problems with KT began to resurface. (D.I. 40 at A-22) Laura Kenton ("LK"), another teller, was working with KT and plaintiff when KT called LK a "bitch." (D.I. 40 at A-21) Plaintiff did not hear this, but when LK reported the incident to JR she implicated plaintiff. (D.I. 40 at A-21-22) Another time that LK went to JR to complain about KT, JR told LK to "stay out of it. The whole thing was between [KT] and [plaintiff]." (D.I. 40 at A-22) JR began to take KT and KT's sister under her wing, and the more she favored them, the more plaintiff suffered. (D.I. 40 at A-22)

### 4. January 1997 to March 1997

Plaintiff claims that she always was one of the "most productive tellers and had been told by management that [*14] she was one of the fastest tellers and that she was pleasant to get along with" (D.I. 1 at P60) During this time period, plaintiff was not aware that her file contained any written documentation of deficiencies in her performance or that she had ever been disciplined by management. (D.I. 1 at P60)

Plaintiff was given a yearly evaluation in the first or second week of January 1997. (D.I. 40 at A-22, A-49) Her evaluation score was only one point above satisfactory. (D.I. 1, P 63; D.I. 40 at A-22) As a result of this score, plaintiff was given a raise of twenty-five cents, rather than fifty cents. (D.I. 40 at A-22) Plaintiff felt as though the evaluation was not a fair assessment and, therefore, questioned it, although she never asked for it to be changed. (D.I. 40 at A-49) CA and JR, plaintiff's supervisors, told plaintiff the reason for her low score was the problems involving KT and the complaints they had been receiving about plaintiff for months. (D.I. 40 at A-22) Plaintiff was never called into the office regarding these complaints. (D.I. 40 at A-22) Plaintiff only signed the evaluation after she was told she could have a copy of it. (D.I. 40 at A-22) After all the evaluations [*15] were done, plaintiff was told that no one could receive a copy of his/her evaluation. (D.I. 40 at A-22)

During the months of January through March 1997, plaintiff alleges that management constantly harassed her by calling her to the office every week with new complaints about her behavior. (D.I. 1, P 102; D.I. 40 at A-32) According to plaintiff, whenever she would file a complaint, management would just sigh, roll their eyes, and stare at the wall. (D.I. 40 at A-44)

When plaintiff reported to work on January 22, 1997, there was a mandatory meeting for the employees. (D.I. 1 at P68; D.I. 40 at A-22) Prior to this day, CA had told plaintiff that plaintiff could not attend the meeting because she needed to remain working on the line. (D.I. 1, P 68; D.I. 40 at A-22) The head teller that night, Joan Biddle ("JB"), asked the tellers whether they wanted to attend the meeting. (D.I. 40 at A-22) Plaintiff responded that CA had told her to remain working and, therefore, she could not attend the meeting. (D.I. 40 at A-22) About forty-five minutes after the meeting had started, plaintiff was told to hurry up and turn her machine off as she was wanted upstairs. (D.I. 1, P 69; D.I. 40 at A-22) [*16] Plaintiff thought she was wanted in the office. (D.I. 1, P 69; D.I. 40 at A-22) Instead, plaintiff was brought into the middle of the meeting, where everyone looked at her when she walked in. (D.I. 1, P 69; D.I. 40 at A-22) One of the topics discussed at the meeting was the willingness of employees to face the person about whom they make an accusation. (D.I. 1, P 70; D.I. 40 at A-22-23)

After the meeting was over, plaintiff returned to the line. (D.I. 1, P 71; D.I. 40 at A-23) While she was working, JB began to recap the meeting, especially making reference to discussions concerning gossiping, starting rumors, and the need for employees who make accusations to face the accused. (D.I. 1, P 71, 72; D.I. 40 at A-23) At that point, plaintiff interjected "that management would not tell her who had been accusing her of things or allow her to face them." (D.I. 1, P 73; D.I. 40 at A-23) JB began to scream loudly at plaintiff. (D.I. 1, P 74; D.I. 40 at A-23) Immediately, JB began accusing plaintiff of constantly walking up and down the line gossiping about KT. (D.I. 1, P 75; D.I. 40 at A-23) Plaintiff denied these allegations and offered that her computer printouts as proof that she was at [*17] her machine punching tickets and not walking up and down the line. (D.I. 1, P 76; D.I. 40 at A-23)

After the screaming incident, plaintiff went up to the third floor office to speak with her supervisors, CA and JR. (D.I. 1, P 77; D.I. 40 at A-23) She told them about JB bringing her into the middle of the meeting and screaming at her in front of customers. (D.I. 1, P 78; D.I. 40 at A-23) CA called JB to the office to find out what happened. (D.I. 1, P 78; D.I. 40 at A-23) JB told CA that plaintiff was gossiping about KT, and "she had to shout to snap [her] out of it." (D.I. 1, P 78; D.I. 40 at A-23) Eventually, although JB attempted to prevent him from doing so, CA agreed to go downstairs to speak with the other tellers who were present when the screaming incident occurred. (D.I. 1, P 79; D.I. 40 at A-23) When CA returned, he stated that the two witnesses confirmed plaintiff's story; this angered JB. (D.I. 1, P 80; D.I. 40 at A-23) JB pointed her finger at plaintiff and yelled, "I see how you are," then gave plaintiff a dirty look and stormed out of the room. (D.I. 1, P 81; D.I. 40 at A-23) Plaintiff, JB, and the eye witnesses were told by management to pretend the whole thing had [*18] never happened and not to talk about it to anyone. (D.I. 1, P 82; D.I. 40 at A-23) When everyone returned to the line, JB was slamming things and tried to close plaintiff's arm in her drawer every chance she could get. (D.I. 40 at A-23)

2000 U.S. Dist. LEXIS 4881, *

Throughout the months of January to March 1997, JB would elbow plaintiff in the back at least once a night whenever they worked together. (D.I. 1, P 66; D.I. 40 at A-44) Plaintiff and JB worked together approximately every other week. (D.I. 40 at A-44) Plaintiff spoke with CA twice about these incidents. (D.I. 40 at A-44) The first time plaintiff spoke with CA, he told her he would talk to JB, but the elbowing did not stop. (D.I. 40 at A-44) The second time plaintiff spoke to CA was her last day at work. (D.I. 40 at A-44)

Another incident occurred in February 1997. (D.I. 1, PP 87, 97; D.I. 40 at A-43) As plaintiff and a male manager were passing each other in the hallway, he "headed towards [her] at full speed [,] took his shoulders and forcibly hit [her] . . . like a hockey player would give a body check." (D.I. 40 at A-43) He neither apologized, nor looked back at plaintiff. (D.I. 40 at A-43) Plaintiff did not report the incident to management. [*19] (D.I. 40 at A-43)

Sometime between January and March, most likely February, plaintiff was brought to the management office by this same male manager because he believed her to have been seven hundred and some dollars short when she turned in her money bag. (D.I. 40 at A-51) He told plaintiff, "Luckily, for you, I went to your machine and you had left all your money at your machine and you had only turned in change." (D.I. 40 at A-51) Plaintiff insists that she did not forget to put the money in the bag, that her husband witnessed her putting the money in the bag, and that the entire story was fabricated. (D.I. 40 at A-51)

Plaintiff worked the whole day on March 11, 1997. (D.I. 40 at A-24) AW was giving plaintiff dirty looks the entire day and plaintiff could not understand why. (D.I. 40 at A-24) That day she said "hello" to FW, and he just turned his head. (D.I. 40 at A-24) AW was flirting with another teller throughout the day. (D.I. 40 at A-24) AW was hugging and touching this teller, who allegedly was receptive to his advances. (D.I. 40 at A-24) For example, she handed AW a rolled up napkin and when he opened it a quarter fell out; the napkin read, "if you can't come call." (D. [*20] I. 40 at A-24) This teller was willing to go along with AW; therefore, she received more hours a week than others who had been there for over a year, such as plaintiff. (D.I. 40 at A-24)

At the end of the day, plaintiff was told to go up to the office after she finished work. (D.I. 40 at A-24) When she got to the office, CA handed her a counseling sheet. (D.I. 40 at A-10, A-24) The sheet stated that plaintiff had used foul language about a fellow teller and that she was spreading rumors about fellow tellers. (D.I. 40 at A-24) When plaintiff asked for an explanation, CA told her that JB had heard plaintiff call her a "black bitch." CA also told plaintiff that JB said plaintiff was talking about the incident that had occurred between the two of them in January and that there were other complaints regarding rumors about fellow tellers. (D.I. 40 at A-24) Plaintiff insisted that she never said these things and that JB was lying. (D.I. 40 at A-24) Plaintiff asked for a meeting to face her accusers, and CA said he would arrange it, but he never did. (D.I. 40 at A-24) Plaintiff did not want to sign the counseling sheet, but CA told her signing it was not an admittance of guilt but only an [*21] acknowledgment that he had spoken with her. (D.I. 40 at A-24) Plaintiff signed the letter and left the office crying. (D.I. 40 at A-24) When plaintiff called CA later that night to discuss her counseling sheet, she informed him that she felt she needed to contact a lawyer to find out her rights. (D.I. 40 at A-25)

On March 20, 1997 plaintiff went to Dr. John Asman's office to ask for a new medication for her stomach pain. n5 (D.I. 40 at A-25) Plaintiff explained to the doctor what she had endured at work and that the stress had worsened not only her stomach problem but also her neck and back problem. (D.I. 40 at A-25) The doctor advised plaintiff not to go back to her position and wrote a letter containing this advice. (D.I. 40 at A-25) Later that same day, plaintiff, accompanied by her husband, went to work. (D.I. 40 at A-25) As she and her husband walked in, AW was standing midway down the main line. (D.I. 40 at A-25) When he saw the two of them, AW ran back to the office and announced their arrival. (D.I. 40 at A-25) When plaintiff arrived at the office, plaintiff handed CA the note her doctor had written. She asked him to put it in her file as it was the reason she would not be [*22] back to work. (D.I. 40 at A-25)

n5 Since approximately the spring of 1996, plaintiff has had a problem with her stomach. (D.I. 40 at 77-80) Her medication for this condition has changed three times since January 1997. (D.I. 40 at A-25) Beginning in January 1997, plaintiff also began taking muscle relaxers and anti-inflammatory pills for stress and tension in her back. (D.I. 40 at A-25)

## III. STANDARD OF REVIEW

A party is entitled to summary judgment only when the court concludes "that there is no genuine issue of material fact and that the party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of proving that no material issue of fact is in dispute. See *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 n. 10, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986).*

Once the moving party has carried its initial burden, the nonmoving party "must come forward with 'specific facts showing that there is a genuine issue for trial.'" [*23] *Id* at 587 (quoting Fed. R. Civ. P. 56(e)). "Facts that could alter the outcome are 'material', and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Federal Kemper Life Assurance Co., 57 F.3d 300, 302 n.1 (3d Cir. 1995).* If the nonmoving party fails to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof, the moving party is entitled to judgment as a matter of law. See *Celotex Corp. v. Catrett, 477 U.S. 317, 322, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986).* The mere existence of some evidence in support of the nonmoving party will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that factual issue. See *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986).* This court, however, must "view all the underlying facts and all reasonable inferences therefrom in the light most favorable [*24] to the party opposing the motion." *Pennsylvania Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995).* With respect to summary judgment in discrimination cases, the court's role is "'to determine whether, upon reviewing all the facts and inferences to be drawn therefrom in the light most favorable to the plaintiff, there exists sufficient evidence to create a genuine issue of material fact as to whether the employer intentionally discriminated against the plaintiff.'" *Revis v. Slocomb Industries, Inc., 814 F. Supp. 1209, 1215 (D. Del. 1993) (quoting Hankins v. Temple Univ., 829 F.2d 437, 440 (3d Cir. 1987)).*

Generally, to state an employment claim under Title VII, a plaintiff may present either direct evidence of discriminatory intent under *Price Waterhouse v. Hopkins, 490 U.S. 228, 104 L. Ed. 2d 268, 109 S. Ct. 1775 (1989)* ("mixed motives" cases) or indirect evidence of discrimination under the framework of *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973)* and *Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 67 L. Ed. 2d 207, 101 S. Ct. 1089 (1981)* [*25] ("pretext" cases). In a mixed motives case under Price Waterhouse, once the plaintiff has produced direct evidence that an illegitimate criterion was a motivating factor in an adverse employment decision, both the burden of production and the burden of persuasion shift to the defendant. See *id., 490 U.S. 228 at 277.* The defendant must show by a preponderance of the evidence that it would have made the same employment decision regardless of its discriminatory animus. See *id at 244-46.* To come within the Price Waterhouse framework, the evidence presented by the plaintiff "must directly reflect a discriminatory . . . animus on the part of a person involved in the decision making process." *Armbruster v. Unisys Corp., 32 F.3d 768, 778 (3d Cir. 1994);* see also *Ostrowski v. Atlantic Mutual Ins. Cos., 968 F.2d 171, 182 (2d Cir. 1992).* "'Direct evidence is evidence which, if believed, proves the fact without inference or presumption.'" *Nixon v. Runyon, 856 F. Supp. 977, 983 (E.D. Pa. 1994) (quoting Brown v. East Miss. Elec. Power Ass'n, 989 F.2d 858, 861 (5th Cir. 1993)); Clark v. Coats & Clark, Inc., 990 F.2d 1217, 1223 (11th Cir. 1993)* [*26] ("Evidence [of discrimination] is direct when it is sufficient to prove discrimination without inference or presumption.").

In contrast, in pretext or indirect evidence cases, a plaintiff must first make a prima facie showing of discrimination. See *Keller v. Orix Credit Alliance, Inc., 130 F.3d 1101, 1108 (3d Cir. 1997) (en banc).* A prima facie case is established when a plaintiff demonstrates the following: (1) she is a member of a protected class; (2) she was qualified for the employment position held or desired; (3) she suffered some form of adverse employment action; and (4) circumstances that give rise to an inference of unlawful discrimination. *Jones v. School Dist. of Philadelphia, 198 F.3d 403, 410-412 (3d Cir. 1999).* Once the plaintiff has established a prima facie case of employment discrimination, the burden of going forward shifts to the defendant who then is required to articulate a legitimate, nondiscriminatory reason for the challenged employment action. See *McDonnell Douglas, 411 U.S. at 802-03; Burdine, 450 U.S. at 252-55; Bellissimo v. Westinghouse Elec. Corp., 764 F.2d 175, 179 (3d Cir. 1985)* [*27] The defendant need only present enough evidence to raise a genuine issue of fact "as to whether it discriminated against the plaintiff." *Burdine, 450 U.S. at 254-55.* If the defendant is successful in meeting its burden of production, the presumption of discrimination created by the prima facie showing drops from the case, and the plaintiff must show by a preponderance of the evidence that the defendant's proffered reason for the employment decision was merely pretext for discriminatory animus. See *id. at 256.* The plaintiff can satisfy her burden of proof "either directly by persuading the [fact finder] that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." Id.; see also *Armbruster, 32 F.3d at 783.* At all times, the ultimate burden of persuading the trier of fact of the defendant's discriminatory intentions remains with the plaintiff. See *St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 507, 125 L. Ed. 2d 407, 113 S. Ct. 2742 (1993).*

## IV. DISCUSSION

It is difficult to discern exactly what plaintiff claims [*28] in this lawsuit. Although she has enumerated in

great detail a great number of facts, plaintiff has left it to defendant and, ultimately, the court to characterize the facts as legal causes of action. The court, as did the defendant, construes the facts and their legal consequences liberally.

**A. Hostile Work Environment (Sexual Harassment)**

The Supreme Court has recognized that Title VII is violated by a "work environment abusive to employees because of their race, gender, religion, or national origin." n6 *Harris v. Forklift Sys., Inc., 510 U.S. 17, 22, 126 L. Ed. 2d 295, 114 S. Ct. 367 (1993)*; see also *Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 66, 91 L. Ed. 2d 49, 106 S. Ct. 2399 (1986)* ("[A] plaintiff may establish a violation of Title VII by proving that discrimination based on sex has created a hostile or abusive work environment.") To be cognizable within the meaning of Title VII, the harassment "must be sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.'" *Meritor Sav. Bank, FSB, 477 U.S. at 67* (quoting *Henson v. Dundee, 682 F.2d 897, 904 (11th Cir. 1982))* [*29] In order to establish a hostile work environment,

> a plaintiff must establish "by the totality of the circumstances, the existence of a hostile or abusive working environment which is severe enough to affect the psychological stability of a minority employee."

*Andrews v. City of Philadelphia, 895 F.2d 1469, 1482 (3d Cir. 1990)* (quoting *Vance v. Southern Bell Tel. & Tel. Co., 863 F.2d 1503, 1510 (11th Cir. 1989))*. Specifically, a plaintiff must demonstrate that:

> (1) she suffered intentional discrimination because of her sex; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same sex in that position; and (5) the existence of respondeat superior liability.

*Id.*; see *Faragher v. City of Boca Raton, 524 U.S. 775, 786-88, 141 L. Ed. 2d 662, 118 S. Ct. 2275 (1998)*. An "employer is vicariously liable for actionable discrimination caused by a supervisor, but subject to an affirmative defense looking to the reasonableness of the employer's

conduct as well as that of the plaintiff [*30] victim." *Faragher, 524 U.S. at 775*

> n6 It shall be an unlawful employment practice for an employer
>
> > (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.
>
> *42 U.S.C. § 2000e-2(a)(1).*

Under Title VII, a plaintiff must file a complaint with the EEOC within 180 days of the alleged discrimination or within 300 days of the alleged discrimination if the person has initially instituted proceedings with a state or local agency with authority to grant or seek relief form such practice. See *42 U.S.C. § 2000e-5(e)*. In the instant action, plaintiff filed her charge of discrimination on March 31, 1997 with the Delaware Department of Labor. Her Title VII action, therefore, would normally include only those incidents alleged to [*31] have occurred in the preceeding three hundred day period, i.e., those events occurring after June 4, 1996. Events occurring prior to this date are considered untimely. Therefore, plaintiff is precluded from averring in support of her hostile work environment claim any allegations of sexual harassment that occurred prior to June 4, 1996. (D.I. 40 at A-27) As a result, plaintiff's allegations that AW sexually harassed her from the time she started her training in November 1995 to the time defendant terminated her employment in April 1996 are time barred. n7 Plaintiff admits that AW never tried to touch her after April 1996, a concession that is supported by the record.

> n7 Plaintiff does not allege a continuing violation, and even if she were to do so, the acts alleged to have occurred outside the limitations period are not continuous in time with the timely acts alleged. This discontinuity is fatal to a continuing violation argument.

In light of the above, the only remaining basis for plaintiff's hostile work environment [*32] claim is her assertion that she was subjected to a continuing pattern of retaliation from management and supervisors. Plaintiff

contends that this retaliation was a result of the meeting management had with female tellers in June 1996, regarding the alleged sexual harassment by AW. (D.I. 43 at B-10-19) Although the discriminatory conduct forming the basis of a hostile work environment claim is "not necessarily required to include sexual overtones in every instance or that each incident be sufficiently severe to detrimentally affect a female employee," *Andrews, 895 F.2d at 1485*, the court finds that plaintiff has not established a prima facie case. Plaintiff did not participate in, and her name was never mentioned during, the June 1996 meeting. Moreover, the alleged retaliatory conduct did not begin until December 1996, six months after the tellers met with management. n8 Furthermore, the conduct plaintiff complains about involves treatment she received from female supervisors. Plaintiff has not provided the court with any evidence from which it could be reasonably inferred that the alleged retaliatory actions were taken by defendant merely because of her gender. [*33] Therefore, plaintiff has failed to establish the first element of a prima face case. Accordingly, the court shall grant summary judgment in favor of defendant on plaintiff's hostile work environment claim.

n8 Plaintiff admits that in October 1996 management was supportive when she went to them to complain about her car being keyed in the parking lot. (D.I. 40 at A-21) Plaintiff's first allegation that involves retaliatory conduct by management or a supervisor concern conduct that occurred in mid-December 1996. (D.I. 40 at A-22)

## B. Retaliation

Title VII prohibits discrimination against an employee who has exercised her rights under the Act:

It shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because she [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because she has made a charge, testified, assisted, or participated, in any manner in an investigation, proceeding, or hearing under this [*34] title.

*42 U.S.C. § 2000e-3(a)(1997); Price v. Delaware Dep't of Correction, 40 F. Supp. 2d 544, 551 n.5 (D. Del. 1999).* Courts analyze Title VII retaliation claims under the same burden-shifting framework outlined earlier. See *Krouse v. American Sterilizer Co., 126 F.3d 494, 500 (3d Cir. 1997).* A plaintiff, therefore, must first establish a prima facie case for retaliation under Title VII. In order to state a prima facie case of retaliation under the statute, the plaintiff must show (1) she engaged in a protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action. See id.; *Robinson v. City of Pittsburgh, 120 F.3d 1286, 1289 (3d Cir. 1997), Woodson v. Scott Paper Co., 109 F.3d 913, 920 (3d Cir. 1997), Price, 40 F. Supp. 2d at 551-52.*

In the case at bar, plaintiff has failed to establish a prima facie showing of retaliation. Plaintiff provides no evidence that she engaged in a protected [*35] employee activity, the touchstone element of a retaliation claim. The record demonstrates that plaintiff never "opposed any practice made an unlawful employment practice by [Title VII];" moreover, plaintiff never "made a charge, testified, assisted, or participated, in any manner in an investigation, proceeding, or hearing under this title." *42 U.S.C. § 2000e-3(a).* Plaintiff did not complain to management that she was being sexually harassed; she was not one of the female tellers who went to management in April 1996 and her name was never mentioned in that meeting. (D.I. 43 at B-10) Although filing a charge of discrimination with the EEOC is a protected activity, plaintiff did not do so until after she resigned in March 1997. See *Robinson, 120 F.3d at 1300; Woodson, 109 F.3d at 920.*

Plaintiff contends that her "involuntary involvement" in SK's letter to the president of defendant was a protected activity. In her December 1996 letter, SK made reference to plaintiff, but never mentioned her by name. (D.I. 40 at A-5-7; D.I. 43 at B-773) There is no evidence to show that management had any idea the letter was referencing plaintiff. [*36] (D.I. 47 at P5; D.I. 48 at P2) Although plaintiff was friendly with SK and SK's sister, that does not make her a participant, in any form, in a protected activity. (D.I. 43 at B-772) Plaintiff argues that she engaged in a protected activity when she refused to write a letter for management about a gay male teller. (D.I. 43 at B-790-791) The court finds that this single nonevent does not constitute "opposition to any practice made an unlawful employment practice" by Title VII.

Even if the court were to assume that plaintiff engaged in a protected activity, the court finds that plaintiff has not shown an adverse employment action taken by defendant sufficient to fulfill the second element of a prima facie case. "The Third Circuit has articulated that 'retaliatory conduct other than discharge or refusal to rehire is ... proscribed by Title VII only if it alters the

employees' compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affect[s] his status as an employee.'" *Price, 40 F Supp. 2d at 552* (citing *Robinson, 120 F 3d at 1300*)(emphasis added). According to the Third Circuit [*37] in Robinson, "not everything that makes an employee unhappy qualifies as retaliation, for otherwise, minor and even trivial employment actions that an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit." *Robinson, 120 F 3d at 1300* The employer's retaliatory conduct must be both "serious and tangible." Id.

Plaintiff alleges that she received an unwarranted low performance review from defendant in January 1997. (D.I. 40 at A-49) There is no evidence to support plaintiff's claim that her review was unwarranted other than her own belief that she deserved a higher score. As a result of this review, plaintiff received a satisfactory score and a twenty-five cent raise. (D.I. 40 at A-22) Plaintiff did not quit when she received her evaluation. Although plaintiff did question management about her score, she never requested that it be changed. (D.I. 40 at A-49)

Constructive discharge may be an adverse employment action. See *Durham Life Ins. Co. v. Evans, 166 F 3d 139, 149 (3d Cir. 1999)* Plaintiff at bar does not argue directly that she was constructively discharged; however, the court will address [*38] the issue, construing the claims and record liberally. Constructive discharge is found where an employer knowingly permits "conditions of discrimination in employment so unpleasant or difficult that a reasonable person would have felt compelled to resign." *Connors v. Chrysler Fin. Corp., 160 F 3d 971, 974 (3d Cir. 1998)* Plaintiff alleges that she was subjected to the following acts of reprisal: she received an unwarranted low performance review; she received several verbal counselings and one written counseling from management; her supervisor (a female) brought her into the middle of a meeting to embarrass her; her supervisor (a female) elbowed her in the back and tried to close her arm in the drawer approximately ten times; and another supervisor (a male) tried to "body check" her in the hallway. These incidents, coupled with her doctor's advice not to return to work, prompted plaintiff to resign. (D.I. 40 at A-25) The court finds that these allegations do not rise to the level of employer action that would "compel a reasonable person to resign." See generally *Robinson, 120 F 3d 1286, 1300-01* (finding that plaintiff's alleged "unsubstantiated oral [*39] reprimands" and "unnecessary derogatory comments" did not rise to the level of what the Third Circuit has described as "adverse employment action").

Even if the court were to find that plaintiff was constructively discharged, there is no causal connection between what she claims to have been the protected activity (her alleged involvement in SK's letter) and the problems that led to her resignation. Plaintiff argues that the substantial and continuous harassment she alleges was at the request of management, because of the letter sent by SK. However, as mentioned above, there is no evidence to suggest that management knew plaintiff was referenced in this letter. Therefore, even if plaintiff were to have met element one by her "involuntary involvement" in SK's letter, and to have met element two through constructive discharge, this court finds that there is no causal connection between the protected activity and the adverse employment action to fulfill element three of a prima facie case of retaliation. n9

n9 The Third Circuit has stated that "temporal proximity between the protected activity and the termination is sufficient to establish a causal link." *Woodson, 109 F.3d at 920-21.* The timing as alleged by plaintiff is SK's December 6, 1996 letter and plaintiff's March 20, 1997 resignation.

[*40]

## C. Disparate Treatment

In an effort to predict what causes of action plaintiff might assert at trial, defendant has addressed the theory of disparate treatment. Plaintiff did not directly address a claim of disparate treatment in her charge of discrimination to the EEOC. (D.I. 40 at A-27) Courts generally are empowered to hear only those employment discrimination claims that have been the subject of a charge timely filed with the EEOC. See *42 U S C § 2000e-5(f)(1), (3).* However, the parameters of the resulting civil complaint that may follow a notice of a right to sue from the EEOC are "'defined by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination,'" regardless of the actual scope of the EEOC investigation. *Hicks v ABT Assocs., Inc., 572 F.2d 960, 966 (3d Cir. 1978)* (quoting *Ostapowicz v Johnson Bronze Co., 541 F 2d 394, 398-99 (3d Cir. 1976))*. Therefore, a court may assume jurisdiction over additional charges only if "the acts alleged in the subsequent Title VII suit are fairly within the scope of the prior EEOC complaint, or the investigation [*41] arising therefrom." *Antol v. Perry, 82 F 3d 1291, 1295 (3d Cir. 1996)* (quoting *Waiters v Parsons, 729 F 2d 233, 237 (3d Cir. 1984))*. This standard must be applied in accord with the "sound and established policy that procedural technicalities should not be used to prevent Title VII claims from being decided on the merits." *Revis, 814 F Supp. at 1216* (quoting *Gooding v. Warner-Lambert Co., 744 F.2d 354, 358-59 (3d Cir. 1984))*

Where the allegations in the complaint were sufficiently distinct from those presented in the EEOC charge and were not part of the EEOC investigation, courts have refused to entertain the expanded claims until administrative procedures have been exhausted. See *Sandom v. Travelers Mortgage Servs., Inc., 752 F. Supp. 1240, 1246-48 (D.N.J. 1990); Zalewski v. M.A.R.S. Enters., Ltd., 561 F. Supp. 601, 604-05 (D. Del. 1982).* Nonetheless, courts have heard claims not specifically mentioned in the prior EEOC charge where there was a close nexus between the facts supporting the claims raised in the charge and those in the complaints. See *Howze v. Jones & Laughlin Steel Corp., 750 F.2d 1208, 1212 (3d Cir. 1984);* [*42] *Ostapowicz, 541 F.2d at 398-99.*

Courts often have stated that "'the nature of the required showing' to establish a prima facie case of disparate treatment based on indirect evidence 'depends on the circumstances of the case'" *Marzano v. Computer Science Corp., 91 F.3d 497, 503 (3d Cir. 1996)*(citing *Torre v. Casio, Inc., 42 F.3d 825, 830 (3d Cir. 1994)*(citation omitted)). Generally, to state a disparate treatment in employment claim under Title VII, a plaintiff must demonstrate that she was "singled out and treated less favorably than others similarly situated on the basis of an impermissible criterion." *Equal Employment Opportunity Comm'n v. Metal Serv. Co., 892 F.2d 341, 347 (3d Cir. 1990).* Plaintiff must first state a prima facie case of gender discrimination. See *McDonnell Douglas, 411 U.S. at 802, Marzano, 91 F.3d at 503.* She can do so by showing by a preponderance of the evidence that: (1) she is a member of the protected class, (2) she suffered an adverse employment action, and (3) that similarly situated members of the opposite sex were treated more favorably. [*43] See *McDonnell Douglas, 411 U.S. at 802; Stinson v. Delaware River Port Auth., 935 F. Supp. 531, 539 (D.N.J. 1996).*

Plaintiff at bar fails to establish a prima facie case. Although plaintiff, a female, is a member of a protected class, she has failed to show that similarly situated males were treated more favorably and did not suffer adverse employment actions. Plaintiff generally alleges that male tellers were not treated in the same disrespectful manner that female tellers were, but she fails to provide sufficient evidence for comparison of the treatment of similarly situated female and male employees.

Plaintiff argues that she received several verbal counselings and one written counseling, but the record reveals that both males and females received oral and written counselings. (D.I. 40 at A-113) Plaintiff argues that qualified females were passed up for promotions while less qualified males were promoted. (D.I. 1 at PP 37-40) As to this issue, the record reveals that both male and female tellers received promotions to head teller. Additionally, plaintiff alleges that her supervisors failed to oust abusive customers at female tellers' requests, [*44] but did so when male tellers so requested. (D.I. 1 at PP 93-94) There is no evidence supporting this allegation. In sum, aside from plaintiff's conclusory allegations, there is no evidence in the record that males were treated more favorably than females while employed by defendant. Therefore, plaintiff, has not met her burden of proof to establish a prima facie case for a Title VII disparate treatment claim.

Even assuming plaintiff has established a prima facie case, defendant has provided a legitimate, nondiscriminatory reason for its actions, shifting the burden back to the plaintiff. *Burdine, 450 U.S. at 254-56.* Defendant has stated that management received complaints about plaintiff from other tellers, two of whom reduced their complaints to writing and, therefore, had reason to counsel plaintiff. (D.I. 40 at A-8,9) The record shows that plaintiff and other tellers violated some of the mutuel department's regulations by being discourteous to co-workers and, therefore, defendant had reason to counsel them. The burden then shifts back to plaintiff to show by a preponderance of the evidence that defendant's reasoning is pretextual. *Burdine, 450 U.S. at 256* [*45] Plaintiff failed to address this claim in her answering brief and, therefore, has failed to meet her burden of showing defendant's proffered reason was merely pretext for discriminatory animus. See *id.*

## V. CONCLUSION

For the reasons stated above, the court concludes that there are no genuine issues of material fact relating to plaintiff's claims of discrimination under Title VII. Therefore, defendant's motion for summary judgment shall be granted. An appropriate order shall issue.

LEXSEE

DONNA HAZEN, Appellant v. MODERN FOOD SERVICES, INC., t/a Smuggler's
Cove, RONALD SARAJIAN, Individually and as President of Modern Food Ser-
vices, Inc., t/a Smuggler's Cove, and MISTY GERRITY, Individually and as a su-
pervisor of Modern Food Services, Inc., t/a Smuggler's Cove

No: 03-4014

UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

113 Fed. Appx. 442; 2004 U.S. App. LEXIS 21467

September 23, 2004, Submitted Pursuant to Third Circuit LAR 34.1(a)
October 15, 2004, Filed

**NOTICE:** [**1] RULES OF THE THIRD CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**PRIOR HISTORY:** Appeal from the United States District Court for the Middle District of Pennsylvania. (D.C. Civil No. 02-cv-00090). District Judge: Hon. James M. Munley.

**DISPOSITION:** Affirmed.

**LexisNexis(R) Headnotes**

**COUNSEL:** For DONNA HAZEN, Appellant: Cynthia L. Pollick, The Employment Law Firm, Pittston, PA.

For MODERN FOOD SERVICES, INC., t/a Smuggler's Cove, RONALD SARAJIAN, Individually and as President of Modern Food Services, Inc., t/a Smuggler's Cove, and MISTY GERRITY, Individually and as a supervisor of Modern Food Services, Inc., t/a Smuggler's Cove, Appellees: Hugh M. Emory, Ryan, Emory & Ryan, Paoli, PA.

**JUDGES:** Before: McKEE, Circuit Judges, ALDISERT and GREENBERG, Senior Circuit Judges.

**OPINIONBY:** McKEE

**OPINION:** [*443] McKEE, Circuit Judge

Donna Hazen appeals the district court's grant of summary judgment in favor of defendants, denying relief

on her claim of retaliation for complaints regarding sexual discrimination. We will affirm.

**I.**

Inasmuch as we are writing only for the parties, we need not repeat the factual or procedural background of this litigation [**2] except insofar as may be helpful to our brief discussion. n1

> n1 Our review of the district court's grant of summary judgment is plenary. Watson v. Eastman Kodak Co., 235 F.3d 851, 854 (3d Cir. 2000). Accordingly, we are required to apply the same test that the district court should have utilized. Boyle v. County of Allegheny Pennsylvania, 139 F.3d 386, 393 (3d Cir. 1998).

To establish a prima facie case of retaliation, Hazen must show: (1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the protected activity and her employer's adverse action. Abramson v. William Paterson College of New Jersey, 260 F.3d 265, 284 (3d Cir. 2001); Krouse v. American Sterilizer Co., 126 F.3d 494, 499 (3d Cir. 1997); Woodson v. Scott Paper Co., 109 F.3d 913 (3d Cir. 1997).

Once an employee establishes a prima facie case of [**3] retaliation, the employer must present a legitimate, non-retaliatory reason for its adverse employment action. Woodson, 109 F.3d at 920 n.2. This burden is "relatively light," and is satisfied if the employer articulates any legitimate reason for the adverse employment action. The employer need not prove that the articulated reason actually motivated the adverse employment action. Id.

If the employer tenders a legitimate reason for the employment action the employee must then convince the factfinder both that the employer's proffered explanation is false, and that the employer's action was actually motivated by a retaliatory animus. Woodson, 109 F.3d at 920 n.2.

In order to prevail on summary judgment, the employer must show that the trier of fact could not conclude, as a matter of law, that retaliatory animus had a determinative effect on the outcome. This may be accomplished by establishing the plaintiff's inability to raise a genuine issue of material fact as to any element of the plaintiff's prima facie case, or the credibility of any proffered explanation for the employment action. Krouse, 126 F.3d at 501.

## II.

We [**4] agree with the district court's conclusion that Hazen's conversation with Torley regarding Sarajian's alleged statement [*444] about the circumstances of Hazen's transfer could be construed as a complaint under Title VII. We have previously held that informal complaints of discrimination that were directed at co-workers rather than management constitute protected activity for purposes of establishing a prima facie case of retaliation. Neiderlander v. American Video Glass Co, 80 Fed. Appx. 256, 259 (3d Cir. 2003). Title VII protects employees from retaliation for the employee's opposition to any unlawful employment practice. Id.

Here, however, the district court concluded that Hazen failed to satisfy the second requirement of her prima facie case because the record did not establish that her transfer from the bar to the dining area constituted a demotion. We agree. It is undisputed that the rate of pay for both areas was $ 2.83 per hour plus tips, and the job responsibilities were the same. Accordingly, Hazen's claim of retaliation fails as a matter of law.

## III.

Hazen's claim that summary judgment is foreclosed by the law of the case doctrine is frivolous. Under [**5] that doctrine, "once an issue has been decided, parties may not relitigate that issue in the same case." Ogbudimkpa v. Ashcroft, 342 F.3d 207 n.7 (3d Cir. 2003)(citing Waldorf v. Shuta, 142 F.3d 601, 616 n.4 (3d Cir. 1998). The defendants' motion for judgment on the pleadings and their motion for summary judgment obviously raised very different issues and required distinct inquiries. In deciding the motion for judgment on the pleadings, the district court determines from the pleadings "if it appears to a certainty that no relief could be granted under any set of facts which could be proved." Morse v. Lower Merion School Dist., 132 F.3d 902, 906 (3d Cir. 1997). However, when deciding a motion for summary judgment, the district court reviews all discovery and determines whether a genuine issue of material fact exists. Farrell v. Planters Lifesavers Co., 205 F.3d 271, at 278. The standard used to decide these two very different motions is obviously not the same. In deciding a motion to dismiss on the pleadings, the court presumes that the plaintiff will be able to prove the allegations set forth in the pleadings, and then determines if those allegations [**6] establish a cause of action. Summary judgment involves no such presumption.

Hazen failed to establish a prima facie case even though her pleading does state a cause of action on its face. Therefore, the law of the case doctrine simply did not apply to the district court's summary judgment analysis.

## IV.

Based on the foregoing analysis, we will affirm the decision of the district court.

LEXSEE

FRANK L. KELLY, Plaintiff, v. LOUIS CALDERA, Secretary of the Department of
the Army, Defendant.

CIVIL ACTION NO. 98-0753-CB-M

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
ALABAMA, SOUTHERN DIVISION

2000 U.S. Dist. LEXIS 3015

February 28, 2000, Decided
February 28, 2000, Filed

**DISPOSITION:** [*1] Defendant's motion for summary judgment granted, claims of the plaintiff, Frank L. Kelly, against the defendant, Louis Caldera, Secretary of the Army, in the above-styled action DISMISSED with prejudice.

**LexisNexis(R) Headnotes**

**COUNSEL:** For FRANK L. KELLY, plaintiff: Ronnie L. Williams, Esq., Mobile, AL.

For LOUIS SECRETARY OF THE ARMY, defendant: Eugene A. Seidel, Esq., U.S. Attorney's Office, Mobile, AL.

**JUDGES:** Charles R. Butler, Jr., CHIEF DISTRICT JUDGE.

**OPINIONBY:** Charles R. Butler, Jr.

**OPINION:**

### OPINION and ORDER

This matter is before the Court on a motion for summary judgment filed by the defendant (Doc. 33). After considering the motion and the briefs and evidence submitted by the parties in light of the applicable law, the Court finds that summary judgment is due to be granted for the reasons set forth below.

### Findings of Fact

Plaintiff Frank L. Kelly is an African American who, at the time of his termination in May of 1995, was a Civil Engineer, grade level GS-11, with the United States Army Corps of Engineers ("the Corps"). Since late 1989 Kelly had been assigned to the Construction Programs Branch of the Construction Division which was located in Mobile. From April 1992 through January [*2] 1993, Kelly was voluntarily detailed to Kuwait. From approximately mid-1990 through June 1993, Kelly received a temporary promotion to GS-12 and in June 1993 he received a temporary promotion to a GS-13 for approximately two months. Kelly was returned to GS-11 status on September 16, 1993. From November 1993 through November 1994, Kelly was temporarily assigned to work in the Homestead, Florida, office.

At the time plaintiff was hired in 1989, construction projects had project managers from both the Corps' Engineering and Construction Divisions. Project managers from the Engineering Division worked primarily on the design phase while project managers from the Construction Division followed projects in the construction phase. In the early 1990s, as its work declined, the Corps began to reorganize its project management. All project management functions were to be transferred to the newly-created Project Management Division, thereby eliminating project manager positions in both the Engineering and Construction Divisions.

As a result of the reorganization, four positions within the Construction Division of the Mobile office, including Kelly's, were to be eliminated. All of those employees [*3] were informed that they should begin looking for other positions. In 1993, Michael Rodgers, the Corps employee who supervised the reorganization in the Mobile District, met with Kelly to discuss other employment options. At that time, Kelly volunteered to take a temporary assignment to Homestead, Florida.

Three persons were affected by the reorganizations besides Kelly. Gary Browder was retained in the Construction Division because of his expertise with computers. John Hollingsworth, Kelly's supervisor, a GS-12, transferred to the Engineering Division as an architect in the latter part of 1994. Don Hendrix, an engineer at the

same grade level as plaintiff, transferred to the Florida Area Office in June of 1994.

Sometime in September of 1994, Kelly filed a grievance about unfair treatment in pay and the fact that his temporary promotion to GS-12 was not made permanent. On September 28, 1994, Rodgers again met with Kelly about finding work. Kelly told Rodgers he wanted to return to Mobile and requested that Rodgers find him a job in any other Division within the Corps' Mobile office. Rodgers spoke with all Division Chiefs and could not obtain a position for Kelly. Rodgers then offered [*4] Kelly a job within any of the Construction Division's Field Offices. Kelly refused, and in February 1995, Rodgers recommended that final action be taken with regard to Kelly. Thereafter, Kelly was formally notified that his position had been abolished and was offered a position at Cape Canaveral, Florida. Kelly refused the transfer and was terminated, effective May 1995.

Kelly was automatically registered by the Mobile District of the Army Corps of Engineers in the Priority Placement Program ("PPP"). This program is used to give consideration to employees who have been separated from the Corps because of their refusal to relocate outside the commuting area. Kelly was registered in the PPP as a GS-11 engineer in the Mobile area for a period of one year after his separation. No positions became available during that time.

In November 1996, Rhonda Wall, an engineer, was hired into the Construction Division as a lateral transfer at the GS-12 grade level. Wall first learned of the position in Mobile in the Fall of 1996. Wall's position was a newly-created one, with job functions different from those that had been performed by Kelly. n1

> n1 Wall's job requirements included budgeting and costing, workload projections, resource projections, resource planning and development and maintenance of ADP equipment--none of which were part of Kelly's job.

[*5]

Kelly filed the instant action on July 22, 1998, after exhausting his administrative remedies. Kelly alleges that he was terminated because of his race and in retaliation for filing a grievance complaining about racial discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII").

### Conclusions of Law n2

> n2 The standards by which a summary judgment motion must be judged are now well-

known and bear only minimal repetition here. Summary judgment should be granted only if "there is no issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). If the moving party meets his initial burden of pointing to evidence on file that demonstrates that there are no genuine issues of material fact that should be decided at trial, then the burden shifts to the nonmoving party to show the existence of a genuine issue of material fact. Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). "If the nonmoving party fails to make 'a sufficient showing on an essential element of [his] case with respect to which [he] has the burden of proof,' the moving party is entitled to summary judgment." Id. (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986)) (footnote omitted). In reviewing the evidence on summary judgment, the Court must resolve all disputed evidence and inferences in favor of the nonmoving party. Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 999 (11th Cir. 1992), cert. denied, 507 U.S. 911, 113 S. Ct. 1259, 122 L. Ed. 2d 657 (1993) (internal citations and quotations omitted).

[*6]

### Discrimination Claim

The analytical framework to be applied to employment discrimination claims is now well established:

> Because direct evidence of discrimination can be difficult to produce, the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), created a framework on the burden of production and order of presentation of proof to analyze circumstantial evidence of discrimination. See Nix v. WLCY Radio/Rahall Communications, 738 F.2d 1181, 1184, reh'g denied, 747 F.2d 710 (11th Cir.1984) (noting that McDonnell Douglas framework is valuable tool for analyzing disparate treatment cases). To prove discriminatory treatment through circumstantial evidence: (1) a plaintiff must first make out a prima facie case, (2) then the burden shifts to the defendant to produce legitimate, nondiscriminatory reasons for the adverse employment action, and (3) then

the burden shifts back to the plaintiff to establish that these reasons are pretextual. McDonnell Douglas, 411 U.S. at 802-04, 93 S. Ct. at 1824-25.

Mayfield v. Patterson Pump Co., 101 F.3d 1371 (11th Cir. 1996). [*7]  n3

n3 Plaintiff relies on circumstantial evidence of discrimination.

"The elements of any claim under Title VII, which will necessarily vary in differing fact situations, are (i) that the plaintiff is a member of a protected class, (ii) that plaintiff was qualified for the job in question; (iii) that the plaintiff suffered an adverse employment decision and (iv) that this adverse decision causally related to the status of the plaintiff as a member of the protected class." Jones v. Firestone Tire & Rubber Co., Inc., 977 F.2d 527, 537-38 (11th Cir. 1992). Plaintiff's ability to satisfy the first three elements is undisputed. Plaintiff and defendant characterize the fourth element differently. Defendant argues that plaintiff cannot establish any causal connection because he was not treated differently from similarly situated white employees. See Weaver v. Casa Gallardo, Inc., 922 F.2d 1515, 1525 (11th Cir. 1991). Plaintiff does not dispute defendant's evidence that the jobs of all [*8] four of the employees in his division were eliminated, that the two employees who remained in Mobile were not similarly situated n4 or that the only similarly situated white employee in his division was also forced to relocate. Instead, plaintiff attempts to satisfy the fourth element by proving that he was replaced by someone outside the protected class. See Nix v. WLCY Radio/Rahall Communications, 738 F.2d 1181, 1184 (11th Cir. 1984).

n4 Kelly's supervisor, John Hollingsworth, was not similarly situated because he had a higher classification level (GS-12), and in order to remain in Mobile he took a position in another division as an architect, which Kelly was not qualified to do. Kelly readily admits that he was not similarly situated to Gary Browder who was able to secure a position in Mobile because of his computer expertise.

Plaintiff's theory is that his former position was, in effect, reinstated or resurrected after he was terminated and filled by Rhonda Wall, a white female. n5 Even though [*9] Wall was not hired until eighteen months after he was terminated, plaintiff argues that Wall re-

placed him because she was hired into the same office where plaintiff had worked, no job vacancy was posted for Wall's position, and Wall was hired a few months after plaintiff's recall rights under the Priority Placement Program had expired. However, evidence that the Corps created a new position eighteen months after a reorganization in which jobs were eliminated does not create an inference that its decisions were motivated by discriminatory intent.

n5 An alternative characterization of plaintiff's theory is failure to rehire. When a plaintiff attempts to establish a prima facie case of discrimination based on failure to rehire, he must establish that he was qualified for the job. Coutu v. Martin Co. Board of County Comm'rs, 47 F.3d 1068, 1073 (11th Cir. 1995). Plaintiff has presented no evidence to prove that he possessed the qualifications necessary for the position Wall filled. In a reply brief (doc. 42) plaintiff, citing Jameson v. The Arrow Co., 75 F.3d 1528 (11th Cir. 1996), argues that the hiring of someone outside the protected class following a reduction in force supports an inference of discrimination. The Jameson court did not, however, do away with the qualification requirement. Rather, the court held that "where a job *for which the plaintiff is qualified*, and for which the plaintiff applies, is available at the time of termination and the employer offers the job to an individual outside the protected [class], an inference of intentional discrimination is permissible." Id. at 1532 (emphasis added).

[*10]

Moreover, plaintiff has presented no evidence that Wall actually replaced him. The position Wall transferred into was a level GS-12, while plaintiff's former position was a level GS-11. The only evidence plaintiff has presented regarding Wall's job functions is the affidavit of Viviene Jennifer Henry, an office automation assistant who worked with plaintiff in the Construction Management Division. Ms. Henry states that she subsequently worked with Ms. Wall and that "from what I could observe of Ms. Wall's day-to-day activities, her work product was no different [sic] than that performed by Mr. Kelly, and in effect, she served as a replacement for Mr. Kelly and/or Mr. Don Hendrix, who also formerly worked in our office." Henry Aff. (Pl.'s Unnumbered Ex.). Ms. Henry's affidavit is equivocal ("from what I could observe") and makes no comparison of the specific job functions performed by Wall vis a vis those performed by Kelly. Furthermore, a reasonable jury could not find by a preponderance of evidence that Wall

replaced Kelly based on evidence that Wall replaced Kelly *and/or* Hendrix.

## Retaliation Claim

Plaintiff also contends that his termination was in retaliation [*11] for having for having complained about discrimination in a grievance filed in September of 1994. The method of proving a retaliation claim based on circumstantial evidence is similar to the method for establishing a claim for discriminatory treatment and "is governed by the framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973)." Goldsmith v. City of Atmore, 996 F.2d 1155, 1163 (11th Cir. 1993). In Goldsmith the Eleventh Circuit explained the specific analytical framework applicable to a retaliation claim.

> In order to prevail the plaintiff must first establish a prima facie case by showing (1) statutorily protected expression, (2) adverse employment action, and (3) a causal link between the protected expression and the adverse action. Once a prima facie case has been established, the defendant may come forward with legitimate reasons for the employment action to negate the inference of retaliation. If the defendant offers legitimate reasons for the employment action, the plaintiff then bears the burden of proving by a preponderance of the evidence that the reasons offered by the [*12] defendant are pretextual.

Id. (citations omitted). Because plaintiff has failed to establish a causal connection between his grievance and his termination, his retaliation claim fails.

The Eleventh Circuit has defined the third element broadly so that a plaintiff must prove only that the adverse action and the protected activity were not wholly unrelated. See, e.g., Meeks v. Computer Assoc. Internat'l, 15 F.3d 1013, 1021 (11th Cir. 1994; Goldsmith v. City of Atmore, 996 F.2d 1155, 1163 (11th Cir. 1993). Despite the expansive definition of a causal connection, defendant has managed to challenge plaintiff's proof as to this element by presenting evidence that the Corps' reorganization was under way long before plaintiff filed his

grievance. Further, plaintiff had been informed of the need to find other employment approximately a year prior to filing his grievance. Plaintiff's attempt to overcome this evidence is unavailing. First, he some argues that causation may be inferred from the close temporal proximity between the protected conduct and the adverse employment action. See Farley v. Nationwide Mutual Ins. Co., 197 F.3d 1322, 1337 (11th Cir. 1999). [*13] However, the six-month interim between the protected conduct and the adverse employment action in this case is too long a delay to give rise to an inference of causation. See, e.g., Richmond v. Oneok, Inc., 120 F.3d 205, 209 (10th Cir. 1997) (three-month delay between protected activity and adverse employment action insufficient); Hughes v. Derwinski, 967 F.2d 1168, 1174 (7th Cir. 1992) (four-month delay insufficient to establish causal connection). Moreover, even a short interval between the protected activity and the job termination does not overcome evidence that the decision to terminate had been made prior to the filing of the grievance.

## Conclusion

In response to defendant's motion for summary judgment, plaintiff has failed to come forward with evidence from which a reasonable jury could find that the Corps' decision to terminate his employment was motivated by an intent to discriminate or retaliate against him. Consequently, the motion for summary judgment is due to be and hereby is **GRANTED**.

It is so **ORDERED**.

**DONE** this the 28th day of February, 2000.

Charles R. Butler, Jr.

**CHIEF DISTRICT JUDGE**

**FINAL JUDGMENT** [*14]

Pursuant to separate order entered this date granting Defendant's motion for summary judgment, it is hereby **ORDERED, ADJUDGED and DECREED** that the claims of the plaintiff, Frank L. Kelly, against the defendant, Louis Caldera, Secretary of the Army, in the above-styled action be and hereby are **DISMISSED with prejudice.**

**DONE** this the 28th day of February, 2000.

Charles R. Butler, Jr.

**CHIEF DISTRICT JUDGE**

LEXSEE 2004 U.S. APP. LEXIS 3792

**THOMAS I. KOVOOR, Appellant v. SCHOOL DISTRICT OF PHILADELPHIA**

No. 03-1583

**UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT**

*93 Fed. Appx. 356; 2004 U.S. App. LEXIS 3792*

**February 9, 2004, Submitted Pursuant to Third Circuit Lar 34.1(a)
February 26, 2004, Filed**

**NOTICE:** [**1] RULES OF THE THIRD CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**PRIOR HISTORY:** On Appeal from the United States District Court for the Eastern District of Pennsylvania D.C. Civil Action No. 00-cv-05873 (Honorable Anita B. Brody).

*Kovoor v. Sch. Dist. of Phila., 211 F. Supp. 2d 614, 2002 U.S. Dist. LEXIS 12983 (E.D. Pa., 2002)*

**DISPOSITION:** Affirmed.

**LexisNexis(R) Headnotes**

**COUNSEL:** For THOMAS I. KOVOOR, Appellant: Answer Ahmad, Harrisburg, PA.

For SCHOOL DISTRICT OF PHILADELPHIA, Appellee: Andrew M. Rosen, School District of Philadelphia, Office of General Counsel, Philadelphia, PA.

**JUDGES:** Before: SCIRICA, Chief Judge, ROTH and McKEE, Circuit Judges.

**OPINIONBY:** SCIRICA

**OPINION:** [*356] OPINION OF THE COURT

SCIRICA, *Chief Judge.*

In this employment discrimination action, plaintiff Thomas Kovoor appeals a [*357] grant of partial summary judgment in favor of defendant School District of Philadelphia. He also requests a new trial alleging erroneous rulings by the district court at trial. We will affirm.

**I.**

Kovoor began working for the school district as an Accounting Clerk in January 1985. Later that year, he became a Financial Management Trainee. Kovoor alleges that during this time his supervisor, Herbert Schectman, harassed him on a daily basis, [**2] making disparaging comments and referring to Kovoor and African-American employees as "sons of slaves." Nonetheless, Kovoor was promoted to an Auditor I position in November 1986. Schectman, however, allegedly refused Kovoor a routine promotion to an Auditor II position in November 1987. In December 1987 Kovoor requested and received a transfer to the Pre-Audit section, where he worked under the supervision of Bonnie Rosen. He received a promotion from Auditor I to Auditor II in March 1988. In January 1989 Kovoor transferred to the Office of Categorical Finance working under the supervision of William Kozlowski. Six months later Kovoor returned to his former position of Auditor II under Rosen's supervision.

Kovoor applied for an Auditor III position in 1989 but allegedly was not permitted to take the required written and oral examinations because he had not completed the requisite number of accounting credits. He then applied for positions in the Transportation Department in 1990, 1991 and 1992. Kovoor rated second in the examination all three times, but in each case the school district awarded the position to the applicant who rated first. Kovoor again applied for a promotion in [**3] the transportation department in 1994 but was disqualified when he failed the written portion of the examination. Kozlowski allegedly called Kovoor "Swami" during the 1994 examination. Kovoor claims he never filed grievances for these promotion denials because he believed an objection would be futile.

In October 1995, the school district transferred Kovoor to the Categorical Finance Department under Kozlowski's supervision. Kovoor and Kozlowski played

cards regularly during their lunch breaks, and Kozlowski allegedly referred to Kovoor as "Swami" and "Gunga Din" n1 during the card games. On July 1, 1996, Kovoor was laid off because of budget constraints. In November 1996 the school district rehired Kovoor in November 1996 in the position of School Operations Officer, a $ 12,000 pay cut from his previous position. In December 1999, the school district hired two other people for Budget Analyst II and III positions, but did not consider Kovoor for the positions. When Kovoor asked Kozlowski why he was not considered, Kozlowski allegedly told him it was because his "degree is from India." Kovoor continues to work for the school district.

> n1 "Gunga Din" is apparently the name of an Indian servant in a movie based on a Rudyard Kipling novel.

[**4]

On February 29, 2000, Kovoor filed a discrimination charge with the EEOC and on November 17, 2000 brought suit in federal court. Kovoor alleges the school district subjected him to a hostile work environment and denied him several promotions because of his nationality in violation of the Civil Rights Act of 1964, *42 U.S.C. § 2000e et seq* ("Title VII") and *42 U.S.C. § 1981* (" *§ 1981*"). The District Court granted the school district's [*358] motion for summary judgment on Kovoor's hostile environment claim, but denied summary judgment on the failure to promote claim. A jury rendered a defense verdict finding the school district did not discriminate against Kovoor on the basis of his national origin.

Kovoor brings three claims on appeal: (1) the court erred in granting the school district's motion for partial summary judgment on the hostile work environment claim; (2) the court erred in failing to charge the jury with a mixed-motive instruction; and (3) the court erroneously limited Kovoor's evidence to post-1998 conduct.

**II.**

We have appellate jurisdiction under U.S.C. § 1291. Our review of the District Court's summary judgment [**5] award on the hostile work environment claim is plenary. *Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 305 (3d Cir. 1999)*. We review jury instructions for abuse of discretion unless the instruction misstates the law, when our review is plenary. *Walden v. Georgia-Pacific Corp., 126 F.3d 506, 513 (3d Cir. 1997)*. We review rulings to exclude evidence for abuse of discretion. *Walden, 126 F.3d at 517*.

**III.**

**A.**

Kovoor contends the District Court erred in granting summary judgment to the school district on his hostile work environment claim. To establish a hostile work environment claim in violation of Title VII, a plaintiff must prove that:

> (1) he or she suffered intentional discrimination because of national origin; (2) the discrimination was "pervasive and regular;" (3) he or she was adversely affected by the discrimination; (4) the discrimination would adversely affect a reasonable person of the same national origin; and (5) that respondeat superior liability applies.

*Andrews v. City of Philadelphia, 895 F.2d 1469, 1482 (3d Cir. 1990)*. Kovoor failed to satisfy the second prong, [**6] citing only one potentially discriminatory incident within the two-year statute of limitations period, n2 Kozlowski's alleged comment about an Indian degree.

> n2 Pennsylvania law applies a two year statute of limitations to personal injury claims, and federal courts generally use this limitations period from the relevant state law for claims under *§ 1981. Goodman v. Lukens Steel Co., 482 U.S. 656, 662, 96 L. Ed. 2d 572, 107 S. Ct. 2617 (1987); Burgh v. Borough Council of Montrose, 251 F.3d 465, 471 (3d Cir. 2001)*. A Title VII claim must be filed within 300 days of the alleged discrimination where there has been a cross-filing with a state agency under state law. *See 42 U.S.C. § 2000e-5(e)(1); Burgh, 251 F.3d at 472*.

Kovoor urges application of the continuing violation theory, which might permit consideration of events that occurred outside the statute of limitations period. *See West v. Philadelphia Elec. Co., 45 F.3d 744, 754 (3d Cir. 1995)*. [**7] To establish a claim under the continuing violation theory, a plaintiff must demonstrate: (1) at least one discriminatory act occurred within the filing period, and (2) the acts created a persistent, ongoing pattern. *West, 45 F.3d at 754-55*.

Kovoor's continuing violation claim fails because he did not demonstrate that the comment was a pattern of an ongoing pattern of behavior. There was a five-year time gap between the "Indian degree" comment and Kozlowski's previous alleged discriminatory comments.

No other event demonstrated racial animus. We will affirm summary judgment on the hostile work environment claim in favor of the school district.

[*359] **B.**

Kovoor contends he should have received a mixed motive jury instruction. The District Judge gave only a pretext charge. App. 1279-85. Unlike a pretext charge, a mixed motive charge shifts the burden of production and risk of nonpersuasion to the defendant. The defendant must then show that the adverse employment decision would have been made in the absence of retaliatory animus. *Walden, 126 F.3d at 512-13.* Strong "direct" evidence is required to show that "an illegitimate criterion was a substantial [**8] factor in the decision." *Price Waterhouse v. Hopkins, 490 U.S. 228, 276, 104 L. Ed. 2d 268, 109 S. Ct. 1775 (1989)* (O'Connor, J., concurring).

The District Judge explained at the charge conference that a mixed motive charge was inapplicable because there was no direct evidence linking discrimination with the failure to promote. App. 1279-85. We agree. The school district required all applicants seeking a promotion to a teaching position to hold a Bachelor's degree from a United States institution or an equivalent degree. The school district determined that Kovoor's degree from India was fifteen or sixteen credits short of an equivalent United States degree and for this reason refused to consider him for a promotion. Kovoor presents no evidence of retaliatory animus. Given this lack of evidence, the District Court properly refused to give a mixed motive jury instruction.

**C.**

Kovoor contends the District Court improperly limited the evidence he was allowed to present at trial to post-1998 conduct but allowed defendant to use pre-1998 evidence in its rebuttal. Kovoor's brief is devoid of any reference to the record to support this claim. n3 Furthermore, the District Court allowed [**9] Kovoor to present considerable pre-1998 evidence at trial. n4 This claim is meritless.

> n3 On January 8, 2004, Kovoor submitted an motion to amend his brief to include instances where the District Court allegedly refused to allow Kovoor's pre-1998 evidence. Notwithstanding, he points to nothing in the record to support this claim.

> n4 This includes testimony from Kovoor's supervisor Bonnie Rosen regarding the school district's failure to promote Kovoor in 1987; testimony by Kovoor regarding alleged discriminatory comments by Schectman in 1985-87 and Kozlowski in 1995-96, among other matters; and testimony of coworkers Levester Keitt, Mayer Krain and Tuyet Hoa Ost and supervisor Sheldon Jahss, all regarding events that took place before 1998.

**IV.**

For the foregoing reasons, we will affirm the judgment of the District Court.