LEXSEE

**WAYNE PEACE, Plaintiff, v. SHELLHORN & HILL, INC., Defendant.**

**C.A. No. 03-1007 (GMS)**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

**2005 U.S. Dist. LEXIS 2533**

**February 18, 2005, Decided**

**DISPOSITION:** Defendant's motion for summary judgment granted. Complaint dismissed.

**LexisNexis(R) Headnotes**

**COUNSEL:** [*1] For Wayne Peace, Plaintiff: John M. LaRosa, Law Office of John M. LaRosa, Wilmington, DE; Thomas S. Neuberger, The Neuberger Firm, P.A., Wilmington, DE.

For Shellhorn & Hill Inc, a Delaware corporation, Defendant: Sheldon N. Sandler, Young, Conaway, Stargatt & Taylor, Wilmington, DE.

For Shellhorn & Hill Inc, Counter Claimant: Sheldon N. Sandler, Young, Conaway, Stargatt & Taylor, Wilmington, DE.

For Wayne Peace, Counter Defendant: John M. LaRosa, Law Office of John M. LaRosa, Wilmington, DE; Thomas S. Neuberger, The Neuberger Firm, P.A., Wilmington, DE.

**JUDGES:** Gregory M. Sleet, UNITED STATES DISTRICT JUDGE.

**OPINIONBY:** Gregory Moneta Sleet

**OPINION:**

**MEMORANDUM**

**I. INTRODUCTION**

On November 4, 2003, Plaintiff Wayne Peace filed a complaint (D.I. 1) against Defendant Shellhorn & Hill, Inc. ("Shellhorn") alleging unlawful age discrimination in violation of the Age Discrimination in Employment Act ("ADEA"). 29 U.S.C. § 621 et seq. Presently before the court is Shellhorn's motion for summary judgment.

(D.I. 22.) For the following reasons, the court will grant Shellhorn's motion.

**II. JURISDICTION**

The court has subject matter jurisdiction [*2] pursuant to 28 U.S.C. § 1331 (1993).

**III. STANDARD OF REVIEW**

Summary judgment is appropriate when there are no genuine issues of material fact. See Fed. R. Civ. P 56(c) A fact is material if it might affect the outcome of the case, and an issue is genuine if the evidence is such that a reasonable factfinder could return a verdict in favor of the nonmovant. See In re Headquarters Dodge, Inc., 13 F.3d 674, 679 (3d Cir. 1993) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 91 L. Ed. 2d 202, 106 S Ct. 2505 (1986)). When deciding a motion for summary judgment, the court must evaluate the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. See Pacitti v. Macy's, 193 F.3d 766, 772 (3d Cir. 1999). The nonmoving party, however, must demonstrate the existence of a material fact supplying sufficient evidence - not mere allegations - for a reasonable jury to find for the nonmovant. See Olson v. GE Astrospace, 101 F.3d 947, 951 (3d Cir. 1996) (citation omitted). To raise a genuine issue of material [*3] fact, the nonmovant "need not match, item for item, each piece of evidence proffered by the movant but simply must exceed the 'mere scintilla' [of evidence] standard." Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., 998 F.2d 1224, 1230 (3d Cir. 1993) (citations omitted). The nonmovant's evidence, however, must be sufficient for a reasonable jury to find in favor of the party, given the applicable burden of proof. See Anderson, 477 U.S. at 249-50.

**IV. BACKGROUND**

For many years, Shellhorn & Hill has supplied heating oil, and has sold and serviced home heaters and air

conditioners to customers in Wilmington, Delaware and the surrounding area. In 1963, Wayne Peace began as a trainee in Shellhorn's service department. (Peace Dep. at 13:10-13.) With the exception of a brief period in the early 1970s, Peace was continuously employed by Shellhorn until February 2002. (Id. at 14:7-8, 22:8-23:20.) In 1984, Peace became a salesman at Shellhorn. (Id. at 23:4-6.) In the late 1980s or early 1990s, Peace was also an assistant service manager. (Id. at 26:1-7.) However, Peace went back to sales full time in 1997. (Id. at 29:23-30:18.) During [*4] his nearly 40 years at Shellhorn, Peace only received one written reprimand, and that was before he became a salesman in 1984. (Hill Dep. at 10:11-21.) In fact, as part of his 1993/1994 Annual Performance/Pay Review, Peace received a $ 5,000 bonus and a 5% pay increase. (D.I. 26 at B083.) In general, the evidence reflects that Peace was very competent at his job.

In spite of this, Peace did not always have good relationships with his co-workers. In 1999, Shellhorn added 46 year-old Tim Johnson to its sales force. (Johnson Dep. at 6:5-8.) n1 And in 2001, Shellhorn added 36 year-old Joe Grajek to its sales force. (Grajek Dep. at 7:19-21.) n2 Peace says that he and Johnson did not get along at all because Peace was frustrated by the fact that Shellhorn's president, Mike Hill, permitted Johnson to do his job improperly. (Peace Dep. at 41:14-21.) It was Peace's opinion that Johnson was consistently underpricing jobs. On one occasion, Peace asked Johnson how he had arrived at an estimate for a particular job. He replied that it was none of Peace's business, to which Peace responded by telling Johnson that he "was going to punch him in his nose." (Id. at 42:1-20.)

n1 Johnson's date of birth is August 23, 1952. (Johnson Dep. at 5:6-7.)

[*5]

n2 Grajek's date of birth is August 1, 1965. (Grajek Dep. at 4:20-21.)

The addition of Johnson to Shellhorn's sales force also required Peace to relinquish some of his sales territory. (Id. at 42:17-20.) Under the new arrangement, each salesman was assigned to particular zip codes. However, Peace had the first opportunity to choose the zip codes he wanted. (Id. at 43:4-16.) Unless a customer asked for either Peace or Johnson by name, Shellhorn's receptionist would route customer calls to the appropriate salesman based on the customer's zip code. (Id. at 43:21-44:11.) Sometimes a customer from a particular salesman's zip code would call when that salesman was out of the of-

fice. If the customer was not content to leave a voice mail, he or she was routed to whichever salesman was available at the time. That salesman would then pass the message on to the other salesman. (Grajek Dep. at 22:11-23:15.) Even in such cases, the commission went to the salesman who was assigned to that customer's zip code. (Hill Aff. P 12.)

On Friday, February 15, 2002 and Monday, February 18, 2002, events transpired that [*6] resulted in the end of Peace's employment with Shellhorn. However, the precise details of those events are in dispute. According to Peace, while he was out of the office on Friday, Johnson called to tell him that a call had come in from Peace's territory. Peace was upset and asked Johnson why he was getting Peace's calls. Johnson's response was that Hill had given him the call. Peace then went to the office and asked Hill why he was giving calls to Johnson. Hill said, "Because he was here." The same thing happened the following Monday. Once again, Peace went to the office to speak to Hill. (Peace Dep. at 44:23-47:1.) Peace says he confronted Hill and asked why Johnson was getting his calls. Hill allegedly answered by saying that Johnson "didn't sit on his ass like [Peace] did." (Id. at 58:2-5.) Peace contends Hill "wanted to get rid of me and he just pushed all the right buttons." (Id. at 45:18-19.) Peace says the conversation ended with Hill saying "Have [your wife] come and pick you up. It's time for you to retire." (Id. at 45:19-20.)

Hill, on the other hand, says Peace was furious on Friday and did not seem to accept his explanation as to why Johnson had been given the call. [*7] (Hill Aff. P 12.) After another call was transferred to Johnson on Monday, Hill says Peace was enraged and accused Johnson of "stealing [his] calls." (Id. P 13.) Hill says he suggested to Peace that he go home and calm down, but Peace declined. Apparently because Hill heard through the rumor mill that Peace had been discussing retirement, Hill asked Peace if he wanted to discuss the topic. Again Peace declined, and then proceeded to give Hill an ultimatum: either fire Johnson, or Peace would not work for the company any longer. Hill allegedly said he was not going to fire Johnson, so Peace should find a ride home. (Id. P 17.) Hill says he considered Peace's confrontations on Friday and Monday to be disrespectful and unprofessional. (Id. P 18.)

Although Hill insists he did not intend to terminate Peace (Hill Dep. at 18:4-6), it was Peace's impression that he was in fact terminated (see Peace Dep. at 23:18-20). Construing the facts in the light most favorable to Peace, the court will assume he was terminated. At that time, Peace was 57 years old. n3 After Peace left Shellhorn, Johnson and Grajek were the only two remaining salesmen. Between the two of them, they assumed Peace's former [*8] territory. (Grajek Dep. at 12:9-

13:19.) However, in March 2003 Grajek was terminated for having less than desirable "work ethics." (Grajek Dep. at 6:22-7:6, 25:12-21.) He was replaced by Tim Johnson's brother, Kelly Johnson. (Second Hill Aff. P 3.)

> n3 Peace's date of birth is May 7, 1944. (Peace Dep. at 2:8-9.)

Subsequent to his termination, Peace filed a Charge of Discrimination with the Delaware Department of Labor. (D.I. 26 at B077.) His charge was dismissed and he appealed to the Equal Employment Opportunity Commission. The EEOC issued a right-to-sue letter on August 8, 2003. (Id. P 4.) On November 4, 2003, Peace brought the present action alleging three counts of unlawful age discrimination in violation of the ADEA. (Id. PP 45-65.) Shellhorn filed this motion for summary judgment on September 10, 2004. (D.I. 22.)

## V. DISCUSSION

Allegations of age discrimination under the ADEA are analyzed under either *Price Waterhouse* burden-shifting framework (for so-called "direct evidence" cases), or the [*9] familiar *McDonnell Douglas* burden-shifting framework (for so-called "indirect evidence" cases). In this case, Peace has conceded that his is an indirect evidence case, and hence, should be analyzed under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973). (D.I. 46 at 2:25-3:2.) Under that framework, the plaintiff bears the initial burden of "establishing a prima facie case of unlawful discrimination." *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994) (quoting *McDonnell Douglas*, 411 U.S. at 802). This requires the plaintiff to produce evidence that (1) he was 40 years old or older at the time of his termination, (2) he was qualified for the position, n4 (3) he was terminated, and (4) he was replaced by a sufficiently younger person to create an inference of age discrimination. *Keller v. Orix Credit Alliance*, 130 F.3d 1101, 1108 (3d Cir. 1997). Once the plaintiff successfully establishes a prima facie case, the burden shifts to the defendant to proffer a nondiscriminatory reason for the plaintiff's termination. *Fuentes*, 32 F.3d at 763. The burden then shifts back to the plaintiff to "point to [*10] some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated reasons [*Fuentes* prong 1]; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action [*Fuentes* prong 2]." *Id.* at 764.

> n4 Shellhorn contends that the plaintiff must also show that he was performing his position to the expectations of his employer. However, the case it cites for this proposition describes the plaintiff's burden as requiring him to "produce evidence that is sufficient to convince a reasonable factfinder to find . . . that the plaintiff was qualified for the job." *Keller v. Orix Credit Alliance*, 130 F.3d 1101, 1108 (3d Cir. 1997). Thus, the court will disregard this aspect of Shellhorn's argument.

Under the first prong of *Fuentes*, the plaintiff "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions [*11] in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence." *Id.* at 765 (internal quotations omitted). However, "the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." *Id.* Alternatively, under the second prong of *Fuentes*, the plaintiff "must identify evidence in the summary judgment record that 'allows the fact finder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action.' *Fuentes*, 32 F.3d at 762. In other words, under this prong, [the plaintiff] must point to evidence that proves age discrimination in the same way that critical facts are generally proved - based solely on the natural probative force of the evidence." *Keller*, 130 F.3d at 1111. If the plaintiff is unable to carry his burden under either *Fuentes* prong, then summary judgment must be granted in favor of the defendant.

In this case, Peace [*12] has established a prima facie case: (1) he was 57 at the time he parted employment with Shellhorn; (2) Shellhorn concedes he was qualified for the position (D.I. 46 at 52:12-53:1); (3) he was terminated; and (4) he was replaced by Johnson and Grajek, who were both younger (49 and 36, respectively) and less experienced than Peace. n5 Although Shellhorn denies actually terminating Peace, its proffered reasons for the termination are (1) Peace's insubordinate, unprofessional, and disrespectful behavior during the Friday and Monday confrontations, and (2) the ultimatum. These are indeed legitimate, nondiscriminatory reasons. Thus, in order to survive summary judgment, Peace must present sufficient evidence under one of the two *Fuentes* prongs.

> n5 Shellhorn argues that Peace was not replaced, but rather that his duties were merely re-

distributed among the remaining salesmen. The record shows that Peace (involuntarily) gave up some sales territory in 1999, when Shellhorn made Johnson a salesman. (Peace Dep. at 42:17-20.) Grajek became Shellhorn's third salesman in 2001, and Peace's remaining territory was mostly given to Grajek when Peace was terminated in 2002. (Johnson Dep. at 21:18-23.) Viewing the facts in the light most favorable to Peace, this series of events could be evidence of an attempt by Shellhorn to "young up" its sales force. Although such evidence standing alone is not enough to pass the second prong of *Fuentes,* it is sufficient for the purpose of establishing Peace's prima facie case -- which is not meant to be a particularly onerous burden. *See Tex. Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 253, 67 L. Ed. 2d 207, 101 S. Ct. 1089 (1981).

[*13]

### A. *Fuentes* - Prong One

Under the first prong of *Fuentes,* Peace makes four arguments. First, Peace says Shellhorn's subsequent explanations of his termination to its employees and customers are inconsistent with its proffered reasons. In particular, Hill told Shellhorn's employees that Peace "had left the company." (Johnson Dep. at 25:16.) Someone at Shellhorn also told one customer that Peace had retired (Spadden Decl. P 6), and someone told another customer that Peace was no longer with the company (Sheesley Decl. P 11). These statements, although possibly inconsistent, certainly do not render Shellhorn's proffered reasons unworthy of credence. Shellhorn was under no obligation to tell any of its employees or customers the reasons for or terms of Peace's departure. In fact, Shellhorn might unnecessarily expose itself to liability if it freely told employees and customers the (proffered) reasons for Peace's termination. So the fact that Shellhorn gave a benign and concise -- albeit slightly inaccurate -- explanation of Peace's departure to uninvolved persons cannot be used against it in this context.

Second, Peace points to Hill's deposition testimony, in which he [*14] is quoted as saying Kelly Johnson replaced Peace in June 2003. (Hill Dep. at 19:5-9.) Peace argues it is implausible to believe Kelly Johnson was his replacement because Peace was terminated in early 2002, which would have left a gap in the sales force for over a year. However, Hill subsequently clarified his deposition testimony through an affidavit, in which he says he intended to say "Kelly Johnson took over the territory that Wayne Peace had handled when he was with the company," but "when Wayne Peace left the company, his territory was divided among the two remaining salesmen, Johnson and Joe Grajek." (Second Hill Aff. P 3.) Given

this unrebutted explanation coupled with the fact that Kelly Johnson replaced Grajek, the court does not find any implausibilities in the time line. Nevertheless, Peace insists that there are other inconsistencies. For example, he contends that Kelly Johnson was in sales when Peace began working in sales. The court assumes Peace is arguing that Kelly Johnson could not have been a replacement for Peace if he was already in sales with him. Again, there is no real inconsistency here because Shellhorn admits that Kelly Johnson worked as a salesman alongside [*15] Peace for a few months in 1997. (Second Hill Aff. PP 1-2; see also Kelly Johnson Aff. P 4.) It was not until Grajek was terminated in 2003 that Kelly Johnson was re-hired as a salesman and assumed Peace's old territory. (Second Hill Aff. P 3; Kelly Johnson Aff. P 7.) Peace also argues that Hill's statement that Peace's sales territory was split between Tim Johnson and Grajek is inconsistent with the testimony of both salesmen. Tim Johnson and Grajek testified that Grajek assumed essentially all of Peace's territory. (Johnson Dep. at 21:12-23; Grajek Dep. at 12:9-13.) However, Grajek's testimony also reveals that he exchanged some of Peace's former territories for some of Tim Johnson's territories. (Grajek Dep. at 12:15-13:24.) In fact, this is consistent with Hill's testimony:

> Q Do you recall you the sales territory was split? Was it equally divided between Grajek and [Tim] Johnson?
>
> A My recollection was that I asked the two of them to work it out between them and give me a new list of zip codes, which is what took place.

(Hill Dep. at 19:20-24.) Essentially, in order to find inconsistency Peace implicitly urges the court to strictly construe Hill's use of the [*16] word "split" to mean "divided in half." Even if it was reasonable to do so (which it is not), Peace misses the point of the prong-one *Fuentes* inquiry. Peace's arguments about who replaced him and how his territory was divided do not show that Shellhorn has strayed from its proffered reasons: (1) Peace was insubordinate, unprofessional, and disrespectful, and (2) the ultimatum. Thus, the court does not find Peace's second argument persuasive.

Peace's third argument is also unpersuasive. At the outset, he contends Hill's testimony regarding the ultimatum is incoherent:

> Q Why did Mr. Peace's employment end on [February 18, 2002]?

A Mr. Peace suggested a contingency for his continued employment and I didn't accept it.

Q What do you mean or what did he mean by contingency?

A Mr. Peace said he would not continue to work for Shellhorn & Hill if Tim Johnson worked for the company.

Q And how did you respond to that?

A I said, "I'm not firing Tim, so you'd better find a ride home."

(Hill Dep. at 18:10-19.) The court fails to grasp exactly what is incoherent about this testimony. Even if Hill's testimony is not incoherent, Peace contends it is inconsistent [*17] with Grajek's statement that "all [he] really heard was Mike [Hill] telling Wayne [Peace] to go home." (Grajek Dep. at 14:21-22.) Once again, the court does not understand how this is inconsistent with Hill's testimony. Nevertheless, Peace further argues that Hill's testimony is contradicted by Peace's own testimony in which he denies having presented Hill with an ultimatum (Peace Dep. at 49:2-4.) However, in *Pamintuan v. Nanticoke Mem'l Hosp.*, the Third Circuit held that a mere "contrary statement" by the plaintiff is insufficient to create a genuine issue of material fact under the first prong of *Fuentes*. 192 F.3d 378, 387 (3d Cir. 1999). Peace's mere denial that he gave Hill an ultimatum is similarly insufficient to withstand summary disposition.

Finally, Peace takes issue with Hill's claim that he "merely asked Peace 'if [the two of them] should discuss retirement [for Plaintiff].'" (D.I. 45.) Peace argues that this "is weak because Plaintiff previously never approached Hill about retirement." (Id.) Even if true, it would be unreasonable to deem Shellhorn's proffered reasons unworthy of credence based on this alone.

In sum, none of Peace's arguments, [*18] viewed individually or collectively, persuade the court that a genuine issue of material fact is present under the first prong of *Fuentes*. Thus, the only avenue remaining available to Peace is prong two.

**B. *Fuentes* -- Prong Two**

Under the second prong of *Fuentes,* Peace argues that the natural probative force of the record evidence is sufficient to allow a reasonable factfinder to conclude that discrimination was more likely than not a motivating or determinative cause of his termination. First is the set

of statements by Hill, which Peace contends is direct evidence of age bias. At some point during the Monday confrontation, Hill allegedly "made a comment that Tim Johnson didn't sit on his ass like [Peace] did." (Peace Dep. at 58:4-5.) Peace argues that this comment is evidence of bias because Johnson is younger than Peace. The court disagrees. The most it would be reasonable to infer from this comment standing alone is that Hill thought Peace was lazy. Peace's next assertion is that during the same conversation Hill said, "Have [your wife] come and pick you up. It's time for you to retire." (Peace Dep. at 45:19-20.) Also, according to Peace, several years prior [*19] Hill commented that "an employee who has been with the Company over ten years is a waste or a liability." n6 Taken in combination, these statements might support Peace's contention. It could be argued that the "ten years" comment demonstrates Hill's generally negative attitude toward older workers, n7 and that the "time for you to retire" comment supplies a causal link between Hill's attitude and Peace's termination. However, in order to accept this argument, a factfinder must infer, by a preponderance of the evidence, that the "ten years" comment is in fact a manifestation of Hill's attitude toward older workers, and that the "time for you to retire" comment does in fact supply the necessary causal link. In other words, because Hill did not explicitly say "I am firing you because you are old," the factfinder must infer that his comments amounted to such a statement in order to accept Peace's argument. Such an inference would be reasonable only if it is supported by other evidence in the record. n8

n6 The timing of this statement is unclear from the record. The declaration of Mark Smith, a former Shellhorn employee, does not specify the date he allegedly heard Hill make the comment. Peace also claims to have heard a similar comment from Hill "when Judy Daley [sic] left the company" (Peace Dep. at 64:5-15), which would have been in April 1999 (Dailey Aff. P 4). Yet counsel for Peace stated that he believes the comment was made around ten years prior. (D.I. 46 at 34:18.) In any case, it was at least several years before Peace was terminated.

[*20]

n7 In opposition to this proposition, Shellhorn cites to *EEOC. v. Clay Printing Co.*, 955 F.2d 936 (4th Cir. 1992). In that case, the Fourth Circuit was confronted with an employer's statement that "if employees had been there 10 years or more, they needed to move on." *Id.* at 942. The court rejected the plaintiff's contention that such a

statement was evidence of age bias because it "applies equally to employees under age 40 as well as employees over age 40." *Id* This court respectfully disagrees. It certainly might be reasonable to conclude that the employer was merely talking about length of service. However, that does not mean it would be unreasonable, in light of other evidence, to conclude that the employer was talking about age. Therefore, the court finds Shellhorn's reliance on *Clay Printing* to be misplaced.

n8 The court does *not* hold that a plaintiff cannot prevail absent explicitly discriminatory statements by the employer. Rather, the court merely holds that when the plaintiff introduces only *arguably* discriminatory statements and seeks to equate them with *explicitly* discriminatory statements, an inferential leap is required which would be unreasonable in the absence of other record evidence.

[*21]

Peace's strongest evidence arises from the fact that he was replaced by two younger workers.n9 In 1999, 46 year-old Johnson was transferred into sales. (Johnson Dep. at 5:6-7; 6:5-8.) As a result, Peace was forced to give up some of his sales territory. (Peace Dep. at 42:17-20.) Then in 2001, 36 year-old Grajek was brought into sales. (Grajek Dep. at 4:20-21; 7:13-21.) Therefore, Shellhorn's termination of the 57 year-old Peace shortly thereafter, might also support his contention. However, whenever an employee of Peace's age (57) is let go, it seems reasonable to presume the chances are substantial that he will be replaced by someone younger. So while his replacement is sufficient to establish a prima facie case, absent other evidence, this fact alone will not support an inference of discrimination.

n9 Peace breaks this into two pieces: (1) "Hill's youth movement to bring younger sales people into the sales department;" and (2) Hill's "usurpation of Plaintiff's sales territory." (D.I. 25 at 26.) Both ideas are encapsulated by re-framing the issue as Peace's replacement by two younger workers. Peace also includes the 1998 termination of 41 year-old salesman Mark Smith within the "youth movement." (Id. at 6.) However, Johnson was transferred into sales in 1999 at the age of 46. (Johnson Dep. at 5:6-7; 6:5-8.) Therefore, the evidence does not support Peace's contention that Smith was terminated as part of a "youth movement."

[*22]

In spite of Peace's assertions to the contrary, the record simply does not contain such evidence. Peace points to several older workers who Hill "discharged, laid off, or harassed and forced to retire." (D.I. 25 at 26.) To test these allegations, the court extracted as much of an age profile of Shellhorn's employees as the record permits. The picture this profile paints is not of a company that discriminates against older workers. For example, the court found employees terminated n10 from Shellhorn with the following ages: 23, 27, 31, 36, 37, 38, 30s, 40, 41, 45, 40s, 50s, 55, 57, 60, 60s. n11 (Hill Aff. P 19; Second Hill Aff. P 4(b); Peace Dep. at 61:5-15, 68:21-69:1, 71:12-72:6, 74:16-20, 75:7-14, 76:13-77:14, 83:10-14; Stigler Decl. P 6; Smith Decl. P 7; Grajek Dep. at 26:3-4.) The court also found four employees hired by Shellhorn with the following ages: 52, 58, 50s, 50s. (Hill Aff. PP 20, 21; Peace Dep. at 74:2-11, 74:21-75:5.) Shellhorn employs seventeen long-term employees with the following ages: 77, 52, 62, 45, 56, 52, 63, 53, 43, 44, 59, 59, 55, 53, 40, 53, 58. (Hill Aff. P 22.) Finally, as of June 2002, Shellhorn had the following age distribution among its employers: [*23]

|              |
|--------------|
| 70s: 1 employee; |
| 60s: 2 employees; |
| 50s: 19 employees; |
| 40s: 15 employees; |
| 30s: 12 employees; and |
| 20s: 10 employees. |

(D.I. 24 at A 106.) Therefore, Peace's assertion that Shellhorn engages in a pattern or practice of discrimination is belied by the record, and thus, does not support a reasonable inference of discrimination.

n10 Shellhorn disputes whether several of these employees were actually terminated. For the purposes of this motion, the court assumes they were in fact terminated.

n11 For the sake of their privacy, the court declines to recount the names of these ex-employees in its opinion. The age at termination of certain ex-employees is unclear from the record. In those case, the best evidence indicates that the employee was in a certain age range, such as thirties (30s).

The same is true of his remaining arguments under prong two. In particular, Peace points to Shellhorn's explanation of his departure to its employees and custom-

ers, and to the lack of criticism he received in [*24] the performance of his job. The court has already discussed and disposed of the first of these issues. As to the lack of criticism, the fact that he performed his job competently does little to support an inference of discrimination. Certainly, the court can see the relevance of this evidence (perhaps more appropriately in the context of the first prong of *Fuentes*) if it is coupled with other evidence. However, the only other pieces of evidence with any potentially probative value are Hill's "ten years" and "time for you to retire" comments, and Peace's replacement by younger salesmen. Taken together, this evidence is greatly overshadowed by Shellhorn's employee profile. Thus, given the fact that Peace has adduced a mere scintilla of evidence, he has failed to carry his burden under prong two of *Fuentes*.

## VI. CONCLUSION

Because Peace has failed to carry his burden under either prong of *Fuentes,* the court is obliged to grant the Shellhorn's motion for summary judgment.

Dated: February 18, 2005

Gregory M. Sleet

UNITED STATES DISTRICT JUDGE

**ORDER**

IT IS HEREBY ORDERED THAT:

1. The defendant's motion for summary judgment be GRANTED; and

2. [*25] The plaintiff's complaint be DISMISSED with prejudice.

Dated: February 18, 2005

Gregory M. Sleet

UNITED STATES DISTRICT JUDGE

LEXSEE

**MAUREEN RICHARDS, Plaintiff, v. THE CITY OF WILMINGTON, Defendant.**

**Civ. No. 03-106-SLR**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

**2004 U.S. Dist. LEXIS 4987**

**March 24, 2004, Decided**

**DISPOSITION:** [*1] Defendant's motion for summary judgment regarding plaintiff's sexual harassment claim denied. Defendant's motion for summary judgment regarding plaintiff's retaliation claim granted.

**LexisNexis(R) Headnotes**

**COUNSEL:** Tiffany Quell Friedman, Esquire, Wilmington, Delaware. Counsel for Plaintiff.

Rosamaria Tassone, Esquire, Wilmington, Delaware. Counsel for Defendant.

**JUDGES:** Sue L. Robinson, United States District Judge.

**OPINIONBY:** Sue L. Robinson

**OPINION:**

**MEMORANDUM OPINION**

Wilmington, Delaware

**ROBINSON, Chief Judge**

**I. INTRODUCTION**

Plaintiff Maureen Richards filed this action on January 22, 2003 against defendants DaRon Mearlon ("Mearlon") and the City of Wilmington (the "City"). (D.I. 1) Plaintiff alleges sexual harassment and retaliation pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII"), and 19 Del. C. § 711. n1 On April 21, 2003, a stipulation of dismissal was filed dismissing Mearlon with prejudice. (D.I. 10) Currently before the court is the City's motion for summary judgment. (D.I. 39) The court has jurisdiction over plaintiff's claims pursuant to 28 U.S.C. § 1331. For the [*2] following reasons, defendant's motion is granted in part and denied in part.

n1 Plaintiff concedes in her answering brief to the instant motion that her claim for retaliation pursuant to 19 Del. C. § 711, her state law claim for intentional infliction of emotional distress, and her claim for punitive damages should be dismissed.

**II. BACKGROUND**

Plaintiff began working as an account clerk in the Finance Department for the City in 1997. (D.I. 1) Her daily duties included preparing the bank deposits and assisting customers with their inquiries. (D.I. 42 at A-348) In 1998, Mearlon also began working in the Finance Department for the City. (Id. at A-347) Plaintiff and Mearlon worked together on the first floor of the City Building.

Plaintiff claims that Mearlon started to sexually harass her after meeting her on his first day. (D.I. 42 at A-350) She alleges that Mearlon continued this harassment for the next three years. Throughout this time period, plaintiff occasionally asked her co-workers or friends [*3] to tell Mearlon to stop bothering her. After receiving these requests, Mearlon initially left plaintiff alone, but eventually resumed his prior behavior. (Id. at A-353)

In July 1999, plaintiff complained about Mearlon to her supervisor, Shayne Williams ("Williams"). Plaintiff said that Mearlon stared at her, expressed a desire to touch her private parts, and called her constantly at her desk. (D.I. 41 at A-354) Plaintiff believed that her conversation with Williams constituted a formal notice of the sexual harassment because Williams was a supervisor. (Id.) Williams spoke to Mearlon about his conduct. After this discussion, he stopped engaging in such behavior with respect to plaintiff. However, he resumed his actions after a few weeks. (Id.)

In December 1999, plaintiff again complained of Mearlon's conduct to the former Director of Personnel, Mary Dees ("Dees"). n2 (Id.) Plaintiff told Dees that Mearlon said that he would not leave her alone and that he made sexual comments to her. She also explained that Mearlon said that she reminded him of his ex-wife. (Id.) In response, Dees informed plaintiff that she would speak to Mearlon. (Id. at A-356) Pursuant to [*4] this second discussion about his conduct, Mearlon stopped bothering plaintiff for a short period of time. Thereafter, he resumed his prior behavior. (Id. at A-358)

n2 Ironically, Dees is Mearlon's sister. (Id. at A-355)

On July 20, 2001, plaintiff filed a written complaint about Mearlon with her manager, Terry Toliver ("Toliver"). (D.I. 42 at A-232-236) In her complaint, plaintiff alleged that Mearlon repeatedly said that she looked liked his ex-wife and that "faith [sic] had brought them together" because both she and his ex-wife were from the islands. (Id.) Plaintiff also claimed that Mearlon "talk[ed] dirty" to her and told her that he was never going to leave her alone. (Id.) Additionally, plaintiff claimed that Mearlon professed his love for her and told her that he was going to take her to Texas where she would never get away from him. (Id.) Apart from his verbal comments, plaintiff explained that Mearlon stared at her while she worked and called her early in the mornings to ask [*5] her what she was wearing and late at night to hear her voice before going to sleep. (Id.) Plaintiff also documented that Mearlon had given her a letter enumerating the reasons why he believed that she loved him and the reasons why he believed she did not love him. (D.I. 41 at A-237) Because plaintiff stopped answering the phone when Mearlon called, she asserted that he called her sister to inquire about her whereabouts. (D.I. 41 at A-237) She further asserted that Mearlon drove to her house on one occasion and waited outside for her to emerge. (D.I. 41 at A-232 to 236) When she did, she immediately got into her car and departed. (Id.) She maintained that Mearlon followed her until she was able to lose him on the road. (Id.) Toliver told plaintiff that she should file a complaint with the police department regarding Mearlon's conduct outside of the workplace. n3 (Id. at A-225, A-230)

n3 Plaintiff filed a complaint with the police on September 21, 2001. (Id. at A-227-A-231) Mearlon was subsequently arrested and charged with stalking and sexual harassment. (Id.) On October 10, 2001, the police issued a "no-contact" order against Mearlon due to criminal charges

pending against him. (D.I. 41 at A-231) The order mandated that Mearlon have no contact, direct or indirect, with plaintiff.

[*6]

In response to plaintiff's complaint, Elinza Cain ("Cain"), the Employee Relations Advisor for the City, investigated Mearlon's conduct within the workplace. (Id. at A-288) Cain substantiated plaintiff's complaint and concluded that Mearlon's actions were offensive. (Id. at A-293) Cain recommended that plaintiff and Mearlon discontinue working in the same area. Additionally, the City issued a written citation to Mearlon and ordered him to attend training about appropriate interaction between friends/co-workers on and off the job. (Id. at A-217)

Subsequent to this investigation, plaintiff asked to be reassigned to a position away from Mearlon. (D.I. 46 at B-90) The City informed plaintiff that only one such opening was available and that it was for a position lower than the one she currently held. (Id.) The City also informed plaintiff that her salary would remain the same in the lower level position, but that her pension benefits would be negatively impacted. (Id.) Plaintiff chose not to accept the opening.

On September 21, 2001, plaintiff began a medical leave of absence due to her problems with Mearlon. She returned to her position in the Finance Department [*7] on April 22, 2002. (D.I. 41 at A-300) At that time, she was informed that Mearlon had been transferred from the Finance Department to a vacant position in the Department of Real Estate and Housing. (Id. at A-221) On April 26, 2002, Mearlon was transferred back into the Finance Department. He was located, however, in a different building from where plaintiff worked. (Id. at A-222)

Following her medical leave, plaintiff alleges that her co-workers harassed her in retaliation for filing charges against Mearlon. (Id. at A-300) She filed a complaint with Monica Gonzales-Gillespie ("Gillespie"), Director of Personnel, as a result of this treatment. (D.I. 41 at A-304) In her complaint, plaintiff asserted that her co-workers excluded her professionally and socially during the workday. (Id.) She likewise claimed that they often discussed Mearlon in her presence, even asking her directly why she chose to file charges against him. (Id.) Additionally, plaintiff avers that she frequently found business cards of mental health professionals on her desk. (D.I. 1) Pursuant to her complaint about her co-workers, the City distributed a copy of the sexual harassment policy to all employees [*8] in the Finance Department at a quarterly staff meeting and reminded employees that no repercussions should occur if harassment is reported. (D.I. 41 at 305-A-306). Since this meeting,

plaintiff made no additional complaints about her co-workers.

## III. STANDARD OF REVIEW

A court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact exists. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 n.10, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986). "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." Horowitz v. Fed. Kemper Life Assurance Co., 57 F.3d 300, 302 n.1 (3d Cir. 1995) (internal citations [*9] omitted). If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e)). The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." Pa. Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995). The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, then the moving party is entitled to judgment as a matter of law. See Celotex Corp. v. Catrett, 477 U.S. 317, 322, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986).

## IV. DISCUSSION [*10]

### A. Sexual Harassment Claim Based on A Hostile Work Environment

Plaintiff alleges that she was subject to sexual harassment in violation of Title VII of the Civil Rights Act of 1964. The sexual harassment section of Title VII provides in pertinent part that it is unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C.A. § 2000e-2(a)(1) (2004). A plaintiff who claims that she has been sexually harassed has a cause of action under Title VII if the unwelcome sexual conduct was either a *quid pro quo* arrangement or if the harassment was so pervasive that it had the effect of creating an intimidating, hostile, or offensive work environment. See Meritor Sav. Bank v. Vinson, 477 U.S. 57, 66, 91 L. Ed. 2d 49, 106 S. Ct. 2399 (1986); see also Kunin v. Sears Roebuck and Co., 175 F.3d 289, 293 (3d Cir. 1999) (stating that it is well established that a plaintiff can prove a violation of Title VII by [*11] establishing that sexual harassment created a hostile or abusive work environment).

To qualify under the hostile work environment category, the conduct in question must be severe or pervasive enough to create both an "objectively hostile or abusive work environment - an environment that a reasonable person would find hostile," and an environment that the victim-employee subjectively perceives as abusive or hostile. See Harris v. Forklift Sys., Inc., 510 U.S. 17, 21-22, 126 L. Ed. 2d 295, 114 S. Ct. 367 (1993); see also Faragher v. City of Boca Raton, 524 U.S. 775, 783, 141 L. Ed. 2d 662, 118 S. Ct. 2275 (1998); Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 752, 141 L. Ed. 2d 633, 118 S. Ct. 2257 (1998). In other words, a plaintiff must prove five elements to fall within the purview of Title VII due to a hostile work environment: (1) she suffered intentional discrimination because of her sex; (2) the discrimination was pervasive and regular; (3) she was detrimentally affected by the discrimination; (4) the discrimination would detrimentally affect a reasonable person of the same sex in the same position; and (5) respondent superior liability exists. See Andrews v. City of Philadelphia, 895 F.2d 1469, 1482 (3d Cir. 1990); [*12] see also Weston v. Pennsylvania, 251 F.3d 420, 426 (3d Cir. 2001). The court must examine the totality of the circumstances in deciding a hostile work environment claim, including: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; whether it unreasonably interferes with an employee's work performance." Harris, 510 U.S. at 23.

With regard to employer liability for sexual harassment, the Supreme Court has distinguished the principles applicable to harassment by co-workers versus the principles applicable to harassment by supervisors. See Faragher, 524 U.S. at 803. Specifically, the Supreme Court has noted that in the instance of co-worker sexual harassment, the standard for employer liability is negligence. See id. at 799. The Supreme Court has defined negligence with respect to sexual harassment as whether the employer knew or should have known about the conduct and failed to stop it. See Ellerth, 524 U.S. at 759 (1998); see also 29 C.F.R. § 1604.11(d) (2004).

Viewing the underlying [*13] facts at bar and all reasonable inferences therefrom in the light most favor-

able to plaintiff, the court finds that genuine issues of material fact exist as to the five elements requisite to a claim for sexual harassment based on a hostile work environment for a limited time period. Prior to July 1999, when plaintiff first complained about Mearlon to her supervisor, plaintiff points to no evidence of sexual harassment so "severe or pervasive" that the City necessarily knew or should have known about Mearlon's conduct. Absent such actual or constructive notice, the City cannot be held liable for Mearlon's behavior from his start date through July 1999. Additionally, after plaintiff returned from her medical leave of absence on September 21, 2001, plaintiff fails to bring forth any concrete evidence to suggest that Mearlon contacted or bothered her in any way. From July 1999 to September 21, 2001, however, the court finds that the present record is susceptible to differing interpretations regarding the existence of a hostile work environment. The court concludes that there are genuine issues of material fact as to the sufficiency of plaintiff's notice to the City and its response thereto, [*14] as well as to the frequency of Mearlon's conduct, its severity, whether it was physically threatening or humiliating, and whether it unreasonably interfered with plaintiff's work performance. Mere "off-hand comments and isolated incidents" are not sufficient to set forth a claim for a hostile work environment. See Faragher, 524 U.S. at 786. Consequently, the court denies the City's motion for summary judgment as to plaintiff's hostile work environment claim for the twenty-seven months defined herein.

**B. Retaliation Claim**

Plaintiff alleges that she was subject to retaliation in violation of Title VII of the Civil Rights Act of 1964. The anti-retaliation section of Title VII provides in pertinent part:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment ... because she has opposed any practice made an unlawful employment practice by this subchapter, or because she has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a) (as amended 1991). [*15] To establish a prima facie case of retaliation under Title VII, a plaintiff must first prove: (1) that she engaged in a protected activity; (2) that her employer took adverse action against her either after, or contemporaneously with, her

protected activity; and (3) that there is a causal connection between the protected activity and the employer's adverse action. Woodson v. Scott Paper Co., 109 F.3d 913, 920 (3d Cir. 1997). "To show the requisite causal link, the plaintiff must present evidence sufficient to raise the inference that her protected activity was the likely reason for the adverse action." Ferguson v. E.I. duPont de Nemours & Co., 560 F. Supp 1172, 1200 (D. Del. 1983). Once the plaintiff succeeds in establishing her prima facie case, the burden of production shifts to the defendant to "articulate some legitimate, nondiscriminatory reason" for its actions. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973). If the defendant is able to successfully articulate such a reason, then the burden shifts back to the plaintiff to show that the defendant's non-discriminatory reason for the termination was [*16] pretextual, and that the real reason for the termination was unlawful discrimination. Id. at 802-804. The plaintiff's "ultimate burden in a retaliation case is to convince the factfinder that retaliatory intent had a 'determinative effect' on the employer's decision." Shaner v. Synthes (USA), 204 F.3d 494, 501 (3d Cir. 2000).

In the case at bar, the court need not engage in an extensive burden-shifting analysis because plaintiff has not presented facts sufficient to state a prima facie retaliation claim. The court finds that plaintiff has failed to meet the second element of the prima facie case of retaliation, namely, that the City took adverse employment action against plaintiff. The Third Circuit has defined an "adverse employment action" as an action that "alters the employee's compensation, terms, conditions, or privileges of employment." See Calloway v. E.I. duPont de Nemours & Co., 2000 U.S. Dist. LEXIS 12642, 2000 WL 1251909 *8 (D. Del. 2000). Plaintiff was not demoted or in any way reprimanded as a result of her multiple complaints against Mearlon. Likewise, she returned to the same position that she held when the alleged misconduct occurred after [*17] she returned from her medical leave of absence. The City did not alter her compensation, terms, conditions or privileges of employment in any way at any time during the course of her employment. Rather, the City investigated plaintiff's complaint, substantiated her allegations, and took corrective actions against Mearlon. Additionally, after learning about her co-workers' actions following her leave, the City admonished the department during a quarterly staff meeting. Since plaintiff cannot establish the second element requisite to a retaliation claim, the court need not consider the remaining two elements. The court, therefore, concludes that plaintiff fails to state a cause of action for retaliation under Title VII and grants the City's motion for summary judgment as to this claim.

**V. CONCLUSION**

2004 U.S. Dist. LEXIS 4987, *

For the reasons stated, the City's motion for summary judgment is denied as to plaintiff's sexual harassment claim for the period of time from July 1999 through September 21, 2001 and granted as to plaintiff's retaliation claim. An appropriate order shall issue.

## ORDER

At Wilmington, this 24th day of March, 2004, consistent with the memorandum opinion issued this same day; [*18]

IT IS ORDERED:

1. Defendant's motion for summary judgment (D.I. 39) regarding plaintiff's sexual harassment claim is denied.

2. Defendant's motion for summary judgment (D.I. 39) regarding plaintiff's retaliation claim is granted.

Sue L. Robinson

United States District Judge

LEXSEE 2004 U.S. DIST. LEXIS 9087

FAROUK SOLIMAN, Plaintiff, -against- DEUTSCHE BANK AG, Defendant.

03 Civ. 104 (CBM)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
NEW YORK

*2004 U.S. Dist. LEXIS 9087*

**May 19, 2004, Decided**
**May 20, 2004, Filed**

**DISPOSITION:** [*1] Defendant's motion for summary judgment granted and plaintiff's claims dismissed in their entirety.

**LexisNexis(R) Headnotes**

**COUNSEL:** For Plaintiff: Nicole Feder, Benedict P. Morelli & Associates, New York, NY.

For Defendant: Timothy Madden, O'Melveny & Myers, New York, NY.

**JUDGES:** CONSTANCE BAKER MOTLEY, United States District Judge.

**OPINIONBY:** CONSTANCE BAKER MOTLEY

**OPINION: MOTLEY, J.**

This case arises out of plaintiff Farouk Soliman's employment with defendant Deutsche Bank. Plaintiff charges defendant with race discrimination, sexual harassment, and retaliation in violation of *New York City Human Rights Law, § 8-107(7), 42 U.S.C. § 2000e et seq.*, ("Title VII"), and *New York State Human Rights Law, § 290 et seq.* Defendant moves for summary judgment dismissing all of plaintiff's claims. For the reasons stated below, defendant's motion is **GRANTED.**

**BACKGROUND**

Plaintiff Farouk Soliman, an Egyptian American male, was hired by defendant Deutsche Bank (hereinafter "the Bank") in August 1995. Soliman Dep. at 14, 549-50. In early 1999, Olaf Pletzinger hired plaintiff as a Vice President and Senior Project Manager in the Bank's In-house Consulting Group ("IHC"), a project-oriented [*2] group providing consulting services. Def.'s Rule 56.1 Stmt, P1; Soliman Dep. at 15-16, 21. Around the same time, Pletzinger also hired Marc McKenzie as the other Senior Project Manager in IHC. Def.'s Rule 56.1 Stmt, P2. Pletzinger, Soliman, and McKenzie constituted the senior management of IHC, with Soliman and McKenzie reporting directly to Pletzinger. Soliman Dep. at 24; McKenzie Dep. at 9. In turn, junior consultants reported to Soliman and McKenzie.

**A. Sexual Harassment**

Plaintiff avers that Pletzinger, an allegedly homosexual male, began to sexually harass him from the first day of his employment with IHC in 1999. Complaint at P15. At the same time, he and Pletzinger "enjoyed a good working relationship from both a personal and professional perspective" until late in 2000 when either he learned of Pletzinger's purported sexuality or he declined to accompany Pletzinger to a "gay bar." Soliman Dep. at 517-518. At that time, he realized "in hindsight" that Pletzinger's acts were sexual advances. Id. at 130, 396.

**1. Plaintiff's evidence of harassment**

Plaintiff points to the following to substantiate his claim of harassment:

*Social Interactions.* Plaintiff accompanied [*3] Pletzinger and other Bank employees to a "gay bar" at Pletzinger's suggestion on two occasions. Id. at 70-74. Pletzinger invited him to a bar to celebrate his birthday in October of 2000, suggesting the same "gay bar" as an option, but Soliman declined. Id. at 77, 396, 518. Pletzinger asked Soliman to go out with him after happy hours, from which Soliman inferred that Pletzinger was inviting him to the same "gay bar," although Pletzinger never explicitly said so. Id. at 59-60. Pletzinger invited Soliman to the movies 10-20 times, to his home, or invited himself to Soliman's home. Id. at 109-10, 144-45. Soliman interpreted these invitation as sexual advances, even though Pletzinger never said or did anything to indicate that anything sexual would take place. Id. at 111.

Pletzinger invited himself to social events such as ski trips and barbecues at which Soliman was present without Pletzinger having invited him, although Soliman also acknowledges that other Bank employees could have invited Pletzinger. Id. at 63-64, 160-64. Soliman claims that on a ski trip in Vermont in January of 2000, Pletzinger assigned sleeping accommodations such that he and plaintiff would [*4] sleep in the same room, although the room had two beds and everyone else on the trip shared a room with one other person in the same fashion. Id. at 191-94. Moreover, he states that Pletzinger invited himself on Soliman's vacations, suggesting that he and Soliman meet up or stay in the same hotel in separate rooms when they were both going to be in the same European city. Id. at 132.

*Touching & Physical Proximity.* According to plaintiff, Pletzinger moved his chair to sit close to Soliman in Soliman's office, leaving approximately six inches between them, and often would not move away when Soliman asked him to. Id. at 97-100. Soliman further claims that at IHC meetings, in the context of talking about team-building, Pletzinger said that they had a "close relationship" while he touched plaintiff's shoulders, thereby implying to his co-workers that they were "close" on an intimate level, not in terms of their work. Id. at 179-84. Although he was present at these meetings, McKenzie does not recall Pletzinger putting his hands on Soliman's shoulders. McKenzie Dep. at 133. Soliman also claims that Pletzinger touched him above his elbow on a number of occasions, in a [*5] fashion that Soliman characterizes as both "playful" and "the way I'd grab my girlfriend's arm," but Soliman always pulled away. Soliman Dep. at 105, 119. Soliman's then-girlfriend, Nina Ostrovsky, who also worked at IHC as a junior consultant, does not recall Soliman telling her that Pletzinger touched him, nor did she ever witness Pletzinger touching him, on the arms or otherwise. Ostrovsky Dep. at 51. Similarly, McKenzie never saw Pletzinger touch any part of Soliman's body in any way, nor did Soliman ever tell him that Pletzinger did so. McKenzie Dep. at 127, 136.

*Favorable Treatment.* In early 2000, Pletzinger awarded Soliman a $ 120,000 bonus which Soliman felt was disproportionate to his $ 50,000 bonus from the previous year. Soliman Dep. at 208-210. However, Pletzinger similarly increased McKenzie's bonus that year, raising it from $ 50,000 or $ 60,000 in 1999 to $ 200,000 in 2000. McKenzie Dep. at 171. Soliman also claims that Pletzinger stated that he was considering nominating Soliman to become a director because Soliman had befriended him. Soliman Dep. at 208- 211. Soliman also believed Pletzinger was expressing an improper preference for him by leaving Soliman in charge [*6] whenever he was out of town because Pletzinger could have just as easily left McKenzie in charge. Id. at 219. Finally,

Soliman cites as evidence of harassment the fact that Pletzinger gave Soliman gummy bears, a t-shirt, and a clock. Id. at 116-18.

*Other.* Soliman avers that Pletzinger told him that he was a "good looking guy" "too many times to count." Soliman Dep. at 119. Soliman claims that he saw Pletzinger looking through Soliman's backpack and desk drawers in his office, whereupon Pletzinger claimed to have been looking for a pen. Id. at 164, 668-69. n1 Pletzinger purportedly made frequent inquiries into Soliman's personal life and told Soliman about his personal problems. Id. at 206. According to McKenzie, Pletzinger also told McKenzie personal information and that Pletzinger "by his very nature asked lots of people who they were dating and what they did over the weekend, etc." McKenzie Dep. at 77, 134. The annoying personal questions that Pletzinger asked were questions like "Did you just come back from lunch?" Id. at 83. Finally, Soliman claims that Pletzinger kept ski clothes that Soliman loaned him and stated that he wanted to keep something of Soliman's [*7] close to him. Soliman Dep. at 114. At the time of this exchange, however, Soliman admits that he did not construe it as a come-on, but just "sort of odd." Id. at 397.

---

n1 Soliman and McKenzie worked in the Bank's offices located in midtown Manhattan while Pletzinger ordinarily worked in downtown Manhattan. When Pletzinger worked in midtown, he sometimes used Soliman's office.

---

**2. Soliman's Rejection of Pletzinger's Alleged Advances**

Soliman made it clear to Pletzinger that he did not want to go to gay bars. Id. at 56. Soliman pulled himself away if Pletzinger ever tried to touch him and "made it clear" that he did not want to have "any kind of relationship other than a professional relationship" with Pletzinger. Id. at 105-06, 108, 110, 119. He declined all of Pletzinger's specific social invitations, but never specifically told Pletzinger to stop inviting him out. Id. at 112. Soliman claims to have sent Pletzinger at least two e-mails telling Pletzinger to stay out of his personal life [*8]. Id. at 413. Although he downloaded and saved e-mails in a folder labeled "asshole" in his desk, the contents of which were dedicated to "building his case" against Pletzinger, id. at 669, the only e-mail of this nature before the court is dated December 7, 2000. In this e-mail sent to Pletzinger, Soliman creates a list of grievances against Pletzinger, one of which is labeled "intrusion into personal matters." He writes:

"It is quite frankly non (sic) of your business what or with whom I have personal appointments with. When I informed you today that I could not meet with you at 5:00 PM because I had a personal appointment, you demanded to know what that personal appointment is. You would not drop the subject until I told you of the specifics of the appointments. Your assertion that you needed to know because lately I have been having a lot of "personal appointments" is factually incorrect and is an infringement of my personal life."

Def.'s Ex. B. Soliman avers that in another e-mail he can no longer locate, he was "more specific," and referred to "the touching, keeping a professional relationship, not wanting him to intrude on my personal life," in addition [*9] to using the word "harassment." Soliman Dep. at 413-14. But in this missing e-mail, he did not tell Pletzinger that he thought Pletzinger was sexually harassing him, hitting on him, or upset with him for rebuffing Pletzinger's sexual advances. Id. at 415.

### 3. The 2001 Evaluation Dispute and Pletzinger's Alleged Quid Pro Quo Request

In January of 2001, plaintiff and Pletzinger had a protracted dispute about Soliman's 2000 evaluation. Id. at 287. In short, Soliman wanted to add his own marks or rebuttal statements to the sections of his evaluation that were supposed to be exclusively completed by Pletzinger. Id. at 291, 294, 301; Def.'s Ex. B. Soliman eventually asked Irene Diamant, the Director of Human Resources and the Human Resources Advisor for IHC, if both he and Pletzinger could submit their own versions of his evaluation. Id. at 312; Def.'s Ex. B; Affidavit of Diamant, P1, 2. She replied in the negative, stating that the Bank could only have one version on file, and twice told him to attach a sheet to Pletzinger's appraisal. Id. at 313, 316-17; Def.'s Ex. B. Soliman thereupon sent Pletzinger an e-mail that stated: "Go ahead write whatever you like (false [*10] or accurate)." Id. at 317; Def.'s Ex. B. He asked Pletzinger to send him the final version of the evaluation before sending it on to Human Resources because "I did not want to give him carte blanche on a document for him to change whatever he liked." Id. at 328.

After this dispute, Soliman and Pletzinger met in February 2001 to discuss his 2000 evaluation and related bonus. Pletzinger gave him a $ 190,000 bonus but stated that he was not recommending Soliman for a promotion. Id. at 213-214. According to Soliman, Pletzinger told him that "if you and I become better friends, I would still

promote you." Id. From the way Pletzinger said the word "friends," Soliman understood Pletzinger to be implying a sexual relationship. Id. at 217. When asked for clarification about Pletzinger's use of the word "friends," Soliman stated in his deposition:

"It was in a soft way. But the way he said it, it was that. He says well, you know, if we improve our working relationship. That's what he meant. To be related to the job. Could have been simply our relationship gets better in terms of working together. You know, I think with the promotion, that's not the way he said it. [*11] "

Id. at 217.

### 4. Defendant Bank's Knowledge of the Alleged Sexual Harassment

Soliman did not complain to anyone at the Bank about Pletzinger's alleged arm-touching, inviting Soliman to his home or himself to Soliman's home, request to keep the clothing he borrowed for a ski trip, or comments concerning Soliman's appearance. Id. at 107-08, 114-15, 126. He did not forward the e-mails in which he allegedly told Pletzinger to stay out of his private life to Diamant. Id. at 411.

Soliman points to the following as evidence that he alerted defendant to Pletzinger's unlawful sexual harassment: During Pletzinger and Soliman's disagreement over the completion of Soliman's 2000 evaluation, Soliman wanted to meet with Diamant. Id. at 331. In an e-mail to Diamant dated March 2, 2001, titled "request for a meeting on the year end evaluation," Soliman queries whether Diamant wants to be involved in resolving the problems relating to the evaluation and if not, if there is someone else in HR he can speak to. Def.'s Ex. B. In an e-mail dated March 5, 2001, Diamant replied, "I am happy to meet with you." Id. Their e-mail correspondence thereafter shows that because [*12] Pletzinger, Soliman, and Diamant were all scheduled to be on vacation for the remainder of March, Diamant offers to set up a meeting between them for the first possible date. Id. In addition to these e-mails, Soliman claims that he left voice mails with Diamant asking to speak with her, although he did not specify the nature of his personal problems with Pletzinger. Soliman Dep. at 322, 324, 339.

Soliman also alleges that he asked to speak to Hans Krauss, Director of Inhouse Consulting, who worked in Germany. He states that in a phone call with Krauss in late February, 2001, he told Krauss that Pletzinger was harassing him for personal reasons and that he was look-

ing to get out of the group, but he did not explain what the "personal reasons" were. Soliman Dep. at 488-492. Further, Soliman claims he unsuccessfully tried to set up a meeting with Krauss when he was in New York, although he did not tell Krauss that Pletzinger's purposed sexual advances were the reason why he needed to talk to him. Id. at 493-495.

Finally, Soliman told Ken Kennedy that Pletzinger harassed Soliman because Soliman tried to keep Pletzinger out of his personal life. Soliman Dep. at 496.

## B. [*13]   Race Discrimination

Soliman claims that Pletzinger called Soliman a "natural salesman" "like all Arabs in a bazaar that sell," someone referred to him a "sand nigger" when he walked down the hall, and he heard Pletzinger make a statement that "all black people are good for is dancing." Id. at 541-543.

Soliman did not report these comments to Diamant, but he avers that in an off-site conference in Vermont, he and Diamant had a general discussion about having to have a "thick skin" in the banking environment. Id. at 545-46.

## C. Plaintiff's Termination

In March of 2001, the Bank conducted an audit of cab charges and discovered that Soliman and Nina Ostrovsky, a junior consultant in IHC who worked with Soliman, were potentially using their corporate cab charges to travel back and forth between one another's homes. Affidavit of Diamant at P3. The Bank subsequently reviewed their e-mail correspondence for January and February 2001. The e-mails contain a number of references to an existing physical relationship, dinner plans, Ostrovsky's mother calling Soliman while he was at work and his efforts to conceal her voice message from his co-workers, Soliman identifying [*14] Ostrovsky as "Sandra" on his calendar to avoid detection, and a Valentine's Day gift of champagne and flowers. Affidavit of Diamant, Ex. C. Most importantly, in an e-mail written by Soliman to Ostrovsky dated January 22, 2001, entitled "your eval," Soliman included a completed copy of Ostrovsky's evaluation, and wrote: "do you like what I wrote, if not change as you see fit, and sign and interrofice (sic) to me." Soliman Ex. 25.

The Bank has a policy prohibiting family members and significant others from working in a "direct reporting or supervisory/management relationship." Affidavit of Diamant, Ex. C. From Diamant's perspective, Soliman and Otrovsky's relationship violated that policy. Affidavit of Diamant at P6

On April 27, 2001, Diamant and John Chocko, a Vice President in the Bank's Audit Department, met with Ostrovsky. They showed her the cab charges in question and e-mails between she and Soliman and queried whether she and Soliman were in a relationship. Whether or not Ostrovsky admitted to the relationship is unclear. Diamant stated in her deposition that although Ostrovsky was hesitant and began crying at one point, she ultimately admitted to having a voluntary relationship [*15] with Soliman. Diamant Dep. at 162-63 (July 11, 2003). Ostrovsky, however, stated that she described the nature of her relationship with Soliman as one of mentorship or friendship, but she admitted that the cab rides were of a personal nature. Ostrovsky Dep. at 112.

Immediately after their meeting with Ostrovsky, Diamant and Chacko met with Soliman. Diamant showed him the cab charges and stated that they appeared to be of a personal nature. Soliman Dep. at 234. Soliman denied using his cab charge for personal reasons, suggested that he had lent his cab charge to someone else who must be the responsible party, and offered to reimburse the Bank for the rides. Id. at 234-35. Diamant then showed him the e-mails between himself and Ostrovsky, including the e-mail Soliman sent to Ostrovsky about her evaluation. In response, Soliman told Diamant that he "would not confirm or deny" a relationship with Ostrovsky and that regardless, she was not his direct report. Id. at 250-53. Thereafter, Diamant gave Soliman a resignation letter which Soliman refused to sign, and told him that she would report back to a committee so that the committee could review the findings. Id. at 270. He [*16] was then placed on administrative leave pending the review.

Soliman claims that in this final meeting, he did not have the opportunity to explain to Diamant that Pletzinger had been making sexual advances towards him. Id. at 259. He told Diamant generally that he wanted to make a complaint against Pletzinger, but she told him to put it in writing so she could show it to the committee reviewing Soliman's possible termination. Id. at 259-60. Soliman did not subsequently write such a letter; instead he contacted Don Jones and asked for a personal meeting with him. Id. at 260. He also contacted Ken Kennedy that same day. Id. at 270.

On May 1, 2001, Soliman received a termination letter. Pl's Ex. F. Pletzinger was ultimately responsible for the decision to terminate Soliman, although the decision was also informed by Diamant, the Audit Department, and the Legal Department. Diamant Dep. at 150 (July 11, 2003). According to Diamant, the Bank did not terminate Ostrovsky because Ostrovsky had not altered her performance evaluation even though Soliman invited her to do so. Diamant Affidavit, at P8.

2004 U.S. Dist. LEXIS 9087, *

### 1. Soliman's Objections to His Termination

#### a. Race discrimination [*17]

Soliman believes that his termination was racially discriminatory because he was fired whereas Ostrovsky is white and she was not fired for having violated the same policy. Soliman Dep. at 538-39. Further, he claims that other Bank employees who were white have been in relationships with one another and they were not terminated. He claims that Dr. Herwig Leins, the Chief Operating Officer of Global Technology and Services, dated Dr. Iris Baeurle, who reported directly to Soliman. Id. at 454, 552. He also claims that Karen and Ken Newman dated and worked in the same department, as did Cathy and Jon Franco. Id. at 554

#### b. Pletzinger set Soliman up

First, Soliman claims that after he spoke to Hans Krauss in Germany about his desire to transfer to a different department, Pletzinger told Soliman that he knew Soliman had been talking to people in Germany. Id. at 424. During an IHC meeting on March 9, 2001, Pletzinger was allegedly very hostile towards Soliman by giving him dirty looks. Id. at 425. After the meeting, Soliman approached Pletzinger to ask why he was being so hostile, and Pletzinger told him, "If you don't leave, I am going to get you fired." Id. [*18] at 427. Soliman believes that Pletzinger must have spoken with Krauss about the discussion Soliman had with Krauss. Id. at 427-28. He claims that he called Krauss after Pletzinger's threat and left Diamant a voice mail telling her that he needed to speak with her. Id. at 428-29.

Second, Soliman claims that Pletzinger learned that he and Ostrovsky were dating in 2000. Id. at 254. Nevertheless, Pletzinger asked Soliman to complete an evaluation for Ostrovsky that McKenzie had already started. Id. at 34. They had a "heated argument" over who would complete her evaluation, but Soliman eventually agreed to do it. Id. at 34.

#### c. He did not violate Bank policy

In his deposition, Soliman admitted that he and Ostrovsky began an intimate relationship sometime in 2000. Id. at 455. He also conceded that he was aware that he should avoid actual or perceived conflicts of interest in the workplace. Id. at 454. He avers, however, that he did not violate Bank policy by completing Ostrovsky's evaluation because she was not his direct report. Id. at 250. He points to an organizational chart for 2000 showing McKenzie as Ostrovsky's administrative report. Id. [*19] at 252-53. When confronted with at least three project report charts identifying Soliman as the project manager of projects to which Ostrovsky was assigned in 2000, Soliman stated that the project manager is not responsible for a project's day-to-day implementation or

that he was not genuinely responsible for the project in question. Id. at 43-48.

In his deposition, McKenzie confirmed that Ostrovsky was his administrative report in 2000. He generally completed the evaluations of his administrative reports unless the employee worked more than half of the time for another project manager, who would then complete the evaluation. McKenzie Dep. 25-26. He does not recall working on any projects with Ostrovsky. Id. at 18. Similarly, Ostrovsky testified in her deposition that while she was working at IHC, she dealt with Soliman more than anyone else. Ostrovsky Dep. at 18. Although McKenzie was her direct manager, if she had a question about a project she was working on, she would go to Soliman. Id. at 29. She worked on one project with McKenzie during 2000, but it was a very short one. Id. at 30.

### STANDARD ON SUMMARY JUDGMENT

Under *Fed. R. Civ. P. 56(c)* [*20] , summary judgment "shall be rendered forthwith" if it is shown that "there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett, 477 U.S. 317, 323 n. 4, 106 S. Ct. 2548, 2552 n. 4, 91 L. Ed. 2d 265 (1986).* "Genuineness runs to whether disputed factual issues can reasonably be resolved in favor of either party, [while] materiality runs to whether the dispute matters, i.e., whether it concerns facts that can affect the outcome under the applicable substantive law." *Mitchell v. Washingtonville Cent. Sch. Dist., 190 F.3d 1, 5 (2d Cir. 1999)* (internal quotations and citations omitted). In order to prove that a genuine issue of material fact exists, a plaintiff "may not rest upon the mere allegations or denials of the pleading[s]," but must by affidavit or otherwise "set forth specific facts showing that there is a genuine issue for trial." *Fed. R. Civ. P. 56(e).* "Conclusory statements, conjecture or speculation by the party resisting the motion will not defeat summary judgment." *Kulak v. City of New York, 88 F.3d 63, 71 (2d Cir. 1996).* [*21]

Courts must resolve all ambiguities and draw all reasonable factual inferences in favor of the non-moving party. See *Nora Beverages, Inc. v. Perrier Group of Am., Inc., 164 F.3d 736, 742 (2d Cir. 1998).* The moving party bears the initial burden of demonstrating an absence of genuine issues of material fact. See *Schwapp v. Town of Avon, 118 F.3d 106, 110 (2d Cir. 1997).* If the initial burden is met, the non-moving party "must produce specific facts indicating that a genuine issue of fact exists. If the evidence [presented by the non-moving party] is merely colorable, or is not significantly probative, summary judgment may be granted." *Scotto Almenas, 143 F.3d 105, 114 (2d Cir. 1998)* (internal quotations and citations omitted) (alteration in original).

Trial courts must be particularly cautious in awarding summary judgment in employment discrimination actions where intent is at issue. *Chertkova v. Connecticut Gen. Life Ins.*, 92 F.3d 81, 87 (2d Cir. 1996). From this cautionary warning, however, it does not follow that a plaintiff is absolved from the responsibility of producing sufficient evidence from which a reasonable [*22] jury could return a verdict in plaintiff's favor. *Welland v. Citigroup, Inc.*, 2003 U.S. Dist. LEXIS 22721, 2003 WL 22973574, at 5 (S.D.N.Y. Dec. 17, 2003), citing *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 461 (2d Cir. 2001), cert. denied, 534 U.S. 993, 122 S. Ct. 460, 151 L. Ed. 2d 378 (2001). "The summary judgment rule would be rendered sterile ... if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion. Indeed, the salutary purposes of summary judgment-- avoiding protracted, expensive and harassing trials--apply no less to discrimination cases than to commercial or other areas of litigation." *Finney v. Planned Parenthood of N.Y. City, Inc.*, 2003 U.S. Dist. LEXIS 22230, 2003 WL 22928730, at 3 (S.D.N.Y. Dec. 10, 2003) citing *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir.), cert. denied, 474 U.S. 829, 106 S. Ct. 91, 88 L. Ed. 2d 74 (1985).

## DISCUSSION

### A. Race Discrimination Under Title VII and New York City and State Human Rights Laws

Title VII prohibits employers from discharging or otherwise discriminating against employees in the terms, conditions, [*23] or privileges of employment on the bases of race. 42 U.S.C. § 2000e-2(a)(1). n2 In the absence of direct evidence of discrimination, a plaintiff relies on the familiar burden-shifting test set forth in *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792, 803, 36 L. Ed. 2d 668, 93 S. Ct. 1817-familiar burden-shifting test set forth in *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792, 803-04, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973). First, the plaintiff has the burden of proving a prima facie case of discrimination by a preponderance of the evidence. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action. Third, if the defendant carries its burden, the plaintiff must prove by a preponderance of the evidence that the defendant's legitimate rationale is a pretext for discrimination. While the burden shifts, the burden to persuade the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253, 67 L. Ed. 2d 207, 101 S. Ct. 1089 (1981) [*24]

n2 Plaintiff's claims under New York state and city human rights laws are subject to the same standard of proof as plaintiff's Title VII claims, negating the necessity of a separate analysis. *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 565, n. 1 (2d Cir. 2000); *Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170, 1177 (2d Cir. 1996); *Espaillat v. Breli Originals*, 227 A.D.2d 266, 268, 642 N.Y.S.2d 875, 877 (1st Dept. 1996).

In order to make out a prima facie case of race discrimination, Soliman must show: 1) he is a member of a protected class; 2) he performed his job satisfactorily; 3) the Bank took an adverse employment action against him; and 4) the circumstances of the adverse employment action give rise to an inference of discrimination based on Soliman's membership in the protected class. *Farias v. Instructional Systems, Inc.*, 259 F.3d 91, 98 (2d Cir. 2001). Plaintiff's burden at this stage is de minimis. *Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 37 (2d Cir. 1994). [*25]

The central dispute between the parties is whether plaintiff can offer legally sufficient evidence to raise an inference of discrimination. Soliman avers that he overheard someone call him a "sand nigger" in passing, Pletzinger told him he was like an Arab selling in a bazaar, and Pletzinger made a statement to the effect that "all blacks are good for is dancing." While understandably offensive, even if the court accepts plaintiff's allegations as true, these stray remarks are insufficient to raise an inference of discrimination. *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997) (there must be more than a few isolated instances of racial enmity); *Hawana v. City of New York*, 230 F. Supp.2d 518, 527 (S.D.N.Y. 2002) (two stray remarks do not satisfy the fourth prong of a prima facie case).

Plaintiff also charges the Bank with race discrimination because he was fired for violating the policy prohibiting employees in a relationship from working in a direct reporting or supervisory relationship, whereas Ostrovsky, who was white, and other white employees were not. A plaintiff can raise an inference of discrimination by showing that the employer [*26] treated him less favorably than a similarly situated employee outside his protected group. See *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000). The employees to be compared must be similar in all material respects, which means that "a plaintiff must show that [his] co-employees were subject to the same performance evaluation and discipline standards...[and] that similarly situated employees who went undisciplined engaged in comparable conduct." *Id.* (internal citations omitted). "Comparable" does not mean identical, but it does require the conduct to be of comparable seriousness. *Id. at*

*40.* There must be a "reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases, rather than a showing that both cases are identical." *Id. at 39.* Whether employees are similarly situated is ordinarily a question for the jury. *Id. at 38.*

Here, taking Soliman's claim that Dr. Leins dated Dr. Baeurle as true, Dr. Leins was not subject to the same Bank policy as plaintiff because the policy does not apply to employees outside of the United States. Diamant Affidavit at P5, 10 and [*27] Exs. B and E, attached thereto. Even if it did, there is no evidence that like Nina Ostrovsky, Baeurle worked directly beneath Dr. Leins or that Leins completed Baeurle's evaluations. To the contrary, Soliman stated that Baeurle worked with him. Soliman Dep. at 454. Although Karen and Ken Newman and Cathy and Jon Franco may have worked in the same department, there is no further showing that they were in a direct reporting or supervisory relationship like plaintiff and Ostrovsky. Equally as significant, plaintiff does not aver that any of these employees engaged in the similarly serious and culpable conduct of allowing the person with whom they were in a relationship to change their performance evaluation as they saw fit. See Soliman Ex. 25. Because no reasonable jury could find that plaintiff and the co-workers he seeks to compare himself with are similarly situated, as a matter of law, Soliman cannot raise an inference of discrimination based on allegedly dissimilar treatment. See *Harlen Associated v. Incorporated Village of Mineola, 273 F.3d 494, 499-500 n.2 (2d Cir. 2001).*

Because plaintiff can not make out a prima facie case of race discrimination, defendant's [*28] motion for summary judgment on plaintiff's Title VII and New York state and city race discrimination claims is hereby **GRANTED.**

### B. Same Sex Harassment

Plaintiff claims that Pletzinger sexually harassed him in violation of Title VII and New York state and city human rights laws. See *42 U.S.C. § 2000e et seq.; N.Y. Exec. Law § 290 et seq.; N.Y.C. Admin. Code § 8-107.* n3 Title VII makes it unlawful for an employer to discriminate against any individual with respect to the terms and conditions of employment on account of the employee's sex. Id. It is well settled that Title VII's prohibition on sex discrimination encompasses same sex harassment where "members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." *Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 79-80, 118 S. Ct. 998, 140 L. Ed. 2d 201 (1998)* quoting *Harris v. Forklift Systems, Inc., 510 U.S. 17, 25, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993)* (Ginsberg, J., concurring). In order to withstand defendant's motion for sum-

mary judgment, plaintiff [*29] must point to evidence creating a genuine issue of fact regarding whether Pletzinger's workplace conduct vis-a-vis plaintiff was "because of [plaintiff's] sex. *Id. at 79.*

> n3 Plaintiff's state and city human rights claims of sexual harassment are subject to the same analysis as plaintiff's Title VII claims of sexual harassment. See *Tomka v. Seiler Corp., 66 F.3d 1295, 1304 n.4 (2d Cir. 1995).*

Here, Plaintiff points to Pletzinger's conduct and purported offer for sexual relations in exchange for a promotion to substantiate his sexual harassment claim. There is no need to distinguish between "hostile work environment" sexual harassment and "quid pro quo" harassment. See *Gregory v. Daly, 243 F.3d 687, 698 (2d Cir. 2001)* (interpreting *Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 118 S. Ct. 2257, 141 L. Ed. 2d 633 (1998),* and *Oncale, 523 U.S. 75, 118 S. Ct. 998, 140 L. Ed. 2d 201).* "These labels, to the extent that they are useful [*30] at all, are so merely as descriptions of varying workplace conditions that violate Title VII's basic prohibition on sex discrimination in terms or conditions of employment." *Id.* citing *Ellerth, 524 U.S. at 751-52, 118 S. Ct. 2257; Oncale, 523 U.S. at 78-81, 118 S. Ct. 998.* Because allegations of "quid pro quo" sexual harassment are merely one type of factual allegation to support a cause of action under Title VII, the court will consider Soliman's claims of quid pro quo harassment as part of his claims that he was subject to a hostile work environment by virtue of Pletzinger's conduct. See also *Yerry v. Pizza Hut of Southeast Kansas, 186 F. Supp.2d 178, 183 (N.D.N.Y. 2002)* (same).

To state a hostile environment claim, a plaintiff must establish that the harassment was "sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment." *Harris, 510 U.S. at 21, 114 S. Ct. 367.* The conduct must have been both objectively and subjectively offensive, meaning that a reasonable person would find the conduct hostile or abusive and that the plaintiff in fact perceived the conduct [*31] as such. Id. The court must examine "all the circumstances," including the frequency, its severity, whether it was physically threatening or humiliating, or merely an offensive utterance. *Id. at 23, 114 S. Ct. 367.* "When the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated." *Oncale, 523 U.S. at 78, 118 S. Ct. 998* citing *Harris, 510 U.S. at 21, 114 S. Ct. 367.* See also *Terry v. Ashcroft, 336 F.3d 128, 148 (2d Cir. 2003)*

("The test is whether the harassment is of such a quality or quantity that a reasonable employee would find the conditions of her employment altered *for the worse* "). Although the "harassing conduct need not be motivated by sexual desire to support an inference of discrimination because of sex," again, it is crucial that the conduct actually constituted discrimination on account of sex. *Oncale, 523 U.S. at 81*. See also *Galdieri-Ambrosini v. National Realty & Dev. Corp., 136 F.3d 276, 289 (2d Cir. 1998)* [*32] (same).

Soliman avers that Pletzinger treated him favorably, touched his arm, touched his shoulders in meetings when describing their relationship as "close" and encouraging other IHC employees to develop similar relationships, sat close to him, commented that he was a "good looking guy," told Soliman he was gay, invited him to social events and an allegedly "gay" bar on two occasions, asked him about his personal life, and so forth. None of these acts are marked by any hint of sexual innuendo, nor do they suggest that Pletzinger's conduct was motivated by animus against males in the workplace. A reasonable jury could not conclude that Pletzinger's neutral acts were motivated by Soliman's sex. See *West v. Mt. Sinai Medical Center, 2002 U.S. Dist. LEXIS 6123, 2002 WL 530984, 1-2* (S.D.N.Y. Apr. 9, 2002) (Motley, J.) (granting summary judgment to defendant where the only reasonable conclusion a jury could draw was that plaintiff's supervisor's favorable treatment towards her and offers to take her to social gatherings were nothing more than simple friendly gestures, not veiled sexual advances); *Moran v. Fashion Inst. of Technology, 2002 U.S. Dist. LEXIS 19387, 2002 WL 31288272, 6* (S.D.N.Y. Oct. 7, 2002) [*33] (plaintiff could not sustain his claim of sexual harassment based on allegations of leering, physical closeness, and brief touching because excessive attention, physical proximity, or casual touching in the context of conversation is sex-neutral conduct). With respect to Pletzinger's purported statement that he would consider nominating Soliman for a promotion if the two men became "better friends," Soliman construed it as a sexual advance because Pletzinger said it "in a soft way." Judged against the background of Soliman and Pletzinger's recent disputes concerning Soliman's 2000 employee evaluation at the time the statement was made, Soliman's conclusory allegation that Pletzinger must have meant something "sexual" as opposed to something professional in referencing the need for them to improve upon their relationship is insufficient to defeat summary judgment. See *Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985)* ("The summary judgment rule would be rendered sterile...if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion."). A single ambiguous statement that may or may not have been motivated by plaintiff's [*34] sex, about which even Soliman concedes could have been sex-neutral, is simply too thin a reed upon which to establish a genuine issue of material fact for a jury.

Further, the conduct Soliman points to falls short of violating Title VII as a matter of law. The court is mindful of not setting the standard for sexual harassment too high, but even construing Soliman's allegations in his favor, a reasonable jury could not conclude that Pletzinger's purported favoritism of Soliman, personal questions, invitations, or casual touching altered Soliman's employment for the worse or created an abusive, intimidating, or hostile working environment. See e.g., *O'Dell v. Trans World Entm't Corp., 153 F. Supp.2d 378, 386 (S.D.N.Y. 2001)* (granting summary judgment to defendant where plaintiff's evidence consisted of invitations out on dates, gifts, compliments about plaintiff's appearance, and written declarations of love); *Feliciano v. Alpha Sector, Inc. 2002 U.S. Dist. LEXIS 12631, 2002 WL 1492139, at 8* (S.D.N.Y. July 12, 2002) (same, but plaintiff's evidence included compliments, invitations to date, attempted hug, a kiss, phone calls, and stated desire to "lay" with plaintiff); *Moran v. Fashion Institute of Technology, 2002 U.S. Dist. LEXIS 19387, 2002 WL 31288272* [*35] (S.D.N.Y. Oct. 7, 2002), (same, where plaintiff presented evidence of casual touching, leering, physical proximity, and talking about plaintiff to coworkers).

Because Soliman has not established a genuine issue of material fact that Pletzinger's conduct towards him was because of his sex or objectively offensive, the Bank's motion for summary judgment on plaintiff's sexual harassment claim is hereby **GRANTED.**

## C. Retaliation

Title VII and New York human rights laws prohibit employers from retaliating against employees for complaining about employment discrimination. See *42 U.S.C. § 2000e(3)(a)*; *N.Y. Exec. Law § 296(1)(e)*. The court analyzes his retaliation claim according to the same McDonnell-Douglas burden-shifting analysis. *Reed v. A.W. Lawrence & Co., 95 F.3d 1170, 1178 (2d Cir. 1996)*. Thus, Soliman must show a prima facie case of retaliation. If he makes such a showing, the Bank must offer a non-discriminatory reason for the adverse employment action. Assuming the Bank does so, Soliman must then establish that the Bank's rationale is simply a pretext for retaliation.

To establish a prima [*36] facie case of retaliation, Soliman must demonstrate that 1) he engaged in a protected activity that the Bank was aware of; 2) the Bank took an adverse employment action against him; and 3) there was a causal connection between Soliman's protected activity and the adverse employment action taken. See *Gordon v. New York City Bd. of Educ., 232 F.3d*

*111, 116 (2d Cir. 2000)*. The Bank argues that Soliman cannot make out the first prong of the prima facie case of retaliation because he never alerted the Bank to Pletzinger's alleged sexual harassment.

"The term 'protected activity' refers to action taken to protest or oppose statutorily prohibited discrimination." *Cruz v. Coach Stores, Inc., 202 F.3d 560, 566 (2d Cir. 2000)*. See also *Brands-Kousaros v. Banco Di Napoli S.P.A., 1997 U.S. Dist. LEXIS 20345, 1997 WL 790748, at 5* (S.D.N.Y. Dec. 23, 1997) ("the protected activity alleged must involve some sort of complaint about a type of discrimination that Title VII forbids."). Protected complaints generally include "making complaints to management, writing critical letters to customers, protesting against discrimination by industry or by society in general, and expressing [*37] support of co-workers who have filed formal charges." *Id. at 566*. Although a plaintiff does not have to lodge a formal complaint to an administrative body in order to have engaged in a protected activity, *Cifra v. General Electric Company, 252 F.3d 205, 208 (2d Cir. 2001)*, doing so is the most obvious example of a protected complaint. See *Lovejoy-Wilson v. NOCO Motor Fuel, Inc., 263 F.3d 208, 223 (2d Cir. 2001)*. The form of a plaintiff's objection may be nothing more than a simple "objection voiced to the employer," *Barcher v. New York Univ. Sch. of Law, 993 F. Supp. 177, 184 (S.D.N.Y. 1998)*, but at the very least, "there must be some form of professional indicia of a complaint made against an unlawful activity. *Moran v. Fashion Institute of Technology, 2002 U.S. Dist. LEXIS 19387, 2002 WL 31288272, at 8* (telling one's supervisor to "stay away" and "leave him alone" did not constitute a protected activity), citing *Cruz, 202 F.3d at 566* (slapping one's harasser, even assuming that it was done in response to unlawful harassment, was not a protected activity).

"Implicit in the requirement that the employer have been aware of [*38] the protected activity is the requirement that it understood, or could reasonably have understood, that the plaintiff's opposition was directed at conduct prohibited by Title VII." *Galdieri-Ambrosini, 136 F.3d at 292*. Accordingly, where a plaintiff's complaint is vague or ambiguous and does not sufficiently articulate the nature of harassment, courts hold that a plaintiff has not engaged in a protected activity. See *Sales v. YM & YMHA, 2003 U.S. Dist. LEXIS 839, 2003 WL 1642768* (S.D.N.Y. Jan. 22, 2003) (because plaintiff failed to explain to the defendant employer the racially derogatory meaning behind the ambiguous term used by his supervisor, the defendant employer cannot be found to have been aware of plaintiff's protected activity); *West v. Mt. Sinai Medical Center, 2002 U.S. Dist. LEXIS*

*6123, 2002 WL 530984, 3-4* (because plaintiff did not specify that there was anything sexual about her alleged harasser's conduct, no reasonable factfinder could conclude that the defendant employer understood that her complaint implicated Title VII); *Moran v. Fashion Institute of Technology, 2002 U.S. Dist. LEXIS 19387, 2002 WL 31288272* (plaintiff never stated he objected to [*39] his supervisor's conduct on the grounds of sexual harassment); *Lapsley v. Columbia University-College of Physicians & Surgeons, 999 F. Supp. 506, 525 (S.D.N.Y. 1998)* (plaintiff complained about the employer's discriminatory promotion practices but did not articulate the basis for her belief of discrimination).

Viewing the evidence in the light most favorable to Soliman, a reasonable factfinder could not conclude that plaintiff Soliman engaged in a protected activity. Telling Pletzinger to stay out of his personal life and pulling his arm away whenever Pletzinger touched him are not protected activities under Title VII. In none of his purported attempts to tell Diamant, Krauss, or Kennedy about Pletzinger's objectionable acts did he state that Pletzinger was sexually harassing him or make any statement that could reasonably be construed accordingly. Because the Bank would not have understood that Soliman's problems with Pletzinger had anything to do with sexual harassment, Soliman's subsequent retaliation cannot, as a matter of law, amount to an unlawful retaliation under Title VII. See *West v. Mt. Sinai, 2002 U.S. Dist. LEXIS 6123, 2002 WL 530984*, supra.

Defendant's motion for summary [*40] judgment on plaintiff's retaliation claim is hereby **GRANTED.**

## CONCLUSION

Having resolved all ambiguities and drawn all reasonable inferences in favor of plaintiff Soliman, the court concludes that no reasonable factfinder could find that defendant Deutsche Bank subjected Soliman to sexual harassment, discriminated against him on account of race, or retaliated against him in violation of Title VII or New York state and city human rights laws. For the reasons cited above, defendant's motion for summary judgment is **GRANTED** and plaintiff's claims are dismissed in their entirety.

Dated: May 19, 2004

New York, New York

CONSTANCE BAKER MOTLEY

United States District Judge

LEXSEE

**ALICE UREY, Appellant v. GROVE CITY COLLEGE**

**No. 03-2753**

**UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT**

**94 Fed. Appx. 79; 2004 U.S. App. LEXIS 7188**

**April 13, 2004, Submitted Under Third Circuit Lar 34.1(a)**
**April 14, 2004, Filed**

**NOTICE:** [**1] RULES OF THE THIRD CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**PRIOR HISTORY:** Appeal from the United States District Court for the Western District of Pennsylvania. (D. C. Civil No. 01-cv-02024). District Judge: Honorable Joy F. Conti.

**DISPOSITION:** Affirmed.

**LexisNexis(R) Headnotes**

**COUNSEL:** For ALICE UREY, Appellant: Neal A. Sanders, Law Offices of Neal Alan Sanders, Butler, PA.

For GROVE CITY COLLEGE, Appellee: Martha H. Munsch, Reed Smith, Pittsburgh, PA.

**JUDGES:** Before: RENDELL, COWEN and LAY *, Circuit Judges.

* Honorable Donald P. Lay, Senior Circuit Judge for the Eighth Circuit, sitting by designation .

**OPINIONBY:** LAY

**OPINION:** [*80] OPINION OF THE COURT

LAY, Circuit Judge.

Alice Urey appeals the District Court's grant of summary judgment in favor of Grove City College on her claims of retaliatory discharge. We will affirm.

**BACKGROUND**

From 1989 until her termination on April 5, 2001, Alice Urey worked as a housekeeper for Grove City College (the "College"), a private college located in Western Pennsylvania. Although Ms. Urey appears to have performed her job duties without incident during her first ten years of employment, [**2] the record reveals several instances of insubordination for which Ms. Urey was subjected to disciplinary action beginning in the spring of 1999.

On May 12, 1999, Ms. Urey received a verbal warning from Thomas Gregg, the Vice President of Operations for the College, stemming from a confrontation with her immediate supervisor over a job performance evaluation. Gregg reassigned Ms. Urey to another supervisor and cautioned her not to make any attempt at retaliation against her former supervisor.

On May 24, 2000, Ms. Urey received a written warning after she refused the requests of her supervisor to leave her workspace and attend a meeting with Gregg. Instead, Ms. Urey stressed that if Gregg wished to talk to her, he would have to come to see her. The purpose of this meeting was to discuss complaints made by Ms. Urey's immediate supervisor that Ms. Urey had recently yelled at her regarding work assignments and the employee dress code.

On April 4, 2001, Ms. Urey walked out of a meeting with Gregg, despite being told that the meeting was not over and that her refusal to remain would be viewed as insubordination. The purpose of this meeting was to discuss a complaint made by Ms. Urey's [**3] immediate supervisor that Ms. Urey had openly accused her of being lazy during a recent employee meeting. The following day, Ms. Urey was terminated.

Following her termination, Ms. Urey filed suit against the College, alleging claims of retaliation under various statutory provisions n1 and the Pennsylvania

common law. Ms. Urey alleged that she was terminated because she engaged in the following activities: (1) giving favorable deposition testimony on April 24, 2000, in support of a co-worker's claim of discrimination against the College; (2) filing her own external charge of discrimination [*81] against the College in May of 2000; and (3) filing several claims seeking workers' compensation benefits due to injuries suffered on the job.

> n1 Ms. Urey alleged violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq.; the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, et seq.; and the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. Cons. Stat. Ann. § 951, et seq.

[**4]

## DISCUSSION

We note at the outset that although Ms. Urey's claims of retaliation are brought under various sources, the analytical framework for each is identical. See Fogleman v. Mercy Hosp., Inc., 283 F.3d 561, 567 (3d Cir. 2002) (analysis for Title VII, ADEA, and PHRA retaliation claims identical); Landmesser v. United Air Lines, Inc., 102 F. Supp. 2d 273, 277 (E. D. Pa. 2000) (analysis for common law and Title VII retaliation claims identical). In order to establish a prima facie case of retaliation, a plaintiff must show: (1) that he or she engaged in a protected activity; (2) that his or her employer took an adverse employment action; and (3) a causal link between the two. See Fogleman, 283 F.3d at 567-68; Landmesser, 102 F. Supp. 2d at 277-78.

The College concedes that each of Ms. Urey's alleged activities were protected. Similarly, the College concedes that its act of firing her constituted an adverse employment action. The dispute between the parties concerns whether Ms. Urey had adduced sufficient evidence to establish the requisite causal link between these two instances, thus preventing [**5] the entry of summary judgment in favor of the College. One method for establishing the causation necessary to make out a prima facie case of retaliation is to demonstrate that the adverse employment action followed closely upon the heels of a protected activity. See Kachmar v. SunGard Data Sys., Inc., 109 F.3d 173, 177 (3d Cir. 1997) (noting that such "temporal proximity" is "an obvious method by which a plaintiff can proffer circumstantial evidence" of discriminatory intent).

Generally, it can be said that "if at least four months pass after the protected action without employer reprisal, no inference of causation is created." Woods v. Bentsen, 889 F. Supp. 179, 187 (E. D. Pa. 2000); see also id. n. 15 (collecting cases). Applying this standard to the undisputed facts, we hold that Ms. Urey has failed to raise an inference of causation. Her act of providing favorable deposition testimony in a co-worker's suit occurred on April 24, 2000-nearly one year before she was terminated. The same holds true for her act of filing a charge of discrimination with the EEOC, which took place in May of 2000. Finally, the last instance in which Ms. Urey filed [**6] a claim for workers' compensation benefits occurred on October 4, 2000-six months before her termination. n2 We hold such a temporal link is too attenuated to support any inference of improper motive.

> n2 We agree with the District Court that under Weston v. Pennsylvania, 251 F.3d 420 (3d Cir. 2001), Gregg's verbal and written warnings to Ms. Urey did not amount to an adverse employment action. The record demonstrates that Ms. Urey did not have her hours or type of work changed, nor did she receive a decrease in wages. Therefore, these warnings did not "effect a material change in the terms or conditions of [her] employment." Id. at 431.

Temporal proximity, while certainly the most common, is not the exclusive method of raising an inference of causation. As this court stated in Kachmar, "circumstantial evidence of a 'pattern of antagonism' following the protected conduct can also give rise to the inference." Kachmar, 109 F.3d at 177 (citation omitted). [**7] Ms. Urey argues that she has demonstrated such a pattern, alleging that following her protected activities, her supervisors increasingly began to nitpick [*82] her work, subject her to unreasonable deadlines, and criticize her appearance. However, the record shows the conduct of which Ms. Urey now complains was taken in response to her own acts of insubordination, including her failure to adhere to the College's dress code and demonstrate respect for her supervisors. We hold the conduct "did not portend any future retaliation," but instead amounted to "discrete responses to particular occurrences." Weston, 251 F.3d at 432.

## CONCLUSION

The judgment of the District Court will be AFFIRMED.