The Real Estate Market Place

D395

12/17/2002



  

HOME | SEARCH PROPERTIES | POST NEW LISTING | DELETE/VIEW LISTING | LOGIN | REGISTER

**Suggestions for Open House Materials**

**Information Kit**

- Articles regarding home purchase opportunities from recent newspapers, Today's Real Estate, etc.

- Presentation page "What Is Title Insurance?"

- Current mortgage interest rates

- Local community information

- Local school information

- Brochures about local points of interest

- Game schedules for local teams

- Personal brochure or resume

- Company publications of current listings

- Presentation page "Open House Survey"

- Homeowner's tax savings analysis

- Buyer information sheet, property inspection sheets, etc.

**Open House Survey**

Name: _____

Address: _____

Work Phone: _____

Home Phone: _____

Please answer the following:

RATE ALERT! Often, we are able to negotiate better than published rates from wholesale sources and rates may vary among different borrowers. Therefore, to protect our partners and prevent possible ill will, we no longer make rates available to the general public. Please APPLY ONLINE, for a no obligation custom rate quote. Thank You.

ZERO Down

Apply for a Mortgage





Post Realtor Profile

Rate A Realtor

View Realtor Ratings

Modify Profile

Calculators

A121

The Real Estate Market Place



**Express Application**

**Subscribe to our Newsletter**

**Mortgage Events**

1. **How did you find out about this home?**

. Newspaper   . Mailing   . Sign

. Referral from a friend   . Referral from another broker

. Other: _____

2. **Are you selling or planning to sell soon?**

. Yes   . No

3. **Are you currently buying or thinking about buying a property?**

. Yes   . No

4. **What did you like most about this property?**

_____

_____

5. **What did you like least about this property?**

_____

_____

The owners appreciate your completion of this market survey. If you ever need the services of a REALTOR®, please do not hesitate to call. Thank you.

<<Back  Next>>

Resource Center

- Search Properties
- Real Estate News

Contact Us | Feedback | Home |

The Eapen Corporation
TERLYN SQUARE # 123 15 West Churchville Road; Suite 115 Bel Air, MD 21014
800.80EAPEN / 410.8792055

Copyright © 1997-2002 EAPEN, Inc. All Rights Reserved.

http://www.eapen.net/fsbobroucher25.asp

D396

12/17/2002

A122

The Real Estate Market Place







HOME | SEARCH PROPERTIES | POST NEW LISTING | DELETE/VIEW LISTING | LOGIN | REGISTER

E A P E N

**Guest Registration**

Property:

Welcome! My name is Tracey Lynn Kelley. As a courtesy to the owners of this home, please complete this register. Thank you!

**What time frame will you buy in?**

Name    Phone

_____    . 2 mos.    . 3 mos.    . 6 mos.
_____    . 2 mos.    . 3 mos.    . 6 mos.
_____    . 2 mos.    . 3 mos.    . 6 mos.
_____    . 2 mos.    . 3 mos.    . 6 mos.
_____    . 2 mos.    . 3 mos.    . 6 mos.
_____    . 2 mos.    . 3 mos.    . 6 mos.
_____    . 2 mos.    . 3 mos.    . 6 mos.
_____    . 2 mos.    . 3 mos.    . 6 mos.
_____    . 2 mos.    . 3 mos.    . 6 mos.
_____    . 2 mos.    . 3 mos.    . 6 mos.
_____    . 2 mos.    . 3 mos.    . 6 mos.
_____    . 2 mos.    . 3 mos.    . 6 mos.
_____    . 2 mos.    . 3 mos.    . 6 mos.

**What Is Included In The Sale Of My Home?**

Items traditionally considered being a part of "Real Property" include all fixtures, built-ins and improvements. Anything, which is attached to the property with electrical wire, nails, bolts, screws, etc.

RATE ALERT! Often, we are able to negotiate better than published rates from wholesale sources and rates may vary among different borrowers. Therefore, to protect our partners and prevent possible ill will, we no longer make rates available to the general public. Please APPLY ONLINE, for a no obligation custom rate quote. Thank You.

ZERO DOWN

Apply for a Mortgage





Post Realtor Profile

Rate A Realtor

View Realtor Ratings

Modify Profile

Calculators



D397

12/17/2002

**A123**

The Real Estate Market Place




**Mortgage Events**

can be considered a part of the property.

1. All window coverings and rods, all light fixtures and ceiling fans.

2. All attached floor coverings.

3. Smoke/fire and security alarm systems and their devices (unless noted as leased systems).

4. Built-in stereo speakers and interior wiring for speakers, including intercom systems.

5. Water conditioning system (unless noted as leased system).

6. Storm windows, doors and screens.

7. Television antennas and cable to television.

8. Range and/or oven and their attachments (even if technically freestanding).

9. Microwave oven if not freestanding.

10. Dishwasher, disposal, built-in refrigerator and/or freezer, wet bar, refrigerator and/or freezer if not built-in (however, regular refrigerators normally do not remain with the property unless specifically negotiated in the purchase contract). The copper tubing for the icemaker should always remain.

11. Note: the "Space Maker" under-the-cabinet appliances such as toasters, coffee makers, etc. Are not considered built-ins.

12. All attached mirrors, cabinets, bookcases and shelving.

13. Fireplace screen and grate, plus glass screen plus vent/blower system.

14. Awning(s) and mail box(es).

15. Lawns, landscaping, sprinkler(s) and automatic sprinkler system(s).

16. Storage sheds if attached to a permanent base.

17. Garage door opener and controls.

18. Equipment necessary to operate pool and/or spa.

D398

12/17/2002

**A124**

The Real Estate Market Place

Walk through your home, inside and out, room-by-room while making a list of all items you wish included and excluded from the sale of your home. Also, make a list of those items to be sold separately. If you are uncertain as to whether or not an item should remain, please discuss the matter with a professional or us.

The list above may not be complete. This list is provided to you to assist you in jogging your memory.

<<Back Next>>

Resource Center

- Search Properties
- Real Estate News

Contact Us | Feedback | Home |

The Eapen Corporation
TERLYN SQUARE # 123 15 West Churchville Road; Suite 115 Bel Air, MD 21014
800.80EAPEN / 410.8792055

Copyright © 1997-2002 EAPEN, Inc. All Rights Reserved.

A125

D399

12/17/2002

The Real Estate Market Place

Page 1 of 4



**Security Considerations**

Maintaining your privacy and peace of mind

When you put up a "For Sale By Owner" sign, you are automatically inviting strangers into your home. Many are bargain hunters and people merely looking for some place different to spend time. Few, if any of these people, will have the slightest intention of buying.

We can. If given enough time to schedule, assist you when you hold an open house. We can attend to your guest registration booklet as well as talk to potential buyers about obtaining a loan approval.

Here are some signs for you to consider:

1. Talk to neighbors; Keep a watchful eye out for suspicious people/cars in the immediate area. You may want to note the make, model plate number of suspicious vehicles.

2. Keep ALL valuables put away and out of sight. In back of closet or safety deposit box.

3. Avoid late appointments after dark.

4. When you have an open house, set up a call back system with your next-door neighbor. If you have any suspicions about a visitor, ask your neighbor to call you back within thirty minutes.

5. Have at least one extra person with you, a good friend, relative or neighbor when showing your home.

6. Avoid getting cornered by the person(s) you are showing your home to, especially if you are the lady of the house.

7. Do not disclose your work schedule to anyone.

RATE ALERT! Often, we are able to negotiate better than published rates from wholesale sources and rates may vary among different borrowers. Therefore, to protect our partners and prevent possible ill will, we no longer make rates available to the general public. Please APPLY ONLINE, for a no obligation custom rate quote. Thank You.





Post Realtor Profile

Rate A Realtor

View Realtor Ratings

Modify Profile

Calculators





**A126**

12/17/2002

D400




**Mortgage
Events**

They could be trying to find out when you will not be home.

8. Do not schedule vacations during the time you have your home up for sale.

**Top Ten Mistakes to Avoid**

For most people buying a home is the biggest investment they will ever make. However, few people do the research necessary to make a good buying decision. The home selling and purchase process is extremely confusing for most people. However, with a little bit of homework and with advice from an experienced professional who has been through the process before, the task can be easier. There is no substitute for taking time to educate yourself before you sell your house.

Concentrating on shoppers that are not pre-approved for a loan is, for the most part, a waste of your time. Do not confuse a pre-approval with a pre-qualification. Pre-qualification only tells someone the monthly payment they qualify for based on their monthly income, not if they can get loan approval. The pre-approval process is much more complete. During the pre-approval process the Mortgage Company does all the work needed for a full loan approval. The underwriter needs income verification, total debt to income ratios, the purchase agreement, appraisal, title search and other documentation. An applicant becomes a **CASH BUYER** when they have been pre-approved for a loan. In some cases (especially in multiple offer situations), having a pre-approved buyer can make the difference between selling your home at your asking price or not.

Many buyers shop for a home before they are pre-approved for a loan. Our Mortgage Company will take anyone through the pre-approval process who is looking at your home. We pre-approve potential buyers at no cost to you or the buyer. All we need from the prospect to get a conditional loan approval is a signed loan application, credit report, 2 years previous W-2's and 2 most recent pay stubs showing year-to-date income. The pre-approval process usually takes 1 to 12 hours.

1. Never enter into negotiations with a prospective buyer without the buyer obtaining pre-approval for a home loan. Pre-qualified is not the same as pre-approved.

A127

The Real Estate Market Place

2. Never make verbal agreements! If a buyer asks you to sign a written document that is contrary to yours or their verbal arrangements...don't do it! Example: the buyer asks that the washer stay with the house, but the purchase agreement states that it will not...the written agreement will over-ride the verbal agreement. In fact, written agreements and contracts almost always override verbal agreements. Selling a house can be a complex process...it's a lot easier when everything is in writing.

3. Never enter into serious negotiations to sell your home with a person or family that has not been approved for a loan. Too many sales of homes have fallen apart just because the buyer has not been approved for a loan.

4. If you are buying a home in conjunction with selling your existing home, never select a Mortgage Company just because they advertise or tell you they have the lowest interest rates. While interest rates are important, don't overlook the overall cost of your loan. Some Mortgage Companies make extra money on a higher than par interest rate. You may want Zero Points, but are you willing to pay the higher interest rate and monthly payments for the life of the loan.

5. Selling a home without a "Home Warranty Inspection and Guarantee". Too many lawsuits have been filed because of needed repairs that were not disclosed before or at the closing of the sale of the house. You should get a home warranty inspection, which will indicate if repairs are needed. This is a must!

6. Never sign documents without reading and understanding them. You must read all paperwork before you sign anything. This is another area that creates a great deal of lawsuits. It is best if you hire a Real Estate Attorney to review the purchase agreement and any related paperwork. Real Estate Attorneys have large caseloads that arose from sellers not consulting an attorney during the sale/purchase process.

7. Never make your moving plans without room for delays. Example: You expect to move out of your house on a Friday and into your new home over the weekend. Then the loan closing gets delayed until next Tuesday or Thursday because the lender needs

D402

12/17/2002

The Real Estate Market Place

Page 4 of 4

one or two additional items from the borrower. The delay could be due to something beyond anyone's' control. What do you do now? It is best to arrange flexible time frames with the buyer(s) of your house before hand...and get it in writing.

8. Don't make the mistake of marketing your home in a half hazard manner. It makes good sense to utilize all the technology available to you in marketing your home. We have the technology and make it available to you "FREE" of charges.

9. Never let anyone preview your home unless you have some security measures in place. There are many documented incidences where a home was cased for a future burglary during an OPEN HOUSE.

10. It is never a good idea to enter any contract or agreement without help from a Professional.

<<Back  Next>>

Resource Center
                                                  ——
                                          - Search Properties
                                          - Real Estate News

Contact Us | Feedback | Home |

The Eapen Corporation
TERLYN SQUARE # 123  15 West Churchville Road; Suite 115 Bel Air, MD 21014
800.80EAPEN / 410.8792055

Copyright © 1997-2002 EAPEN, Inc. All Rights Reserved.

A129

D403

12/17/2002

The Real Estate Market Place



HOME | SEARCH PROPERTIES | POST NEW LISTING | DELETE/VIEW LISTING | LOGIN | REGISTER

E A P E N

**Security Considerations**

Maintaining your privacy and peace of mind

When you put up a "For Sale By Owner" sign, you are automatically inviting strangers into your home. Many are bargain hunters and people merely looking for some place different to spend time. Few, if any of these people, will have the slightest intention of buying.

We can, if given enough time to schedule, assist you when you hold an open house. We can attend to your guest registration booklet as well as talk to potential buyers about obtaining a loan approval.

Here are some signs for you to consider:

1. Talk to neighbors; Keep a watchful eye out for suspicious people/cars in the immediate area. You may want to note the make, model plate number of suspicious vehicles.

2. Keep ALL valuables put away and out of sight. In back of closet or safety deposit box.

3. Avoid late appointments after dark.

4. When you have an open house, set up a call back system with your next-door neighbor. If you have any suspicions about a visitor, ask your neighbor to call you back within thirty minutes.

5. Have at least one extra person with you, a good friend, relative or neighbor when showing your home.

6. Avoid getting cornered by the person(s) you are showing your home to, especially if you are the lady of the house.

7. Do not disclose your work schedule to anyone.

RATE ALERT! Often, we are able to negotiate better than published rates from wholesale sources and rates may vary among different borrowers. Therefore, to protect our partners and prevent possible ill will, we no longer make rates available to the general public. Please APPLY ONLINE, for a no obligation custom rate quote. Thank You.






Post Realtor Profile
Rate A Realtor
View Realtor Ratings
Modify Profile
Calculators

A130

http://www.eapen.net/fsbobroucher27.asp

The Real Estate Market Place

 Express Application

 Subscribe to our Newsletter

**Mortgage Events**

They could be trying to find out when you will not be home.

8. Do not schedule vacations during the time you have your home up for sale.

**Top Ten Mistakes to Avoid**

For most people buying a home is the biggest investment they will ever make. However, few people do the research necessary to make a good buying decision. The home selling and purchase process is extremely confusing for most people. However, with a little bit of homework and with advice from an experienced professional who has been through the process before, the task can be easier. There is no substitute for taking time to educate yourself before you sell your house.

Concentrating on shoppers that are not pre-approved for a loan is, for the most part, a waste of your time. Do not confuse a pre-approval with a pre-qualification. Pre-qualification only tells someone the monthly payment they qualify for based on their monthly income, not if they can get loan approval. The pre-approval process is much more complete. During the pre-approval process the Mortgage Company does all the work needed for a full loan approval. The underwriter needs income verification, total debt to income ratios, the purchase agreement, appraisal, title search and other documentation. An applicant becomes a **CASH BUYER** when they have been pre-approved for a loan. In some cases (especially in multiple offer situations), having a pre-approved buyer can make the difference between selling your home at your asking price or not.

Many buyers shop for a home before they are pre-approved for a loan. Our Mortgage Company will take anyone through the pre-approval process who is looking at your home. We pre-approve potential buyers at no cost to you or the buyer. All we need from the prospect to get a conditional loan approval is a signed loan application, credit report, 2 years previous W-2's and 2 most recent pay stubs showing year-to-date income. The pre-approval process usually takes 1 to 12 hours.

1. Never enter into negotiations with a prospective buyer without the buyer obtaining pre-approval for a home loan. Pre-qualified is not the same as pre-approved.

D405

12/17/2002

The Real Estate Market Place

2. Never make verbal agreements! If a buyer asks you to sign a written document that is contrary to yours or their verbal arrangements...don't do it! Example: the buyer asks that the washer stay with the house, but the purchase agreement states that it will not...the written agreement will over-ride the verbal agreement. In fact, written agreements and contracts almost always override verbal agreements. Selling a house can be a complex process...it's a lot easier when everything is in writing.

3. Never enter into serious negotiations to sell your home with a person or family that has not been approved for a loan. Too many sales of homes have fallen apart just because the buyer has not been approved for a loan.

4. If you are buying a home in conjunction with selling your existing home, never select a Mortgage Company just because they advertise or tell you they have the lowest interest rates. While interest rates are important, don't overlook the overall cost of your loan. Some Mortgage Companies make extra money on a higher than par interest rate. You may want Zero Points, but are you willing to pay the higher interest rate and monthly payments for the life of the loan.

5. Selling a home without a "Home Warranty Inspection and Guarantee". Too many lawsuits have been filed because of needed repairs that were not disclosed before or at the closing of the sale of the house. You should get a home warranty inspection, which will indicate if repairs are needed. This is a must!

6. Never sign documents without reading and understanding them. You must read all paperwork before you sign anything. This is another area that creates a great deal of lawsuits. It is best if you hire a Real Estate Attorney to review the purchase agreement and any related paperwork. Real Estate Attorneys have large caseloads that arose from sellers not consulting an attorney during the sale/purchase process.

7. Never make your moving plans without room for delays. Example: You expect to move out of your house on a Friday and into your new home over the weekend. Then the loan closing gets delayed until next Tuesday or Thursday because the lender needs

D406

The Real Estate Market Place

one or two additional items from the borrower. The delay could be due to something beyond anyone's' control. What do you do now? It is best to arrange flexible time frames with the buyer(s) of your house before hand...and get it in writing.

8. Don't make the mistake of marketing your home in a half hazard manner. It makes good sense to utilize all the technology available to you in marketing your home. We have the technology and make it available to you "**FREE**" of charges.

9. Never let anyone preview your home unless you have some security measures in place. There are many documented incidences where a home was cased for a future burglary during an OPEN HOUSE.

10. It is never a good idea to enter any contract or agreement without help from a Professional.

<<Back  Next>>

Resource Center

- Search Properties
- Real Estate News

Contact Us | Feedback | Home |

The Eapen Corporation
TERLYN SQUARE # 123  15 West Churchville Road; Suite 115 Bel Air, MD 21014
800.80EAPEN / 410.8792055

Copyright © 1997-2002 EAPEN, Inc. All Rights Reserved.

A133

D407

12/17/2002

http://www.eapen.net/fsbobroucher27.asp

The Real Estate Market Place

D408

12/17/2002





| HOME | SEARCH PROPERTIES | POST NEW LISTING | DELETE/VIEW LISTING | LOGIN | REGISTER |

RATE ALERT!
Often, we are able to negotiate better than published rates from wholesale sources and rates may vary among different borrowers. Therefore, to protect our partners and prevent possible ill will, we no longer make rates available to the general public. Please APPLY ONLINE, for a no obligation custom rate quote. Thank You.

ZERO DOWN

Apply for a Mortgage

**Tips From A Real Estate Attorney**

Getting a real estate attorney is your choice. Our goal in this FSBO book is to provide you with information, ideas and suggestions. You always have the choice. This letter is from a well-known real estate attorney. We included this letter for your information only.

**Real Estate and Lawyers**

How can you avoid lawsuits - reduce your risk - save money - sleep better at night? Hire an Attorney to look out for your rights! Every party to a real estate transaction should have an attorney. The only exception may be a seasoned buyer or seller participating in a transaction that is remarkably similar to past transactions. Yes - attorneys charge money but you are insuring against the "What If Something Happens". In my humble opinion as a lawyer, money spent on a lawyer in a real estate transaction is always worth it. Anything could go wrong so why not take the necessary precautions to protect yourself.

<u>Attorney's Fees</u>

If you cannot afford the car insurance, do not drive. If you think you cannot afford to hire an attorney to assist you in a real estate transaction, don't. Often times a buyer or seller can consult an attorney and obtain the legal help they need for a few hundred dollars depending on the extent and content of the purchase agreement. However, the cost of any single mistake in a real estate transaction can greatly exceed the cost of legal defense counsel. A good real estate lawyer (please note: the term "good lawyer") will normally charge an hourly rate of about $150.00 to $250.00. Do not necessarily select your lawyer based on this rate. Many lawyers offer a consultation for a set fee. Some charge a straight hourly rate, and some will hold your hand all the way through closing



Post Realtor Profile

Rate A Realtor

View Realtor Ratings

Modify Profile

Calculator

Express
Application

Subscribe
to our
Newsletter

## Mortgage Events

for a flat fee. You should ask on your first contact with a lawyer how they charge. Generally, if a buyer or seller is being prudent by carefully reading, and understanding their documents, a few to several hours of legal help will be sufficient and the lawyer's fee will be insignificant compared to the big picture.

### How To Choose An Attorney

It is commonly thought in real estate offices that attorneys are deal killers. Unfortunately, this is often true, which is why you must read this section carefully, and choose a lawyer that will facilitate your transaction and help you fine tune, rather than pick apart, the little details that should not kill the deal. Generally, the best way to select a lawyer is by his or her reputation. You can call Realtors and Title Companies and ask them for names of real estate attorneys they have chosen to work with in the past. If the same name(s) keep coming up, and they will, you will know whom to call. You can also look in the yellow pages under real estate lawyers. Those who practice primarily real estate law advertise in that section. This can narrow your search early.

Once you get your search down to a small list, how do you choose the right attorney? Unfortunately, most lawyers will tell you they practice real estate law. However, you need a lawyer whose practice consists of primarily real estate matters. You also need a lawyer with a number of years of experience in real estate. Beware of the lawyer who says they can handle your deal when their primary area of practice is not real estate. Real estate law is not a topic where a green lawyer can get up to speed quickly with a little research - nothing can replace experience.

### The Attorney's Role

The attorney's role may vary from case to case, but normally a lawyer's job is to consult, review, and advise.

**Consulting**-During the initial consultation, you should deliver a copy of all pertinent materials, including any proposed agreements, signed agreements, listing materials, photos, covenants, appraisals, deeds, title material, etc. You should also describe your goals, and requirements in writing. This is important because each piece of real property is as unique as are you. If you want good legal advice, you

The Real Estate Market Place

need to inform your lawyer all about your situation, your needs and requirements, so they can tailor their advice to you and your transaction.

**Reviewing**-You may choose to have your attorney review all of your documents, or simply the parts you have questions about. I generally recommend a full review. Remember, the more mistakes your attorney can help you avoid the more time, effort, and money you can save. If your materials are lengthy, you might consider delivering them to your lawyer before your initial meeting. That can lead to a more productive and shorter session. **Advice**-It is a rare attorney that has a problem giving an opinion. Your attorney's job is to protect your best interest by giving you the best possible advice regarding your legal options. Whether you need minor adjustments, or a major overhaul, your attorney's advice is the result you are seeking in this relationship.

**When To Hire An Attorney**

Now! You may choose to consult your lawyer briefly before you even begin your efforts to buy or sell. You must talk to your lawyer before you sign documents; and you absolutely must talk to your attorney before you close.

**Conclusion** The first step in any real estate transaction should be to identify your needs and goals. You should read and understand every word, on every page, of every document; Real estate transactions are generally the largest, most important financial activities in a person's life. Once you know your goals, and understand the deal, get good advice from a good lawyer, that is the surest way to success in your real estate transaction.

Can you think of anything else?

1. _____

2. _____

3. _____

4. _____

5. _____

**A136**

**D410**

Page 4 of 4

The Real Estate Market Place

<<Back  Next>>

Contact Us | Feedback | Home |

Resource Center

The Eapen Corporation
TERLYN SQUARE # 123  15 West Churchville Road; Suite 115 Bel Air, MD 21014
800.80EAPEN / 410.8792055

Copyright © 1997-2002 EAPEN, Inc. All Rights Reserved.

- Search Properties
- Real Estate News

D411

12/17/2002

A137

http://www.eapen.net/fsbobroucher28.asp

The Real Estate Market Place



HOME | SEARCH PROPERTIES | POST NEW LISTING | DELETE/VIEW LISTING | LOGIN | REGISTER

E A P E N

The following pages are indented for your prospective purchasers. We can customize these pages incorporating the specifics of your home to be used as handouts during the open house.

**RATE ALERT!** Often, we are able to negotiate better than published rates from wholesale sources and rates may vary among different borrowers. Therefore, to protect our partners and prevent possible ill will, we no longer make rates available to the general public. Please APPLY ONLINE, for a no obligation custom rate quote. Thank You.

Please call Tracey Kelley-Eapen to discuss details.

## Finance Guide

4834 Main Street, Anytown, US 12345

### Finance presentation by

Tracey Lynn Kelley

The Eapen Corporation
106 Wakefield Drive
Bel Air, MD 21014

<u>Download Financial Guide</u>

<<Back







Post Realtor Profile

Rate A Realtor

View Realtor Ratings

Modify Profile

Calculators

Express Application

Subscribe to our Newsletter

**Mortgage Events**

Contact Us | Feedback | Home |

Resource Center

- Search Properties
- Real Estate News

The Eapen Corporation
TERLYN SQUARE # 123 15 West Churchville Road; Suite 115 Bel Air, MD 21014
800.80EAPEN / 410.8792055

Copyright © 1997-2002 EAPEN, Inc. All Rights Reserved.

A139

D413

## O'Neill, John P (Info Sec)

| | |
|---|---|
| **From:** | Eapen, Justus |
| **Sent:** | Wednesday, January 08, 2003 3:48 AM |
| **To:** | Schulz, Dave; Dell, Jim; Campbell, Jason; O'Neill, John P (Info Sec) |
| **Subject:** | UAT DMZ Servers inlcuding 03T and 05T |

Around 10:45 PM as part of the Audit readiness preparation (such as checking IDD, Dumpsec reports, ITA, NAV etc.), I attempted to log on to the UAT DMZ servers last night.

I was unable to logon using my account or the default admin account. I paged Jason and with his permission logged on as Jcampbe4/Jcampbell and proceeded to reset my account. However, upon logging on with my ID on the MMS boxes, I realized that the machine policy was preventing me from gaining administrative access. I proceeded to delete my account and recreate one hoping the policy will not be applied to the new account. However, this was not the case. We need to look into this to determine the root cause.

At this point, I called Jim Dell, but overlooked to discuss my account thinking it was not significant and I could fix it on my own.

After I got off the phone with Jim Dell, I recognized that certain required information from a Deerfield server got truncated and I went back to collect this. While I was in Deerfield, John Oneill and Dave Schulz paged me to find out what I was doing to the DMZ environment. I explained to them that my account was not functional, so I deleted and recreated my ID. *[handwritten annotations in right margin]*

I also reiterated that I need to talk to Jim before being at liberty to discuss the matter further. Command Center had told me certain senior manager was in the room and I did not want to explain using Jason's ID on a conference call that was being listened to by all in the Command Center.

Dave, John and I agreed that I will refrain from further accessing the box for the rest of the night. So I left those servers logged on, but locked.

At this point, I paged Jim Dell and Jason Campbell and updated them about what happened. Further, Jim and I agreed that if there are further questions regarding this matter, he will be the primary contact.

Regards,

D514

The outcome of this alert resulted in a meeting with DTC management. It was determined that Justice Eapen used Jason Campbell's administrator account to make changes on DMZ servers without change management. Justice called Jason and used his account because he was locked out of his account and he could not remember the administrator's account. The way that the event occurred is that Dave Schulz and John O'Neill received 23 pages from the dmz servers stating that changes were being made. At 11:11 pm the first page came in. The last page came in at 11:22 pm. John O'Neill dialed into MBNA to view the SQL output. It was determined that Jason and Justice appeared to be in work making changes. Dave and I conferenced into MBNA and got Justice on the phone. The responses that we received were not the correct responses. We determined that Jason was not at work. At this point Dave and John O'Neill stated that Justice was to do no more work on the servers. Justice stated that he was making changes for an Audit walkthrough that was occurring the next day. Dave and John stated no more changes. Due to the multiple Information Security violations. DTC management turned this over to Personnel for review

**A141**



# CORRECTIVE ACTION REPORT

| Date: | 1/12/03 | Id Number: | 78616 | Name: | Jason ~~~~~~ |
|---|---|---|---|---|---|
| | | | | Job Title: | PC Specialist |
| Status/Grade: | FT/350 | DOH: | 11/15/99 | Manager Name/ID: | Ernesto Marra/22751 |
| Cost Center: | 5753 | Department: | Desktop Computing Services | | |

**Corrective Action Status:**
___X___ First Warning     _____ Final Warning     _____ Dismissal
Date of Previous Action(s): N/A

**Documentation:**
Jason is being placed on First Warning for misconduct according to Personnel Policy 601. More specifically, he violated Information Security Guidelines by sharing passwords with another co-worker.

On 1/7/03, Jason received a page from a co-worker advising that he could not remember his password and needed to access the User Acceptance Test server in order to complete a testing assignment by 8:00 a.m. the next morning. The co-worker advised Jason that he would use his logon ID and password to gain access to the system. Upon completing the task, the co-worker would log-out and use his own password.

On 1/14/03, Personnel met with Jason to discuss the incident. Jason admitted that he verbally communicated his password to the co-worker and responded, "it was bad judgement on my part." Jason stated that he did not think to advise his co-worker to notify his Manager, Jim Dell regarding the issue because he was not alert after being asleep. Jason confirmed the process of notifying the Manager should these type of issues or others occur. In addition, Jason confirmed that he was aware of the Information Security Guidelines.

Jason has been re-educated on the importance of following Information Security Guidelines and Policy 601.

This First Warning will remain active for six months. Any further incidents of misconduct or below standard performance during this timeframe may result in further corrective action. Jason is not eligible to job post for six months.

**Individual's Comments Regarding Corrective Action:**

_Signature_     8/13/03  **Date**          _Personnel_     2/13/03  **Date**

2/14/0

Revised 2/7/02

D157



**INTERNAL MEMORANDUM**

| To: | File | Phone: | 68678 / 74493 |
| From: | Richard T. Kilmon / Renee Cuffee-Williams | Department: | Personnel |
| Date: | 1/21/03 | Mailstop: | 2216 |
| Subject: | **Justus Eapen** | | |
| | **CONFIDENTIAL CONFERENCE** | | |

**Background:**

| | Systems Engineer | | 406 / PBO |
| | 2/28/00 | | Ernesto Marra |
| | Desktop Computing | | 3.30 (12/22/01) |
| | None | | |

*History:* 2

On 12/17/03 Rich Kilmon of Personnel received a call from Jim Dell, Manager to discuss conduct issues regarding Justus Eapen. Jim indicated that he had several issues with Justus. First, Justus was not completing work as assigned. Secondly, he was observed sleeping during work hours, and lastly, he indicated that he has a tardiness issue. Additionally, Jim said that he was told that Justus was involved in a real estate business as a mortgage broker and that he was soliciting MBNA people during work hours. Jim referenced the web-site that pertained to the mortgage business. As a result, an investigation was conducted. The investigation revealed the following. A web-site was discovered identifying Justus as a CEO of the company and phone reports revealed that during the months of September and December 2002, phone calls were made to non-work related vendors and financial institutions during work hours. While continuing the investigation, Personnel was contacted on 1/9/02 by Jim Micek, Director of Desktop Computing, advising that Justus had been identified as violating information security guidelines. Specifically, Justus logged onto a server under a co-workers password. Additionally, he attempted to change his level of system access after gaining access to the server. Upon completion of all investigations, Personnel contacted the ethics office and confirmed that Justus' actions were a conflict of interest with MBNA's mortgage business.

On 1/21/03, Justus met with Renee Cuffee-Williams and Richard Kilmon of Personnel regarding the issues. Justus indicated that he was aware of the reason he was meeting with Personnel. He stated that he had used the telephone excessively or abused telephone privileges while working. He said that he occasionally uses the phone at work once or twice a week to call home in Maryland, but very little because he works at night. Justus was told that he was visiting Personnel for reasons above and beyond using the phone. Rich Kilmon advised Justus of knowing about the mortgage business. Justus explained that his wife works for Wells Fargo as a mortgage broker and that the web-site belongs to her and he assists in maintaining it. He further commented that he is not involved in the business or the corporation. When asked again about the web site and to explain the corporation Justus said, " I have a web site...no, she has a web site that generates leads and that it does help her to talk about it as our business." Justus added that if he and his wife were at a party or some other social event they would talk about the corporation in an effort to generate leads or to network. He said that his wife has given her business cards to coworkers while attending the MBNA cornboil. He said that he saw the social events as an opportunity to network. He was asked if he had ever solicited MBNA people to generate leads or to network and he said, " Everybody knows she is in the mortgage business just by being friends....I would have told people what she does." Justus the said, "If you're asking me if I solicited business from MBNA, absolutely not, I don't like doing business with friends or family." He than added that a coworker named Glen Ford called him regarding a mortgage but he refused to discuss matter. Justus said that he might have communicated with

coworkers about mortgage rates because he recently purchased a house. He was asked if he ever made any calls using MBNA telephones for the business. He said, "I have no reason to." He was then asked if he used MBNA equipment on behalf of Eapen Corporation and solicited MBNA people. Justus responded that he had not.

Justus was then advised that telephone reports revealed that a total of 10 calls had been made from his MBNA telephone extension to eight technical vendors, one to an insurance company and one to Wells Fargo Mortgage Company. The list was reviewed with Justus. He advised that the technical vendors were for MBNA business, and he could not remember calling an insurance company. Additionally, calls to Wells Fargo were to his wife. Justus was informed that none of the technical vendors were identified by his department as business partners. Justus then explained that he sees ads in magazines from time to time and calls them out of curiosity. He also confirmed that one of the vendors, Go Daddy.com is one he uses for the Eapen Corporation web site.

Upon asking about the officers of the company, Justus confirmed that the web site was registered under name. He also said that the business, Eapen Corporation, is registered in Maryland under his name with him being the principal officer. He then corrected himself and said, "No, it's under my wife's name." He then said that in order to access the web site a person would have to know the web site address, "Eapen.net" or the site would not be able to be accessed. At this point I did a search on the Internet in his presence using only "Eapen" and the site was immediately identified. I then pulled the site up and the web page for Eapen Corporation was revealed. Justus then said, "It was wrong sir, you're absolutely right sir, it is a conflict of interest." He was then asked again if he was involved in the mortgage business and if he was involved in Eapen Corporation and he said that he was not, that it is only a web page for her to develop leads and he has no involvement.

Justus was then questioned about the Information Security violations. Personnel reviewed the information with him as it indicated by his manager.

> On 1/7/03, around 10:45 p.m., Justus unsuccessfully attempted to log on to the UAT DMZ servers to complete a testing assignment. Justus was unable to log on to the system using his account, as well as, the default administrative account. After several unsuccessful attempts, Justus paged Jason Campbell, a co-worker, at his residence and obtained his logon ID and password. Justus proceeded to use Jason's administrative rights to reset his account. At some point during this process, Justus realized that a security policy implemented on those servers earlier was preventing him from gaining administrative access. Once Justus identified the problem, he proceeded to delete his account and recreate one with the belief that the security policy that was preventing his access would no longer play a part. The policy however, did not respond as expected and Justus contacted his Manager, Jim Dell at his residence. Justus failed to discuss the locked account issue with his Manager. On 1/8/03, Jake Catanzarite from Information Security notified Justus' Management to advise that a policy violation had been commited.

Justus responded, "I do understand that what I did was wrong and I should not have asked Jason for his password because I am more experienced." Justus stated that his Manager, Jim advised him that the assignment needed to be completed by 8:00 a.m. the next morning, which is the reason that he contacted Jason. Justus stated that he spoke with his Manager, Jim three to four times that evening regarding other issues, however he did not advise him of the logon account issue. When asked the reason for failing to advise Jim of the issue, Justus stated that he felt under pressure to get the assignment completed and he did not want his Manager, Jim to think that he was incompetent.



# INTERNAL MEMORANDUM

| | | | |
|---|---|---|---|
| **To:** | File | **Phone:** | (302) 457-3399 |
| **From:** | Rich Kilmon/Mary Stafford | **Department:** | Personnel |
| **Date:** | 1/22/03 | **Mailstop:** | 2216 |
| **Subject:** | **Glenn A. Ford** | | |
| | **CONFIDENTIAL CONFERENCE** | | |

**Background:**

| Position | PC Specialist | Grade / Officer Level | 350 |
|---|---|---|---|
| Date of Hire | 1/23/97 | Manager | Neela Chacko / 74145 |
| Department | Desktop Computing | EPA | 3.55 (12/23/02) |
| Previous Actions | N/A | | |

On 1/22/03, Rich Kilmon and Mary Stafford of Personnel conducted a confidential conference with Glenn Ford regarding Justus Eapen. Glenn and Justus are co-workers who sit next to each other in Desktop Computing.

Glenn stated that he was, "Under the impression that Justus has a mortgage business" and he had heard co-workers refer to the business as "Justus' wife's business". Justus had never approached Glenn to sell him a mortgage but Glenn had confided in him during the time when he was buying a house that he was looking for best interest rates that he could find. He said that Justus offered to try to get him a better rate during his initial mortgage search. Glenn said that one morning while at his desk at work, Justus searched the Internet for him in an attempt to identify better mortgage interest rates. Glenn wanted to deal with a big mortgage company so he didn't really take Justus seriously. He thought the whole situation was "weird" and possibly "not right", that Justus would be running a mortgage business while working at MBNA.

He stated that he was aware of Justus' web site, Eapen.net. He was also aware that Justus had spoken to Neela Chacko and possibly John Hartnett regarding mortgages.



# INTERNAL MEMORANDUM

| | | | |
|---|---|---|---|
| To: | File | Phone: | (302) 457-3399 |
| From: | Rich Kilmon/Mary Stafford | Department: | Personnel |
| Date: | 1/22/03 | Mailstop: | 2216 |
| Subject: | **John P. Hartnett, Jr.**<br>**CONFIDENTIAL CONFERENCE** | | |

**Background:**

| | | | |
|---|---|---|---|
| Position | Sr. PC Specialist | Grade/Officer Level | 355 |
| Date of Hire | 10/12/99 | Manager/MLX | Neela Chacko / 74145 |
| Department | Desktop Computing | LPAD | 3.57 (12/23/02) |
| Written Actions | N/A | | |

On 1/22/03, Rich Kilmon and Mary Stafford of Personnel conducted a confidential conference with John Hartnett regarding Justus Eapen. John and Justus are co-workers in Desktop Computing.

John stated that he had heard Justus talk about mortgages in the past while in the office. He said he is aware that Justus' wife runs a mortgage business although at times Justus has talked about the business in the "first person". John stated that he understands that it would be a conflict of interest if Justus were selling mortgages while working at MBNA, although he finds it hard to believe that a husband wouldn't be involved with a wife's business.

In September 2002, John obtained a mortgage but did not go through Justus or his wife. John stated that Justus had never approached him regarding a mortgage or ever indicated that he could get him a good interest rate.

John stated that he was aware of Justus' web site, Eapen.net. He said he had never been to the web site but he assumed that Justus built the web site and that it was for his business.

John said it is possible that Justus had spoken to Brian McKeon or Rich Wagner regarding mortgages because he knew they each were actively searching for mortgage rates.



# INTERNAL MEMORANDUM

| To: | File | Phone: | (302) 457-3399 |
|---|---|---|---|
| From: | Rich Kilmon/Mary Stafford | Department: | Personnel |
| Date: | 1/22/03 | Mailstop: | 2216 |
| Subject: | **Neela B. Chacko** | | |
| | **CONFIDENTIAL CONFERENCE** | | |

**Background:**

| Position | Desktop Computing Manager I | Grade/Officer Level | 510 |
|---|---|---|---|
| Date of Hire | 7/17/00 | Manager/Ext | Ernesto Marra / 75340 |
| Department | Desktop Computing | LPA | 3.35 (12/23/02) |
| Previous Conf | N/A | | |

On 1/22/03, Rich Kilmon and Mary Stafford of Personnel conducted a confidential conference with Neela Chacko regarding Justus Eapen. Neela is a coworker of Justus's. She stated that she has talked to Justus' wife, Tracy Eapen, regarding mortgages because Tracy works for Accubanc Mortgage (800-333-0709) in Maryland and she was in the market for a mortgage. Neela said that she always called her from home. She noted that she first met Tracy at the MBNA Company cornboil and that Tracey gave her a business card in the event she ever needed her services when mortgage shopping. Neela said that she also receives Christmas cards containing flyers and business cards from Tracy during the holidays.

In December 2000, Neela refinanced a couple of her rental properties through Tracy. She said that from December 2000 to June 2001, Tracy also has assisted her with a total of seven mortgages, four in March and two in December of 2000, and one in June 2001 through National City Mortgage, 800-822-5626, P. O. Box 17677, Baltimore, MD, 21297-1677.

Neela stated that Justus has told her of his web site, Eapen.net but she has never visited the site. She stated that she would be surprised if Eapen is involved in the mortgage business since he works at MBNA. One time while at work and speaking with Tracy on the phone, she said to Justus, "I'm talking with Tracy" and he replied "I don't get involved with that, it's her business". She said Justus has never talked to her regarding mortgages. Neela also stated that she is unaware of Justus assisting others in obtaining mortgages.

D125



# INTERNAL MEMORANDUM

| | | | |
|---|---|---|---|
| To: | File | Phone: | (302) 457-3399 |
| From: | Rich Kilmon /Mary Stafford | Department: | Personnel |
| Date: | 1/23/03 | Mailstop: | 2216 |
| Subject: | **Brian K. McKeon** | | |
| | **CONFIDENTIAL CONFERENCE** | | |

**Background:**

| Position | PC Specialist | Grade /Officer Level | 350 |
|---|---|---|---|
| Date of Hire | 1/23/97 | Manager /EIN | Chad Yates / 74667 |
| Department | Desktop Computing | IPA | 3.60 (12/23/02) |
| Previous Actions | N/A | | |

On 1/23/03, Rich Kilmon and Mary Stafford of Personnel conducted a confidential conference with Brian McKeon regarding Justus Eapen. Brian and Justus are co-workers in Desktop Computing.

Brian stated that Justus has brought up in previous conversations that he is in the mortgage business and helps his wife who is a mortgage broker. He said that takes from the conversations that Justus is in the business with his wife. Brian indicated that in the past during group settings, members of his team, including Justus Eapen had discussed mortgage rates because several members of the team were looking for mortgages at the end of 2002.

When Brian mentioned that he was looking for a mortgage in November 2002, Justus said to him, "Let me know and I'll see if we can help you". Justus never referred Brian to any mortgage companies. Brian stated that he doesn't like to mix business with his personal life so he didn't pursue a mortgage through Justus.

Brian had viewed Justus' web site, Eapen.net, with Justus once. Justus said he wanted to show Brian his profile and how his stocks update automatically. When asked if Brian had ever witnessed any flyers or business cards relating to Justus' mortgage dealings, being distributed at work he stated "no".

Brian noted that Justus might have spoken to Brian Villegas regarding mortgages as well.

**T T**

**Lee Tannenbaum, M.D.**
**Beverly Tyler, M.D.**

BT2397467
BT1057327

2012 Tollgate Road, Suite 102
Bel Air, MD 21015
(410) 569-9429

1/27/2003

Justus Eapen

$R$x

Please excuse Mr. Eapen from work thru 01/31/03

Thanks

no refills
Please Label

*Lee Tannenbaum* ,M.D.

D1835

**A149**

MBNA

scanned 02/21/03

**HEALTH SERVICES**
**CERTIFICATE OF DISABILITY**

RECEIVED IN CCHSS
FEB 21 2003

To process your Short-Term Disability leave benefit payments accurately, MBNA requires written notification and proof of your disability at its beginning and periodically during the disability. Have your health-care provider complete the information requested below. Return the completed form to the Health and Safety Services department in the envelope provided. As a condition of beginning or continuing on Short-Term Disability leave, you may be required to be examined by MBNA's medical director or a health-care provider of MBNA's choice. MBNA's Health and Safety Services department also reserves the right to periodically contact the health-care provider who signs this form, and any other health-care provider that may provide services relating to your disability, to discuss your diagnosis, prognosis, length of disability, and ability to return to work.

This Certificate of Disability will also be used to determine eligibility for leave under the Family and Medical Leave Act (FMLA).
Please sign and print your name, then submit this form to your health-care provider.

I (your signature) _____ (print name)_____ hereby give (print provider's name) _____ permission to release the information requested below and to discuss with MBNA Health and Safety Services my medical condition, length of disability, and return to work. I understand and agree that MBNA will use this information for determining my eligibility for Short-Term Disability benefits and/or FMLA, and that MBNA may share this information with its long-term disability insurance carrier in connection with its administration of benefits.

## TO BE COMPLETED BY ATTENDING HEALTH-CARE PROVIDER
### (PLEASE PRINT.)

SS No. 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

Patient's Name: Justus Eapen

Diagnosis (ICD9 Code): Primary ___311___ Secondary_____ Third_____

A) Patient's Symptoms: Stomach pain, sadness, suicidal thoughts, depression, vomiting, headaches
B) Objective Findings: normal bloodwork
C) Current Medications: Lexapro 10 mg QD
D) Current Treatment and Plan of Care: medication, follow up, possible counseling

_____
_____
_____

E) If pregnancy, EDC: _____ Type of Delivery, if known: _____

Patient hospitalized (check one):    Yes ☐    No ☑

Dates:_____

Surgery indicated (check one):    Yes ☐    No ☑

Type:_____    Date:_____

Dates patient will be out of work: From 2/3/03 to 2/14/03
Date patient will be able to return to work: 2/17/03 - possible
If unsure of actual date, estimate date: 2/17/03    Date: 2/11/03

Health-Care Provider's Signature: Lee Tannenbaum

Health-Care Provider's Name (please print): Lee Tannenbaum, MD    Phone: 410-569-9429

Office Address: 2012 Tollgate Rd, Ste 102, Bel Air, MD 21015

### RETURN TO
MBNA America, Health and Safety Services Department, MS 2712 Wilmington, DE 19884-2712; or fax to (302) 457-0834.

CC

D1834

**A150**

## Justus Daniel Eapen

**From:** "Justus Daniel Eapen" <eapen@eapen.net>
**To:** "Dell, Jim" <Jim.Dell@MBNA.COM>
**Cc:** <Jim.Micek@mbna.com>; "Chacko, Neela" <Neela.Chacko@mbna.com>;
<Renee.CuffeeWilliams@mbna.com>; <Doug.Denton@mbna.com>;
<Anne_Butler@MBNA.COM>
**Sent:** Friday, February 21, 2003 12:23 PM
**Subject:** My employment at MBNA.

Dear Mr. Jim Dell:

This communication is to specifically address the password sharing incident that lead to the recent abhorrent interrogation by personnel department during my tenure working as a direct report to you.

I am convinced that the task assigned to me during the night of the alleged incident is a direct result of your desire to frame me and sabotage my career with MBNA. In your unrelenting efforts to derail my enthusiasm and esteemed regard for MBNA, you continued to embezzle the job satisfaction and job ownership at every opportunity for nearly two years that culminated in this setup.

Further, I have reliable validation to conclude all other unrelated personnel investigations are also a direct or circumlocutory effort on your part to cease my career at MBNA, due your practiced and calculated effort exclusively based on my Race and or National Origin, both a violation of the federal statutes as well as MBNA Policies.

It is unfortunate that individuals such as yourself are allowed such atrocious and consistent exercise in a manner contradictory to published MBNA precepts. However, that should not be reason for me to accept a Last & Final Warning or any other form of disciplinary action.

I respectfully request that you do whatever it takes to correct or remove any derogatory record pertaining to matters discussed herewith as your actions have caused too much emotional and physical impairment requiring extensive rehabilitation.

Sincerely,

Justus

**A151**

**MBNA AMERICA**

### CORRECTIVE ACTION REPORT

| | | | | Name: | | Justus Eapen |
|---|---|---|---|---|---|---|
| **Date:** | 3/10/03 | **Id Number:** | 79694 | **Job Title:** | | Systems Engineer |
| **Status/Grade:** | FT/406 | **DOH:** | 2/28/00 | **Manager Name/ID:** | | Ernesto Marra/22751 |
| **Cost Center:** | 5753 | **Department:** | Desktop Computing | | | |

| Corrective Action Status: | | | |
|---|---|---|---|
| _____ First Warning | _____ Final Warning | **X** Dismissal | |

Date of Previous Action(s): N/A

**Documentation:**
Justus is being dismissed for conduct according to MBNA Personnel Policies 601 and 606. More specifically, he violated Information Security Guidelines by utilizing the password of a peer to obtain system access. In addition, Justus has engaged in outside employment with his own corporation (Eapen Corporation) as a mortgage broker, which conflicts with the interests of MBNA.

On 1/7/03, Justus unsuccessfully attempted to log on to a server to complete a testing assignment. Because he was unable to log on to the system using his account or the default administrative account Justus paged a co-worker and obtained his co-worker's logon ID and password and proceeded to use his co-worker's administrative rights to reset his own account. A security policy on the servers was preventing him from gaining administrative access. Justus deleted his account and created a new one so that he could bypass the security policy that was preventing his access, which also failed. Justus contacted his manager advising him of the problem but did not tell his manager of his use of the coworker's ID and password to access the system. On 1/8/03, Information Security notified Justus' manager and advised him that Justus had committed a policy violation.

Additionally, Personnel was made aware of a conflict of interest that existed as a result of Justus' involvement with Eapen Corporation, a mortgage brokerage firm. The conflict exists because MBNA is involved in the mortgage business. Personnel was advised that Justus had a web site on the Internet for Eapen Corporation that it is dedicated to real estate services and also provides information for obtaining mortgages through the Eapen Corporation. Personnel was also advised that Justus discussed mortgage rates with coworkers and accessed mortgage rates using the Internet through MBNA computer systems.

On 1/21/03, Personnel met with Justus to discuss both issues. In regards to the information security issue, Justus said, "I do understand that what I did was wrong and I should not have asked my co-worker for his password because I am more experienced." Justus stated that he had an assignment that needed to be completed by 8:00 a.m. the next morning, which is why he contacted his co-worker to obtain his logon. Justus stated that he spoke with his manager several times during that evening, regarding other issues, however, he did not tell him about using the coworker's ID and password to access the system.

The conflict of interest was also discussed with Justus and he denied involvement in the mortgage business and denied assisting co-workers in obtaining mortgage rates. He stated that the Eapen Corporation web site is used to develop leads by his wife who is a mortgage broker for Wells Fargo. Justus also said that he might have mentioned to co-workers that his wife was in the mortgage business and that he has discussed the Eapen Corporation at MBNA social events in order to generate business for his wife. He said that his wife has given MBNA people her business cards while attending the MBNA cornboil. Justus eventually admitted that his involvement in the corporation was a conflict of interest. Further investigation via the internet has revealed Justus Eapen as being Chief Executive Officer of Eapen Corporation.

For the reasons stated above, Justus is being dismissed.

Revised 2/7/02

**A152**

D155

**Individual's Comments Regarding Corrective Action:**

_Failed to return phone calls. 3/26/03_
Signature                                              Date

_Personnel_

Business Area DM or
Director (Finals/Dismissals)                    Date

_3/26/03_
Date



# CORRECTIVE ACTION REPORT

| Date: | 04/28/03 | Id Number: | 1586 | Name: | Patrick ▓▓▓▓ |
|---|---|---|---|---|---|
| Status/Grade: | Full / 219 | DOH: | 12/20/99 | Job Title: | Recovery Specialist |
| Cost Centre: | 1528 | Department: | Loss Prevention | Manager Name/Ext: | Tasha Turner / 4365 |

**Corrective Action Status:**
_____ First Warning    _____ Second Warning    _____ Final Warning    _X_ Dismissal

**Date of Previous Action(s):**
09/26/00 – 2-year Final Warning – Falsification of timesheets
04/03/00 – First Notice – Absenteeism

**Documentation:**
Patrick ▓▓▓▓ is being dismissed for breaching Personnel Policy #606, Statement of Ethics and Responsibility by engaging in outside business that is in direct conflict with his role at MBNA Canada as well as using MBNA equipment in order to engage in these activities.

On 04/24/03, during a standard listening session for incentive purposes, Patrick was heard taking four calls, two with Customers and two with external personal business associates. The first conversation was with an external skip tracer who was discussing payment arrangements for work completed on behalf of Patrick. The conversation including using the Internet in order to discuss Internet banking payment methods to complete pay for services rendered. The second conversation was with Patrick's business partner. They discussed payment arrangements with the skip tracer as well how they were going to get more work for her.

On 04/28/03, Patrick was asked to meet with Personnel in order to discuss the taped conversation. When asked whether he knew about the Ethics Policy, Patrick answered that "Yes, I have had the Ethics education." Patrick was then asked about the telephone conversations and whether he had a business on the side dealing with collections. He stated that "No, I had set up the connection the skip tracer and my friend since she was working on her own and he was looking for someone to work in this capacity." He then went on to add "I do not have a business on the side."

As a result of the telephone conversations that occurred on 04/24/03, Patrick is being dismissed.

**Individual's Comments Regarding Corrective Action:**

| | | |
|---|---|---|
| _signature_ | 5/2/03 | _signature_ 05/02/03 |
| Director of Personnel – Louise Nail | Date | Employment Manager Julie Richer Date |
| _signature_ | 5/2/03 | _signature_ 05/02/03 |
| Manager's Signature – Tasha Turner | Date | Director of Loss Prevention Norm Stanley Date |

Please sign, keep a copy for Manager's file, and forward a copy to your Personnel Representative.

D154