IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

EQUAL EMPLOYMENT OPPORTUNITY )
COMMISSION,                   )
                              )
          Plaintiff,          )
                              )
v.                            )     Civil Action No.
                              )     04-CV-425 SLR
MBNA AMERICA BANK, N.A., a    )
subsidiary of MBNA            )
CORPORATION,                  )
                              )
          Defendant.          )

          Deposition of JUSTUS DANIEL EAPEN taken
pursuant to notice at the law offices of Young, Conaway,
Stargatt & Taylor, LLP, The Brandywine Building,
1000 West Street, 17th Floor, Wilmington, Delaware,
beginning at 10:00 a.m. on Monday, April 4, 2005, before
Robert Wayne Wilcox, Jr., Registered Professional
Reporter and Notary Public.

APPEARANCES:

          TERRENCE R. COOK, ESQ.
          U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
            21 South Fifth Street
            The Bourse - Suite 400
            Philadelphia, Pennsylvania  19106
            for the Plaintiff,

          SHELDON N. SANDLER, ESQ.
          YOUNG, CONAWAY, STARGATT & TAYLOR, LLP
            The Brandywine Building
            1000 West Street - 17th Floor
            Wilmington, Delaware  19801
            for the Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
                    WILCOX & FETZER
    1330 King Street - Wilmington, Delaware 19801
                    (302) 655-0477



**WILCOX & FETZER LTD.**

**A155**

```
 1     Q.    Is your wife employed currently?

 2     A.    Yes, she is.

 3     Q.    Where?

 4     A.    Wells Fargo Bank.

 5     Q.    How long has she been employed there?

 6     A.    I believe maybe four or five years.

 7     Q.    Okay.  Is that a competitor of MBNA?

 8            MR. COOK:  Objection to the form.  You can

 9   answer, if you know.

10     A.    My perspective, no.

11     Q.    What do they do?

12     A.    The area that she works in -- mortgage banking.

13     Q.    What else does the company do besides mortgage

14   banking?

15            MR. COOK:  Object to the form.  You can

16   answer, if you know.

17     A.    I don't know exactly what they do beyond that.

18     Q.    Where is her office?

19     A.    White Marsh.

20     Q.    Maryland?

21     A.    Maryland, yes.

22     Q.    How far is that from your home?

23     A.    Fifteen minutes.

24     Q.    Okay.  Was your wife employed by MBNA at one
```

1        Q.    New York.

2               Is that the only connection you've had with

3    the courts, so to speak?

4        A.    Correct.

5        Q.    Okay.  My understanding is that before you became

6    an employee at MBNA you worked as a contractor.  Right?

7        A.    That is correct.

8        Q.    About how long did you work as a contractor?

9        A.    Approximately three years.

10       Q.    Were you an independent contractor or were you

11   working for an employment agency?

12       A.    I was an independent contractor.

13       Q.    Just by yourself you were hired as a contractor.

14   Is that right?

15       A.    I did not work directly.  I was a subcontractor.

16       Q.    Who was the contractor?

17       A.    It was a company called On-Site Technologies.

18       Q.    What were your duties in that position?

19       A.    I was in the problem management area, so the

20   duties -- whatever problem that arose, I helped

21   coordinate a solution to that problem.

22       Q.    A computer-related problem?

23       A.    Correct.

24       Q.    When was that?

1       A.      That was, I believe, from '97 through 2000.

2       Q.      Did you have some other job before '97?

3       A.      Before '97 I was involved with that -- I

4    mentioned that I was involved with the school project.

5       Q.      The one in India?

6       A.      Correct.

7       Q.      Okay.  So the contract job with MBNA was your

8    first computer-related job.  Is that right?

9       A.      No.  When I was working in New York, I'd say -- I

10   worked for a company called Modi Rubber, which was an

11   enterprise of, I believe, Continental Tires.  I worked as

12   the controller during that time.  I was involved with

13   computers quite extensively.  I did not actually perform,

14   you know, computer programming or, you know, like -- I

15   was involved in the management of the environment.

16      Q.      But you say you were the controller?

17      A.      That is correct, sir.

18      Q.      So was that primarily an accounting job?

19      A.      I think it entails a lot of operations, not just

20   primarily accounting.

21      Q.      How long did you have that job?

22      A.      About two years.

23      Q.      So what:  '95 to '97?

24      A.      No.  It should be prior to that, because '95

1    Q.    According to my records, you began as an employee

2    of MBNA February 28th, 2000.  Does that sound right?

3    A.    Correct.

4    Q.    Okay.  How did you come to get that?

5          I understand you were a contractor, but just

6    tell me about how that transition went.

7    A.    Well, I believe I -- to the best of my knowledge,

8    I was the longest running contractor in the area that I

9    was working -- they did not use contractors like that --

10   and was asked to take different jobs at different times.

11   But nothing that panned out in a -- every time that we

12   discussed opportunities, I think my income as a

13   contractor was more than my income as a -- if I were to

14   work over there.

15         It came to a point one time one of the

16   managers told me that I need to take a job as an employee

17   or, you know, my contract will possibly come to an end in

18   the next, you know, several weeks.  And at that time I --

19   Chad Yates called me and told me that -- to apply for

20   this job.  He was in that department.  I applied and they

21   offered me a job.  And I accepted.

22   Q.    Okay.  Would that job bring you more income or

23   less income or the same income as what you were earning

24   as a contractor?

1      A.    It was -- I think the official title was PC

2    technician.  My responsibilities were as an Exchange

3    engineer.

4      Q.    Is "Exchange" with a capital E?  Is that a

5    program of some kind?

6      A.    Exchange is a Microsoft program that supports

7    e-mail functions.

8      Q.    So as an Exchange engineer, what were your

9    obligations or duties?

10     A.    As an Exchange engineer, the obligation would to

11   be make sure that all of the Microsoft Exchange servers

12   were running, functional.  You know, you make sure it has

13   the most up-to-date software.  Things like that.

14     Q.    Okay.  Who did you report to?  Who was your

15   immediate supervisor?

16     A.    Janet Dempsey.

17     Q.    Who was her supervisor?

18     A.    Bellverie Ross.

19     Q.    Okay.  How long did Janet Dempsey remain your

20   supervisor?

21     A.    About two months approximately.

22     Q.    Who became your supervisor after that?

23     A.    Ray Brady.

24     Q.    How long did he remain your supervisor?

1      A.    About a month.

2      Q.    Why did he only remain your supervisor for a

3   month?

4      A.    He left MBNA.

5      Q.    Was he only there for a month?

6      A.    No.  He was -- after I started reporting to him,

7   he left.

8      Q.    It had nothing to do with your reporting to him?

9      A.    Well, later on I found out maybe there could have

10  been something to do with me reporting to him, but I'm

11  not sure and I'm not privileged to know the details.  So

12  I don't know.

13     Q.    What did you find out later?

14     A.    Me and another Indian fellow was reporting to Ray

15  Brady and --

16     Q.    What was his name, the other Indian fellow?

17     A.    Vikas Amin.

18              And Ray Brady felt that we were being

19  treated differently.  And he addressed the issue.  And

20  there was no outcome.  So I believe that he chose to

21  leave.

22     Q.    With whom did he address the issue, if you know?

23     A.    To the best of my knowledge, to Bellverie Ross

24  and Bill Davis.  Maybe even some higher-ups.  I don't

1    know.

2         Q.    Who told you about that?

3         A.    I cannot recall exactly how I came to find out

4    about it.

5         Q.    Okay.  What is it that was different about your

6    treatment?

7         A.    I mean, I could point out hundreds of instances

8    where I felt, you know, why -- how we were treated

9    differently.

10              Do you want me to get into specific

11   examples?

12        Q.    No.  I'm asking you what he thought.

13        A.    What he thought?

14        Q.    Yes.

15        A.    I'm not exactly sure, because he --

16        Q.    You didn't hear about that?

17        A.    He did not talk to me about it, no.

18        Q.    All right.  So after Ray Brady left, who became

19   your supervisor?

20        A.    Neela Chacko.

21        Q.    Okay.  How long was she your supervisor?

22        A.    She was probably, I would say, four to six

23   months.  No.  Four months, I would say.

24        Q.    After that who was your supervisor?

Justus Daniel Eapen                    33

1    A.    Rich Wegner.

2    Q.    How long was he your supervisor?

3    A.    About two months.

4    Q.    After that?

5    A.    Jim Dell.

6    Q.    Jim Dell.

7          How long was he your supervisor?

8    A.    For the rest of my association with MBNA.

9    Q.    Did he become your supervisor in March of 2001?

10   A.    That's possibly correct.  I'm not exactly sure

11   that date.  If that is true, then probably the months

12   that I told could be a little bit longer or could be a

13   little bit less with all the other supervisors.

14   Q.    Was there a time when Bellverie Ross was

15   reassigned or left your area?

16   A.    That was close to the time when I was fired.

17   That's when Bellverie Ross left the area, if that is the

18   question, if I understood you correctly.

19   Q.    Well, let me see if I can focus on that.

20          My indication is that she moved out of the

21   area in May of 2002.

22   A.    That could be.

23   Q.    Okay.  So that was --

24   A.    That --

1    Q.    -- eight or nine months before you left.

2              Isn't that right?

3    A.    Yeah.  If you say so.  That should be more

4    accurate than my memory.

5    Q.    Okay.  When she left, Jim Micek took over.  Is

6    that correct?

7    A.    That is correct.

8    Q.    Then Ernesto Marra -- Ernie Marra --

9    A.    If my understanding --

10   Q.    -- came in under Jim Micek?

11   A.    That is correct.

12   Q.    But he didn't come in for a little while --

13   Marra?

14   A.    I don't remember the exact, you know, timing.  I

15   kind of felt that Ernest Marra replaced Bellverie Ross

16   and Jim Micek was just another layer of management that

17   was brought in, because he was higher than Bellverie

18   Ross.  I could be wrong.

19   Q.    Okay.  But your impression is that Micek was

20   higher up than Marra or Bellverie Ross?

21   A.    Yes.

22   Q.    Now, when you started as an employee of MBNA,

23   were you working days or nights?

24   A.    I was working days.

1    Q.   Was that also true when you were a contractor?

2    A.   When I was a contractor, I worked days and nights

3    at certain times.

4    Q.   Different times?

5    A.   Right.  Different times.

6    Q.   Did you switch to the night shift in March of

7    2002 as an employee?

8    A.   That could be right.  I don't remember the exact

9    timings, but...

10   Q.   How did that come about?

11   A.   They had hired Bridget Williams to work at night.

12   And she was there for a while.  And she did not start

13   working at night.  I don't know exactly what happened.

14   And one day Jim Dell asked me to start working at nights,

15   because he needs someone to work at nights.  Something to

16   that effect.  And I guess that's how I came about working

17   at nights.  I kind of felt like, you know, I needed to

18   accept that night job.

19   Q.   Did you think you'd have more time on the night

20   shift to work on other business?

21   A.   That's what Jim Dell --

22            MR. COOK:  Objection to the form.  Go ahead.

23            THE WITNESS:  That's what Jim Dell told me

24   multiple times.  But I don't know why he said that.  He

1    talked about things like that frequently.

2    BY MR. SANDLER:

3        Q.    What did he tell you?

4        A.    He told me specifically what you just told me --

5    that I would have time to work on, you know, my outside

6    business activities if I worked the night or the

7    midnight.

8        Q.    Okay.  What did you say when he said that?

9        A.    I always pacified whatever he said.  I agreed

10   with him.

11       Q.    What business activities was he referring to, if

12   you know?

13       A.    I'm not absolutely sure what he was referring to.

14       Q.    What business activities did you have?

15       A.    While I was working at MBNA?  No active business

16   activities.

17       Q.    What sort of things did you do on the night

18   shift?  Was it different than the day shift?

19       A.    Yes.  It is different from the day shift, because

20   when I was working in the Exchange environment I was

21   busy.  At night shift I practically had nothing to do.  I

22   had possibly half a dozen to maybe a dozen events that I

23   needed to check, which took about 30 seconds.  That was

24   all my responsibility.

1    Q.    Okay.  Did anybody else work on the night shift?

2    A.    Eventually, we hired -- well, on night shift,

3    towards maybe like February of 2003, I think, you know,

4    they hired -- in a different area, they hired another

5    person, I think, and he started working.  So he would be

6    in the same desktop computing department.  So he was

7    there at night.

8    Q.    Who was that?

9    A.    I cannot recall his name at the moment.

10   Q.    Was it Jason Campbell?

11   A.    It's not Jason Campbell.

12   Q.    Did Jason Campbell work nights?

13   A.    No, he did not work nights.

14   Q.    Did he work days?

15   A.    I believe he worked in the afternoon till I got

16   there.  I came in at, if my memory is correct -- at 6:00.

17   So he worked till 6:00.  So he probably came in at 9:00

18   in the morning.

19   Q.    Did you work every day at night?

20   A.    No.  I worked three days -- 14-hour shifts -- 13

21   and a half hour shifts.

22   Q.    What were the days, do you remember?  Which days

23   of the week?

24   A.    Friday, Saturday and Sunday nights.

1    he could hold an 8:15 meeting in the morning.

2        Q.    Who would be at this meeting?

3        A.    It would be me, Jason Campbell, Dan Weir and Jim

4    Dell.

5        Q.    How about Bridget Williams?

6        A.    I don't remember her being in that meeting.

7        Q.    Okay.

8        A.    Or not frequently, I guess.

9        Q.    What was the purpose of the meeting?

10       A.    The purpose of the meeting -- I'm not sure the

11   purpose of the meeting other than to make sure that I was

12   there until nine o'clock.

13       Q.    When you began at MBNA, did you receive

14   information about its employment policies?

15       A.    Not specifically.

16       Q.    Did you receive a handbook?

17       A.    Yes, I did.

18       Q.    Okay.  Was that handbook updated from time to

19   time?

20       A.    I'm sure it was.

21       Q.    Did you receive updates?

22       A.    I'm sure I did.

23       Q.    Were you aware of MBNA's policies for reporting

24   problems in the workplace?

1      A.    Well, not specifically from the book, because I

2    don't think that I may have read the whole book from

3    cover to cover.  But I think I had an understanding of

4    what the procedures were.

5      Q.    Did you hear about something called the

6    Affirmative Action Office?

7      A.    I had an -- I believe there was -- there is an

8    office, yes.

9      Q.    Okay.  Do you know who managed that office?

10     A.    I did not know who managed that office, but I did

11   have an opportunity to speak to that office.  And what I

12   gathered from -- after speaking to the individual who was

13   supposed to be possibly the affirmative action officer --

14   it was my understanding that the affirmative action

15   officers change every couple of years, and there's

16   nothing that they could really do for me, because the

17   individual that I spoke to -- to me expressed the same

18   frustration that I was expressing to her.

19     Q.    Who was that individual?

20     A.    I cannot recall the name, sir.

21     Q.    Was it Danlyn Brown?

22     A.    That name sounds familiar.

23     Q.    What do you mean she expressed the same

24   frustration?

1      A.    I understood that she would not be able to do

2   anything to help me.

3      Q.    Did she say that?

4      A.    May not be exactly that sentence but she

5   communicated that meaning.

6      Q.    Okay.  Did you receive a promotion in June of

7   2002?

8      A.    That could be correct, yes.

9      Q.    What were you promoted to?

10     A.    I was promoted to a systems engineer.

11     Q.    How did you learn that you were going to be

12   promoted?

13     A.    Jim Micek told me.

14     Q.    Did your duties change after the promotion?

15     A.    Jim Dell told me that I would have tremendous

16   amount of responsibilities that come with, you know,

17   being a systems engineer, but to the best of my

18   knowledge, nothing changed.  I still had those seven to

19   maybe a dozen check -- things to check during the night.

20   And that was it.

21     Q.    At the time you were promoted, was Jim Dell your

22   immediate supervisor?

23     A.    Yes, sir.

24     Q.    So as far as you know, did he disagree with your

1    being promoted?

2        A.    Absolutely.

3        Q.    Tell me about that.

4        A.    He told me that if it was up to him I would not

5    have been promoted.

6        Q.    Okay.  When did he tell you that?

7        A.    When -- possibly shortly after they announced my

8    promotion or, you know, that I learned about my promotion

9    or when he told me that it's going to be, you know, a

10   tremendous amount of responsibility coming my way.

11       Q.    Did he say anything else?

12       A.    Specifically?

13       Q.    Did he just volunteer that if it was up to him

14   you wouldn't have been promoted?  What was the context of

15   that?

16       A.    Well, see, I routinely received conflicting

17   information from Jim Dell.  If we were all as a group

18   sitting there, he would talk like, you know, I'm doing

19   everything that I'm supposed to be doing.  You know, in

20   that case he talks me up.  But in person he often

21   expressed his displeasure of, you know, things like

22   that -- you know, like I'm not doing my job.  That's why

23   he created a checklist of, you know, half a dozen items

24   that I need to be doing every day.  Now, those half a

1    dozen items are so trivial it takes me 30 seconds to

2    finish.

3              And sometimes I express my frustration by

4    not checking it, you know, as done, because it's -- it

5    really is meaningless.  Then, you know, he would make a

6    big deal about it -- that, you know, I couldn't even get

7    that done during the night.  So how could you do more if

8    you cannot even do, you know, something small like that?

9    Q.    Well, you say that he told you after the

10   promotion was announced or was about to be announced that

11   he didn't support it.  I mean, did he just volunteer

12   that?

13   A.    Yes.  He volunteered things like that.  For

14   instance, you know, I learned after the investigation

15   that -- or during the investigation that I was not to

16   know that there is an investigation, you know, going on.

17   But he told me that MBNA will be investigating me for

18   excessive use of telephone for my personal business

19   and -- there was like three or four investigations that

20   he told me that personnel is investigating, so I should

21   be careful.  So he multiple times acted like he is, you

22   know, advising me so I will be careful, you know, about

23   different things.

24             So just like that, you know, he -- you know,

1   during one of those conversations is when he said, you

2   know, that I'm not doing, you know, what I'm supposed to

3   be doing, let alone -- but when I had my review, he gave

4   me an excellent review.  So -- because the review is seen

5   by others.  So to me -- he talk to me like -- you know,

6   if others are involved, you know, he makes -- he wants to

7   look like everything is normal.  But, otherwise, he wants

8   to, you know, put me down.

9        Q.   Was it your understanding that he actually

10  supported your promotion at some point?

11       A.   It was my understanding that he never supported

12  it.

13       Q.   Okay.  Do you think you could have gotten

14  promoted if your immediate supervisor didn't support the

15  promotion?

16       A.   I did not know exactly why I got promoted.  I

17  mean, I would not have expected a promotion because of my

18  relationship with Jim Dell.  And the only reason that I

19  believe I got the promotion is because Jim Micek

20  understood certainly there was a problem and, you know,

21  probably he needed to, you know, fix the problem.

22            MR. SANDLER:  Let me get this marked as the

23  first exhibit.

24            (Eapen Deposition Exhibit No. 1 was marked



1    for identification.)

2    BY MR. SANDLER:

3        Q.    You've been handed what's been marked Eapen 1.

4                   Is that your signature on that first page?

5        A.    Absolutely.

6        Q.    Okay.  Is that the employment application that

7    you filled out?

8        A.    Yes, sir.

9                   MR. SANDLER:  Mark this as 2.

10                  (Eapen Deposition Exhibit No. 2 was marked

11   for identification.)

12   BY MR. SANDLER:

13       Q.    Is that your signature also on Eapen 2?

14       A.    You're referring to this exhibit?

15       Q.    Yes.

16       A.    Yes, it is.

17       Q.    Okay.  Those are the Information Security

18   Guidelines.  Correct?

19       A.    Yes.  It is.

20                  MR. SANDLER:  Okay.  Mark this as 3.

21                  (Sandler Deposition Exhibit No. 3 was marked

22   for identification.)

23   BY MR. SANDLER:

24       Q.    You have what's been marked as Eapen 3?

Justus Daniel Eapen                                47

1      A.    Yes.

2      Q.    This is an excerpt from MBNA's Statements of

3   Ethics & Responsibility on outside employment.

4              Have you seen that before?

5      A.    I believe I saw this when Rich Kilmon was talking

6   to me about outside employment or activities.

7              (Eapen Deposition Exhibit No. 4 was marked

8   for identification.)

9   BY MR. SANDLER:

10     Q.    Again, another excerpt from the Statement of

11  Ethics and Responsibility.  G talks about your Awareness

12  of Company Policies and Regulatory Requirements.

13             Do you see that?

14     A.    Yes, I do.

15     Q.    Okay.  That says that everybody has a

16  responsibility to become familiar with the company's

17  policies.  Correct?

18     A.    Absolutely.  It says that.

19     Q.    Now, you mentioned that Jim Micek took over

20  supervisor responsibility as some point.  When he did

21  that, did he conduct a series of meetings with the

22  employees?

23     A.    Yes, he did.

24     Q.    Did you attend any of those meetings?

1    for a person, other than possibly a Caucasian, to have

2    job satisfaction or perform any meaningful work.  And so

3    that is, in general, the problems.  I mean, there's

4    thousands of instances where, you know, things could, you

5    know, come around where you no longer feel like, you

6    know, you could do anything.

7        Q.    Well, my question was:  What did you tell Jim

8    Micek?  Is that what you told Jim Micek?

9        A.    Absolutely.  In so many -- probably in a

10   different statement.  But that's exactly what I conveyed

11   to him.

12       Q.    When you're saying a "different" statement, how

13   was it different?

14       A.    I probably explained to him a different

15   experience that I had in desktop computing that led to

16   that feeling.  I mean, that meeting lasted, I think,

17   about two hours.  So I'm sure that I talked plenty.

18       Q.    Do you remember saying that Jim Dell is a great

19   guy but a bad manager?

20       A.    I may have said that.

21       Q.    Okay.  What did you mean by that?

22       A.    He's -- he has certain skill set, you know, that

23   if he wasn't my manager, for instance, and he -- like

24   before he was managing me, he was a very amiable guy.

1    And he was -- you know, we had conversations and, you

2    know, we had lunch together.  You know, we had a very

3    amiable relationship.

4        Q.    What happened after that that caused the change?

5    Or at least what did you tell Jim Micek happened?

6        A.    I don't recall individual, you know, statements

7    that I made to Jim Micek, but I told him -- I'm sure I

8    expressed, you know, my frustration that I was

9    experiencing in desktop computing.  I don't recall

10   individual things that I told him.  But I came out with

11   the understanding it was crystal clear to Jim Micek that

12   he -- you know, there were problems in the department

13   that he needed to change.  And he told me -- he assured

14   me that it would be changed.

15       Q.    What happened after that meeting, if anything?

16       A.    Well, after that meeting I was convinced that he

17   would change things, but unfortunately, it took too much

18   of a time.  Like, for instance, Jim Micek put into place

19   I was to report put to Neela Chacko possibly beginning

20   even before January.  But the transition never took

21   place.  From what I understand, Jim Dell continued to

22   tell management I -- he's got all this work that I need

23   to get done before actually the transition could take

24   place.  So the transition actually never took place.  I

1        A.    Right.

2        Q.    What was the purpose of Eapen.net?

3        A.    Well, Eapen.net was a vision that I had that,

4    eventually, if I could find the funding, could be -- I

5    thought could be something like Yahoo! but with a

6    specialized image.

7        Q.    What was the specialty?

8        A.    I was thinking more about real estate and

9    insurance or financials.

10        Q.    So was it a way that people could sell and buy

11    real estate and insurance?

12        A.    No.    That was not the intention.    My intention

13    was just like if you go to Yahoo!    You go to Yahoo!

14    Finance.    You could probably be -- see an advertisement

15    or get referred to Bankrate.com.    So when they click on

16    the link, Yahoo! would probably get a compensation.    So I

17    was thinking in more of those lines as an advertising

18    medium for different enterprises in that sector.

19        Q.    Okay.    I saw a press release about the Eapen

20    Corporation that I think was produced that mentioned that

21    it was, quote, a private-held entity established in 1990,

22    unquote.    What does that refer to?

23        A.    That I have no idea.    I saw a couple of things

24    like that when I was being investigated by MBNA.    Like

1    one of them, if my memory is correct, was written by

2    someone in the Orient -- I don't remember exactly the

3    country -- who I have no idea who it is.  All I could

4    think of is -- and if people write different things,

5    they're going to create links.  And I'm thinking it could

6    be one of those.  That I'm not exactly sure.

7         Q.   So you had nothing to do with that?

8         A.   I don't know what you're referring to, sir.  In

9    1990 there was no Eapen Corporation that I know of.

10        Q.   You don't have anything to do with a press

11   release representing that there was one in 1990?

12             MR. COOK:  Do you have a press release to

13   show him?  That might help him refresh his recollection.

14             MR. SANDLER:  Would you mark this?

15             (Eapen Deposition Exhibit No. 6 was marked

16   for identification.)

17   BY MR. SANDLER:

18        Q.   Directing your attention to the bottom of that

19   first page, Mr. Eapen, that's what I'm referring to.

20             MR. COOK:  The last paragraph.

21        A.   Oh, okay.  This type of stuff were a series of

22   information or writings that I acquired as part of --

23   from a ghost writer as part of a package deal to create

24   links that would eventually come to Eapen.net.  It wasn't

1    functional links.  It never got to where I had ambition

2    of where it should be.  You know, it never got -- the

3    business aspect never, you know, actually really come

4    into force.

5        Q.   Well, what I'm asking you about is the

6    representation down at the bottom that says that "The

7    Eapen Corporation is a privately-held entity established

8    in Maryland since 1990."

9        A.   Well, I don't know who -- why it's saying, you

10   know, established in Maryland since 1990.  There was

11   nothing established in Maryland since 1990.  And I really

12   didn't read all of these specific things.  Like right now

13   I am reading to understand exactly what it was.  So I

14   don't know.

15       Q.   Well, you're listed as the contact, aren't you,

16   for this?

17       A.   Yes.  It is.

18       Q.   All right.  You say that you arranged with a

19   ghost writer to prepare these kinds of articles, such as

20   the one that's here in Eapen 6?

21       A.   Correct.

22       Q.   When did you make those arrangements?

23       A.   I cannot recall the dates specifically.

24       Q.   How about the year?



1    A.    It could be sometime in 2000, 2001.  This has a

2    date of 2002, so it could -- I don't know exactly when

3    this was written and when this was -- you know, came live

4    on the website.

5    Q.    Who was the ghost writer?

6    A.    I cannot recall the name at the moment.  I find

7    people on the Internet to do these things all the time.

8    Q.    All right.  There's an address listed there just

9    above the middle of the page --

10   A.    Right.

11   Q.    -- 15/115 West Churchville Road.

12   A.    Right.

13   Q.    What's that?

14   A.    That's a mailbox.

15   Q.    Was that something that you took out -- that

16   mailbox?

17   A.    Yes.  It is a mailbox that I own.

18   Q.    What's Suite 123?

19   A.    That's a Mailbox No. 123.

20   Q.    Did you receive any communications at that

21   mailbox?

22   A.    Not that I -- no.

23   Q.    Do you recall when you first got that mailbox?

24   A.    That mailbox I don't know.  But I had mailboxes

1    like that probably for like years so that I could -- I

2    would say probably I had it for two or three years.

3    Q.    Starting what year?

4    A.    It could be 2000.

5    Q.    Okay.  Do you hold a real estate license?

6    A.    I do have a real estate license.

7    Q.    When did you get your real estate license?

8    A.    I believe it is in 2001 when I was reporting to

9    Jim Dell.  After I started reporting to him.

10   Q.    What did you use that license for?

11   A.    I have really not used it for commercial

12   purposes.  I referred a friend of mine to a builder.  I

13   got -- yeah.  Just once.  I referred a friend of mine to

14   a builder.

15   Q.    When was that?

16   A.    I don't recall the date, but I did get a check

17   for that last year.  Sometime during the last quarter of

18   last year, if my memory is correct.  Of 2004.

19   Q.    What did you have to do in order to get the real

20   estate license?

21   A.    Simply have to attend a course, take a test, pay

22   $195, I believe, and you're licensed.

23   Q.    How long was the course?

24   A.    I think four days or eight days, part-time.

1     Q.    At night?

2     A.    No.   During the day.

3     Q.    During the day.

4           Okay.   Because you were working nights?

5     A.    No.   At that time I was working during the day.

6     So I took time off from work and got permission from Jim

7     Dell specifically to take that class.   He accommodated me

8     actually with that.

9     Q.    What was your expectation in getting that real

10    estate license?   What were your plans?

11    A.    Well, to me it's a great investment, because for

12    $195 you get a license that you could use when you buy

13    your house.   If you buy a half-a-million-dollar house,

14    you get the three percent.   Because you're a realtor, you

15    can keep that three percent, or you could lawfully earn

16    that three percent.   So I thought, if I do buy a home,

17    that would be a great investment of $195 to earn

18    thousands of dollars.

19    Q.    Does your wife have a real estate license?

20    A.    No, she does not.

21    Q.    Has she ever had one?

22    A.    No, she's never had one.

23    Q.    What did she do?

24    A.    She's a mortgage banker.

1    Q.    Mortgage banker?

2    A.    Right.

3    Q.    So, in theory, if you made a sale of a house to

4    someone --

5    A.    Mm-hmm.

6    Q.    -- you could arrange to get the mortgage through

7    your wife.

8          Is that --

9    A.    Well, that I perceive would be a conflict of

10   interest.  You know, you arrange a sale of a house, and

11   then your wife do the mortgage.  I don't know if you

12   really want to do that.

13   Q.    Why would that be a conflict of interest?

14   Wouldn't that just facilitate the ability to get the

15   house?

16   A.    I believe, if I'm a real estate agent selling the

17   house, what I think I should be doing -- the best thing

18   for the client.  So should I be, you know, having my

19   wife, you know, give them a mortgage too so my wife can

20   earn an income?  I would think that the client would

21   perceive a conflict of interest there.

22   Q.    So that wasn't your plan?

23   A.    No, that wasn't my plan.

24   Q.    Okay.  Does a real estate agent work for a

1    broker?

2        A.    Yes.   They do work for a broker.

3        Q.    In your case did you have a relationship with a

4    broker?

5        A.    With Long & Foster.

6        Q.    Okay.   That's a sizable company?

7        A.    Absolutely.

8        Q.    Who in particular at Long & Foster did you make

9    this arrangement with?

10       A.    I don't recall the name -- whoever the manager is

11   of the nearest -- I believe her first name was Janet.   I

12   know her first name is Janet.   I forgot the last name.

13       Q.    Where was she located?

14       A.    In Bel Air.

15       Q.    When did you make that arrangement?

16       A.    When I took the class in 2001.

17       Q.    Did you take the class before you had that

18   arrangement or did you make the arrangement first?

19       A.    During the class.

20       Q.    How did you hook up with her?

21       A.    I must have called.   If my memory is correct, I

22   think I must have seen an advertisement at Long & Foster.

23   There was free classes.   And I think I called her -- and

24   I think they must have transferred me to her or something

1    have a site similar to Yahoo! with a specialization in

2    finance.

3        Q.    Did you tell anybody that your wife was a

4    mortgage banker or broker at the time that you were

5    hired?

6        A.    I'm sure everybody at MBNA knew.

7        Q.    Did you tell anybody in particular?

8                  Let me ask you this:  Why are you sure that

9    everybody knew?

10       A.    Because we worked together for three years.  I

11   have no idea why they would not know.

12       Q.    When you were interviewed or your resume was

13   submitted, did anybody ask you what your wife did or did

14   you volunteer?

15       A.    My wife's job is not listed on my resume.  I

16   don't think that anyone specifically asked me is your

17   wife a mortgage banker.

18       Q.    Okay.  When did you say the Eapen Corporation was

19   incorporated?

20       A.    I am thinking in December 2002 or December 2001.

21   I'm not exactly sure which year.  Or maybe January it

22   could be.

23       Q.    Did you ever ask anybody at MBNA if it was a

24   conflict of interest to have Eapen Corporation

1   Incorporated?

2       A.    I don't specifically recall asking for permission

3   because I didn't really perceive any conflict of

4   interest.  But I'm sure Jim Dell knew.

5       Q.    What did he know?

6       A.    I had talked to him about it, because during that

7   time I had taken my test to register for investment

8   advisor and I took time off.  And I remember having

9   conversations with him about Eapen Corporation.  So I'm

10  sure I did.

11      Q.    What about Eapen Corporation?  What conversations

12  did you have with him about Eapen Corporation?

13      A.    I don't recall the specifics, but -- I don't

14  really recall the specifics.

15      Q.    By the way, in 2003 you were still employed by

16  MBNA for several months, weren't you?

17      A.    Yes.  For three months, I believe.

18      Q.    So you would have received income from MBNA,

19  wouldn't you?

20      A.    Yes.  I did.

21      Q.    But you said before you didn't have any income in

22  2003.

23      A.    Well, then, I'm wrong.

24      Q.    Did you submit an income tax return?



1                    (The deposition was interrupted.)

2                      - - - - -

3                   JUSTUS DANIEL EAPEN, resumes

4    BY MR. SANDLER:

5        Q.    Did you have a coworker named Glenn Ford?

6        A.    Yes, I did.

7        Q.    Did you talk to him about mortgage interest

8    rates?

9        A.    I'm sure I have.

10       Q.    Okay.  Did you help him search for a mortgage

11   interest rate?

12       A.    I do not recall helping him search.  No, I did

13   not do that.

14       Q.    You don't recall searching the Internet looking

15   for mortgage interest rates for him?

16       A.    Not specifically for him, because I don't know

17   anything about his financial circumstances, even if I

18   were to do that.  But in general conversation, when

19   everybody is talking about rates, did I look something up

20   along with him?  I might have.

21       Q.    Did Neela Chacko do business with your wife?

22       A.    Yes, she did.

23       Q.    What sort of business?

24       A.    She got mortgages from my wife.

1       Q.    For what purpose?

2       A.    I'm not sure exactly what purpose.

3       Q.    How about John Hartnett?  Did you ever talk to

4    him about getting mortgages?

5       A.    Getting mortgages?

6       Q.    Yes.

7       A.    No.

8       Q.    How about anything to do with a mortgage?

9       A.    I'm sure the last few months that I worked at

10   MBNA is when the rates were going down historically

11   lowest.  Everybody was talking about mortgage rates every

12   day.  So I'm sure I had a conversation with John Hartnett

13   and possibly the rest of the people at desktop computing

14   that I worked with.

15      Q.    Okay.  Brine McKeon too?

16      A.    I'm sure I had conversations with him.

17      Q.    Did you ever show him the Eapen Corporation

18   website?

19      A.    I'm sure he has seen the website.

20      Q.    Why are you sure?

21      A.    Because everybody that I worked with knew about

22   Eapen.net.

23      Q.    Did you ever offer to help him get a mortgage?

24      A.    No, I did not.

1    A.    No.  I, Justus Daniel Eapen, signed this

2  document.

3    Q.    Okay.  You couldn't have your son do it, for one

4  reason, because he wasn't 18 years old.  Was he?

5    A.    Right.  So if you asked me if I had discussed

6  something about my son being Eapen Corporation, it's

7  quite possible, yes, because that was one of my

8  intentions.

9    Q.    Who is Eapen.net registered to?

10   A.    If my memory is correct, it's registered under my

11  wife's name.

12   Q.    Okay.  Do you have to pay something to keep it

13  registered?

14   A.    I'm sure, yes.

15   Q.    Have you done that?

16   A.    Yes, I have.

17   Q.    Does it still exist -- that website?

18   A.    Not the way -- the Eapen.net still is registered,

19  but it's -- is the website up?  No.  But it is still an

20  active domain.

21   Q.    How about Eapen Corporation?  Is it an active

22  Corporation?

23   A.    No.  I did not pay the taxes, because it got to

24  this mess.  It looked like it's not a -- things did not

1    feel good with me.

2        Q.    During the last time that you worked at MBNA,

3    were changes made in that Eapen.net website periodically?

4        A.    It was a dynamic website, so changes would take

5    place almost daily.

6        Q.    Would you be the person who would make the

7    changes?

8        A.    No.   I wasn't.   It was dynamic and automatic.

9    And if anyone physically did need to do something, I

10   had -- Tarun Chopra -- that I mentioned before -- would

11   be the one who would be doing things like that.

12       Q.    Were you capable of making those changes?

13       A.    To a limited extent.

14       Q.    How would you communicate with Tarun Chopra?

15       A.    Tarun Chopra -- we did not communicate on a

16   regular basis.   You know, we both understood what needed

17   to be done.   But to communicate by e-mail or telephone.

18       Q.    How often would you communicate by telephone?

19       A.    Probably once a month.

20       Q.    How about e-mail?

21       A.    Could be once a week, if that much.

22       Q.    Do you still communicate with him that way?

23       A.    Yes, I do.

24       Q.    Did you meet with Richard Kilmon and Renee

1    would clear my name.

2       Q.   So where did this meeting take place?

3       A.   In the personnel office.  I believe it's

4    Christiana I, II or III.  I don't remember which

5    building.

6       Q.   When you came in there, what did you say?

7       A.   I told them exactly what I was coached to say by

8    Jim Dell, Ernest Marra and Jim Micek.  I was told certain

9    things is what he wants to hear, and as long as I said

10   specifically that, you know, there would not be any

11   repercussions and my job would be safe.  So they told me

12   to tell them that I was wrong and that I would not repeat

13   whatever I did that night.

14      Q.   When did they tell you that?

15      A.   They told me that multiple times during the weeks

16   leading to the meeting with Rich Kilmon.

17      Q.   Were they together when they told you that or

18   separate?

19      A.   Sometimes together; sometimes separately.  When I

20   was talking with Jim Micek, Ernest Marra was there too.

21   So they both told me exactly what I need to say.

22      Q.   They told you admit you are wrong and assure them

23   that there won't be a recurrence.  Is that what you're

24   saying?

1    A.    Right.  As long as I don't repeat it and I admit

2    that I was wrong instead of trying to justify what I did.

3    So admit that I am wrong, tell him that I would not

4    repeat it and apologize for, you know, doing it, and

5    everything will be okay.

6    Q.    Well, in point of fact, didn't you deny

7    wrongdoing and try to justify what you were doing?

8    A.    Well, only after -- well, during the meeting --

9    after the meeting -- when the meeting progressed, I

10   realized that Richard Kilmon's intentions were different.

11   So I was forced to advocate for myself, you know, things,

12   because I had already lied, because what I did in my mind

13   was not wrong in the environment that I did.  Right?  So

14   I am admitting guilt without being guilty.

15        So I'm -- so all the conversation that I had

16   is trying to justify myself because Richard Kilmon is

17   putting words in my mouth or like coercing me to say

18   statements in a certain fashion.  He wants to hear an

19   answer.  So the question will be, you know, phrased in a

20   way -- the answer would come out in a certain way.  So

21   that's what happened for the rest of that meeting.

22   Q.    Was one of the things that was discussed at the

23   meeting your use of phone numbers that were not work

24   related?

1       A.    I'm sure I must have used MBNA phones for

2   non-work related, but I did not consider anything

3   abusive, because if nobody told me that I am not to use

4   MBNA phones for anything but business purposes -- so if I

5   used a phone for something else -- I must have used it.

6   I'm sure I did.  But nothing that could be considered

7   abusive by anyone for any purpose.

8       Q.    Was one of the numbers that was discussed for a

9   company called Godaddy.com?

10      A.    I'm sure it could have been.

11      Q.    Was that a company that the Eapen Corporation or

12  Eapen.net did business with?

13      A.    I'm sure Eapen.net is registered through

14  Godaddy.com.

15      Q.    Okay.  Did you also tell Rich Kilmon that you

16  gave out your wife's cards to generate business for her?

17      A.    I don't specifically recall saying that I handed

18  out my wife's cards.  But the question was phrased in a

19  way -- and I recall talking to him that -- if I was in a

20  social setting and if the conversation came up, I'm sure,

21  you know, I could -- you know, I do -- I would promote my

22  wife's business, yes.

23      Q.    Did you also tell Rich Kilmon that the website

24  for Eapen.net was not readily accessible or the website

1      Q.    Did you, by the way, endorse a software company

2    as the CEO of Eapen Corporation?

3      A.    Clarify that question.  I'm sorry.

4      Q.    In your capacity as the president of Eapen

5    Corporation --

6      A.    Mm-hmm.

7      Q.    -- did you endorse some software company so that

8    it appeared on a press release or on the Internet that

9    Justus Eapen, President of Eapen Corporation, endorses

10   such and such a company?

11     A.    I cannot recall endorsing any companies of any

12   type for any matter.

13     Q.    After you left MBNA, did Eapen Corporation and

14   Eapen.net remain the same for at least a period of time?

15     A.    It remained the same for a while.  I didn't do

16   anything with it until a few months later until I decided

17   to take it off.

18     Q.    During that time did press releases and articles

19   continue to appear on Eapen.net with your name in it?

20     A.    I'm sure even today, you know, things would

21   appear, because I guess the ones that get on the

22   Internet, you know, will continue to appear until --

23   years later it would go away, I guess.

24     Q.    Did you have an e-mail address at Eapen.net?

1      A.    Yes, sir.  I still have it.

2      Q.    Do you have other e-mail addresses?

3      A.    Yes.  I have.

4      Q.    How many?

5      A.    Probably -- I'm not sure exactly how many, but

6  one that I use is Justus@eapen.net.

7                 MR. SANDLER:  Let me hand you Eapen 2.

8                 MR. COOK:  The Security Guidelines?

9                 THE WITNESS:  Right.

10 BY MR. SANDLER:

11     Q.    Looking at the third paragraph, that says that

12 people are not to share their personal user ID or

13 password or use their user ID or password to log into

14 MBNA computer systems for another person.  Correct?

15     A.    That is correct.

16     Q.    Okay.  Isn't that exactly what you did?

17     A.    In the production environment, that is correct.

18 I did it in a test environment.  If I did not do that in

19 the test environment at that time, MBNA would not have a

20 production environment like that, because there's no way

21 to test it.

22     Q.    Are there separate test passwords that can be

23 used?

24     A.    Yes, there is.  Yeah.

1              In the production environment, you don't

2      even unplug a hard drive without having a change

3      management request approved.  So there are occasions

4      where I did things outside the scope of, you know, those

5      seven or ten daily checks that I had to do.  And that was

6      one of them.  I -- on every server I changed all the hard

7      drives.  All of them.

8      Q.    You did that at night?

9      A.    Yes, I did that at night.

10     Q.    Okay.  Was there an -- go ahead.

11     A.    And that should have worked to get, you know,

12     something like this to information security.

13     Obviously -- I don't know why they didn't get it.  The

14     only reason is because they didn't have ITA installed in

15     that environment when I was doing that.  ITA is the

16     software that actually reports these kinds of things back

17     to information security.

18     Q.    Are you referring to the last exhibit?  The one

19     you just held up, was that Eapen 11?

20     A.    Eapen 11, right.

21     Q.    Was there an instance where you were caught

22     sleeping on the property at MBNA by Jim Dell?

23     A.    Exactly.  That's one of the framing that -- Jim

24     Dell showed up one night asked me to do something.  Next

1    morning he told Bellverie that I was sleeping on the job.

2    Well, I explained to Bellverie -- even if I was sleeping

3    on the job -- when I'm not at my desk, I made a practice

4    of writing down on the white board exactly where I am,

5    because I think after September 11th, you know, there

6    were, you know, several incidents where -- if they don't

7    know where you are, people would, you know, probably

8    worry.  So I write down on the white board exactly where

9    I am.

10            When Jim Dell came in, I was on my break.

11   And if Jim Dell cannot for some reason find me anywhere,

12   he just simply had to call me on my cell phone.  So he

13   fabricated that incident.  He is lying about it.

14       Q.    Well, were you sleeping or weren't you sleeping?

15       A.    No, I wasn't sleeping.

16       Q.    Where were you?

17       A.    I was in the test lab.

18       Q.    Okay.  Did you see him in the test lab?

19       A.    Yes.  When he came in, you know, I was walking

20   out, because I knew someone had come in because he turned

21   the light on in the other room.  So I knew there was

22   someone, you know, coming in.  So I was just about to

23   walk out of there.  But because I was in that room, I

24   don't know if he -- that -- I'm assuming, you know --

1    because I was not at my desk and in the room in the

2    corner, he assumed that I was sleeping.  He's just

3    outright lying.  And I explained about exactly what that

4    was.  And it did not get anywhere.

5        Q.    Did Bellverie Ross ask you about that accident --

6        A.    Yes.

7        Q.    -- or did you go to her and tell her about it?

8        A.    She was on vacation.  And if my memory was

9    correct, she called me from where she was asking me what

10   happened.

11       Q.    What did she say?

12       A.    What did she say?

13       Q.    Yes.

14       A.    I don't recall exactly what she said because I

15   assumed it had no impact on anything, because what I do

16   on my break -- I don't know why Jim Dell, you know, even

17   created a problem like that.  If he's lying, it doesn't

18   bother me, I mean, because I have nothing to worry about.

19       Q.    Did you explain to her that you were on a break?

20   Is that what you discussed?

21       A.    Yes, I did.  It's on the blackboard anytime -- I

22   mean, on the white board anytime I take a break.  And

23   Jim -- Bellverie explained to him that I was allowed so

24   many breaks because it was a 13-hour shift.

1        Q.    Okay.

2        A.    And I think he created that because when I was

3    working in problem management he heard that I slept on

4    the job.  I was told specifically by Peter Liberatore

5    that everybody in the command center used to sleep at

6    night during their break sitting right at the command

7    center.  So people knew that, you know, the people who

8    worked in the command center made a practice of sleeping.

9    So like Jim Dell, you know, when I transferred to desktop

10   computing, he assumed, you know, that's what I was doing.

11       Q.    Okay.  Did you have a nickname that referred to

12   your sleeping?

13       A.    Yes.  Sleepin' Eapen.

14       Q.    Who called you that?

15       A.    Desktop computing.

16       Q.    Was that just sort of a kidding name?

17       A.    Well, that is, I assume, a kidding name.  It

18   never bothered me.

19       Q.    What did you usually do during your breaks?

20       A.    What do I usually do?

21       Q.    During these breaks that you mentioned that

22   you --

23       A.    Sometimes you go outside, you know, talk to

24   people.  Sometimes we go to the restaurant, you know, and

1    the person and talk about their evaluation?

2       A.    Yes.  Yes, we do.

3       Q.    Did you talk about that sentence?

4       A.    No.  When I got this evaluation, I was thinking

5    that he was going to give me an unsatisfactory

6    evaluation.  So I was surprised to see an excellent.  So

7    I just signed it and said, "Thank you."  That's it.

8       Q.    Why did you think you were going to get an

9    unsatisfactory?

10      A.    Because my relationship with personal experience

11   with him is that he was always dissatisfied with me.

12      Q.    On the third page of the evaluation --

13      A.    Yes, sir.

14      Q.    -- under Opportunities for Improvement, about a

15   third of the way down, there is a sentence:  "He needs to

16   ensure that all issues are reported to management in a

17   timely manner and to improve communications when changes

18   have been completed on schedule."

19              Do you see that?

20      A.    Correct.  I see that.

21      Q.    Did you take note of that?  Did you talk to him

22   about that?

23      A.    I did not.  Like I said, I was expecting an

24   unsatisfactory review.  When I got an excellent review, I

Justus Daniel Eapen                                136

1    thought it was more than I could ask for.  So anything
2    that he said I was satisfied with it.  So I did not talk
3    about it.
4        Q.    All right.  You're claiming in this case that
5    Mr. Dell was discriminating against you based on your
6    national origin.  Correct?
7        A.    Absolutely.  That is my conviction.
8        Q.    What's your evidence of that?
9        A.    I think some of these are evidence right here.
10       Q.    You're pointing to some documents?
11       A.    Yes.  These documents.  Like not taking ownership
12   for problems.  This e-mail that I was discussing to you,
13   he should have been honest about it instead of saying,
14   you know --
15       Q.    But what does that have to do with your national
16   origin?
17       A.    It's not just one of this.  This is hundreds of
18   incidents.
19       Q.    Well, does that necessarily mean that it's your
20   national origin that's driving at the situation?
21            Maybe he just didn't like you.
22       A.    Well, if he just didn't like me, then some of the
23   things that happened over the -- why does he call me
24   Osama Bin Laden?

1      Q.    Jim Dell called you Osama Bin Laden?

2      A.    Yes, he did.

3      Q.    Okay.  Did he call you anything else that you

4   feel was focused on your national origin?

5      A.    There was a lot of things that I was called --

6   brown person, brown, BP, as short, Osama Bin Laden, OBL,

7   Osama Bin Laden's brother, Saddam Hussein, Saddam

8   Hussein's brother.

9      Q.    By Jim Dell?

10     A.    Jim Dell and multiple other people in desktop

11  computing.  It was an acceptable form of communication in

12  desktop computing.

13     Q.    Well, I'm, for the moment at least, focusing just

14  on Jim Dell.  Did Jim Dell call you each of those terms

15  that you just called off?

16     A.    Yes, sir.  Yes, sir.

17     Q.    Did you make any response to that?

18     A.    How would -- do you expect me to respond to a

19  call like that?

20     Q.    I asked you whether you did, you know.

21     A.    Well, I act like whatever he's doing is a

22  pleasure.

23     Q.    So you didn't respond?

24     A.    That's how I respond.  It's a pleasure to hear

1    him call me "OBL." So at least he doesn't get the

2    pleasure of, you know, hurting me.

3        Q.    You also alleged in one of your letters that the

4    meeting that you had with Rich Kilmon and Renee

5    Cuffee-Williams caused you, quote, emotional and physical

6    impairment requiring extensive rehabilitation, period,

7    unquote.

8                    Do you remember saying that?

9        A.    Mm-hmm.

10       Q.    What are you referring to there?

11       A.    I'm still going through rehabilitation.  I'm

12   trying to rehabilitate myself.

13       Q.    Well, what is it that you're rehabilitating

14   yourself from?

15       A.    From the extensive emotional damage Jim Dell

16   caused.

17       Q.    Well, he wasn't at the meeting, was he?

18       A.    What meeting?

19       Q.    The personnel meeting.

20       A.    He caused the meeting to happen.

21       Q.    Okay.  So it wasn't the people at the meeting.

22                   It was the fact that the meeting took place?

23       A.    That also.  The fact that the meeting took place.

24   The fact that Richard Kilmon did not even give me a

1      Q.    And others.

2      A.    Right.

3      Q.    But are you saying that Jim Dell used each of the

4   epithets that you listed?

5      A.    Yes, sir.

6      Q.    And other people did as well?

7      A.    Yes, sir.

8      Q.    All right.  Now, you also say there was an

9   incident with a mailroom clerk.

10     A.    Correct.

11     Q.    Tell us about that.

12           What happened?

13     A.    Well, when the mailroom clerk was distributing

14   the mail, Glenn Ford was sitting across on the other side

15   of the cubicle.  The guy was in Glenn Ford's cubicle.

16   Glenn Ford, John Hartnett, Rich Wresneski -- and there

17   one more guy who was a line administrator -- I forgot his

18   name -- they were there.  They told the mailroom guy that

19   I'm Osama Bin Laden's brother.  So the guy got excited,

20   and he motioned like he was going to jump on me.  So they

21   refrained him from doing that and told him that they were

22   just kidding.

23     Q.    This is Rob Dunphy, the mailroom clerk?

24     A.    I don't know.

1    learning disabled individual, I really don't think that

2    he has the ability to comprehend, you know, that I am or

3    am not Osama Bin Laden's brother.  All I know is he

4    thinks I have something to do with Osama Bin Laden.

5        Q.    But, I mean, as far as the incident is concerned,

6    he didn't continue to try to do anything to you, did he?

7        A.    Because I would not go in his presence if I

8    possibly could.  I don't remember being that close to him

9    ever again.

10       Q.    I'm talking about that day.

11             Did he not make any further effort to get to

12   you?

13       A.    I left immediately, so I -- he did not try to.

14       Q.    Nothing else happened after that.  Correct?

15       A.    Correct.

16       Q.    Did you see him after that?

17       A.    I do not remember seeing him in close proximity.

18   Or if I saw him, I avoided him.

19       Q.    After this incident did you report what happened

20   to anybody?

21       A.    I do not specifically recall going to somebody

22   saying, hey, this learning disabled person, you know, was

23   about to attack me because of this.  But the entire

24   desktop computing was there, so it's not like a secret.

1    Q.    Yes.

2    A.    I never recall having any conversation with

3    Ernest Marra about that incident.

4    Q.    All right.  Did you report the incident to the

5    Affirmative Action Office?

6    A.    No, I did not.

7    Q.    Was there an instance when you were called a

8    "sand nigger"?

9    A.    Yes, there was.

10    Q.    Was that one time or more than one time?

11    A.    I think that particular gentleman used that term

12    three or four times, and he also used the term "nigger"

13    once.

14    Q.    Who was that gentleman?

15    A.    His last name is Todd, first name is, I think,

16    Rich.

17    Q.    Okay.  When did that occur?

18    A.    That should have been shortly after 9/11.

19    Q.    What was your response to that?

20    A.    At that time I did not know what "sand nigger"

21    meant.  So when he referred to me as a "sand nigger," I

22    did not do anything, because I did not understand what

23    that meant until he used the term "nigger" and I

24    consulted with someone else, you know, what "sand nigger"

Justus Daniel Eapen

1    Q.    When was that?

2    A.    That was in the '80s, I think.  Late '80s.

3    Q.    Are you a certified financial planner?

4    A.    Again, I finished the course work, but I -- you

5    need three years' experience to be in the field of -- as

6    a practicing planner in order to be using the CFP

7    credentials.  I never pursued that as a career.

8    Q.    Is that about the same time that you obtained

9    your CDL driver's license?

10    A.    No.  I think CDL was maybe after that.

11    Q.    After that.

12          Okay.  About when did you get the CDL?

13    A.    I will be guessing if I give you a date.

14    Q.    Well, best estimate.

15    A.    I would say late -- early '90s.  I think early

16    '90s.

17    Q.    Did you ever drive a truck after you got that CDL

18    until this recent job that you described?

19    A.    Did I ever really drive a truck?  Not really

20    drive a truck, no.

21    Q.    Did you continue to keep your CDL license --

22    A.    Yes.

23    Q.    -- active?

24    A.    Yes, sir.

1

```
 1              IN THE UNITED STATES DISTRICT COURT
 2                 FOR THE DISTRICT OF DELAWARE
 3
 4
    EQUAL EMPLOYMENT OPPORTUNITY    )
 5  COMMISSION,                     )
                                    )   Civil Action No.
 6              Plaintiff,          )   04-CV-425-SLR
                                    )
 7  v.                              )
                                    )
 8  MBNA AMERICA BANK, N.A., a      )
    subsidiary of MBNA Corporation,)
 9                                  )
                Defendant.          )
10
11              Deposition of SUNG BYUN taken pursuant to
    notice at the law offices of YOUNG CONAWAY STARGATT &
12  TAYLOR, 1000 West Street, Wilmington, Delaware,
    beginning at 10:05 a.m. a.m. on Monday, July 18, 2005,
13  before Renee A. Meyers, Registered Professional
    Reporter and Notary Public.
14  APPEARANCES:
15              TERRENCE R. COOK, ESQ.
                U.S. EQUAL EMPLOYMENT OPPORTUNITY
16              COMMISSION
                  21 South Fifth Street
17                The Bourse, Suite 400
                  Philadelphia, Pennsylvania  19106-2515
18                for the Plaintiffs,
19              SHELDON N. SANDLER, ESQ.
                YOUNG CONAWAY STARGATT & TAYLOR
20                1000 West Street, 17th Floor
                  Wilmington, Delaware  19899
21                for the Defendant.
22  ALSO PRESENT:  Launice Sills, Esq.
23                      WILCOX & FETZER
        1330 King Street - Wilmington, Delaware 19801
24                      (302) 655-0477
```

1   Mr. Kennedy, were you disciplined in any manner?

2   A.   No.

3   Q.   At the time, you said you reported to Neela

4   Chacko who reported to Bellverie Ross; is that

5   correct?

6   A.   That's correct.

7   Q.   Were they aware of the password sharing

8   incident?

9   A.   No.

10   Q.   Was any management aware of the password

11   sharing incident?

12   A.   No.

13   Q.   Are you aware of any other password sharing

14   incident besides the two you testified to?

15   A.   No.

16   Q.   So, it's your testimony that in the six years

17   you worked for MBNA, the only two instances in which

18   you were aware of personal passwords being shared was

19   the incident between Mr. Eapen and Mr. Campbell;

20   correct?

21   A.   Correct.

22   Q.   And the incident between yourself and

23   Mr. Kennedy; is that correct?

24   A.   Correct.   And that's personal passwords.

17

1    Q.    Correct.

2    A.    Yes.

3    Q.    And, by the way, with respect to the password

4    sharing incident between yourself and Mr. Kennedy,

5    were you aware if Mr. Kennedy was disciplined at all

6    for asking for your password?

7    A.    He was disciplined, but I don't know if it was

8    for -- I don't think it was for this instance.

9    Q.    You are not sure?

10    A.    Yeah.  I am not sure.

11    Q.    Now, let's talk about the administrator account

12    passwords.

13              Are those passwords that are generally

14    known by everyone in the department?

15    A.    In the beginning of our development, you know,

16    our -- you know, as our -- as our department was kind

17    of maturing, so during that, in the beginning process,

18    yes, people knew the administrator password.

19    Q.    And, at some point in time, did that become

20    confidential information?

21    A.    Yes.

22    Q.    At what time period did it go from being

23    generally known amongst Desktop Computing personnel to

24    being confidential?

Sung Byun

28

1 situated?

2    A.    Not like phone conversations.  But, you know,

3 if he spoke, you know, a little bit more than a normal

4 voice, yes, a lit bit louder than a normal voice, yes.

5    Q.    Do you recall speaking with an investigator

6 from the EEOC about Mr. Eapen's allegations about

7 harassment and discrimination at MBNA?

8    A.    Yes.

9    Q.    And did Mr. Eapen tell you about the problems

10 he was having at MBNA with respect to --

11    A.    Yes.

12    Q.    -- issues of harassment?

13    A.    Yes.  Towards the -- towards the end.

14    Q.    And what did Mr. Eapen tell you?  What do you

15 recall about your conversations with Mr. Eapen about

16 issues of harassment?

17    A.    That he said that he did not enjoy his job and

18 he said that he -- his relationship with Jim Dell was

19 getting pretty bad.

20    Q.    Did he ever tell you he thought he was being

21 harassed because of his national origin?

22    A.    No, not to my recollection.

23    Q.    Did he ever tell you he thought he was being

24 discriminated against because of his national origin?

37

1    Q.    And did Bill Kennedy make remarks or refer to

2    an A team or a W team?

3    A.    Yes.

4    Q.    And what was your understanding of what the A

5    team was?

6    A.    A team started out as, you know, A team and B

7    team.  We were building servers, and, you know, we

8    wanted -- we had two teams building servers, and, you

9    know, it was kind of like a -- like a, you know, team

10   kind of competitiveness.  And, so, he started out with

11   an A team and a B team.  Then the A team became, you

12   know, the "A-team," "Mr. T," that whole "A-team" in

13   the '80s.  Then it start kind of went to, Oh, the A

14   team, as the Asian team.  Then, if the A team is the

15   Asian team, then we are the W team for the White team.

16   That's how it kind of evolved.

17   Q.    There was no black team?

18   A.    No.

19   Q.    So, "B" never had reference to black?  B was

20   just A and B for letters of the alphabet?

21   A.    Correct.

22   Q.    And was that the way that Bill's team were

23   commonly referred to, as the A team and the W team?

24   A.    No.  It was just more of an inside joke amongst

Sung Byun

38

1   a few friends.

2     Q.   What time period, if you recall, was the use of

3   the A team or the W team used amongst the few friends

4   there in Desktop Computing?

5     A.   This is probably the Bellverie and the Neela

6   era.

7     Q.   And was Neela Chacko aware of the use of the A

8   team and W team in reference to the Asian and White

9   team?

10    A.   She may have heard the A team and she said,

11  "What's that"?  And we just -- probably just chuckled.

12    Q.   Do you know if Bellverie Ross was aware of the

13  A team and the W team and what that stood for?

14    A.   No.  I don't think it went that high.

15    Q.   Would you describe the atmosphere there as a

16  pretty, a joking atmosphere, playful atmosphere?

17    A.   Oh, very.

18    Q.   And the jokes included jokes of race and

19  religion or was it simply race or national origin?

20    A.   Just national origin.

21    Q.   And was Jim Dell in Desktop Computing present

22  when any of these comments were made?

23    A.   When these comments were made, he was part of

24  Desktop Computing but not in front of him.

40

1  not a, you know, a blatant -- because I -- you know, I

2  am -- because I am, at that time, very sensitive to

3  that issue, and I would have, you know, recognized it.

4     Q.   And the reference to Mr. Eapen as Osama bin

5  Laden or OBL, things of that nature, did you know

6  whether or not comments of that nature violate MBNA's

7  harassment policy?

8     A.   At that time, because we were kind of

9  participating in the joking atmosphere of that

10  workplace, I didn't know it -- I didn't recognize it

11  as a harassment or unwanted, you know...

12     Q.   Now, do you recall an incident in which a mail

13  room clerk who was distributing mail was told that

14  Mr. Eapen was Osama bin Laden's brother?  Do you

15  recall an incident regarding that?

16     A.   Yes.

17     Q.   What do you recall about that incident?

18     A.   We have a mail boy who is -- who is, not

19  handicapped, but -- but who is a slow learner, and,

20  you know, he used to -- he started to develop -- you

21  know, deliver mail to our group.  And I remember one

22  of the guys saying that there is bin Laden's brother

23  over there in the corner, and he -- you know, he

24  became very furious.

42

1   Q.   No?

2   A.   (Witness nods.)

3   Q.   You don't recall?

4   A.   No.

5   Q.   Did you ever hear Justus Eapen referred to as a

6   sand nigger?

7   A.   Yes.

8   Q.   How many times have you heard Mr. Eapen

9   referred to as a sand nigger?

10  A.   Probably once or twice.

11  Q.   By whom?

12  A.   Yeah, if I guess, I am taking a guess, but I

13  think it was kind of a little bit extreme, that, as a

14  joking, I thought that was a little bit extreme when I

15  heard it.

16  Q.   The person that referred to Mr. Eapen as a sand

17  nigger, does the last name Todd --

18  A.   Uh-uh.

19  Q.   -- refresh your recollection as to who it may

20  have been?

21  A.   No.

22  Q.   Did you ever hear anyone refer to Mr. Eapen as

23  a nigger?

24  A.   No.

43

1    Q.   And the joking that went on in Desktop

2  Computing, was that a phrase that was used at any

3  point in time?

4    A.   No.  That's pretty, you know, that's pretty out

5  of hand.

6    Q.   And did you, at any point, report any of these

7  comments that were made to Mr. Eapen to any management

8  official at MBNA?

9    A.   No.

10   Q.   To your knowledge, did any management official

11  at MBNA become aware of the use of these comments in

12  Desktop Computing?

13   A.   I remember those couple of instances where two

14  managers made some comment.

15   Q.   And which managers were those, if you recall?

16   A.   One manager was Dave Armstrong, he did overhear

17  the BP, brown people word, and said, "Knock it off."

18  And another person was Mike McDaniel -- no.  Mike --

19  Mike -- he is one of the managers.

20   Q.   Is Mike, the Mike we are referring to, is he

21  white or black?

22   A.   He is white.  I remember him making a comment

23  or reporting something especially when the mail boy

24  came around, it was the -- it was getting out of hand.

46

1    Q.    And the comments that were made toward you,

2    were they made on a regular basis?  On a daily basis?

3    Part of the atmosphere?

4    A.    It was a consistent basis, but we, you know,

5    for the record, you know, I made, you know, I made,

6    you know, my -- I made my share of jokes.

7    Q.    So people make jokes about --

8              MR. SANDLER:  Can you let him finish?

9    BY MR. COOK:

10   Q.    Were you done?

11   A.    No.

12   Q.    I am sorry.  I apologize.

13   A.    And the reason why, you know, a lot of -- I

14   participated in those jokes, for me, personally, was

15   that race played very minor -- minor role in my career

16   at MBNA, meaning, yes, it was there, no doubt about

17   it, but a lot of the -- if there was any prejudice,

18   the prejudice was based on performance rather than

19   race.  Meaning that the small percentage that I did

20   have to -- that there was a race, maybe, was that I

21   had to work extra hard, I had to prove myself, you

22   know.

23              There was, you know, there was doubt at

24   first.  Then you proved yourself and then you got the

Sung Byun

50

1    three, was Mr. Eapen still employed at that time?

2    A.    Yes.

3    Q.    Did you ever hear any comments, racial comments

4    toward African Americans in the workplace?

5    A.    No.    Oh -- oh, we had, in the beginning part of

6    that group, we had George Taylor sitting -- sitting

7    close to our -- our area, and we joked about -- he --

8    you know, he participated in some jokes that we were

9    joking about.

10   Q.    Is George Taylor African-American?

11   A.    Yes, he is.

12   Q.    Now, you say he participated in some jokes.

13             Were jokes made about Mr. Taylor's being

14   African-American, that you recall?

15   A.    Yeah.

16   Q.    And what kind of jokes do you recall being made

17   about Mr. Taylor being African-American?

18   A.    Like, you know, like this isn't -- I probably

19   said that this isn't like -- this isn't your ghetto or

20   something like that.

21   Q.    And in what context was that comment made?

22   A.    In a joking manner.

23   Q.    But what was it that precipitated that joke?

24   Was there any kind of conduct on Mr. Taylor's --

Sung Byun

54

1    A.    It was in a joking, you know, joking manner.

2    Q.    Now, so, in addition to being the victim of

3    jokes, you, yourself, also participated in the joking;

4    is that fair to say?

5    A.    Yes.

6    Q.    Were there any jokes or comments made about any

7    other national origin or race?  As we talked about

8    comments made to Mr. Eapen, because he was Indian,

9    comments made to you, because you are South Korean,

10   and comments made to Mr. Taylor, because he is black.

11   Any other comments made to an employee based on their

12   national origin or race?

13   A.    No.

14   Q.    Were there comments made about females because

15   of their gender?

16   A.    No.  It was just based on who participated in

17   our -- in our joking aspect, and no female

18   participated in that.

19        MR. COOK:  Mr. Byun, I don't have any

20   other questions.  Thank you for your time.

21   Mr. Sandler may have some questions for you.

22        MR. SANDLER:  I have a few questions.

23   BY MR. SANDLER:

24   Q.    You mentioned earlier that the term "red neck"

55

1  was used in this joking back and forth comments.

2    A.    Right.

3    Q.    To whom was that directed?

4    A.    Bill Kennedy.

5    Q.    And who used that term?

6    A.    I did.

7    Q.    And what does it mean?

8    A.    I guess it would mean someone who is not --

9  good question.  Someone who is not -- not intelligent,

10  someone who is backwards in time.

11    Q.    Doesn't it usually refer to a low class white

12  person?

13    A.    Right.

14    Q.    In discussing the training that was received

15  and your understanding of what was and wasn't unlawful

16  harassment, I think you used the phrase, "unwanted."

17  In other words, if something was accepted or welcomed,

18  that wasn't perceived as harassment; correct?

19    A.    Of course.

20    Q.    And the kinds of back and forth comments that

21  were engaged in by these so-called worker bees in

22  Desktop Computing, is it correct to say that those

23  comments were welcomed or were not unwanted?

24    A.    Correct.  If I, you know, sense something that

1   was unwanted or sensitive, I mean, things like that,

2   you know, you know, I would have immediately stopped

3   because I -- I am very sensitive towards those things,

4   too.  So, if I felt that that were -- behind the

5   jokes, there were hostility or back stabbing or

6   certain things behind that -- those jokes, I would --

7   I would be very upset by it.  But there -- within the,

8   you know, what I call the worker bees, we did have a

9   good, you know, camaraderie of, you know, of younger

10  men, you know, just doing the work.

11      Q.   And kidding each other?

12      A.   Kidding each other, correct.

13      Q.   Did Mr. Eapen participate also in this back and

14  forth?

15      A.   Yes, he did.

16      Q.   Do you recall any comments that he made?

17      A.   No.  I don't really recall exactly what

18  comments he made, but he did, you know, he had his

19  share, too, in joking.

20      Q.   Did he say something about the "Seeks" wearing

21  beards and cutting off their beards?

22      A.   Wearing beards -- oh, yeah.  We did talk about

23  where, after the 9/11, a lot of the contractors who

24  happened to be, I believe, Indian or Pakistan origin,

58

1    know, for lunch and hang out and things like that, or

2    if there was new technology, new cell phones, we would

3    get the latest cell phone and show off to one another.

4    But Justus Eapen didn't participate in those things.

5        Q.   He didn't have the same level of interest as

6    some of the other people?

7        A.   Yeah.   That wasn't his motivating factor.   For

8    us, you know, to have the fastest computer or the

9    fastest lap top or the LCD screens or things like that

10   was our motivation.   For him, it wasn't really a -- he

11   wasn't really inspired by those things.

12       Q.   What seemed to motivate Mr. Eapen?

13       A.   He was motivated by finance, like, you know,

14   you know, making money.   He shared with me about his

15   -- his stockbroker or trader incident when he was

16   young, and he told me that those kind of things were

17   his interests.

18       Q.   Were you aware that he had a side business?

19       A.   Yes.

20       Q.   What was that side business?

21       A.   I believe it was a mortgage, like, refinancing

22   company, but he was under his wife's name.

23       Q.   And did he solicit you in any way for that

24   business?

59

1    A.    Yeah.  He said if you wanted to refinance, you

2    know, get the lower rate, you know, why don't you, you

3    know, put in your application through the web.

4    Q.    And how through the web?  How would you do

5    that?

6    A.    You just go to the website and then there is an

7    application form and you just type in your

8    information.

9    Q.    What website?

10   A.    There was a website that he made.  I don't

11   think, you know, from our point of view, we didn't

12   think that he designed the website.  He probably had

13   somebody else design it.

14           MR. SANDLER:  No further questions.

15   BY MR. COOK:

16   Q.    Mr. Young, just to follow-up on some of your

17   testimony, did you have any discussions with Mr. Eapen

18   to determine whether or not he welcomed being called

19   Osama bin Laden's brother and dot head and other

20   references to his national origin?

21   A.    He didn't tell me that he did not welcome it,

22   but, I mean, I do know that it's not -- you know, it's

23   not something that you look forward to, you know, you

24   come to work and you look forward to hearing those

Sung Byun

60

1    things.

2                    And same with me, you know, I didn't want

3    to be heard as, you know, rice cooker, something like

4    that.  But we felt that that was part of being in,

5    just in the competitive, edgy group that we were in.

6    Q.    But you don't have any specific knowledge that

7    Justus Eapen welcomed that type of -- those type of

8    jokes or comments about his national origin?

9    A.    Correct.  He didn't come up to me and say, "Oh,

10    I love these jokes," or "These jokes are great," but

11    he didn't show any displeasure or depression or

12    frustration.  He showed me other frustrations with,

13    you know, either his manager or with Jim Dell or, you

14    know, maybe with his career, but he didn't share any

15    frustrations about the joking that was going on

16    because we thought it was, you know, just kind of

17    casual or just kind of like --

18    Q.    Did you complete your answer?

19    A.    Pardon?

20    Q.    Did you complete your answer?

21    A.    Yeah.

22    Q.    Now, you also made reference to you thought

23    that the prejudice was based more on performance than

24    it was on race; correct?

61

1    A.    Correct.

2    Q.    Did the level of joking toward Mr. Eapen have

3    anything to do with his performance?

4    A.    Yeah.  We did -- we did draw some connections.

5    You know, I remember us talking about that connection

6    where sometimes joking about it does -- does, you

7    know, play into your psychic.  Maybe I am not good

8    enough.  Maybe, you know -- we did talk about that.

9    But we also did talk about, you know, you know, being

10   a better person and not letting those things, you

11   know, interfere, but look at your career and your

12   accomplishments.

13   Q.    When you are talking about those things

14   interfering, you are talking about the comments and

15   the jokes?

16   A.    Yeah.  I think what -- like, even for me,

17   initially, like, when you don't know the group or the

18   dynamics or the joking or, you know, in what context

19   are they joking these things about, it did, I think

20   for me, kind of put me in a very isolated role.  But

21   as I started to be friends with the people that I was

22   working with, and after I understood that, you know,

23   that, you know, that we would watch each other's back,

24   we would help each other out, you know, I understood

62

1   that the joking wasn't based on hostility or based on

2   aggression or based on thinking less of you.

3      Q.   And based on your training, did you have an

4   understanding that joking, in reference to a person's

5   national origin or race, whether it was welcomed or

6   not, if it was unlawful behavior?

7      A.   I recognized it as a discrimination based on

8   your, you know, based on your national, you know,

9   based on your race and national origin, discrimination

10  in terms of, you know, your position, your career, you

11  know, your project, your, you know, your being

12  included in the group, those kind of things.  But in

13  terms of joking, at that time, we didn't really, like,

14  equate those things.  We were just, you know --

15     Q.   You didn't equate the joking with being illegal

16  behavior?

17     A.   Yes.

18     Q.   Did you recognize it as being unprofessional

19  behavior?

20     A.   Yes.  It wasn't professional.  But then we also

21  felt -- we didn't want it to be -- it was like an

22  underlying comment.  We didn't want our working

23  relationships amongst, you know, ten, 15 of us to be,

24  like, very formal.  You know, we wanted to be very

63

1   informal.  We wanted to say, Hey, Sung, can you come

2   in tomorrow night and help me re-boot some of these

3   servers.  We wanted to be very informal, kind of watch

4   each other's back, you know, be a, you know, kind of

5   like brother and teamwork kind of relationship.  And I

6   felt that we did have that.

7     Q.    You mentioned that Mr. Eapen asked you if you

8   wanted to refinance and put an application into the

9   website; correct?

10    A.    Correct.

11    Q.    Do you recall when this conversation took

12  place?

13    A.    This -- well, this was -- I don't know exact

14  date, but this was when he was working for Jim Dell,

15  the same period.

16    Q.    Now, you said you were aware that he had a side

17  business?

18    A.    Mm-hmm.

19    Q.    And how did you become aware of that?

20    A.    He showed me.

21    Q.    What did he show you?

22    A.    His website.

23    Q.    And what did he tell you about his website?

24    A.    He wanted some input, some feedback.  He said,

Sung Byuh

64

1   "This is what it's doing, this is some of the

2   information I have." And I was very impressed. I

3   said, "Wow, that looks very professional." And that's

4   how he wanted to be, very professional.

5     Q.   Did you have an understanding of what the

6   website was for?

7     A.   Yes.  It was for refinancing or home mortgage.

8     Q.   Did you understand the website to be a place on

9   the Internet where you can check for stocks and things

10  of that nature as well?

11    A.   Yes.

12    Q.   And do you recall the time frame in which he

13  showed you this website?

14    A.   Yeah.  This was that same period.

15    Q.   Jim Dell period?

16    A.   When he was working for Jim Dell.

17    Q.   Now, how did it come up that Mr. Eapen asked

18  you, if you wanted to refinance, to submit an

19  application?  Tell me everything you recall about that

20  conversation.

21    A.   You come to work, and he is like, Hey, Sung, I

22  have something, you know, something to show you.

23  Right now we are setting up, you know, a mortgage

24  company under my wife's name and I am working on some

65

1    website.  You know, if you have any ideas, let me

2    know.

3              I was like, "Oh, wow, great, I will let

4    you know if anything is going on."  And then maybe a

5    week later, he brought me over and actually he showed

6    me the website.  When he, you know, first told me, I

7    didn't really, you know, believe, you know, what -- I

8    didn't know how extensive it was going to be.  But

9    when he showed me the website and, you know, with the

10   stock, looking at the stocks and all these things, I

11   was pretty impressed with the website.

12   Q.   And just so I am clear, there are two occasions

13   when you looked at the website, one when he was first

14   setting it up and then one a couple weeks later?

15   A.   Correct.

16   Q.   Were there any other times when you reviewed

17   his website or Mr. Eapen asked you to view his

18   website?

19   A.   No, twice.

20   Q.   And during the second time you viewed

21   Mr. Eapen's website, did he ask you to fill out an

22   application to refinance your mortgage?

23   A.   Yeah.  He asked me, but not like, Do it now.

24   He said, you know, If you are going to refinance your