1

```
1              IN THE UNITED STATES DISTRICT COURT
2                 FOR THE DISTRICT OF DELAWARE
3
4
  EQUAL EMPLOYMENT OPPORTUNITY     )
5 COMMISSION,                      )
                                   )   Civil Action No.
6              Plaintiff,          )   04-CV-425-SLR
                                   )
7 v.                               )
                                   )
8 MBNA AMERICA BANK, N.A., a       )
  subsidiary of MBNA Corporation,  )
9                                  )
               Defendant.          )
10
               Deposition of JAMES A. DELL, JR. Taken
11 pursuant to notice at the law offices of YOUNG CONAWAY
   STARGATT & TAYLOR, 1000 West Street, Wilmington,
12 Delaware, beginning at 9:00 a.m. on Tuesday, July 19,
   2005, before Renee A. Meyers, Registered Professional
13 Reporter and Notary Public.
14 APPEARANCES:
15              TERRENCE R. COOK, ESQ.
                U.S. EQUAL EMPLOYMENT OPPORTUNITY
16              COMMISSION
                  21 South Fifth Street
17                The Bourse, Suite 400
                  Philadelphia, Pennsylvania  19106-2515
18                for the Plaintiffs,
19              SHELDON N. SANDLER, ESQ.
                YOUNG CONAWAY STARGATT & TAYLOR
20                1000 West Street, 17th Floor
                  Wilmington, Delaware  19899
21                for the Defendant.
22 ALSO PRESENT:  Launice Sills, Esq.
23                   WILCOX & FETZER
      1330 King Street - Wilmington, Delaware 19801
24                  (302) 655-0477
```

James A. Dell

23

1   Q.   To another shift?

2   A.   Yes.

3   Q.   And what shift did you change that to?

4   A.   That was a three-day a week shift, working

5   from, I believe, six p.m. to seven a.m. three days a

6   week.

7   Q.   Do you recall when the change in Mr. Eapen's

8   schedule occurred?

9   A.   2001.

10   Q.   And why was that switch made?

11   A.   PSN growth required 24-5 coverage.

12   Q.   And what do you mean by "24-5"?

13   A.   Coverage for 24 hours five days a week.

14   Q.   Prior to the time you switched Mr. Eapen to the

15   three-day a week schedule, was there anyone else,

16   amongst the team of five individuals you managed, that

17   worked a three-day a week schedule from six p.m. to

18   seven a.m.?

19   A.   Prior to?

20   Q.   Yes.

21   A.   No.

22   Q.   And how did you go about selecting Mr. Eapen to

23   work the three-day a week six p.m. to seven a.m.

24   shift?

James A. Dell

24

1    A.    I offered the shift to Mr. Eapen.

2    Q.    Had Mr. Eapen expressed an interest in changing

3    his shift to you prior to this time?

4    A.    No.   Because the shift actually just came

5    available.

6    Q.    Did you offer to change the shift of any other

7    of the five individuals that you supervised?

8    A.    Jason Campbell.

9    Q.    And did you offer Mr. Campbell the position

10   prior to the shift change prior to issuing it to

11   Mr. Eapen?

12   A.    It was a -- it was a first half and a second

13   half coverage of the week.

14   Q.    Explain that to me.

15   A.    Well, you would need two people to do that

16   shift, so it was offered to both of them.

17   Q.    Did they both accept it?

18   A.    Yes.

19   Q.    You didn't offer that shift to Dan Weir?

20   A.    It was offered to the group.

21   Q.    And how was it offered to the group?  Was it

22   one of the group meetings?  Was it by e-mail?

23   A.    Group meeting.

24   Q.    And tell me what you said to the group or how

James A. Dell

25

1    it was communicated that there was going to be a shift

2    change and you needed volunteers?

3    A.    Growth of the department, we need to go 24-5,

4    do any of you volunteer for a particular shift in the

5    evenings?

6    Q.    And what was Mr. Eapen's response?

7    A.    He needed two weeks to think about it.

8    Q.    Did he tell you why he needed so much time to

9    think about it?

10   A.    He needed to discuss it with his family.

11   Q.    Did Mr. Eapen advise you that he had children

12   and he had responsibilities with his children that may

13   have made it difficult for him to work that shift?

14   A.    Yes.

15   Q.    When he communicated that he had family issues,

16   he had children, that it may make it difficult for him

17   to work that shift, did you, at that point, talk to

18   another team member about perhaps taking the shift?

19   A.    I believe that's during the -- during the group

20   discussion, that's why he needed the two weeks.

21   Q.    When you asked the question during the group

22   meeting, did Mr. Eapen volunteer and say, "I will

23   consider it"?

24   A.    Yes.

James A. Dell

28

1   A.   Roughly four months, five months.

2   Q.   What do you recall him telling you?

3   A.   He could use more work to do.

4   Q.   What did you do in response to Mr. Eapen

5   telling you that?

6   A.   I assigned him some research to do related to

7   new software initiatives that we wanted to put into

8   the Perimeter Security Network.

9   Q.   Anything else?

10   A.   That's about it.

11   Q.   Did Mr. Eapen, at any other time, complain to

12   you that he did not have enough work to do on the six

13   p.m. to seven a.m. shift?

14   A.   I only know of one instance.

15   Q.   Did you notice a change in the quality of

16   Mr. Eapen's work from the day shift to the night

17   shift?

18   A.   I did.

19   Q.   And what change did you notice?

20   A.   Some tasks were not being completed.

21   Q.   Anything else?

22   A.   No.

23   Q.   Going back to the time you asked for volunteers

24   for the night shift, you indicated Mr. Eapen told you

44

1   A.   No.  He already had administrator rights.

2   That's the most you can have.

3   Q.   Getting back to your conversation with

4   Mr. Eapen, you told him to document everything he did

5   and to cooperate with Information Security; correct?

6   A.   Correct.

7   Q.   What other steps or actions did you take in

8   response to this phone call you received at 3:00 a.m.?

9   A.   I informed senior management first thing in the

10   morning.

11   Q.   And who would that be?

12   A.   At that time, I believe it was still Bellverie.

13   Q.   And what happened next with respect to that

14   incident?

15   A.   Information Security then took it from there.

16   I was out of the picture.

17   Q.   Did you have any other conversations with

18   Mr. Eapen concerning this password sharing incident

19   other than the 3:00 a.m. phone call?

20   A.   I don't believe so.

21          MR. COOK:  Let's mark that as No. 1.

22          (EEOC Exhibit No. 1, which is two e-mails,

23   were marked for identification.)

24   BY MR. COOK:

**W&F**

**A235**

James A. Dell

48

1    to a password and you don't have any conversations

2    with him about it, simply the e-mails?

3        A.    After this incident, there was a disconnect

4    from Justus Eapen, where I don't recall exactly what

5    has happened at this point, but I believe he went on

6    Family Medical Leave or something because he wasn't

7    around for me to discuss this.

8        Q.    And when you say "disconnect," is that what you

9    mean, that he was not physically at the MBNA facility?

10       A.    Correct.

11       Q.    And did you have any conversations with Ernesto

12   Marra concerning this password violation?

13       A.    Well, I mean, other than giving him this

14   information and alerting him to the fact that this

15   happened the prior evening, no.

16       Q.    When you say you alerted him to what had

17   happened, I know you alerted him by e-mail.

18            Did you also verbally speak with him about

19   the incident?

20       A.    Yes.

21       Q.    What do you recall about that conversation with

22   Mr. Marra?

23       A.    About?

24       Q.    About this password sharing incident?

James A. Dell

51

1   A.   Yes.

2   Q.   You don't recall having any conversations with

3   Mr. Micek concerning this password sharing incident?

4            MR. SANDLER:  I thought he just said he

5   did.

6            THE WITNESS:  I did.  Yeah.

7            MR. COOK:  I am sorry.

8   BY MR. COOK:

9   Q.   What do you recall discussing with Mr. Micek?

10  A.   Exactly the issue that happened.

11  Q.   When do you recall having that conversation

12  with Mr. Micek?

13  A.   The next morning.

14  Q.   Also on Thursday?

15  A.   Correct.

16  Q.   The 9th?

17  A.   (Witness nods.)

18  Q.   Was Mr. Marra present at this meeting?

19  A.   He was not.

20  Q.   Did yourself and Mr. Micek meet with Mr. Eapen

21  at any point to discuss the incident?

22  A.   No.

23  Q.   Do you have any knowledge whether Jim Micek and

24  Ernest Marra met with Mr. Eapen to discuss this

52

1   password sharing incident?

2    A.    I do not.

3    Q.    Did you speak with Jason Campbell about the

4   password sharing incident?

5    A.    I did.

6    Q.    And when did you speak with Mr. Campbell?

7    A.    When he actually came in during his shift.

8    Q.    What do you recall telling Mr. Campbell about

9   this incident?

10    A.    That you understand the policy, that you are

11   not supposed to share user accounts and passwords.

12    Q.    Now, did you recommend either Mr. Eapen or

13   Mr. Campbell be disciplined in any way for this

14   password sharing violation?

15    A.    No.

16    Q.    How come you did not recommend any type of

17   discipline?

18    A.    This was an Information Security issue, and I

19   am out of it at that point.

20    Q.    Going back to EEOC 1 and your response to

21   Mr. Eapen, you say that no I.D. and password

22   information should ever be transferred over the phone

23   line or via e-mail.

24              What's the reason for that?

59

1    A.    I do not.

2    Q.    Was it 2001?  2002?

3    A.    I don't recall.

4    Q.    And what was the reason for the lack of

5   communication, lack of talking?

6    A.    He was, apparently, angry at me.

7    Q.    And do you know why Mr. Eapen was angry at you?

8    A.    I discovered him sleeping at MBNA during his

9   shift.

10    Q.    And do you recall when that was, when you

11   discovered him sleeping?

12    A.    I do not.

13    Q.    How is it that you discovered Mr. Eapen

14   sleeping?

15    A.    I would periodically come in at three or four

16   in the morning, get my workday started.

17    Q.    And what did you observe when you came in at

18   three or four?

19    A.    The test lab was very dark, and when I walked

20   in, Justus was sleeping between two chairs.

21    Q.    Who else was in the test lab at the time?

22    A.    No one.

23    Q.    Did you wake Mr. Eapen?

24    A.    He woke when I came to the door.

James A. Dell

60

1  Q.  Did you say anything to Mr. Eapen at that time

2  about him sleeping?

3  A.  I just said, Justus, this doesn't look good,

4  that, if it was not me walking through the door, what

5  if it was someone of a senior level?

6  Q.  What did he say in response?

7  A.  I don't recall.

8  Q.  Did you tell Mr. Eapen you were going to write

9  him up or discipline him in any way for sleeping on

10  the job?

11  A.  No.  I didn't know what the policy was about

12  that.  I was concerned about perception.

13  Q.  Now, at the time you walked in, were you aware

14  if Mr. Eapen was on a break or not?

15  A.  No.

16  Q.  Did Mr. Eapen, was he entitled to work breaks

17  during the night shift?

18  A.  Yes.

19  Q.  Do you know how many work breaks he was

20  entitled to?

21  A.  Fifteen minutes, I believe, every two and a

22  half hours, three hours, hour for lunch.

23  Q.  One hour for lunch?

24  A.  Yes.



61

1    Q.    And are these set times?

2    A.    No.

3    Q.    Do you have any way of telling whether or not

4    Mr. Eapen was on a break or at lunch --

5    A.    I do not --

6              MR. SANDLER:   Let him finish.

7    BY MR. COOK:

8    Q.    Do you have any way of telling whether

9    Mr. Eapen was either on a break or at lunch when you

10   came in at three or four in the morning and discovered

11   him sleeping?

12   A.    No.

13   Q.    And are you aware of any MBNA policy that would

14   prohibit an employee from sleeping on their lunch

15   break or on their 15-minute break?

16   A.    No.

17   Q.    And is it after you discovered Mr. Eapen

18   sleeping that there was this period where there was no

19   communication between the two of you?

20   A.    After I asked my manager, Bellverie Ross, about

21   policy.

22   Q.    So, as a result of this incident, you informed

23   Bellverie Ross that you discovered Mr. Eapen sleeping?

24   A.    Correct.

63

1   A.   Yes.

2   Q.   And what did you do to follow-up?

3   A.   I asked her if she had anymore follow-up about

4   policy about sleeping.

5   Q.   She told you she had not?

6   A.   She had not.

7   Q.   Did you call anybody in personnel to find out

8   what the policy was?

9   A.   I did not.

10  Q.   Now, did Mr. Eapen tell you he was upset over

11  that incident?

12  A.   Yes.

13  Q.   And when did this conversation take place?

14  A.   I don't recall.

15  Q.   What did he tell you about him being upset over

16  this incident?

17  A.   He said that Bellverie had called him in and

18  asked him about the incident.

19  Q.   What else did he say?

20  A.   He felt betrayed.

21  Q.   Did he tell you why he felt betrayed?

22  A.   That I told Bellverie about the incident.

23  Q.   Had you ever come in and discovered Jason

24  Campbell sleeping?



1   believe it was TACS education.

2   Q.   T-A-C-S?

3   A.   Yes.

4   Q.   What's that an acronym for?  If you don't know,

5   that's fine.

6   A.   I don't know.

7   Q.   Once you get here, you don't get any help.

8            And did you check to see if, in fact, he

9   was in a TACS education?

10  A.   I did.

11  Q.   And what did you find out?

12  A.   I did find that he was there.

13  Q.   Now, you said, once you discovered he was gone,

14  you -- who did you contact once you realized he had

15  not completed his assignments for the night?

16  A.   I actually called Justus.  He was in Deerfield.

17  Q.   And he split his time between -- or had

18  responsibilities for both facilities?

19  A.   Correct.

20  Q.   So, after you spoke with Justus and he told you

21  he was in the TACS education, you verified that

22  information; correct?

23  A.   Yes.

24  Q.   And did you communicate this to anybody, either

James A. Dell

102

1    was another example of the harassment he was

2    experiencing at MBNA?

3              MR. SANDLER:  I think -- I think you used

4    Mr. Eapen twice.

5              MR. COOK:  Let me see if I can clean that

6    up.

7    BY MR. COOK:

8      Q.    Did Mr. Eapen ever complain to you that the

9    issue with respect to the password between himself and

10   Mr. Campbell was another example of the harassment he

11   was experiencing at MBNA based on his national origin

12   or race?

13     A.    In an e-mail.

14              (EEOC Exhibit No. 3, which is an e-mail

15   from Justus Eapen to Jim Dell dated February 21, 2003,

16   was marked for identification.)

17   BY MR. COOK:

18     Q.    Mr. Dell, you have been handed what's been

19   marked as EEOC 3 for identification.  It's an e-mail

20   from Justus Eapen to yourself, and it's cc'd to

21   several individuals, Jim Micek, Neela Chacko, Renee

22   Cuffee Williams, Doug Denton, and Anne Butler.  It's

23   dated February 21st, 2003, concerning:  My employment

24   at MBNA.

**W&F**

103

1           Have you seen this document before?

2    A.    Yes.

3    Q.    And is this the document you were just

4    referring to?

5    A.    Correct.

6    Q.    Do you recall receiving this document on or

7    about Friday, February 21st, 2003?

8    A.    I don't recall receiving it.

9    Q.    At any point in time or just on that particular

10   date?

11   A.    Just on that particular date.

12   Q.    You do acknowledge receiving this; correct?

13   A.    Correct.

14   Q.    Did you understand this e-mail to be a

15   complaint of discrimination or harassment?

16   A.    No.

17   Q.    What was your understanding of what that

18   e-mail, the substance of this e-mail was about?

19   A.    I believe his opinion.

20   Q.    I will direct your attention to the third

21   paragraph.  The second part of that sentence, it says,

22   -- I will read the whole thing.  "Further, I have

23   reliable validation to conclude all other unrelated

24   personnel investigations are also a direct or a

**W&F**

104

1    circumlocutory effort on your part to cease my career

2    at MBNA, due your practice and calculated effort

3    exclusively based on my race and/or national origin,

4    both a violation of the Federal Statutes as well as

5    MBNA policies."

6              I tried to read that to the best of my

7    ability.

8    A.    You did well.

9    Q.    Based on that, did you understand this to be a

10   complaint of race or national origin discrimination?

11   A.    I did not.

12   Q.    Did you believe Mr. Eapen thought he was being

13   discriminated against based on his race or national

14   origin?  Whether or not you believed it to be true,

15   did you understand that that was what Mr. Eapen was

16   communicating?

17   A.    Yes.

18   Q.    And based on your training at MBNA, you

19   indicated that when you receive a complaint of race or

20   a complaint of harassment or discrimination, that you

21   elevate it to the next level of management; correct?

22   A.    That's correct.

23   Q.    And on February 21st, 2003, would that have

24   been Ernesto Marra or would that have been Bellverie

105

1  Ross?

2    A.    I believe Ernesto.

3    Q.    And do you recall forwarding this e-mail to

4  Ernesto Marra?

5    A.    I believe so.

6    Q.    And did you have discussions with Mr. Marra

7  concerning this e-mail?

8    A.    And Mr. Micek.

9    Q.    And Mr. Micek?

10    A.    (Witness nods.)

11    Q.    And what, if any, steps did yourself,

12  Mr. Micek, or Mr. Marra take in response to this

13  e-mail?

14    A.    I just informed them about the e-mail.  I made

15  sure they were aware of it.  From there, I do not know

16  of any steps taken.

17    Q.    And when you informed Mr. Micek and Mr. Marra

18  of this e-mail, did you do that in person or did you

19  forward the e-mail to them?

20    A.    In person.  I saw where Mr. Micek was copied.

21    Q.    So, you met with Mr. Micek in person and you

22  met with Mr. Marra in person; correct?

23    A.    Correct.

24    Q.    Did you meet with them at the same time?



James A. Dell

109

1    Q.    And did you speak with Anne Butler concerning

2    this e-mail?

3    A.    I did not.

4    Q.    And what was Anne Butler's position at the

5    time?

6    A.    I don't recall.

7    Q.    Had you, at any time prior to February 21st,

8    2003, received any complaint from Justus Eapen

9    concerning issues of race or national origin?

10    A.    No.

11    Q.    Discrimination or harassment?

12    A.    No.

13    Q.    At the bottom of this e-mail, he says,

14    "However, that should not be reason for me to accept a

15    last and final warning or any other form of

16    disciplinary action."

17                    Had you, at any point, put Mr. Eapen on a

18    last and final warning concerning his conduct or

19    performance?

20    A.    No.

21    Q.    The final paragraph says, "I respectfully

22    request that you do whatever it takes to correct,

23    remove any derogatory record pertaining to matters

24    discussed herewith as your actions have caused too

James J. Micek

1

```
1          IN THE UNITED STATES DISTRICT COURT
2            FOR THE DISTRICT OF DELAWARE
3
4
   EQUAL EMPLOYMENT OPPORTUNITY      )
5  COMMISSION,                       )
                                     )    Civil Action No.
6            Plaintiff,              )    04-CV-425-SLR
                                     )
7  v.                                )
                                     )
8  MBNA AMERICA BANK, N.A., a        )
   subsidiary of MBNA Corporation,)
9                                    )
             Defendant.              )
10
11          Deposition of JAMES J. MICEK pursuant to
   notice at the law offices of YOUNG CONAWAY STARGATT &
12 TAYLOR, 1000 West Street, Wilmington, Delaware,
   beginning at 9:10 a.m. on Wednesday, July 19, 2005,
13 before Renee A. Meyers, Registered Professional
   Reporter and Notary Public.
14 APPEARANCES:
15          TERRENCE R. COOK, ESQ.
            U.S. EQUAL EMPLOYMENT OPPORTUNITY
16          COMMISSION
               21 South Fifth Street
17             The Bourse, Suite 400
               Philadelphia, Pennsylvania  19106-2515
18             for the Plaintiffs,
19          SHELDON N. SANDLER, ESQ.
            YOUNG CONAWAY STARGATT & TAYLOR
20             1000 West Street, 17th Floor
               Wilmington, Delaware  19899
21             for the Defendant.
22 ALSO PRESENT:  Launice Sills, Esq.
23                WILCOX & FETZER
      1330 King Street - Wilmington, Delaware 19801
24                (302) 655-0477
```

James J. Micek

22

1   communicator.

2   Q.   Anything else you recall discussing with

3   Mr. Eapen during your meeting during this transition?

4   A.   Yes.  He also informed me that he had expressed

5   interest in a new opportunity in telecommunications at

6   MBNA.

7   Q.   Anything else you recall?

8   A.   And that they had expressed interest in

9   offering him an opportunity, a job opportunity, and he

10  had told me that he had decided to not accept that job

11  and remain behind in Desktop Computing, principally,

12  because of his knowledge of me and our previous work

13  experience with one another, and he decided to stay in

14  the department.

15  Q.   Did Mr. Eapen raise to you any complaints of

16  discrimination or harassment based on his race or

17  national origin?

18  A.   No.

19  Q.   Now, with respect to the lack of communication

20  that Mr. Eapen raised to you, is that a lack of

21  communication between himself and Mr. Dell or did it

22  involve other people within the group?

23  A.   Twofold.  Specifically, between himself and Jim

24  Dell and the broader context of the lack of

James J. Micek

23

1   communication centers about the earlier point with

2   confusion between operations and engineering.

3   Q.   Did Mr. Eapen share with you that he felt

4   Mr. Dell did not respond to his e-mails?

5   A.   He did, yes.

6   Q.   And did Mr. Eapen share with you his belief

7   that there was a period of time that Mr. Dell would

8   not talk to him at all about business related matters?

9   A.   My recollection was that it was infrequent, but

10  that there was, on occasion, communications.

11  Q.   Do you recall whether you met with Mr. Eapen

12  before you met with Mr. Dell, or do you have an idea

13  of who you met with first?

14  A.   Let me think that one through for a second.

15       I don't know definitively.  Normally, I

16  meet with managers before individuals is my normal

17  approach, but I couldn't tell you definitively.  I'd

18  have to check my records.

19  Q.   And on these, I guess, one-on-ones you had with

20  everybody within the operations, did you take notes?

21  A.   Yes.

22  Q.   Did you retain those notes?

23  A.   Yes.

24  Q.   Do you still have those notes today?



1

1          IN THE UNITED STATES DISTRICT COURT
2              FOR THE DISTRICT OF DELAWARE
3
4

EQUAL EMPLOYMENT OPPORTUNITY      )
5   COMMISSION,                       )
                                      )   Civil Action No.
6              Plaintiff,             )   04-CV-425-SLR
                                      )
7   v.                                )
                                      )
8   MBNA AMERICA BANK, N.A., a        )
    subsidiary of MBNA Corporation,)
9                                     )
               Defendant.             )
10

              Deposition of NEELA B. CHACKO taken
11   pursuant to notice at the law offices of YOUNG CONAWAY
     STARGATT & TAYLOR, 1000 West Street, Wilmington,
12   Delaware, beginning at 1:05 p.m. on Wednesday, July
     20, 2005, before Renee A. Meyers, Registered
13   Professional Reporter and Notary Public.
14   APPEARANCES:
15              TERRENCE R. COOK, ESQ.
                U.S. EQUAL EMPLOYMENT OPPORTUNITY
16              COMMISSION
                  21 South Fifth Street
17                The Bourse, Suite 400
                  Philadelphia, Pennsylvania   19106-2515
18                for the Plaintiffs,
19              SHELDON N. SANDLER, ESQ.
                YOUNG CONAWAY STARGATT & TAYLOR
20                1000 West Street, 17th Floor
                  Wilmington, Delaware   19899
21                for the Defendant.
22   ALSO PRESENT:  Launice Sills, Esq.
23                        WILCOX & FETZER
        1330 King Street - Wilmington, Delaware 19801
24                     (302) 655-0477

**W&F**

16

1   share with you any problems he was having with James

2   Dell?

3      A.   Only in the hallway conversations I have had

4   towards the end.

5      Q.   Do you recall the nature of the problems that

6   Mr. Eapen may have had with Mr. Dell?

7      A.   He seemed to feel that Mr. Dell was picking on

8   him.

9      Q.   Did he tell you why he believed Mr. Dell was

10  picking on him?

11     A.   He mentioned that he wasn't being included in

12  the meetings and he wasn't getting any work, there was

13  no work there for him at night.  Things of that

14  nature.  He was bored at night.

15     Q.   Did Mr. Eapen ever tell you that he believed

16  that Mr. Dell was picking on him based on his race or

17  national origin?

18     A.   No.  He didn't mention that.

19     Q.   Did Mr. Eapen ever relay to you that other

20  members of Desktop Computing would call him derogatory

21  names based on his race or national origin?

22     A.   No.

23     Q.   Did Mr. Eapen ever tell you that employees

24  would call him Osama bin Laden or Osama bin Laden's

17

1    brother?

2    A.    No.

3    Q.    Or OBL?

4    A.    No.  I never heard that.

5    Q.    Did you ever hear Mr. Eapen -- or did Mr. Eapen

6    ever tell you that he was referred to as Sadam

7    Hussein?

8    A.    No.

9    Q.    Or Sadam Hussein's brother?

10   A.    No.

11   Q.    Did Mr. Eapen ever tell you that he was

12   referred to as a sand nigger?

13   A.    No.

14   Q.    Did Mr. Eapen ever tell you he was referred to

15   as a nigger?

16   A.    No.

17   Q.    Did Mr. Eapen ever tell you he was referred to

18   as BP, for brown people?

19   A.    No.

20   Q.    Have you ever --

21   A.    I have heard those terms around, like -- not

22   being called, but, you know, in conversation with

23   other people, I might have -- what is BP?  Brown

24   people.  But I have never heard anybody calling

31

1    A.    No.

2    Q.    Did she ever complain to you about race or sex

3    discrimination within MBNA?

4    A.    No.

5    Q.    Now, do you know Justus Eapen's wife?

6    A.    Yes, I do.

7    Q.    Tracy Eapen?

8    A.    Yes, I do.

9    Q.    Now, were you aware if Justus Eapen had an

10   outside business while he was employed at MBNA?

11   A.    No.  Because it was -- I knew he had a

12   business, but it was -- I knew it as his wife's

13   business.

14   Q.    And what type of business was that?

15   A.    Mortgage.  She used to be a mortgage broker.

16   Q.    How did you first meet Miss Eapen?

17   A.    I invited my team to my wedding in 2000,

18   November, and that's how I met all the spouses.

19   Q.    And that was in November of --

20   A.    2000.

21   Q.    And that was a non-MBNA related event?

22   A.    Yes.

23   Q.    And when was the next time you met Miss Eapen?

24   A.    I think I met her next at the corn boil, the

32

1    next year.

2      Q.    Is that an MBNA sponsored event?

3      A.    Yes.

4      Q.    At your wedding, was there any discussion

5    between yourself and Miss Eapen concerning her

6    business?

7      A.    Yes.  We -- at the reception, when we were

8    chatting, I asked her what she does, and, you know,

9    she said she has a -- she -- she is a mortgage broker.

10   So --

11     Q.    Did she provide you with a business card or

12   anything like that at that time?

13     A.    No, not at that time.  No, I don't think.

14     Q.    Was Justus also present at this wedding?

15     A.    Yes.

16     Q.    Did he participate in this conversation with

17   his wife concerning the business?

18     A.    I don't recall.  There were a lot of people

19   around.

20     Q.    And at the corn boil, did you also have

21   discussions with Miss Eapen concerning her business?

22     A.    I don't believe so.

23     Q.    At some point, did you conduct business with

24   Miss Eapen?



33

1    A.    Yes.

2    Q.    Do you recall when?

3    A.    I think sometime in early 2001.

4    Q.    And did you, in fact, get a mortgage, obtain a

5 mortgage through Miss Eapen?

6    A.    Yes, I did.

7    Q.    And has Justus Eapen ever solicited you for a

8 mortgage for his wife's company?

9    A.    No.

10    Q.    Has Justus Eapen ever suggested that if you

11 wanted to refinance your mortgage, to do it through

12 his wife's company?

13    A.    No.

14    Q.    Have you discussed his wife's business or the

15 mortgage business with Justus Eapen at all?

16    A.    No.

17    Q.    How many mortgages did you obtain from

18 Miss Eapen; do you recall?

19    A.    Three or four.  A couple of them were

20 refinances.

21    Q.    Was Justus Eapen involved in any of the

22 mortgages or the refinances that you obtained through

23 Tracy Eapen?

24    A.    No.

```
1              IN THE UNITED STATES DISTRICT COURT
2                  FOR THE DISTRICT OF DELAWARE
3
4
   EQUAL EMPLOYMENT OPPORTUNITY    )
5  COMMISSION,                     )
                                   )   Civil Action No.
6             Plaintiff,           )   04-CV-425-SLR
                                   )
7  v.                              )
                                   )
8  MBNA AMERICA BANK, N.A., a      )
   subsidiary of MBNA Corporation,)
9                                  )
              Defendant.           )
10
11              Deposition of ERNESTO E. MARRA taken
    pursuant to notice at the law offices of YOUNG CONAWAY
    STARGATT & TAYLOR, 1000 West Street, Wilmington,
12  Delaware, beginning at 9:00 a.m. on Thursday, July 21,
    2005, before Renee A. Meyers, Registered Professional
13  Reporter and Notary Public.
14  APPEARANCES:
15              TERRENCE R. COOK, ESQ.
                U.S. EQUAL EMPLOYMENT OPPORTUNITY
16              COMMISSION
                  21 South Fifth Street
17                The Bourse, Suite 400
                  Philadelphia, Pennsylvania  19106-2515
18                for the Plaintiffs,
19              SHELDON N. SANDLER, ESQ.
                YOUNG CONAWAY STARGATT & TAYLOR
20                1000 West Street, 17th Floor
                  Wilmington, Delaware  19899
21                for the Defendant.
22  ALSO PRESENT:  Launice Sills, Esq.
23                      WILCOX & FETZER
      1330 King Street - Wilmington, Delaware 19801
24                    (302) 655-0477
```



A258


1   Institute as an LPN?

2   A.    Approximately two years.

3   Q.    Have you held any other employment?

4   A.    No.   That's it.

5   Q.    Have you ever been disciplined at any of your

6   prior employments?

7   A.    No, sir.

8   Q.    Have you been terminated from a position?

9   A.    No, sir.

10  Q.    Have you ever been accused of harassment or

11  discrimination at any of your previous positions?

12  A.    No, sir.

13  Q.    You started with MBNA approximately August of

14  2002?

15  A.    Yes, sir.

16  Q.    What was your initial position when you started

17  with MBNA?

18  A.    I was the DTC server operation manager.

19  Q.    DTC would be Desktop --

20  A.    Desktop Computing.

21  Q.    Were you taking that position over from

22  somebody else?

23  A.    At the time I got the position, there was no

24  one in charge.  Everyone reported to Jim Micek.

1    Q.    Did you advise Mr. Eapen to admit that he was

2    wrong to Personnel?

3    A.    No.  I told him to relay the truth and be

4    honest and not to hold any information back.

5    Q.    After January of '03, did you receive any

6    complaint from Justus Eapen regarding discrimination

7    or harassment based on his race or national origin?

8    A.    We had a meeting in the course of which he

9    indicated that he felt discriminated against.

10   Q.    Do you recall the time frame of the meeting you

11   had with Mr. Eapen in which he shared this

12   information?

13   A.    I can't give you the exact time frame, but it

14   was after all of this incident occurred and he wasn't

15   quite happy with the results of what the Personnel

16   action would be, that were being done, his meetings

17   with Personnel and so on and so forth.  He actually

18   asked me if I could see him for a couple minutes, and

19   the purpose of the meeting, as he put it, was to vent.

20   He didn't want anything -- just wanted to talk to me

21   to vent his feelings with someone, and I gave him that

22   opportunity.

23   Q.    Do you recall whether this meeting you had

24   where Mr. Eapen vented was in January of '03?

54

1    A.    It was after the incident.

2    Q.    But you don't have a specific recollection of

3    whether -- was it in the month of January or February

4    or some other month?

5    A.    I seem to recall that it was probably more

6    towards, like, the end, last couple weeks in January.

7    Q.    And this was a one-on-one with Mr. Eapen?

8    A.    Yeah.   It was, again, one of those impromptu,

9    he had just got off his shift type deal, and he asked

10   me if I could see him for a couple minutes.

11   Q.    Now, he indicated to you that he felt

12   discriminated against.

13              Did he give you any --

14   A.    No details.

15   Q.    He gave you no details about what he believed

16   was -- how he was discriminated against, rather?

17   A.    Correct.   It was just a general statement.   And

18   when I informed him the MBNA policy was zero tolerance

19   and if he felt that people discriminated against him,

20   to inform us of this, identify the individual so they

21   would do something about it, he said he was not

22   interested in that, he was just there to vent.   So, he

23   provided no details.

24   Q.    And did he tell you that he felt discriminated

55

1    against based on his race or national origin?

2    A.    No.

3    Q.    He just used the term "discriminated against"?

4    A.    Correct.

5    Q.    Did you ask him for any examples for how he

6    felt he was discriminated against?

7    A.    Multiple occasions during the meeting, I

8    attempted to get him to commit to a specific event,

9    specific name, something that I could exercise a

10   policy and bring that policy against, and he did not

11   provide not a name, not an event, not anything that

12   was specific enough.  He just said he wanted to vent

13   and that he felt frustrated.

14   Q.    What did he express frustration with?

15   A.    Nothing specific.

16   Q.    Did he express frustration concerning the lack

17   of assignments he was getting during the night shift?

18   A.    No.

19   Q.    Did he express any frustration about

20   communication issues that he had with Mr. Dell?

21   A.    In this particular meeting, yes.

22   Q.    Did he express frustration during this meeting

23   about feeling isolated because he worked the night

24   shift?

57

1  Mr. Dell did not communicate with him for a six-month

2  period concerning any business related matters?

3     A.    No.

4     Q.    Was there any discussion of the password

5  incident during this venting session?

6     A.    He addressed it in general terms.  He -- he got

7  very emotional about the fact that he firmly believed

8  that the policy was not necessary, that the DMZ was --

9  the DMZ test environment was immune to it, or it

10  should have been as an exception to it.  He really

11  felt that, I got the impression it was almost at the

12  personal level, that he felt that he was right, that

13  this -- that they should admit that he was right and

14  go on with it.

15     Q.    You said that Mr. Eapen was emotional.  What

16  led you to that belief?

17     A.    During the entire meeting, he just jumped from

18  subject to subject.  He was very -- he got very

19  emotional towards the end of it.

20     Q.    Did he cry?

21     A.    Not as someone would interpret the word "cry."

22  But I think that he was -- it was a difficult time

23  controlling his emotions.

24     Q.    Was he glassy-eyed or anything like that, like

1    A.   Correct.

2    Q.   Based on the fact that he told you he felt

3  discriminated against, did you have an obligation,

4  under MBNA's harassment policy, to elevate that

5  complaint to either your manager or to Personnel?

6    A.   In the environment that we have, I did, without

7  an external environment, because I didn't want to

8  break the bond of the trust that Justus and I had

9  established, that he could feel comfortable coming

10  into my office and talk to me about things, that I

11  would not break that trust.

12          I inquired about things throughout the

13  one-on-ones and throughout staff meetings to ascertain

14  whether there was a feeling, and there was no grounds,

15  no one came up and said, No, I think he is right or he

16  is wrong.  But, again, the meeting that he requested

17  was one of privacy, close the door, and what we say --

18  and, again, had he provided me with a formal complaint

19  or some sort of information, then it would have gone

20  forward.

21    Q.   So, you didn't relate to Mr. Micek anything

22  Mr. Eapen told you during this venting session; is

23  that correct?

24    A.   Correct.

60

1    Q.    Based on your knowledge of the harassment

2    policy at MBNA, can you tell me what constitutes a

3    formal complaint of discrimination or harassment?

4    A.    Anyone walks in the office and says, "I have an

5    issue; I feel that" -- at that point, it becomes

6    formal.  When Justus walked into my office, his first

7    statement was, "This is between you and I.  I do not

8    want this to go" -- and he went into the privacy

9    things.  So, it was our building a trust, working

10   relationship with each other.  And, again, he did not

11   provide anything but just the statement.

12   Q.    Based on your knowledge of the policy, is it

13   enough for a person to say that they were

14   discriminated against in order to invoke the

15   procedures under the policy?

16   A.    I need to answer the question in two parts.

17   Q.    Sure.

18   A.    If someone says, "I feel discriminated

19   against," then yes.  In the case with Justus, he

20   specifically stated that he did not want anything

21   other than to vent.

22            I asked him repeatedly to move this into

23   the other aspect, to make this something that I could

24   do something about.

**W&F**

1    Q.    Now, so, I take it from your testimony that

2    Mr. Eapen telling you he was discriminated against was

3    enough to trigger the procedures set forth in the MBNA

4    harassment policy, but you made the decision not to

5    invoke those procedures because Mr. Eapen asked you to

6    keep it confidential?

7    A.    I am not quite sure I --

8    Q.    We will go over it again.

9              The original question was:  Was

10    Mr. Eapen's complaint, that he was discriminated

11    against, a complaint of discrimination or harassment

12    under MBNA's policy, as you understood it?

13    A.    No.  Because the only thing that he stated to

14    me is, "I have been discriminated against," without

15    any details, without anything else to corroborate,

16    without anything that we could go about and

17    investigate.  There was no substance other than, "I

18    have been discriminated against."  So, there was

19    nothing for me, as a manager, to go out and say, Okay,

20    give me the details and I can do the initial stages of

21    the process and then go through the MBNA policy and

22    turn it over to the right people.  There was nothing

23    other than a statement that I think was made in

24    frustration.

62

1    Q.    And then you say it was made in frustration

2    based on what?

3    A.    I think that the emotional state that he was

4    in.

5    Q.    And what was that emotional state?

6    A.    Throughout the meeting, he was very emotional,

7    as I stated earlier.

8    Q.    So, I am correct that you did not view

9    Mr. Eapen telling you he felt discriminated against to

10   be a complaint of discrimination under MBNA's

11   harassment policy?

12   A.    In this context, correct.

13   Q.    And the context being that he did not provide

14   you details as to why he believed he was discriminated

15   against?

16   A.    That and the fact that he was very specific

17   about the meeting being one where he wanted me to

18   respect his privacy.

19   Q.    Are you familiar with the harassment policy at

20   MBNA, Mr. Marra?

21   A.    Yes.

22              MR. COOK:  Let's mark that.

23              (EEOC Exhibit No. 8 entitled "Personnel

24   Policy MBNA Corporation" was marked for

1

```
 1              IN THE UNITED STATES DISTRICT COURT
 2                 FOR THE DISTRICT OF DELAWARE
 3
 4
    EQUAL EMPLOYMENT OPPORTUNITY     )
 5  COMMISSION,                      )
                                     )    Civil Action No.
 6              Plaintiff,           )    04-CV-425-SLR
                                     )
 7  v.                               )
                                     )
 8  MBNA AMERICA BANK, N.A., a       )
    subsidiary of MBNA Corporation,  )
 9                                   )
                Defendant.           )
10
                Deposition of RICHARD T. KILMON taken
11  pursuant to notice at the law offices of YOUNG CONAWAY
    STARGATT & TAYLOR, 1000 West Street, Wilmington,
12  Delaware, beginning at 12:35 p.m. on Thursday, July
    21, 2005, before Renee A. Meyers, Registered
13  Professional Reporter and Notary Public.
14  APPEARANCES:
15                 TERRENCE R. COOK, ESQ.
                   U.S. EQUAL EMPLOYMENT OPPORTUNITY
16                 COMMISSION
                      21 South Fifth Street
17                    The Bourse, Suite 400
                      Philadelphia, Pennsylvania  19106-2515
18                    for the Plaintiffs,
19                 SHELDON N. SANDLER, ESQ.
                   YOUNG CONAWAY STARGATT & TAYLOR
20                    1000 West Street, 17th Floor
                      Wilmington, Delaware  19899
21                    for the Defendant.
22  ALSO PRESENT:  Launice Sills, Esq.
23                      WILCOX & FETZER
       1330 King Street - Wilmington, Delaware 19801
24                      (302) 655-0477
```





A268

Richard T. Kilmon

31

1    Q.    Now, with respect to the tardiness issue raised

2    by Mr. Dell, tell me everything you did with respect

3    to that portion of the investigation.

4    A.    At that point in time, I didn't really pursue

5    the tardiness piece, as I recall.

6    Q.    Do you recall speaking with Mr. Eapen about

7    whether or not he was tardy or anything of that

8    nature?

9    A.    I don't recall, sir.

10   Q.    Do you recall pulling any time records to

11   determine whether or not Mr. Eapen was timely?

12   A.    I don't recall whether I did or not.

13   Q.    Did Mr. Dell raise to you his concern that

14   Mr. Eapen was missing or not accounted for in the work

15   environment for a period of five hours sometime in

16   2002?

17   A.    I don't recall that.  He may have, but I don't

18   recall that.

19   Q.    Now, with respect to the outside business

20   interest allegation, tell me everything you did with

21   respect to that particular investigation.

22   A.    Okay.  We spoke with Mr. Eapen about it, did

23   some research.  I found where there was a web site on

24   the computer, on-line.  I found a web site for Eapen

32

1   Corporation, I think it was.

2            When I opened up the web site, it was Real

3   Estate oriented.  It talked about selling the home by

4   owner.  It talked about mortgages, mortgage rates, I

5   believe, how to obtain mortgages, those kind of

6   things.  It provided his name, address.  It provided

7   the web site.

8            So then I -- I put his name in as Eapen

9   and I found testimonials, a testimonial from him from

10  a software company that identified him as CEO of Eapen

11  Corporation.

12  Q.   This is all on the computer, the research you

13  did on the computer; correct?

14  A.   Yes.

15  Q.   Anything else you recall about the computer

16  based research you did into this issue?

17  A.   Not particularly.

18  Q.   You spoke with Mr. Eapen, you did some computer

19  research.

20  A.   Well, we did the research and then we spoke

21  with Mr. Eapen; okay?  Like I said, I was pulling some

22  things together for, you know, for the investigation,

23  some --

24  Q.   Mr. Kilmon, besides researching Eapen

34

1   computers to search mortgage web sites for another

2   individual, looking at rates during working hours.

3     Q.   Besides interviewing the coworkers, researching

4   Eapen Corporation, and speaking with Mr. Eapen, is

5   there anything else you did as part of your

6   investigation?

7     A.   Into that piece alone?

8     Q.   Into the outside business interest.

9     A.   Yes.

10    Q.   What else?

11    A.   Reviewed our policy.

12    Q.   Which policy was that?

13    A.   Policy, I believe it's -- I think it's -- well,

14  it's -- I think it's 60 -- I think it's 603, I think.

15    Q.   Do you recall the name of the policy?

16    A.   It's conflict of interest policy.  And then I

17  contacted our Ethics Office.

18    Q.   What's the function of the Ethics Office in

19  this type of investigation?

20    A.   To -- well, in this type of investigation, from

21  my perspective, it's to determine if, in fact,

22  ethically, there is an issue with someone engaged in

23  some kind of a business that may have a direct

24  conflict of interest with MBNA and MBNA's business.

Richard T. Kilmon

36

1    what information we had.  He denied that it was his

2    business.  He said that it was -- his wife was in the

3    business, worked for a -- for Wells Fargo.

4         The web site -- I explained about the web

5    site.  He said, No, there was no web site.  So I

6    turned around to my computer while he was sitting

7    there.  He said I wouldn't be able to find it.  So I

8    just did a Google search, just typed in Eapen, and it

9    came up.  I opened it and there it was.

10   Q.   So, you are telling me that Mr. Eapen denied

11   the existence of a web site connected to a business he

12   was involved in?

13   A.   Yes.

14   Q.   Did you ask Mr. Eapen questions during this

15   meeting about his outside business interest?

16   A.   Yes, I did.

17   Q.   Was this from a written list of questions?

18   A.   No.

19   Q.   Do you recall any of the questions you asked

20   Mr. Eapen during this session?

21   A.   Initially, I asked him if he knew why he was

22   there.  He responded that he thought it was because he

23   was using the phone too much for personal reasons.  I

24   explained that that wasn't the issue.  I asked him if

37

1   he, in fact, was involved with a personal business, if

2   he was involved with a mortgage business or a mortgage

3   brokerage business. He said no, he was not.

4           I explained to him again the information

5   that we had, and then I asked him if he had ever

6   discussed mortgages with anybody that he worked with.

7   Initially, it was no, because he wasn't involved in

8   that. And, at that point, that's when I brought up

9   the web site so he could see it. I explained to him

10  that I had seen the web site also prior to doing that.

11  And then he said -- I asked him, "Is this your web

12  site? Is this your address"? There was an address on

13  there. And he acknowledged that it was.

14          And then he made a comment similar to -- I

15  believe it was in regards to that I have a -- well, my

16  wife has a web site. And, so, you know, at that

17  point, I just told him, Look, you know, here it is.

18  You know, if you are involved in it, let's talk about

19  it and let's get it cleared up. Help me understand

20  about what your, you know, what your role is in it.

21  Q.    And what did Mr. Eapen tell you about his role

22  in the business?

23  A.    That he didn't have a role in the business,

24  that it was his wife's business, that she was a

38

1   mortgage broker.  And then he openly talked about he

2   saw the web site as -- he said he saw the web site as

3   something to generate leads and that he would go to

4   MBNA related social events with his wife and give out

5   business -- her business cards, for instance, at the

6   MBNA corn boil, which is held on MBNA property, to

7   foster her mortgage business, other social gatherings

8   with MBNA coworkers, and utilize that to help build

9   her business.

10      Q.    Did you have any discussion with Mr. Eapen

11   concerning the particular MBNA policy he may have

12   violated by engaging in an outside business?

13      A.    Yes, I did.

14      Q.    And did you ask Mr. Eapen if he was aware of

15   the policy?

16      A.    I don't know whether -- I don't recall whether

17   I did or not, sir.

18      Q.    Do you recall asking Mr. Eapen any hypothetical

19   questions regarding violations of that particular

20   policy?

21      A.    For instance?

22      Q.    For example, if, in fact, Mr. Eapen, you handed

23   out your wife's business card on MBNA property, would

24   you consider that a violation of this policy?  Did you

Richard T. Kilmon

42

1    them?

2    A.    Yes.

3    Q.    Now, you also mentioned that you contacted the

4    Ethics Office.

5            Do you recall whether you contacted the

6    Ethics Office prior to the meeting you had with

7    Mr. Eapen and Miss Williams?

8    A.    I think it may have been, but I am not sure

9    exactly.  I mean, it's been two years, almost three.

10   Q.    Was there anybody in particular in the Ethics

11   Office that you spoke with concerning this incident?

12   A.    Yes, sir.

13   Q.    Who was that?

14   A.    That was Alfred Scarpitti, S-c-a-r-p-i-t-t-i.

15   Q.    Did you provide Mr. Scarpitti with anything in

16   writing concerning this incident?

17   A.    I don't believe I did.  I don't know whether I

18   wrote up an e-mail and sent it to him.  I know we had

19   a verbal discussion as well.  But I may have -- I am

20   not sure.

21   Q.    And, again, the purpose in contacting

22   Mr. Scarpitti from the Ethics Office was to determine

23   whether or not Mr. Eapen's conduct was actually --

24   actually violated the conflict of interest policy at

Richard T. Kilmon

43

1    MBNA?

2     A.    It was for clarification of that policy, yes,

3    sir, from an ethical standpoint.

4     Q.    Did Mr. Scarpitti, or anybody from the Ethics

5    Office, make a recommendation, based on what you told

6    them, whether or not there was a violation?

7     A.    Yes.

8     Q.    And what was that conclusion?

9     A.    That it was, in fact, a conflict of interest.

10    Q.    Did Mr. Scarpitti, or anybody from the Ethics

11    Office, make a recommendation as to the discipline

12    that Mr. Eapen should experience as a result of this

13    violation?

14    A.    Mr. Scarpitti doesn't make recommendations for

15    any corrective action.

16    Q.    Who would make that type of recommendation?

17    A.    My manager or higher, in Personnel or the Law

18    Department.

19    Q.    And at the time this investigation was being

20    conducted, you were managed by Rob Sorentino?

21    A.    No, sir, I was managed by Tamika Sainten.

22    Q.    And do you recall if Miss Sainten made any

23    recommendations as to the discipline Mr. Eapen should

24    experience as a result of violating MBNA's conflict of

59

1  mortgage.

2            Is that violative of MBNA's conflict of

3  interest policy?

4    A.    No.

5    Q.    Now, she goes on further to tell you that she

6  first met Tracy at the MBNA company corn boil and that

7  Tracy gave her a business card in the event she ever

8  needed her services for mortgage shopping.

9            Was that conduct, by Tracy Eapen, in any

10  way violative of MBNA's policy on conflict of interest

11  as it relates to Mr. Eapen?

12    A.    Based upon that comment and what he told me the

13  purpose of giving those cards out to MBNA people to

14  generate leads for her at an MBNA company function, I

15  would say yes.

16    Q.    Did Miss Chacko tell you that she first met

17  Tracy Eapen at her wedding, at Miss Chacko's wedding?

18    A.    No.

19    Q.    She didn't mention that to you?

20    A.    I don't recall that.

21    Q.    Miss Chacko also stated that Mr. Eapen, Justus,

22  has told her of his web site, Eapen.Net, though she

23  never visited the site.

24            Do you see that?

Richard T. Kilmon

90

1    A.    Let me just say this:  You are saying

2  Miss Sainten made the recommendation.  The

3  recommendation was made by higher ups.  I mean, the

4  decision and everything was made through conversations

5  of the incident.  So, to say that Miss Sainten made

6  that decision, I don't think, is fair.  But --

7    Q.    And I don't mean to be unfair, Mr. Kilmon.  I

8  thought you just testified earlier that yourself,

9  Miss Sainten, perhaps Miss Stafford, perhaps

10  Miss Williams, got together and there was a discussion

11  as to terminating Mr. Eapen's employment as a result

12  of the violations of Policy 601 and 606, did you not?

13    A.    Yes.

14    Q.    And based on your meeting, I believe you

15  testified that a recommendation was made and it was

16  sent then to the next person up the chain of process,

17  and that was to Patricia McKeown?

18    A.    Once the recommendation is made --

19    Q.    The recommendation for what?

20    A.    For dismissal.

21    Q.    Made by who?

22    A.    People issues.  We talk about it on a

23  conference call.

24    Q.    Who is "people issues."  Is there a particular

1   person involved?

2     A.    All those people that I just discussed, Patty

3   McKeown, Patty Bescript, Brian Gimlet, Law Department.

4     Q.    Doug Denton?

5     A.    Doug Denton is not on that.  It's all Personnel

6   and Law.  Health and Safety Services people were

7   there, and Security.

8     Q.    And, so, I believe you also testified that a

9   packet of information is prepared to send to the next

10  level, which would be Miss McKeown?

11    A.    That's once the recommendation is made for

12  whatever level of corrective action is to be

13  administered.  I --

14    Q.    And that recommendation is made in conjunction

15  with consulting Miss McKeown --

16    A.    Our senior management, yes, sir.  That's the

17  Personnel decision I had made reference to.  And then

18  it's written up and sent up and reviewed and approved

19  or denied.

20              (EEOC Exhibit No. 17 entitled "Dismissal

21  Summary" was marked for identification.)

22  BY MR. COOK:

23    Q.    Mr. Kilmon, you have been handed a document

24  marked EEOC 17, which is marked, "Dismissal Summary."

93

1    A.    The possibility of dismissal.

2    Q.    The possibility of dismissal.

3         And did either yourself or Miss Sainten

4    have any conversations with Pat McKeown, Brian Gimlet,

5    Patty Bescript, or any other individual prior to the

6    package being sent up?

7    A.    Yes.

8    Q.    And did you have discussions with each of those

9    individuals?

10   A.    As a group.

11   Q.    Now, are these discussions done --

12   A.    It was a presentation of the facts.

13   Q.    So, you being the Personnel generalist on the

14   people's team, you make a presentation to the upper

15   management as to what the facts are?

16   A.    Yes.

17   Q.    Is this done by phone or is this done in

18   person?

19   A.    By phone.

20   Q.    Is it a conference call?

21   A.    Yes, sir.

22   Q.    And would all these individuals, Miss McKeown,

23   Mr. Gimlet, Miss Bescript, were involved in that

24   conference call?

**W&F**
**A280**

1

1      IN THE UNITED STATES DISTRICT COURT
2          FOR THE DISTRICT OF DELAWARE
3
4
       EQUAL EMPLOYMENT OPPORTUNITY      )
5      COMMISSION,                       )
                                         )   Civil Action No.
6              Plaintiff,                )   04-CV-425-SLR
                                         )
7      v.                                )
                                         )
8      MBNA AMERICA BANK, N.A., a        )
       subsidiary of MBNA Corporation,)
9                                        )
               Defendant.                )
10
               Deposition of GLENN A. FORD taken pursuant
11     to notice at the law offices of YOUNG CONAWAY STARGATT
       & TAYLOR, 1000 West Street, Wilmington, Delaware,
12     beginning at 9:00 a.m. on Monday, August 1, 2005,
       before Renee A. Meyers, Registered Professional
13     Reporter and Notary Public.
14     APPEARANCES:
15              TERRENCE R. COOK, ESQ.
                U.S. EQUAL EMPLOYMENT OPPORTUNITY
16              COMMISSION
                   21 South Fifth Street
17                 The Bourse, Suite 400
                   Philadelphia, Pennsylvania  19106-2515
18                 for the Plaintiffs,
19              SHELDON N. SANDLER, ESQ.
                YOUNG CONAWAY STARGATT & TAYLOR
20                 1000 West Street, 17th Floor
                   Wilmington, Delaware  19899
21                 for the Defendant.
22     ALSO PRESENT:  Launice Sills, Esq.
23                    WILCOX & FETZER
          1330 King Street - Wilmington, Delaware 19801
24                    (302) 655-0477



A281 

10

1   know all of us sat with him in the same general area.

2   Q.   In what context would Mr. Eapen refer to

3   himself as Osama bin Laden's cousin or brother?

4   A.   I don't recall that.

5   Q.   You don't recall anything about the context or

6   circumstances under which Mr. Eapen would refer to

7   himself as Osama bin Laden's cousin or brother?

8   A.   No.  It was a long time ago.

9   Q.   Have you ever heard Mr. Eapen referred to as

10  OBL, short for Osama bin Laden?

11  A.   I have not, no.

12  Q.   Have you ever heard Mr. Eapen referred to as

13  Osama bin Laden's brother besides --

14  A.   No, not besides him.

15  Q.   Have you ever heard Mr. Eapen referred to as BP

16  for brown people?

17  A.   Never.

18  Q.   Have you ever heard Mr. Eapen referred to as a

19  sand nigger?

20  A.   No.

21  Q.   Have you ever heard Mr. Eapen referred to as a

22  nigger?

23  A.   Absolutely not.

24  Q.   Have you ever heard Mr. Eapen referred to as

Glenn A. Ford

29

1    Q.   Have you ever heard Mr. Wagner refer to

2  Mr. Eapen as Osama bin Laden or OBL or OBL's brother?

3    A.   No.

4    Q.   Have you ever heard Mr. Wagner refer to

5  Mr. Eapen in any derogatory term?

6    A.   No.

7    Q.   Have you ever heard Mr. Wagner use profanities

8  in the workplace?

9    A.   No, not that I can recall.

10    Q.   Do you know Jim Dell?

11    A.   Yes, I do.

12    Q.   Was Jim Dell in that Desktop -- part of the

13  Desktop Computing section?

14    A.   Yes, he was.

15    Q.   And would Jim Dell be in the area in which you

16  sat on occasion?

17    A.   Yes.

18    Q.   Was he there on a daily basis or was he -- or

19  was it less frequently?

20    A.   Well, he was part of Desktop, so, I mean, when

21  he was at work, we all sat in a general vicinity of

22  each other.  I mean, if he was at work, he was there.

23    Q.   How close was Mr. Dell's, I guess, office or

24  cubicle from where you sat?

30

1   A.   Probably about 30 or 40 feet away.

2   Q.   And there would be occasions when Mr. Dell

3   would come out of his office to actually come by where

4   you were sitting; is that fair?

5   A.   Yeah.  Yes.

6   Q.   Would he do that on a daily basis or less

7   frequently?

8   A.   I don't recall.  I didn't work for Jim, so I

9   wouldn't remember if he did or if he didn't.

10   Q.   Did you ever hear Mr. Dell refer to Mr. Eapen

11   in any derogatory term?

12   A.   No.

13   Q.   Was Mr. Dell present at any point when jokes

14   were being told within the -- amongst yourselves in

15   Desktop Computing?

16   A.   I don't recall.

17   Q.   Do you recall Mr. Dell laughing at any of the

18   jokes that were told in Desktop Computing?

19   A.   I don't recall that.  I know he did not sit in

20   our general -- what we call the working area, where

21   you referred to as the ghetto.  I mean, he did not sit

22   in that area.  I think, you know, the managers have

23   their side.  He was -- he was a manager and he would

24   come in and out through there, but I couldn't tell you

```
 1              IN THE UNITED STATES DISTRICT COURT
 2                 FOR THE DISTRICT OF DELAWARE
 3
 4
    EQUAL EMPLOYMENT OPPORTUNITY      )
 5  COMMISSION,                       )
                                      )    Civil Action No.
 6              Plaintiff,            )    04-CV-425-SLR
                                      )
 7  v.                                )
                                      )
 8  MBNA AMERICA BANK, N.A., a        )
    subsidiary of MBNA Corporation,)
 9                                    )
                Defendant.            )
10
                Deposition of THOMAS W. LIDDLE, JR. taken
11  pursuant to notice at the law offices of YOUNG CONAWAY
    STARGATT & TAYLOR, 1000 West Street, Wilmington,
12  Delaware, beginning at 10:30 a.m. on Monday, August 1,
    2005, before Renee A. Meyers, Registered Professional
13  Reporter and Notary Public.
14  APPEARANCES:
15              TERRENCE R. COOK, ESQ.
                U.S. EQUAL EMPLOYMENT OPPORTUNITY
16              COMMISSION
                   21 South Fifth Street
17                 The Bourse, Suite 400
                   Philadelphia, Pennsylvania  19106-2515
18                 for the Plaintiffs,
19              SHELDON N. SANDLER, ESQ.
                YOUNG CONAWAY STARGATT & TAYLOR
20                 1000 West Street, 17th Floor
                   Wilmington, Delaware  19899
21                 for the Defendant.
22  ALSO PRESENT:  Launice Sills, Esq.
23                      WILCOX & FETZER
       1330 King Street - Wilmington, Delaware 19801
24                    (302) 655-0477
```





9

1    Q.    What were your responsibilities as a PC

2  specialist two?

3    A.    As a PC specialist two?

4    Q.    Yes.

5    A.    I worked on operations of enterprise

6  applications, such as our corporate intranet site, and

7  a variety of other server applications.

8    Q.    Are the projects you worked on generally

9  individual projects or did they involve other MBNA

10 employees?

11   A.    Individual projects.

12   Q.    In the course of performing your duties, have

13 you ever shared your password with anyone?

14   A.    No.

15   Q.    Has anyone ever asked you for your password?

16   A.    No.

17   Q.    During your tenure at MBNA, are you aware of

18 any employees exchanging passwords for any purpose?

19   A.    No.

20   Q.    Do you know Jason Campbell?

21   A.    Yes, I do.

22   Q.    Do you know Justus Eapen?

23   A.    Yes, I do.

24   Q.    Are you aware of an incident where they

15

1   Computing, have you ever heard any jokes involving

2   someone's national origin?

3       A.   No.

4       Q.   Have you ever heard any jokes regarding

5   someone's religious background?

6       A.   No.

7       Q.   Have you ever heard Mr. Eapen tell any jokes?

8       A.   No.

9       Q.   Have you ever heard Mr. Ford tell any jokes?

10      A.   No.

11      Q.   Were you on the PSN and intranet operations

12  teams prior to September 11th, 2001?

13      A.   Yes.

14      Q.   And you were also on that team after September

15  11th, 2001?

16      A.   That's correct.

17      Q.   Prior to the events of September 11th, 2001,

18  did you ever hear Mr. Eapen referred to in a

19  derogatory term based on his national origin?

20      A.   No, I do not.

21      Q.   Did you ever hear anyone refer to Mr. Eapen as

22  Osama bin Laden prior to September 11th?

23      A.   No, I did not.

24      Q.   Or OBL, for Osama bin Laden?



30

1    A.   No.

2    Q.   With respect to the joking that went on in

3  Desktop Computing, did any supervisor or manager ever

4  talk to you or talk to the employees in that section

5  about the level of joking or the contents of the jokes

6  that went on in that area?

7    A.   No.

8    Q.   At any time?

9    A.   No.

10    Q.   Did Jim Dell ever make any comments about the

11  nature of the jokes that were being told in that area?

12    A.   No.

13    Q.   Was Jim Dell aware of the jokes that were being

14  told in that area?

15    A.   I don't know if he was or not.

16    Q.   I am sorry.  What was that last part?

17    A.   I don't know if he was or not.

18    Q.   Have you had any conversations with Glenn Ford

19  regarding Mr. Eapen's lawsuit against MBNA?

20    A.   No.

21    Q.   How did you find out Mr. Eapen was suing MBNA?

22    A.   How did I find out?

23    Q.   Yes.

24    A.   I was called down about a year ago to talk to

37

1    of expertise, so he was asking how to do certain

2    things, how to make it a little bit more colorful.

3    Q.    And did you provide him with assistance in that

4    regard?

5    A.    Yes.

6    Q.    Did you ever visit the web site with Mr. Eapen

7    for the purpose of obtaining a mortgage interest rate

8    or a mortgage?

9    A.    No.

10    Q.    Did Mr. Eapen ever solicit from you or offer to

11    sell you a mortgage?

12    A.    No.

13    Q.    Did you ever hear Mr. Eapen refer to the

14    business as his wife's business?

15    A.    No.

16    Q.    Besides the three or four times in which

17    Mr. Eapen came to you for web design advice, are there

18    any other occasions in which he discussed this

19    mortgage business with you?

20    A.    No.  On a couple occasions, I asked him about

21    how mortgages work and mortgage prices and things like

22    that, but nothing pertaining to his business.  Just a

23    general knowledge.  He seemed pretty knowledgeable in

24    the area.

38

1    Q.    Now, were you aware if other MBNA employees had

2    side businesses or side consulting businesses they

3    would operate?

4    A.    No, not that I know of.  We all do little side

5    jobs, but they are not actually businesses.  Usually,

6    they help out people of the company when they are

7    having problems with their personal computers or web

8    design, but they are not official businesses.

9    Q.    Did you ever work the night shift with

10    Mr. Eapen?

11    A.    No.

12    Q.    There was a period of time when Mr. Eapen

13    worked the night shift; do you recall that period of

14    time?

15    A.    Yes.

16    Q.    During that period of time, how often would you

17    see Mr. Eapen?

18    A.    Half an hour to an hour.

19    Q.    Every day?

20    A.    Every day.

21    Q.    There was an overlap between when you came to

22    work and Mr. Eapen would leave for work?

23    A.    That's correct.

24    Q.    In Desktop Computing, did you ever hear any



A290

39

1  derogatory comments toward African-Americans?

2  A.   No.

3  Q.   Any derogatory comments toward women?

4  A.   No.

5  Q.   Do you know Bridget Williams?

6  A.   Yes.

7  Q.   Did you ever know Miss Williams to make any

8  complaints of discrimination or harassment based on

9  her race or gender?

10  A.   No.

11  Q.   Have you ever known Miss Bridget Williams to

12  give her password out to anybody or to ask for a

13  password from anybody?

14  A.   No.

15  Q.   Did Mr. Eapen ever relate to you problems he

16  was having with Jim Dell?

17  A.   No.

18  Q.   Have you had any conversations with Mr. Eapen

19  since he has been terminated from MBNA?

20  A.   No, I have not.

21  Q.   Do you know why Mr. Eapen was terminated from

22  MBNA?

23  A.   I am not 100 percent sure.

24  Q.   Did anyone ever tell you, any manager ever tell

1

```
 1            IN  THE  UNITED  STATES  DISTRICT  COURT
 2              FOR  THE  DISTRICT  OF  DELAWARE
 3
 4
    EQUAL EMPLOYMENT OPPORTUNITY      )
 5  COMMISSION,                       )
                                      )    Civil Action No.
 6              Plaintiff,            )    04-CV-425-SLR
                                      )
 7  v.                                )
                                      )
 8  MBNA AMERICA BANK, N.A., a        )
    subsidiary of MBNA Corporation,)
 9                                    )
                Defendant.           )
10
                Deposition of BRIDGET C. WILLIAMS pursuant
11  to notice at the law offices of YOUNG CONAWAY STARGATT
    & TAYLOR, 1000 West Street, Wilmington, Delaware,
12  beginning at 9:05 a.m. on Tuesday, August 2, 2005,
    before Renee A. Meyers, Registered Professional
13  Reporter and Notary Public.
14  APPEARANCES:
15            TERRENCE R. COOK, ESQ.
              U.S. EQUAL EMPLOYMENT OPPORTUNITY
16            COMMISSION
                 21 South Fifth Street
17               The Bourse, Suite 400
                 Philadelphia, Pennsylvania  19106-2515
18               for the Plaintiffs,
19            SHELDON N. SANDLER, ESQ.
              YOUNG CONAWAY STARGATT & TAYLOR
20               1000 West Street, 17th Floor
                 Wilmington, Delaware  19899
21               for the Defendant.
22  ALSO PRESENT:  Launice Sills, Esq.
23                     WILCOX & FETZER
        1330 King Street - Wilmington, Delaware 19801
24                    (302) 655-0477
```

W&F

A292



13

1    A.    No, I am not.

2    Q.    Now, what about the production environment, are

3    you aware of any password, personal passwords being

4    exchanged amongst any MBNA employee in the production

5    environment?

6    A.    Yes.

7    Q.    What are you aware of?

8    A.    On one occasion -- are you talking about myself

9    or just in general?

10    Q.    Let's talk in general.  Are you aware of any

11    instance in which an MBNA employee -- again, we are

12    not talking about you right now -- are you aware of

13    any instance in which an MBNA employee shared or

14    exchanged their password with someone else in the

15    production environment?

16    A.    No, I am not.

17    Q.    Are you personally aware of any instance in

18    which you shared your password or someone asked you

19    for your password?

20    A.    Yes.

21    Q.    Can you tell me about that?

22    A.    It was late one night, Jim Dell called me and

23    asked me -- told me that he was -- we were having a

24    production issue and he had went over to the DFO to

**W&F**
**A293**

14

1   get into the system and his account was locked out.

2   Q.   And what did Mr. Dell ask you?

3   A.   For my password so that he can get into the

4   system.

5   Q.   And did he ask you for your personal password?

6   A.   Yes.

7   Q.   And this was a phone call from Mr. Dell to

8   yourself; is that correct?

9   A.   Yes.

10   Q.   Was anybody else on the phone call?

11   A.   No.

12   Q.   And the explanation Mr. Dell gave you as to why

13   he needed your password is that he had been locked out

14   of his account?

15   A.   Yes.

16   Q.   Did he tell you why he was locked out of his

17   account?

18   A.   No.  He must have forgotten his password.

19   Q.   Do you know why he called you, as opposed to

20   another employee, for the password?

21   A.   No.

22   Q.   Did he tell you he had called anybody else to

23   ask them for their password?

24   A.   I don't remember.



18

1    Q.    And can you give me an estimate of how closely

2    you were seated to Justus Eapen in terms of feet or

3    yards, cubicles?

4    A.    The first time, about two rows over, as far as

5    cubicles went.  And the second time, he was right

6    across from me, one seat over.

7    Q.    When you say "the first time," what period of

8    time are we talking about, from the time you started

9    until a certain date?  Can you give me an idea?

10   A.    He moved his seat when he -- when he joined the

11   team, he got a new desk, so I am not exactly sure of

12   the time frame.

13   Q.    Did you know Mr. Eapen to have a mortgage

14   business while he was employed at MBNA?

15   A.    Yes.

16   Q.    And how did you know about that?

17   A.    Just by talking, conversating.

18   Q.    Talking with Mr. Eapen or talking with other

19   employees?

20   A.    Talking with him.

21   Q.    Did Mr. Eapen ever offer to get you a mortgage

22   or an interest rate or anything along those lines?

23   A.    No.

24   Q.    Did Mr. Eapen tell you that he and his wife

19

1   owned a business or that he owned the business or that

2   his wife owned the business?

3   A.    I am not exactly sure how he phrased it.  I

4   know that it was a family business, that his wife was

5   involved in it.  I am not exactly sure how I came

6   about that knowledge, but I know that, you know, just

7   in conversation.

8   Q.    And were you aware that Mr. Eapen had a web

9   site, Eapen.net?

10  A.    Yes.

11  Q.    How did you become aware of that?

12  A.    He was hosting my church's web site for a

13  period of time.

14  Q.    Hosting your church's web site?

15  A.    Yes.

16  Q.    What's the name of your church?

17  A.    Glorious Full Gospel Tabernacle Center.

18  Q.    That was the church that you went to the

19  non-accredited bible institute?

20  A.    Yes.

21  Q.    Are they in Wilmington?

22  A.    Yes.

23  Q.    Have you ever been to Eapen.net while you were

24  at MBNA, that web site?

26

1   really don't remember who they were.  I mean, you

2   know, shortly after that time, I probably could have

3   told you who they were, but I don't remember right now

4   who they were.

5   Q.   If, for any reason, your memory comes back

6   during the deposition, let me know.  After the

7   deposition, please let Mr. Sandler know.

8   A.   Okay.

9   Q.   Any other incidents in which reference was made

10  to a person's race, national origin, ethnicity,

11  gender, that you recall during your tenure at MBNA in

12  Desktop Computing?

13  A.   No, not really.

14  Q.   With respect to the individuals saying that

15  Osama bin Laden was back there, have you ever heard

16  any employee in Desktop Computing refer to Mr. Eapen

17  as Osama bin Laden or Osama bin Laden's brother?

18  A.   No.

19  Q.   Have you ever heard Mr. Eapen referred to as a

20  sand nigger or a nigger?

21  A.   No.

22  Q.   Have you ever heard of the term -- well, the

23  section in Desktop Computing where the employees sat,

24  have you ever heard that referred to as "the ghetto,"



1

1    IN THE UNITED STATES DISTRICT COURT
2         FOR THE DISTRICT OF DELAWARE
3
4

EQUAL EMPLOYMENT OPPORTUNITY    )
5    COMMISSION,                 )
                                 )    Civil Action No.
6              Plaintiff,        )    04-CV-425-SLR
                                 )
7    v.                          )
                                 )
8    MBNA AMERICA BANK, N.A., a   )
     subsidiary of MBNA Corporation,)
9                                )
               Defendant.        )
10

           Deposition of WILLIAM F. KENNEDY pursuant
11   to notice at the law offices of YOUNG CONAWAY STARGATT
     & TAYLOR, 1000 West Street, Wilmington, Delaware,
12   beginning at 10:40 a.m. on Tuesday, August 2, 2005,
     before Renee A. Meyers, Registered Professional
13   Reporter and Notary Public.
14   APPEARANCES:
15              TERRENCE R. COOK, ESQ.
                U.S. EQUAL EMPLOYMENT OPPORTUNITY
16              COMMISSION
                   21 South Fifth Street
17                 The Bourse, Suite 400
                   Philadelphia, Pennsylvania  19106-2515
18                 for the Plaintiffs,
19              SHELDON N. SANDLER, ESQ.
                YOUNG CONAWAY STARGATT & TAYLOR
20                 1000 West Street, 17th Floor
                   Wilmington, Delaware  19899
21                 for the Defendant.
22   ALSO PRESENT:  Launice Sills, Esq.
23                 WILCOX & FETZER
        1330 King Street - Wilmington, Delaware 19801
24                 (302) 655-0477



**A298**



20

1    Q.    You had different passwords for each of those

2    different environments?

3    A.    It was only two.  One set of credentials in

4    test lab, one set of credentials outside of the test

5    lab.

6    Q.    At any point in time during your employment at

7    MBNA, were you aware of employees exchanging personal

8    passwords in the test lab or that testing environment

9    of which I spoke?

10    A.    No.

11    Q.    And with respect to the production environment,

12    are you aware of any instance in which employees

13    exchanged passwords in the production environment

14    during your employment at MBNA?

15    A.    Only as a result of this.

16    Q.    The lawsuit?

17    A.    Yes.

18    Q.    Were you made aware of the incident involving

19    Justus Eapen and Jason Campbell?

20    A.    Yes.

21    Q.    You had no personal knowledge of what went on

22    with respect to that password sharing incident?

23    A.    I do not.

24    Q.    Did you know Justus Eapen?



A299

William F. Kennedy

34

1    Q.    So, out of everybody on the A team and the W

2    team, he told you that he created a term to reference

3    himself as BP, for brown people?

4    A.    Yes.

5    Q.    Did anybody else pick up on the term "BP," for

6    brown people, and use it in any other manner besides

7    reference to Mr. Shiwpal?

8    A.    I believe Mark told other people that he, you

9    know, that's how he classified himself, as BP, but he

10   didn't call anyone else BP.

11   Q.    Besides Mr. Shiwpal, have you heard anybody

12   else use the term "BP" within Desktop Computing?

13   A.    No.

14   Q.    What summer was Mr. Shiwpal present at MBNA?

15   A.    I would have to say he is still employed at

16   MBNA.   He is a full-time employee.   But as an intern,

17   it would be between 2000, 2002, his junior and senior

18   years.

19   Q.    We are talking about the period of time after

20   September 11th, 2001, have you ever heard Mr. Eapen

21   referred to as a sand nigger?

22   A.    No.

23   Q.    Have you ever heard the term "sand nigger" used

24   towards anyone within Desktop Computing?

W&F

A300

William F. Kennedy

35

1    A.    No, I have not.

2    Q.    Have you ever heard Mr. Eapen referred to as a

3    nigger?

4    A.    No.

5    Q.    Have you ever heard anyone use the phrase

6    "nigger" within Desktop Computing?

7    A.    No.

8    Q.    Have you ever heard Mr. Eapen referred to as

9    Sadam Hussein?

10    A.    No.

11    Q.    Have you ever heard anyone referred to as Sadam

12    Hussein within Desktop Computing?

13    A.    No, I have not.

14    Q.    And have you heard Mr. Eapen referred to as

15    Sadam Hussein's brother?

16    A.    No.

17    Q.    Have you ever heard that phrase used within

18    Desktop Computing?

19    A.    No.

20    Q.    Are you aware, Mr. Kennedy, of an incident in

21    which a mail room clerk, mentally disabled mail room

22    clerk was told that Mr. Eapen was Osama bin Laden's

23    brother?

24    A.    No.

41

1  the use of that particular word would be a violation

2  of MBNA's harassment policy?

3    A.    I believe it would be a violation if we used it

4  without him asking us to use it.  If he wants us to

5  refer to him as that, I believe it's not harassment.

6  I think if we initiate it, using that term, I think

7  that's --

8    Q.    Did Mr. Eapen ever complain to you or tell you

9  his belief that he was being harassed or discriminated

10  against at MBNA?

11    A.    No.

12    Q.    How often did you and Mr. Eapen interact on a

13  regular basis?  And I understand it's been a long

14  time.  Just give me an average of twice a week?

15  Daily?

16    A.    Not even that.  Justus worked the night shift.

17  I was on the day shift.  For me to see him, to

18  physically see him, it would have to be an overnight

19  production issue.  So there would be no scheduled time

20  we would see each other.

21    Q.    Based on your training, the training you have

22  had at MBNA on issues of harassment and

23  discrimination, do you have an understanding what you

24  were to do if you believe someone was being subjected

51

1   the times when you were in?

2   A.    Not unless it was an emergency.

3   Q.    So, the only time that you would see Justus

4   Eapen, if those hours are correct or approximately

5   correct, would be if you -- if you had to come in in

6   the evening or if he had to come in during the day?

7   A.    That's correct.

8   Q.    If you left your desk area for work purposes,

9   was there any other place in the complex that you

10  would go on a regular basis?

11  A.    The nature of my job was not to be at my desk.

12  It was to be in the data center, one story below, on

13  the first floor, working on the servers.

14  Q.    So, you weren't even on the same floor with

15  these other people a lot of the times?

16  A.    Correct.  My general course of business was one

17  floor below.

18  Q.    How old are you, by the way?

19  A.    Thirty-nine.

20  Q.    I think you said that you would characterize

21  your relationship with Mr. Eapen as that of a

22  colleague rather than friend.

23            Did you have a good relationship?

24  A.    Yes.

57

1    A.    Yes.

2    Q.    Now, what hours did you work?

3    A.    Eight to five.

4    Q.    I will tell you Mr. Eapen worked from seven to

5    seven.  Would there be an overlap between your shift

6    and his shift in the morning?  Would you interact or

7    see Mr. Eapen in the mornings?

8    A.    No.

9    Q.    You don't recall that?

10   A.    No.

11   Q.    What period of time was it that you worked the

12   eight to five shift, Mr. Eapen worked the seven to

13   seven shift, and you guys would not have any

14   interaction at all?

15   A.    The entire time.  I have never changed shifts.

16   To my knowledge, I don't believe he ever changed

17   shifts.

18   Q.    So, what would be the occasions on which you

19   would see Mr. Eapen in the workplace?

20   A.    Overnight production emergencies, obviously,

21   where I would have to come in after hours, or if he

22   had to come in early for any reason.

23   Q.    Do you have any specific recollection of any

24   overnight production emergencies that would require

**W&F**

**A304**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

EQUAL EMPLOYMENT OPPORTUNITY )
COMMISSION,                  )
                             )
        Plaintiff,           )
                             )
v.                           )    Civil Action No.
                             )     04-CV-425-SLR
MBNA AMERICA BANK, N.A., a    )
subsidiary of MBNA           )
Corporation,                 )
                             )
        Defendant.           )

        Deposition of RICHARD LEE WEGNER, JR., taken
pursuant to notice at the law offices of Young, Conaway,
Stargatt & Taylor LLP, 1000 West Street, 17th Floor,
Wilmington, Delaware, beginning at 9:50 a.m. on Thursday,
October 6, 2005, before Robert Wayne Wilcox, Jr.,
Registered Professional Reporter and Notary Public.

APPEARANCES:

        TERRENCE R. COOK, ESQ.
        UNITED STATES EQUAL EMPLOYMENT
        OPPORTUNITY COMMISSION
          The Bourse
          21 South Fifth Street - Suite 400
          Philadelphia, Pennsylvania  19106
          for the Plaintiff,

        SHELDON N. SANDLER, ESQ.
        YOUNG, CONAWAY, STARGATT & TAYLOR LLP
          1000 West Street - 17th Floor
          Wilmington, Delaware  19801
          for the Defendant.

--------------------------------------------------------
                    WILCOX & FETZER
    1330 King Street - Wilmington, Delaware 19801
                    (302) 655-0477



**A305**



1      A.    I don't recall who I heard the rumor from.

2      Q.    This rumor about the person leaving early from

3   work in exchange for doing something for Ms. Ross, was

4   this before or after the TACS listening incident?

5      A.    I don't recall.

6      Q.    Were you disciplined at all for any part of this

7   rumor that the person was allowed to leave early?

8      A.    No.  I did not -- it was just a rumor I heard.

9      Q.    Okay.  So we now have three incidents when you

10  were disciplined while you were employed at MBNA.  Are

11  you aware of any other time you were disciplined, either

12  verbally or written warnings, for any of your conduct or

13  performance while at MBNA?

14     A.    Not that I can think of at this time.  I don't

15  believe so.

16     Q.    Okay.  If you recall anything else during the

17  course of this deposition, let me know.

18     A.    Okay.

19     Q.    After this deposition, if you recall something

20  else, please let Mr. Sandler know, and he will notify me

21  of that.  Okay?

22     A.    Okay.

23     Q.    Now, during your time at MBNA, were you aware if

24  employees shared passwords for any purpose?

1    A.    No.

2    Q.    You're not aware?

3    A.    Not other than the one service account that I

4    told you about that a small group of people knew about.

5    No.  In fact, they changed the rules where even the

6    administrative passwords that could be changed were

7    changed on a monthly basis.  But sharing your own

8    personal e-mail or personal log-in account password was

9    completely prohibited.

10    Q.    You said there was a change in the rules.

11          Do you recall when in terms of time -- month

12    or year -- that this change occurred?

13    A.    No.  I don't exactly recall when that was done,

14    but it was -- it might have been -- it was probably like

15    in 2002.

16    Q.    Prior to the change in the rules, were you aware

17    of any personal passwords being exchanged amongst

18    employees for any purposes?

19    A.    No.

20    Q.    In either the testing or production environment?

21    A.    No.

22    Q.    Have you ever shared your password with any MBNA

23    employee?

24    A.    No.

1    A.    No.

2    Q.    Have you ever heard that phrase at all within

3    MBNA?

4    A.    Brown people?

5    Q.    "BP" or brown people, either one.

6    A.    No.  That's actually new to me.  No.

7    Q.    Have you ever heard Mr. Eapen referred to as a

8    "sand nigger"?

9    A.    No.

10   Q.    Or a "nigger"?

11   A.    No.

12   Q.    Are you aware of the existence of an A team and a

13   W team within desktop computing -- A for Asian team and

14   W for white team?

15   A.    I heard the initials, but I didn't know what they

16   stood for.

17   Q.    So you've heard the reference to an A team and a

18   W team, but you didn't know that it referred to Asian or

19   white.  Is that what you're telling me?

20   A.    Yes.  I thought that had something to do with who

21   belonged to the team or somebody's last name or something

22   like that.

23   Q.    The reference to the A team or W team, was that

24   something that you heard on a regular basis or --

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

EEOC,                              )
                                   )
     Plaintiff,                    )
                                   )
       v.                          ) C.A. No. 04-CV-425-SLR
                                   )
MBNA AMERICA BANK, N.A.,           )
a subsidiary of MBNA               )
Corporation,                       )
                                   )
       Defendant.                  )

               Deposition of RICHARD A. WRESNESKI taken
pursuant to notice at the law offices of Young Conaway
Stargatt & Taylor, LLP, The Brandywine Building,
17th Floor, 1000 West Street, Wilmington, Delaware,
beginning at 1:40 p.m., on Wednesday, October 12, 2005,
before Kimberly A. Hurley, Registered Merit Reporter and
Notary Public.

APPEARANCES:

          TERRENCE R. COOK, ESQUIRE
          UNITED STATES EEOC
            21 South Fifth Street
            The Bourse - Suite 400
            Philadelphia, Pennsylvania 19106-2515
            for the Plaintiff

          SHELDON N. SANDLER, ESQUIRE
          YOUNG CONAWAY STARGATT & TAYLOR, LLP
            The Brandywine Building - 17th Floor
            1000 West Street
            Wilmington, Delaware 19801
            for the Defendant

ALSO PRESENT:

          LAUNICE P. SILLS
          MBNA

               WILCOX & FETZER
   1330 King Street - Wilmington, Delaware 19801
               (302) 655-0477



**A309**



1      A.    Yes.

2      Q.    During your employment at MBNA were you issued

3   passwords to access MBNA computers?

4      A.    Yes.

5      Q.    Were you aware if it was the practice in Desktop

6   Computing to share a password among employees at any point

7   in time?

8      A.    Personal passwords and personal accounts,

9   absolutely not.

10     Q.    Are you aware of any situation in which an MBNA

11   employee in Desktop Computing shared their password with

12   another MBNA employee for any purpose or any reason?

13     A.    Not directly, but I have heard the stories.

14     Q.    What have you heard?

15     A.    That Jason Campbell and Justus Eapen issue.   I

16   believe it was Jason Campbell.

17     Q.    Where did you hear that from?

18     A.    Grapevine.  I can't remember.

19     Q.    Office talk?

20     A.    Office talk.  And we were reeducated on the

21   policy directly afterwards.

22     Q.    Who gave you the reeducation on the policy?

23     A.    Management.

24     Q.    Anybody in particular you recall?

Richard A. Wresneski                              53

1      A.    No.  I'm not entirely sure if that was left to

2   direct management or if the higher management...

3      Q.    When you say that policy, what policy are you

4   referring to?

5      A.    It's the computer security policy, I believe.  I

6   can't remember exact.  It's more common sensical to me

7   because I was a security manager for the Air Force.

8      Q.    Besides the one incident that you heard about

9   through office talk with Mr. Eapen and Mr. Campbell,

10  you're not aware of any other incident in which MBNA

11  employees in Desktop Computing shared their password?

12     A.    No.

13     Q.    Did you ever work with Jim Dell?

14     A.    Never directly.

15     Q.    He was part of Desktop Computing?

16     A.    Yes.

17     Q.    Was he seated near you at any point in time

18  during your employment?

19     A.    No.

20     Q.    There's been testimony in this case that the

21  area in Desktop Computing which you were seated and some

22  others was a joking atmosphere.

23          Would you agree or disagree with that

24  characterization?

Richard A. Wresneski                              71

1   refer to Mr. Eapen as OBL or Osama Bin Laden's brother?

2       A.      Specific people I can't remember who -- it was a

3   group.

4       Q.     Was it that group that sat there in Desktop

5   Computing?

6       A.      The group that sat there.  I don't know if it

7   expanded beyond those cubes or not, but I was there

8   sometimes, I wasn't there sometimes.

9       Q.      There's also been testimony in this case that

10  Mr. Eapen was referred to as BP, short for brown people.

11  Have you ever heard that comment during your employment at

12  MBNA?

13      A.      BP?  No.

14      Q.      There's been testimony in this case that

15  Mr. Eapen was referred to as a sand nigger.  Have you ever

16  heard that phrase used at MBNA?

17      A.      Absolutely not.  I'd, frankly, be surprised if

18  it was said in the office.

19      Q.      Why would you be surprised?

20      A.      I don't know.  I have a higher -- I think the

21  people that I work with have a better character than

22  saying something as dumb as that.

23      Q.      You understand that phrase to be offensive to

24  someone who's of Middle Eastern descent?

Richard A. Wresneski                    81

1       A.      Look over your shoulder.

2       Q.      Was that a comment in reference to management or

3   just the other employees that were in the section?

4       A.      As far as?

5       Q.      Looking over your shoulder.  I understand that

6   to mean you've got to watch your back.

7       A.      Management.

8       Q.      You described your time at MBNA as kind of

9   tumultuous.  Was there anything besides the one write-up

10  and the one counseling that made your employment

11  tumultuous?

12      A.      No.  I believe the write-up kind of continued

13  and I didn't get a fair shake from Micek afterwards.

14      Q.      Did you know Mr. Eapen to have another business

15  outside of MBNA?

16      A.      Yes.

17      Q.      What did you know?

18      A.      Insurance and real estate, Web site, eapen.net,

19  I believe.

20      Q.      You have been to the site?

21      A.      Oh, yeah.

22      Q.      How did you learn of the site?

23      A.      Talking with Justus.  He was proud of what he

24  was going through with the testing for the insurance and

## CERTIFICATE OF SERVICE

I hereby certify that on November 15, 2005, I electronically filed a true and correct copy of foregoing **Appendix to Defendant MBNA's Opening Brief in Support of Its Motion for Summary Judgment** with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for viewing and downloading to the following counsel of record:

> Rudolph Contreras
> Assistant U.S. Attorney, Chief Civil Division
> U.S. Department of Justice
> 1007 Orange Street, Suite 700
> P.O. Box 2046
> Wilmington, DE 19899-2046

I further certify that on November 15, 2005, I caused a copy of **Appendix to Defendant MBNA's Opening Brief in Support of Its Motion for Summary Judgment** to be served by hand-delivery on the following counsel of record:

> Rudolph Contreras, Esquire
> Assistant U.S. Attorney, Chief Civil Division
> U.S. Department of Justice
> 1007 Orange Street, Suite 700
> P.O. Box 2046
> Wilmington, DE 19899-2046

I further certify that on November 15, 2005, I served the foregoing **Appendix to Defendant MBNA's Opening Brief in Support of Its Motion for Summary Judgment** on the following non-registered participants in the manner indicated below:

> Terrence R. Cook, Esquire **(By First Class Mail)**
> U.S. Equal Employment Opportunity Commission
> Philadelphia District Office
> 21 South Fifth Street
> The Bourse, Suite 400
> Philadelphia, PA 19106-2515

> YOUNG CONAWAY STARGATT & TAYLOR, LLP
>
> Sheldon N. Sandler, Esquire (No. 0245)
> The Brandywine Building
> 1000 West Street, 17th Floor
> P.O. Box 391
> Wilmington, Delaware 19899-0391
> Telephone: (302) 571-6673
> Facsimile: (302) 576-3330
> Email: ssandler@ycst.com
> Attorneys for Defendant

Dated: November 15, 2005