IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION,

           Plaintiff,

        v.

MBNA AMERICA BANK, N.A., a
subsidiary of MBNA CORPORATION,

           Defendant.

Civil Action No. 04-425 (SLR)

## PLAINTIFF EEOC'S ANSWERING BRIEF IN OPPOSITION TO DEFENDANT MBNA'S MOTION FOR SUMMARY JUDGMENT

Dated: December 14, 2005

United States Attorney's Office
Rudolph Contreras, Chief-Civil Division
Assistant United States Attorney
1007 Orange Street, Suite 700
Post Office Box 2046
Wilmington, Delaware 19899-2046
(302) 573-6277
rudolph.contreras@usdoj.gov
*Local Counsel for Plaintiff EEOC*

United States Equal Employment Opportunity Commission
Philadelphia District Office
Terrence R. Cook, Senior Trial Attorney
21 South 5th Street, Suite 400
Philadelphia, PA 19106
(215) 440-2688; (215) 440-2848 (Fax)
terrence.cook@eeoc.gov
*Counsel for Plaintiff EEOC*

## **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES..................................................................................i

NATURE AND STAGE OF PROCEEDING.....................................................4

SUMMARY OF ARGUMENT...........................................................................5

COUNTER STATEMENT OF FACTS..............................................................6

    A.    Eapen's Background...........................................................................6

    B.    Problems In Desktop Computing.......................................................6

        1.    Ethnic Slurs............................................................................7

        2.    Eapen Moved to Night Shift.................................................10

    C.    Complaints........................................................................................11

    D.    Outside Business...............................................................................13

    E.    Password Sharing Incident................................................................16

    F.    Termination Decision........................................................................19

LEGAL ARGUMENT......................................................................................21

I.    THIS COURT SHOULD DENY SUMMARY JUDGMENT BECAUSE THERE
    ARE GENUINE ISSUES OF MATERIAL FACT IN DISPUTE AS TO WHETHER
    DEFENDANT SUBJECTED JUSTUS EAPEN TO A HOSTILE WORK
    ENVIRONMENT BASED ON HIS NATIONAL ORIGIN AND FURTHER
    SUBJECTED HIM TO RETALIATION.........................................................21

II.    THE COMMISSION CAN ESTABLISH THAT MBNA SUBJECTED
    JUSTUS EAPEN TO A HOSTILE WORK ENVIRONMENT BASED ON HIS
    NATIONAL ORIGIN....................................................................................23

    A.    The Commission Can Establish that the Discriminatory Acts Were Severe or
    Pervasive...........................................................................................25

        1.    Co-Worker Harassment.........................................................26

        2.    Supervisory Harassment .......................................................29

          3.     Harassment Directed to Other Co-Workers is Relevant............................31

III.    THIS COURT SHOULD DENY SUMMARY JUDGMENT
       BECAUSE EEOC CAN ESTABLISH A *PRIMA FACIE* CASE
       OF RETALIATION UNDER TITLE VII.........................................................................37

       A.     Eapen Engaged in Protected Activity Prior to the Adverse Action........................39

       B.     Eapen Suffered an Adverse Employment Action....................................................40

       C.     A Causal Connection Exists Between the
            Protected Activity and the Adverse Employment Action........................................41

       D.     MBNA's Justification for Terminating Eapen is a
            Pretext to Unlawful Discrimination........................................................................43

CONCLUSION.....................................................................................................................46

## TABLE OF AUTHORITIES

FEDERAL CASES

Abramson v. William Patterson College of New Jersey, 260 F.3d 265, 279 (3rd Cir. 2001) . -30-, -39-

Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1081 (3d Cir.1996) .............. -22-

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) ...................... -21-, -31-

Andrews v. City of Philadelphia, 895 F.2d 1469, 1482 (3d Cir.1990) ............. -26-, -34-

Barber v. CSX Distribution Services, 68 F.3d 694, 702 (3d Cir. 1995) ................ -40-

Big Apple, BMW, Inc. v. BMW of N. Am. Inc., 974 F.2d 1358, 1362-63 (3d Cir.1992) ... -22-, -36-

Bray v. Marriott Hotels, 110 F.3d 986, 990 (3d Cir. 1997) .......................... -38-

Burlington Indus., Inc., v. Ellerth, 524 U.S. 742, 761-62 (1998) ...................... -29-

Cardenas v. Massey, 269 F.3d 251 (3d Cir. 2001) ................................ -26-

Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986) ............................... -21-

Distasio v. Perkin Elmer Corp., 157 F.3d 55, 61 (2d Cir. 1998) ...................... -23-

Farrell v. Planters Lifesavers Co., 206 F.3d 271, 279 (3d Cir. 2000) .......... -38-, -40-, -43-

Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir.1994) .............................. -43-

Gallo v. Prudential Residential Services, Ltd. Partnership, 22 F.3d 1219, 1224 (2d Cir. 1994) ...................................................................... -22-

Goosby v. Johnson & Johnson Medical, Inc., 228 F. 3d 313 (3rd Cir. 2000) ............ -22-

Graham v. F.B. Leopold Co., Inc., 779 F.2d 170, 173 (3d Cir.1985) ................... -35-

Harris v. Forklift Sys, Inc., 510 U.S.17 (1993) ............................... -24-, -25-

Horowitz v. Fderal Kemper Life Assurance Co., 57 F.3d 300, 302 n.1 (3d Cir. 1995) ..... -21-

Hurley v. Atlantic City Police Department, 174 F.3d 95, 110 (3d Cir. 1999) ............ -31-

Iadimarco v. Runyon, 190 F.3d 151, 157 (3d Cir.1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . -34-

Jackson v. University of Pittsburgh, 826 F.2d 230, 232 (3d Cir. 1987) . . . . . . . . . . . . . . . . -22-

Jalil v. Avdel Corp., 873 F.2d 701,708 (3d Cir.1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -38-

Josey v. John R. Hollingsworth Corp., 996 F.2d 632, 637 (3rd Cir. 1993) . . . . . . . . . . . . . . -22-

Kachmar v. Sungard Data Sys., Inc., 109 F.3d 173, 177 (3d Cir. 1997) . . . . . . . .  -38-, -42-, -43-

Krouse v. American Sterilizer Co., 126 F.3d 494, 500-01 (3d Cir.1997) . . . . . . . . . . . . -38-, -43-

Marrero v. Camden County Bd. of Soc. Servs., 164 F. Supp. 2d 455 . . . . . . . . . . . . . . . . . . . -41-

Matsushita Elec. Indus. Co. v. Zenith Radio Corp, 475 U.S. 574, 586 n.10 (1986) . . . . . . . . -21-

Meritor Savings Bank FSB v. Vinson, 477 U.S. 57, 65 (1986) . . . . . . . . . . . . . . . . . . . . . . . . -24-

Morales-Evans v. Administrative Office of the Courts, 102 F.Supp.2d 577, 589 (D.N.J. 2000)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -31-

National R.R. Passenger Corp. v. Morgan, 536 U.S. 101 (2002). . . . . . . . . . . . . . . . . . . . . . . -35-

Price v. Delaware Dept. of Correction, 40 F.Supp.2d 544 (D. Del. 1999) . . . . . . . . . . . . . . . -42-

Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 148 (2000) . . . . . . . . . . . . . . -44-

Richardson v. New York State Dep't of Correctional Serv., 180 F.3d 426, 437 (2d Cir. 1999)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -22-, -23-

Robinson v. City of Pittsburgh, 120 F.3d 1286, 1300 (3d Cir. 1997) . . . . . . . . . . . . . . . . . . -40-

Schwapp v. Town of Avon, 118 F.3d 106, 112 (2d Cir.1997) . . . . . . . . . . . . . . . . . . . . . . . -32-

St. Mary's Honor Ctr v. Hicks, 509 U.S. 502 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . -21-, -38-

Stewart v. Rutgers, The State University, 120 F.3d 426, 431 (3d. Cir. 1997) . . . . . . . . . . . . . -22-

Suders v. Easton, 325 F.3d 432,434 (3rd Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -29-

Velez v. QVC, 227 F.Supp.2d 384, 411 (E.D. Pa. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . -31-

Weldon v. Kraft, 896 F.2d 793, 800 (3d Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -35-

Williams v General Motors Corp., 187 F3d 553, 563 (6 th Cir 1999) . . . . . . . . . . . . . . . . . . -32-

Woodson v. Scott Paper Co., 109 F.3d 913, 920 n. 2 (3d Cir.1997) . . . . . . . . . . . . . . . -38-, -42-

FEDERAL STATUTES

42 U.S.C. § 2000e-2(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -23-

42 U.S.C. § 2000e-3a . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -39-

42 U.S.C. § 2000e-3(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -37-

## NATURE AND STAGE OF THE PROCEEDINGS

The United States Equal Employment Opportunity Commission ("EEOC" or "Commission") filed this action on June 23, 2004 to correct unlawful employment practices on the basis of national origin, race and/or retaliation and to provide appropriate relief to Justus Eapen and a class of similarly situated employees in Defendant MBNA's Desktop Computing Services Department who were adversely affected by such practices while employed by Defendant.[1] Discovery ended on September 30, 2005. Defendant filed its Opening Brief in Support of Summary Judgment on November 15, 2005. On November 30, 2005, the parties stipulated to adjust the briefing and affidavit schedule. Under the Stipulation, the Commission was to file its Answering Brief no later than December 12, 2005. On December 12, 2005, the Commission moved to adjust the briefing and affidavit schedule to allow submission of its Answering Brief no later than December 14, 2005, to allow time for the Commission to finalize its brief (i.e. prepare table of contents, table of authorities, nature of case, summary of argument, etc.). The Commission now files its Answering Brief in Opposition to Defendant, MBNA's Motion for Summary Judgment.

---

[1]    EEOC now seeks relief on behalf of only Justus Eapen on the basis of national origin discrimination and retaliation.

## **SUMMARY OF ARGUMENT**

This Court should deny Defendant MBNA's Motion for Summary Judgment because there are genuine issues of material fact in dispute as to whether Defendant subjected Justus Eapen to a hostile work environment under Title VII. Although the Commission can establish a *prima facie* case of national origin harassment, A factual dispute exists as to whether the conduct at issue arises to the level of severe or pervasive. Specifically, the nature and extent of derogatory and offensive national origin based comments is disputed.

This Court should also deny Defendant MBNA's Motion for Summary Judgment because there are genuine issues of fact in dispute as to whether Defendant terminated Justus Eapen in retaliation for his complaints of national origin discrimination and harassment. Although the Commission can establish a *prima facie* case of retaliation under Title VII, disputed factual issues exists concerning the timing of Justus Eapen's national origin complaints; whether Defendant's decision to terminate Mr. Eapen occurred after he complained of national origin discrimination and harassment; and whether Defendant's legitimate, non-discriminatory reason for terminating Justus Eapen is a pretext to discrimination.

The Commission asserts that based on the record of evidence, including the pleadings, depositions, exhibits, and answers to interrogatories, there are material issues in dispute precluding the granting of MBNA's Motion for Summary Judgment. Accordingly, MBNA's Motion for Summary Judgment must be denied in its entirety.

## COUNTER-STATEMENT OF FACTS

### A.    Eapen's Background

Jutus Eapen is Indian.[2] He began his employment with MBNA as a PC Technician on or about February 28, 2000 (B184).  Justus Eapen had numerous direct supervisors during his employment at MBNA.  Janet Dempsey (two months), Ray Brady (one month), Neela Chacko (four months) and Richard Wegner (two months) (B186-188).  In March 2001, Mr. Eapen started reporting to Jim Dell, (non-Indian, caucasian) Assistant Vice-President of MBNA's  Desktop Computing Operations, who remained his supervisor until Eapen's termination from MBNA (B189).  In June of 2002, he was promoted to the position of Personal Banking Officer, with the title of Systems Engineer (B7).  Mr. Eapen remained in that position until he was terminated on March 26, 2003.

### B.    Problems in Desktop Computing

While working in desktop computing, Jutus Eapen was subjected to ethnic slurs and other derogatory comments by a group of co-workers and his supervisor Jim Dell.  The harassers, Glenn Ford, Thomas Liddle, Richard Wresneski, John Hartnett and William Kennedy, are young white males.  This group of white males often socialized outside of the office, played sports, went to happy hours, and engaged in other recreational activities together.  Justus Eapen was never invited to any of these social events (B30-33, 256-258).

It was widely known that Desktop Computing was a joking atmosphere.  All the co-workers that testified acknowledged the joking atmosphere.  Thomas Liddle, Jr., testified that

---

[2] Justus Eapen was born February 2, 1968 in Erathu, Kerala in India.  Mr. Eapen moved to the United States of America in April 1985 (B2).

there were a lot of jokes in desktop computing (B46). Glen Ford testified Desktop Computing was an atmosphere where they joked about anything (B42). Ford admitted that there were jokes about national origin in desktop computing (B42). William Kennedy testified that desktop computing was a joking atmosphere, including racial jokes (B34). The existence of racial jokes was confirmed by the testimony of Sung Byun, who also stated that there were jokes about race within desktop computing (B57). Mr. Eapen's supervisor, Jim Dell, was part of desktop computing when all the derogatory comments were being made and sat in close proximity to the employees making the jokes (B209, 261-262 ). Moreover, Jim Dell acknowledged the joking atmosphere between employees in Desktop Computing (B217 ).

### 1.   Ethnic Slurs

After the terrorist attacks of September 11, 2001, Justus Eapen's co-workers referred to him as "Osama Bin Laden." (B62). Richard Wresneski, Glenn Ford, Thomas Liddle and possibly John Hartnett all participated in calling  Justus Eapen "Osama Bin Laden" or a variation of "Osama Bin Laden," such as "OBL" or "Osama Bin Laden's brother" (B60-61). Jim Dell, Mr.Eapen's supervisor, also called him "Saddam Hussein" and "Saddan Hussein's brother" (B24). Further, Justus Eapen was also called "sand-nigger" three or four times by Richard Todd, a co-worker. Todd also used the term nigger one time (B27). This was an acceptable form of communication in Desktop Computing (B24).

A few weeks after September 11, 2001, Mr. Eapen was almost attacked by a learning disabled mailroom clerk, Rob Dunphy (B65). On this occasion, while located in Glenn Ford's cubicle, either John Hartnett, Thomas Liddle, Glenn Ford or Richard Wresneski, told Rob Dunphy - a learning disabled mailroom clerk - "there is Bin Laden's brother over there in the

corner" referencing Justus Eapen. Rob Dunphy became excited and "very furious," after hearing that Eapen was Osama Bin Laden's brother (B63). Dunphy motioned like he was going to jump on Mr. Eapen (B25). The harassers stopped Dunphy from attacking Mr. Eapen, telling Dunphy that they were just kidding (B25). Following this incident, Mr. Eapen did not know whether Dunphy had the ability to comprehend that he [Eapen] was not Osama Bin Laden's brother, so Eapen would try to avoid Dunphy (B26).

References to race and national origin were also used to identify groups within MBNA. For example, when referencing different teams of employees, William Kennedy coined the phrase "A" Team for Asian team and "W" team for White team. According to Kennedy, the White team was the pro team and the Asian team were the amateurs (B35-36).

Prior to September 11, 2001, Byun heard Eapen called "dot-head." (B62). He understood the term "dot-head" was a reference to Indian people (B59). Sung Byun heard the phrase "dot-head" used in desktop computing on at least five occasions (B60). Justus was present when these ethnic slurs were being used (B60). William Kennedy referred to Justus Eapen and Mark Shiwpal (Indian) as "BP," short for "brown people" (B40). Kennedy called Eapen "BP" on a daily basis (B62). Kennedy believed Shiwpal, an MBNA intern, created the term between 2000 and 2001 to refer to himself because Shiwpal would have been an individual to hear the term "A" team and "W" team and wanted to come up with his own team (B38-39). Kennedy referred to Shiwpal as BP on more than one occasion (B40).

Desktop Computing was constantly referred to as the "ghetto." Byun said that he has used this term on over 20 occasions (B69). Wresneski and Liddle also used the phrase with the same frequency (B69-70). The term "ghetto" started being used in desktop computing when

-8-

Byun told George Taylor, a Black employee, "this isn't your ghetto" (B68). Byun used this term in response to Taylor asking Byun "how come all Koreans have cleaners?" (B69). When Byun used the term "ghetto", he did so based on Taylor's African-American national origin (B71).

"Ghetto" later became a reference for the area where technical people worked (B70). Richard Wresenki testified that he coined the phrase "ghetto" to refer to the section where the employees as opposed to MBNA management sat (B150). Richard Wegner heard desktop computing referred to as the "ghetto" two or three times (B93). Kennedy also heard a section of desktop computing referred to as the "ghetto." (B36). Neela Chacko, an MBNA mananger, also heard of the desktop computing section referred to as the "ghetto." (B96) Specifically, she has heard Richard Wresneski and Glenn Ford say, "Okay, I'm going back to my desk in the ghetto." (B97).

In addition to the ethnic slurs directed at Justus Eapen, there were derogatory comments made toward other employees. Sung Byun (non-Indian, Asian) told George Taylor, African-American, that "Black people don't shoot their guns correctly, they shoot sideways." (B260). William Kennedy would tell Byun, that his [Byun's] relatives "built this technology," "your brother built this PC", and "your family built this PC." (B37). Richard Wresneski called Byun "rice bowl" on at least five occasions. Byun understood "rice-bowl" to be a derogatory term based on his Korean national origin (B58-59). Byun was also just called "rice" (B66). Byun referred to William Kennedy "red neck" and "whitey." (B211-212). No MBNA manager spoke with desktop computing about the offensive comments in that area (B43). Sung Byun recalls that MBNA supervisor Dave Armstrong overheard the BP- brown people phrase and said "knock it off." (B64).

2.    **Eapen Moved to the NightShift**

In March 2002, Jim Dell asked Eapen to work on the night shift (B73). Eapen had not

expressed an interest in changing his shift and had advised Dell that he had children and that his

responsibilities towards his children may make it difficult to work the night shift (B73-74).

After discussing the issue with his family, Eapen accepted the position. Dell told Mr. Eapen

that by working the night shift, Eapen would have more time to work on his business (B5).

Eapen did not know, however, to what Dell was referring (B5). On the night shift, Eapen would

be responsible for multiple site visits, command center interaction, morning shift turnover, and

evening shift turnover (B75-76). Eapen worked Friday, Saturday and Sunday nights. He worked

thirteen and a half hour shifts (B73).

Jim Dell frequently changed Mr. Eapen's work shifts at his [Dell's] convenience (B190).

Mr. Eapen expressed his frustration regarding the changing work shifts to Danyln Brown from

MBNA's Affirmative Action Office (B191). In addition, four or five months after working the

night shift, Eapen told Dell that he did not have enough work (B76-77). In response to Eapen's

complaint, Dell assigned him a research project (B77). Eapen also complained to Ernesto Marra

that he did not have enough work during the night shift and that he did not feel challenged (B81).

Eapen told Neela Chacko that he felt isolated working on the night shift (B98). Mr. Eapen also

told Bellverie Ross, a Senior Vice-President in Desktop Computing, that he needed more work

(B6). Ross related Eapen's concerns to Jim Micek (B265-266). Eapen had approximately a

dozen events that he needed to check during the night shift, which took about "30 seconds." (B5)

Ms. Ross told Mr. Eapen that more work would be coming. Jim Dell told Eapen that they had

new projects starting and that Eapen would be busy (B6).

-10-

Although Eapen worked the night shift, the national origin harassment continued. In the mornings, as Mr. Eapen was leaving, the group of harassers would greet him with "good morning OBL" (B28).

## C.    Complaints

Mr. Eapen complained that Jim Dell refused to speak with him about projects and further withheld from him information necessary to complete his assigned projects (B67). On multiple occasions, Eapen noticed that when Dell was not in the office, Eapen was not being told what was going on.  When Dell would return, he would make it look like Eapen was incompetent, stating, "Justus should have known about it." (B22-23).

Eapen complained to Neela Chacko[3] about Jim Dell picking on him.  Eapen told Chacko that while he was on vacation, someone took his computer monitor.  Chacko reported this incident to her manager, Bellverie Ross (B95). When Eapen asked Dell about his missing computer monitor, Dell told him that he [Eapen] would have to "live with whatever they left" him and that he did not "want to hear about it" anymore. (B204).  Dell did not take any non-Indian employee's computer monitor (B219).  Eapen spoke to Byun about issues of harassment and how his relationship with his supervisor,  Jim Dell, was getting pretty bad (B54). Byun discussed with Eapen how Black or Asian employees had to work harder to prove themselves (B55).  Byun believed that he also did not get proper recognition for his hard work because he was a minority (B55-56).  According to Byun, a former Indian employee, Vikas Amin,  also

---

[3] In 2001 or 2002, Neela Chacko, Indian national origin, also raised concerns that she was also being treated differently to Bellverie Ross when Ross was her manager.  She felt that her authority was being undermined and that she was not being included in the decision-making processes.   She also believed she was not included in round-table meetings.

complained about being discriminated against at MBNA because of his national origin (B56).

For a period of time, Eapen stopped complaining about the problems he was having in Desktop Computing because he became known as a complainer (B26,202). Jim Dell specifically told Mr. Eapen if he [Eapen] complained too much, it made Eapen look "stupid." (B202) In mid-January 2003, however, Eapen complained to Ernesto Marra, Desktop Computing Server Operations Manager, that he was being discriminated against (B221). During this meeting he expressed his frustration over the treatment he received from Jim Dell (B223). He told Marra that the level of communication between he and Dell was not optimal (B86). Eapen became "glassy-eyed" and on the verge of tears during this meeting when discussing his problems with Dell (B87). Marra simply viewed the discussion as Eapen "venting," and did not tell his superior, Jim Micek, Executive Vice-Preseident of MBNA's Technology Unit, responsible for Desktop Computing, or anyone in personnel about Eapen's complaint (B221-231).

Ernesto Marra had previously mismanaged a sexual harssment complaint. In November 2002, during a one-on-one meeting, Marra learned of a an incident where an employee in desktop computing made a sexual joke. Marra did not view the employee informing him of this information as a complaint (B82). Although Marra told Jim Micek about the joke, Micek advised him to only follow MBNA policy if it happened again (B82). Under MBNA policy, Marra was supposed to inform the Personnel Department about such conduct (B83).

Further, MBNA employee Bridget Williams (Black) complained to Marra her belief that she was being discriminated against because of her race. Marra, however, did not take her complaint seriously and made a joke of it. Marra did not communicate Bridget William's complaint to Jim Micek or anyone in the Personnel Department (B140-143).

In 2002, when Jim Micek took over supervisory responsibility, he held a one-on-one meeting with Justus Eapen (B267). Mr. Eapen recalls meeting with Micek and explaining to him problems he was experiencing in desktop computing (B8). Mr. Eapen told Jim Micek he did not believe a non-Caucasian could have any job satisfaction or perform any meaningful work (B9). Eapen was crying during this meeting (B8). Micek told Eapen that things would change. Jim Micek told Eapen that he was to start reporting to Neela Chacko, of Indian descent, however, that transition never took place (B10).

On February 21, 2003, Mr. Eapen formalized his complaints and sent an e-mail complaining of discrimination and national origin harassment to Jim Dell (B154). On March 6, 2003, Eapen filed a charge of discrimination with the EEOC (B152).

**D.    Outside Business**

In December 2001, Justus Eapen formed Eapen Corporation (B268). Eapen Corporation was established only to protect the name "Eapen" in the event he wanted to use it later for a legitimate business interest (B192). Mr. Eapen is the only officer of the corporation (B17). Eapen Corporation did not engage in any business (B11).

Justus Eapen obtained a real estate license from the State of Maryland in 2001 (B16). He was associated with the real estate firm of Long & Foster (B195). Eapen only used the license to refer a friend to a builder (B17). Eapen saw his real estate license as a great investment. According to Eapen, for one hundred and ninety-five dollars, he received a license that he could use to save commission if he bought a home (B193). Eapen testified that it was never his plan to sell real estate and direct his clients to his wife for a mortgage. Eapen believed such conduct would be a conflict of interest (B194).

Eapen.net was a website set up by a friend of Mr. Eapen (B11). Eapen.net was a vision that Mr. Eapen had. Mr. Eapen envisioned that Eapen.net would operate like Yahoo!, but for real estate, financials and insurance (B12). Eapen.net was essentially to be an advertising medium for different enterprises in the financial sector. Eapen never received funding for his website and it never became functional (B12). There were no functional links on the web page (B13-14). Mr. Eapen was listed as the contact person for Eapen.net, it provided an address, but Eapen never received any communications at the mailbox (B15).

Richard Kilmon (non-Indian, caucasian), worked for MBNA as a personnel generalist in MBNA's People Relations Department. Kilmon investigated Eapen's alleged outside business interest. Kilmon was made aware of Eapen's alleged outside business interest and other performance related issues by Jim Dell (B119). Dell called Kilmon on or about December 17, 2002, and told him that he had issues with Mr. Eapen. Specifically, Dell told Kilmon that he heard Eapen was involved in a mortgage brokerage business, and that he may have been soliciting co-workers for mortgages (B120). Dell also told Kilmon that Eapen was sleeping on the job, was tardy, and used the phones excessively (B120-123). When Dell called Kilmon, however, he was not aware that Eapen was a mortgage broker (B78). Further, Dell had never visited Eapen.net and had no idea of the content of the site (B79). Nevertheless, based on Jim Dell's representations, Kilmon started an official investigation into Eapen's conduct (B123).

As part of his investigation, Kilmon interviewed some of Mr. Eapen's co-workers, Glen Ford, John Hartnett, Jr., Neela Chacko and Brian Mckeon. Glen Ford told Kilmon that Justus Eapen never approached him about a mortgage (B127). Ford had general conversations about mortgages with Justus Eapen and co-worker John Hartnett (B44). On one occasion, Eapen

searched the internet for mortgage rates for Ford, who was looking to buy a home. Ford, however, does not know whether Eapen used Eapen.net to make his search (B44). Ford said that there were no other instances where he discussed mortgages with Justus Eapen, either before or after Eapen looked for a better interest rate for him (B263).

John Hartnett told Kilmon that he was aware that Eapen's wife was in the mortgage business and he heard Eapen talk about it in the first person at times. Hartnett also heard Justus talk about mortgages in the office. Kilmon, however, did not inquire into the nature of Eapen's discussion of mortgages (B128). Hartnett also told Kilmon that Justus had never approached him regarding a mortgage or ever indicated that he [Justus] could get him a good interest rate (B128).

Brian McKeon told Kilmon that he heard Justus say that he "helped his wife who was in the mortgage business." (B129). There was no discussion of what type of help he gave his wife. McKeon also stated that during group meetings, members of the group, including Mr. Eapen, discussed mortgages because several members were looking for interest rates at the end of 2002 (B129). McKeon also stated that Justus showed him Eapen.net and how his stocks were automatically updated.

Neela Chacko told Kilmon that she also knew Justus Eapen's wife, Tracey. In 2000, Chacko invited Justus and his wife to her wedding, a non-MBNA event (B241). This is the first time she met Tracey Eapen. At her reception, she recalls asking Tracey what she does, and that is when she learned that Tracey Eapen was a mortgage banker (B241). She next met Tracey Eapen at the MBNA Corn Boil, but did not have any discussion with her at that time concerning Tracey Eapen's mortgage business (B242). Chacko says that Justus Eapen has never solicited

-15-

her for a mortgage for his wife's company, has never suggested that Chacko refinance her

mortgage, or otherwise discussed his wife's business with her (243). Another employee not

interviewed by Kilmon, said that Justus Eapen never solicited mortgage business from him, and

Liddle never saw Eapen.net for the purpose of obtaining a mortgage (B47).

     Also, as part of his investigation into Eapen's alleged outside business, Kilmon contacted

MBNA's Ethics Office. He submitted the issue to the Ethics Office to determine if in fact there

was a conflict (B249-250). On January 13, 2003, the ethics office found a violation (B181-182).

They recommended that Eapen be given the choice of dropping his business and continuing with

MBNA or vice versa (B181-182). This option was not discussed with MBNA senior

management. Based on his investigation, Kilmon also concluded that Eapen had engaged in an

outside business in violation of MBNA's conflict of interest policy and that Eapen was not

telling truth, a subjective assessment. Kilmon did not recall whether he came to any conclusion

as to whether Eapen had violated any policy regarding the sleeping incident (B248). Kilmon

does not recall investigating the tardiness issue at all (B124).

### E.    Password Sharing

     The night of the password sharing violation, Justus Eapen's password did not work on

the computer system or did not give him the functionality he needed to complete an assignment

that he was working on in MBNA's test environment[4] that was due the next day. Apparently,

some changes had been made to that particular computer environment without Eapen's

---

[4] MBNA has both a test and production environment for computer applications. The
production environment is the computer system used for the customer. The test environment
does not impact the production environment and is used to test computer applications prior to
use in the production environment.

knowledge that prevented him from accessing the computer as he normally did (B19). After failing to log-on using his administrative account, as well as generic accounts, Justus Eapen called co-worker Jason Campbell, and obtained his password. After logging into the computer system using Mr. Campbell's password, Eapen either reset or deleted his account, and tried to create a new one so he could finish his project. This action triggered an information security alert (B20-21).

      As an administrator, Eapen had total access to the test environment (B20). Eapen set up the test environment and probably had the passwords for everyone in that environment (B89). Prior to this incident, Jim Dell told Eapen that sharing passwords in the test environment was acceptable. Dell has shared his password with Mr. Eapen for use in the test environment (B18).

      Renee Cuffee-Williams (non-Indian, Black), investigated the password sharing incident between Justus Eapen and Jason Campbell. Williams had no prior experience investigating password sharing violations (B114-115). Ernesto Marra learned of the password sharing incident on January 8, 2003 from MBNA information security. Marra met with Dell to discuss what he learned from information security (B84). Marra and Dell did not discuss any form of discipline, including termination, that Mr. Eapen may experience as a result of the password sharing incident (B85). On January 9, 2003, Ms. Williams was notified of this incident by Jim Micek and Ernesto Marra (B101). The same day, Ms. Williams had a half-hour meeting with Micek and Marra to discuss the password sharing incident. There was no discussion during this meeting of terminating Justus Eapen for an information security guidelines violation (B102-103).

      Following this meeting, Ms. Williams met with her supervisor Tamika Sainten to advise her what she had learned. There was no discussion of terminating Mr. Eapen during this meeting

-17-

(B103-104). Williams next met with Jason Campbell concerning the password sharing incident (B105). Following this meeting, Ms. Williams recommended that Mr. Campbell be placed on a first warning[5] for his participation in the incident (B106).[6]

On January 21, 2003, Williams and personnel generalist Richard Kilmon met with Justus Eapen (B107). During this interrogation, Eapen was questioned about the password sharing incident, conflict of interest, tardiness and excessive use of the phone (B108).[7] Based on her investigation, Williams recommended that Eapen be placed on final warning. In support of her decision, Williams relied upon section two of MBNA's Information Security Guidelines which states:

> "User IDs and passwords are used to establish accountability for activity performed on MBNA computer systems, and all actions performed are the full responsibility of the person who has been assigned that User ID. People are not to share their personal User ID or password or use their User ID or password to log into MBNA computer systems for another person. Passwords must remain confidential and should not include information that can be easily guessed." (B156).

Williams, however, could not identify any particular provision of MBNA's information security guidelines that Eapen's conduct violated (B109-110).

There have been other instances where MBNA employees have violated MBNA's information security guidelines, but were not terminated. Sung Byun was aware of more than one incident where employees exchanged personal passwords (B49). Byun was also aware of

---

[5] The hierarchy of corrective action or discipline at MBNA is re-education, verbal warning, first warning, final warning, termination.

[6] MBNA uses a matrix to determine what level of corrective action should be given out for a particular violation. This document is not available to MBNA employees.

[7] Williams questioned Eapen about the password sharing incident. Richard Kilmon questioned Eapen about the conflict of interest, tardiness, and excessive phone usage.

situations where employees shared administrator account passwords (B53). Byun himself

shared his password with William Kennedy (B50). Byun knew that giving Kennedy his

password violated MBNA information security guidelines (B51). Neither Sung Byun nor

William Kennedy were disciplined for this conduct (B52).

Bridgette Williams testified that Jim Dell called her at her home and requested her

password from her. Even more egregious is that Dell asked for Ms. Williams password while he

was working in MBNA's production environment, as opposed to its testing environment (B135-

139). Dell was not disciplined for this violation.

Other information security violations have not resulted in termination. For example, co-

worker Richard Wegner (non-Indian, caucasian) served as Justus Eapen's supervisor for a brief

period of time in 2002 (B233,234). Wegner violated MBNA's security guidelines two separate

occassions, but was not terminated.    In 2001, Wegner used his authority as the e-mail

administrator to access another MBNA employee's e-mail without their permission (B92).

Wegner testified that he accessed the other employees mailbox for both business and personal

reasons (B236). For this abuse of authority, Wegner was given a verbal warning  (B237-239).

In October 2004, Wegner was performing a backup on a server but once into the system fixed

another problem while logged in using a service account that was not be used other than

approved maintenance upgrades (B235, 238,239). Wegner's actions caused a security alert to be

triggered (B90). For this violation, Wegner was put on six-month warning.

### F.    Termination Decision

Renee Cuffee-Williams was not involved in the decision to terminate Justus Eapen

(B111). Richard Kilmon made no recommendation to Tamika Sainten regarding the corrective

action Eapen should receive (B126).  Kilmon does not recall who brought up the possibility of

terminating Mr. Eapen (B131).  But, either on or soon after the January 21, 2003 meeting that

Williams had with Eapen, Williams, Kilmon and Sainten meet to discuss the password sharing

incident, and the conflict of interest violations.  It was during this meeting that they discussed

elevating the corrective action to the next level, termination (B251-252).  There was no firm

decision made on the corrective action, however, because it was not Personnel's decision to

make.

    During MBNA's bi-weekly, "people issues" telephone conference call, Eapen's

termination was recommended for the first time.  The call consists of other regions in MBNA

(Hunt Valley and Cleveland), attorneys, health and safety services, security and MBNA senior

management of personnel from all regions (B112). During this call, Kilmon does not recall if the

option of having Eapen drop his alleged outside business was discussed as an option (B133).

Williams did not know whose decision it was to terminate Mr. Eapen because a dismissal

requires several different signatures (B113).

    On March 10, 2003, the corrective action plan recommending termination was created.

The corrective action plan was not signed, however, until March 26, 2003 - the date Eapen was

terminated.  The corrective action plan, the dismissal summary[8] and various other documents are

submitted to MBNA senior management for signatures.  The corrective action/dismissal is not

final until all required signatures have been received (B116)

    On March 26, 2003, MBNA sent Eapen a termination letter. Besides the March 26, 2003

---

[8] The dismissal summary - an undated document -  indicates that Eapen was terminated
for violation of MBNA policies 601 and 606.

corrective action report and the termination letter, there are no other documents that show when

MBNA decided to terminate Justus Eapen. Kilmon has investigated at least ten password sharing

violations during his employment at MBNA.  He is not aware of any other employee terminated

for this violation.

## LEGAL ARGUMENT

I.    **THIS COURT SHOULD DENY SUMMARY JUDGMENT BECAUSE THERE ARE GENUINE ISSUES OF MATERIAL FACT IN DISPUTE AS TO WHETHER DEFENDANT SUBJECTED JUSTUS EAPEN TO A HOSTILE WORK ENVIRONMENT BASED ON HIS NATIONAL ORIGIN AND FURTHER SUBJECTED HIM TO RETALIATION**

Summary judgment should only be entered where admissible evidence shows "that there

is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law." Fed. R. Civ. P. 56(c).  The moving party bears the burden of proving that no

genuine issue of material fact exists. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp, 475

U.S. 574, 586 n.10 (1986), See also, Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986) (The

initial burden is on the summary judgment movant  to show the absence of a genuine issue of

material fact.). "Facts that could alter the outcome are 'material' and disputes are 'genuine' if

evidence exists from which a rational person could conclude that the position of the person with

the burden of proof on the disputed issue is correct. Anderson v. Liberty Lobby, Inc., 477 U.S.

242, 248 (1986);  Horowitz v. Fderal Kemper Life Assurance Co., 57 F.3d 300, 302 n.1 (3d Cir.

1995).

The Supreme Court has recognized that there is always a question of material fact for the

fact finder once the plaintiff establishes a *prima facie* case and raises genuine issues as to

whether the employer's proffered reasons are pretext. St. Mary's Honor Ctr v. Hicks, 509 U.S.

502 (1993). To raise a genuine issue of material fact, the summary judgment opponent need not match, item for item, each piece of evidence proffered by the movant. Big Apple, BMW, Inc. v. BMW of N. Am. Inc., 974 F.2d 1358, 1362-63 (3d Cir.1992). If the opponent has exceeded the "mere scintilla" threshold and has offered a genuine issue of material fact, then the court cannot credit the movant's version of events against the opponent, even if the quantity of the movant's evidence far outweighs that of its opponent. Id.

In determining whether there are issues of fact requiring a trial, the court must view the facts in the light most favorable to the non-moving party. Josey v. John R. Hollingsworth Corp., 996 F.2d 632, 637 (3rd Cir. 1993). The non-movant's allegations must be taken as true and, when these assertions conflict with those of the movant, the former must receive the benefit of the doubt. Jackson v. University of Pittsburgh, 826 F.2d 230, 232 (3d Cir. 1987). If there is any evidence in the record from any source from which a reasonable inference may be drawn in favor of the nonmoving party, the moving party is not entitled to summary judgment. Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1081 (3d Cir.1996). These standards are to be applied with added vigor in employment discrimination cases where intent and credibility are crucial issues. Stewart v. Rutgers, The State University, 120 F.3d 426, 431 (3d. Cir. 1997). See also, (Goosby v. Johnson & Johnson Medical, Inc., 228 F. 3d 313 (3rd Cir. 2000), citing (Gallo v. Prudential Residential Services, Ltd. Partnership, 22 F.3d 1219, 1224 (2d Cir. 1994)(In an employment discrimination case "a trial court must be cautious about granting summary judgment to an employer when, as here, its intent is at issue").

Hostile work environment claims, such as the instant case, may not be suited for resolution on summary judgment because they often involve "mixed questions of law and fact."

-22-

Richardson v. New York State Dep't of Correctional Serv., 180 F.3d 426, 437 (2d Cir. 1999);

see also Distasio v. Perkin Elmer Corp., 157 F.3d 55, 61 (2d Cir. 1998) ("Summary judgment

should be used 'sparingly' when, as is often the case in sexual harassment claims, state of mind

or intent are at issue."). The Second Circuit Court recently noted in the context of plaintiff's

hostile work environment claim that:

> Such mixed questions are especially well-suited for jury determination
> and summary judgment may be granted only when reasonable minds
> could not differ on the issue. Although such questions may be ripe for
> summary adjudication where the underlying facts are undisputed, that
> the facts are undisputed does not automatically mandate summary
> judgment; Rather, summary judgment is appropriate only where application
> of the law to those undisputed facts will reasonably support only one
> ultimate conclusion. Richardson, 180 F.3d 426, 437-38 (2d Cir. 1999)
> (internal quotations and citations omitted).

Here, MBNA's motion for summary judgment must be denied because genuine issues of

material fact exist for resolution by jury trial. Specifically, the genuine issues of material fact for

the jury include: (1) whether the totality of the circumstances constitute offensive conduct so

severe or pervasive as to create a hostile work environment; and (2) whether MBNA retaliated

against Justus Eapen for complaining about the hostile work environment. As set forth herein,

MBNA has failed to meet its burden of demonstrating the absence of disputed material facts on

these issues. Thus, MBNA's motion for summary judgment must be denied.

## II.    THE COMMISSION CAN ESTABLISH THAT MBNA SUBJECTED JUSTUS EAPEN TO A HOSTILE WORK ENVIRONMENT BASED ON HIS NATIONAL ORIGIN

Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer to

"discriminate against any individual with respect to his compensation, terms, conditions or

privileges of employment because of such individual's …..national origin." 42 U.S.C. § 2000e-

-23-

2(a)(1). The Supreme Court has held that hostile work environment harassment occurs when discriminatory conduct unreasonably interferes with a person's performance or creates an intimidating, hostile, or offensive working environment. See, <u>Meritor Savings Bank FSB v. Vinson</u>, 477 U.S. 57, 65 (1986).

In order to establish a *prima facie* case of hostile work environment under Title VII, a plaintiff must prove that: (1) plaintiff suffered intentional discrimination because of his membership in the protected class; (2) the discrimination was severe or pervasive; (3) discrimination detrimentally affected plaintiff; (4) the discrimination would have detrimentally affected reasonable person of the same protected class in that position; and (5) the existence of *respondeat* superior liability. <u>Harris v. Forklift Sys, Inc.</u>, 510 U.S.17 (1993).

The Supreme Court in <u>Harris</u> held that when the work place is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated. <u>Id</u>. In applying the severe or pervasive standard to the present facts, the Commission contends that Justus Eapen was subjected to a hostile work environment based on his national origin by his co-workers and his supervisor, Jim Dell.

MBNA claims that EEOC has failed to establish that any alleged comment rose to the level of "severe" or "pervasive." In its Brief in Support of Summary Judgment MBNA does not address, and thereby concedes the other elements of the Commission's *prima facie* case of hostile work environment harassment under Title VII. Specifically, MBNA does not challenge the Commission's ability to prove: (1) Eapen suffered intentional discrimination because of his national origin; (2) the discrimination detrimentally affected Mr. Eapen; (3) the discrimination

would detrimentally affect a reasonable person of the same national origin in that position; and (4) the existence of *respondeat* superior liability. Although the Commission can establish all elements of its *prima facie* case of hostile work environment harassment, for purposes of this opposition brief, we will focus only on MBNA's claim that the conduct at issue did not rise to the level of severe or pervasive.

### A.    The Commission Can Establish that the Discriminatory Acts Were Severe or Pervasive

For an atmosphere of harassment or hostility to be actionable under Title VII, the offending behavior must be sufficiently severe <u>or</u> pervasive to alter the victim's employment conditions and create an abusive working environment. <u>Harris</u> at 21. This standard requires that the environment be both objectively and subjectively offensive. <u>Id</u>. Otherwise stated, for actionable harassment to exist, a reasonable person must be able to find the work environment hostile or abusive, and the victim must actually perceive it to be so.

In <u>Harris</u>, the Supreme Court held that "Title VII comes into play before the harassing conduct leads to a nervous breakdown." <u>Id</u>. at 22. The Court declined to provide a "mathematically precise test" for a hostile work environment; this determination can only be made by looking at all of the circumstances. These factors may include the frequency of the discriminatory conduct;[9] its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. <u>Harris at 22</u>. The effect on the employee's psychological well-being is . . . [also] relevant. . . . <u>Id.</u>

---

[9] Discrimination is considered pervasive where the "incidents of harassment occur either in concert or with regularity." <u>Andrews at</u> 1482.

Accordingly, when evaluating whether the harassment is severe or pervasive, it is not proper to parse the record into single incidents, as MBNA suggests. Rather, the district court must consider the "totality of the circumstances." Andrews v. City of Philadelphia, 895 F.2d 1469, 1482 (3d Cir.1990). This is particularly applicable in the discrimination area where "it is often difficult to determine the motivations of an action and any analysis is filled with pitfalls and ambiguities. A play cannot be understood on the basis of some of its scenes but only on its entire performance, and similarly, a discrimination analysis must concentrate not on individual incidents, but on the overall scenario." Id. See Cardenas v. Massey, 269 F.3d 251 (3d Cir. 2001)(In considering whether Cardenas has established the elements of a hostile work environment claim, the record must be evaluated as a whole to decide whether the plaintiff has proved his or her case...[A] discrimination analysis must concentrate not on individual incidents, but on the overall scenario"). Applying the totality-of-the-circumstances standard to the record of evidence in this case, it is clear that MBNA allowed Justus Eapen to be subjected to national origin harassment from his supervisor and co-workers that was both severe and pervasive.

### 1.    Co-Worker Harassment

Summary Judgment is not appropriate because Justus Eapen was consistently called derogatory and offensive names based on his national origin by a group of co-workers in Desktop Computing. As demonstrated herein, the evidence shows that Justus Eapen was subjected to a steady barrage of severe ethnic slurs. The nature and timing of the ethnic slurs hurled at Justus Eapen by his co-workers in light of the terrorist attack of September 11, 2001, demonstrates the severity of the harassment. After September 11th, Osama Bin Laden was the most wanted man in the world and perhaps the most vile terrorist in the history of the world.

Saddam Hussein's history of tyranny and terror is well known. After the terrorist attacks on

September 11th, it is hard to imagine more opprobrious epithets than to repeatedly call Justus

Eapen the names of some of the most reviled men in the world.

Prior to September 11, 2001, his co-workers called him derogatory names based on his

Indian national origin such as sand-nigger, nigger and dot-head (B27, 210). Mr. Eapen was also

referred to as "BP" - short for brown people - by co-worker Bill-Kennedy on a daily basis (B62).

Following the terrorist attacks of September 11, 2001, and continuing until his

termination, Justus Eapen's non-Indian co-workers erroneously tried to associate him with the

September 11th terrorists (terrorist), because of his Indian national origin. Eapens co-workers

repeatedly called him offensive and derogatory names. On numerous occasions Richard

Wresneski, Thomas Liddle, Glenn Ford and possibly John Hartnett called Mr. Eapen "Osama

Bin Laden," "Osama Bin Laden's brother," and "OBL" short for "Osama Bin Laden." (B60-61).

Eapen also testified that these co-workers and others called him "Saddam Hussein" or "Saddam

Hussein's brother." (B24).

In further support of the Commission's position that the ethnic slurs and comments at

issue rise to the level of severe or pervasive, there is evidence of record in the instant case that

Justus Eapen was physically threatened, his work was sabotaged and that he was otherwise

hindered in performing his assigned duties. Following the events of September 11, 2001, Justus

Eapen was almost physically attacked by a learning disabled mailroom clerk by the name of Ron

Dunphy who believed that Justus Eapen was Osama Bin Laden's brother (B25, 200). On this

particular occasion, the mail room clerk was in Glenn Ford's cubicle (B25). Glenn Ford, John

Hartnett and Richard Wresneki were present in the cubicle as well. Glenn Ford told the

-27-

mailroom clerk that Justus Eapen was Osama Bin Laden's brother (B201). The mailroom clerk

believed what the harasser told him, became enraged and started running towards Justus Eapen,

presumably to physically attack "Osama Bin Laden's brother." The mailroom clerk only

stopped running towards Mr. Eapen when he was restrained and informed that what he was told

by the harassers was a joke, and that Mr. Eapen was actually not Osama Bin Laden's brother

(B25, 200). Following this incident, Mr. Eapen did not know whether Dunphy had the ability to

comprehend that he [Eapen] was not Osama Bin Laden's brother, so Eapen would try to avoid

Dunphy (B26, 202).

        In addition to the threat of a physical attack because of his association with Osama Bin

Laden, Justus Eapen's ability to perform his work duties was sabotaged. The harassment towards

Justus Eapen included co-workers and managers taking his computer equipment. Deposition

testimony establishes that on one occasion, someone took the mouse-ball out of Justus Eapen's

work area. Eapen informed his manager Jim Dell of this offense (B218). Jim Dell did not find

out who took Eapen's computer equipment. In response to this incident, Dell simply told the

other employees, "no more jokes." (B218). In light of the severity of ethnic slurs made to Eapen,

Dell's directive "no more jokes" did not sufficiently convey a message that the conduct at issue

would not be tolerated.    Moreover, Dell's directive is disingenuous given his own conduct

towards Mr. Eapen.

        In April 2002, when Justus Eapen returned from his vacation, his computer monitor was

missing. According to Eapen, when he came to work one evening, someone had replaced his

LCD monitor with a defective regular monitor and he was forced to find a replacement (B155).

Prior to having his monitor replaced, Eapen had acquired the monitor from the Perimeter

-28-

Security Network ("PSN") inventory because everyone on the Perimeter Security Network team had better hardware than Eapen, including bigger LCD monitors. Further, Eapen needed the larger monitor to alleviate the strain on his eyes (B155).

On April 8, 2002, Eapen complained, by e-mail, about his missing LCD monitor to Belleverie Ross, who was Jim Dell's manager. Jim Dell testified that he took Eapen's Computer monitor without Eapen's knowledge and that he did not take anyone else's LCD computer monitor (B219).

### 2.    Supervisory Harassment

In addition to the harassment by Eapen's co-workers, the record contains ample evidence of harassing conduct by Eapen's supervisor, Jim Dell. When the source of the discrimination is a supervisor, the employer is strictly liable for those acts if the discrimination or harassment at issue results in a tangible employment action. Suders v. Easton, 325 F.3d 432,434 (3rd Cir. 2003). The Supreme Court has defined a tangible employment action in general, categorical terms: "a significant change in employment status," often, but not always, resulting in economic injury." Id. quoting Burlington Indus., Inc., v. Ellerth, 524 U.S. 742, 761-62 (1998). When no tangible employment action results, the employer may still be held liable, but it may raise an affirmative defense to liability or damages. Id. The affirmative defense has two components: (a) that the employer exercised reasonable care to prevent and correct promptly any harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. Id. quoting Ellerth, 524 U.S. at 765.

Summary judgment is inappropriate here since Jim Dell not only condoned the unlawful

-29-

hostile work environment created by Mr. Eapen's coworkers, but actively participated in the harassment. Jim Dell maliciously associated Eapen with the September 11th terrorists and called Eapen all the same offensive names as Eapen's co-workers including, Osama Bin Laden, OBL, Osama Bin Laden's brother, Saddam Hussein, and Saddam Hussein's brother and brown person, BP (B24).

In addition to the verbal harassment, Jim Dell inexplicably closely monitored Justus Eapen. The Third Circuit has explicitly found that unprecedented monitoring can be a factor contributing to a hostile work environment. Abramson v. William Patterson College of New Jersey, 260 F.3d 265, 279 (3rd Cir. 2001). In this case, Justus Eapen's actions on the night shift were closely scrutinized by Jim Dell. Justus Eapen worked a 13 hour shift (B214). During this time frame, Justus split his time between two MBNA facilities (B75). He was responsible for MBNA's Deerfield and Christiana locations. Jim Dell worked the day shift beginning an hour after Eapen's shift ended. Dell would follow-up on Eapen's activities by coming into the facility at 3:00 or 4:00 a.m. (B215). Dell could not "recall" whether he made similar inquiries into Jason Campbell's conduct, a white employee that also worked the night shift (B216). Mr. Eapen denies that he was sleeping while working and contents that Dell is lying about the incident in an effort to frame him (B198,199).

MBNA contends that Justus Eapen's testimony concerning harassment by Jim Dell is contradictory. In its Motion for Summary Judgment, MBNA argues that it seems inconceivable that Eapen would use positive language to describe a person who used offensive epithets. MBNA suggests that because Mr. Eapen described Jim Dell as a "great guy but a bad manager" and further described their relationship as "amiable," that it is unlikely that Dell used offensive

epithets. MBNA only asks the Court to consider Eapen's description of Dell to improperly raise issues of credibility at the summary judgment stage. On summary judgment, however, it is not the Court's function to test the sufficiency of the evidence. Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. Anderson, 477 U.S. at 255. Moreover, as the non-movant, the Commission's evidence must be accepted as true and all reasonable inferences must be resolved in the Commission's favor. Big Apple BMW, Inc. at 1363.

### 3. Harassment Directed to Other Co-Workers is Relevant

In further support of the severe and pervasive harassment in Desktop Computing, the record evidence demonstrates that derogatory and pervasive comments were made to other employees. The Third Circuit recognizes that evidence of [racial] discrimination or harassment which has been directed at a plaintiff's co-workers may, under certain circumstances, be relevant in establishing a hostile work environment claim. See Morales-Evans v. Administrative Office of the Courts, 102 F.Supp.2d 577, 589 (D.N.J. 2000). Thus, for example, evidence that Plaintiff witnessed other black employees being harassed by co-workers or supervisory personnel could potentially contribute to the perception that her work environment has become hostile to African-Americans. Hurley v. Atlantic City Police Department, 174 F.3d 95, 110 (3d Cir. 1999).

In some instances, evidence of harassment of others will support a finding of discriminatory intent with regard to a later incident. Evidence of harassment of other workers may be relevant in order "to demonstrate that [Plaintiff] did not weave his allegations out of whole cloth, and bolster the confidence of the finder of fact in the plaintiff's veracity and in objective reasonableness of his claim." See Velez v. QVC, 227 F.Supp.2d 384, 411 (E.D. Pa.

-31-

2002)(Observing that an employee's awareness of incidents in which other co-workers were subjected to harassment or discrimination may be relevant in establishing a generally hostile work environment). The question is whether – in light of –incidents directed at other employees as members of the same or other protected classes, the incidents that the plaintiff experienced more directly would reasonably be perceived and were perceived, as hostile or abusive. Schwapp v. Town of Avon, 118 F.3d 106, 112 (2d Cir.1997).

Here, in addition to the direct harassment against Justus Eapen, the harassers have engaged in other inappropriate conduct that demonstrates their total disregard for the federal anti-discrimination laws and MBNA policy. For example, the work area where Justus Eapen and other employees sat was routinely referred to as the "ghetto." (B36, 68, 98). One co-worker commented to a black employee that "blacks hold their guns sideways." (B260). Jim Dell, a manager, accused another black female manager of only getting her job because she was "black, short and fat." (B203). Asian employees in Desktop Computing were referred to as the "A" team, for Asian team and white employees were referred to as the "W" team (B62, 35). Further, an Asian employee was repeatedly referred to as "rice bowl." (B59). These racial and national origin based derogatory comments support the Commission's argument that MBNA subjected Justus Eapen to a hostile work environment based on his national origin.

Although the courts are required to separate conduct by a supervisor from conduct by co-workers in order to apply the appropriate standards for employer liability, the totality of the circumstances test mandates that district courts consider harassment by all perpetrators combined when analyzing whether a plaintiff has alleged the existence of a hostile work environment. See Williams v General Motors Corp., 187 F3d 553, 563 (6 th Cir 1999).

In the instant case, the court must consider the supervisory harassment, co-worker harassment and the harassment directed toward other co-workers in determining the existence of a hostile work environment.    As set forth above, the evidence shows that MBNA's desktop computing section was filled with offensive and derogatory comments, physical threats, and sabotage.  Desktop Computing was commonly known as the "ghetto."  There were offensive comments made about Blacks and Asians.    Justus Eapen was aware of all of these offensive comments.  More importantly, Justus Eapen was subjected to a variety of offensive ethnic slurs.

It is abundantly clear that the Commission has demonstrated that the evidence was sufficiently severe to establish a hostile work environment, especially when one examines, the frequency of the discriminatory conduct (more than 8 different ethnic slurs used constantly since at least September 11, 2001),  the severity of the humiliating comments, including the threat of a physical assault after coworkers misled a disabled coworker about Mr. Eapen's identity, and the effect on Eapen's work performance.

Rather than address numerous derogatory and offensive national origin based comments, as set forth above, MBNA improperly focuses on one term - sand-nigger - and claims that there were no comments that rose to the level of severe or pervasive.  MBNA's principal argument in support of its position is that the use of term "sand-nigger" in the workplace was an isolated incident.  MBNA also argues that the Commission cannot demonstrate the existence of a discriminatory animus by the employee that made the sand-nigger comment.  Finally, MBNA argues that the sand-nigger comment happened in 1999, four years prior to the filing of Mr. Eapen's charge of discrimination and is therefore not timely.  These arguments do not comport with the facts or the applicable case law.

First, in focusing on the severity of one ethnic slur "sand-nigger," MBNA improperly isolates the evidence of national origin harassment, while ignoring the abundance of other derogatory and offensive national origin based comments directed at Mr. Eapen.   The Third Circuit requires an examination of the totality of the circumstances. <u>Andrews</u> at 1482.   The "sand-nigger" comment must be examined along with, for example, evidence that: Mr. Eapen was called "Osama Bin Laden," "Osama Bin Laden's brother," "OBL," "dot-head," "BP," "Saddam Hussein," "Saddam Hussein's brother," etc., (B24, 60,61); Mr. Eapen's computer equipment was taken; and, Mr. Eapen was almost attacked by a disabled employee who was told Eapen was Osama Bin Laden's brother (B25).

Second,  no direct showing of "discriminatory animus" is necessary for a hostile work environment claim under Title VII.   While a plaintiff must show that discrimination was because of membership in a protected class, there is no requirement that a harasser announce that he is making the offensive comment because of membership in the protected class.  Supreme Court precedent does not support the need for a plaintiff to demonstrate direct evidence of his harasser's motivation for discrimination against him.  Rather, the intent to discriminate can be inferred. <u>Andrews,</u> 895 F.2d at 1482 n. 3 (referring to sexual misconduct), <u>see also</u> <u>Iadimarco v. Runyon,</u> 190 F.3d 151, 157 (3d Cir.1999) ("The Supreme Court has recognized that an employer who discriminates will almost never announce a discriminatory animus or provide employees or courts with direct evidence of discriminatory intent").

Third, the Supreme Court has held that an employer may be held liable for all acts constituting a hostile environment as long as one act contributing to that environment occurred

-34-

within the applicable 180- or 300-day filing period.[10] National R.R. Passenger Corp. v. Morgan, 536 U.S. 101 (2002). The Morgan Court specifically recognized the continuing, ongoing nature of a hostile work environment claim under Title VII: "A hostile environment claim, which involves repeated conduct that does not occur on one particular day, "is comprised of a series of separate acts that collectively constitute one 'unlawful employment practice.'". Id at 116. The separate acts are part of one unlawful practice, and the employer may be held liable for all of the acts, including those that fall outside the filing period. In the instant case, when the sand-nigger comment is viewed in relation to those comments that took place after 1999, it is clear that they are part of one unlawful practice creating a hostile work environment as discussed in Morgan.

In its Brief, MBNA argues that the Commission case consists virtually entirely on assertions by Eapen, without any corroboration. This argument is contrary to the law and the evidence. The Third Circuit has recognized that the testimony of a discrimination plaintiff, standing alone, can make out a case of discrimination to withstand a summary judgment motion. Weldon v. Kraft, 896 F.2d 793, 800 (3d Cir. 1990).(See also Graham v. F.B. Leopold Co., Inc., 779 F.2d 170, 173 (3d Cir.1985) (plaintiff's deposition testimony could suffice to create a genuine dispute about material facts). Moreover, as the non-moving party, the Commission's evidence must be accepted as true and all reasonable inferences must be drawn in its favor. Thus, Eapen's testimony must be considered true for summary judgment purposes. Where there is a conflict in the evidence, it must be resolved in favor of Mr. Eapen. Inferences should be drawn in the light most favorable to Mr. Eapen and where Mr. Eapen's testimony contradicts

---

[10] Because Justus Eapen filed with the Commission, the applicable filing period is 300 days.

MBNA's evidence, then Mr. Eapen's testimony must be taken as true. <u>Big Apple BMW, Inc. v.</u>

<u>BMW of North America, Inc.</u>, 974 F.2d 1358, 1363 (3d Cir. 1992). Therefore, Mr. Eapen's

testimony of severe and pervasive national origin harassment alone is sufficient to defeat

MBNA's Summary Judgment motion.

Further, in its effort to obtain summary judgment, MBNA has purposely and improperly

ignored evidence contrary to its position. For example, Sung Byun, an MBNA employee,

corroborates Eapen's allegations that he was called "sand-nigger," "Osama Bin Laden," "Osama

Bin Laden's brother," "BP," and "dot-head." Byun also identified some of the individuals that

made the comments, such as Glenn Ford, Thomas Liddle, Richard Wresneski, and John Hartnett.

Although most of the accused individuals deny making such comments, others admitted to their

offensive conduct, but tried to minimize the offensive language by saying it was just "joking"

amongst friends.

MBNA also inexplicably comments on Eapen's alleged disrespect for MBNA's

management and policies, citing Eapen's alleged use of MBNA's telephones for Eapen

Corporation. MBNA is engaging in a smoke and mirrors attempt to shift the Court's focus away

from its own unlawful conduct and improperly focus on Justus Eapen's alleged disrespect

towards his supervisors. This bid must fail because Mr. Eapen's conduct is not at issue. In

determining whether the work environment was sufficiently severe or pervasive to create a

hostile work environment, the courts do not require an examination of an employee's work

conduct or performance. Rather, the court must examine the frequency of the discriminatory

conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive

utterance; and whether it unreasonably interferes with Eapen's work performance. MBNA made

no record of his alleged insubordination to any supervisor, nor any record of a policy violation prior to his complaint of national origin harassment prior to the charge of discrimination. Moreover, MBNA does not argue that Justus Eapen had insubordination problems with any other supervisor he reported to during his employment at MBNA. Jim Dell, an alleged harasser, is the only supervisor to whom Justus Eapen is alleged to have been insubordinate.

In short, MBNA has not met its burden of proving the absence of material facts on the existence of a hostile work environment. The Commission has demonstrated that the harassing conduct occurred in concert or with regularity and is thus pervasive. Moreover, the evidence establishes that there are disputed factual issues concerning the severity and pervasiveness of the conduct at issue and to the existence of a hostile work environment. Both of these disputed factual issues must be resolved by a jury. Accordingly, MBNA has failed to meet its burden of demonstrating the absence of disputed material facts and its Motion for Summary Judgment should be denied.

## III.    THIS COURT SHOULD DENY SUMMARY JUDGMENT BECAUSE EEOC CAN ESTABLISH A *PRIMA FACIE* CASE OF RETALIATION UNDER TITLE VII

Title VII provides that: "It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a).

In order to successfully establish a claim of retaliation under Title VII, a plaintiff must prove: (1) he engaged in protected activity; (2) the defendant took adverse employment action against him; and (3) a causal link exists between the protected activity and the adverse action. Farrell v. Planters Lifesavers Co., 206 F.3d 271, 279 (3d Cir. 2000)(citing See, e.g., Kachmar v.

Sungard Data Sys., Inc., 109 F.3d 173, 177 (3d Cir. 1997); Jalil v. Avdel Corp., 873 F.2d

701,708 (3d Cir.1988).  If the plaintiff succeeds, the production burden shifts to  defendant to

advance a legitimate, non-retaliatory reason for its employment decision. Woodson v. Scott

Paper Co., 109 F.3d 913, 920 n. 2 (3d Cir.1997). "The defendant's burden at this stage is

relatively light; it is satisfied if the defendant articulated any legitimate reason" for the adverse

decision. Id. If the defendant satisfies its burden of production, the presumption of discrimination

drops from the case; to prevail, the plaintiff must be able to demonstrate that defendant's

proffered reason is false and that discrimination was the real reason. Id. (citing St. Mary's Honor

Center v. Hicks, 509 U.S. 502, 512 (1993)) see also, Bray v. Marriott Hotels, 110 F.3d 986, 990

(3d Cir. 1997) ("The plaintiff must produce evidence from which a reasonable factfinder could

conclude either that the defendant's proffered justifications are not worthy of credence or that the

true reason for the employer's act was discrimination"). In this case, the Commission can

establish its *prima facie* case of retaliation and demonstrate that MBNA's justification for

terminating Justus Eapen was a pretext to unlawful discrimination.

MBNA  does not challenge the Commission's ability to show that Justus Eapen engaged

in protected activity.  MBNA acknowledges that Mr. Eapen's letter complaint of February 21,

2003 and his Charge of Discrimination,[11] filed with the EEOC on March 6, 2003, constitutes

protected activity. Rather, MBNA argues that the Commission cannot establish the second and

third prongs of a *prima facie* case of retaliation under Title VII - adverse action and a causal link.

MBNA contends the decision to terminate Justus Eapen occurred prior to the time he engaged in

---

[11]It is well-established that filing a charge of discrimination ...... constitutes protected
activity. See Krouse v. American Sterilizer Co., 126 F.3d 494, 504 (3d Cir.1997).

-38-

protected activity and thus, there could be no adverse action stemming from protected activity.

MBNA further argues that there is no causal connection between Mr. Eapen's protected activity

and the alleged adverse employment action.

MBNA fails to reference Eapen's prior complaints of discrimination made to Bellverie

Ross, Jim Micek and Ernesto Marra, all MBNA managers (B205, 8,9, 86-87). Further, there is

no evidence in the record that MBNA's "official" termination decision occurred prior to Eapen's

protected activity. Officially, MBNA terminated Justus Eapen on March 26, 2003. Because

MBNA cannot show that they terminated Mr. Eapen prior to him engaging in protected activity,

MBNA now argues that the *decision* to terminate Eapen took place in January 2003. Yet, there

are no documents that support MBNA's position (B246). The only document of record to

support the date of MBNA's termination decision is the corrective action report which is dated

March 10, 2003, one week after Mr. Eapen filed his charge of discrimination with the

Commission. MBNA has failed to meet its burden of demonstrating the absence of disputed

material facts on these issues. Accordingly, MBNA's Motion for Summary Judgment should be

denied

### A.   Eapen Engaged in Protected Activity Prior to the Adverse Action

Employees engage in protected activity under Title VII when they (1) oppose an

unlawful employment practice, (2) file a charge of discrimination, or (3) participate in a charge

brought by another. Zappan v. Pa. Bd. of Prob. & Parole, 2005 U.S. App. LEXIS 23202 ; 42

U.S.C. § 2000e-3a; see also Abramson v. William Patterson Coll., 260 F. 3d 265, 288 (3d Cir.

2001) (stating that complaints -- whether oral or written, formal or informal -- about unlawful

employment practice satisfy the first prong of the *prima facie* case under Title VII). See also,

-39-

Barber v. CSX Distribution Services, 68 F.3d 694, 702 (3d Cir. 1995)("we do not require a formal letter of complaint to an employer or the EEOC as the only acceptable indicia of the requisite 'protected conduct.'" ).

Here, Justus Eapen engaged in protected activity prior to February 21, 2003.  Mr. Eapen testified that he complained about the harassing environment and unfair treatment towards him to Bellverie Ross, Ernesto Marra and Jim Micek. (B205, 8,9, 86-87).  He complained to Belleverie Ross concerning the problems he was having in Desktop Computing and his missing computer equipment.  (B155).  Eapen told Ernesto Marra that he was being discriminated against, but Marra took no action (221-231).  Eapen meet with Jim Micek to complain to him about the problems he was experiencing in Desktop Computing, and how it wasn't possible for any non-Caucasians to have job satisfaction (B9).  Eapen also complained to Neela Chacko about his problems in Desktop Computing and how he felt isolated working the night shift (B98).    All these complaints took place prior to February 21, 2003.

**B.     Eapen Suffered an Adverse Employment Action**

The second element of retaliation requires the employer to take an adverse employment action after or contemporaneous with the employee's protected activity.  Farrell, 206 F.3d  at 278.  Conduct by an employer qualifies as an adverse employment action only if it is "serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges or employment." Robinson v. City of Pittsburgh, 120 F.3d 1286, 1300 (3d Cir. 1997). The evidence clearly establishes that MBNA took adverse action against Justus Eapen when they terminated his employment on March 26, 2003, two weeks after he filed his Charge of Discrimination with the Commission.

-40-

**C.    A Causal Connection Exists Between the Protected Activity and the Adverse Employment Action**

The last element of retaliation requires that a causal link exist between the protected activity and the employer's adverse action.  Courts have recognized, in analyzing retaliation cases under Title VII that evidence of "temporal proximity" between protected conduct and adverse action is an obvious method by which a plaintiff can proffer circumstantial evidence sufficient to raise the inference that her protected activity was the likely reason for the adverse action.  Marrero v. Camden County Bd. of Soc. Servs., 164 F. Supp. 2d 455, 2001 U.S. Dist. LEXIS 15776 (D.N.J., October 4, 2001).

Several district courts in the Third Circuit have also held that timing alone can be sufficient to establish a causal link between the protected activity and the adverse action when it is unusually suggestive. See, Burton v. MBNA Am. Bank, N.A., 2005 U.S. Dist. LEXIS 12154 (D. Del., June 22, 2005)( If timing alone could ever be sufficient to establish a causal link, the timing of the alleged retaliatory action must be "unusually suggestive" of retaliatory motive before a causal link will be inferred);  Addison-Eady v. Phila. Parking Auth., 2005 U.S. Dist. LEXIS 9661 (E.D. Pa. May 18, 2005) (timing alone can be sufficient to establish the necessary causal link between the protected activity and the adverse action when it is unusually suggestive. Absent unusually suggestive timing, however, timing alone is generally insufficient to establish the causal link. In such circumstances, courts may look for other evidence from which a causal connection can be inferred, such as evidence of a pattern of antagonism occurring between the protected activity and the adverse action).

The Commission has a strong argument that the timing of Mr. Eapen's termination in relation to his internal and external complaints of discrimination raises an inference of

retaliation. Justus Eapen complained of the hostile work environment on several occasions prior to his letter complaint of February 21, 2003. It was only after MBNA failed to take remedial action in response to these informal complaints that Mr. Eapen put his complaint in writing and subsequently filed a charge with the EEOC on March 6, 2003. After receiving these complaints, MBNA fired Justus Eapen on March 26, 2003. The two week period between Eapen's EEOC charge and MBNA's official termination is unusually suggestive of a retaliatory motive, especially in light of the absence of any evidence from MBNA suggesting that Justus Eapen be terminated for either his performance or conduct.

In addition to temporal proximity, circumstantial evidence of a pattern of antagonism following the protected conduct can also give rise to the inference that the employee's protected activity was likely the reason for the adverse employment action. Price v. Delaware Dept. of Correction, 40 F.Supp.2d 544 (D. Del. 1999)(citing, Kachmar, 109 F.3d at 177. See also Woodson, 109 F.3d at 920 ("a plaintiff can establish a link between his or her protected behavior and subsequent discharge if the employer engaged in a pattern of antagonism in the intervening period"). Here, the evidence showed that Eapen was subjected to a pattern of antagonism between his complaints to Ernesto Marra, Jim Micek and Bellverie Ross. For example, Jim Dell's reporting of the Eapen Corporation issue to an MBNA human resources official and MBNA's investigation into the password sharing incident can be considered acts of antagonism considering that Jim Dell was aware of the existence of Eapen Corporation since Mr. Eapen reported to him, but only reported this alleged policy violation to MBNA after Eapen complained.

Temporal proximity and circumstantial evidence of a pattern of antagonism, however,

-42-

"are not the exclusive ways to show causation, as the proffered evidence, looked at as a whole, may suffice to raise the inference." Reap v. Continental Gas. Co., 2002 WL 1498679 (D.N.J. 2002), citing Kachmar, 109 F.3d at 177; see also Farrell, 206 F.3d at 280-81 (stating that causation may be inferred from other circumstantial evidence gleaned from the record as whole). A plaintiff may rely upon a broad array of evidence to illustrate a causal link. Farrell at 283. Here, the court must consider the temporal proximity between the protected activity and the adverse employment action (two weeks), the Commission's circumstantial evidence of a pattern of antagonism (investigation into outside business) and other circumstantial evidence as gleaned from the record as a whole. Applying these standards, the Commission has established that a dispute of material fact exists concerning the causal link between Mr. Eapen's protected activity and MBNA's adverse employment action.

### D.    MBNA's Justification for Terminating Eapen is a Pretext to Unlawful Discrimination

In a case alleging retaliation, the employee must establish a *prima facie* case of retaliation, and to survive summary judgment must raise a genuine issue of material fact as to whether the employer's proffered explanation was a pretext for retaliation. Krouse v. American Sterilizer Co., 126 F.3d 494, 500-01 (3d Cir.1997), See Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir.1994)(to survive summary judgment, the employee must then "point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action"); Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 148 (2000) (a plaintiff's *prima facie* case, combined with sufficient evidence to find that the employer's asserted justification is false, may

-43-

permit the trier of fact to conclude that the employer unlawfully discriminated).

MBNA alleges Justus Eapen was fired for sharing a password and for engaging in outside business activities, in violation of MBNA policies 601 and 606. MBNA's reliance on these policies to justify Justus Eapen's termination is a smoke screen and pretext to unlawful discrimination. Both of these policies were unfairly applied to Justus Eapen. With respect to the password sharing violation, MBNA alleges Justus Eapen, while working on the night-shift, called co-worker, Jason Campbell and asked him for his password because he had been locked out of the server. But, the record shows that several employees shared passwords without being terminated, or even disciplined in any fashion. There is even record evidence that shows Jim Dell, an MBNA manager, called an employee at her home and requested her password because he was locked out of the server (B135-139). Jim Dell was not disciplined for his password sharing violation.

With respect to the outside business activities, MBNA alleges Justus Eapen had a mortgage business and a real estate business that conflicted with MBNA's interests. Justus Eapen's wife, Tracey Eapen is a mortgage broker for Wells Fargo Bank. In an effort to assist his wife, he set up a website, EAPEN.NET. Justus was proud of the work he did on the website and asked a few MBNA employees to give him their opinion of the website. There is no record evidence, however, that Eapen conducted any business on the website or solicited any business from any MBNA employee by use of the website.

On the website, Justus Eapen is listed as the CEO of Eapen Corporation. Eapen testified, however, that Eapen Corporation was only set up to preserve the name "Eapen Corporation" if he wanted to use it later (B192). Eapen Corporation conducted no business (B11). Justus Eapen

-44-

spent no time conducting any business for Eapen Corporation. Justus Eapen did not use any MBNA equipment for Eapen Corporation.

In addition, Eapen was never active as a Realtor. The record reflects Eapen received only one commission from the sale of real estate since he received his realtor's license. This was from the referral of a friend to a builder (B68). It is unclear whether this commission was obtained during Mr. Eapen's employment with MBNA.

Nevertheless, record evidence shows that other non-Indian employees who were actively engaged in outside business activities were given the option of continuing their employment with MBNA if they stopped their outside activities. MBNA's Ethics Office specifically recommended that Mr. Eapen be given the choice of continuing his employment at MBNA if he stopped his outside activity (B181). Mr. Eapen, however, was never presented with this option, and was terminated instead.

Based on the foregoing evidence, a reasonable jury could disbelieve MBNA's articulated reasons for terminating Justus Eapen or believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of MBNA's action.

The record evidence, when viewed in a light most favorable to the Commission and resolving any factual conflict in favor of the Commission, does not support MBNA's Motion for Summary Judgment. In short, MBNA has not met its burden of showing there are no disputed factual issues or that it is entitled to judgment as a matter of law concerning whether the ethnic slurs were severe and pervasive, whether Justus Eapen engaged in protected activity prior to MBNA's adverse employment action and whether MBNA's justification for terminating Mr. Eapen is a pretext for unlawful retaliation. Accordingly, MBNA's Motion for Summary

Judgment should be denied.

## **CONCLUSION**

For the foregoing reasons, Plaintiff EEOC respectfully requests that the Court deny

Defendant's Motion for Summary Judgment in its entirety.

Respectfully submitted,

/s/ Rudolph Contreras

Rudolph Contreras
Assistant United States Attorney
Chief, Civil Division
1007 N. Orange Street, Suite 700
Post Office Box 2046
Wilmington, Delaware 19899-2046
(302) 573-6277 ext. 154
rudolph.contreras@usdoj.gov

*Local Counsel for Plaintiff EEOC*

Jacqueline H. McNair
Regional Trial Attorney

Judith A. O'Boyle
Supervisory Trial Attorney

/s/ Terrence R. Cook

Terrence R. Cook
Senior Trial Attorney
United States Equal Employment Opportunity
Commission
Philadelphia District Office
21 South 5th Street, Suite 400
Philadelphia, PA 19106
(215) 440-2688; (215) 440-2848 (Fax)
terrence.cook@eeoc.gov

*Counsel for Plaintiff EEOC*

CERTIFICATE OF SERVICE

I hereby certify that on this 14th day of December 2005, I electronically filed the attached PLAINTIFF EEOC'S ANSWERING BRIEF IN OPPOSITION TO DEFENDANT MBNA'S MOTION FOR SUMMARY JUDGMENT with the Clerk of the Court using CM/ECF which will send notification of such filing to the following:

Sheldon N. Sandler
The Brandywine Bldg.
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE 19899-0391

_____/S/_____
RUDOLPH CONTRERAS
Chief, Civil Division
Assistant United States Attorney
1007 Orange Street
Suite 700
Post Office Box 2046
Wilmington, Delaware 19899-2046
(302) 573-6277