## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

**EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION,**

           **Plaintiff,**

      **v.**

**MBNA AMERICA BANK, N.A., a
subsidiary of MBNA CORPORATION,**

           **Defendant.**

**Civil Action No. 04-425 (SLR)**

## APPENDIX TO PLAINTIFF EEOC'S ANSWERING BRIEF IN OPPOSITION TO DEFENDANT MBNA'S MOTION FOR SUMMARY JUDGMENT

Dated: December 19, 2005

United States Attorney's Office
Rudolph Contreras, Chief-Civil Division
Assistant United States Attorney
1007 Orange Street, Suite 700
Post Office Box 2046
Wilmington, Delaware 19899-2046
(302) 573-6277
rudolph.contreras@usdoj.gov
*Local Counsel for Plaintiff EEOC*

United States Equal Employment Opportunity Commission
Philadelphia District Office
Terrence R. Cook, Senior Trial Attorney
21 South 5th Street, Suite 400
Philadelphia, PA 19106
(215) 440-2688; (215) 440-2848 (Fax)
terrence.cook@eeoc.gov
*Counsel for Plaintiff EEOC*

## TABLE OF CONTENTS

Excerpts from the Deposition Transcript of Justus Eapen
dated April 4, 2005..................................................................................................B0001

Excerpts from the Deposition Transcript of William F. Kennedy
dated August 2, 2005...............................................................................................B0029

Excerpts from the Deposition Transcript of Glenn A. Ford
dated August 1, 2005...............................................................................................B0041

Excerpts from the Deposition Transcript of Thomas W. Liddle, Jr.
Dated August 1, 2005...............................................................................................B0045

Excerpts from the Deposition Transcript of Sung Byun
dated July 18, 2005..................................................................................................B0048

Excerpts from the Deposition Transcript of James A. Dell
dated July 19, 2005..................................................................................................B0072

Excerpts from the Deposition Transcript of Ernesto E. Marra
dated July 21, 2005..................................................................................................B0080

Excerpts from the Deposition Transcript of Richard Lee Wegner, Jr.,
dated October 6, 2005...............................................................................................B0089

Excerpts from the Deposition Transcript of Neela Chacko
dated July 20, 2005..................................................................................................B0094

Excerpts from the Deposition Transcript of Renee Cuffee-Williams
dated October 6, 2005...............................................................................................B0100

Excerpts from the Deposition Transcript of Richard T. Kilmon
dated July 21, 2005..................................................................................................B0118

Excerpts from the Deposition Transcript of Bridget C. Williams
dated August 2, 2005...............................................................................................B0134

Excerpts from the Deposition Transcript of Richard A. Wresneski
dated October 12, 2005.............................................................................................B0144

Justus Eapen's Charge of Discrimination..............................................................B0152

E-mail From Justus Eapen to Jim Dell, et al., dated February 21, 2003..................................B0154

E-mail from Justus Eapen to Bellverie E. Ross, dated April 8, 2002......................................B0155

MBNA's Information Security Guidelines...........................................................................B0156

Corrective Action Report, dated March 26, 2003.................................................................B0157

MBNA Personnel Policy No. 606......................................................................................B0159

MBNA Personnel Policy No. 601......................................................................................B0172

Dismissal Summary Sheet, undated...................................................................................B0180

Ethics Inquiry...............................................................................................................B0181

Additional Excerpts from the Deposition Transcript of Justus Eapen
dated April 4, 2005......................................................................................................B0183

Additional Excerpts from the Deposition Transcript of William Kennedy
dated August 2, 2005....................................................................................................B0206

Additional Excerpts from the Deposition Transcript of Sung Byun
dated July 18, 2005......................................................................................................B0207

Additional Excerpts from the Deposition Transcript of James A. Dell
dated July 29, 2005......................................................................................................B0213

Additional Excerpts from the Deposition Transcript of Ernesto E. Marra
dated July 21, 2005......................................................................................................B0220

Additional Excerpts from the Deposition Transcript of Richard Lee Wegner, Jr.,
dated October 6, 2005...................................................................................................B0232

Additional Excerpts from the Deposition Transcript of Neela B. Chacko
dated July 20, 2005......................................................................................................B0240

Additional Excerpts from the Deposition Transcript of Renee Cuffee-Williams
dated October 6, 2005...................................................................................................B0244

Additional Excerpts from the Deposition Transcript of Richard T. Kilmon
dated July 21, 2005......................................................................................................B0247

Additional Excerpts from the Deposition Transcript of Richard A. Wresneski
dated October 12, 2005................................................................................................................B0255

Additional Excerpts from the Deposition Transcript of Glenn A. Ford
dated August 1, 2005..................................................................................................................B0259

Excerpts from the Deposition Transcript of James J. Micek
dated April 4, 2005....................................................................................................................B0264

Articles of Incorporation for Eapen Corporation....................................................................B0268

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

EQUAL EMPLOYMENT OPPORTUNITY      )
COMMISSION,                       )
                                  )
            Plaintiff,            )
                                  )
v.                                )      Civil Action No.
                                  )      04-CV-425 SLR
MBNA AMERICA BANK, N.A., a        )
subsidiary of MBNA               )
CORPORATION,                      )
                                  )
            Defendant.            )

        Deposition of JUSTUS DANIEL EAPEN taken
pursuant to notice at the law offices of Young, Conaway,
Stargatt & Taylor, LLP, The Brandywine Building,
1000 West Street, 17th Floor, Wilmington, Delaware,
beginning at 10:00 a.m. on Monday, April 4, 2005, before
Robert Wayne Wilcox, Jr., Registered Professional
Reporter and Notary Public.

APPEARANCES:

        TERRENCE R. COOK, ESQ.
        U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
          21 South Fifth Street
          The Bourse - Suite 400
          Philadelphia, Pennsylvania  19106
          for the Plaintiff,

        SHELDON N. SANDLER, ESQ.
        YOUNG, CONAWAY, STARGATT & TAYLOR, LLP
          The Brandywine Building
          1000 West Street - 17th Floor
          Wilmington, Delaware  19801
          for the Defendant.

------------------------------------------------

                WILCOX & FETZER
  1330 King Street - Wilmington, Delaware 19801
                (302) 655-0477



**WILCOX & FETZER LTD.**
Registered Professional Reporters

B-00001

1    A.    We both own the house.

2    Q.    How old are you?

3    A.    Thirty-seven.

4    Q.    What's your birthdate?

5    A.    February 2, '68.  I'm sorry.  February 8, 1968.

6    Q.    Where were you born?

7    A.    In India.

8    Q.    Where in particular?

9    A.    Do you want the specific city?

10   Q.    Yes.

11   A.    Okay.  It's Erathu, E-r-a-t-h-u.

12   Q.    What county or province or state is that?

13   A.    The state would be Kerala, spelled K-e-r-a-l-a.

14   Q.    When did you come to the United States?

15   A.    April 1985.

16   Q.    What was the reason for coming here?

17   A.    Well, I wanted to do computer engineering, so my

18   uncle told me that Wright State University is a good

19   school.  He lived in Fairborn, Ohio, and Wright State was

20   in Fairborn, Ohio.  So I believe that was the primary.

21   Q.    Wrightstown University?

22   A.    Wright State University.

23   Q.    Wright State University?

24   A.    Right.

Justus Daniel Eapen                    12

```
1      Q.    Is your wife employed currently?

2      A.    Yes, she is.

3      Q.    Where?

4      A.    Wells Fargo Bank.

5      Q.    How long has she been employed there?

6      A.    I believe maybe four or five years.

7      Q.    Okay.  Is that a competitor of MBNA?

8            MR. COOK:  Objection to the form.  You can

9     answer, if you know.

10     A.    My perspective, no.

11     Q.    What do they do?

12     A.    The area that she works in -- mortgage banking.

13     Q.    What else does the company do besides mortgage

14    banking?

15           MR. COOK:  Object to the form.  You can

16    answer, if you know.

17     A.    I don't know exactly what they do beyond that.

18     Q.    Where is her office?

19     A.    White Marsh.

20     Q.    Maryland?

21     A.    Maryland, yes.

22     Q.    How far is that from your home?

23     A.    Fifteen minutes.

24     Q.    Okay.  Was your wife employed by MBNA at one
```

Justus Daniel Eapen                    35

1     Q.   Was that also true when you were a contractor?

2     A.   When I was a contractor, I worked days and nights

3   at certain times.

4     Q.   Different times?

5     A.   Right.  Different times.

6     Q.   Did you switch to the night shift in March of

7   2002 as an employee?

8     A.   That could be right.  I don't remember the exact

9   timings, but...

10    Q.   How did that come about?

11    A.   They had hired Bridget Williams to work at night.

12  And she was there for a while.  And she did not start

13  working at night.  I don't know exactly what happened.

14  And one day Jim Dell asked me to start working at nights,

15  because he needs someone to work at nights.  Something to

16  that effect.  And I guess that's how I came about working

17  at nights.  I kind of felt like, you know, I needed to

18  accept that night job.

19    Q.   Did you think you'd have more time on the night

20  shift to work on other business?

21    A.   That's what Jim Dell --

22             MR. COOK:  Objection to the form.  Go ahead.

23             THE WITNESS:  That's what Jim Dell told me

24  multiple times.  But I don't know why he said that.  He

Justus Daniel Eapen                    36

1    talked about things like that frequently.

2    BY MR. SANDLER:

3       Q.    What did he tell you?

4       A.    He told me specifically what you just told me --

5    that I would have time to work on, you know, my outside

6    business activities if I worked the night or the

7    midnight.

8       Q.    Okay.  What did you say when he said that?

9       A.    I always pacified whatever he said.  I agreed

10   with him.

11      Q.    What business activities was he referring to, if

12   you know?

13      A.    I'm not absolutely sure what he was referring to.

14      Q.    What business activities did you have?

15      A.    While I was working at MBNA?  No active business

16   activities.

17      Q.    What sort of things did you do on the night

18   shift?  Was it different than the day shift?

19      A.    Yes.  It is different from the day shift, because

20   when I was working in the Exchange environment I was

21   busy.  At night shift I practically had nothing to do.  I

22   had possibly half a dozen to maybe a dozen events that I

23   needed to check, which took about 30 seconds.  That was

24   all my responsibility.

1    Q.    What did you do the rest of the time?

2    A.    Just sat there.

3    Q.    Okay.  Did you tell anyone that you needed more

4    work?

5    A.    Yes, I did.

6    Q.    Who did you tell?

7    A.    Bellverie Ross.

8    Q.    Anybody else?

9    A.    No.  She was the -- she was his supervisor.  So I

10   let her know multiple times.  Possibly 25, 50 different

11   times.

12   Q.    What did she say when you would say that?

13   A.    Well, she didn't specifically tell me anything

14   about that, I don't remember.  But she told me that we

15   will be, you know, getting in more -- there's a lot of

16   stuff coming.  Jim Dell would come back and tell me we

17   have a lot of work coming and we have all these new

18   projects starting, so we will busy.  So I need to tell

19   them that I'm busy because we needed to hire more people

20   in that department.  So Jim Dell wanted me to advise the

21   management that I was extremely busy.  That way we could

22   add more people.

23   Q.    Did he say that to you?

24   A.    Yes, sir.



Justus Daniel Eapen                    42

1          A.    I understood that she would not be able to do

2     anything to help me.

3          Q.    Did she say that?

4          A.    May not be exactly that sentence but she

5     communicated that meaning.

6          Q.    Okay.  Did you receive a promotion in June of

7     2002?

8          A.    That could be correct, yes.

9          Q.    What were you promoted to?

10         A.    I was promoted to a systems engineer.

11         Q.    How did you learn that you were going to be

12    promoted?

13         A.    Jim Micek told me.

14         Q.    Did your duties change after the promotion?

15         A.    Jim Dell told me that I would have tremendous

16    amount of responsibilities that come with, you know,

17    being a systems engineer, but to the best of my

18    knowledge, nothing changed.  I still had those seven to

19    maybe a dozen check -- things to check during the night.

20    And that was it.

21         Q.    At the time you were promoted, was Jim Dell your

22    immediate supervisor?

23         A.    Yes, sir.

24         Q.    So as far as you know, did he disagree with your

Justus Daniel Eapen                    48

1      A.    Yes, I did.

2      Q.    How many meetings did you attend?

3      A.    At least one that I remember.

4      Q.    What did he say was the purpose of those

5  meetings?

6      A.    I don't recall exactly what he said.

7      Q.    What was discussed?

8      A.    What was --

9      Q.    I mean in general, if you can remember.

10     A.    Well, I do remember explaining to him problems

11  that I was experiencing in the desktop computing.  And it

12  was very emotional.  In fact, I was crying.  And he --

13  I'm sure he understood crystal clear that I was having

14  extremely difficult environment in desktop computing.

15  And he assured me that he would change it.

16     Q.    Was that a meeting with a large group or was that

17  you just you and him?

18     A.    Just me and him.

19     Q.    Okay.  Were there also meetings with a larger

20  group?

21     A.    There were meetings with a larger group.

22     Q.    Did you attend those meetings?

23     A.    One that I remember.

24     Q.    What was discussed?  What was the subject matter

Justus Daniel Eapen                              50

1    for a person, other than possibly a Caucasian, to have

2    job satisfaction or perform any meaningful work.  And so

3    that is, in general, the problems.  I mean, there's

4    thousands of instances where, you know, things could, you

5    know, come around where you no longer feel like, you

6    know, you could do anything.

7        Q.   Well, my question was:  What did you tell Jim

8    Micek?  Is that what you told Jim Micek?

9        A.   Absolutely.  In so many -- probably in a

10   different statement.  But that's exactly what I conveyed

11   to him.

12       Q.   When you're saying a "different" statement, how

13   was it different?

14       A.   I probably explained to him a different

15   experience that I had in desktop computing that led to

16   that feeling.  I mean, that meeting lasted, I think,

17   about two hours.  So I'm sure that I talked plenty.

18       Q.   Do you remember saying that Jim Dell is a great

19   guy but a bad manager?

20       A.   I may have said that.

21       Q.   Okay.  What did you mean by that?

22       A.   He's -- he has certain skill set, you know, that

23   if he wasn't my manager, for instance, and he -- like

24   before he was managing me, he was a very amiable guy.

1   And he was -- you know, we had conversations and, you

2   know, we had lunch together. You know, we had a very

3   amiable relationship.

4       Q.    What happened after that that caused the change?

5   Or at least what did you tell Jim Micek happened?

6       A.    I don't recall individual, you know, statements

7   that I made to Jim Micek, but I told him -- I'm sure I

8   expressed, you know, my frustration that I was

9   experiencing in desktop computing. I don't recall

10  individual things that I told him. But I came out with

11  the understanding it was crystal clear to Jim Micek that

12  he -- you know, there were problems in the department

13  that he needed to change. And he told me -- he assured

14  me that it would be changed.

15      Q.    What happened after that meeting, if anything?

16      A.    Well, after that meeting I was convinced that he

17  would change things, but unfortunately, it took too much

18  of a time. Like, for instance, Jim Micek put into place

19  I was to report put to Neela Chacko possibly beginning

20  even before January. But the transition never took

21  place. From what I understand, Jim Dell continued to

22  tell management I -- he's got all this work that I need

23  to get done before actually the transition could take

24  place. So the transition actually never took place. I

1    A.    It did not do any business.

2    Q.    Was there an entity called Eapen Corporation,

3    even though it might not have been incorporated, that was

4    active before the incorporation?

5    A.    Prior to the issuing as a corporation?

6    Q.    Yes.

7    A.    I don't know of any Eapen Corporation prior to

8    that.  I didn't open.

9    Q.    What's "Eapen.net"?

10   A.    It is a website.

11   Q.    Who set up that website?

12   A.    I got help from a couple of resources that I have

13   to set it up.

14   Q.    Did you set it up?

15   A.    Did I physically set it up?

16   Q.    Yes.

17   A.    No.  I had a friend of mine or, you know, one of

18   the resources.

19   Q.    Who was that?

20   A.    If my memory is correct, Tarun Chopra in India.

21   Q.    Dharam, D-h-a-r-a-m?  How do you spell the first

22   name?

23   A.    Oh.  T-a-r-u-n.

24   Q.    Oh, Tarun, T-a-r-u-n.



Justus Daniel Eapen                    60

1    A.    Right.

2    Q.    What was the purpose of Eapen.net?

3    A.    Well, Eapen.net was a vision that I had that,

4    eventually, if I could find the funding, could be -- I

5    thought could be something like Yahoo! but with a

6    specialized image.

7    Q.    What was the specialty?

8    A.    I was thinking more about real estate and

9    insurance or financials.

10   Q.    So was it a way that people could sell and buy

11   real estate and insurance?

12   A.    No.    That was not the intention.    My intention

13   was just like if you go to Yahoo!  You go to Yahoo!

14   Finance.  You could probably be -- see an advertisement

15   or get referred to Bankrate.com.  So when they click on

16   the link, Yahoo! would probably get a compensation.  So I

17   was thinking in more of those lines as an advertising

18   medium for different enterprises in that sector.

19   Q.    Okay.  I saw a press release about the Eapen

20   Corporation that I think was produced that mentioned that

21   it was, quote, a private-held entity established in 1990,

22   unquote.  What does that refer to?

23   A.    That I have no idea.  I saw a couple of things

24   like that when I was being investigated by MBNA.  Like

Justus Daniel Eapen                            61

1    one of them, if my memory is correct, was written by

2    someone in the Orient -- I don't remember exactly the

3    country -- who I have no idea who it is.  All I could

4    think of is -- and if people write different things,

5    they're going to create links.  And I'm thinking it could

6    be one of those.  That I'm not exactly sure.

7        Q.    So you had nothing to do with that?

8        A.    I don't know what you're referring to, sir.  In

9    1990 there was no Eapen Corporation that I know of.

10       Q.    You don't have anything to do with a press

11   release representing that there was one in 1990?

12               MR. COOK:   Do you have a press release to

13   show him?  That might help him refresh his recollection.

14               MR. SANDLER:  Would you mark this?

15               (Eapen Deposition Exhibit No. 6 was marked

16   for identification.)

17   BY MR. SANDLER:

18       Q.    Directing your attention to the bottom of that

19   first page, Mr. Eapen, that's what I'm referring to.

20               MR. COOK:   The last paragraph.

21       A.    Oh, okay.  This type of stuff were a series of

22   information or writings that I acquired as part of --

23   from a ghost writer as part of a package deal to create

24   links that would eventually come to Eapen.net.  It wasn't

1  functional links.  It never got to where I had ambition

2  of where it should be.  You know, it never got -- the

3  business aspect never, you know, actually really come

4  into force.

5      Q.   Well, what I'm asking you about is the

6  representation down at the bottom that says that "The

7  Eapen Corporation is a privately-held entity established

8  in Maryland since 1990."

9      A.   Well, I don't know who -- why it's saying, you

10  know, established in Maryland since 1990.  There was

11  nothing established in Maryland since 1990.  And I really

12  didn't read all of these specific things.  Like right now

13  I am reading to understand exactly what it was.  So I

14  don't know.

15     Q.   Well, you're listed as the contact, aren't you,

16  for this?

17     A.   Yes.  It is.

18     Q.   All right.  You say that you arranged with a

19  ghost writer to prepare these kinds of articles, such as

20  the one that's here in Eapen 6?

21     A.   Correct.

22     Q.   When did you make those arrangements?

23     A.   I cannot recall the dates specifically.

24     Q.   How about the year?



Justus Daniel Eapen                     63

1    A.     It could be sometime in 2000, 2001.  This has a

2   date of 2002, so it could -- I don't know exactly when

3   this was written and when this was -- you know, came live

4   on the website.

5        Q.     Who was the ghost writer?

6        A.     I cannot recall the name at the moment.  I find

7   people on the Internet to do these things all the time.

8        Q.     All right.  There's an address listed there just

9   above the middle of the page --

10       A.     Right.

11       Q.     -- 15/115 West Churchville Road.

12       A.     Right.

13       Q.     What's that?

14       A.     That's a mailbox.

15       Q.     Was that something that you took out -- that

16  mailbox?

17       A.     Yes.  It is a mailbox that I own.

18       Q.     What's Suite 123?

19       A.     That's a Mailbox No. 123.

20       Q.     Did you receive any communications at that

21  mailbox?

22       A.     Not that I -- no.

23       Q.     Do you recall when you first got that mailbox?

24       A.     That mailbox I don't know.  But I had mailboxes

Justus Daniel Eapen                    64

1    like that probably for like years so that I could -- I

2    would say probably I had it for two or three years.

3        Q.    Starting what year?

4        A.    It could be 2000.

5        Q.    Okay.  Do you hold a real estate license?

6        A.    I do have a real estate license.

7        Q.    When did you get your real estate license?

8        A.    I believe it is in 2001 when I was reporting to

9    Jim Dell.  After I started reporting to him.

10       Q.    What did you use that license for?

11       A.    I have really not used it for commercial

12   purposes.  I referred a friend of mine to a builder.  I

13   got -- yeah.  Just once.  I referred a friend of mine to

14   a builder.

15       Q.    When was that?

16       A.    I don't recall the date, but I did get a check

17   for that last year.  Sometime during the last quarter of

18   last year, if my memory is correct.  Of 2004.

19       Q.    What did you have to do in order to get the real

20   estate license?

21       A.    Simply have to attend a course, take a test, pay

22   $195, I believe, and you're licensed.

23       Q.    How long was the course?

24       A.    I think four days or eight days, part-time.

**W&F**

Justus Daniel Eapen                    '            68

1    to that effect -- and took the class.

2        Q.    Does Eapen Corporation have any officers other

3    than you?

4        A.    I do not believe so.  When I filed the

5    incorporation papers, I think I just signed it, unless my

6    wife happens to be on it.  I don't recall.

7        Q.    Did you make any sales for Long & Foster?

8        A.    No, sir.  Other than the one that I already said

9    that I referred a friend of mine to a builder.

10       Q.    In 2004?

11       A.    I don't recall exactly when I made the referral.

12   But I got the compensation for that -- I got a 1099 at

13   the end of the year.  So I'm sure I got it sometime in

14   2004.  But I don't know when the transaction took place,

15   because I really did not follow up or -- I did not pay

16   attention to it exactly.

17       Q.    Do you say you got a 1099 last year from Long &

18   Foster?

19       A.    Correct.

20       Q.    Have you submitted your income tax return for

21   2004?

22       A.    No.  I need -- I still need to do that.

23       Q.    How about 2003?

24       A.    2003?  No, I did not.  I did not have any income

1      A.    No.    Absolutely not.    It was for the test

2    environment.

3      Q.    Did Jim Dell tell you that sharing passwords was

4    acceptable?

5      A.    In the test environment, always.

6      Q.    Did he tell you that?

7      A.    Yes, he did.

8      Q.    Okay.

9      A.    I have done it with him.

10     Q.    You've used his password?

11     A.    Yes.    He has.

12     Q.    He's used yours or you've used his?

13     A.    No.    He's never used mine, because I don't think

14   there was any reason for him to or -- I don't recall

15   sharing my password with anyone.    Because there is a

16   difference in MBNA -- you know, the way that I understood

17   it, if you give your password, then you were at fault.    I

18   mean, you could ask me for your password all day long.

19   As long as I don't give it to you, there's no wrongdoing.

20     Q.    Right.

21     A.    But if I give it to you, then I'm at fault.    So I

22   should be the one not disclosing my password.

23     Q.    So Jason Campbell was at fault here and you

24   weren't.    Is that what you're saying?

Justus Daniel Eapen                    91

1    A.    I did not say that.  I said, if in an environment

2    someone discloses a password, the person who discloses

3    the password is the one who violated the policy.

4    Q.    Okay.

5    A.    But if I used his password in the production

6    environment, then I'm violating the policy too, because

7    that's what it says right here.

8    Q.    So let me see if I understand this.

9         The password that you used --

10   A.    Yes.

11   Q.    -- initially didn't work in January of this

12   incident.

13   A.    The night that I was using my password on that

14   system it did not work.  I don't recall the exact

15   scenario.  Either it did not work or it did not give me

16   the functionality that it should have had to perform my

17   job that night.  So something changed in that environment

18   without my knowledge or without having proper

19   documentation.  If there were documentation, then I would

20   know when something changed.

21   Q.    Since your password didn't work, that's when you

22   called up Jason Campbell?

23   A.    I believe after trying the administrative

24   account, as well as generic accounts, is when I called

Justus Daniel Eapen                    92

1    Jason Campbell, if my memory is correct.

2        Q.    Okay.

3        A.    I mean, I wasn't really thinking about, you know,

4    memorizing this, because I did not really think there was

5    any implication.  It was something that I did casually,

6    you know, not to memorize.

7        Q.    Did you go into this system to basically change

8    it so that your password would work?

9        A.    Exactly.  I logged onto the system using his

10   account.  I think, if I had an ID, I deleted that and

11   created a new one.  And I must have done the same thing

12   with the administrative accounts as well so the problem

13   would not be there.

14       Q.    So you reset your password.  Correct?

15       A.    Either I reset it or I deleted my account

16   altogether and created a new one.

17       Q.    Did you also use the password to add yourself to

18   different groups to which you didn't have access?

19       A.    No.  Absolutely not.  I had access to that

20   environment.  I had total access to that environment.  If

21   there was -- it's quite possible that that night when I

22   was logging onto that system probably my rights were

23   changed.  That's why it did not work.

24       Q.    Right.



Justus Daniel Eapen                    93

1      A.    But in that environment I had total access just

2    like the administrator account.

3      Q.    I see.

4      A.    So if I created a new ID, I'm sure I created the

5    new ID with all administrative rights.

6      Q.    Is that what triggered the alerts to the security

7    people?

8      A.    See, I wasn't aware of any alerts ever being

9    triggered to information security in that environment

10    ever prior to that incident.

11      Q.    But it was triggered that time, wasn't it?

12      A.    Yes.    It did.

13            Are you asking me if the action of giving

14    myself administrator rights or the action that I deleted

15    the password -- deleted the account and created a new

16    account?

17      Q.    Well, either one.

18      A.    Well, whatever I did -- just by deleting an

19    account and creating a new one would trigger that type of

20    an action in the production environment.  So me giving

21    myself rights does not make any difference in the level

22    of communication that took place with information

23    security.

24      Q.    Well, did you tell information security, in

Justus Daniel Eapen                        129

1    your responsibility.  And you will notice that I did that

2    all the time without fail on two rings.

3         Q.    You said something about going to a restaurant.

4               What restaurant are you referring to that

5    was open in the middle of the night?

6         A.    Well, Wawa is open.  There's a restaurant -- I

7    think it's Denny's, it's called, that's open.  And

8    there's one right by the university that is open -- I

9    forgot -- some chicken place.  So there is several

10   restaurants that are open 24 hours.

11        Q.    Okay.  On this particular evening, what were you

12   doing in the test area?

13        A.    I must have browsed the Internet.  I don't know.

14   I forgot what I was doing.

15        Q.    Was there a time when you and Jim Dell got along

16   well?

17        A.    Initially, yes.  I got along well.  I was

18   thinking that until I learned that, you know, there was

19   certain ways that he does things.  For instance, things

20   were going normal.  When I learn that he, you know,

21   doesn't disclose all the information to me -- for

22   instance, when he went on vacation, he did not tell me,

23   you know, a problem in the SQL environment.  And if I

24   don't know what the problem is, if he didn't tell me

**W&F**

Justus Daniel Eapen                           130

1    anything about it, you know, I'm in the dark.

2              So multiple times I noticed when he's not in

3    the office I'm not being told, you know, what is going on

4    in the environment where I'm made to look like I don't

5    know what's happening. And he would come back and he

6    would say, oh, this is it. Justus should have known

7    about it. Well, unless he told me that there is a

8    problem, I would have to trouble-shoot until I find. So

9    it is going to take time.

10             So, you know, everybody knows when there's a

11   problem. So all he had to do was simply communicate with

12   me, which he refused to. So multiple times when things

13   like that happened I knew on the surface, you know, he's

14   acting, you know, like he's a nice guy. But he's always

15   trying to, you know, set me up and back stab me every

16   opportunity that he gets.

17        Q.   Did other people feel the same way about him?

18        A.   I communicated this to Bellverie, and I think

19   they had conversations about it. In fact, in one of the

20   incidents that happened even John O'Neill from

21   information security was involved where he set up the SQL

22   licensing on a per client basis to just five clients.

23   When 25,000, 28,000 clients are trying to access it, it's

24   not going to work. So he should have told me that he set

Justus Daniel Eapen                    137

1       Q.    Jim Dell called you Osama Bin Laden?

2       A.    Yes, he did.

3       Q.    Okay.  Did he call you anything else that you

4    feel was focused on your national origin?

5       A.    There was a lot of things that I was called --

6    brown person, brown, BP, as short, Osama Bin Laden, OBL,

7    Osama Bin Laden's brother, Saddam Hussein, Saddam

8    Hussein's brother.

9       Q.    By Jim Dell?

10      A.    Jim Dell and multiple other people in desktop

11   computing.  It was an acceptable form of communication in

12   desktop computing.

13      Q.    Well, I'm, for the moment at least, focusing just

14   on Jim Dell.  Did Jim Dell call you each of those terms

15   that you just called off?

16      A.    Yes, sir.  Yes, sir.

17      Q.    Did you make any response to that?

18      A.    How would -- do you expect me to respond to a

19   call like that?

20      Q.    I asked you whether you did, you know.

21      A.    Well, I act like whatever he's doing is a

22   pleasure.

23      Q.    So you didn't respond?

24      A.    That's how I respond.  It's a pleasure to hear

Justus Daniel Eapen                                    141

1      Q.    And others.

2      A.    Right.

3      Q.    But are you saying that Jim Dell used each of the

4    epithets that you listed?

5      A.    Yes, sir.

6      Q.    And other people did as well?

7      A.    Yes, sir.

8      Q.    All right. Now, you also say there was an

9    incident with a mailroom clerk.

10     A.    Correct.

11     Q.    Tell us about that.

12           What happened?

13     A.    Well, when the mailroom clerk was distributing

14   the mail, Glenn Ford was sitting across on the other side

15   of the cubicle. The guy was in Glenn Ford's cubicle.

16   Glenn Ford, John Hartnett, Rich Wresneski -- and there

17   one more guy who was a line administrator -- I forgot his

18   name -- they were there. They told the mailroom guy that

19   I'm Osama Bin Laden's brother. So the guy got excited,

20   and he motioned like he was going to jump on me. So they

21   refrained him from doing that and told him that they were

22   just kidding.

23     Q.    This is Rob Dunphy, the mailroom clerk?

24     A.    I don't know.

1    learning disabled individual, I really don't think that

2    he has the ability to comprehend, you know, that I am or

3    am not Osama Bin Laden's brother.  All I know is he

4    thinks I have something to do with Osama Bin Laden.

5        Q.    But, I mean, as far as the incident is concerned,

6    he didn't continue to try to do anything to you, did he?

7        A.    Because I would not go in his presence if I

8    possibly could.  I don't remember being that close to him

9    ever again.

10       Q.    I'm talking about that day.

11              Did he not make any further effort to get to

12   you?

13       A.    I left immediately, so I -- he did not try to.

14       Q.    Nothing else happened after that.  Correct?

15       A.    Correct.

16       Q.    Did you see him after that?

17       A.    I do not remember seeing him in close proximity.

18   Or if I saw him, I avoided him.

19       Q.    After this incident did you report what happened

20   to anybody?

21       A.    I do not specifically recall going to somebody

22   saying, hey, this learning disabled person, you know, was

23   about to attack me because of this.  But the entire

24   desktop computing was there, so it's not like a secret.

W&F

B-00026

Justus Daniel Eapen                                    146

1      Q.    Yes.

2      A.    I never recall having any conversation with

3    Ernest Marra about that incident.

4      Q.    All right.  Did you report the incident to the

5    Affirmative Action Office?

6      A.    No, I did not.

7      Q.    Was there an instance when you were called a

8    "sand nigger"?

9      A.    Yes, there was.

10     Q.    Was that one time or more than one time?

11     A.    I think that particular gentleman used that term

12   three or four times, and he also used the term "nigger"

13   once.

14     Q.    Who was that gentleman?

15     A.    His last name is Todd, first name is, I think,

16   Rich.

17     Q.    Okay.  When did that occur?

18     A.    That should have been shortly after 9/11.

19     Q.    What was your response to that?

20     A.    At that time I did not know what "sand nigger"

21   meant.  So when he referred to me as a "sand nigger," I

22   did not do anything, because I did not understand what

23   that meant until he used the term "nigger" and I

24   consulted with someone else, you know, what "sand nigger"

Justus Daniel Eapen                                    176

1      Q.    Did the comments that you've identified as

2   discriminatory stop after you moved to the night shift?

3      A.    No, sir.  It never stopped.

4      Q.    Weren't you by yourself on the night shift?

5      A.    Yeah.  But when they see me in the morning, it

6   could be a "Good morning, OBL."

7      Q.    Who would say that?

8      A.    All of them.

9      Q.    Bridget Williams?

10     A.    No.  Bridget Williams would not say it.

11     Q.    Who is Dr. Rajaan Sood?

12     A.    Dr. Rajaan Sood is a friend of mine.

13     Q.    What does he know about the case?

14     A.    I don't know if he knows anything about -- well,

15  let me rephrase it.  He's an acquaintance of mine.  I was

16  trying to set up a physician's practice management with

17  him after I left MBNA.  I think his wife must have

18  learned about this case.  And we no longer do business

19  or -- it did not come to fruition -- my preference to get

20  the physician's practice management firm established.  So

21  I don't know what he knows.

22     Q.    You say his wife learned about the case.

23           What would have caused her to take action

24  against you because of that?

W&F
WILCOX & ——
B-00028

1

```
 1                 IN THE UNITED STATES DISTRICT COURT
 2                  FOR THE DISTRICT OF DELAWARE
 3
 4
    EQUAL EMPLOYMENT OPPORTUNITY     )
 5  COMMISSION,                      )
                                     )   Civil Action No.
 6              Plaintiff,           )   04-CV-425-SLR
                                     )
 7  v.                               )
                                     )
 8  MBNA AMERICA BANK, N.A., a       )
    subsidiary of MBNA Corporation, )
 9                                   )
                Defendant.           )
10
                Deposition of WILLIAM F. KENNEDY pursuant
11  to notice at the law offices of YOUNG CONAWAY STARGATT
    & TAYLOR, 1000 West Street, Wilmington, Delaware,
12  beginning at 10:40 a.m. on Tuesday, August 2, 2005,
    before Renee A. Meyers, Registered Professional
13  Reporter and Notary Public.
14  APPEARANCES:
15               TERRENCE R. COOK, ESQ.
                 U.S. EQUAL EMPLOYMENT OPPORTUNITY
16               COMMISSION
                   21 South Fifth Street
17                 The Bourse, Suite 400
                   Philadelphia, Pennsylvania  19106-2515
18                 for the Plaintiffs,
19               SHELDON N. SANDLER, ESQ.
                 YOUNG CONAWAY STARGATT & TAYLOR
20                 1000 West Street, 17th Floor
                   Wilmington, Delaware  19899
21                 for the Defendant.
22  ALSO PRESENT:  Launice Sills, Esq.
23                      WILCOX & FETZER
        1330 King Street - Wilmington, Delaware 19801
24                      (302) 655-0477
```



William F. Kennedy

13

1   Q.   Were they company events or other --

2   A.   Team building sessions, going to happy hour.

3   Q.   And these team building sessions, is that an

4   MBNA designation?

5   A.   No.

6   Q.   Is that something that you kind of just called

7   the events?

8   A.   The event was called -- it's not an MBNA

9   sponsored event.

10   Q.   So, you have been to happy hour with

11   Mr. Broughton on a couple occasions?

12   A.   Less than five, and that's over a ten-year

13   period.

14   Q.   Do you know John Hartnett?

15   A.   I do.

16   Q.   Have you socialized outside of MBNA with

17   Mr. Hartnett as well?

18   A.   I have.

19   Q.   Something different than what you have already

20   testified to or was it the same type of team building

21   sessions when you went to happy hour?

22   A.   Something different.  I have done work at his

23   house.  He has worked on my vehicle.  I can do home

24   repair and he can do auto mechanics, so we have done

14

1    that outside of work.

2        Q.    Anything else besides the exchange of skills --

3        A.    No.

4        Q.    -- that you did outside the office?

5        A.    I mean, he -- he -- my nephew enjoys P.T.

6    Cruisers and his father has one, and he went and

7    picked up my nephew on his birthday and drove him

8    around.

9        Q.    Do you consider Mr. Hartnett a friend or a

10   colleague?

11       A.    Closer to friend.

12       Q.    And Mr. Broughton, do you consider him a friend

13   or a colleague?

14       A.    More of a colleague.

15       Q.    More than a colleague?

16       A.    More of a colleague.

17       Q.    Do you know Glenn Ford?

18       A.    I do.

19       Q.    Have you socialized with Mr. Ford outside the

20   office?

21       A.    Yes.

22       Q.    What type of things have you done with Mr. Ford

23   outside the office?

24       A.    Similar to John Hartnett.  We recently built a



15

1    deck on his house.

2    Q.    A deck on Mr. Ford's home?

3    A.    Yes.

4    Q.    Anything else?

5    A.    No.

6    Q.    Do you consider Mr. Ford a friend or a

7    colleague?

8    A.    A friend.

9    Q.    Do you know Richard Wagner?

10   A.    I do.

11   Q.    Have you socialized with Mr. Wagner outside of

12   the office?

13   A.    His relationship would be similar to Mike

14   Broughton's.

15   Q.    The happy hour type of events?

16   A.    Yes.  I don't associate with him outside work.

17   Q.    Would you consider him more of a friend or a

18   colleague?

19   A.    More of a colleague.

20   Q.    Do you also know Richard Wresneski?

21   A.    I do.

22   Q.    And have you socialized with Mr. Wresneski

23   outside of the office?

24   A.    No.



William F. Kennedy

16

1    Q.    Do you know Thomas Liddle?

2    A.    I do.

3    Q.    Have you socialized with Mr. Liddle outside of

4    the office?

5    A.    Not outside of the office.

6    Q.    Do you consider Mr. Liddle a friend or a

7    colleague?

8    A.    Closer to a friend.

9    Q.    Do you consider Mr. Wresneski a friend or a

10   colleague?

11   A.    Closer to a colleague.

12   Q.    Mr. Liddle and Mr. Ford have testified that, on

13   occasion, they have tried to start a dodge ball

14   league.

15        Were you involved at all with that?

16   A.    No.

17   Q.    Now, these individuals we just went over,

18   Mr. Broughton, Mr. Hartnett, Ford, Wagner, Wresneski,

19   and Liddle and yourself, did you all sit in the same

20   general area within Desktop Computing?

21   A.    No.

22   Q.    You did not?

23   A.    No.

24   Q.    In 2001, do you recall which employees that we



William F. Kennedy

22

1    Q.    The Desktop Computing Department, that has been

2    referred to by other witnesses who have testified to

3    be a joking atmosphere.

4              Would you agree with that

5    characterization?

6    A.    I would.

7    Q.    What type of jokes or joking atmosphere have

8    you witnessed as an employee of Desktop Computing?

9    A.    I mean, general pranks as far as unplugging

10   someone's monitor to general verbal exchanges.

11   Q.    With respect to the pranks, there has been

12   testimony of people taking computer equipment from a

13   work area, changing monitors, things of that nature.

14             Have you ever witnessed anybody engaging

15   in those type of pranks?

16   A.    I would have to say yes, I am sure I have at

17   least seen one.

18   Q.    And can you tell me the name of anyone you saw

19   engaging in that type of conduct?

20   A.    I think I saw John Hartnett doing work on Glenn

21   Ford's PC.

22   Q.    Anything else?

23   A.    Not that I can recall.

24   Q.    Did you ever observe anyone tampering with the



25

1    A.    That's pretty much it.

2    Q.    Did Mr. Eapen ever call you red neck or whitey?

3    A.    No.

4    Q.    Did you ever hear him refer to any employee as

5    red neck or whitey?

6    A.    No.

7    Q.    What type of comments, if any, did you make

8    about Mr. Byun's race or national origin?

9    A.    It became, you know, I would classify him as

10   the A team.

11   Q.    What did the "A" stand for, was that for Asian?

12   A.    Initially, there was a competition going on

13   between four people in a race to build equipment.  My

14   -- I was working with John Golden and Sung was working

15   with Dave Ings.  And we were the A team, John and I

16   were the A team, and Sung and Dave were the B team

17   because we finished our equipment ahead of them.  And

18   it somehow evolved into, instead of team A being us,

19   team A evolved to being Sung, and I don't know who

20   exactly came up with the "A" for Asian, but that's

21   what it did stand for.

22   Q.    Was there a W team for the white team?

23   A.    Yes.

24   Q.    And you were a member of what was the A team



William F. Kennedy

27

1    Q.    Besides the four of you individuals, Mr. Ings,

2    Mr. Golden, Mr. Byun, and yourself, did the A team or

3    the W team reference any other MBNA employees?

4    A.    No.

5    Q.    And was this a phrase that was commonly known

6    within Desktop Computing, that the A team constituted

7    Mr. Byun and Mr. Ings and the W team constituted

8    yourself and Mr. Golden?

9    A.    I am -- I am not sure if other people were

10   told.  I mean, it was inside, between us, so --

11   Q.    There has been testimony in this case that the

12   area in which the employees of Desktop Computing sat,

13   the cubicles were a little smaller than the managers,

14   and that area became known as the ghetto.

15              Have you ever heard that area referred to

16   as the ghetto?

17   A.    I have heard that term, "the ghetto."

18   Q.    And did you hear it in context of that

19   particular area where the employees in Desktop

20   Computing sat or some other meaning?

21   A.    It was, in essence, every cube that was smaller

22   than a manager's cube.  So, out of a room of

23   approximately 200, we will say 180, between 170 and

24   180 qualified as the ghetto.

William F. Kennedy

31

1  Q.  Have you ever heard anybody refer to Mr. Byun

2  as rice or rice bowl?

3  A.  No.

4  Q.  Have you told me everything you can recall

5  about the nature of the jokes that you exchanged

6  between yourself and Mr. Byun?

7  A.  I mean, I don't know what else to say other

8  than, for instance, when it comes to technology, you

9  know, we have jokes that, you know, his relatives

10  built this technology.  It will be something in the

11  order of, you know, your brother built this PC; your

12  family built this PC.

13  Q.  Those would be comments you would make to

14  Mr. Byun based on his Korean national origin; correct?

15  A.  Yes.

16  Q.  That was like a joke told amongst each other on

17  a regular basis or a comment you would make on a

18  regular basis?

19  A.  Not on a regular basis, but it was always

20  between Sung and I.  It was not in the population by

21  any means.

22  Q.  After the events of September 11th, 2001, did

23  you ever hear Mr. Eapen referred to as Osama bin

24  Laden?



32

1    A.    No.

2    Q.    By any employee?

3    A.    No.

4    Q.    Have you ever heard that phrase used in a

5    derogatory term in Desktop Computing?

6    A.    No.

7    Q.    Have you ever heard Mr. Eapen referred to as

8    OBL, short for Osama bin Laden?

9    A.    No, I have not.

10    Q.    Have you ever heard Mr. Eapen referred to as

11    Osama bin Laden's brother or cousin?

12    A.    No, I have not.  I mean, other than the

13    Delaware News Journal.

14    Q.    Other than the article that came out about the

15    lawsuit?

16    A.    Yes.  I have not heard other than the article.

17    Q.    Have you ever heard Mr. Eapen referred to as

18    BP, for brown people?

19    A.    No.

20    Q.    Have you ever heard any employee referred to as

21    BP, for brown people, within Desktop Computing?

22    A.    Yes.

23    Q.    Who?

24    A.    Mark Shiwpal.



William F. Kennedy

33

1    Q.    Who is Mark Shiwpal?

2    A.    Mark Shiwpal was an intern for Desktop

3    Computing.

4    Q.    What's his national origin or race?

5    A.    I believe he is Indian.

6    Q.    Did he refer to someone as BP or was he

7    referred to as BP?

8    A.    He created the term because -- I imagine

9    because he would be someone that would have heard team

10   A or team W, and in an effort to join that, he came up

11   with his own team.  So he classified himself as BP.

12   Q.    And what do you base that on?  Was that with

13   conversations with Mr. Shiwpal?

14   A.    He -- he started -- he started his own team, a

15   one-man team.

16   Q.    And did Mr. Shiwpal tell you what "BP" stood

17   for?

18   A.    Yes.

19   Q.    And what did he tell you?

20   A.    Brown people.

21   Q.    And did he also tell this to the other people

22   on the A and W teams, Mr. Ings, Mr. Golden, or

23   Mr. Byun?

24   A.    I would say no, probably not.



William F. Kennedy

47

1    A.    Yes.

2    Q.    Besides Mr. Eapen?

3    A.    No.

4    Q.    And Mr. Campbell?

5    A.    No.

6    Q.    Did you ever have any discussions with Mr. Byun

7    about Japanese cars versus American made cars?  Do you

8    recall any conversations along those lines?

9    A.    I don't recall.

10    Q.    Have you ever heard the phrase or Mr. Eapen

11    referred to as a dot head?

12    A.    No.

13    Q.    Now, you said that a Mr. Mark Shiwpal created

14    the term "BP" for himself?

15    A.    Yes.

16    Q.    Did you refer to Mr. Shiwpal as BP?

17    A.    I may have.

18    Q.    On more than one occasion?

19    A.    Probably.

20    Q.    Did you refer to any other employees as BP

21    besides Mr. Shiwpal?

22    A.    No.

23    Q.    Were you interviewed by either Richard Kilmon

24    or Renee Cuffee-Williams regarding any conduct related



1

```
 1              IN THE UNITED STATES DISTRICT COURT
 2                FOR THE DISTRICT OF DELAWARE
 3

 4
   EQUAL EMPLOYMENT OPPORTUNITY      )
 5 COMMISSION,                       )
                                     )   Civil Action No.
 6              Plaintiff,           )   04-CV-425-SLR
                                     )
 7 v.                                )
                                     )
 8 MBNA AMERICA BANK, N.A., a        )
   subsidiary of MBNA Corporation,)
 9                                   )
                Defendant.           )
10
```

11          Deposition of GLENN A. FORD taken pursuant
   to notice at the law offices of YOUNG CONAWAY STARGATT
12 & TAYLOR, 1000 West Street, Wilmington, Delaware,
   beginning at 9:00 a.m. on Monday, August 1, 2005,
13 before Renee A. Meyers, Registered Professional
   Reporter and Notary Public.
14 APPEARANCES:
15             TERRENCE R. COOK, ESQ.
               U.S. EQUAL EMPLOYMENT OPPORTUNITY
16             COMMISSION
                 21 South Fifth Street
17               The Bourse, Suite 400
                 Philadelphia, Pennsylvania  19106-2515
18               for the Plaintiffs,
19             SHELDON N. SANDLER, ESQ.
               YOUNG CONAWAY STARGATT & TAYLOR
20               1000 West Street, 17th Floor
                 Wilmington, Delaware  19899
21               for the Defendant.
22 ALSO PRESENT:  Launice Sills, Esq.
23                   WILCOX & FETZER
      1330 King Street - Wilmington, Delaware 19801
24                   (302) 655-0477

```



**WILCOX & FETZER LTD.**
Registered Professional Reporters

Glenn A. Ford

14

1    brother or OBL?

2      A.    No.

3                  MR. SANDLER:    Objection, asked and

4    answered.

5                  THE WITNESS:    I have never heard anyone

6    directly call him -- or I don't really remember anyone

7    directly calling him Osama bin Laden.

8    BY MR. COOK:

9      Q.    Did you ever hear Thomas Liddle refer to

10   Mr. Eapen as Osama bin Laden, OBL, or Osama

11   bin Laden's brother?

12     A.    No.    It would be -- again, I don't remember

13   anyone calling him Osama bin Laden.

14     Q.    Mr. Byun testified it was a pretty joking

15   atmosphere in Desktop Computing in the area which you

16   sat.

17                 Would you agree with that statement?

18     A.    Yes.

19     Q.    What did you joke about?

20     A.    Pretty much anything that -- anything -- that's

21   a broad question.    I mean, we joked about anything,

22   pretty much.

23     Q.    Did you joke about national origin?

24     A.    There was joking about national origin.

Glenn A. Ford

19

1    A.    Yes.    I am sorry.

2    Q.    And what about Mr. Liddle, does he use

3    profanities within the office?

4    A.    No, not -- not to -- I think Rich did stand out

5    because, I mean, he said, you know, he used

6    profanities on the small bit of occasion.    That's not

7    something that's very common, so it stands out.

8    Q.    What about John Hartnett?

9    A.    No, not John.

10    Q.    Did you ever hear Mr. Eapen complain about the

11    names he was being called or complain about any issues

12    of national origin or religion while you were there?

13    A.    Never once.

14    Q.    Did any managers ever talk to the folks in

15    Desktop Computing about the joking that went on in

16    that section?

17    A.    I don't think they ever talked about the

18    joking.    I think the talk that I can remember was

19    about standing up, just in general, that there would

20    be times where people would just gather and stand and

21    talk.    That was brought up, but it was -- nothing, to

22    my knowledge, was ever brought up about joking.

23    Q.    Who do you recall speaking to the Desktop

24    employees about standing up?    Which manager?



Glenn A. Ford

40

1    him and his mortgage business.

2    Q.    Now, were you present when Mr. Eapen searched

3    the Internet in an attempt to identify a better

4    mortgage interest rate?

5    A.    That was the time where we sat with each other

6    or sat directly -- our cubes were open to each other,

7    so I was present in that manner.  I don't know if -- I

8    don't remember now if I, you know, pulled my chair

9    over to his desk.  I don't recall.

10   Q.    And can you tell me whether or not he was

11   looking for interest rates with his mortgage company

12   or another mortgage company?

13   A.    I don't know.  I don't recall.

14   Q.    And you also mentioned Mr. Hartnett was also in

15   the market to buy a new home; correct?

16   A.    That's correct.

17   Q.    And did you discuss mortgage interest rates

18   with Mr. Hartnett, or any other employee besides

19   Justus Eapen, as general conversation?

20   A.    As general conversation, with John Hartnett,

21   yes, sir, because we were friends outside of work and

22   we talked about mortgages.

23   Q.    During your interview with Mr. Kilmon -- do you

24   recall your interview with Mr. Kilmon?

1

```
1              IN THE UNITED STATES DISTRICT COURT
2                FOR THE DISTRICT OF DELAWARE
3
4
   EQUAL EMPLOYMENT OPPORTUNITY   )
5  COMMISSION,                    )
                                  )   Civil Action No.
6              Plaintiff,         )   04-CV-425-SLR
                                  )
7  v.                             )
                                  )
8  MBNA AMERICA BANK, N.A., a     )
   subsidiary of MBNA Corporation,)
9                                 )
               Defendant.         )
10
11             Deposition of THOMAS W. LIDDLE, JR. taken
   pursuant to notice at the law offices of YOUNG CONAWAY
12 STARGATT & TAYLOR, 1000 West Street, Wilmington,
   Delaware, beginning at 10:30 a.m. on Monday, August 1,
13 2005, before Renee A. Meyers, Registered Professional
   Reporter and Notary Public.
14 APPEARANCES:
15             TERRENCE R. COOK, ESQ.
               U.S. EQUAL EMPLOYMENT OPPORTUNITY
16             COMMISSION
                 21 South Fifth Street
17               The Bourse, Suite 400
                 Philadelphia, Pennsylvania  19106-2515
18               for the Plaintiffs,
19             SHELDON N. SANDLER, ESQ.
               YOUNG CONAWAY STARGATT & TAYLOR
20               1000 West Street, 17th Floor
                 Wilmington, Delaware  19899
21               for the Defendant.
22 ALSO PRESENT:  Launice Sills, Esq.
23                   WILCOX & FETZER
      1330 King Street - Wilmington, Delaware 19801
24                   (302) 655-0477
```

Thomas W. Liddle, Jr.

13

1    Q.    How short of a period of time?

2    A.    Six months.  Six to eight months.

3    Q.    When you say close physical proximity, can you

4    give me an estimate on the feet or the yards, how far

5    away you were from Mr. Eapen?

6    A.    I'd say maybe about six feet.

7    Q.    And you folks worked in cubicles; is that

8    correct?

9    A.    Correct.

10   Q.    There has been testimony in this case that the

11   environment in the Desktop Computing section where you

12   sat, where Mr. Eapen sat, where Mr. Ford sat,

13   Mr. Wresneski, Mr. Hartnett, that there were a lot of

14   jokes going on in that area.

15          Do you agree with that statement?

16   A.    Yes.

17   Q.    Do you recall any of the jokes that were told

18   in that area at any time?

19   A.    I just remember Glenn and I playing practical

20   jokes on each other.

21   Q.    What type of practical jokes?

22   A.    Such as taping each other's phone so it would

23   be hard to hear somebody on the receiving end or hard

24   to talk.  We would tape each other's network cables so

37

1    of expertise, so he was asking how to do certain

2    things, how to make it a little bit more colorful.

3        Q.    And did you provide him with assistance in that

4    regard?

5        A.    Yes.

6        Q.    Did you ever visit the web site with Mr. Eapen

7    for the purpose of obtaining a mortgage interest rate

8    or a mortgage?

9        A.    No.

10       Q.    Did Mr. Eapen ever solicit from you or offer to

11   sell you a mortgage?

12       A.    No.

13       Q.    Did you ever hear Mr. Eapen refer to the

14   business as his wife's business?

15       A.    No.

16       Q.    Besides the three or four times in which

17   Mr. Eapen came to you for web design advice, are there

18   any other occasions in which he discussed this

19   mortgage business with you?

20       A.    No.  On a couple occasions, I asked him about

21   how mortgages work and mortgage prices and things like

22   that, but nothing pertaining to his business.  Just a

23   general knowledge.  He seemed pretty knowledgeable in

24   the area.

Sung Byun

1

```
 1              IN THE UNITED STATES DISTRICT COURT
 2                  FOR THE DISTRICT OF DELAWARE
 3
 4
    EQUAL EMPLOYMENT OPPORTUNITY       )
 5  COMMISSION,                        )
                                       )    Civil Action No.
 6              Plaintiff,             )    04-CV-425-SLR
                                       )
 7  v.                                 )
                                       )
 8  MBNA AMERICA BANK, N.A., a         )
    subsidiary of MBNA Corporation,)
 9                                     )
                Defendant.             )
10
11              Deposition of SUNG BYUN taken pursuant to
    notice at the law offices of YOUNG CONAWAY STARGATT &
12  TAYLOR, 1000 West Street, Wilmington, Delaware,
    beginning at 10:05 a.m. a.m. on Monday, July 18, 2005,
13  before Renee A. Meyers, Registered Professional
    Reporter and Notary Public.
14  APPEARANCES:
15              TERRENCE R. COOK, ESQ.
                U.S. EQUAL EMPLOYMENT OPPORTUNITY
16              COMMISSION
                  21 South Fifth Street
17                The Bourse, Suite 400
                  Philadelphia, Pennsylvania  19106-2515
18                for the Plaintiffs,
19              SHELDON N. SANDLER, ESQ.
                YOUNG CONAWAY STARGATT & TAYLOR
20                1000 West Street, 17th Floor
                  Wilmington, Delaware  19899
21                for the Defendant.
22  ALSO PRESENT:  Launice Sills, Esq.
23                     WILCOX & FETZER
        1330 King Street - Wilmington, Delaware 19801
24                     (302) 655-0477   .
```

Sung Byun

12

1    development of the infrastructure?

2        A.    You were not allowed to share any personal

3    information.    I mean, it's like, Why would you share a

4    password where they can, you know, log in and e-mail,

5    you know, using your account?    You didn't want things

6    like that.    So we did not, in practice, share

7    passwords, personal passwords.

8        Q.    Are you aware of any situation in which any

9    employee shared a personal password with another

10   employee during your tenure at MBNA?

11       A.    Yes.

12       Q.    And are you aware of more than one incident

13   where employees exchanged personal passwords?

14       A.    Yes.

15       Q.    Was it something that was done frequently?

16       A.    No.

17       Q.    How would you characterize the exchanging or

18   sharing of passwords, personal passwords during your

19   tenure at MBNA?    Infrequent?    Regular?    How would you

20   describe it?

21       A.    Very rare.

22       Q.    And are you aware of any particular

23   circumstances in which a password was shared, personal

24   password?



Sung Byun

14

1    Q.    I just want the record to be clear.

2              So you heard rumors that they had

3    exchanged passwords, Mr. Eapen and Mr. Campbell; is

4    that correct?

5    A.    Correct.

6    Q.    Did you ever speak to Mr. Eapen about that

7    incident?

8    A.    I haven't spoke to him about that incident, but

9    I have spoke to him.

10   Q.    Did you speak to Mr. Campbell about that

11   password sharing incident?

12   A.    No.

13   Q.    Besides this password sharing incident between

14   Mr. Eapen and Mr. Campbell, are you aware of any other

15   situation in which personal passwords were exchanged?

16   A.    I personally have done it once.

17   Q.    And who did you share -- just so I am clear,

18   did you share your password for somebody or did you

19   ask somebody for their password?

20   A.    I shared my information.

21   Q.    And who did you share your information with?

22   A.    To Bill Kennedy.

23   Q.    Bill Kennedy is an employee in Desktop

24   Computing as well?



**WILCOX & FETZER LTD.**
Registered Professional Reporters

Sung Byun

15

1    A.    Yes.

2    Q.    And can you give me the time frame in which

3    this password sharing incident took place?

4    A.    This was when I was working for Bellverie Ross

5    and Neela Chacko probably three to four years ago.    I

6    lived in Cherry Hill, New Jersey, which is about an

7    hour away, and Bill Kennedy lived five minutes away,

8    and I believe either I was logged into that server or

9    some, you know, some production issue failed and he

10   needed, you know, either to unlock, you know, take --

11   because I was logged in, he needed to unlock me out of

12   that server, so that's when I gave him my password.

13   It was probably like two, three in the morning.

14   Q.    Did Mr. Kennedy call you at your residence to

15   ask for the password?

16   A.    Yes.

17   Q.    And how did you communicate your password to

18   Mr. Kennedy?    Was it verbally over the phone?

19   A.    It was verbally over the phone.

20   Q.    And at the time that you gave Mr. Kennedy your

21   password, were you aware of any written policy of MBNA

22   that prohibited sharing of passwords?

23   A.    Yes.

24   Q.    And as a result of sharing your password with

Sung Byun

16

1   Mr. Kennedy, were you disciplined in any manner?

2     A.    No.

3     Q.    At the time, you said you reported to Neela

4   Chacko who reported to Bellverie Ross; is that

5   correct?

6     A.    That's correct.

7     Q.    Were they aware of the password sharing

8   incident?

9     A.    No.

10    Q.    Was any management aware of the password

11  sharing incident?

12    A.    No.

13    Q.    Are you aware of any other password sharing

14  incident besides the two you testified to?

15    A.    No.

16    Q.    So, it's your testimony that in the six years

17  you worked for MBNA, the only two instances in which

18  you were aware of personal passwords being shared was

19  the incident between Mr. Eapen and Mr. Campbell;

20  correct?

21    A.    Correct.

22    Q.    And the incident between yourself and

23  Mr. Kennedy; is that correct?

24    A.    Correct.  And that's personal passwords.



Sung Byun

19

1    A.    Right.    Only once.

2    Q.    Are you aware of any instances where employees

3   shared the administrative account password?

4    A.    In the beginning, yes.

5    Q.    What about after this period three years ago

6   when it became confidential?

7    A.    No.    There was -- there was no way.

8    Q.    And you said, in the beginning, yes.

9           How frequently was it done in the

10   beginning that people would share the administrator

11   account password?

12    A.    It was rare in terms of frequency, but if you

13   needed access or if you wanted to be -- if you --

14   yeah, it was rare.

15    Q.    And did you know Jim Dell?

16    A.    Yes, very well.

17    Q.    Mr. Dell is a personal friend?

18    A.    Mm-hmm.

19    Q.    Is that yes?

20    A.    Yes.

21    Q.    Do you socialize with Mr. Dell outside of the

22   office?

23    A.    Yes.

24    Q.    Do you do that on a regular basis?



Sung Byun

28

1 situated?

2    A.   Not like phone conversations. But, you know,

3 if he spoke, you know, a little bit more than a normal

4 voice, yes, a lit bit louder than a normal voice, yes.

5    Q.   Do you recall speaking with an investigator

6 from the EEOC about Mr. Eapen's allegations about

7 harassment and discrimination at MBNA?

8    A.   Yes.

9    Q.   And did Mr. Eapen tell you about the problems

10 he was having at MBNA with respect to --

11    A.   Yes.

12    Q.   -- issues of harassment?

13    A.   Yes. Towards the -- towards the end.

14    Q.   And what did Mr. Eapen tell you? What do you

15 recall about your conversations with Mr. Eapen about

16 issues of harassment?

17    A.   That he said that he did not enjoy his job and

18 he said that he -- his relationship with Jim Dell was

19 getting pretty bad.

20    Q.   Did he ever tell you he thought he was being

21 harassed because of his national origin?

22    A.   No, not to my recollection.

23    Q.   Did he ever tell you he thought he was being

24 discriminated against because of his national origin?

Sung Byun

29

1    A.    I am trying to think back three years, four

2    years.

3    Q.    Sure.

4    A.    We did not have specific conversation about

5    discrimination.

6    Q.    Well, did you have general conversations in

7    which he expressed that he felt he was being treated

8    differently or treated worse than other employees

9    because of his national origin or his race?

10   A.    We did talk about where Asians or Blacks or,

11   you know, Indians, where we had to kind of prove

12   ourselves and work, you know, work harder to kind of

13   prove ourselves.  That's what we did talk about.

14   Q.    And did you ever express to Mr. Eapen that you

15   believe you weren't promoted because you were a

16   minority at MBNA?

17   A.    I shared with him some of my frustrations, not

18   necessarily being promoted, but more towards getting

19   recognitions or getting, you know, "at a boys" because

20   I wasn't, you know, I wasn't -- because I was a

21   minority.

22   Q.    You had a belief that you did all the work but

23   you didn't get recognition for the work that you did;

24   is that correct?

Sung Byun

30

1    A.   Correct.

2    Q.   Now, did you ever complain that you were being

3    mistreated because of your national origin?

4    A.   To him?

5    Q.   To anyone at MBNA.

6    A.   No.  I mean, I may have had side conversations

7    with, you know, someone like Justus Eapen or we had

8    also this person called -- I forget his name -- there

9    was an Indian guy that was hired for six months and he

10   left.

11   Q.   Vikas Amin?

12   A.   Vikas, yes.

13   Q.   And did Vikas Amin complain that he was being

14   discriminated against because of his national origin?

15   A.   Yes.

16   Q.   Did Mr. Eapen complain to you that he was being

17   discriminated against because of his national origin?

18   A.   He may have.  I don't recollect having that

19   kind of conversation, but we did discuss about some of

20   the frustrations that we were having.

21   Q.   The Desktop Computing section, give me an idea

22   of how large that was in terms of the number of

23   employees.

24   A.   Probably about 35 members.



Sung Byun

31

```
1     Q.    And were you all, for the most part, situated
2   in the same physical area at MBNA?
3     A.    Yes.
4     Q.    And how would you describe the work environment
5   in terms of the people of -- did people get along?
6     A.    People got along.  It was just a very edgy
7   group.
8     Q.    And what do you mean by that?
9     A.    Very competitive.  We had a large budget for
10  few people and we had a lot of high profile projects,
11  so it was very competitive.
12    Q.    Was there jokes about race and religion
13  exchanged within Desktop --
14    A.    Yes.
15    Q.    -- Computing?
16          And do you recall any type of jokes or
17  comments that were made about race or religion?
18    A.    Yes.
19    Q.    What do you recall?
20    A.    Things from, you know, rice bowls to --
21    Q.    Rice bowls, b-o-w-l-s?
22    A.    Mm-hmm.
23    Q.    Is that a yes?
24    A.    Yes, to dot head, to red neck.
```



Sung Byun

32

1    Q.   For the record, sir, what's your national
2    origin?

3    A.   I am South Korean.

4    Q.   Was there anybody in particular that you heard
5    made the comment "rice bowls"?

6    A.   Any particular person?

7    Q.   Yeah.

8    A.   Yeah.

9    Q.   Do you recall the name?

10    A.   Rich Wresneski.

11    Q.   Is he a white male?

12    A.   Yes.

13    Q.   Anyone else?

14    A.   I mean, do you want the whole list or do you
15    want --

16    Q.   I want the name of everybody you recall making
17    a racial comment in Desktop Computing during your
18    employment.  And let me stop and let me rephrase.
19    Because right now I am specifically asking you about
20    the "rice bowls" comment.

21          Do you recall specifically who made that
22    comment?

23    A.   Oh, that was just Rich Wresneski.

24    Q.   And did you understand the "rice bowl" comment

Sung Byun

33

1   to be a derogatory comment based on your national

2   origin?

3       A.   Yes.

4       Q.   And in what context did that comment come up?

5       A.   We are talking about, like, a Mustang muscle

6   car versus, like, a Japanese sports car, and they were

7   referring to the Japanese sports car as rice burners,

8   and then, you know, the "rice bowl" comment came up.

9       Q.   On how many occasions was the "rice bowl"

10  comment made?  Just an estimate, approximation?

11      A.   Five times until it was no longer funny.

12      Q.   And did you believe Richard Wresneski believed

13  that comment was funny?

14      A.   Yes.

15      Q.   And what led you to that belief?

16      A.   Because he would laugh or smirk.

17      Q.   And you made reference to the phrase "dot

18  head," and did you understand that to be a reference

19  to people of Indian national origin?

20      A.   Yes.

21      Q.   Who do you recall making a comment about dot

22  heads?

23      A.   There was a person called Sinibolla.  He is

24  probably not on our list.  I don't think he works for

Sung Byun

34

1    MBNA anymore.

2    Q.    What was his national origin?

3    A.    He was Caucasian.  I don't know his --

4    Q.    Or his race, rather?

5    A.    Right.

6    Q.    And he made the "dot head" comment?

7    A.    Yes.

8    Q.    Do you know if Mr. Eapen was present when that

9    comment was made?

10   A.    Yeah.  I am sure.

11   Q.    And did the "dot head" comment, was that made

12   on more than one occasion?

13   A.    Yeah.

14   Q.    And, again, if you can give me your best

15   estimate of the number of times you have heard that

16   comment in the workplace?

17   A.    Five times.

18   Q.    And did you ever hear Mr. Eapen referred to as

19   Osama bin Laden?

20   A.    Yes.

21   Q.    Did you hear Richard Wresneski call him Osama

22   bin Laden?

23   A.    I have different versions of Osama bin Laden,

24   but, yes, Rich.



Sung Byun

35

1    Q.    And would some of those different versions be

2    OBL, Osama bin Laden's brother?

3    A.    Yeah.

4    Q.    And would other individuals, besides Richard

5    Wresneski, use those terms?

6    A.    Yes.

7    Q.    Who else?

8    A.    Glen Ford.

9    Q.    Who else?

10    A.    Probably Tom Liddle.

11    Q.    What about Mike Broughton, did you ever hear

12    him refer to Mr. Eapen as Osama bin Laden?

13    A.    No.   I have not heard of that.

14    Q.    How about John Hartnett?

15    A.    Possibly.   They were all sitting in that same

16    row.

17    Q.    What about Bill Kennedy?

18    A.    No.   I don't recall.

19    Q.    What about Richard Wagner, did you ever hear

20    him make any -- refer to Justus Eapen as Osama bin

21    Laden or OBL or any of the derivatives?

22    A.    No.   I don't recall that.

23    Q.    So, Richard Wresneski, Glen Ford, and Thomas

24    Liddle?

Sung Byun

36

1    A.    Correct.

2    Q.    And with respect to Osama bin Laden, did those

3    comments start after the events of September 11th,

4    2001?

5    A.    Yes.

6    Q.    Prior to September 11th, 2001, did you hear any

7    employee make derogatory comments toward Justus Eapen

8    based on his national origin?

9    A.    Probably like dot head.

10    Q.    Did you hear anyone refer to Justus Eapen as

11    "BP," for brown people?  Have you heard that phrase in

12    the workplace?

13    A.    Yes.

14    Q.    And who have you heard make that comment?

15    A.    I guess that was from probably Bill Kennedy.

16    Q.    He is a white male?

17    A.    Yes.

18    Q.    And did anyone else refer to Mr. Eapen as BP?

19    A.    No, not to my recollection.

20    Q.    And did Mr. Kennedy refer to Mr. Eapen as BP on

21    a daily basis?

22    A.    Yeah.  He may have pushed it a little bit

23    longer than, you know, than to the point where, you

24    know, the funny aspect was no longer there.



Sung Byun

40

1    not a, you know, a blatant -- because I -- you know, I

2    am -- because I am, at that time, very sensitive to

3    that issue, and I would have, you know, recognized it.

4        Q.    And the reference to Mr. Eapen as Osama bin

5    Laden or OBL, things of that nature, did you know

6    whether or not comments of that nature violate MBNA's

7    harassment policy?

8        A.    At that time, because we were kind of

9    participating in the joking atmosphere of that

10   workplace, I didn't know it -- I didn't recognize it

11   as a harassment or unwanted, you know...

12       Q.    Now, do you recall an incident in which a mail

13   room clerk who was distributing mail was told that

14   Mr. Eapen was Osama bin Laden's brother?  Do you

15   recall an incident regarding that?

16       A.    Yes.

17       Q.    What do you recall about that incident?

18       A.    We have a mail boy who is -- who is, not

19   handicapped, but -- but who is a slow learner, and,

20   you know, he used to -- he started to develop -- you

21   know, deliver mail to our group.  And I remember one

22   of the guys saying that there is bin Laden's brother

23   over there in the corner, and he -- you know, he

24   became very furious.

Sung Byun

43

1    Q.    And the joking that went on in Desktop

2    Computing, was that a phrase that was used at any

3    point in time?

4    A.    No.    That's pretty, you know, that's pretty out

5    of hand.

6    Q.    And did you, at any point, report any of these

7    comments that were made to Mr. Eapen to any management

8    official at MBNA?

9    A.    No.

10   Q.    To your knowledge, did any management official

11   at MBNA become aware of the use of these comments in

12   Desktop Computing?

13   A.    I remember those couple of instances where two

14   managers made some comment.

15   Q.    And which managers were those, if you recall?

16   A.    One manager was Dave Armstrong, he did overhear

17   the BP, brown people word, and said, "Knock it off."

18   And another person was Mike McDaniel -- no.    Mike --

19   Mike -- he is one of the managers.

20   Q.    Is Mike, the Mike we are referring to, is he

21   white or black?

22   A.    He is white.    I remember him making a comment

23   or reporting something especially when the mail boy

24   came around, it was the -- it was getting out of hand.

Sung Byun

44

1    Q.   You say "the mail boy," was that the Osama bin

2  Laden, the brother incident?

3    A.   Right.

4    Q.   And with respect to that incident, just going

5  back, that took place after September 11th, 2001?

6    A.   Mm-hmm.

7    Q.   Do you recall when it took place, what month or

8  year?

9    A.   Probably, you know, a month, couple of months,

10  within that time.

11    Q.   So, it was in close proximity to the events of

12  September 11th?

13    A.   Right.

14    Q.   How is that work environment today?  Are there

15  still jokes of a racial nature or national origin or

16  religion that are told within the Desktop Computing?

17    A.   No.  No.

18    Q.   And, at a point in time, you reported to Bill

19  Davis; is that correct?  Or Bill Davis was one of your

20  superiors?

21    A.   Yes.  He was -- he was a third level.

22    Q.   And did you have any problems with Mr. Davis

23  yelling at you on occasion?

24    A.   Yeah.  He yelled at me a couple times.

