Sung Byun

45

1   Q.   And did you share this with Neela Chacko, that

2   Mr. Davis would yell at you?

3   A.   Yeah.

4   Q.   And were you of the opinion that Mr. Davis

5   would yell at you but he would not yell at other white

6   employees?

7   A.   Oh, no.   He yelled at everybody.

8   Q.   To your knowledge, was Richard Wresneski ever

9   disciplined for making racial comments in the

10  workplace?

11  A.   I know he was disciplined, but I don't know for

12  what reasons.

13  Q.   Were you ever called derogatory comments by

14  anyone in Desktop Computing?

15  A.   Yeah.   Sure.

16  Q.   What kind of comments were made toward you?

17  A.   You know, things of, like rice, you know --

18  Q.   We know there was the rice bowl comment

19  reference?

20  A.   Mm-hmm.

21  Q.   And then just rice?

22  A.   Rice.   Let me see what else.   Boy, you know,

23  now I can't think of any of these things, but I had my

24  share.

Sung Byun

48

1    was in the earlier part of 2003 or 2002 that Mr. Dell

2    told you about problems he had with Mr. Eapen's

3    performance?

4      A.   Probably the later part where -- maybe three or

5    four months before his termination.

6      Q.   And what do you recall Mr. Dell telling you

7    about Mr. Eapen's performance?

8      A.   He wasn't happy because the tasks that were

9    assigned to him didn't get done.

10      Q.   Anything else?

11      A.   Lack of communication.

12      Q.   Did Mr. Eapen ever share with you his belief

13    that Mr. Dell refused to communicate with him about

14    projects?

15      A.   Yes.

16      Q.   And what did Mr. Eapen tell you about that?

17      A.   He said that he -- that Jim Dell is withholding

18    information, that he's not giving him the right

19    information to complete his task; he is not giving all

20    the tools; he is setting up -- that he is giving, you

21    know, he can't meet his deadlines because it's

22    unreasonable deadlines and so forth.

23      Q.   And what time period did you recall Mr. Eapen

24    telling you about these problems?

Sung Byun

50

1    three, was Mr. Eapen still employed at that time?

2    A.    Yes.

3    Q.    Did you ever hear any comments, racial comments

4    toward African Americans in the workplace?

5    A.    No.   Oh -- oh, we had, in the beginning part of

6    that group, we had George Taylor sitting -- sitting

7    close to our -- our area, and we joked about -- he --

8    you know, he participated in some jokes that we were

9    joking about.

10    Q.    Is George Taylor African-American?

11    A.    Yes, he is.

12    Q.    Now, you say he participated in some jokes.

13          Were jokes made about Mr. Taylor's being

14    African-American, that you recall?

15    A.    Yeah.

16    Q.    And what kind of jokes do you recall being made

17    about Mr. Taylor being African-American?

18    A.    Like, you know, like this isn't -- I probably

19    said that this isn't like -- this isn't your ghetto or

20    something like that.

21    Q.    And in what context was that comment made?

22    A.    In a joking manner.

23    Q.    But what was it that precipitated that joke?

24    Was there any kind of conduct on Mr. Taylor's --

Sung Byun

51

1    A.    No.

2    Q.    You got to let me finish.  Was there any

3    conduct on Mr. Taylor's part that precipitated that

4    joke?

5    A.    Probably he said something like, How come all

6    Koreans have cleaners, and we probably talked about

7    ghetto and things like that.

8    Q.    And the phrase, "This isn't your ghetto," was

9    that used on more than one occasion by you?

10   A.    Yes.

11   Q.    How many times did you make that comment to

12   Mr. Taylor or anybody else?

13   A.    That was made quite frequently -- quite

14   moderately.

15   Q.    More than ten times?

16   A.    Yeah.  Probably.

17   Q.    More than 20?

18   A.    Maybe.

19   Q.    More than 100?

20   A.    No.

21   Q.    Can you give me an approximation, somewhere

22   between 20 and 100?

23   A.    20 is a good number.

24   Q.    Anybody else use that comment?  Did

Sung Byun

52

1   Mr. Wresneski or Mr. Liddle or anyone else pick up on

2   that comment and use that as well?

3     A.   Yes.

4     Q.   Did Mr. Wresneski use the comment?

5     A.   Yes.

6     Q.   Did Mr. Liddle use the comment?

7     A.   I don't recollect.

8     Q.   What about Richard Wagner, did he use the

9   comment?

10    A.   No.

11    Q.   Mike Broughton?

12    A.   No.

13    Q.   James Hartnett?

14    A.   No.

15    Q.   Bill Kennedy use the comment?

16    A.   Possibly, yes.

17    Q.   And did they also use it about 20 times a piece

18  or with what frequency?

19    A.   Yeah.  It was -- "the ghetto" became a

20  reference to our area where we, you know, it's kind of

21  like the -- the designated area for the technical

22  people who do the work.

23    Q.   It became that after -- over time?

24    A.   Yeah.  It just became -- because there is -- if

1    I can just kind of say that there is -- there were two

2    groups of people, you know, within that area, which is

3    the managers and the, we called ourselves the worker

4    bees.  And the managers had the big cubes, which was

5    probably, like, bigger than the six-by-six that I

6    mentioned, probably maybe eight-by-eight, so they had

7    the bigger cubes, so they were situated on the one

8    side of the room and then the smaller cubes were

9    situated on the other side of the rooms.  And, so,

10    those smaller cubes, you know, we started to designate

11    that as the ghetto.

12    Q.    Prior to designating the smaller cubes as the

13    ghetto, when you made the reference to Mr. Taylor that

14    this isn't your ghetto, was that a comment based on

15    the cubical size or was it based on Mr. Taylor's

16    African-American national origin?

17    A.    At that time, probably, you know, to his origin

18    because, you know, he was joking about, you know, the

19    Asian -- Asian jokes.

20    Q.    And do you have a belief that African-Americans

21    reside in the ghetto?

22    A.    No.

23    Q.    So why would you make that type of comment,

24    sir?



James A. Dell

1

```
 1          IN THE UNITED STATES DISTRICT COURT
 2             FOR THE DISTRICT OF DELAWARE
 3
 4

EQUAL EMPLOYMENT OPPORTUNITY    )
 5  COMMISSION,                      )
                                     )  Civil Action No.
 6             Plaintiff,            )  04-CV-425-SLR
                                     )
 7  v.                               )
                                     )
 8  MBNA AMERICA BANK, N.A., a       )
    subsidiary of MBNA Corporation,)
 9                                   )
               Defendant.            )
10
               Deposition of JAMES A. DELL, JR. Taken
11  pursuant to notice at the law offices of YOUNG CONAWAY
    STARGATT & TAYLOR, 1000 West Street, Wilmington,
12  Delaware, beginning at 9:00 a.m. on Tuesday, July 19,
    2005, before Renee A. Meyers, Registered Professional
13  Reporter and Notary Public.
14  APPEARANCES:
15             TERRENCE R. COOK, ESQ.
               U.S. EQUAL EMPLOYMENT OPPORTUNITY
16             COMMISSION
                 21 South Fifth Street
17               The Bourse, Suite 400
                 Philadelphia, Pennsylvania  19106-2515
18               for the Plaintiffs,
19             SHELDON N. SANDLER, ESQ.
               YOUNG CONAWAY STARGATT & TAYLOR
20               1000 West Street, 17th Floor
                 Wilmington, Delaware  19899
21               for the Defendant.
22  ALSO PRESENT:  Launice Sills, Esq.
23                  WILCOX & FETZER
        1330 King Street - Wilmington, Delaware 19801
24                  (302) 655-0477
```

**W&F**

WILCOX & FETZER LTD.
Registered Professional Reporters

James A. Dell

24

1    A.    I offered the shift to Mr. Eapen.

2    Q.    Had Mr. Eapen expressed an interest in changing

3    his shift to you prior to this time?

4    A.    No.  Because the shift actually just came

5    available.

6    Q.    Did you offer to change the shift of any other

7    of the five individuals that you supervised?

8    A.    Jason Campbell.

9    Q.    And did you offer Mr. Campbell the position

10   prior to the shift change prior to issuing it to

11   Mr. Eapen?

12   A.    It was a -- it was a first half and a second

13   half coverage of the week.

14   Q.    Explain that to me.

15   A.    Well, you would need two people to do that

16   shift, so it was offered to both of them.

17   Q.    Did they both accept it?

18   A.    Yes.

19   Q.    You didn't offer that shift to Dan Weir?

20   A.    It was offered to the group.

21   Q.    And how was it offered to the group?  Was it

22   one of the group meetings?  Was it by e-mail?

23   A.    Group meeting.

24   Q.    And tell me what you said to the group or how



James A. Dell

25

1    it was communicated that there was going to be a shift

2    change and you needed volunteers?

3      A.    Growth of the department, we need to go 24-5,

4    do any of you volunteer for a particular shift in the

5    evenings?

6      Q.    And what was Mr. Eapen's response?

7      A.    He needed two weeks to think about it.

8      Q.    Did he tell you why he needed so much time to

9    think about it?

10     A.    He needed to discuss it with his family.

11     Q.    Did Mr. Eapen advise you that he had children

12   and he had responsibilities with his children that may

13   have made it difficult for him to work that shift?

14     A.    Yes.

15     Q.    When he communicated that he had family issues,

16   he had children, that it may make it difficult for him

17   to work that shift, did you, at that point, talk to

18   another team member about perhaps taking the shift?

19     A.    I believe that's during the -- during the group

20   discussion, that's why he needed the two weeks.

21     Q.    When you asked the question during the group

22   meeting, did Mr. Eapen volunteer and say, "I will

23   consider it"?

24     A.    Yes.



James A. Dell

26

1    Q.    And did Mr. Campbell also volunteer?

2    A.    Yes.

3    Q.    Mr. Liddle didn't volunteer?

4    A.    He did not.

5    Q.    Miss Williams did not?

6    A.    She did not.

7    Q.    What about Dan Weir?

8    A.    Did not.

9    Q.    Now, how did Mr. Eapen's job responsibilities

10   change, if at all, when he went from the eight to five

11   shift to the six p.m. to the seven a.m. shift?

12   A.    He became responsible for his entire shift

13   since he was working unsupervised.

14   Q.   So, in addition to the list of responsibilities

15   you gave me a little earlier, was there anything else

16   that would be added to that list as a result of the

17   shift change?

18   A.    There would be.

19   Q.    And what added responsibilities would he have?

20   A.    Multiple site visits.

21   Q.    What else?

22   A.    Command center interaction in the evenings.

23   Q.    Anything else?

24   A.    Morning shift turnover, evening shift turnover,

W&F

James A. Dell

27

1   since he covered both.

2       Q.    Anything else?

3       A.    That's about all.

4       Q.    That's about it?

5       A.    Mm-hmm.

6       Q.    Was there a change in the level of the work

7   that Mr. Eapen had to perform between the eight to

8   five shift and the six p.m. to seven a.m. shift?  What

9   I mean by that:  Was it busier during the day than it

10  was in the evenings?

11      A.    I'd have to believe that it would be somewhat

12  busier in the evenings since Justus didn't have

13  resources to call upon, so he would be more by himself

14  in, like, for instance, server builds.

15      Q.    What do you make that statement based on, that

16  he would be busier in the evenings?

17      A.    He wouldn't have a team member to assist.

18      Q.    Did Mr. Eapen ever tell you that he did not

19  have enough work in the evenings?

20      A.    Yes.

21      Q.    Do you recall the time frame he told you that?

22      A.    I do not.

23      Q.    Do you recall how long he had been working the

24  evening shift before he told you that?

James A. Dell

28

1    A.    Roughly four months, five months.

2    Q.    What do you recall him telling you?

3    A.    He could use more work to do.

4    Q.    What did you do in response to Mr. Eapen

5    telling you that?

6    A.    I assigned him some research to do related to

7    new software initiatives that we wanted to put into

8    the Perimeter Security Network.

9    Q.    Anything else?

10    A.    That's about it.

11    Q.    Did Mr. Eapen, at any other time, complain to

12    you that he did not have enough work to do on the six

13    p.m. to seven a.m. shift?

14    A.    I only know of one instance.

15    Q.    Did you notice a change in the quality of

16    Mr. Eapen's work from the day shift to the night

17    shift?

18    A.    I did.

19    Q.    And what change did you notice?

20    A.    Some tasks were not being completed.

21    Q.    Anything else?

22    A.    No.

23    Q.    Going back to the time you asked for volunteers

24    for the night shift, you indicated Mr. Eapen told you

James A. Dell

89

1    Q.    So, just in casual conversation, "By the way, I

2    am in a Real Estate business"?

3    A.    Yes.

4    Q.    Who else was present when he said that?

5    A.    To me?

6    Q.    Yes.

7    A.    No one that I know of.

8    Q.    He told you he was also a mortgage broker?

9    A.    He did not describe that.

10    Q.    Did someone else tell you he was a mortgage

11    broker?

12    A.    Yes.

13    Q.    Who?

14    A.    Bellverie Ross.

15    Q.    Was this before or after you contacted

16    Mr. Kilmon?

17    A.    After.

18    Q.    So, at the time you contacted Mr. Kilmon, you

19    had no idea that he was a mortgage broker?

20    A.    That's correct.

21    Q.    That Mr. Eapen was a mortgage broker?

22    A.    That's correct.

23    Q.    And did Mr. Eapen ask you, solicit any business

24    from you?

James A. Dell

93

1    A.    No.

2    Q.    The next sentence reads that Jim referenced the

3    website that pertains to the mortgage business; do you

4    see that?

5    A.    Yes.

6    Q.    Were you aware of a website that pertained to a

7    mortgage business that Mr. Eapen was involved in?

8    A.    I was aware of a Real Estate website, as

9    described by Justus, that Justus was very proud of.

10   Q.    Do you recall telling Mr. Kilmon about that

11   website?

12   A.    Just that there was one.

13   Q.    And had you ever visited that website?

14   A.    No.

15   Q.    So, you really had no idea what the content of

16   that website was?

17   A.    Correct.

18   Q.    Did Mr. Kilmon ask you any other questions

19   concerning Mr. Eapen's outside business?

20   A.    No.

21   Q.    How long was your conversation with Mr. Kilmon

22   concerning Mr. Eapen's outside business?

23   A.    I don't recall.

24   Q.    More than five minutes?



1

```
 1            IN THE UNITED STATES DISTRICT COURT
 2               FOR THE DISTRICT OF DELAWARE
 3
 4
    EQUAL EMPLOYMENT OPPORTUNITY      )
 5  COMMISSION,                       )
                                      )   Civil Action No.
 6               Plaintiff,           )   04-CV-425-SLR
                                      )
 7  v.                                )
                                      )
 8  MBNA AMERICA BANK, N.A., a        )
    subsidiary of MBNA Corporation,   )
 9                                    )
                 Defendant.           )
10
                 Deposition of ERNESTO E. MARRA taken
11  pursuant to notice at the law offices of YOUNG CONAWAY
    STARGATT & TAYLOR, 1000 West Street, Wilmington,
12  Delaware, beginning at 9:00 a.m. on Thursday, July 21,
    2005, before Renee A. Meyers, Registered Professional
13  Reporter and Notary Public.
14  APPEARANCES:
15               TERRENCE R. COOK, ESQ.
                 U.S. EQUAL EMPLOYMENT OPPORTUNITY
16               COMMISSION
                    21 South Fifth Street
17                  The Bourse, Suite 400
                    Philadelphia, Pennsylvania  19106-2515
18                  for the Plaintiffs,
19               SHELDON N. SANDLER, ESQ.
                 YOUNG CONAWAY STARGATT & TAYLOR
20                  1000 West Street, 17th Floor
                    Wilmington, Delaware  19899
21                  for the Defendant.
22  ALSO PRESENT:  Launice Sills, Esq.
23                      WILCOX & FETZER
       1330 King Street - Wilmington, Delaware 19801
24                    (302) 655-0477
```



**WILCOX & FETZER LTD.**
Registered Professional Reporters

1    complaints to you concerning Jim Dell?

2       A.    Not that I recall.

3       Q.    From August, 2002, to January, '03, did

4    Mr. Eapen make any complaints to you about working on

5    the night shift?

6       A.    No.  He liked working the night shift.

7       Q.    Did Mr. Eapen ever share with you that he felt

8    isolated working on the night shift?

9       A.    He shared that he would like if there were

10   other people working night shift with him.

11      Q.    Did he use the word "isolated" or that he felt

12   alone or anything like that, that you recall?

13      A.    I am not sure that he used the word "isolated."

14   I would seem to remember that he did talk, at times,

15   he was -- he had a feeling of being alone on the floor

16   all by himself with no one else occupying the cubes.

17      Q.    Between August of '02 and January of '03, did

18   Mr. Eapen relate to you that he did not have enough

19   work to do while on the night shift?

20      A.    He related to me that he did not feel that he

21   was challenged enough with his work.

22      Q.    And do you know what he meant when he said he

23   was not challenged?

24      A.    There was a lot of work to do, but it was

20

1    A.    Server Operations Team, Neela Chacko, no, sir.

2    Q.    You do not know if he made the joke?

3    A.    Correct.

4    Q.    And did you take any notes or document the

5    complaint about the sexual joke?

6    A.    No, sir.

7    Q.    Did you share with Mr. Micek that an employee

8    had complained about a sexual joke?

9    A.    It actually was not a complaint.  It was during

10   a one-on-one and it was just one of those things that

11   I wanted to establish with the individuals.  So when

12   an individual gave me the information, I addressed it

13   immediately.

14   Q.    Did you address it with Mr. Micek at all?

15   A.    I believe so during one of my one-on-ones.

16   Q.    And did Mr. Micek give you any direction or

17   feedback as to what you should do in response to an

18   employee telling you about this sexual joke?

19   A.    Yes.  He made sure that I did the -- that I

20   done the initial thing, which was talk to the entire

21   group, which was done, and then to monitor the group

22   and make sure there was no recurrence.  And then if

23   there was a recurrence, to follow MBNA policies.

24   Q.    And did you have a sense of what you were

1  supposed to do under MBNA's harassment policy if you

2  received a complaint of harassment or you were aware

3  of harassment?

4     A.    Yes, sir.

5     Q.    And what were you supposed to do underneath

6  MBNA's policy?

7     A.    If a complaint was fielded, the procedures are

8  listed in our policy for sexual harassment and

9  harassment in general.  I believe it's 603.  We are to

10 follow through with all the steps involved.  I would

11 inform Jim Micek initially, then inform Personnel,

12 provide all the information to Personnel, and then

13 proceed with the Personnel recommendations and do all

14 the counseling and whatever else was necessary in

15 terms of documentation of paperwork.

16    Q.    Now, between the time you started in August of

17 '02 and the time this joke was reported to you, had

18 you had any training on issues of harassment or

19 discrimination at MBNA?

20    A.    I am not too sure about that time line, but I

21 did receive some education immediately after I got

22 there, and we covered sexual harassment and those kind

23 of things and what was acceptable to MBNA during the

24 officer orientation, which was the initial two-day

1    A.    Yes.

2    Q.    And do you recall when you learned of this

3    incident?

4    A.    I received a call while I was at work probably

5    between seven and 7:30.

6    Q.    In the morning?

7    A.    Yes.

8    Q.    And the call was from Information Security?

9    A.    Yes, sir.

10    Q.    Was that the first you learned of this

11    incident?

12    A.    Yes, sir.

13    Q.    What did you do in response to this phone call

14    you received from Information Security?

15    A.    I immediately proceeded to take additional

16    steps to identify exactly what had transpired.  I got

17    more information from Information Security in terms of

18    all the details.  Then got together with Jim Dell,

19    identified what transpired in terms of the PSN, which

20    is our security, PSN security network, and got

21    together with Dave Armstrong, Jake Catanzarite, and

22    Jim Dell to identify what steps we had to take next.

23    Q.    So, I want you to walk me through this.  So you

24    get off the phone with Information Security.  Do you

1  he aware of the password sharing incident?

2      A.    He was made aware by the same route as I was, I

3  believe.  I seem to recall that he got the information

4  from -- the detailed information from Information

5  Security.

6      Q.    And besides the details as related from

7  Information Security, what else did you discuss with

8  Mr. Dell during this meeting?

9      A.    The policy about sharing passwords, the process

10  involved, now that this was brought out, and what he

11  needed to do in terms of getting all the information

12  gathered into a logical sequence.

13      Q.    What particular policy did you discuss?

14      A.    The sharing passwords.

15      Q.    Were notes taken at this meeting?

16      A.    I don't recall taking any notes because I was

17  in and out for -- we had some production issues.

18      Q.    Were there production issues related to this

19  password incident or something different?

20      A.    No.    Something totally different, unrelated.

21      Q.    Was there any discussion, during this meeting,

22  of any form of discipline that Mr. Eapen may

23  experience as a result of this password sharing

24  violation?

56

```
 1      A.     No.

 2      Q.     Did he express frustration during this meeting

 3   that he believed Jim Dell was trying to get him fired?

 4      A.     No.

 5      Q.     Did he express concern at this meeting

 6   regarding any comments that employees, derogatory

 7   comments employees were calling him based on his race

 8   or national origin?

 9      A.     No.

10      Q.     That was a no?

11      A.     That's correct.

12      Q.     Now, he did discuss communication issues with

13   you or problems he was having with communicating with

14   Mr. Dell?

15      A.     No.   His statement was only that he felt that

16   communication was not optimal.

17      Q.     Communication with whom?

18      A.     With Jim Dell.

19      Q.     Did he give you any examples?

20      A.     No.

21      Q.     Did Mr. Eapen relate to you his belief that Jim

22   Dell did not respond to his e-mails?

23      A.     No.

24      Q.     Did Mr. Eapen relate to you his belief that
```

57

1    Mr. Dell did not communicate with him for a six-month

2    period concerning any business related matters?

3        A.    No.

4        Q.    Was there any discussion of the password

5    incident during this venting session?

6        A.    He addressed it in general terms.    He -- he got

7    very emotional about the fact that he firmly believed

8    that the policy was not necessary, that the DMZ was --

9    the DMZ test environment was immune to it, or it

10   should have been as an exception to it.    He really

11   felt that, I got the impression it was almost at the

12   personal level, that he felt that he was right, that

13   this -- that they should admit that he was right and

14   go on with it.

15       Q.    You said that Mr. Eapen was emotional.    What

16   led you to that belief?

17       A.    During the entire meeting, he just jumped from

18   subject to subject.    He was very -- he got very

19   emotional towards the end of it.

20       Q.    Did he cry?

21       A.    Not as someone would interpret the word "cry."

22   But I think that he was -- it was a difficult time

23   controlling his emotions.

24       Q.    Was he glassy-eyed or anything like that, like

1   on the verge of tears or anything, that you observed?

2     A.   I would characterize it as that, yes.

3     Q.   And was there anything else discussed in this

4   meeting that you haven't already told me about that

5   you can recall?

6     A.   The only thing that stuck in my mind was that,

7   at the end of the meeting, when we were done, he shook

8   my hand, he told me that he really appreciated the

9   opportunity to vent, and that he really appreciated

10  the fact that there was a sense of privacy that we

11  had, that what he told me would not leave my office.

12           He indicated he enjoyed working for the

13  team, that things had gotten better, and then he left.

14    Q.   Based on this venting session with Mr. Eapen,

15  do you believe he had raised a complaint of

16  discrimination or harassment?

17    A.   No.   I was -- again, I -- I was emphatic about

18  trying to find out more, and I told him, during the

19  meeting, that it was necessary for him to step up --

20  when he made those kind of statements, he needed to

21  provide me with all the information, and he said that

22  it was not that kind of a meeting.

23    Q.   But he did tell you he felt discriminated

24  against; he just didn't provide detail; correct?

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

EQUAL EMPLOYMENT OPPORTUNITY      )
COMMISSION,                       )
                                  )
            Plaintiff,            )
                                  )
v.                                )      Civil Action No.
                                  )        04-CV-425-SLR
MBNA AMERICA BANK, N.A., a        )
subsidiary of MBNA               )
Corporation,                      )
                                  )
            Defendant.            )

        Deposition of RICHARD LEE WEGNER, JR., taken
pursuant to notice at the law offices of Young, Conaway,
Stargatt & Taylor LLP, 1000 West Street, 17th Floor,
Wilmington, Delaware, beginning at 9:50 a.m. on Thursday,
October 6, 2005, before Robert Wayne Wilcox, Jr.,
Registered Professional Reporter and Notary Public.

APPEARANCES:

        TERRENCE R. COOK, ESQ.
        UNITED STATES EQUAL EMPLOYMENT
        OPPORTUNITY COMMISSION
          The Bourse
          21 South Fifth Street - Suite 400
          Philadelphia, Pennsylvania  19106
          for the Plaintiff,

        SHELDON N. SANDLER, ESQ.
        YOUNG, CONAWAY, STARGATT & TAYLOR LLP
          1000 West Street - 17th Floor
          Wilmington, Delaware  19801
          for the Defendant.

------------------------------------------------------
                    WILCOX & FETZER
   1330 King Street - Wilmington, Delaware 19801
                    (302) 655-0477



**WILCOX & FETZER LTD.**
Registered Professional Reporters

Richard Lee Wegner, Jr.                27

1    I was already remotely attached to the server, I fixed

2    the problem.  But at the time I was logged in using a

3    service account which was not to be used other than

4    approved maintenance upgrades -- that thing of thing --

5    which I was initially using it for.  And because I fixed

6    the problem, our information security group that has

7    built-in alarms on these servers was alerted.  They asked

8    me about it.  And I was given a first warning for it.

9        Q.    A written first warning?

10       A.    Yes.

11       Q.    All right.  You were logged into a server --

12       A.    ·Using a service account.

13       Q.    Using a service account.  Correct.

14              Were you authorized to log into a server

15   using a service account?

16       A.    Yes.

17       Q.    Were you logged into the service account using a

18   service account password?

19       A.    They all have passwords.  So yes.

20       Q.    Are those individual confidential passwords or

21   are they group passwords that anybody can access?

22       A.    Well, they're not anybody.  They're only -- these

23   passwords are only known by the group that's working on

24   the server.  So a small group of people actually would

Richard Lee Wegner, Jr.                    30

1    A.    No.

2    Q.    How long was the warning that you were put on?

3  How long was that?

4    A.    I believe it was six months.

5    Q.    Were you informed at any point that you could

6  have lost your job as a result of this violation?

7    A.    Yes.

8    Q.    Who told you that?

9    A.    The person from personnel, if it was Renee.

10    Q.    She told you that was one of the options that

11  MBNA had at their disposal in dealing with this issue?

12    A.    Yes.

13    Q.    Do you have an understanding as to why you were

14  not terminated for this security violation?

15    A.    Even though it was deemed as a security

16  violation, it wasn't really a security risk, I guess.

17  And for the most part, I was just trying to perform my

18  job.  I just chose poorly in respect to what account I

19  was using.

20    Q.    Did this incident with the service account have

21  anything to do with MBNA offering you a severance

22  package?

23    A.    No.

24    Q.    Were there any other incidents in which you were

Richard Lee Wegner, Jr.                    31

1    disciplined for while you were employed by MBNA?

2        A.    Yes.

3        Q.    What was the nature of the offense?

4        A.    I accessed somebody's e-mail without their

5    permission.

6        Q.    When did this occur?

7        A.    I believe the latter half of 2001.

8        Q.    Whose e-mail was it that you accessed?

9        A.    I don't recall his name.  He was in Dallas.  He

10   was on the IT team in Dallas.

11       Q.    So it was a male employee on the IT team in

12   MBNA's Dallas, Texas facility?

13       A.    Yes.  A better --

14       Q.    Go ahead.  I'm sorry.

15       A.    I was going to say a better description would be

16   that they're a land group there in Texas.

17       Q.    Did you know this individual?

18       A.    Yes.  I never met him in person, but I dealt with

19   him on a regular basis.

20       Q.    You knew him from your employment with MBNA?

21       A.    Yes.

22       Q.    Was there any legitimate business reason why you

23   accessed this individual's e-mail?

24       A.    It was concerning a dispute that we had, or

Richard Lee Wegner, Jr.                    51

1    A.    No.    I wouldn't say I heard it on a regular

2    basis.    Maybe two or three times at most.

3    Q.    Do you have a recollection of who used that

4    reference to an A team or W team?

5    A.    No.

6    Q.    There has been testimony in this case that the

7    area of cubicles where Mr. Eapen, Mr. Wresneski, Mr. Ford

8    Mr. Liddle and some other of the other workers sat was

9    referred to as the "ghetto."    Have you heard that term

10   used within MBNA during your employment?

11   A.    I -- yes.    I did.

12   Q.    Did you understand the "ghetto" to be the area of

13   cubicles where those individuals sat?

14   A.    Yes.

15   Q.    Who did you hear use or refer to that area of

16   cubicles as the "ghetto"?

17   A.    I believe the people that sat in those -- that

18   area.

19   Q.    Did you sit in that area?

20   A.    No.

21   Q.    How many times, if you can approximate, have you

22   heard that area referred to as the "ghetto"?    Was it

23   something on a regular basis?

24   A.    No.    Just a few times.    Two, three times.

1

```
 1              IN THE UNITED STATES DISTRICT COURT
 2                 FOR THE DISTRICT OF DELAWARE
 3
 4
    EQUAL EMPLOYMENT OPPORTUNITY     )
 5  COMMISSION,                      )
                                     )   Civil Action No.
 6              Plaintiff,           )   04-CV-425-SLR
                                     )
 7  v.                               )
                                     )
 8  MBNA AMERICA BANK, N.A., a       )
    subsidiary of MBNA Corporation,)
 9                                   )
                Defendant.           )
10
11              Deposition of NEELA B. CHACKO taken
    pursuant to notice at the law offices of YOUNG CONAWAY
12  STARGATT & TAYLOR, 1000 West Street, Wilmington,
    Delaware, beginning at 1:05 p.m. on Wednesday, July
13  20, 2005, before Renee A. Meyers, Registered
    Professional Reporter and Notary Public.
14  APPEARANCES:
15                   TERRENCE R. COOK, ESQ.
                     U.S. EQUAL EMPLOYMENT OPPORTUNITY
16                   COMMISSION
                       21 South Fifth Street
17                     The Bourse, Suite 400
                       Philadelphia, Pennsylvania  19106-2515
18                     for the Plaintiffs,
19                   SHELDON N. SANDLER, ESQ.
                     YOUNG CONAWAY STARGATT & TAYLOR
20                     1000 West Street, 17th Floor
                       Wilmington, Delaware  19899
21                     for the Defendant.
22  ALSO PRESENT:  Launice Sills, Esq.
23                   WILCOX & FETZER
           1330 King Street - Wilmington, Delaware 19801
24                      (302) 655-0477
```



Neela B. Chacko

12

1   he would say, Oh, I am not doing that well; things

2   aren't that great, that kind of answer.  I didn't

3   probe beyond that too much.

4      Q.   So, during the time period, the three-month

5   time period in 2000, which he reported to you, he made

6   no complaints of discrimination or harassment to you?

7      A.   No.

8      Q.   When he did complain to you later on in his

9   employment, did he complain to you about issues of

10  race or national origin discrimination or harassment?

11     A.   No.  I remember one incident where he

12  complained about his -- he was on vacation and he came

13  back and his monitor was gone.  And I did report that

14  to my manager.

15     Q.   Did he tell you who took the monitor?

16     A.   No.

17     Q.   Any other incidents that Mr. Eapen complained

18  to you about officially or unofficially?

19     A.   I don't remember -- if it comes, I will let you

20  know.

21     Q.   Once that three-month period in 2000 was over

22  and you no longer supervised Mr. Eapen, how frequently

23  would you see Mr. Eapen on an average week?

24     A.   He worked nights, so once in two weeks or maybe

Neela B. Chacko

19

1    term called brown people and sometimes it's referred

2    to as BP?  And I said, "Yes."  I cannot remember where

3    it came from.

4       Q.    And do you have a recollection of the person

5    that told you that, whether they were an MBNA employee

6    or not?

7       A.    I cannot remember.

8       Q.    Besides hearing this BP comment from somebody,

9    have you ever heard it yourself within the workplace

10   at MBNA?

11      A.    No, I have not.

12      Q.    Did Mr. Eapen ever complain to you or tell you

13   that employees referred to him as a dot head?

14      A.    No.

15      Q.    Have you ever heard any complaints about the

16   use of the term "rice" or "rice bowl" directed towards

17   a Korean employee?

18      A.    No.

19      Q.    Did Sung Byun ever make any complaints to you

20   about people calling him rice or rice bowl?

21      A.    No.

22      Q.    Have you ever heard of the operations section

23   of Desktop Computing referred to as the ghetto?

24      A.    Ghetto?  I -- I think I have heard it

Neela B. Chacko

20

1    mentioned, like, for example, Rich Wresneski or Glen

2    or somebody will, you know, come to see us and then

3    say, "Okay, I am going to go back to my desk in the

4    ghetto," or something like that, they mentioned.

5       Q.    You said Rich or who --

6       A.    One of those guys who sit -- all of them would

7    sit there, like Rich Wresneski.  I can't remember who

8    said it, but I think they would like, as a joke,

9    mention, Okay, you guys have bigger cubes, we have

10   smaller cubes, so we are going to go back and sit in

11   our little cubes, and they call it the ghetto area.

12      Q.    Have you heard that phrase more than one time?

13      A.    I cannot recall.

14      Q.    Have you heard of the term or section of

15   Desktop Computing referred to as the A team or the W

16   team, the "A team" for Asian team and "W team" for

17   white team?

18      A.    No.

19      Q.    And are you aware of an incident in which a

20   mail room clerk was advised that Mr. Eapen was Osama

21   bin Laden's brother and then the mail room clerk

22   attempted to attack Mr. Eapen?

23      A.    I only read it in the newspaper.  That was the

24   first I heard of it.

Neela B. Chacko

21

1    Q.    Now, did you ever hear Jim Dell make any racist

2    or derogatory comments based on anyone's national

3    origin?

4    A.    No.

5    Q.    When Mr. Eapen spoke to you about the problems

6    that he had with Mr. Dell, did he advise you that he

7    had a communication problem with Mr. Dell, that

8    Mr. Dell was not returning e-mails and things of that

9    nature?

10    A.    Not specifically.  Basically, just that he

11    wasn't getting any information out of what's happening

12    in that team because he wasn't in the meeting -- not

13    in the meetings.

14    Q.    Did Mr. Eapen tell you that he felt isolated

15    that he worked on the night shift?

16    A.    Yes, he did.

17    Q.    Now, you said, Miss Chacko, that, I believe you

18    said in 2003, you went to Distributed Systems?

19    A.    Mm-hmm.

20    Q.    Is that a yes?

21    A.    Yes.

22    Q.    What was the reason for that move?

23    A.    Because I was unhappy in the Desktop Computing

24    and I wanted a change.

Neela B. Chacko

22

1    Q.    Why were you unhappy in Desktop Computing?

2    A.    I didn't feel like I fit in there.    I didn't

3    feel like I was part of the group.

4    Q.    And what's the process you went through to

5    transfer from Desktop Computing to Distributed

6    Systems?

7    A.    I started talking to people in -- I actually

8    first approached my manager, who was Jim Micek at that

9    time, and I asked him if I could be reassigned to

10   something.    And he mentioned that they were not moving

11   people around, there was no open way of -- no job

12   postings and all that, but if I talked to somebody and

13   I found a position, that could be one way, but then we

14   will have to do a swap because he couldn't just give

15   up a position.    So, that's how I started it.

16          Then I started talking to people in other

17   areas, and I also actually made up -- set up an

18   appointment with Bob Fraser to see if he knew anybody

19   and could help me.

20   Q.    When you spoke with Mr. Micek about your desire

21   to transfer, did you inform Mr. Micek that you were

22   unhappy in Desktop Computing?

23   A.    I talked briefly about, you know, what my

24   prospects were in Desktop Computing and he mentioned

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

EQUAL EMPLOYMENT OPPORTUNITY       )
COMMISSION,                        )
                                   )
          Plaintiff,               )
                                   )
v.                                 )    Civil Action No.
                                   )    04-CV-425-SLR
MBNA AMERICA BANK, N.A., a         )
subsidiary of MBNA                 )
Corporation,                       )
                                   )
          Defendant.               )

          Deposition of RENEE CUFFEE-WILLIAMS taken
pursuant to notice at the law offices of Young, Conaway,
Stargatt & Taylor LLP, 1000 West Street, 17th Floor,
Wilmington, Delaware, beginning at 2:10 p.m. on Thursday,
October 6, 2005, before Robert Wayne Wilcox, Jr.,
Registered Professional Reporter and Notary Public.

APPEARANCES:

          TERRENCE R. COOK, ESQ.
          UNITED STATES EQUAL EMPLOYMENT
          OPPORTUNITY COMMISSION
            The Bourse
            21 South Fifth Street - Suite 400
            Philadelphia, Pennsylvania  19106
            for the Plaintiff,

          SHELDON N. SANDLER, ESQ.
          YOUNG, CONAWAY, STARGATT & TAYLOR LLP
            1000 West Street - 17th Floor
            Wilmington, Delaware  19801
            for the Defendant.

-----------------------------------------------------

WILCOX & FETZER
1330 King Street - Wilmington, Delaware 19801
(302) 655-0477



**WILCOX & FETZER LTD.**
Registered Professional Reporters

Renee Cuffee-Williams                    18

1    A.    Yes.

2    Q.    When did you first meet Mr. Eapen?

3    A.    I met him first -- I believe it was mid January

4    when Mr. Kilmon and myself met with him.

5    Q.    What year?

6    A.    2003.

7    Q.    Was this in connection with an incident in which

8    Mr. Eapen shared another employee's password?

9    A.    Yes.

10    Q.    Okay.  How did you become aware of that incident?

11    A.    I was notified by Jim Micek, the director of

12    desktop, as well as Ernie Marra.

13    Q.    Do you recall when in January you were notified

14    by Mr. Micek and Mr. Marra?

15    A.    I believe it was the 9th.

16    Q.    When they notified you, was this a phone call or

17    a face-to-face meeting?

18    A.    First it was a phone call to advise me that they

19    needed to have a meeting, and then they came over to meet

20    with me face to face-to-face.

21    Q.    On the phone call, was it both Mr. Micek and

22    Mr. Marra?

23    A.    It was just him on the phone.

24    Q.    What did Mr. Micek tell you on the phone?



1    result, he wanted to speak with me about it.  And we just

2    talked about the sharing of passwords by the two of them.

3        Q.    Did this information come from Mr. Micek or

4    Mr. Marra?

5        A.    It actually came from Mr. Micek.

6        Q.    Okay.  What did Mr. Marra say during this

7    meeting, if anything?

8        A.    For the most part, he basically listened.  For

9    the most part, Mr. Micek likes to have someone else there

10   that's in his chain of management that's familiar with

11   both of the people, to my recollection.

12       Q.    Was there any discussion during this meeting as

13   to what the next step should be from your perspective?

14       A.    Yes, it was.

15       Q.    What was discussed?

16       A.    That I would need to meet with both individuals

17   separately.

18       Q.    Was there any discussion about any potential

19   corrective action that should be distributed or given to

20   the employees as a result of this incident?

21       A.    There was discussion that there may be some level

22   of corrective action based on that violation and

23   depending upon what I would learn in the investigation.

24       Q.    Was there any discussion that the corrective

1    action may be a termination?

2        A.    No.

3        Q.    That wasn't discussed during the January 9th

4    meeting with Mr. Micek and Mr. Marra?

5        A.    Not to my knowledge.

6        Q.    Did you review the information security

7    guidelines with Mr. Micek or Mr. Marra during that

8    meeting?

9        A.    No, I did not.

10       Q.    Were they discussed at all?

11       A.    I believe some form of the guidelines was

12   discussed.

13       Q.    Did you take any notes during this meeting?

14       A.    Yes, I did.

15       Q.    What did you do with those notes?

16       A.    I put them in the file.

17       Q.    As a result of the meeting on January 9th, what

18   was the next step that you were going to take?

19       A.    The next step was I needed to -- after my meeting

20   with Mr. Micek and Mr. Marra, I then went to my boss, the

21   department manager, Tamika Sainten, just to advise her of

22   the information that I learned regarding that incident.

23       Q.    Did you call Ms. Sainten or did you go to her

24   office to advise her of what you had learned?

Renee Cuffee-Williams                    22

1    A.    I went to her office.

2    Q.    Did Ms. Sainten give you any advice as to what

3    you need to do next?

4    A.    Well, she -- we both knew what my next step would

5    be -- would be that I would need to meet with Jason.

6    Q.    Was there any discussion with Ms. Sainten about

7    the corrective action that should be taken against either

8    Mr. Campbell or Mr. Eapen as a result of this incident?

9    A.    No.

10    Q.    Was there any discussion with Ms. Sainten

11    regarding the possible termination of either Mr. Campbell

12    or Mr. Eapen in connection with this password sharing

13    incident?

14    A.    No.

15    Q.    What other action did you take on January 9th

16    after your meeting with Ms. Sainten regarding this

17    password sharing incident?

18    A.    After that I called to meet with Jason.  Well, I

19    called the manager to meet with Jason.  I wanted to find

20    out what his schedule was.

21    Q.    When you said you called the manager, who did you

22    call?

23    A.    Specifically, Ernie.

24    Q.    That was to get Mr. Campbell's schedule?

1      Q.    Was there any discussion between yourself and

2   Mr. Campbell as to the corrective action that would be

3   administered as a result of his violation?

4      A.    I advised him that he could be placed on

5   corrective action but there was no specific definitive

6   that you would be placed on corrective action.

7      Q.    Was there any discussion with Mr. Campbell about

8   being terminated as a result of this violation?

9      A.    No, there was not.

10     Q.    Who ultimately, if you know, decided what

11  corrective action Mr. Campbell should receive as a result

12  of this password sharing violation?

13     A.    After my meeting with Mr. Campbell, I went in to

14  talk with my boss, Mrs. Sainten.  And then it was

15  determined -- and I'm not -- I don't recall if we had

16  another meeting with regard to that.  But based on the

17  action of the violation, we did determine that he needed

18  to be placed on -- or he would be placed on corrective

19  action.

20     Q.    Was that a joint decision between yourself and

21  Ms. Sainten?

22     A.    I would have made a recommendation for a

23  corrective action, but, obviously, I don't have the

24  authority to say that a person is going to be put on

Renee Cuffee-Williams                    38

1   corrective action.

2       Q.   Did you recommend some form of corrective action

3   for Mr. Campbell?

4       A.   Yes.

5       Q.   What did you recommend to Ms. Sainten?

6       A.   I recommended that he be placed on a first

7   warning.

8       Q.   Am I correct that the different corrective

9   actions -- that there are verbal warnings, first

10  warnings, final warnings and then termination?

11      A.   Yes.  But there's one before that.  It's

12  re-education, then verbal, first, final and dismissal.

13      Q.   So the hierarchy of corrective action goes

14  re-education, then verbal warning, first warning, final

15  warning and then termination?

16      A.   Correct.

17      Q.   Is there any policy that dictates what level of

18  corrective action should go with the particular

19  violation?

20      A.   Yes.  We also have an information security

21  guideline.  We have a matrix that we also worked -- or

22  basically that we worked specifically with information

23  security on.

24      Q.   So as a result of this, Mr. Campbell was given a

Renee Cuffee-Williams                    40

1   Eapen?

2        A.    Yes.   Mr. Kilmon and I did.

3        Q.    Do you recall when that meeting took place?

4        A.    It was January 21st, I believe.

5        Q.    So it was the three of you -- yourself, Richard

6   Kilmon and Justus Eapen?

7        A.    Correct.

8        Q.    Did you take notes on this meeting?

9        A.    I did.

10       Q.    Are those notes part of the file?

11       A.    Yes, they are.

12       Q.    Are you aware if Mr. Kilmon took notes during the

13  meeting?

14       A.    Yes.   He did.

15       Q.    How long did your meeting last with Mr. Eapen?

16       A.    That might have been a couple of hours.

17       Q.    A couple of hours?

18       A.    Yes.

19       Q.    Did Mr. Eapen explain to you the events of

20  January 8th, 2003 when he asked Mr. Campbell for his

21  password?

22       A.    Yes, he did.

23       Q.    Besides the password sharing incident, was

24  there anything else discussed with Mr. Eapen during this

Renee Cuffee-Williams                    41

1    meeting on January 21st?

2       A.    Yes, there was.

3       Q.    What else?

4       A.    It was the conflict of interest and tardiness, as

5    well as excessive use of the phone.

6       Q.    With respect to the password sharing incident --

7    and based on your prior investigation, your conversations

8    with Mr. Campbell -- did you believe Mr. Eapen was

9    telling you the truth about what happened that particular

10   evening?

11      A.    On the password sharing incident?

12      Q.    Mm-hmm.

13      A.    Somewhat.

14      Q.    In what way do you believe Mr. Eapen was not

15   telling the truth regarding the password sharing

16   incident?

17      A.    Well, he indicated at one point that he wasn't

18   aware that, you know, he should -- he should not have

19   used Jason's Campbell.  And then when I asked him about

20   the information security guidelines, if he was aware of

21   them and if he received them, he told me he did.  And I

22   asked him, you know, what did that mean to him.  Did he

23   think that based on his violation that he should have

24   done what he did?  And he said, no, he wouldn't --

1      A.    The ones we just mentioned?

2      Q.    Conflict of interest, tardiness and excessive use

3    of the telephone.

4      A.    Correct.

5      Q.    Now, with respect to the violation of the

6    information security guidelines, is there a particular

7    provision on this piece of paper Mr. Eapen violated by

8    obtaining Mr. Campbell's password and using it?

9      A.    Yes.

10     Q.    Can you direct me to that?

11     A.    Bullet No. 2.

12     Q.    Okay.  I'm going to read it into the record, and

13   then I'm going to ask you to identify if there's a

14   particular part of that bullet that you believe Mr. Eapen

15   violated.  It says:  "User IDs and passwords are used to

16   establish accountability for activity performed on MBNA

17   computer systems, and all actions performed are the full

18   responsibility of the person who has been assigned that

19   User ID.  People are not to share their personal User ID

20   or password or use their User ID or password to log into

21   MBNA computer systems for another person.  Passwords must

22   remain confidential and should not include information

23   that can be easily guessed."

24     A.    I would say that entire bullet.

1    Q.    Okay.  It says, "User IDs and passwords are used

2    to establish accountability..."  Correct?

3    A.    That's correct.

4    Q.    With respect to this particular incident, whose

5    User ID and password was used?

6    A.    Mr. Eapen used Mr. Campbell's.

7    Q.    It goes on further to say that "...all actions

8    performed are the full responsibility of the person who

9    has been assigned that User ID."  Correct?

10   A.    That's correct.

11   Q.    So in this situation, whatever happened on the

12   MBNA computer systems would be the full responsibility of

13   Jason Campbell because he was assigned that User ID.  Am

14   I correct?

15   A.    That's correct.

16   Q.    Okay.  As part of your investigation, besides the

17   act of trying to change, I guess, accounts or passwords,

18   was there any MBNA information that was taken off of the

19   computers or disclosed to anyone else while Mr. Eapen was

20   using Mr. Campbell's User ID and password?

21   A.    Not to my knowledge.

22   Q.    The second sentence says, "People are not to

23   share their personal User ID or password..."  Did I read

24   that correctly?

1   or details in here.  And then once I was done with this

2   document, I actually forward it to my boss, Tamika

3   Sainten, for her review.

4       Q.   Okay.  You're aware that Mr. Eapen's appointment

5   with MBNA was terminated on March 26th, 2003?

6       A.   Yes.

7       Q.   Were you at all involved in the decision to

8   terminate Mr. Eapen's employment?

9       A.   No.

10      Q.   To your knowledge, was Mr. Kilmon at all involved

11  in Mr. Eapen's termination?

12      A.   Only from a recommendation standpoint in

13  presenting the facts to senior management.

14      Q.   You say from a recommendation standpoint.

15           Was it your understanding that Mr. Kilmon

16  recommended Mr. Eapen's termination from MBNA?

17      A.   My recollection from that is, once Mr. Kilmon had

18  gathered all the facts after our meeting, he then

19  elevated it to our manager, department manager, who's

20  Tamika Sainten.  That particular situation with Mr. Eapen

21  and everything that we met with him about, including my

22  piece of the password violation, was then discussed on

23  what we call a people issues conference call.

24           And the -- normally what happens on those

1      Q.    Okay.  So that's the recommendation.

2            You then have a meeting with, I think you

3    said, people issues.

4      A.    Yes.

5      Q.    Is that correct?

6      A.    Yes.  It's called biweekly people issues.  A

7    conference call.

8      Q.    Is that personnel's opportunity to inform other

9    folks at MBNA what kind of issues you've been dealing

10   with for the past two weeks?

11     A.    Yes.  What happens is that call consists of other

12   regions.  It consists of our law department -- not law

13   department -- but some of the legal attorneys, health and

14   safety services, security and then senior management of

15   personnel from all the regions.

16     Q.    When you say "all the regions," are you talking

17   about Christiana and the different buildings that MBNA

18   has here in the area?

19     A.    In the area in Delaware as well as out in

20   Hunt Valley and Cleveland.

21     Q.    Okay.

22     A.    Because that's the one time -- it's a call that

23   happens twice a week.  And it's for any issues that comes

24   up.  And the purpose of that call is to make sure that

**W&F**

Renee Cuffee-Williams                    74.

1    to discuss any issues that the regions have.

2        Q.    Are you required to run decisions as to

3    termination or discipline -- are you required to get the

4    approval of the people issues committee before it's

5    approved?

6        A.    I'm sorry.  Can you ask that question again or

7    maybe clarify it?

8        Q.    Yes.  I can try.

9            Do you have an understanding of who gives

10    the ultimate authority for termination within the area

11    you worked at in 2003?

12        A.    I'm sorry.  Can you ask that again?

13        Q.    Yes.

14            Whose decision was it to terminate

15    Mr. Eapen?  Who authorized that?

16        A.    To my knowledge, again, that dismissal required

17    several different signatures.  So it wasn't just one

18    person that authorized that particular dismissal.

19            MR. COOK:  Let's take five.  We've been

20    going for a little bit here.  Let's take five minutes.

21            (A recess was taken.)

22            - - - - -

23            RENEE CUFFEE-WILLIAMS, resumes

24

Renee Cuffee-Williams                                          88

1      A.     No.

2      Q.     Did you look into whether or not he had violated

3  information security guidelines in the past?

4      A.     What my -- what I do is I look to see if there

5  were any corrective action or any disciplinary issues at

6  all.  So not specifically around that one thing.

7      Q.     With respect to a verbal warning, without going

8  over the obvious, it's verbal.  Is there any record at

9  all that would be kept anywhere within MBNA of a verbal

10  warning?  Does personnel keep records of those things?

11      A.     Yes.  Normally for six months, because a verbal

12  warning is effective for six months.  And then it's

13  typically something that is destroyed after that.  And

14  it's a written document.

15      Q.     In January of 2003, how many investigations had

16  you conducted into violations of MBNA's information

17  security guidelines?

18      A.     I'm sorry.  Can you repeat that?

19      Q.     Sure.

20             How many investigations had you conducted

21  prior to conducting the investigation into the Jason

22  Campbell and Justus Eapen password sharing incident?

23      A.     None to my knowledge.

24      Q.     This was your first investigation into a

Renee Cuffee-Williams                                89

1    violation of MBNA's information security guidelines?

2        A.    Yes.   Because I wasn't supporting the technical

3    areas.   I was supporting the operations.

4        Q.    Since Mr. Eapen's incident and Mr. Campbell's

5    incident, have you conducted any other investigations

6    into violations of MBNA's information security

7    guidelines?

8        A.    I may have done one or two.   I don't know

9    specifically.   I can't tell who or when specifically.

10       Q.    Prior to investigating the password sharing

11   incident in January of 2003, what type of investigations

12   had you conducted at MBNA?

13       A.    Disciplinary issues involving misconduct,

14   inappropriate comments, inappropriate behavior, threats,

15   profanity, performance issues, tardiness, PTO.

16       Q.    With respect to Mr. Eapen's termination or the

17   decision to terminate Mr. Eapen, are you aware of any

18   document that exists that shows when that decision was

19   made?

20       A.    It may have been the letter that was sent to

21   Mr. Eapen advising him of the termination.

22       Q.    Right.   That letter was dated March 26th, 2003.

23             We have the corrective action report.   I

24   forget the exhibit number.

Renee Cuffee-Williams                    91

1    Q. · So based on that document, I can't really

2    determine when the decision was made to dismiss

3    Mr. Eapen.  Correct?

4    A.    That's correct.

5    Q.    Are you aware of what document would exist that

6    has that information?  I know you told me either

7    Ms. Sainten or Ms. McKeown may have that information.

8    Are you aware of any documents that would show when the

9    decision was made to terminate Mr. Eapen in addition to

10   the dismissal summary or the corrective action report?

11   A.    Actually, also what I mentioned before is there

12   are signature pages that go with this whole packet.  And

13   the last person -- I believe it would have been either

14   been Bill Esposito or maybe Lance Weaver.  Those are --

15   that is like the final signature.  When all the other

16   signatures have been received, that would say that the

17   dismissal is final.  So somewhere on when those dates --

18   when it was signed.  But most of the time, once they're

19   signed, it may take a day or two, you know, for the

20   information to be communicated to the person.

21   Q.    So there's a document with signatures on it which

22   gives the ultimate approval for termination?

23   A.    That's right.

24   Q.    So you're aware of that document?

Renee Cuffee-Williams                    92

1     A.    Yes.

2     Q.    Is there any other document that exists that

3     would show when the decision was made to terminate

4     Mr. Eapen?

5     A.    Not to my knowledge.

6     Q.    Would that signature document show when the

7     decision was made to terminate Mr. Eapen or simply when

8     it became official?

9     A.    When it became official.

10    Q.    Okay.  Are you aware of any document that would

11    show when the decision was made to terminate Mr. Eapen?

12    Any memo?  Notes?  Letters?  Anything that would show

13    when MBNA made the decision to terminate Mr. Eapen?

14    A.    Just the letter that was sent to Mr. Eapen

15    advising him of his termination.

16    Q.    Okay.  I show you what's been marked as EEOC 14

17    for identification.

18    A.    Okay.

19    Q.    Ms. Williams, I believe you testified that one of

20    the policies that Mr. Eapen violated was Policy 606.  Is

21    that correct?

22    A.    That was mentioned in the dismissal summary.

23    Q.    Are you aware of the particular provision of

24    Policy 606 that was used as the basis for terminating

```
 1              IN THE UNITED STATES DISTRICT COURT
 2                 FOR THE DISTRICT OF DELAWARE
 3
 4
    EQUAL EMPLOYMENT OPPORTUNITY       )
 5  COMMISSION,                        )
                                       )   Civil Action No.
 6              Plaintiff,             )   04-CV-425-SLR
                                       )
 7  v.                                 )
                                       )
 8  MBNA AMERICA BANK, N.A., a         )
    subsidiary of MBNA Corporation,)
 9                                     )
                Defendant.            )
10
                Deposition of RICHARD T. KILMON taken
11  pursuant to notice at the law offices of YOUNG CONAWAY
    STARGATT & TAYLOR, 1000 West Street, Wilmington,
12  Delaware, beginning at 12:35 p.m. on Thursday, July
    21, 2005, before Renee A. Meyers, Registered
13  Professional Reporter and Notary Public.
14  APPEARANCES:
15              TERRENCE R. COOK, ESQ.
                U.S. EQUAL EMPLOYMENT OPPORTUNITY
16              COMMISSION
                  21 South Fifth Street
17                The Bourse, Suite 400
                  Philadelphia, Pennsylvania  19106-2515
18                for the Plaintiffs,
19              SHELDON N. SANDLER, ESQ.
                YOUNG CONAWAY STARGATT & TAYLOR
20                1000 West Street, 17th Floor
                  Wilmington, Delaware  19899
21                for the Defendant.
22  ALSO PRESENT:  Launice Sills, Esq.
23                     WILCOX & FETZER
      1330 King Street - Wilmington, Delaware 19801
24                     (302) 655-0477
```



**WILCOX & FETZER LTD.**
Registered Professional Reporters

Richard T. Kilmon

22

1    violation of policy?

2    A.    I can be asked my recommendation.  What, you

3    know, what do I think from my investigation?

4    Q.    You are aware of a situation involving Justus

5    Eapen that arose at MBNA around 2003?

6    A.    Yes.

7    Q.    And that was a situation involving Mr. Eapen's

8    involvement in an outside business?

9    A.    I was involved in one situation with him

10   involving an outside business.

11   Q.    Prior to your involvement in that situation,

12   had you had any contact with Mr. Eapen prior to that?

13   A.    My recollection is I have never had any prior

14   contact with Mr. Eapen until January is when I talked

15   to him.

16   Q.    What was the issue that was raised to you?

17   A.    It was a performance related situation.  It had

18   to do with sleeping, tardiness, those kind of things.

19   Q.    Who raised these issues to you?

20   A.    Jim Dell.

21   Q.    How did he raise the issues?  Was it a phone

22   call?  Was it a letter?  An e-mail?

23   A.    It was a phone call.

24   Q.    What did Mr. Dell tell you?

23

1    A.    As I recall, he called and said that, you know,

2    he had this -- these issues with Justus, he wanted to

3    talk to me about them, explained what was going on.

4    And I said, Okay.  And I wanted to set up an

5    appointment with him.

6    Q.    With Mr. Dell?

7    A.    Yes.

8    Q.    How long did the phone call last?

9    A.    My recollection is it wasn't very long.  It was

10   just like a briefing.

11   Q.    Do you recall Mr. Dell raising to you his

12   suspicions that Mr. Eapen had an outside business

13   interest?

14   A.    Yes.

15   Q.    This was during that initial phone call?

16   A.    Yes.

17   Q.    Do you recall what he told you about his

18   suspicions that Mr. Eapen had an outside business

19   interest?

20   A.    He said that he had heard that Justus had a --

21   Mr. Eapen had a -- was involved in a mortgage

22   brokerage business, a personal mortgage brokerage

23   business.

24   Q.    Did he tell you anything else about his



Richard T. Kilmon

24

1   suspicions about the mortgage brokerage business?

2      A.   That he -- he thought he may have been or had

3   heard that he may have been soliciting coworkers for

4   mortgages.

5      Q.   Anything else you recall from that conversation

6   with respect to Mr. Eapen's outside business interest?

7      A.   No, sir.

8      Q.   Do you recall whether or not Mr. Dell raised to

9   you his belief that Mr. Eapen's outside business

10  interests were interfering with his work?

11     A.   Yes.

12     Q.   Do you recall Mr. Dell raising to you his

13  concern that Mr. Eapen may be using MBNA time and/or

14  equipment in connection with his outside business

15  interest?

16     A.   I know that came up, and I don't know whether

17  it was during that phone call.  I don't recall because

18  that was one of the things that, you know, we,

19  obviously, looked into.

20     Q.   Besides the sleeping and the tardiness issues,

21  was there anything specific Mr. Dell told you about

22  Mr. Eapen's work that he felt was suffering because of

23  his outside business?

24     A.   I can't recall specifically, but I know that he

Richard T. Kilmon

25

1     -- there was the issue of him sleeping while he was

2     supposed to be working.  He worked a long shift, which

3     would impact his work if that were, in fact, the case.

4     And -- but I don't recall him saying specifically that

5     he thought that that was, you know, a direct result,

6     so, I guess I don't recall.  That's the long and short

7     of that.

8        Q.   So, you have this conversation with Mr. Dell.

9              As a result of that conversation, did you

10    give Mr. Dell any instructions as to what would happen

11    next or what he should do next?

12       A.   Typically, what I do is have them send me

13    something over.  I schedule a meeting so we can sit

14    down.  That's my process and that's -- and I don't

15    recall whether he did that.  I know I did meet with

16    Mr. Dell at a later date.

17       Q.   That was the next thing you did, with respect

18    to this phone call Mr. Dell made to you, is to have a

19    sit down with him?

20       A.   I met with Mr. Dell, but I don't recall the

21    date.  I did some background things, pulled some

22    information on Mr. Eapen so that I could, you know,

23    understand who he is and where he works and what he

24    does and that kind of thing.



Richard T. Kilmon

26

1    .Q.    Let's go back to that phone call.

2              Based on the phone call Mr. Dell made to

3    you, did that trigger a formal investigation by you

4    into the allegations Mr. Dell made?

5    A.    In terms of what?

6    Q.    In terms of any violation of MBNA policy for

7    either sleeping on the job or tardiness or having an

8    outside business interest?

9    A.    Yes, sir, it did.

10    Q.    And did it trigger an investigation into all

11    three of those issues?

12    A.    Yes, it did.

13    Q.    Tell me everything you did with respect to

14    investigating the sleeping incident in which Mr. Dell

15    related to you?

16    A.    Well, when I talked to Mr. Dell, he brought up

17    about the sleeping, and I just don't, off the top of

18    my head, recall exactly what was said, but -- I don't

19    know whether he walked in on him or someone else

20    walked in and saw him sleeping.  There really wasn't a

21    whole lot to get from that, as I -- as I recall.  I

22    don't remember really getting way much into that.

23    Q.    Well, were you aware of any particular MBNA

24    policy that would have been violated if, in fact,

Richard T. Kilmon

31

1   Q.   Now, with respect to the tardiness issue raised

2  by Mr. Dell, tell me everything you did with respect

3  to that portion of the investigation.

4   A.   At that point in time, I didn't really pursue

5  the tardiness piece, as I recall.

6   Q.   Do you recall speaking with Mr. Eapen about

7  whether or not he was tardy or anything of that

8  nature?

9   A.   I don't recall, sir.

10   Q.   Do you recall pulling any time records to

11  determine whether or not Mr. Eapen was timely?

12   A.   I don't recall whether I did or not.

13   Q.   Did Mr. Dell raise to you his concern that

14  Mr. Eapen was missing or not accounted for in the work

15  environment for a period of five hours sometime in

16  2002?

17   A.   I don't recall that.  He may have, but I don't

18  recall that.

19   Q.   Now, with respect to the outside business

20  interest allegation, tell me everything you did with

21  respect to that particular investigation.

22   A.   Okay.  We spoke with Mr. Eapen about it, did

23  some research.  I found where there was a web site on

24  the computer, on-line.  I found a web site for Eapen

W&F

**WILCOX & FETZER LTD.**
Registered Professional Reporters

Richard T. Kilmon

43

1    MBNA?

2        A.    It was for clarification of that policy, yes,

3    sir, from an ethical standpoint.

4        Q.    Did Mr. Scarpitti, or anybody from the Ethics

5    Office, make a recommendation, based on what you told

6    them, whether or not there was a violation?

7        A.    Yes.

8        Q.    And what was that conclusion?

9        A.    That it was, in fact, a conflict of interest.

10       Q.    Did Mr. Scarpitti, or anybody from the Ethics

11   Office, make a recommendation as to the discipline

12   that Mr. Eapen should experience as a result of this

13   violation?

14       A.    Mr. Scarpitti doesn't make recommendations for

15   any corrective action.

16       Q.    Who would make that type of recommendation?

17       A.    My manager or higher, in Personnel or the Law

18   Department.

19       Q.    And at the time this investigation was being

20   conducted, you were managed by Rob Sorentino?

21       A.    No, sir, I was managed by Tamika Sainten.

22       Q.    And do you recall if Miss Sainten made any

23   recommendations as to the discipline Mr. Eapen should

24   experience as a result of violating MBNA's conflict of

Richard T. Kilmon

44

1    interest policy?

2      A.   No, sir.  Because -- no, sir.

3      Q.   Did you make any recommendations to

4    Miss Sainten about the discipline Mr. Eapen should

5    have?

6      A.   No, sir.

7      Q.   Did you prepare a memo or report containing

8    your findings with respect to the investigation?

9      A.   Yes, sir.

10                 (EEOC Exhibit No. 9 entitled "Personnel

11   Consultation" dated 1/21/03 was marked for

12   identification.)

13   BY MR. COOK:

14     Q.   Mr. Kilmon, I have handed you what's been

15   marked as EEOC 9 for identification.  This is a

16   Personnel Consultation.  It's dated 1/21/03.  And

17   there are initials at the top of the page, "Conducted

18   by: RCW."  Is that Renee Cuffee-Williams?

19     A.   Renee Cuffee-Williams.

20     Q.   Renee Cuffee.  Thank you.  And RTK, is that

21   you?

22     A.   Yes, it is.

23     Q.   Do you recognize the writing on this page?

24     A.   Yes, sir.

Richard T. Kilmon

54

1   document, you conducted these investigations along

2   with Mary Stafford; is that correct?

3       A.   That's correct.

4       Q.   And Mr. Ford told you that he was under the

5   impression that Justus had a mortgage business; is

6   that correct?

7       A.   That's correct.

8       Q.   And he also told you that he had heard

9   coworkers refer to that as Justus' wife's business?

10      A.   That's correct.

11      Q.   And Mr. Ford also told you that Mr. Eapen never

12  approached him to sell a mortgage; correct?

13      A.   That's correct.

14      Q.   And Mr. Ford also told you that he wanted to

15  deal with the bigger mortgage company so he didn't

16  take Justus seriously; did he tell you that?

17      A.   That's correct.

18      Q.   And Mr. Ford told you that he was aware that

19  Justus had spoken to Neela Chacko and possibly John

20  Hartnett regarding mortgages?

21      A.   That's correct.

22      Q.   Mr. Ford also told you that, one morning,

23  Mr. Eapen made a search on the Internet for him in an

24  attempt to identify better mortgage interest rates; is

Richard T. Kilmon

56

1    A.    I don't think so.

2    Q.    When Mr. Hartnett told you he heard Mr. Eapen

3    talk about mortgages in the past while in the office,

4    did you inquire as to what the nature of the

5    conversation was?

6    A.    No, sir.

7    Q.    Did you inquire to whether or not Mr. Eapen was

8    talking about mortgages that could be attained through

9    his wife?

10    A.    I don't recall.  I don't think -- I don't think

11    so.

12    Q.    But if you did, that would be contained in this

13    report, wouldn't it?

14    A.    More than likely, yes.

15    Q.    And Mr. Hartnett also says he is aware that

16    Justus' wife runs a mortgage business and he says that

17    Justus, at times, has talked about the business in the

18    first person?

19    A.    That's correct.

20    Q.    Further down, Mr. Hartnett says that Justus had

21    never approached him regarding a mortgage or ever

22    indicated that he could get him a good interest rate;

23    is that correct?

24    A.    That's correct.



Richard T. Kilmon

61

1    A.    Yes, sir.

2    Q.    Mr. McKeon indicated to you, "Brian stated that

3    Justus has brought up in previous conversations that

4    he is in the mortgage business and helps his wife, who

5    is a mortgage broker.  He said that takes from the

6    conversation that Justus is in the business with his

7    wife.  Brian indicated that, in the past, during group

8    settings, members of his team, including Justus Eapen,

9    had discussed mortgage rates because several members

10   of the team were looking for mortgages at the end of

11   2002."

12            Do you see that?

13   A.    Yes, sir.

14   Q.    He also related to you that Justus had never

15   referred him to any mortgage company; is that correct?

16   A.    Yes.

17   Q.    And that Mr. McKeon did not like to mix

18   business with his personal life, so he did not pursue

19   a mortgage through Justus?

20   A.    That's correct.

21   Q.    Brian did tell you that he had viewed that

22   Eapen.Net web site one time with Mr. Eapen and that

23   the purpose of that visit was for Mr. Eapen to show

24   Brian his profile and how his stocks update

Richard T. Kilmon

62

1    automatically; correct?

2      A.   That's not what that says, sir.

3      Q.   "Justus said he wanted to show Brian his

4    profile and how his stocks updated automatically"; did

5    I read that correct, that sentence?

6      A.   The first part.  You said "one time."  It

7    doesn't say "one time."

8      Q.   I will read the sentence for the record.  We

9    are at the fourth paragraph of this memo.  "Brian had

10   viewed Justus' web site, Eapen.Net, with Justus once";

11   correct?

12     A.   That's correct.

13     Q.   Did Mr. McKeon tell you that he viewed Justus'

14   web site on his own?

15     A.   No.

16     Q.   And based on your interview with Mr. McKeon,

17   did you conclude that Mr. Eapen had violated MBNA's

18   policy on conflict of interest?

19     A.   Yes.

20     Q.   And besides Miss Stafford, who else saw these

21   internal memorandums that are marked EEOC 11?

22     A.   My manager.

23     Q.   Is that Miss Sainten?

24     A.   Miss Sainten.  And then our consistency person,

Richard T. Kilmon

68

1  level of dismissal because of the significance of the

2  issues based upon our investigation and reviewing the

3  policies.

4            So, we, you know, were discussing what the

5  recommendation should be.

6  Q.   And do you have a recollection as to whether --

7  first of all, when you met with Miss Sainten

8  concerning termination, was Miss Stafford or

9  Miss Williams involved in that discussion as well?

10 A.   Renee may have been there.  Mary may have been

11 there.  Mary was -- Mary Stafford was new to the

12 People Relations Team, and she was there to, you know,

13 see how we do things.

14 Q.   And do you have a recollection as to who first

15 brought up the issue of termination, whether it was

16 yourself, Miss Stafford, Miss Williams, or

17 Miss Sainten?

18 A.   No, sir.  I don't recall who brought up

19 dismissal.  Mrs. Stafford wouldn't have because, as I

20 said, she was new and had not been involved in these

21 kinds of issues as of yet.  This, I believe, was one

22 of the first major issues she was actually working on.

23 Q.   And regardless of who brought up the issue of

24 termination, did anyone have any objections to the

Richard T. Kilmon

76

1       Q.      I have handed you what's been marked as EEOC 15

2    for identification.

3               Have you seen this document before?

4       A.      Yes, sir.

5       Q.      And this is an Ethics Inquiry; is that correct?

6       A.      Yes, sir.

7       Q.      And who prepares this document?

8       A.      Alfred Scarpitti, the ethics person for the

9    company.

10      Q.      And in the summary portion of this document,

11   the last sentence of the first page says, "Writer

12   advised Rich and Tamika."

13              Was that yourself and Miss Sainten?

14      A.      That's correct.

15      Q.      "That, by policy, this was definitely a

16   conflict, and the person should be offered a choice of

17   either continuing with the bank and dropping his

18   personal business or vice versa."

19              Do you see that?

20      A.      Yes.

21      Q.      Was Mr. Eapen offered a choice of dropping his

22   personal business and staying with the bank?

23      A.      No, sir.

24      Q.      And do you --

Richard T. Kilmon

99

1          The Personnel senior management would make

2    the recommendation based upon the presentation at the

3    time of the call.  And even though they give that

4    recommendation, I think it's only fair to tell you

5    that even though they do that, once it's written and

6    sent up and approved or reviewed, it may not occur.

7    So, it may be changed.

8      Q.    So it is exactly that; it's a recommendation?

9      A.    It's a recommendation.

10     Q.    And during that presentation of facts, do you

11   recall any discussion as to whether or not the option

12   of offering Mr. Eapen the option of dropping the side

13   business was discussed?

14     A.    I don't think that -- my recollection is no.

15     Q.    That was not discussed?

16     A.    Because there was a recommendation of

17   dismissal.

18          MR. COOK:  I don't have any further

19   questions.

20   BY MR. SANDLER:

21     Q.    I have a few.

22     A.    Okay.

23     Q.    Do you have EEOC 11?

24     A.    I got EEOC everything.  I got a lot of things.

```
 1           IN THE UNITED STATES DISTRICT COURT
 2              FOR THE DISTRICT OF DELAWARE
 3
 4
   EQUAL EMPLOYMENT OPPORTUNITY      )
 5 COMMISSION,                       )
                                     )   Civil Action No.
 6            Plaintiff,             )   04-CV-425-SLR
                                     )
 7 v.                                )
                                     )
 8 MBNA AMERICA BANK, N.A., a        )
   subsidiary of MBNA Corporation,   )
 9                                   )
              Defendant.             )
10
11           Deposition of BRIDGET C. WILLIAMS pursuant
   to notice at the law offices of YOUNG CONAWAY STARGATT
   & TAYLOR, 1000 West Street, Wilmington, Delaware,
12 beginning at 9:05 a.m. on Tuesday, August 2, 2005,
   before Renee A. Meyers, Registered Professional
13 Reporter and Notary Public.
14 APPEARANCES:
15           TERRENCE R. COOK, ESQ.
             U.S. EQUAL EMPLOYMENT OPPORTUNITY
16           COMMISSION
                21 South Fifth Street
17              The Bourse, Suite 400
                Philadelphia, Pennsylvania  19106-2515
18              for the Plaintiffs,
19           SHELDON N. SANDLER, ESQ.
             YOUNG CONAWAY STARGATT & TAYLOR
20              1000 West Street, 17th Floor
                Wilmington, Delaware  19899
21              for the Defendant.
22 ALSO PRESENT:  Launice Sills, Esq.
23                   WILCOX & FETZER
      1330 King Street - Wilmington, Delaware 19801
24                   (302) 655-0477
```

Bridget C. Williams

13

1    A.    No, I am not.

2    Q.    Now, what about the production environment, are

3    you aware of any password, personal passwords being

4    exchanged amongst any MBNA employee in the production

5    environment?

6    A.    Yes.

7    Q.    What are you aware of?

8    A.    On one occasion -- are you talking about myself

9    or just in general?

10    Q.    Let's talk in general.  Are you aware of any

11    instance in which an MBNA employee -- again, we are

12    not talking about you right now -- are you aware of

13    any instance in which an MBNA employee shared or

14    exchanged their password with someone else in the

15    production environment?

16    A.    No, I am not.

17    Q.    Are you personally aware of any instance in

18    which you shared your password or someone asked you

19    for your password?

20    A.    Yes.

21    Q.    Can you tell me about that?

22    A.    It was late one night, Jim Dell called me and

23    asked me -- told me that he was -- we were having a

24    production issue and he had went over to the DFO to



Bridget C. Williams

14

1    get into the system and his account was locked out.

2    Q.    And what did Mr. Dell ask you?

3    A.    For my password so that he can get into the

4    system.

5    Q.    And did he ask you for your personal password?

6    A.    Yes.

7    Q.    And this was a phone call from Mr. Dell to

8    yourself; is that correct?

9    A.    Yes.

10   Q.    Was anybody else on the phone call?

11   A.    No.

12   Q.    And the explanation Mr. Dell gave you as to why

13   he needed your password is that he had been locked out

14   of his account?

15   A.    Yes.

16   Q.    Did he tell you why he was locked out of his

17   account?

18   A.    No.  He must have forgotten his password.

19   Q.    Do you know why he called you, as opposed to

20   another employee, for the password?

21   A.    No.

22   Q.    Did he tell you he had called anybody else to

23   ask them for their password?

24   A.    I don't remember.

