Bridget C. Williams

15

1    Q.    Do you recall the time frame in which this

2    happened or what -- in terms of was it 2002?  2003?

3    What year it was?

4    A.    It was shortly after I had gotten there, so --

5    I don't think I had been there a year.

6    Q.    Sometime in 2001 or 2002?

7    A.    Yes.

8    Q.    And did you give Mr. Dell your password?

9    A.    Yes.

10    Q.    What else do you recall from that conversation

11    in which Mr. Dell called you sometime in 2001 or 2002

12    and asked you for your password?

13    A.    Nothing else.

14    Q.    How long was that conversation you had with

15    Mr. Dell?

16    A.    A couple minutes.

17    Q.    Did you have any other discussions with

18    Mr. Dell after that particular evening concerning the

19    exchange of passwords?

20    A.    No.

21    Q.    Did Mr. Dell ever advise you it was against

22    MBNA policy to share your password?

23    A.    No.

24    Q.    Were you ever disciplined for giving Mr. Dell

Bridget C. Williams

16

1    your password that evening?

2      A.    No.

3      Q.    And this was just, just to be clear, this

4    happened in the production environment?

5      A.    Yes.

6      Q.    Did you tell anyone else that Mr. Dell had

7    asked you for your password, any other MBNA employee?

8      A.    No.

9      Q.    Did Mr. Dell ask you to keep it confidential

10   that he was asking you for your password?

11     A.    No.

12     Q.    On any other occasion, besides this incident in

13   2001, 2002, did Mr. Dell ask you for a password?

14     A.    Not that I recall.

15     Q.    Did you have to change your password after

16   giving it to Mr. Dell?  Did you have to get a new

17   password?

18     A.    Yes.

19     Q.    And how do you change a password?  Is that

20   something you do as a PC specialist, or does someone

21   in Information Security have to change that for you?

22     A.    The system prompts you every 30 days to change

23   your password.

24     Q.    And, so, as a result of sharing your password

Bridget C. Williams

17

1   with Mr. Dell, did you change your password

2   immediately or did you wait for the expiration of the

3   30-day period?

4      A.   I don't recall.

5      Q.   Are you clear, Miss Williams, that Mr. Dell

6   called you at home and asked you for your personal

7   password in the production environment in 2001, 2002?

8      A.   Yes.

9      Q.   And did any other manager ever ask you to give

10  them your password for any reason?

11     A.   No.

12     Q.   Mr. Dell has denied that he called you and

13  asked you for your password.

14          Would he be lying about that incident?

15     A.   Yes.

16     Q.   Besides what you testified to about the

17  incident, the password sharing incident with Mr. Dell,

18  are you aware of any other incident in which any

19  employee of MBNA exchanged their password with another

20  employee for any purpose?

21     A.   Uh-uh.  No.

22     Q.   Now, within the Desktop Computing section, were

23  you seated near Justus Eapen?

24     A.   Yes.

Bridget C. Williams

38

1    A.    He signed the form right there in his office.

2    Q.    So, you were able to take the course, but you

3    had to go beyond your supervisor to the next level of

4    management to get permission; is that correct?

5    A.    The next two levels, yes.

6    Q.    The next two levels.

7              Did you have any other conversations with

8    Mr. Dell concerning this security course in New York

9    after your conversation with Mr. Micek?

10   A.    No.

11   Q.    Do you know if Mr. Micek spoke with Mr. Dell

12   about Mr. Dell's refusal to sign the paperwork?

13   A.    I am sure he did.

14   Q.    But neither Mr. Micek nor Mr. Dell spoke with

15   you concerning this educational opportunity once

16   Mr. Micek signed the form; is that correct?

17   A.    Mm-hmm.

18   Q.    You have to answer verbally?

19   A.    Yes.

20   Q.    Now, explain to me your meeting with Mr. Marra

21   concerning the upgrading application and the access

22   you needed?

23   A.    After I was up against opposition with

24   Mr. Dell, I went into Mr. Marra's office -- I am not

Bridget C. Williams

39

1  exactly sure if we had a one-on-one set up or whether

2  it was an initial -- whether I initiated a meeting

3  with him, but I told him, I said, "I don't know what

4  his problem is.  I don't know if it's because of my

5  race or because of my gender, pick one, I really don't

6  care, but he needs to stop."

7  Q.    Do you specifically recall telling Mr. Marra

8  that you believed whatever the problem you had with

9  Mr. Dell may have been based on either your race or

10 gender?

11 A.    Yes.

12 Q.    How did Mr. Marra respond to that?

13 A.    He sort of brushed it off.  He was like, you

14 know --

15 Q.    Did Mr. Marra tell you that he would contact

16 somebody, a Personnel specialist or someone from H.R.

17 to deal with that issue?

18 A.    No.

19 Q.    Do you know if he ever contacted anybody from

20 Personnel or H.R. to deal with that issue?

21 A.    I don't know if he contacted anyone.

22 Q.    And when you say he kind of blew it off, did he

23 verbally respond to you in any way when you told him

24 it was because of your race or gender?

Bridget C. Williams

40

1    A.    I am sorry.  Say that again.

2    Q.    Sure.  You said he kind of blew it off when you

3    told him it was because of your race or gender?

4    A.    Yes.

5    Q.    Do you recall --

6              MR. SANDLER:  I think she said "brushed it

7    off."

8              MR. COOK:  I am sorry, did I say blew it

9    off?

10              MR. SANDLER:  Yes, you did.

11    BY MR. COOK:

12    Q.    When he brushed it off, did he make any verbal

13    response to you concerning your belief that Mr. Dell's

14    action was based on your race or gender?

15    A.    I am sorry.  There was just too much going on.

16    You want to know --

17    Q.    That's okay.  I will see if I can get your

18    attention.

19    A.    Okay.  All right.  One more time, please.

20    Q.    No problem.  Concerning your conversation with

21    Mr. Marra, you indicated you told him you didn't know

22    what his problem was, you didn't know if it was

23    because of your race or your gender?

24    A.    Correct.

Bridget C. Williams

41

1    Q.    And then you indicated that he sort of brushed

2    it off.

3    A.    Yes.

4    Q.    Did he give you any verbal response when you

5    said you believed it was because of your race or

6    gender?

7    A.    No.  He -- he, basically, just skipped over it,

8    sort of laughed, as he usually does, and turned it

9    into some military term, some business --

10   Q.    What do you mean when you said "turned it into

11   some military term"?

12   A.    No.  He spoke as if he was still in the

13   military.  So the scenario he gave me of explaining,

14   you know, why things were the way they were, just was

15   not relevant to my issue.

16   Q.    Do you believe he took your allegation that it

17   may have been race or gender seriously?

18   A.    No.

19   Q.    And what time frame do you recall going to

20   Mr. Marra regarding the access issue and your

21   complaint of race or gender discrimination?

22   A.    It was shortly after the security course.

23   Probably in like January or February of the following

24   year.

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

EEOC,                              )
                                   )
     Plaintiff,                    )
                                   )
     v.                            )  C.A. No. 04-CV-425-SLR
                                   )
MBNA AMERICA BANK, N.A.,           )
a subsidiary of MBNA               )
Corporation,                       )
                                   )
     Defendant.                    )

          Deposition of RICHARD A. WRESNESKI taken
pursuant to notice at the law offices of Young Conaway
Stargatt & Taylor, LLP, The Brandywine Building,
17th Floor, 1000 West Street, Wilmington, Delaware,
beginning at 1:40 p.m., on Wednesday, October 12, 2005,
before Kimberly A. Hurley, Registered Merit Reporter and
Notary Public.
APPEARANCES:

          TERRENCE R. COOK, ESQUIRE
          UNITED STATES EEOC
             21 South Fifth Street
             The Bourse - Suite 400
             Philadelphia, Pennsylvania 19106-2515
             for the Plaintiff

          SHELDON N. SANDLER, ESQUIRE
          YOUNG CONAWAY STARGATT & TAYLOR, LLP
             The Brandywine Building - 17th Floor
             1000 West Street
             Wilmington, Delaware 19801
             for the Defendant

ALSO PRESENT:

          LAUNICE P. SILLS
          MBNA

               WILCOX & FETZER
   1330 King Street - Wilmington, Delaware 19801
               (302) 655-0477



Richard A. Wresneski                                    66

1      A.      Doesn't even ring a bell.

2      Q.      There's also been testimony in this case from

3  Mr. Byun that he heard you refer to Justus Eapen as

4  Osama Bin Laden.  Do you agree with Mr. Byun's statement?

5      A.      Not entirely true, no.  We were joking with

6  Justus.  He was involved.

7      Q.      Tell me what you recall about the

8  Osama Bin Laden comment made toward Justus Eapen.  Tell me

9  what you recall.

10     A.      A challenged mailroom person used to come up.

11 He was the type to read the news, interpret it his own

12 way, and come up with fantastic stories based off the

13 news.  Weeks before then Vice President Gore conceded to

14 George Bush.  He was walking around saying that Gore

15 ceded.  Telling everybody about it.  And he talked WWF.

16 We talk Osama Bin Laden.  We will talk all that stuff.

17 I'd say Robert had fun.  We had fun.

18     Q.      Robert is the name of the mailroom clerk that's

19 learning-disabled.

20     A.      Yes, sir.  The Osama Bin Laden wasn't ever

21 Justus Osama Bin Laden.  It was Justus was

22 Osama Bin Laden's brother to get Robert roweled up, and he

23 played along with it.  I was not the one that made the

24 comment.  I can't remember the exact person, but I was

1   involved in the conversation.

2                   MR. SANDLER:  Just to clarify, you said "he

3   played along with it."  Who's "he"?

4                   THE WITNESS:  Justus and Robert.  Justus

5   never spoke up and said anything, and Robert just played.

6   Being Robert.

7        Q.    Do you recall when that incident happened with

8   the mailroom clerk and Mr. Eapen?

9        A.    As far as --

10       Q.    In terms of --

11       A.    -- discussion?

12       Q.    In terms of a year or month, was it in 2001,

13   2002?  Do you recall when that happened?

14       A.    It was enough after 9/11 that people just

15   started talking about it.  So was it early 2002?  I don't

16   know exactly.

17       Q.    You said that Robert played along with it.  What

18   did he do to play along with it?  What kind of conduct did

19   he display that made you believe he was playing along with

20   it?

21       A.    He was laughing and basically saying oh, you're

22   his brother, how's he doing, this and that.  I believe

23   something along those lines.

24       Q.    Did you observe Robert try to assault or attack

Richard A. Wresneski                 68

1   Mr. Eapen after learning or being told that he was

2   Osama Bin Laden's brother?

3       A.    I don't believe it happened that day.  I didn't

4   hear about that incident until it was in the newspapers a

5   year or two later.

6       Q.    So at the time it happened and you were present,

7   you didn't observe Robert make any motions toward

8   Justus Eapen?

9       A.    Absolutely not.

10      Q.    What do you recall Robert saying to

11  Justus Eapen, if anything?

12      A.    I don't believe he said anything.  I mean, other

13  than playing along and saying oh, you're his brother, hi,

14  and things like that.  Messing around in that sense.

15      Q.    You said Justus played along with it.  What gave

16  you the belief that he played along with this joke?

17      A.    He was laughing and playing along with it.  It

18  wasn't a shake my head and kind of play along with it just

19  to appease the people there, or it wasn't a protest to it

20  being said.  It was Justus being Justus and having a good

21  time.

22      Q.    Was there any discussion with Mr. Eapen

23  beforehand that Robert was going to be told that he was

24  Osama Bin Laden's brother?

Richard A. Wresneski                    69

1      A.     I believe it just came up somewhere in the

2   context.   Probably Robert brought a story in about

3   Osama Bin Laden or something along those lines.

4      Q.     There's been testimony that the individuals that

5   were involved with that were yourself, John Hartnett,

6   Tom Little, and Glenn Ford.

7              Does that sound like who was present for

8   this particular incident?

9      A.     That's the set of cubes.   Robert would come over

10  and talk to John and Glenn every day about WWF or the news

11  or whatever.

12     Q.     There's also been testimony that it was

13  Glenn Ford who told Robert that Justus Eapen was

14  Osama Bin Laden's brother.   Is that your recollection?

15     A.     I'm not sure who was the first to say it.

16     Q.     It was said by more than one person?

17     A.     It was repeated, I think.

18     Q.     Did you repeat it?

19     A.     Don't recall.   I was involved in the fact that I

20  was standing up and discussing things with those guys when

21  Robert came up.

22     Q.     In addition to referring to Justus Eapen as

23  Osama Bin Laden's brother, did you ever hear him referred

24  to as OBL, short for Osama Bin Laden?

Richard A. Wresneski

70.

1      A.    I believe that followed.

2      Q.    Was that within the context of the incident with

3   the mailroom clerk or at other points in time?

4      A.    Yeah.  It was mostly involved with the Robert

5   thing.  I'm struggling to think of an instance outside of

6   that context.

7      Q.    Is it your testimony that you have only heard

8   Mr. Eapen referred to as Osama Bin Laden,

9   Osama Bin Laden's brother, or OBL on the one occasion in

10  which Robert, the learning disabled mailroom clerk, was

11  involved?

12     A.    Like I said, I don't remember him ever being

13  called Osama Bin Laden.  The other two I have.  And I

14  believe I did hear it after the original -- that original

15  day.

16     Q.    After the mailroom clerk incident?

17     A.    Uh-huh.

18     Q.    How many other times have you heard Mr. Eapen

19  referred to as either Osama Bin Laden's brother or OBL, if

20  you can just give me an estimate?

21     A.    I'm trying to think of specifics so I'm

22  absolutely positive.  I'd have to guess and say probably

23  half dozen times.  But usually in a jocular context.

24     Q.    Did you ever hear Glenn Ford make the comment or

Richard A. Wresneski                                    72

1        A.      Absolutely.

2        Q.      Have you ever heard Mr. Eapen referred to as a

3    nigger?

4        A.      No.

5        Q.      Have you ever heard that phrase in the workplace

6    during your employment at MBNA?

7        A.      No.

8        Q.      Have you ever heard Mr. Eapen referred to as

9    Saddam Hussein?

10       A.      No.

11       Q.      Or Saddam Hussein's brother?

12       A.      No.

13       Q.      There's been testimony in this case that the

14   cubicles in Desktop Computing where you sat and others sat

15   were referred to as the ghetto.  Have you heard that

16   phrase used in reference to Desktop Computing?

17       A.      I coined it.

18       Q.      What was the basis for your coining that area a

19   ghetto?

20       A.      The vice presidents and the people that made

21   more money sat on the opposite side of the room, and we

22   sat within the elbow joint of the cubicle farm away from

23   essentially the money of the organization.

24       Q.      Any other reasons you referred to it as ghetto?

Richard A. Wresneski                                    73

1      A.    No.   Absolutely not.

2      Q.    Did that kind of catch on and everyone in that

3   area started referring to it as the ghetto, to your

4   knowledge?

5      A.    The general group around me, yeah.   People

6   outside of it probably were aware that we called it that.

7   It was not necessarily a high-light area.   It was a well

8   traffic area.   Just kind of set aside, like I said, from

9   money -- the money-makers, per se.

10     Q.    When did you coin that phrase, if you recall, in

11  terms of 2002, 2001?

12     A.    It was Christiana Center 4.   So it was before we

13  moved to 3.

14     Q.    Once you moved to 3, did the conditions change

15  such that you didn't refer to the area in which you sat as

16  a ghetto or did that carry over?

17     A.    No, it didn't carry.   Honestly, I'm curious why,

18  because management still sat in the one room and the

19  bigger cubes.   Maybe it was just spread out as opposed to

20  being surrounded by people in management.

21     Q.    So the same kind of system that existed in

22  Christiana 4 that led you to coin the phrase also existed

23  in Christiana 3, but you don't believe the phrase got

24  picked up once you moved?

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

B-00151

# CHARGE OF DISCRIMINATION

| | AGENCY | CHARGE NUMBER |
|---|---|---|
| This form is affected by the Privacy Act of 1974; See Privacy Act Statement before completing this form. | ☐ FEPA<br>☒ EEOC | 170A300836 |

DDOL Labor Law Enforcement Section    PHILADELPHIA, D. and EEOC
*State or local Agency, if any*

03 MAR -6 AM 10: 03

| NAME *(Indicate Mr., Ms., Mrs.)* | HOME TELEPHONE *(Include Area Code)* |
|---|---|
| Mr. Justus D. Eapen | (410) 459-0808 |

| STREET ADDRESS          CITY, STATE AND ZIP CODE | DATE OF BIRTH |
|---|---|
| 141 W. Heather Road, Bel Air, MD 21014 | 02/08/1968 |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME *(If more than one list below.)*

| NAME | NUMBER OF EMPLOYEES, MEMBERS | TELEPHONE *(Include Area Code)* |
|---|---|---|
| MBNA-America | Cat A (15-100) | (800) 441-7048 |

| STREET ADDRESS          CITY, STATE AND ZIP CODE | COUNTY |
|---|---|
| 1000 Samossett Drive, Wilmington, DE 19884 | 003 |

| NAME | TELEPHONE NUMBER *(Include Area Code)* |
|---|---|
| | |

| STREET ADDRESS          CITY, STATE AND ZIP CODE | COUNTY |
|---|---|
| | |

CAUSE OF DISCRIMINATION BASED ON *(Check appropriate box(es))*

☐ RACE  ☐ COLOR  ☐ SEX  ☐ RELIGION  ☒ NATIONAL ORIGIN
☐ RETALIATION  ☐ AGE  ☐ DISABILITY  ☐ OTHER *(Specify)*

| DATE DISCRIMINATION TOOK PLACE | |
|---|---|
| EARLIEST | LATEST |
| 03/02/2000 | 01/21/2003 |
| ☒ CONTINUING ACTION | |

THE PARTICULARS ARE *(If additional space is needed, attach extra sheet(s)):*

I was hired as a Senior PC Technician in February 2000. Since on or around March 3, 2000, I have been discriminated against because of my national origin. I have received a progressive demotion in responsibilities, even though I was promoted once and received two excellent performance reviews. I did not get the opportunity to provide reasonable explanations when I was interrogated about my work.

I have been harassed by co-workers and Jim Dell with ethnic jokes and comments. I have been referred to as a "sand nigger" and am constantly referred to as "Osama Bin Laden" or "Osama Bin Laden's brother". This happened to such a degree that my nickname became "OBL". Approximately 6 months ago, when the learning-disabled mailroom clerk came into our area, my co-workers told him that I was Osama Bin Laden's brother. The clerk believed them and attempted to attack me. My co-workers stopped him in time, but they all thought it was a big joke. I complained about this OBL harassment and Jim Dell told me to stay away from my co-workers. Any employee of color is an island there because ethnic jokes and comments are tolerated and condoned.

My direct supervisor, Jim Dell, Assistant Vice President, set me up to be on last and final warning and possible dismissal. He did not have the common courtesy to talk to me or reply to my emails for almost six months. I reported this in writing multiple times to Bellverie Ross, Sr. VP for Desktop Computing. Mr. Dell took much pleasure in changing

## ** Text is Continued on Attached Sheet(s) **

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or telephone number and cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY - *(When necessary for State and Local Requirements)* |
|---|---|
| I declare under penalty of perjury that the foregoing is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |
| | SIGNATURE OF COMPLAINANT |
| 03-06-03 | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE |
| Date          Charging Party *(Signatu...)* | *(Month, day and year)* |

EEOC FORM 5 (Rev. 07/99)                    B-00152

FILE COPY          0000000177

Mar  6 10:16 2003  CP Initials ⟨VDE⟩  Chg # 170A300836, Attachment Page 1
                                    PHILADELPHIA, D.C.
-------------------------------------------------03 MAR -6 A 10: 03----------
Equal Employment Opportunity Commission
Form 5 - Charge of Discrimination, Additional Text
---------------------------------------------------------------------

my shcedule on short notice and having me make child care arrangements,
only to revert my schedule back to the original schedule.  Mr.  Dell
authorized someone to take my equipment away from me after I worked on
weekends.  I was not reimbursed for exam fees or PAL lunches as other
employees were.  If a task I am assigned to is not completed, it becomes
a critical event.  However, if the same taks assigned to a white
employee does not get done, it is never a problem.  Mr.  Dell never
approved a class I requested to improve my skill level, while the
requests of white co-workers were always approved.  He made it a point
not to disclose critical information to me so that when he was away it
appeared that I was incompetent.  He took credit for projects that I
worked on exclusively such as SSH/VNC remote administration.  All the
white employees were trained on Windows 2000; myself and a black
employee, Bridget Williams, were the only ones not trained.  Mr.  Dell
consistently and deliberately took steps to make it appear that I was
stupid and incompetent.  On January 22, 2003, I was placed on "First &
Final Warning", which I never received in writing per company policy.

I am forced to accept the blame for problems created by white co-workers
or superiors.  On two separate occasions Rich Wegner, Assistant VP,
ordered me to delete the log files and reboot the machine.  I told him
this was not the right thing to do, but he ordered me to do it anyway.
When the machines would not come back up, I was blamed both times for
the machines being down.  Mr.  Wegner never accepted the blame or even
told anyone that he had had something to do with it.  When our LAN
Coordinator visited from Canada and was introduced to me for the first
time, he immediately identified me as the one who "created the massive
problem by deleting the log files".  Everyone laughed at this.

It is impossible for me to be taken seriously as a professional and be
given credit for my work, my ideas and my achievements in this
environment where I am being so disrespected.  When I complained about
employees tampering with my equipment, Mr.  Dell told me that I am
looked upon as "foolish" for complaining.  One of my co-workers, Dan
Weir, who has the same job title I do, has Mr.  Dell's approval to
assign work to me and Bridget Williams (BF).  Even though I have worked
with Mr.  Weir for 3 years, he continually deliberately refuses to spell
my first name correctly (Justac, Justis or Justice) despite my repeated
corrections to him.

I believe I am being discriminated against because of my national
origin/Indian because I am being harassed and treated differently than
similarly-situated white employees.

0000000178

RECEIVED IN CCHSS
MAR 06 2003

**Justus Daniel Eapen**

| | |
|---|---|
| **From:** | "Justus Daniel Eapen" <eapen@eapen.net> |
| **To:** | "Dell, Jim" <Jim.Dell@MBNA.COM> |
| **Cc:** | <Jim.Micek@mbna.com>; "Chacko, Neela" <Neela.Chacko@mbna.com>; <Renee.CuffeeWilliams@mbna.com>; <Doug.Denton@mbna.com>; <Anne_Butler@MBNA.COM> |
| **Sent:** | Friday, February 21, 2003 12:23 PM |
| **Subject:** | My employment at MBNA. |


**DEPOSITION EXHIBIT**
Eapen 10
Roussle 4-4-05

Dear Mr. Jim Dell:

This communication is to specifically address the password sharing incident that lead to the recent abhorrent interrogation by personnel department during my tenure working as a direct report to you.

I am convinced that the task assigned to me during the night of the alleged incident is a direct result of your desire to frame me and sabotage my career with MBNA. In your unrelenting efforts to derail my enthusiasm and esteemed regard for MBNA, you continued to embezzle the job satisfaction and job ownership at every opportunity for nearly two years that culminated in this setup.

Further, I have reliable validation to conclude all other unrelated personnel investigations are also a direct or circumlocutory effort on your part to cease my career at MBNA, due your practiced and calculated effort exclusively based on my Race and or National Origin, both a violation of the federal statutes as well as MBNA Policies.

It is unfortunate that individuals such as yourself are allowed such atrocious and consistent exercise in a manner contradictory to published MBNA precepts. However, that should not be reason for me to accept a Last & Final Warning or any other form of disciplinary action.

I respectfully request that you do whatever it takes to correct or remove any derogatory record pertaining to matters discussed herewith as your actions have caused too much emotional and physical impairment requiring extensive rehabilitation.

Sincerely,

Justus

3/5/2003

B-00154

**Ross, Bellverie E**

| | |
|---|---|
| m: | Eapen, Justus |
| t: | Monday, April 08, 2002 7:54 AM |
| To: | Ross, Bellverie E |
| Subject: | Missing LCD Monitor |
| | |
| Importance: | High |



When I came in last night, someone had replaced my LCD monitor with a defective regular monitor. I was forced to find a temporary replacement.

I had painstakingly acquired the captioned monitor from PSN hardware inventory and deeply disturbed by the callous manner in which it was removed from my cubicle without even having the courtsey to leave a note. Almost every one on the team has better hardware, including bigger LCD monitors and I am appaled by the deragatory treatment of my items by DTC associates.

This LCD monitor was not an item of indulgence but rather a necessity that helped alleviate substantial strain on my eyes. The process required to procure such a monitor thru Health & Safety Services is rather cumbersome and <u>therefore, I trust that you will have the perpetrator return it.</u>

Hardware is routinely scavenged from my cubicle including an instance of installed memory being removed from my workstation. I try to prevent a disparaging spin to such matters, but this event was rather reprehensible.

Regards,

0000000094

DEPOSITION
EXHIBIT

Eapen 2
Rawpa 4.4.05

## MBNA America
## Information Security Guidelines

Your position with MBNA may give you access to information regarded by MBNA as confidential. Defined broadly, confidential or proprietary corporate information is any information that gives MBNA an advantage over its competitors. MBNA views this information as a corporate asset and, as with any asset, misuse may damage the company. The following guidelines, along with MBNA's Personnel Policies and the Guide to Employment and Benefits, outline your responsibility for the protection of confidential corporate information. If you have any question at all relating to the confidential or proprietary nature of information at MBNA, you should assume that it is confidential and proprietary unless advised otherwise by your manager. Any questions relating to these guidelines or confidential and proprietary information should be directed to your manager. Please read these guidelines carefully.

- MBNA's computer, electronic, and telephone systems and all communications and information stored, transmitted, received, or contained in these systems are MBNA property and are to be used solely for job-related purposes. To ensure proper use of MBNA's communications systems, the company may monitor their use from time to time. Misuse of these systems may result in disciplinary action, up to and including dismissal.

- User IDs and passwords are used to establish accountability for activity performed on MBNA computer systems, and all actions performed are the full responsibility of the person who has been assigned that user ID. People are not to share their personal user ID or password or use their user ID or password to log in to MBNA computer systems for another person. Passwords must remain confidential and should not include information that can be easily guessed.

- All people must log off of MBNA computer systems when leaving the work area for an extended period of time (e.g., at the end of a business day). A password-locked screen-saver must be invoked when leaving the work area in all other instances.

- People are prohibited from processing or approving any transaction to their own personal or business card account or the accounts of friends or relatives.

- Corporate information is to be used for the performance of company business and must remain confidential. This information should be provided on a "need-to-know" basis and stored in a secured location when not in use.

- In the absence of a written contract stating otherwise, all software developed on MBNA computer systems is the property of MBNA America and/or its subsidiaries.

- Copying of licensed software for unauthorized purposes is prohibited. People are prohibited from operating any personally owned PC hardware or software on company premises.

- Managers must notify Information Security in advance of any departmental transfer or change in access requirements. Appropriate access request forms must be approved and submitted to Information Security to facilitate any change in access.

You are required to notify Information Security immediately if unauthorized use of user IDs or passwords is detected. Information Security should also be contacted if unauthorized access to our corporate systems or noncompliance with the above requirements is suspected.

I have read the above Information Security Guidelines and acknowledge that MBNA expects me to adhere to them. I understand that failure to comply with these guidelines may result in disciplinary action, up to and including immediate dismissal, and that MBNA reserves the right to take legal action to remedy any damage that may result from noncompliance with these guidelines.

Name (print): _JUSTUS D. EAPEN_        SSN: _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_

Department: _DESKTOP COMPUTING_        Maiden Name: _____
                                              (if changed while at MBNA)

Signature: _____        Date: _02-28-00_

D242

**EXHIBIT H**



CORRECTIVE ACTION REPORT

| Date: | 3/10/03 | Id Number: | 79694 | Name: | Justus Eapen |
|---|---|---|---|---|---|
| Status/Grade: | FT/406 | DOH: | 2/28/00 | Job Title: | Systems Engineer |
| Cost Center: | 5753 | Department: | Desktop Computing | Manager Name/ID: | Ernesto Marra/22751 |

**Corrective Action Status:**

_____ **First Warning**    _____ **Final Warning**    __X__ **Dismissal**

**Date of Previous Action(s): N/A**

**Documentation:**

Justus is being dismissed for conduct according to MBNA Personnel Policies 601 and 606. More specifically, he violated Information Security Guidelines by utilizing the password of a peer to obtain system access. In addition, Justus has engaged in outside employment with his own corporation (Eapen Corporation) as a mortgage broker, which conflicts with the interests of MBNA.

On 1/7/03, Justus unsuccessfully attempted to log on to a server to complete a testing assignment. Because he was unable to log on to the system using his account or the default administrative account Justus paged a co-worker and obtained his co-worker's logon ID and password and proceeded to use his co-worker's administrative rights to reset his own account. A security policy on the servers was preventing him from gaining administrative access. Justus deleted his account and created a new one so that he could bypass the security policy that was preventing his access, which also failed. Justus contacted his manager advising him of the problem but did not tell his manager of his use of the coworker's ID and password to access the system. On 1/8/03, Information Security notified Justus' manager and advised him that Justus had committed a policy violation.

Additionally, Personnel was made aware of a conflict of interest that existed as a result of Justus' involvement with Eapen Corporation, a mortgage brokerage firm. The conflict exists because MBNA is involved in the mortgage business. Personnel was advised that Justus had a web site on the Internet for Eapen Corporation that it is dedicated to real estate services and also provides information for obtaining mortgages through the Epean Corporation. Personnel was also advised that Justus discussed mortgage rates with coworkers and accessed mortgage rates using the Internet through MBNA computer systems.

On 1/21/03, Personnel met with Justus to discuss both issues. In regards to the information security issue, Justus said, "I do understand that what I did was wrong and I should not have asked my co-worker for his password because I am more experienced." Justus stated that he had an assignment that needed to be completed by 8:00 a.m. the next morning, which is why he contacted his co-worker to obtain his logon. Justus stated that he spoke with his manager several times during that evening, regarding other issues, however, he did not tell him about using the coworker's ID and password to access the system.

The conflict of interest was also discussed with Justus and he denied involvement in the mortgage business and denied assisting co-workers in obtaining mortgage rates. He stated that the Eapen Corporation web site is used to develop leads by his wife who is a mortgage broker for Wells Fargo. Justus also said that he might have mentioned to co-workers that his wife was in the mortgage business and that he has discussed the Eapen Corporation at MBNA social events in order to generate business for his wife. He said that his wife has given MBNA people her business cards while attending the MBNA cornboil. Justus eventually admitted that his involvement in the corporation was a conflict of interest. Further investigation via the internet has revealed Justus Eapen as being Chief Executive Officer of Eapen Corporation.

For the reasons stated above, Justus is being dismissed.

DEPOSITION EXHIBIT 13
EEOC
7-21-05
PENGAD 800-631-6989

Revised 2/7/02

0000000399

**Individual's Comments Regarding Corrective Action:**

_Failed to return phone calls - 3/26/03_    _[signature] J. Hoffman_    _3/26/03_
Signature                          Date          Personnel                    Date

_____          _____
Business Area DM  or                   Date
Director (Finals/Dismissals)

Revised 2/7/02

B-00158

0000000400

# Personnel Policy
# MBNA Corporation

| Section<br>PERFORMANCE/CONDUCT | Policy Number<br>606 | Page<br>1 of 13 |
|---|---|---|
| Subject<br>STATEMENT OF ETHICS & RESPONSIBILITY | Effective Date<br>AUGUST 2003 | |
| Applies To<br>ALL PEOPLE OF MBNA CORPORATION<br>(UNITED STATES ONLY) | Approved by | |

## A. POLICY

The continuing success of any company depends largely on its ability to inspire public trust and confidence. MBNA constantly strives to maintain and enhance its reputation for integrity by adhering to the highest standards of business conduct. Meeting these standards is expected by MBNA and, in many cases, required by law. In short, the people of MBNA and its officers and directors (subject to section J below) have the responsibility to conduct themselves in a manner consistent with this Statement of Ethics and Responsibility.

MBNA's Ethics Officer is responsible for the overall implementation, interpretation, and administration of this policy. The Ethics Officer also has overall responsibility for all ethics education programs and related communication. To assist with these responsibilities, the Ethics Officer may designate a person to serve as Ethics Advisor. The Ethics Advisor, at the direction of the Ethics Officer, will assist with the development and delivery of ethics education and communication and will serve as an additional confidential contact for ethics-related questions or concerns for all MBNA people. Both the Ethics Officer and the Ethics Advisor will be available to provide policy interpretation and confidential guidance on handling ethics-related issues. In the course of fulfilling these responsibilities, the Ethics Officer may call upon the appropriate individuals within other areas of the company to assist and provide technical guidance, also in confidence.

While this policy offers guidance regarding some of the most common and sensitive situations, it is only a guide. General questions about the policy may be addressed with managers, the Ethics Officer, or the Ethics Advisor. If a person has any question about whether a specific course of conduct is ethical, the person should refrain from the conduct until consulting with his or her manager, the Ethics Officer, or the Ethics Advisor.

## B. INSIDER TRADING AND TRANSACTIONS

### 1. Insider Trading

MBNA people frequently have access to information before it is disclosed to the public. This information, such as unannounced annual and quarterly earnings results, significant changes in delinquency rates or provisions for loan losses, changes in the dividend policy, stock splits,

DEPOSITION EXHIBIT

D1151

B-00159

# Personnel Policy
# MBNA Corporation

| Section<br>PERFORMANCE/CONDUCT | Policy Number<br>**606** | Page<br>2 of 13 |
|---|---|---|
| Subject<br>STATEMENT OF ETHICS & RESPONSIBILITY | Effective Date<br>**AUGUST 2003** | |
| Applies To<br>ALL PEOPLE OF MBNA CORPORATION<br>(UNITED STATES ONLY) | Approved by | |

changes in management or business structure, offerings of additional stock, and significant acquisitions, could affect the price of MBNA stock or investors' decisions to buy, sell, or hold stock.

Using information about the company or its Customers for personal gain through buying or selling securities or disclosing the information to others (including family members and others living in the same household) constitutes "insider trading." Insider trading will result in immediate dismissal and possibly in criminal prosecution.

As a general rule, to avoid suspicion of insider trading, MBNA people should not engage in trading from the time they become aware of inside information until the **third business day following public release of the information.** These restrictions also apply to fund transfers into or out of the MBNA Stock Fund under the MBNA 401(k) Plus Savings Plan.

MBNA Policies <u>105C</u> (Securities Trading by Directors and Senior Officers) and <u>106C</u> (Securities Trading by MBNA Officers and People) also address insider trading in detail and should be carefully reviewed.

2. **Other Insider Transactions**

In general, MBNA people should not engage in the following activities:
a) Approving any transaction if they may benefit directly or indirectly from the decision
b) Soliciting anything of value in return for any business, service, or confidential information of the company
c) Accepting anything of value in connection with the business of the company, except for a salary or other compensation paid in the normal course of business
d) Risking the appearance of impropriety by closely monitoring MBNA's relationships with family members

These guidelines should also be followed for vendors who are also MBNA Customers.

Transactions between MBNA and its officers and directors (including any other organizations with which they are affiliated) should be made on substantially the same terms as those between MBNA and unaffiliated persons. Care should be taken to avoid even the appearance of

D1152

# Personnel Policy
# MBNA Corporation

| Section<br>PERFORMANCE/CONDUCT | Policy Number<br>606 | Page<br>3 of 13 |
| --- | --- | --- |
| Subject<br>STATEMENT OF ETHICS & RESPONSIBILITY | Effective Date<br>AUGUST 2003 | |
| Applies To<br>ALL PEOPLE OF MBNA CORPORATION<br>(UNITED STATES ONLY) | Approved by | |

preferential treatment in these situations. MBNA Policy 15P (Loans to Insiders) also relates to this topic and should be carefully reviewed.

## C. CONFIDENTIALITY

Confidential, proprietary, and sensitive business information are among MBNA's most significant assets and are critically important to the company's continued success. The fact that MBNA operates in a highly competitive industry makes the protection of this information even more critical. MBNA people should always be aware of, and try to avoid, situations in which confidential, proprietary, or sensitive information could be compromised.

### 1. Confidential Information

Defined broadly, this type of information includes information about MBNA's Customers, people, business practices, programs, strategies, and organizational structure. Some of the most common forms of confidential information, and how they should be handled, are discussed below.

A. Corporate Communication - MBNA's Investor Relations and Media Relations departments have been designated by management to speak on behalf of the company to stockholders and other interested parties concerning MBNA's business and to release company information to the public. All verbal and written communications that contain or suggest company endorsement should be made only by, or with the approval of, these departments. All media contacts of any nature should be referred directly to the Media Relations department.

B. Confidential Business Information - This should be held in strict confidence and not discussed outside, or even within, the company except as needed in connection with company business. Special care should be taken when using unsecured forms of communication, such as facsimile machines, speakerphones, e-mail, Internet connections, and cellular telephones, and when conversing in public areas. When it is necessary to communicate confidential information for business purposes, the person receiving the information should be informed that the information is confidential.

**D1153**

# Personnel Policy
# MBNA Corporation

| Section<br>PERFORMANCE/CONDUCT | Policy Number<br>606 | Page<br>4 of 13 |
|---|---|---|
| Subject<br>STATEMENT OF ETHICS & RESPONSIBILITY | Effective Date<br>AUGUST 2003 | |
| Applies To<br>ALL PEOPLE OF MBNA CORPORATION<br>(UNITED STATES ONLY) | Approved by | |

C.  Confidential Customer Information - As a general rule, unless clearly stated otherwise, all information about any Customer should be presumed confidential and held in strict confidence. Customer information should be used only for serving that Customer and should not be revealed except as absolutely required by a particular transaction or in response to an appropriate legal or regulatory request. Confidential Customer information is also addressed in MBNA Policy 1P (Privacy Policy).

D.  Confidential People Information -- Information about MBNA people, such as compensation and benefits information or health and medical information, should be kept confidential and used only as appropriate for purposes of providing compensation and other benefits.

## D. FAIR DEALING

MBNA people should endeavor to deal fairly with the company's Customers, suppliers, and competitors and with all other MBNA people. No one should take unfair advantage through manipulation, concealment, abuse of privileged information, misrepresentation of material facts, or any other unfair practices.

## E. CONFLICTS OF INTEREST

MBNA people are expected to conduct their business and outside activities in a manner that avoids actual conflicts, and does everything possible to avoid perceived conflicts, with the interests of MBNA or its Customers and that protects and preserves company assets. Conflicts of interest arise when personal business and outside activities influence, or may be perceived to influence, a person's decisions or judgment in his or her work at MBNA. Potential conflicts are most likely to arise in dealings with Customers and third parties, in outside activities, and in situations involving non-MBNA employment and confidential MBNA information. Several examples are described below. Violations of these guidelines may result in corrective action up to and including dismissal.

### 1. Customers, Vendors, and Third Parties

As a general rule, dealings with Customers, vendors, and other third parties should relate only to MBNA business, should be consistent with the MBNA person's level of authority,

D1154

# Personnel Policy
# MBNA Corporation

| Section<br>PERFORMANCE/CONDUCT | Policy Number<br>606 | Page<br>5 of 13 |
|---|---|---|
| Subject<br>STATEMENT OF ETHICS & RESPONSIBILITY | Effective Date<br>AUGUST 2003 | |
| Applies To<br>ALL PEOPLE OF MBNA CORPORATION<br>(UNITED STATES ONLY) | Approved by | |

and are subject to the following guidelines.  MBNA people owe a duty to the company to advance its legitimate interests when the opportunity to do so arises.

a.   Business Ventures

People should not participate in business ventures with Customers, vendors, or others seeking to do business with MBNA unless the business opportunity is generally available to the public and is not associated with the person's position at MBNA.

b.   Financial Transactions

MBNA people should not engage in personal financial transactions with a Customer or vendor (including a person employed by a Customer or vendor) unless the Customer or vendor is a recognized financial institution and the transaction involves terms generally available to the public.

c.   Corporate Opportunities

MBNA people should not do the following:
- Take opportunities for themselves that are identified through the use of corporate property, information, or position
- Use corporate property, information, or position for personal gain
- Compete with this company

d.   Personal Use of Providers of Goods and Services

The potential for conflict of interest problems also exists in the relationship between MBNA people and the company's service providers when people employ those providers for non-MBNA purposes.  It is strictly forbidden for MBNA people or other representatives of the company to knowingly use in any way their rank or position with the company to obtain favorable terms from a provider. If personal use of an MBNA provider is made, people should act in a manner designed to safeguard the interests of themselves and MBNA by scrupulously avoiding even the implication that MBNA's business is affected in any way by the fact that or the terms upon which the provider serves the individual personally.

D1155

# Personnel Policy
# MBNA Corporation

| Section | | Policy Number | Page |
|---|---|---|---|
| PERFORMANCE/CONDUCT | | 606 | 6 of 13 |
| Subject | | Effective Date | |
| STATEMENT OF ETHICS & RESPONSIBILITY | | AUGUST 2003 | |
| Applies To | | Approved by | |
| ALL PEOPLE OF MBNA CORPORATION (UNITED STATES ONLY) | | | |

e. Professional Consultation

From time to time, MBNA people may be asked to render what could be construed as professional advice, such as investment, financial planning, legal, or tax advice, regarding a particular transaction or course of conduct. People should refrain from offering such advice unless doing so is an explicit part of their job responsibilities at MBNA. MBNA people and Customers who request professional advice in connection with personal matters should be urged to consult with their own professional advisors.

f. Gifts, Fees, and Special Favors

- People generally may not accept anything of value for themselves, friends, or relatives from Customers, vendors, or other third parties in connection with MBNA's business, either before or after a transaction is discussed or consummated.
- People may not solicit anything of value for themselves, friends, or relatives or any other third party (aside from MBNA) in return for any MBNA business, MBNA service, or confidential MBNA information.
- People may not accept special terms, price considerations, or personal benefits not generally available to the public from Customers, prospective Customers, vendors, or other third parties.

g. Gifts, Fees, and Special Favors Exceptions

The above guidelines regarding gifts, fees, and special favors do not prohibit the following:

- The acceptance of gifts or awards reflecting obvious family, civic, charitable, educational, or personal relationships or the acceptance of gifts of a value not to exceed $100 for commonly recognized events such as birthdays, holidays, promotions, wedding, retirement, etc.
- The acceptance of meals, refreshments, travel accommodations, or entertainment, all of reasonable value, associated with MBNA business.
- The acceptance of promotional material of reasonable value, such as key chains, pens, calendars, and other incidental items.

D1156

B-00164

# Personnel Policy
# MBNA Corporation

| Section PERFORMANCE/CONDUCT | Policy Number 606 | Page 7 of 13 |
|---|---|---|
| Subject STATEMENT OF ETHICS & RESPONSIBILITY | Effective Date AUGUST 2003 | |
| Applies To ALL PEOPLE OF MBNA CORPORATION (UNITED STATES ONLY) | Approved by | |

- The acceptance of corporate discounts and other incentives made available to all MBNA people (such as discounts on retail purchases).

  In many circumstances, good judgment will determine whether or not the circumstances surrounding the receipt of a gift, and not just its monetary value, are such that it places the person or MBNA in a potentially compromising or even illegal situation.

h.  Gifts, Fees, and Special Favors—Reporting and Review Process

  A person who receive gifts, fees, or other special favor that does not clearly fall within one of the exceptions is required to report the receipt of the gift, fee, or favor to his or her manager. As directed by the Ethics Officer or Ethics Advisor, the manager will review the situation and determine whether it presents an actual or perceived conflict of interest under this policy.

## 2. Outside Activities

People should conduct their outside activities in a manner that does not suggest MBNA sponsorship or support (unless previously approved by the appropriate senior officer) and that does not conflict or interfere with their work at MBNA. The following guidelines should help avoid conflicts of interest in this area:

a.  Directorships

  People may not accept positions as officers or members of the board of directors of "for-profit" corporations without the prior written approval by the bank's CEO in addition to being reported to the Ethics Officer.

b.  Use of MBNA Assets

  Absent prior approval, people may not engage in outside activities (charitable or otherwise) that involve the use of MBNA equipment, supplies, or facilities. Appropriate approval may

**D1157**

B-00165

# Personnel Policy
# MBNA Corporation

| Section | | Policy Number | Page |
|---|---|---|---|
| **PERFORMANCE/CONDUCT** | | **606** | **8 of 13** |
| Subject | | Effective Date | |
| **STATEMENT OF ETHICS & RESPONSIBILITY** | | **AUGUST 2003** | |
| Applies To | | Approved by | |
| **ALL PEOPLE OF MBNA CORPORATION (UNITED STATES ONLY)** | | | |

be obtained through the bank's CEO or the directors of Facility Management, Community Relations, or their designees.

## 3. Outside Employment

MBNA people should not engage in any outside employment or provide outside services that conflict with the interests of MBNA. In general, the following situations should be avoided:

- Any activity, association, or relationship that creates an actual or perceived risk that confidential MBNA information may be compromised such as being employed by or providing services to any other credit card issuer
- Being employed as a broker, dealer, or agent in the field of insurance, securities transactions, corporate and consumer finance transactions, home equity or second mortgage transactions or any other field in which MBNA conducts business
- Sharing a home with or having an immediate family member who is employed by or provides services to a recognized competitor of MBNA in any of its lines of business
- Any employment or activity that conflicts with a person's time or ability to perform his or her MBNA job
- Any employment or activity that involves giving advice or exercising judgment based on company information acquired primarily from employment at MBNA
- Any outside employment or activity that implies the company's sponsorship or support

All people employed by MBNA have the obligation to report situations that could constitute or appear to constitute conflicts of interest to their managers, the Ethics Officer, or the Ethics Advisor. The determination of whether a particular situation constitutes a conflict of interest will be made by the Ethics Officer in conjunction with the manager and the Director of Personnel and will involve consideration of the MBNA person's position, the frequency of the interaction giving rise to the potential conflict of interest, and the overall best interests of the company. If a conflict of interest is determined to exist because of a personal or business relationship, the MBNA person, at the discretion of the Director of Personnel, may be asked to remedy the situation through acceptance of a less sensitive position, resignation, or another suggested action. If the person does not remedy the situation when asked to do so, he or she may be dismissed.

## 4. Illegal and Other Improper Payments

D1158

# Personnel Policy
# MBNA Corporation

| Section<br>PERFORMANCE/CONDUCT | Policy Number<br>606 | Page<br>9 of 13 |
|---|---|---|
| Subject<br>STATEMENT OF ETHICS & RESPONSIBILITY | Effective Date<br>AUGUST 2003 | |
| Applies To<br>ALL PEOPLE OF MBNA CORPORATION<br>(UNITED STATES ONLY) | Approved by | |

- MBNA people may not make any payment or loan or give anything of value to any public official for the purpose of influencing the public official in the performance of his or her official duties. Political contributions may be made to candidates for public office in accordance with applicable laws as provided below.
- MBNA people may not, directly or indirectly, make any payment or loan or give anything of value to any director, officer, or employee of any other business, or to any relative of such person or other person for the benefit of the director, officer, or employee of such business, for the purpose of improperly influencing the director, officer, or employee in the conduct of any business with MBNA. Gifts may be made to directors, officers, or employees of other businesses or to their relatives in circumstances comparable to those in which MBNA people may accept them.

## 5. Protection and Proper Use of Company Assets

All MBNA people should protect the company's assets and ensure their efficient use. Theft, carelessness, and waste have a direct impact on the company's profitability. All company assets should be used for legitimate purposes only.

## F. OUTSIDE CIVIC AND CHARITABLE ACTIVITY

MBNA encourages people to participate fully in their community, including charitable, religious, fraternal, or civic activities. In general, all activities should be undertaken in a manner that will not reflect negatively on the company, suggest corporate sponsorship (absent prior approval), or create any actual or perceived conflict with the interests of the company. Some specific guidelines follow:

- **Public Office**
  People should obtain written approval of the Ethics Officer before becoming candidates for public office or accepting appointments to public office.
- **Political Participation**
  People should consult with the Corporate Affairs department regarding restrictions on engaging in politics or making political contributions (including gifts, deposits of money, use of MBNA equipment, loan of personnel, etc.). Political contributions on behalf of MBNA generally must be made through the MBNA Corporation Federal Political Action Committee or the MBNA Delaware Political Action Committee and must be approved by

D1159

# Personnel Policy
# MBNA Corporation

| Section | Policy Number | Page |
|---|---|---|
| PERFORMANCE/CONDUCT | 606 | 10 of 13 |

| Subject | Effective Date |
|---|---|
| STATEMENT OF ETHICS & RESPONSIBILITY | AUGUST 2003 |

| Applies To | Approved by |
|---|---|
| ALL PEOPLE OF MBNA CORPORATION (UNITED STATES ONLY) | |

MBNA's chief counsel to ensure compliance with legal requirements. Federal and state law provide for significant penalties for corporate contributions made in violation of the law. Individual political contributions must also comply with applicable laws. People considering individual political contributions may consult with MBNA's chief counsel or their own legal advisors.

- **Religious, Charitable, or Civic Activities**
  People are encouraged to take part in religious, charitable, civic, or fraternal activities within the limits of their own time and talents. However, before accepting a directorship (officer position or other position on the board of directors) of a charitable (not-for-profit) institution, an MBNA person is advised to discuss the position with the director of Community Relations.

- **Where to Obtain Additional Information**
  Questions regarding outside civic and charitable activity should be addressed through the director of Community Relations, the Ethics Officer, or the Ethics Advisor. Questions regarding public office or political participation should be addressed to the Ethics Officer or Ethics Advisor. Questions regarding political contributions or other support for political purposes or candidates should be addressed to MBNA's chief counsel.

## G. AWARENESS OF COMPANY POLICIES AND REGULATORY REQUIREMENTS

Each MBNA person has the responsibility to become familiar with company policies in general, and specifically with those policies and outside regulatory requirements (laws, rules, and regulations) that directly affect their jobs and the duties and tasks they regularly perform. MBNA officers have an even greater obligation to be aware of company policies and regulatory requirements that affect the people they support and functions for which they have responsibility. Officers have a further responsibility to provide education on critical policies and regulations and to ensure compliance. Personnel and Corporate policies are available on MBNA PeopleNet, and people may contact the Ethics Officer, the Ethics Advisor, or Personnel with questions regarding the policies.

## H. COMPLETE AND ACCURATE RECORD KEEPING AND COMPLIANCE WITH ACCOUNTING PROCEDURES

Compliance with internal control and accounting procedures is required at all times. Accuracy and reliability in the preparation of all business records and public disclosures are required by law and critical to MBNA's decision-making processes and its financial and legal reporting obligations. It is

D1160

# Personnel Policy
# MBNA Corporation

| Section | | Policy Number | Page |
|---|---|---|---|
| PERFORMANCE/CONDUCT | | 606 | 11 of 13 |
| Subject | | Effective Date | |
| STATEMENT OF ETHICS & RESPONSIBILITY | | AUGUST 2003 | |
| Applies To | | Approved by | |
| ALL PEOPLE OF MBNA CORPORATION (UNITED STATES ONLY) | | | |

imperative that all MBNA business records, of whatever nature, are maintained and prepared with diligence and honesty. All company funds and assets must be recorded in accordance with applicable procedures. False or misleading entries in such records are unlawful and not permitted for any reason. To that end, the chief executive officer, chief financial officer, chief accounting officer, controller, and other senior financial officers should promote the full, fair, accurate, timely, and understandable disclosure of reports and documents that MBNA files with, or submits to, the Securities and Exchange Commission and in other public communications made by MBNA. No person employed by MBNA is authorized to depart from this policy or to condone such action by another person. Any person who observes possible violations of these procedures should immediately advise the responsible area manager, the Ethics Officer, or the Ethics Advisor.

## I. PROCEDURE

1.  MBNA's Ethics Officer is responsible for the overall administration of this policy and for ensuring appropriate and timely guidance, education, and communication on ethics policy and related issues. The Ethics Officer may be assisted in this activity by the Ethics Advisor and other specifically designated persons who report directly to the Ethics Officer. Any person employed by MBNA may contact the Ethics Officer or Ethics Advisor at any time to confidentially discuss concerns or questions regarding ethics-related issues and receive guidance and assistance, including policy interpretation.

2.  Unethical conduct should neither be tolerated nor ignored. People having information or knowledge of any violation of law, company policies, including this policy, must promptly report such matters to their managers, the Ethics Officer, or the Ethics Advisor. All such matters shall be handled in confidence to the extent permitted by law, and no person will face retribution for reporting, in good faith, potential violations of this policy.

3.  Violations of any principle or guideline contained in this policy or related policies may result in corrective action up to and including dismissal. MBNA officers have a heightened responsibility to adhere to the principles of this policy and their failure to do so may result in a more advanced stage of corrective action, up to and including dismissal. Any conduct that violates federal or state law may also result in criminal prosecution or other legal process.

4.  Any requested exceptions to this policy must be directed, in writing, to the Ethics Officer or Ethics Advisor. Exception approval, if granted, will be communicated in writing to the

# Personnel Policy
# MBNA Corporation

| Section PERFORMANCE/CONDUCT | Policy Number 606 | Page 12 of 13 |
|---|---|---|
| Subject STATEMENT OF ETHICS & RESPONSIBILITY | Effective Date AUGUST 2003 | |
| Applies To ALL PEOPLE OF MBNA CORPORATION (UNITED STATES ONLY) | Approved by | |

requesting party. Any exception to this policy or waiver for executive officers or directors may be made only by the Board of Directors or a Board committee, and must be promptly disclosed to shareholders.

5. Any complaints or concerns regarding accounting, internal accounting controls, or auditing matters that are received by the Ethics Officer or Ethics Advisor (whether from MBNA people or others) must be reported in writing to the Audit Committee on a regular basis. The Ethics Officer or Ethics Advisor must initiate inquiries, investigations, and make reports, and take such other action with respect to such complaints or concerns, as he or she determines is reasonable and appropriate or as may be directed by the Audit Committee. The Ethics Officer or Ethics Advisor will provide follow-up reports to the Audit Committee on the status and treatment of significant complaints or concerns. Records of such complaints and concerns and any action taken in connection with them must be retained as provided by applicable MBNA document retention policies. Unless otherwise required by law, the Ethics Officer and Ethics Advisor must accommodate the confidential and anonymous submission by MBNA people of concerns regarding questionable accounting or auditing matters.

6. People employed by MBNA may be required to sign a statement acknowledging their awareness and understanding of this policy. This statement will be maintained in each individual's Personnel file. Refusal to sign the statement may result in dismissal.

7. MBNA officers designated by the Ethics Officer or Ethics Advisor may be required to sign an annual statement acknowledging receipt of this policy and any subsequent changes to the policy.

8. With the approval of and in consultation with the Ethics Officer or Ethics Advisor, individual divisions and/or departments may develop more specific processes regarding compliance with this policy, particularly the protection of confidential information.

9. This policy is not intended to in any way limit other MBNA policies that address professional and ethical conduct.

## J. APPLICABILITY TO OUTSIDE DIRECTORS

Pursuant to applicable law, directors of MBNA owe fiduciary duties to MBNA and its stockholders, including the duties of loyalty and fair dealing. In fulfilling their legal duties, non-employee

D1162

# Personnel Policy
# MBNA Corporation

| Section | | Policy Number | Page |
|---|---|---|---|
| PERFORMANCE/CONDUCT | | 606 | 13 of 13 |
| Subject | | Effective Date | |
| STATEMENT OF ETHICS & RESPONSIBILITY | | AUGUST 2003 | |
| Applies To | | Approved by | |
| ALL PEOPLE OF MBNA CORPORATION (UNITED STATES ONLY) | | | |

directors should use the provisions of this Statement of Ethics and Responsibility as guiding principles and not specific requirements. When applying their fiduciary duties, non-employee directors may consult with the Ethics Officer or Ethics Advisor.

D1163

# Personnel Policy
# MBNA Corporation

| Section **PERFORMANCE/CONDUCT** | Policy Number **601** | Page **1 of 8** |
|---|---|---|
| Subject **CORRECTIVE ACTION** | Effective Date **FEBRUARY 2000** | |
| Applies To **ALL PEOPLE OF MBNA CORPORATION (UNITED STATES ONLY)** | Approved by | |

## A. POLICY

MBNA's ability to effectively serve its Customers is directly related to the level of service provided and the quality of work produced by the people of MBNA. If a person's conduct or performance fails to meet expectations, his or her manager will make every effort to advise the person of the specific concerns, the steps necessary to correct the situation, and the consequences of continued noncompliance.

## B. DEFINITION

Corrective action is a series of progressive verbal and written warnings designed to address below-standard performance and situations of inappropriate conduct. Progressive steps may not be warranted in severe conduct situations. Failure to maintain minimum performance standards, or to observe or adhere to any established company policy or regulation, displaying unacceptable behavior, and exceeding one's authority are some examples of situations that may result in written corrective action.

Failure to maintain minimum performance standards, to observe or adhere to any established company rule or regulation, the displaying of unacceptable behavior, and/or exceeding one's authority are some examples of situations which may result in written corrective action.

## C. STAGES OF CORRECTIVE ACTION

### Plan for Success (PFS)

Required for performance situations before the administration of a written warning. Administered after two consecutive months of below-standard performance in the same category or three months of below- standard performance in any category within a six-month period. The PFS will include joint initiatives identified to enhance performance.

The Plan for Success form and related documents can be found in the Microsoft Exchange or Outlook Public folders at:

*People Information \Employment \ Corrective Action.



DEPOSITION 16
EXHIBIT
EEOC
7-21-05
PENGAD 800-631-6989

**D1143**

# Personnel Policy
# MBNA Corporation

| Section<br>PERFORMANCE/CONDUCT | Policy Number<br>601 | Page<br>2 of 8 |
|---|---|---|
| Subject<br>CORRECTIVE ACTION | Effective Date<br>FEBRUARY 2000 | |
| Applies To<br>ALL PEOPLE OF MBNA CORPORATION<br>(UNITED STATES ONLY) | Approved by | |

**First Written Warning**
Used to address significant performance concerns. In performance situations, the first written warning should be preceded by a PFS. The first written warning is administered after two months of below-standard performance in any category within a six-month period. The first written warning will be accompanied by a modified PFS that will include joint initiatives identified to enhance performance.

**Final Written Warning**
Used as a final warning stage for significant performance concerns. The final written warning is administered after two months of below-standard performance in any category within a six-month period. A first written warning will precede a final warning for performance. The final written warning will be accompanied by a modified PFS that will include joint initiatives identified to enhance performance.

**Dismissal**
Administered for extreme performance situations. Refer to Personnel Policy No. 702, Involuntary Dismissal, for detailed information.

## D. CORRECTIVE ACTION FOR CONDUCT

**Verbal Warning**
May be appropriate for minor conduct situations before the administration of a written warning. Documentation should consist of a memo to the working file.

**First Written Warning**
Used to address significant conduct situations. In most conduct cases, a first written warning will be the first level of corrective action.

**Final Written Warning**
Used as a final warning stage for significant conduct situations. In most cases, a first written warning for conduct will precede a final warning.

D1144

# Personnel Policy
# MBNA Corporation

| Section PERFORMANCE/CONDUCT | Policy Number 601 | Page 3 of 8 |
|---|---|---|
| Subject CORRECTIVE ACTION | Effective Date FEBRUARY 2000 | |
| Applies To ALL PEOPLE OF MBNA CORPORATION (UNITED STATES ONLY) | Approved by | |

Immediate final written warning may be used at the discretion of department managers, in conjunction with Personnel, for an immediately dismissible offense. These final warnings, with the exception of conduct that falls under the auspices of sexual harassment and remains active indefinitely, will be active for two years and administered without regard to performance levels.

**Dismissal**
Administered for extreme conduct situations. Refer to Personnel Policy No. 702, Involuntary Dismissal, for detailed information.

## E. DOCUMENTATION
Documentation for all written warnings, including the PFS, must be detailed and contain specific information regarding the action taken. The essential elements of a written corrective action include the following:
- The action being taken
- A detailed description of the situation
- A description of necessary improvement
- Specific time frames for improvement
- Specific next steps and consequences

## F. MANAGERS RESPONSIBILITIES
1. Consistently communicate expected levels of performance and conduct and keep people informed of their progress.

2. Upon identification of unacceptable levels of performance or conduct, gather relevant documentation and contact Personnel to begin the research to determine a consistent course of action.

3. Prepare the corrective action document with the assistance of Personnel and obtain appropriate department and Personnel signatures.

4. Following Personnel approval, meet with the person and administer the corrective action. A representative of Personnel should be present during the administration

D1145

# Personnel Policy
# MBNA Corporation

| Section | | Policy Number | Page |
|---|---|---|---|
| PERFORMANCE/CONDUCT | | .601 | 4 of 8 |
| **Subject** | | **Effective Date** | |
| CORRECTIVE ACTION | | FEBRUARY 2000 | |
| **Applies To** | | **Approved by** | |
| ALL PEOPLE OF MBNA CORPORATION (UNITED STATES ONLY) | | | |

of any warning that will immediately precede dismissal.

5. Provide a copy of the corrective action document to the person during the meeting and request that the person comment, sign, and date the document. If the person refuses to sign it, note this on the document, ("refused to sign", for example), with the date, and forward it to Personnel.

6. Personnel, in conjunction with department managers, will facilitate all dismissals.

## G. COMMENTS

1. Only one stage of corrective action will be administered at a time.

2. Performance and conduct issues will be considered together when determining the appropriate stage of corrective action.

3. A PFS is required for all stages of corrective action for performance.

4. A verbal warning may be appropriate for certain misconduct situations.

5. Whenever possible, corrective action should be administered within two weeks of the last incident.

6. Each stage of written corrective action will be in effect for six months. A person may proceed to the next stage of corrective action in less than six months when documentation has clearly provided a reasonable time to improve (such as, 60 days).

7. A person on first or final written warning will be restricted from job posting for six months. Any corrective action may be considered in the job posting process.

8. A person on first or final written warning is ineligible for monthly incentive for a period of one to six months, based on department standards.

**D1146**

# Personnel Policy
# MBNA Corporation

| Section PERFORMANCE/CONDUCT | Policy Number 601 | Page 5 of 8 |
|---|---|---|
| Subject CORRECTIVE ACTION | Effective Date FEBRUARY 2000 | |
| Applies To ALL PEOPLE OF MBNA CORPORATION (UNITED STATES ONLY) | Approved by | |

9. A person on first or final written warning is ineligible to receive Customer Satisfaction Test payout for the quarter in which the corrective action is administered.

10. A final written warning for an immediately dismissible offense will be active for a period of two years, and the person will be restricted from job posting for six months.

11. A final written warning for conduct, that falls under the auspices of sexual harassment will remain active indefinitely the person will be restricted from job posting for six months.

12. A final written warning for a nondismissable offense will be administered in place of a first warning when a performance or conduct incident occurs within 12 months of the date of a previous final warning for a similar offense.

13. Unsatisfactory performance or conduct of officers that results from poor attendance or punctuality should be addressed through progressive stages of written corrective action.

14. Immediate dismissal is appropriate only in severe conduct-related issues. A director of Personnel or his or her designee is authorized to suspend any person with or without pay during an investigation.

## H. IMMEDIATE DISMISSAL

A person may be dismissed for any reason not prohibited by law, including but not limited to misconduct, unsatisfactory job performance, excessive absenteeism or tardiness, sexual harassment, or any other reason deemed by MBNA senior managers to warrant such action.

Examples of immediately dismissible offenses at MBNA include, but are not limited to, the following:

D1147

# Personnel Policy
# MBNA Corporation

| Section PERFORMANCE/CONDUCT | Policy Number 601 | Page 6 of 8 |
|---|---|---|
| Subject CORRECTIVE ACTION | Effective Date FEBRUARY 2000 | |
| Applies To ALL PEOPLE OF MBNA CORPORATION (UNITED STATES ONLY) | Approved by | |

1. Insubordination, including disobedience to proper authority or refusing a job assignment.

2. Sexual, verbal, or physical harassment or threats of any type toward a co-worker, manager, or third party that occur on company premises or that create a threat in the workplace.

3. Use of obscene or profane language directed toward managers, co-workers, or Customers.

4. Any intentional violation of a rule or regulation affecting the security or the safety of another person.

5. Unlawful conduct that occurs off company premises or during non-working hours.

6. Job abandonment.

7. Malicious destruction of company property.

8. Any theft or misappropriation of company property or funds in any form or theft from another person or entity.

9. Removal of another person's property or removal of company property without permission.

10. Gambling on company premises or soliciting others for gambling purposes on company premises.

11. The dishonest use of uncollected checking account funds (kiting) or using a debit card to obtain a cash advance against uncollected funds.

12. Providing false information to a company representative or falsifying any company record such as employment applications or addendums, time sheets,

D1148

# Personnel Policy
# MBNA Corporation

| Section<br>PERFORMANCE/CONDUCT | Policy Number<br>601 | Page<br>7 of 8 |
|---|---|---|
| Subject<br>CORRECTIVE ACTION | Effective Date<br>FEBRUARY 2000 | |
| Applies To<br>ALL PEOPLE OF MBNA CORPORATION<br>(UNITED STATES ONLY) | Approved by | |

tracking sheets, disability or benefit forms, etc.

13. Inappropriate conduct relating to a company investigation, including but not limited to the following:
    - Refusing to assist managers with an investigation
    - Interfering with an investigation
    - Breaching the confidentiality of an investigation

14. Being under the influence of, or the unauthorized use or sale of, alcoholic beverages on company premises.

15. Being under the influence of, or the use, possession, or sale of, any controlled dangerous substance or paraphernalia on company premises.

16. Failing a drug test under MBNA's Personnel Policy No. 605, Drug Free Workplace (in Maine, Personnel Policy 605.1), or failing to successfully complete a substance rehabilitation program as provided for in that policy.

17. The unauthorized use or possession of destructive or deadly weapons on company premises or in any vehicle owned by MBNA.

18. Engaging in activities that could result in the unauthorized disclosure or dissemination, misuse, or destruction of MBNA corporate information.

19. Violation of Information Security Guidelines or procedures.

20. Inappropriate use of a corporate credit card.

21. Conviction of a crime involving breach of trust, dishonesty, or money laundering or entering into a pretrial diversion program relating to a charge for such a crime.

22. A criminal history (arrests or convictions) that would indicate unsuitability for employment.

D1149

# Personnel Policy
# MBNA Corporation

| Section<br>PERFORMANCE/CONDUCT | Policy Number<br>601 | Page<br>8 of 8 |
|---|---|---|
| Subject<br>CORRECTIVE ACTION | Effective Date<br>FEBRUARY 2000 | |
| Applies To<br>ALL PEOPLE OF MBNA CORPORATION<br>(UNITED STATES ONLY) | Approved by | |

23. Intentionally violating any government rule, regulation, or law applicable to MBNA.

24. Any other serious conduct that creates a significant legal, safety, or other risk to MBNA or its people or Customers.

Personnel, in conjunction with the appropriate department (such as Internal Audit, Corporate Investigations, or Corporate Security), will conduct all investigations involving dismissable offenses and make recommendations for appropriate corrective action.

**D1150**

# DISMISSAL SUMMARY

**Name:** Justus Eapen

**Status (FT/PRM/PT):** Full Time

**Date of Hire/Tenure:** 2/28/00 / 2 years, 11 months

**Department / Cost Center:** Desktop Computing Services DE/5753

**Position/Job Grade or Officer Title:** Systems Engineer / 406 - AVP

**Manager:** Ernesto Marra

**Location:** CCIV

**Last Two Performance Appraisals:** 12/23/02, (3.48)

12/22/01, (3.30)

**Administrative Leave:** N/A

**Reason for Dismissal:**
Justus is being dismissed for conduct according to MBNA Personnel Policies 601 and 606. More specifically, he violated Information Security Guidelines by sharing passwords and impersonating a peer to obtain system access. Additionally, Justus violated MBNA's Ethic's policy particularly conducting business that conflicts with MBNA's business activities.

**Previous Conduct Corrective Action(s):**
None



B-00180

0000000410

al's
records

## ETHICS INQUIRY



DEPOSITION
EXHIBIT 15
EEOC
7-21-05

| Inquiry #: | 03-016 | Open Date: | 01/10/2003 |
| Inq.Type: | Outside activity | Closed Date: | 01/13/2003 |
| Ethics Line: | No | | |
| Anonymous Call: | No | Personnel Referral: | |

# Name Information

## Subject:

| | | | |
|---|---|---|---|
| Last Name: | Eapen | Position: | Systems Engineer |
| First Name: | Justus | Site: | DE |
| Phone: | 45-74518 | Sector: | TEC |
| Affected Dept: | Desktop Computing Services DE | Division: | Distributed & Desktop Computing Ops. |
| Job Grade: | O | Department: | Desktop Computing Services De |
| | | Location: | CC |

## Reporting Person:

| | | | |
|---|---|---|---|
| Last Name: | Kilmon | Position: | |
| First Name: | Rich | Site: | |
| Phone: | | Sector: | |
| Affected Dept: | | Division: | |
| Job Grade: | | Department: | TEC Personnel |
| | | Location: | |

# Summary

http://www.eapen.net/ - Eapen's web site address

The EO was contacted by Rich Kilmon and Tamika Sainten of TEC Personnel in reference to Justus Eapen. Eapen is a systems engineer who works a three day, forty hour week, that runs from 6 p.m. to approximately 8 a.m. It was overheard that Eapen may be working as a real estate agent during his off hours. Information was received that Eapen's company had a web site. Upon checking, it was found that Eapen is working as a real estate agent and a mortgage broker, with mortgage companies other than MBNA.

Writer advised Rich and Tamika that by policy, this was definitely a conflict, and the person should be

offered a choice of either continuing with the bank and dropping his personal business, or vice versa.

D415

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

EQUAL EMPLOYMENT OPPORTUNITY ）
COMMISSION, ）
）
          Plaintiff, ）
）
v. ）          Civil Action No.
）          04-CV-425 SLR
MBNA AMERICA BANK, N.A., a ）
subsidiary of MBNA ）
CORPORATION, ）
）
          Defendant. ）

          Deposition of JUSTUS DANIEL EAPEN taken
pursuant to notice at the law offices of Young, Conaway,
Stargatt & Taylor, LLP, The Brandywine Building,
1000 West Street, 17th Floor, Wilmington, Delaware,
beginning at 10:00 a.m. on Monday, April 4, 2005, before
Robert Wayne Wilcox, Jr., Registered Professional
Reporter and Notary Public.

APPEARANCES:

          TERRENCE R. COOK, ESQ.
          U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
            21 South Fifth Street
            The Bourse - Suite 400
            Philadelphia, Pennsylvania  19106
            for the Plaintiff,

          SHELDON N. SANDLER, ESQ.
          YOUNG, CONAWAY, STARGATT & TAYLOR, LLP
            The Brandywine Building
            1000 West Street - 17th Floor
            Wilmington, Delaware  19801
            for the Defendant.

------------------------------------------------------------

                    WILCOX & FETZER
   1330 King Street - Wilmington, Delaware 19801
                    (302) 655-0477



WILCOX & FETZER LTD.

B-00183

1        Q.   According to my records, you began as an employee

2    of MBNA February 28th, 2000.  Does that sound right?

3        A.   Correct.

4        Q.   Okay.  How did you come to get that?

5             I understand you were a contractor, but just

6    tell me about how that transition went.

7        A.   Well, I believe I -- to the best of my knowledge,

8    I was the longest running contractor in the area that I

9    was working -- they did not use contractors like that --

10   and was asked to take different jobs at different times.

11   But nothing that panned out in a -- every time that we

12   discussed opportunities, I think my income as a

13   contractor was more than my income as a -- if I were to

14   work over there.

15            It came to a point one time one of the

16   managers told me that I need to take a job as an employee

17   or, you know, my contract will possibly come to an end in

18   the next, you know, several weeks.  And at that time I --

19   Chad Yates called me and told me that -- to apply for

20   this job.  He was in that department.  I applied and they

21   offered me a job.  And I accepted.

22       Q.   Okay.  Would that job bring you more income or

23   less income or the same income as what you were earning

24   as a contractor?



1      A.   I think it was a little bit less income.

2      Q.   But you accepted it because otherwise you were

3   going to be out of a contracting job, anyway.  Is that

4   right?

5      A.   I wouldn't characterize it like that.  I liked

6   MBNA as a company.  I thought it would -- given the right

7   circumstances, I thought it would be a great opportunity.

8      Q.   By the way, do you have a special license to

9   drive the tractor-trailer or the --

10     A.   Yes, sir, I do.

11     Q.   -- car haul?

12                What sort of a license?

13     A.   It is a CDL Class A.

14     Q.   When did you get that?

15     A.   I would think sometime in the '80s.

16     Q.   What was the purpose of getting that when you got

17  it?

18     A.   Well, I knew there was a -- that type of a job is

19  in demand.  And I could, if I needed to -- could always

20  make a living working as a truck driver.

21     Q.   Okay.  So when you first began at MBNA as an

22  employee, what was your position?

23     A.   As an employee?

24     Q.   Yes.



1    A.    It was -- I think the official title was PC

2    technician.  My responsibilities were as an Exchange

3    engineer.

4    Q.    Is "Exchange" with a capital E?  Is that a

5    program of some kind?

6    A.    Exchange is a Microsoft program that supports

7    e-mail functions.

8    Q.    So as an Exchange engineer, what were your

9    obligations or duties?

10   A.    As an Exchange engineer, the obligation would to

11   be make sure that all of the Microsoft Exchange servers

12   were running, functional.  You know, you make sure it has

13   the most up-to-date software.  Things like that.

14   Q.    Okay.  Who did you report to?  Who was your

15   immediate supervisor?

16   A.    Janet Dempsey.

17   Q.    Who was her supervisor?

18   A.    Bellverie Ross.

19   Q.    Okay.  How long did Janet Dempsey remain your

20   supervisor?

21   A.    About two months approximately.

22   Q.    Who became your supervisor after that?

23   A.    Ray Brady.

24   Q.    How long did he remain your supervisor?

Justus Daniel Eapen                    31

1      A.    About a month.

2      Q.    Why did he only remain your supervisor for a

3  month?

4      A.    He left MBNA.

5      Q.    Was he only there for a month?

6      A.    No.  He was -- after I started reporting to him,

7  he left.

8      Q.    It had nothing to do with your reporting to him?

9      A.    Well, later on I found out maybe there could have

10  been something to do with me reporting to him, but I'm

11  not sure and I'm not privileged to know the details.  So

12  I don't know.

13      Q.    What did you find out later?

14      A.    Me and another Indian fellow was reporting to Ray

15  Brady and --

16      Q.    What was his name, the other Indian fellow?

17      A.    Vikas Amin.

18            And Ray Brady felt that we were being

19  treated differently.  And he addressed the issue.  And

20  there was no outcome.  So I believe that he chose to

21  leave.

22      Q.    With whom did he address the issue, if you know?

23      A.    To the best of my knowledge, to Bellverie Ross

24  and Bill Davis.  Maybe even some higher-ups.  I don't

1    know.

2       Q.    Who told you about that?

3       A.    I cannot recall exactly how I came to find out

4    about it.

5       Q.    Okay.  What is it that was different about your

6    treatment?

7       A.    I mean, I could point out hundreds of instances

8    where I felt, you know, why -- how we were treated

9    differently.

10              Do you want me to get into specific

11   examples?

12      Q.    No.  I'm asking you what he thought.

13      A.    What he thought?

14      Q.    Yes.

15      A.    I'm not exactly sure, because he --

16      Q.    You didn't hear about that?

17      A.    He did not talk to me about it, no.

18      Q.    All right.  So after Ray Brady left, who became

19   your supervisor?

20      A.    Neela Chacko.

21      Q.    Okay.  How long was she your supervisor?

22      A.    She was probably, I would say, four to six

23   months.  No.  Four months, I would say.

24      Q.    After that who was your supervisor?

1      A.    Rich Wegner.

2      Q.    How long was he your supervisor?

3      A.    About two months.

4      Q.    After that?

5      A.    Jim Dell.

6      Q.    Jim Dell.

7            How long was he your supervisor?

8      A.    For the rest of my association with MBNA.

9      Q.    Did he become your supervisor in March of 2001?

10     A.    That's possibly correct.  I'm not exactly sure

11   that date.  If that is true, then probably the months

12   that I told could be a little bit longer or could be a

13   little bit less with all the other supervisors.

14     Q.    Was there a time when Bellverie Ross was

15   reassigned or left your area?

16     A.    That was close to the time when I was fired.

17   That's when Bellverie Ross left the area, if that is the

18   question, if I understood you correctly.

19     Q.    Well, let me see if I can focus on that.

20           My indication is that she moved out of the

21   area in May of 2002.

22     A.    That could be.

23     Q.    Okay.  So that was --

24     A.    That --

1    Q.    No one else worked during the week at night?

2    A.    Not that I know of, sir.

3    Q.    Okay.  You mentioned Bridget Williams.

4          Did she work sort of an overlap shift?

5    A.    I thought she worked 8:00 to 5:00 regular shift.

6    Q.    Regular?

7    A.    Yes.

8    Q.    Tell me again what your hours were.

9    A.    6 p.m. to -- I was supposed to work two 13-hour

10   shifts on Friday and Saturday, and Sunday night I was

11   supposed to work a 14-hour shift.  So 6:00 to 6:00 in the

12   morning.  And I guess -- not 6:00 to 6:00.  It's 6:00 to

13   7:00.  But it -- see, how it worked was he required me to

14   stay till 8:15 in the morning until he could do a meeting

15   on Mondays.  So regardless of what -- when I worked, I

16   would end up being there till about 9:00 in the morning

17   for the meetings.

18   Q.    That was every Monday?

19   A.    Every Monday or whenever I worked at night,

20   except if it fell on a Saturday and Sunday.  He

21   frequently changed my shifts at his convenience.  So

22   there was a time period when I was coming in 10-hour

23   shifts and he had me come in during the weekdays.  And

24   during that entire time period, I would stay till 9:00 so

1    A.    Well, not specifically from the book, because I

2    don't think that I may have read the whole book from

3    cover to cover. · But I think I had an understanding of

4    what the procedures were.

5    Q.    Did you hear about something called the

6    Affirmative Action Office?

7    A.    I had an -- I believe there was -- there is an

8    office, yes.

9    Q.    Okay.  Do you know who managed that office?

10    A.    I did not know who managed that office, but I did

11    have an opportunity to speak to that office.  And what I

12    gathered from -- after speaking to the individual who was

13    supposed to be possibly the affirmative action officer --

14    it was my understanding that the affirmative action

15    officers change every couple of years, and there's

16    nothing that they could really do for me, because the

17    individual that I spoke to -- to me expressed the same

18    frustration that I was expressing to her.

19    Q.    Who was that individual?

20    A.    I cannot recall the name, sir.

21    Q.    Was it Danlyn Brown?

22    A.    That name sounds familiar.

23    Q.    What do you mean she expressed the same

24    frustration?



1    A.    No, I do not recall specifically going asking

2    Bridget to say, "Hey, Bridget, did you have Windows 2000

3    training?" No.

4    Q.    Why are you so sure that the others did have it?

5    A.    Because to perform your job in an acceptable

6    manner you need to have training.

7    Q.    Are you just assuming that they had that

8    training?

9    A.    No.  I am -- from the environment I am in, I

10   learned that they all had -- all -- I'm convinced that

11   they had the training.

12   Q.    Well, how do you know?

13   A.    That is my understanding.  I don't know exactly

14   how I came into that understanding, but I'm convinced

15   that they did have the proper training to do their job.

16   Otherwise, it would be difficult for the environment to

17   function.

18   Q.    When was the Eapen Corporation established?

19   A.    I believe it's December 2001 or 2002.

20   Q.    What is the Eapen Corporation?

21   A.    It's just a corporation to protect the name

22   "Eapen" so someone else wouldn't take the name.

23   Q.    Was it a functioning entity? Did it do

24   something?

Justus Daniel Eapen                    65

1    Q.    At night?

2    A.    No.   During the day.

3    Q.    During the day.

4                Okay.   Because you were working nights?

5    A.    No.   At that time I was working during the day.

6    So I took time off from work and got permission from Jim

7    Dell specifically to take that class.   He accommodated me

8    actually with that.

9    Q.    What was your expectation in getting that real

10   estate license?   What were your plans?

11   A.    Well, to me it's a great investment, because for

12   $195 you get a license that you could use when you buy

13   your house.   If you buy a half-a-million-dollar house,

14   you get the three percent.   Because you're a realtor, you

15   can keep that three percent, or you could lawfully earn

16   that three percent.   So I thought, if I do buy a home,

17   that would be a great investment of $195 to earn

18   thousands of dollars.

19   Q.    Does your wife have a real estate license?

20   A.    No, she does not.

21   Q.    Has she ever had one?

22   A.    No, she's never had one.

23   Q.    What did she do?

24   A.    She's a mortgage banker.



1        Q.    Mortgage banker?

2        A.    Right.

3        Q.    So, in theory, if you made a sale of a house to

4    someone --

5        A.    Mm-hmm.

6        Q.    -- you could arrange to get the mortgage through

7    your wife.

8              Is that --

9        A.    Well, that I perceive would be a conflict of

10   interest.  You know, you arrange a sale of a house, and

11   then your wife do the mortgage.  I don't know if you

12   really want to do that.

13       Q.    Why would that be a conflict of interest?

14   Wouldn't that just facilitate the ability to get the

15   house?

16       A.    I believe, if I'm a real estate agent selling the

17   house, what I think I should be doing -- the best thing

18   for the client.  So should I be, you know, having my

19   wife, you know, give them a mortgage too so my wife can

20   earn an income?  I would think that the client would

21   perceive a conflict of interest there.

22       Q.    So that wasn't your plan?

23       A.    No, that wasn't my plan.

24       Q.    Okay.  Does a real estate agent work for a

1   broker?

2       A.    Yes.    They do work for a broker.

3       Q.    In your case did you have a relationship with a

4   broker?

5       A.    With Long & Foster.

6       Q.    Okay.    That's a sizable company?

7       A.    Absolutely.

8       Q.    Who in particular at Long & Foster did you make

9   this arrangement with?

10      A.    I don't recall the name -- whoever the manager is

11  of the nearest -- I believe her first name was Janet.    I

12  know her first name is Janet.    I forgot the last name.

13      Q.    Where was she located?

14      A.    In Bel Air.

15      Q.    When did you make that arrangement?

16      A.    When I took the class in 2001.

17      Q.    Did you take the class before you had that

18  arrangement or did you make the arrangement first?

19      A.    During the class.

20      Q.    How did you hook up with her?

21      A.    I must have called.    If my memory is correct, I

22  think I must have seen an advertisement at Long & Foster.

23  There was free classes.    And I think I called her -- and

24  I think they must have transferred me to her or something

Justus Daniel Eapen                    . 89

1    A.    Correct.

2    Q.    Okay.  Is there a risk if people use other

3  people's password?

4    A.    In that environment?

5    Q.    No.  Just generally.

6    A.    In production environment, absolutely.

7    Q.    What's the risk?

8    A.    I could pretend to be Jason and cause much damage

9  to MBNA systems, and Jason would be in trouble.

10   Q.    You could change files?

11   A.    Absolutely.

12   Q.    Did you know anyone else's passwords besides

13  Jason Campbell's?

14   A.    In this test environment?

15   Q.    Yes.

16   A.    I set up that environment, so I probably created

17  the passwords for everybody in that specific environment.

18  I probably even knew the password for information

19  security people in that environment.

20   Q.    Do you have a different password for the non-test

21  environment?

22   A.    Yes, we do.

23   Q.    Okay.  Are you saying the password that Jason

24  Campbell gave you was not his regular password?

Justus Daniel Eapen                           114

1       Q.    Do you want to say anything about else about the

2   conversation with Ernie Marra?

3       A.    I don't recall the conversation right now.    What

4   I'm trying to say is I have no disrespect for that policy

5   at all.    I respect the policy and I abide by the policy

6   in the production environment at all times.    So I will

7   never make a statement that policy is stupid.

8       Q.    Would information security have been alerted if

9   you're exclusively operating in a testing environment?

10      A.    See, that's exactly why -- I don't know why they

11  were allowed when they set up the system to alert

12  information security.  And it is my belief that Jim Dell

13  set it up specifically to implicate me, because prior to

14  that I was not aware that the test environment three

15  years it existed ever reported to information security

16  anything that I was doing there or anybody else was doing

17  there.    So it is -- whatever happened was set up

18  specifically during those days so they will be alerted.

19  And then I wasn't notified that ITA was set up in the

20  test environment.

21      Q.    So you think that Jim Dell alerted or changed the

22  system to catch you doing something?

23      A.    Jim Dell or, you know, someone else, you know,

24  made it happen.    And it is my belief that without Jim

Justus Daniel Eapen                    124

1              In the production environment, you don't

2    even unplug a hard drive without having a change

3    management request approved.  So there are occasions

4    where I did things outside the scope of, you know, those

5    seven or ten daily checks that I had to do.  And that was

6    one of them.  I -- on every server I changed all the hard

7    drives.  All of them.

8        Q.    You did that at night?

9        A.    Yes, I did that at night.

10       Q.    Okay.  Was there an -- go ahead.

11       A.    And that should have worked to get, you know,

12   something like this to information security.

13   Obviously -- I don't know why they didn't get it.  The

14   only reason is because they didn't have ITA installed in

15   that environment when I was doing that.  ITA is the

16   software that actually reports these kinds of things back

17   to information security.

18       Q.    Are you referring to the last exhibit?  The one

19   you just held up, was that Eapen 11?

20       A.    Eapen 11, right.

21       Q.    Was there an instance where you were caught

22   sleeping on the property at MBNA by Jim Dell?

23       A.    Exactly.  That's one of the framing that -- Jim

24   Dell showed up one night asked me to do something.  Next

**W&F**

1    morning he told Bellverie that I was sleeping on the job.

2    Well, I explained to Bellverie -- even if I was sleeping

3    on the job -- when I'm not at my desk, I made a practice

4    of writing down on the white board exactly where I am,

5    because I think after September 11th, you know, there

6    were, you know, several incidents where -- if they don't

7    know where you are, people would, you know, probably

8    worry.  So I write down on the white board exactly where

9    I am.

10            When Jim Dell came in, I was on my break.

11   And if Jim Dell cannot for some reason find me anywhere,

12   he just simply had to call me on my cell phone.  So he

13   fabricated that incident.  He is lying about it.

14        Q.   Well, were you sleeping or weren't you sleeping?

15        A.   No, I wasn't sleeping.

16        Q.   Where were you?

17        A.   I was in the test lab.

18        Q.   Okay.  Did you see him in the test lab?

19        A.   Yes.  When he came in, you know, I was walking

20   out, because I knew someone had come in because he turned

21   the light on in the other room.  So I knew there was

22   someone, you know, coming in.  So I was just about to

23   walk out of there.  But because I was in that room, I

24   don't know if he -- that -- I'm assuming, you know --

Justus Daniel Eapen                    142

1    Q.    You don't know his name?

2    A.    No.

3    Q.    Okay.  Was he someone who was there every day

4  distributing the mail?

5    A.    Yes, sir.

6    Q.    He has an impairment.  He's a disabled person.

7  Is that right?

8    A.    I believe that he is -- he may have some sort of

9  learning disability.

10    Q.    What was the context in which he was told that

11  you were Osama Bin Laden's brother?

12    A.    My presence caused them to address me as "OBL"

13  or Osama Bin Laden.

14    Q.    I mean, in this particular instance --

15    A.    Maybe I just stood up.  I don't recall.  Maybe I

16  stood up in my cubicle and I was visible.  And they

17  pointed out that I'm Osama Bin Laden's brother.  Or they

18  were already having a conversation and I, you know, stood

19  up.  I don't know.  I don't remember exactly.  All I

20  remember is after the fact, you know, when -- I didn't

21  realize that I was going to take it so seriously until I

22  realized that he was going to jump on me.  So it all

23  happened within a few seconds.  But -- you know, so I

24  wasn't recollecting exactly what happened and apply it to

 1   those few moments.

 2       Q.   You say he was in Glenn Ford's cubicle?

 3       A.   Correct.

 4       Q.   So he didn't really get to your cubicle, did he?

 5       A.   No, he did not.

 6       Q.   Okay.  So basically what happened was, from your

 7   standpoint, you heard --

 8       A.   I didn't hear it.  I saw.

 9       Q.   You saw and heard?

10       A.   What?  I'm sorry.

11       Q.   Let me finish.

12            Did you hear Glenn Ford say, "He's Osama Bin

13   Laden's brother"?

14       A.   Yes.

15       Q.   The individual got upset about that?

16       A.   Yes.

17       Q.   And made what:  a motion toward you or something?

18       A.   Correct.

19       Q.   They stopped it.  Correct?

20       A.   Correct.

21       Q.   They told him we're just kidding?

22       A.   Yes.

23       Q.   That's it.  Correct?

24       A.   I don't think that is it, because if he's a

1   And I stopped complaining, because if I -- it came to a

2   point where the more I complained I'm known as a

3   complainer.  And Jim Dell specifically told me that if

4   I'm complaining too much it just makes me look stupid.

5   So stop complaining.

6       Q.    Did you tell Ernie Marra about the incident?

7       A.    About that incident?  He was not working there at

8   that time.

9       Q.    When was it?

10      A.    I would say it was in 2002 sometime or maybe late

11  2001.

12      Q.    Okay.  But did you later tell Ernie Marra about

13  the incident?

14      A.    I don't recall discussing that specific incident

15  with Ernest Marra, no.  That is not to say I did not, but

16  I do not recall discussing that with him.

17      Q.    If I can refresh your recollection, do you recall

18  him asking you if you wanted him to do something about

19  that and your saying, no, don't bother?

20          MR. COOK:  We're referencing the incident

21  with the mailroom clerk?

22          MR. SANDLER:  Correct.

23      A.    Did Ernest Marra ask me if he wants -- I want him

24  to do anything about it?

1    talked to Tom Thomaides about it.

2      Q.    Regarding Bellverie Ross, were the employees who

3    worked for her unhappy with the way she treated them?

4      A.    They thought that she has her job because she is

5    black, short and fat.

6      Q.    Who said that?

7      A.    Jim Dell specifically on multiple times directly

8    at me and -- yeah.  That's -- yes.  Jim Dell.

9      Q.    Anybody else?

10     A.    I have overheard conversations where they make

11   similar remarks about her in the entire desktop computing

12   environment multiple times.

13     Q.    Were you unhappy with the way Bellverie Ross

14   treated people?

15     A.    Was I unhappy with the way?  Well, at one point I

16   wasn't sure where I was -- where, you know, management is

17   getting this perception that -- it was brought to my

18   attention that I was a subpar performer -- or it is Tom

19   Thomaides' understanding that me and Bellverie -- not

20   Bellverie -- that Bridget Dell -- I'm sorry.  I get

21   confused with names.

22     Q.    Bridget Williams?

23     A.    Bridget Williams were subpar performers.

24             And somehow it was brought to my knowledge

Justus Daniel Eapen                    170

1      A.    That is correct.

2      Q.    Were you working on an LLB degree?

3      A.    Yes.  I'm registered at the University of London

4   for my LLB.

5      Q.    Is that one of those external programs?

6      A.    Yes, sir.

7      Q.    Is that something you do at home?

8      A.    I think that's part of this document that you're

9   getting that information from.

10     Q.    Right.

11     A.    Yes.  I'm doing it on my own.

12           (Eapen Deposition Exhibit No. 17 was marked

13   for identification.)

14   BY MR. SANDLER:

15     Q.    Did you prepare this e-mail as Eapen 17?

16     A.    Yes, sir.

17     Q.    It's an e-mail dated April 8th, 2002, to

18   Bellverie Ross.  Correct?

19     A.    That is correct.

20     Q.    All right.  Did you ever get a response to that

21   e-mail?

22     A.    Yes.  Jim Dell came back and told me I had to

23   live with whatever they left me in the cubicle and he

24   doesn't want to hear about it anymore.

1    problem between yourself and Jim Dell.  Is that right?

2       A.    Absolutely.

3       Q.    I think you said that that's why you felt you

4    were promoted?

5       A.    Correct.  That's what I said.

6       Q.    Tell me more about that.

7             Why do you think that that's how you got

8    promoted?

9       A.    What specifically would you like to know?  I

10   mean, that's too general.  I don't know how much you want

11   me to get into.

12      Q.    Well, first of all, what do you think Mr. Micek

13   was aware of?

14      A.    I think Micek is aware of the problems that I was

15   experiencing in desktop computing.

16      Q.    The "problems" meaning what?

17      A.    The problems like my difficulty in having a

18   meaningful job in desktop computing and harassment like

19   this letter that I wrote to Bellverie.  I have similar

20   letters that I wrote to Micek when I was having problems

21   even after this.

22      Q.    Do you have copies of those letters?

23      A.    No.  I don't have copies of anything, sir.

24   Because I was fired, I didn't have access to any of them.

William F. Kennedy

12

1    of?

2      A.    No.

3      Q.    Did Mr. Wresneski ever tell you what was on

4    those audio files?

5      A.    No.

6      Q.    Is that the only time you have been disciplined

7    while you have been employed at MBNA?

8      A.    Yes.

9      Q.    Were you ever disciplined at your job at First

10   Investors in Cherry Hill?

11     A.    No.

12     Q.    And what was the nature of the discipline?

13     A.    First and final notice.

14     Q.    First and final notice.  How long did that

15   last?

16     A.    Two years.

17     Q.    Did you know Mike Broughton?

18     A.    Yes.

19     Q.    He works in Desktop Computing with you?

20     A.    Desktop LAN Services.  He is part of the Server

21   Engineering Team.

22     Q.    Did you ever socialize with Mr. Broughton

23   outside of the office?

24     A.    I am sure once or twice in the last ten years.

Sung Byun

1

```
 1            IN THE UNITED STATES DISTRICT COURT
 2               FOR THE DISTRICT OF DELAWARE
 3
 4
    EQUAL EMPLOYMENT OPPORTUNITY      )
 5  COMMISSION,                       )
                                      )   Civil Action No.
 6                Plaintiff,          )   04-CV-425-SLR
                                      )
 7  v.                                )
                                      )
 8  MBNA AMERICA BANK, N.A., a        )
    subsidiary of MBNA Corporation,)
 9                                    )
                  Defendant.          )
10
11            Deposition of SUNG BYUN taken pursuant to
    notice at the law offices of YOUNG CONAWAY STARGATT &
11  TAYLOR, 1000 West Street, Wilmington, Delaware,
12  beginning at 10:05 a.m. a.m. on Monday, July 18, 2005,
    before Renee A. Meyers, Registered Professional
13  Reporter and Notary Public.
14  APPEARANCES:
15            TERRENCE R. COOK, ESQ.
              U.S. EQUAL EMPLOYMENT OPPORTUNITY
16            COMMISSION
                21 South Fifth Street
17              The Bourse, Suite 400
                Philadelphia, Pennsylvania  19106-2515
18              for the Plaintiffs,
19            SHELDON N. SANDLER, ESQ.
              YOUNG CONAWAY STARGATT & TAYLOR
20              1000 West Street, 17th Floor
                Wilmington, Delaware  19899
21              for the Defendant.
22  ALSO PRESENT:  Launice Sills, Esq.
23                   WILCOX & FETZER
       1330 King Street - Wilmington, Delaware 19801
24                   (302) 655-0477
```

Sung Byun

37

1    Q.    And did Bill Kennedy make remarks or refer to

2    an A team or a W team?

3    A.    Yes.

4    Q.    And what was your understanding of what the A

5    team was?

6    A.    A team started out as, you know, A team and B

7    team.    We were building servers, and, you know, we

8    wanted -- we had two teams building servers, and, you

9    know, it was kind of like a -- like a, you know, team

10   kind of competitiveness.    And, so, he started out with

11   an A team and a B team.    Then the A team became, you

12   know, the "A-team," "Mr. T," that whole "A-team" in

13   the '80s.    Then it start kind of went to, Oh, the A

14   team, as the Asian team.    Then, if the A team is the

15   Asian team, then we are the W team for the White team.

16   That's how it kind of evolved.

17   Q.    There was no black team?

18   A.    No.

19   Q.    So, "B" never had reference to black?  B was

20   just A and B for letters of the alphabet?

21   A.    Correct.

22   Q.    And was that the way that Bill's team were

23   commonly referred to, as the A team and the W team?

24   A.    No.    It was just more of an inside joke amongst

Sung Byun

38

1   a few friends.

2     Q.   What time period, if you recall, was the use of

3   the A team or the W team used amongst the few friends

4   there in Desktop Computing?

5     A.   This is probably the Bellverie and the Neela

6   era.

7     Q.   And was Neela Chacko aware of the use of the A

8   team and W team in reference to the Asian and White

9   team?

10    A.   She may have heard the A team and she said,

11  "What's that"?  And we just -- probably just chuckled.

12    Q.   Do you know if Bellverie Ross was aware of the

13  A team and the W team and what that stood for?

14    A..  No.  I don't think it went that high.

15    Q.   Would you describe the atmosphere there as a

16  pretty, a joking atmosphere, playful atmosphere?

17    A.   Oh, very.

18    Q.   And the jokes included jokes of race and

19  religion or was it simply race or national origin?

20    A.   Just national origin.

21    Q.   And was Jim Dell in Desktop Computing present

22  when any of these comments were made?

23    A.   When these comments were made, he was part of

24  Desktop Computing but not in front of him.

Sung Byun

42

1    Q.    No?

2    A.    (Witness nods.)

3    Q.    You don't recall?

4    A.    No.

5    Q.    Did you ever hear Justus Eapen referred to as a

6    sand nigger?

7    A.    Yes.

8    Q.    How many times have you heard Mr. Eapen

9    referred to as a sand nigger?

10    A.    Probably once or twice.

11    Q.    By whom?

12    A.    Yeah, if I guess, I am taking a guess, but I

13    think it was kind of a little bit extreme, that, as a

14    joking, I thought that was a little bit extreme when I

15    heard it.

16    Q.    The person that referred to Mr. Eapen as a sand

17    nigger, does the last name Todd --

18    A.    Uh-uh.

19    Q.    -- refresh your recollection as to who it may

20    have been?

21    A.    No.

22    Q.    Did you ever hear anyone refer to Mr. Eapen as

23    a nigger?

24    A.    No.

Sung Byun

54

1    A.   It was in a joking, you know, joking manner.

2    Q.   Now, so, in addition to being the victim of

3    jokes, you, yourself, also participated in the joking;

4    is that fair to say?

5    A.   Yes.

6    Q.   Were there any jokes or comments made about any

7    other national origin or race?  As we talked about

8    comments made to Mr. Eapen, because he was Indian,

9    comments made to you, because you are South Korean,

10   and comments made to Mr. Taylor, because he is black.

11   Any other comments made to an employee based on their

12   national origin or race?

13   A.   No.

14   Q.   Were there comments made about females because

15   of their gender?

16   A.   No.  It was just based on who participated in

17   our -- in our joking aspect, and no female

18   participated in that.

19        MR. COOK:  Mr. Byun, I don't have any

20   other questions.  Thank you for your time.

21   Mr. Sandler may have some questions for you.

22        MR. SANDLER:  I have a few questions.

23   BY MR. SANDLER:

24   Q.   You mentioned earlier that the term "red neck"

Sung Byun

55

1   was used in this joking back and forth comments.

2   A.   Right.

3   Q.   To whom was that directed?

4   A.   Bill Kennedy.

5   Q.   And who used that term?

6   A.   I did.

7   Q.   And what does it mean?

8   A.   I guess it would mean someone who is not --

9   good question.  Someone who is not -- not intelligent,

10  someone who is backwards in time.

11  Q.   Doesn't it usually refer to a low class white

12  person?

13  A.   Right.

14  Q.   In discussing the training that was received

15  and your understanding of what was and wasn't unlawful

16  harassment, I think you used the phrase, "unwanted."

17  In other words, if something was accepted or welcomed,

18  that wasn't perceived as harassment; correct?

19  A.   Of course.

20  Q.   And the kinds of back and forth comments that

21  were engaged in by these so-called worker bees in

22  Desktop Computing, is it correct to say that those

23  comments were welcomed or were not unwanted?

24  A.   Correct.  If I, you know, sense something that