James A. Dell

1

```
 1          IN THE UNITED STATES DISTRICT COURT
 2            FOR THE DISTRICT OF DELAWARE
 3
 4
    EQUAL EMPLOYMENT OPPORTUNITY    )
 5  COMMISSION,                     )
                                    )   Civil Action No.
 6              Plaintiff,          )   04-CV-425-SLR
                                    )
 7  v.                              )
                                    )
 8  MBNA AMERICA BANK, N.A., a      )
    subsidiary of MBNA Corporation,)
 9                                  )
                Defendant.          )
10
                Deposition of JAMES A. DELL, JR. Taken
11  pursuant to notice at the law offices of YOUNG CONAWAY
    STARGATT & TAYLOR, 1000 West Street, Wilmington,
12  Delaware, beginning at 9:00 a.m. on Tuesday, July 19,
    2005, before Renee A. Meyers, Registered Professional
13  Reporter and Notary Public.
14  APPEARANCES:
15          TERRENCE R. COOK, ESQ.
            U.S. EQUAL EMPLOYMENT OPPORTUNITY
16          COMMISSION
               21 South Fifth Street
17             The Bourse, Suite 400
               Philadelphia, Pennsylvania  19106-2515
18             for the Plaintiffs,
19          SHELDON N. SANDLER, ESQ.
            YOUNG CONAWAY STARGATT & TAYLOR
20             1000 West Street, 17th Floor
               Wilmington, Delaware  19899
21             for the Defendant.
22  ALSO PRESENT:  Launice Sills, Esq.
23                  WILCOX & FETZER
        1330 King Street - Wilmington, Delaware 19801
24                  (302) 655-0477
```

James A. Dell

23

1    Q.    To another shift?

2    A.    Yes.

3    Q.    And what shift did you change that to?

4    A.    That was a three-day a week shift, working

5    from, I believe, six p.m. to seven a.m. three days a

6    week.

7    Q.    Do you recall when the change in Mr. Eapen's

8    schedule occurred?

9    A.    2001.

10    Q.    And why was that switch made?

11    A.    PSN growth required 24-5 coverage.

12    Q.    And what do you mean by "24-5"?

13    A.    Coverage for 24 hours five days a week.

14    Q.    Prior to the time you switched Mr. Eapen to the

15    three-day a week schedule, was there anyone else,

16    amongst the team of five individuals you managed, that

17    worked a three-day a week schedule from six p.m. to

18    seven a.m.?

19    A.    Prior to?

20    Q.    Yes.

21    A.    No.

22    Q.    And how did you go about selecting Mr. Eapen to

23    work the three-day a week six p.m. to seven a.m.

24    shift?

James A. Dell

59

1    A.    I do not.

2    Q.    Was it 2001?  2002?

3    A.    I don't recall.

4    Q.    And what was the reason for the lack of

5    communication, lack of talking?

6    A.    He was, apparently, angry at me.

7    Q.    And do you know why Mr. Eapen was angry at you?

8    A.    I discovered him sleeping at MBNA during his

9    shift.

10    Q.    And do you recall when that was, when you

11    discovered him sleeping?

12    A.    I do not.

13    Q.    How is it that you discovered Mr. Eapen

14    sleeping?

15    A.    I would periodically come in at three or four

16    in the morning, get my workday started.

17    Q.    And what did you observe when you came in at

18    three or four?

19    A.    The test lab was very dark, and when I walked

20    in, Justus was sleeping between two chairs.

21    Q.    Who else was in the test lab at the time?

22    A.    No one.

23    Q.    Did you wake Mr. Eapen?

24    A.    He woke when I came to the door.

James A. Dell

64

```
 1    A.    No.

 2    Q.    Did you come in and visit Jason Campbell in the

 3   evening as well, or the early morning, rather?

 4    A.    Yes.

 5    Q.    In the early morning, three, four a.m.?

 6    A.    I don't recall.

 7    Q.    You don't recall if you ever came in early,

 8   3:00 or 4:00 in the morning, on the days or the shifts

 9   in which Jason Campbell was working?

10    A.    I don't recall coming in early in the morning

11   when Jason was there, to meet specifically with Jason.

12    Q.    What were your hours at MBNA from the time in

13   which you came in early that morning to see Mr. Eapen?

14    A.    It would have been eight to five.

15    Q.    So, on the occasion when you came in and you

16   found Mr. Eapen sleeping, had you come in for the

17   specific purpose of speaking with Mr. Eapen about some

18   work-related matter?

19    A.    No.

20    Q.    Was it more just a surprise visit?

21    A.    No.  It was to get, actually, busy on what I

22   needed to do for the day.

23          MR. COOK:  Do you want to take five?

24   Let's take five, ten minutes.
```

**W&F**

James A. Dell

66

1    A.    No.

2    Q.    And how big is the area in which Desktop

3    Computing was located in terms of feet or yards?  If

4    you can give me an approximation?

5    A.    Maybe 6,000 square feet.

6    Q.    And how would you describe that environment

7    where you guys were located in terms of the

8    relationship amongst the employees in that area?

9    A.    I'd say a fun group.

10    Q.    Did everyone seem to get along?

11    A.    Oh, yes.

12    Q.    Were you aware of any joking going on between

13    the employees in that area?

14    A.    Yeah.

15    Q.    Were you aware of any racial jokes or were they

16    just jokes told amongst the employees in that area?

17    A.    No.

18    Q.    Were you aware of any racial comments made by

19    anyone in that group?

20    A.    No.

21    Q.    Were you aware of any comments, or jokes,

22    rather, based on Mr. Eapen's national origin that were

23    told amongst those employees?

24    A.    No.

James A. Dell

75

1    Q.    What about Tom Liddle, did he have Windows 2000

2    training?

3    A.    No.

4    Q.    What about Jason Campbell?

5    A.    No.

6    Q.    Do you recall an incident where Mr. Eapen

7    complained to you about employees tampering with his

8    computer equipment?

9    A.    About a mouse ball, yes.

10    Q.    Do you recall the time frame that he complained

11    to you about this?

12    A.    I don't.

13    Q.    And what was his complaint?

14    A.    Someone removed his mouse ball out of his

15    mouse.

16    Q.    And what did you do in response to his

17    complaint?

18    A.    I walked over to the individuals in the area,

19    and I said, "No more jokes."

20    Q.    Did you recover the mouse ball?

21    A.    I did not recover it personally.

22    Q.    Did you ever find out who took the mouse ball?

23    A.    I did not.

24    Q.    Did Mr. Eapen complain to you on more than one

James A. Dell

77

1    Q.    And was anyone else's monitor replaced?

2    A.    No.

3    Q.    How long had Mr. Eapen had the server monitor,

4    if you are aware?

5    A.    I am not aware.    It was a short period.    30

6    days.

7    Q.    Do you recall any other incident when Mr. Eapen

8    complained to you about employees tampering with his

9    computer equipment?

10   A.    No.

11   Q.    Did you ever discipline Mr. Eapen in any way

12   while he was under your supervision?

13   A.    No.

14   Q.    Did you alert someone in personnel about your

15   belief that Mr. Eapen had engaged or was engaging in

16   an outside business?

17   A.    I did not alert.    I was asked questions and I

18   answered those questions.

19   Q.    Who were you asked questions by?

20   A.    Rich Kilmon.

21   Q.    It's your testimony Rich Kilmon contacted you

22   and asked you whether or not Mr. Eapen was engaging in

23   outside business?

24   A.    It was during an issue where Justus was -- had

**W&F**

1

1      IN THE UNITED STATES DISTRICT COURT
2            FOR THE DISTRICT OF DELAWARE
3
4

EQUAL EMPLOYMENT OPPORTUNITY       )
5  COMMISSION,                        )
                                    )   Civil Action No.
6            Plaintiff,              )   04-CV-425-SLR
                                    )
7  v.                                )
                                    )
8  MBNA AMERICA BANK, N.A., a         )
   subsidiary of MBNA Corporation,)
9                                    )
             Defendant.             )
10

             Deposition of ERNESTO E. MARRA taken
11  pursuant to notice at the law offices of YOUNG CONAWAY
   STARGATT & TAYLOR, 1000 West Street, Wilmington,
12  Delaware, beginning at 9:00 a.m. on Thursday, July 21,
   2005, before Renee A. Meyers, Registered Professional
13  Reporter and Notary Public.
14  APPEARANCES:
15            TERRENCE R. COOK, ESQ.
             U.S. EQUAL EMPLOYMENT OPPORTUNITY
16            COMMISSION
               21 South Fifth Street
17             The Bourse, Suite 400
               Philadelphia, Pennsylvania  19106-2515
18             for the Plaintiffs,
19            SHELDON N. SANDLER, ESQ.
             YOUNG CONAWAY STARGATT & TAYLOR
20             1000 West Street, 17th Floor
               Wilmington, Delaware  19899
21             for the Defendant.
22  ALSO PRESENT:  Launice Sills, Esq.
23                    WILCOX & FETZER
      1330 King Street - Wilmington, Delaware 19801
24                    (302) 655-0477

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

1    Q.    Did you advise Mr. Eapen to admit that he was

2    wrong to Personnel?

3    A.    No.    I told him to relay the truth and be

4    honest and not to hold any information back.

5    Q.    After January of '03, did you receive any

6    complaint from Justus Eapen regarding discrimination

7    or harassment based on his race or national origin?

8    A.    We had a meeting in the course of which he

9    indicated that he felt discriminated against.

10   Q.    Do you recall the time frame of the meeting you

11   had with Mr. Eapen in which he shared this

12   information?

13   A.    I can't give you the exact time frame, but it

14   was after all of this incident occurred and he wasn't

15   quite happy with the results of what the Personnel

16   action would be, that were being done, his meetings

17   with Personnel and so on and so forth.    He actually

18   asked me if I could see him for a couple minutes, and

19   the purpose of the meeting, as he put it, was to vent.

20   He didn't want anything -- just wanted to talk to me

21   to vent his feelings with someone, and I gave him that

22   opportunity.

23   Q.    Do you recall whether this meeting you had

24   where Mr. Eapen vented was in January of '03?

1    A.    It was after the incident.

2    Q.    But you don't have a specific recollection of

3    whether -- was it in the month of January or February

4    or some other month?

5    A.    I seem to recall that it was probably more

6    towards, like, the end, last couple weeks in January.

7    Q.    And this was a one-on-one with Mr. Eapen?

8    A.    Yeah.  It was, again, one of those impromptu,

9    he had just got off his shift type deal, and he asked

10   me if I could see him for a couple minutes.

11   Q.    Now, he indicated to you that he felt

12   discriminated against.

13             Did he give you any --

14   A.    No details.

15   Q.    He gave you no details about what he believed

16   was -- how he was discriminated against, rather?

17   A.    Correct.  It was just a general statement.  And

18   when I informed him the MBNA policy was zero tolerance

19   and if he felt that people discriminated against him,

20   to inform us of this, identify the individual so they

21   would do something about it, he said he was not

22   interested in that, he was just there to vent.  So, he

23   provided no details.

24   Q.    And did he tell you that he felt discriminated

1    against based on his race or national origin?

2    A.    No.

3    Q.    He just used the term "discriminated against"?

4    A.    Correct.

5    Q.    Did you ask him for any examples for how he

6    felt he was discriminated against?

7    A.    Multiple occasions during the meeting, I

8    attempted to get him to commit to a specific event,

9    specific name, something that I could exercise a

10    policy and bring that policy against, and he did not

11    provide not a name, not an event, not anything that

12    was specific enough.  He just said he wanted to vent

13    and that he felt frustrated.

14    Q.    What did he express frustration with?

15    A.    Nothing specific.

16    Q.    Did he express frustration concerning the lack

17    of assignments he was getting during the night shift?

18    A.    No.

19    Q.    Did he express any frustration about

20    communication issues that he had with Mr. Dell?

21    A.    In this particular meeting, yes.

22    Q.    Did he express frustration during this meeting

23    about feeling isolated because he worked the night

24    shift?

1    A.   Correct.

2    Q.  Based on the fact that he told you he felt

3  discriminated against, did you have an obligation,

4  under MBNA's harassment policy, to elevate that

5  complaint to either your manager or to Personnel?

6    A.  In the environment that we have, I did, without

7  an external environment, because I didn't want to

8  break the bond of the trust that Justus and I had

9  established, that he could feel comfortable coming

10  into my office and talk to me about things, that I

11  would not break that trust.

12         I inquired about things throughout the

13  one-on-ones and throughout staff meetings to ascertain

14  whether there was a feeling, and there was no grounds,

15  no one came up and said, No, I think he is right or he

16  is wrong.  But, again, the meeting that he requested

17  was one of privacy, close the door, and what we say --

18  and, again, had he provided me with a formal complaint

19  or some sort of information, then it would have gone

20  forward.

21    Q.  So, you didn't relate to Mr. Micek anything

22  Mr. Eapen told you during this venting session; is

23  that correct?

24    A.   Correct.

1    Q.    Based on your knowledge of the harassment

2    policy at MBNA, can you tell me what constitutes a

3    formal complaint of discrimination or harassment?

4    A.    Anyone walks in the office and says, "I have an

5    issue; I feel that" -- at that point, it becomes

6    formal.    When Justus walked into my office, his first

7    statement was, "This is between you and I.  I do not

8    want this to go" -- and he went into the privacy

9    things.  So, it was our building a trust, working

10   relationship with each other.  And, again, he did not

11   provide anything but just the statement.

12   Q.    Based on your knowledge of the policy, is it

13   enough for a person to say that they were

14   discriminated against in order to invoke the

15   procedures under the policy?

16   A.    I need to answer the question in two parts.

17   Q.    Sure.

18   A.    If someone says, "I feel discriminated

19   against," then yes.  In the case with Justus, he

20   specifically stated that he did not want anything

21   other than to vent.

22            I asked him repeatedly to move this into

23   the other aspect, to make this something that I could

24   do something about.

1 Q. Now, so, I take it from your testimony that

2 Mr. Eapen telling you he was discriminated against was

3 enough to trigger the procedures set forth in the MBNA

4 harassment policy, but you made the decision not to

5 invoke those procedures because Mr. Eapen asked you to

6 keep it confidential?

7 A. I am not quite sure I --

8 Q. We will go over it again.

9    The original question was:  Was

10 Mr. Eapen's complaint, that he was discriminated

11 against, a complaint of discrimination or harassment

12 under MBNA's policy, as you understood it?

13 A. No.  Because the only thing that he stated to

14 me is, "I have been discriminated against," without

15 any details, without anything else to corroborate,

16 without anything that we could go about and

17 investigate.  There was no substance other than, "I

18 have been discriminated against."  So, there was

19 nothing for me, as a manager, to go out and say, Okay,

20 give me the details and I can do the initial stages of

21 the process and then go through the MBNA policy and

22 turn it over to the right people.  There was nothing

23 other than a statement that I think was made in

24 frustration.

1  Q. And then you say it was made in frustration

2 based on what?

3  A. I think that the emotional state that he was

4 in.

5  Q. And what was that emotional state?

6  A. Throughout the meeting, he was very emotional,

7 as I stated earlier.

8  Q. So, I am correct that you did not view

9 Mr. Eapen telling you he felt discriminated against to

10 be a complaint of discrimination under MBNA's

11 harassment policy?

12  A. In this context, correct.

13  Q. And the context being that he did not provide

14 you details as to why he believed he was discriminated

15 against?

16  A. That and the fact that he was very specific

17 about the meeting being one where he wanted me to

18 respect his privacy.

19  Q. Are you familiar with the harassment policy at

20 MBNA, Mr. Marra?

21  A. Yes.

22     MR. COOK:  Let's mark that.

23     (EEOC Exhibit No. 8 entitled "Personnel

24 Policy MBNA Corporation" was marked for

1    identification.)

2    BY MR. COOK:

3      Q.    Mr. Marra, you have been handed what's been

4    marked as EEOC 8 for identification.

5      A.    Yes.

6      Q.    Do you understand this to be MBNA's harassment

7    policy?

8      A.    Yes, sir.

9      Q.    This is policy No. 603; correct?

10     A.    Correct.

11     Q.    And the effective date of this particular

12   policy is June 1999; correct?

13     A.    Correct.

14     Q.    Are you aware if there is a later version of

15   this policy that's currently in use?

16     A.    No, sir.

17     Q.    I will direct your attention to numbered

18   paragraph D on the second page, which is the reporting

19   procedure for issues of harassment at MBNA.

20     A.    Yes, sir.

21     Q.    Are you aware of any provision underneath

22   paragraph D that says you do not have to report an

23   incident of harassment or discrimination at MBNA if

24   the person asks you to keep it confidential?

1    A.    It does not state that.

2    Q.  · And can you show me anywhere in the policy

3    where it says that the details of the discrimination

4    or harassment have to be shared in order for it to be

5    an adequate report of discrimination or harassment?

6    A.    You have to determine that it is harassment

7    first.

8    Q.    And that's a decision that the person receiving

9    the complaint has to make; is that what you are

10   telling me?

11   A.    I have reviewed this, and throughout the

12   meeting, this is what I referenced with Justus.

13   Q.    So, because you didn't believe it to be a

14   complaint of discrimination or harassment, that was

15   your decision to make underneath this policy; is that

16   what you are telling me?

17·  A.    No.  I acted on the request that Justus made to

18   keep that confidential in our private meeting, that

19   there was not -- he did not come in to complain.

20   Q.    If Mr. Eapen had provided you detail of his --

21   why he believed he was discriminated against, would

22   that have changed your opinion as to whether or not

23   you needed to report that to someone higher than

24   yourself?

1    A.   If he felt that he had been discriminated

2   against and provided the details of what had

3   transpired, then yes, and there would have been a

4   complaint more so than just venting.

5    Q.   So, if Mr. Eapen comes to you and says, "The

6   employees in my section call me Osama bin Laden, they

7   call me dot head or sand nigger, but I am just

8   venting, I don't want you to tell anybody," would you

9   have an obligation, under the policy, to report that

10   to someone higher than yourself?

11    A.   Yes.

12    Q.   So, am I correct that it's not so much that

13   Mr. Eapen asked you to keep your meeting private, that

14   you did not report this to someone higher than

15   yourself, it's because you did not believe this to be

16   a complaint of discrimination?

17    A.   Incorrect.  It's not --

18    Q.   So why didn't you --

19           MR. SANDLER:  Were you finished?

20           MR. COOK:  I believe he said it was

21   incorrect.

22           THE WITNESS:  Incorrect.

23           MR. SANDLER:  I thought you started to say

24   something else.

1   BY MR. COOK:

2    Q.   Did I cut you off?

3    A.   No.  That's fine.

4    Q.   I want the record to be clear.  I don't want to

5   cut you off if you wanted more to add.

6              Tell me again why you didn't elevate

7   Mr. Eapen's telling you that he felt discriminated

8   against to Mr. Micek or personnel or another level?

9    A.   Combination of three factors.  Factor No. 1,

10   when we initiated the meeting, he asked that this

11   meeting, it was a venting, it was a -- based on our

12   trust that we had developed during our working

13   relationship that he felt, and that it was just a

14   venting.  Two, that he did not want any action taken

15   based on the fact it was something we should keep

16   between us so that he could vent, feel free to vent.

17   Three, when he identified the fact, he made the

18   statement that he felt discriminated, it was just a

19   statement.  He did not want to get into anything else.

20   So, it was a combination of all these factors.

21              Had he come in on a normal day and said,

22   "I'd like to talk to you for a second; I feel

23   discriminated against," then I would go to the next

24   stage.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

EQUAL EMPLOYMENT OPPORTUNITY    )
COMMISSION,                      )
                                 )
          Plaintiff,             )
                                 )
v.                               )    Civil Action No.
                                 )    04-CV-425-SLR
MBNA AMERICA BANK, N.A., a       )
subsidiary of MBNA              )
Corporation,                     )
                                 )
          Defendant.             )

          Deposition of RICHARD LEE WEGNER, JR., taken
pursuant to notice at the law offices of Young, Conaway,
Stargatt & Taylor LLP, 1000 West Street, 17th Floor,
Wilmington, Delaware, beginning at 9:50 a.m. on Thursday,
October 6, 2005, before Robert Wayne Wilcox, Jr.,
Registered Professional Reporter and Notary Public.

APPEARANCES:

          TERRENCE R. COOK, ESQ.
          UNITED STATES EQUAL EMPLOYMENT
          OPPORTUNITY COMMISSION
            The Bourse
            21 South Fifth Street - Suite 400
            Philadelphia, Pennsylvania  19106
            for the Plaintiff,

          SHELDON N. SANDLER, ESQ.
          YOUNG, CONAWAY, STARGATT & TAYLOR LLP
            1000 West Street - 17th Floor
            Wilmington, Delaware  19801
            for the Defendant.

-------------------------------------------------------
                 WILCOX & FETZER
   1330 King Street - Wilmington, Delaware 19801
                    (302) 655-0477



Richard Lee Wegner, Jr.                           10

1    Carlisle?

2        A.    Actually, there was a couple of times, I think, I

3    reported to her.  I don't remember exact dates.  I mean,

4    the first time we were a group where her and I kind of

5    shift roles where she -- I was a manager and she worked

6    underneath me.  And then we kind of switched where I

7    chose to be more technical and she wanted to manage.  So

8    she became the group team leader/manager.  Then I went

9    back to being a manager again.  I didn't work under her

10   but worked under Jim Micek.  And then I went back to

11   working for Connie again.

12       Q.    Okay.  Let me see if I can get some clarity on

13   that.  After you stopped being managed by Bellverie Ross

14   sometime in early 2002, did you report to someone else or

15   did you yourself become a manager?

16       A.    I was -- if I recall, I was temporarily a manager

17   once Jim Micek took over our group.

18       Q.    Do you recall that time frame?

19       A.    May, June, July.  Something like that.

20       Q.    2002?

21       A.    Yes.

22       Q.    So you were temporary manager for a short period

23   of time?

24       A.    Yes.  And I told him that I was more interested

Richard Lee Wegner, Jr.                    11

1    in being technical than a manager.  So he put me under

2    Connie again.

3        Q.    For the period of time that you were a manager,

4    did you supervise other employees?

5        A.    Yes.

6        Q.    Who did you supervise?

7        A.    Justice Eapen for one, Connie Carlisle, Debbie

8    Crimian, Dan Weir, Mike Broughton, Darlene McKinney, Drew

9    Boyer.  I'm sure that's not all, but I don't recall any

10   other names.

11       Q.    The period of time you were a temporary manager,

12   was that two or three months?  Does that sound about

13   right?

14       A.    That's probably pretty close, yes.

15       Q.    During the time period that you supervised Justus

16   Eapen, did you have any performance issues with

17   Mr. Eapen?

18       A.    Yes.

19       Q.    Did you have any conduct issues with Mr. Eapen?

20       A.    Yes.

21       Q.    What performance issues did you have with

22   Mr. Eapen during the time you supervised him?

23       A.    Just in general not completing work that was

24   assigned to him when some of the work that he had done

Richard Lee Wegner, Jr.                    26

1    anyway, a 25-cent valve stem was put on a person's tire,

2    and they weren't charged for it.

3        Q.    Did they consider that stealing?

4        A.    Apparently so.

5        Q.    So you were fired from Farm & Fleet for stealing.

6    Is that correct?

7        A.    It sounds like it, yes.

8        Q.    The item was a 25-cent valve stem.  Is that what

9    you're telling me?

10       A.    Yes.

11       Q.    Had you ever been disciplined while you were at

12   Farm & Fleet for stealing or anything else besides the

13   termination?

14       A.    No.

15       Q.    With respect to the discipline at MBNA, when were

16   you disciplined, if you recall a month or a year?

17       A.    Well, it was last year.  It was probably about

18   this time last year.  Probably October.

19       Q.    About October 2004?

20       A.    Yes.

21       Q.    Why were you disciplined?

22       A.    I was performing some maintenance and/or an

23   upgrade on a backup server remotely from my desk.

24   Another issue came up that I needed to fix.  And because

Richard Lee Wegner, Jr.                    32

1    disagreement.

2        Q.   Did the disagreement involve MBNA business or was

3    it personal?

4        A.   Probably a little bit of both.

5        Q.   What was the nature of the disagreement?

6        A.   I don't recall what the exact disagreement was.

7    It had something to do with -- I'm sure it had

8    something -- just because of our interaction with them

9    that they wanted to control the e-mail servers there when

10   they weren't supposed to.  They felt that their

11   response -- or they felt that they owned the e-mail

12   servers when, in actuality, our group did.  And that's

13   what started the disagreement -- dispute.

14       Q.   So the dispute was over the ownership of the

15   e-mail system or e-mail services within MBNA?

16       A.   Yes.

17       Q.   You said it was kind of both personal and

18   business.  Where did it become personal?

19       A.   I don't recall.

20                 His name is Brad Hall.

21       Q.   Thank you.

22                 Was that H-a-l-l --

23       A.   Yes.

24       Q.   -- or Hull?

**W&F**

**WILCOX & FETZER LTD.**
Registered Professional Reporters

B-00236

1         You don't recall what it was about the

2    dispute that was personal?

3    A.    I don't recall the exact details.  Somewhere it

4    had gotten personal.  I had taken it personally when I

5    probably shouldn't have.  But I don't remember the exact

6    details of exactly what happened.

7    Q.    What did you do once you accessed Mr. Hall's

8    e-mail?

9    A.    I shared an e-mail with Mr. Bill Davis.

10   Q.    So you accessed Mr. Hall's e-mail, retrieved an

11   e-mail and shared that with Bill Davis?

12   A.    Yes.  That's correct.

13   Q.    How was it that you were able to access

14   Mr. Hall's e-mail?

15   A.    Because I was an e-mail administrator.  And the

16   way that things were set up at the time, I had access to

17   probably just about everybody's e-mail in the company.  I

18   pretty much did until I left.

19   Q.    So by virtue of your position and the authority

20   given to you, you had the ability to access pretty much

21   any employee's e-mail system.  Correct?

22   A.    That is correct.

23   Q.    The e-mail that you retrieved and shared with

24   Mr. Davis, was this an e-mail that was authored by

1   Mr. Hall?

2      A.   No.   That's what the issue was.

3      Q.   Who was the e-mail authored --

4      A.   I'm sorry.   Authored, yes.   I thought -- okay.   I

5   misunderstood what you said.

6      Q.   Okay.   So this was an e-mail that Brad Hall wrote

7   or drafted?

8      A.   That's correct.

9      Q.   Who did he send it to?

10      A.   I don't remember exactly, but it -- I don't

11   remember the exact names, but I think it was his direct

12   reports -- people that worked underneath him.

13      Q.   Was it just one e-mail that you retrieved or were

14   there multiple e-mails?

15      A.   I don't recall.   It was at least one, obviously.

16   But I don't remember if there was more than one.

17      Q.   What was it about this particular e-mail that you

18   felt it was necessary to retrieve it and show it to

19   Mr. Davis?

20      A.   The fact that he was working against us instead

21   of with us.

22      Q.   How was this violation discovered?

23      A.   I told Mr. Bill Davis that I had done it.   I

24   showed it to him, obviously.   He informed me that he was

1    not comfortable with it.  I think -- I don't remember if

2    there was a period of time between when I showed it and

3    after he called me back in his office.  But he did tell

4    me that he had told human resources about it.  And

5    shortly after that I went and spoke to one of the human

6    resources representatives.

7        Q.   Do you recall which HR rep you spoke with?

8        A.   It was a male.  I don't recall his name.

9        Q.   As a result of this particular offense, what type

10   of discipline were you given?

11       A.   A verbal.

12       Q.   A verbal warning?

13       A.   Yes.

14       Q.   Do you know if there was anything put in writing

15   in your personnel folder about this incident?

16       A.   Do I know for a fact?  No.  I never looked at

17   it.

18       Q.   Again, this was in the 2001 time frame?

19       A.   I believe so, yes.  The latter half of the year,

20   yes.

21       Q.   Was there any other discipline that you were

22   subjected to while you were employed at MBNA?

23       A.   No.

24       Q.   Okay.  You've now told me all the incidents in

Neela B. Chacko

1

```
 1              IN THE UNITED STATES DISTRICT COURT
 2                 FOR THE DISTRICT OF DELAWARE
 3
 4
    EQUAL EMPLOYMENT OPPORTUNITY    )
 5  COMMISSION,                     )
                                    )     Civil Action No.
 6              Plaintiff,          )     04-CV-425-SLR
                                    )
 7  v.                              )
                                    )
 8  MBNA AMERICA BANK, N.A., a      )
    subsidiary of MBNA Corporation,)
 9                                  )
                Defendant.          )
10
                Deposition of NEELA B. CHACKO taken
11  pursuant to notice at the law offices of YOUNG CONAWAY
    STARGATT & TAYLOR, 1000 West Street, Wilmington,
12  Delaware, beginning at 1:05 p.m. on Wednesday, July
    20, 2005, before Renee A. Meyers, Registered
13  Professional Reporter and Notary Public.
14  APPEARANCES:
15              TERRENCE R. COOK, ESQ.
                U.S. EQUAL EMPLOYMENT OPPORTUNITY
16              COMMISSION
                  21 South Fifth Street
17                The Bourse, Suite 400
                  Philadelphia, Pennsylvania  19106-2515
18                for the Plaintiffs,
19              SHELDON N. SANDLER, ESQ.
                YOUNG CONAWAY STARGATT & TAYLOR
20                1000 West Street, 17th Floor
                  Wilmington, Delaware  19899
21                for the Defendant.
22  ALSO PRESENT:  Launice Sills, Esq.
23                     WILCOX & FETZER
        1330 King Street - Wilmington, Delaware 19801
24                     (302) 655-0477
```



Neela B. Chacko

31

1    A.    No.

2    Q.    Did she ever complain to you about race or sex

3    discrimination within MBNA?

4    A.    No.

5    Q.    Now, do you know Justus Eapen's wife?

6    A.    Yes, I do.

7    Q.    Tracy Eapen?

8    A.    Yes, I do.

9    Q.    Now, were you aware if Justus Eapen had an

10   outside business while he was employed at MBNA?

11   A.    No.   Because it was -- I knew he had a

12   business, but it was -- I knew it as his wife's

13   business.

14   Q.    And what type of business was that?

15   A.    Mortgage.   She used to be a mortgage broker.

16   Q.    How did you first meet Miss Eapen?

17   A.    I invited my team to my wedding in 2000,

18   November, and that's how I met all the spouses.

19   Q.    And that was in November of --

20   A.    2000.

21   Q.    And that was a non-MBNA related event?

22   A.    Yes.

23   Q.    And when was the next time you met Miss Eapen?

24   A.    I think I met her next at the corn boil, the

1  next year.

2    Q.   Is that an MBNA sponsored event?

3    A.   Yes.

4    Q.   At your wedding, was there any discussion

5  between yourself and Miss Eapen concerning her

6  business?

7    A.   Yes.  We -- at the reception, when we were

8  chatting, I asked her what she does, and, you know,

9  she said she has a -- she -- she is a mortgage broker.

10  So --

11   Q.   Did she provide you with a business card or

12  anything like that at that time?

13   A.   No, not at that time.  No, I don't think.

14   Q.   Was Justus also present at this wedding?

15   A.   Yes.

16   Q.   Did he participate in this conversation with

17  his wife concerning the business?

18   A.   I don't recall.  There were a lot of people

19  around.

20   Q.   And at the corn boil, did you also have

21  discussions with Miss Eapen concerning her business?

22   A.   I don't believe so.

23   Q.   At some point, did you conduct business with

24  Miss Eapen?



Neela B. Chacko

33

1    A.    Yes.

2    Q.    Do you recall when?

3    A.    I think sometime in early 2001.

4    Q.    And did you, in fact, get a mortgage, obtain a

5    mortgage through Miss Eapen?

6    A.    Yes, I did.

7    Q.    And has Justus Eapen ever solicited you for a

8    mortgage for his wife's company?

9    A.    No.

10   Q.    Has Justus Eapen ever suggested that if you

11   wanted to refinance your mortgage, to do it through

12   his wife's company?

13   A.    No.

14   Q.    Have you discussed his wife's business or the

15   mortgage business with Justus Eapen at all?

16   A.    No.

17   Q.    How many mortgages did you obtain from

18   Miss Eapen; do you recall?

19   A.    Three or four.  A couple of them were

20   refinances.

21   Q.    Was Justus Eapen involved in any of the

22   mortgages or the refinances that you obtained through

23   Tracy Eapen?

24   A.    No.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

EQUAL EMPLOYMENT OPPORTUNITY )
COMMISSION, )
                     )
        Plaintiff, )
                     )
v. )   Civil Action No.
                     )   04-CV-425-SLR
MBNA AMERICA BANK, N.A., a )
subsidiary of MBNA )
Corporation, )
                     )
        Defendant. )

       Deposition of RENEE CUFFEE-WILLIAMS taken
pursuant to notice at the law offices of Young, Conaway,
Stargatt & Taylor LLP, 1000 West Street, 17th Floor,
Wilmington, Delaware, beginning at 2:10 p.m. on Thursday,
October 6, 2005, before Robert Wayne Wilcox, Jr.,
Registered Professional Reporter and Notary Public.

APPEARANCES:

         TERRENCE R. COOK, ESQ.
         UNITED STATES EQUAL EMPLOYMENT
         OPPORTUNITY COMMISSION
           The Bourse
           21 South Fifth Street - Suite 400
           Philadelphia, Pennsylvania  19106
           for the Plaintiff,

         SHELDON N. SANDLER, ESQ.
         YOUNG, CONAWAY, STARGATT & TAYLOR LLP
           1000 West Street - 17th Floor
           Wilmington, Delaware  19801
           for the Defendant.

-------------------------------------------------------
WILCOX & FETZER
1330 King Street - Wilmington, Delaware 19801
(302) 655-0477



Renee Cuffee-Williams                          84

1    Rich Kilmon and Tamika Sainten of TEC personnel in

2    reference to Justus Eapen -- do you see that?

3       A.    Yes.

4       Q.    Okay.  Were you aware that Mr. Kilmon and

5    Ms. Sainten had contacted the ethics office concerning

6    Mr. Eapen?

7       A.    I was aware that they contacted them, but I don't

8    know the specifics of what that conversation entailed.

9       Q.    The last sentence on this page and the first

10   sentence on the other page reads that the writer advised

11   Rich and Tamika that, by policy, this was definitely a

12   conflict and the person should be offered a choice of

13   either continuing with the bank and dropping his personal

14   business, or vice versa.

15              Do you see that?

16      A.    I see that, yes.

17      Q.    Now, in the discussion that you had with

18   Mrs. Kilmon and Mrs. Sainten, do you recall any

19   discussion of giving Mr. Eapen an option of dropping his

20   outside business interests and continuing with MBNA?

21      A.    I don't recall that.

22      Q.    You don't recall that was discussed at all?

23      A.    That's correct.

24      Q.    I'm handing you what's been marked as EEOC 13 for

Renee Cuffee-Williams                    90

1    A.    Oh, right here.

2    Q.    Okay.  What exhibit number is that?

3    A.    It's EEOC 13.

4    Q.    EEOC 13 -- thank you --

5    A.    Mm-hmm.

6    Q.    -- with the date of 3/10/2003 recommending

7  dismissal of Mr. Eapen.

8              Correct?

9    A.    That's correct.

10   Q.    Are you aware of any other document which exists

11  with a date prior to March 10th, 2003 recommending that

12  Mr. Eapen be dismissed from MBNA?

13   A.    No.

14   Q.    Who would know that information?

15   A.    Make Patti McKeown or maybe Tamika Sainten.  I

16  mean, any of the ones involved.  But they would have only

17  received the packet of information, the dismissal

18  information.  That's all they review.

19   Q.    Okay.

20   A.    So anything else shouldn't exist.

21   Q.    Now, this dismissal summary, which is EEOC 17,

22  does not have a date on it, correct, besides the date at

23  the bottom left-hand corner which is 2/7/02?

24   A.    The date of the template.  No.



1

```
 1              IN THE UNITED STATES DISTRICT COURT
 2              FOR THE DISTRICT OF DELAWARE
 3
 4
    EQUAL EMPLOYMENT OPPORTUNITY     )
 5  COMMISSION,                      )
                                     )   Civil Action No.
 6              Plaintiff,           )   04-CV-425-SLR
                                     )
 7  v.                               )
                                     )
 8  MBNA AMERICA BANK, N.A., a       )
    subsidiary of MBNA Corporation,)
 9                                   )
                Defendant.           )
10
             Deposition of RICHARD T. KILMON taken
11  pursuant to notice at the law offices of YOUNG CONAWAY
    STARGATT & TAYLOR, 1000 West Street, Wilmington,
12  Delaware, beginning at 12:35 p.m. on Thursday, July
    21, 2005, before Renee A. Meyers, Registered
13  Professional Reporter and Notary Public.
14  APPEARANCES:
15              TERRENCE R. COOK, ESQ.
                U.S. EQUAL EMPLOYMENT OPPORTUNITY
16              COMMISSION
                   21 South Fifth Street
17                 The Bourse, Suite 400
                   Philadelphia, Pennsylvania  19106-2515
18                 for the Plaintiffs,
19              SHELDON N. SANDLER, ESQ.
                YOUNG CONAWAY STARGATT & TAYLOR
20                 1000 West Street, 17th Floor
                   Wilmington, Delaware  19899
21                 for the Defendant.
22  ALSO PRESENT:  Launice Sills, Esq.
23                     WILCOX & FETZER
       1330 King Street - Wilmington, Delaware 19801
24                     (302) 655-0477
```

**W&F**

WILCOX & FETZER LTD.
Registered Professional Reporters

Richard T. Kilmon

30

1    touching on the sleeping incident, what else did you

2    do to investigate this incident?

3    A.    I didn't do each incident alone.  As far as I

4    was concerned, it was a complete situation.  I looked

5    at phone records to see what time phone calls were

6    being made in regards to other -- another part of the

7    investigation.

8    Q.    Well, I wanted to focus on the part of the

9    investigation that dealt with the sleeping incident.

10   A.    I understand.

11   Q.    So, you spoke with Mr. Eapen.

12              Do you recall doing anything else with

13   respect to that part of the investigation, to the

14   sleeping incident?

15   A.    No, I don't recall doing anything else about

16   that.

17   Q.    Based on your investigation into that part of

18   the allegations, the sleeping incident, did you come

19   to the conclusion as to whether or not Mr. Eapen had

20   violated any MBNA policy?

21   A.    In regards to sleeping?

22   Q.    Yes.

23   A.    I don't recall whether I definitively did or

24   not, to be honest with you.

Richard T. Kilmon

34

1    computers to search mortgage web sites for another

2    individual, looking at rates during working hours.

3       Q.    Besides interviewing the coworkers, researching

4    Eapen Corporation, and speaking with Mr. Eapen, is

5    there anything else you did as part of your

6    investigation?

7       A.    Into that piece alone?

8       Q.    Into the outside business interest.

9       A.    Yes.

10      Q.    What else?

11      A.    Reviewed our policy.

12      Q.    Which policy was that?

13      A.    Policy, I believe it's -- I think it's -- well,

14   it's -- I think it's 60 -- I think it's 603, I think.

15      Q.    Do you recall the name of the policy?

16      A.    It's conflict of interest policy.  And then I

17   contacted our Ethics Office.

18      Q.    What's the function of the Ethics Office in

19   this type of investigation?

20      A.    To -- well, in this type of investigation, from

21   my perspective, it's to determine if, in fact,

22   ethically, there is an issue with someone engaged in

23   some kind of a business that may have a direct

24   conflict of interest with MBNA and MBNA's business.

1    Q.    You testified earlier that you spoke with

2    Mr. Eapen as part of your investigation into his

3    outside business interest.  I believe you used the

4    term, "We spoke with Eapen."

5              Who is the "we" you are referring to?

6    A.    Myself and Renee Cuffee-Williams.

7    Q.    And do you recall when you met with Mr. -- you

8    and Miss Williams met with Mr. Eapen to discuss his

9    outside business interest?

10   A.    It was in January, mid January, maybe around

11   the 20th, or somewhere in that neighborhood.

12   Q.    2003; correct?

13   A.    Yes.

14   Q.    And besides the three of you, Mr. Eapen,

15   yourself, and Miss Cuffee-Williams, was anyone else

16   present?

17   A.    Not that I recall.  There would be no reason

18   for anybody else to be there.

19   Q.    And how long did the meeting take place?

20   A.    It may have been an hour or so, maybe a little

21   longer.  I am not sure exactly.

22   Q.    And what took place during the meeting with

23   Mr. Eapen?

24   A.    We discussed the issue.  I explained to him

Richard T. Kilmon

69

1   suggestion that Mr. Eapen be terminated for violations

2   of the policy 601 and 606?

3      A.    No.   I don't believe so.

4      Q.    So, collectively --

5      A.    Because if there had been, it wouldn't be a

6   dismissal.

7      Q.    So, collectively, you believe there was an

8   agreement that termination was justified in this

9   situation?

10     A.    Yes, sir.

11     Q.    And this is done by the People Relations Team;

12  correct?

13     A.    Senior management.

14     Q.    And is then a recommendation made to someone

15  else, that you had recommended termination, is that

16  elevated to someone else?

17     A.    Once the determination of a recommendation for

18  dismissal is made, that's when we prepare the

19  documentation, we will contact the Law Department to

20  make sure that we are, you know, we are within the

21  law, that it would rise to that level.   And then we

22  prepare the documentation.

23     Q.    Now, the documentation, would that be the

24  corrective action report or is there another document?

Richard T. Kilmon

70

1    A.    The whole packet.   It's a dismissal packet.

2    It's the -- there are a couple signature forms that

3    are on the face.   There are the confidential

4    conference documents, and then there is the corrective

5    action report.   And that goes as a package.

6    Q.    Who does that go to?

7    A.    For me, it would go to Miss Sainten.

8    Q.    Do you know who it goes to after Miss Sainten

9    reviews it?

10   A.    It would go to Patty McKeown.

11   Q.    And do you know where it goes after it goes to

12   Miss McKeon?

13   A.    Patty Bescript.

14   Q.    What was her title, Miss Bescript?

15   A.    She is a first vice president, and I believe

16   it's Personnel manager.   I am not exactly sure.

17   Q.    Where does it go from there?

18   A.    The Law Department.

19   Q.    Do you have any idea where it goes to from

20   there?

21   A.    It goes to the business area, the senior

22   management in the business area, as well as Brian

23   Gimlet, and then he presents it to the vice chairman

24   of Personnel.

1    Q.    Mr. Denton?

2    A.    No.

3    Q.    I am sorry, who would that be?

4    A.    At that time, I don't recall -- it may have

5    been Lance Weaver, I am not sure, or -- I am not

6    exactly sure.  I'd have to see the signature page.

7    Q.    Did you prepare a final investigative summary

8    or report to present to Miss Sainten or anyone else?

9    A.    What I prepare are these documents and that

10   serves as that.  So, I guess when you asked me that

11   earlier, I was -- I wasn't planning on confusing you

12   with the nomenclature of the various documents.

13              MR. COOK:  Let's take ten minutes.

14              (Recess taken.)

15              (EEOC Exhibit No. 14 entitled "Personnel

16   Policy MBNA Corporation" was marked for

17   identification.)

18   BY MR. COOK:

19   Q.    Mr. Kilmon, you have in front of you what's

20   been marked as EEOC 14 for identification.

21   A.    That's correct.

22   Q.    It's MBNA Policy 606.

23              Is this the policy which you allege

24   Mr. Eapen violated for engaging in an outside

1    BY MR. COOK:

2      Q.    Okay.

3      A.    And I think this was in response to that, after

4    that.  Well, obviously, because of what it says.

5      Q.    Do you have an idea or do you have a reason why

6    this choice of staying with MBNA and dropping the side

7    business was not offered or discussed with Mr. Eapen?

8      A.    At this point, we hadn't concluded our

9    investigation and we hadn't spoken with Mr. Eapen at

10   that time.

11     Q.    What is it about the investigation or your

12   conversations with Mr. Eapen that would take away the

13   option of dropping the side business and staying with

14   the bank?

15     A.    As a result of my investigation, it appeared to

16   me that he was engaged in this business on the side,

17   it was a direct conflict with MBNA's mortgage

18   business.  He was not being, in my opinion, truthful

19   in regards to his involvement and his capacity in the

20   company, and that's just that one piece of it.

21           Then there were the other -- there were

22   the other issues that were involved.

23     Q.    About the password issues?

24     A.    Yes, sir.



1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

EEOC,                           )
                                )
     Plaintiff,                 )
                                )
     v.                         )  C.A. No. 04-CV-425-SLR
                                )
MBNA AMERICA BANK, N.A.,        )
a subsidiary of MBNA            )
Corporation,                    )
                                )
     Defendant.                 )

          Deposition of RICHARD A. WRESNESKI taken
pursuant to notice at the law offices of Young Conaway
Stargatt & Taylor, LLP, The Brandywine Building,
17th Floor, 1000 West Street, Wilmington, Delaware,
beginning at 1:40 p.m., on Wednesday, October 12, 2005,
before Kimberly A. Hurley, Registered Merit Reporter and
Notary Public.
APPEARANCES:

          TERRENCE R. COOK, ESQUIRE
          UNITED STATES EEOC
             21 South Fifth Street
             The Bourse - Suite 400
             Philadelphia, Pennsylvania 19106-2515
             for the Plaintiff

          SHELDON N. SANDLER, ESQUIRE
          YOUNG CONAWAY STARGATT & TAYLOR, LLP
             The Brandywine Building - 17th Floor
             1000 West Street
             Wilmington, Delaware 19801
             for the Defendant

ALSO PRESENT:

          LAUNICE P. SILLS
          MBNA

               WILCOX & FETZER
1330 King Street - Wilmington, Delaware 19801
               (302) 655-0477



Richard A. Wresneski                    22

1    voice?

2         A.    Not necessarily, unless I was a Little bit

3    louder.

4         Q.    Where was Mr. Eapen seated in relationship to

5    your cubicle at Christiana 3?

6         A.    My aisle, directly across on an angle.

7    Diagonally across the aisle.

8         Q.    Close enough that you can hear him and he can

9    hear you?

10        A.    Absolutely.

11        Q.    Mr. Kennedy, where was he seated in relationship

12   to your cubicle?

13        A.    A few rows away, I believe.

14        Q.    Were you able to speak with Mr. Kennedy in

15   regular conversation with tones on --

16        A.    No.   I'd have to go over and walk to talk to

17   him.

18        Q.    How would you describe your relationship with

19   Glenn Ford?

20        A.    Friendly.

21        Q.    Do you consider Mr. Ford a friend?

22        A.    Yes.

23        Q.    Did you attend Mr. Ford's wedding?

24        A.    No.



1       Q.      Were you invited?

2       A.      No.

3       Q.      During your employment at MBNA, did you

4    socialize with Mr. Ford outside of the work environment?

5       A.      On occasion, yes.

6       Q.      There's been some testimony in this case about

7    poker games at various individuals' homes.  Have you

8    played poker with Mr. Ford?

9       A.      Absolutely.

10      Q.      How many times?

11      A.      Dozen or two.  Maybe more.

12      Q.      Whose home were the poker games normally held

13   at?

14      A.      Wagner.

15      Q.      There's also been some testimony in this case

16   about some of the employees in Desktop Computing playing

17   dodgeball or some other type of sporting event together.

18   Did you participate in any of those?

19      A.      Yes.

20      Q.      What in particular?

21      A.      Dodgeball, paintball, volleyball after work,

22   basketball after work.

23      Q.      Did you play any leagues with Mr. Ford in either

24   dodgeball or volleyball?

Richard A. Wresneski                    24

1      A.    The dodgeball was a one-time thing.  Basketball

2    we played in a league, but it only lasted a couple weeks

3    because our third left the team.

4      Q.    How many times have you been paint-balling with

5    Mr. Ford?

6      A.    Less than a half dozen.

7      Q.    Did you attend any happy hours with Mr. Ford

8    after work?

9      A.    He wasn't the one to really do happy hours that

10   often.

11     Q.    Is it your testimony you never attended a happy

12   hour with Mr. Ford?

13     A.    No.  I'm sure I have been in that setting.

14     Q.    How many times, if you could quantify it?

15     A.    Less than a half dozen times.

16     Q.    When was the last time you spoke to Glenn Ford?

17     A.    Monday.

18     Q.    Monday, October -- Columbus day?

19     A.    Yes.

20     Q.    Did Mr. Ford call you or did you call Mr. Ford?

21     A.    Glenn called me.

22     Q.    Was there any discussion about your testimony in

23   this case?

24     A.    No.

1

```
1              IN THE UNITED STATES DISTRICT COURT
2                 FOR THE DISTRICT OF DELAWARE
3
4
   EQUAL EMPLOYMENT OPPORTUNITY    )
5  COMMISSION,                     )
                                   )      Civil Action No.
6              Plaintiff,          )      04-CV-425-SLR
                                   )
7  v.                              )
                                   )
8  MBNA AMERICA BANK, N.A., a      )
   subsidiary of MBNA Corporation,)
9                                  )
               Defendant.          )
10
              Deposition of GLENN A. FORD taken pursuant
11 to notice at the law offices of YOUNG CONAWAY STARGATT
   & TAYLOR, 1000 West Street, Wilmington, Delaware,
12 beginning at 9:00 a.m. on Monday, August 1, 2005,
   before Renee A. Meyers, Registered Professional
13 Reporter and Notary Public.
14 APPEARANCES:
15              TERRENCE R. COOK, ESQ.
                U.S. EQUAL EMPLOYMENT OPPORTUNITY
16              COMMISSION
                  21 South Fifth Street
17                The Bourse, Suite 400
                  Philadelphia, Pennsylvania  19106-2515
18                for the Plaintiffs,
19              SHELDON N. SANDLER, ESQ.
                YOUNG CONAWAY STARGATT & TAYLOR
20                1000 West Street, 17th Floor
                  Wilmington, Delaware  19899
21                for the Defendant.
22 ALSO PRESENT:  Launice Sills, Esq.
23                    WILCOX & FETZER
     1330 King Street - Wilmington, Delaware 19801
24                    (302) 655-0477
```



**WILCOX & FETZER LTD.**
Registered Professional Reporters

B-00259

Glenn A. Ford

15

1    Q.    What do you recall about joking about national

2    origin?

3    A.    There was one incident that I recall because it

4    was pretty funny that, you know -- it had other people

5    standing up and laughing, and there was a fellow,

6    George Taylor, who was -- and George was

7    African-American, and Sung and they mentioned

8    something about -- Sung mentioned something to George

9    about, you know, Why do you shoot your gun sideways?,

10   referring to, you know, George saying, Black people

11   don't shoot their guns correctly, or something of that

12   effect.

13               And it was -- that was the kind of

14   atmosphere that it was.  It was joking.  And when we

15   came in here, Justus, that was one of the questions

16   that I had, I was very confused because Justus joked

17   more than anybody.  And I don't recall because, again,

18   it wasn't something that felt or seemed like or was a

19   harassing environment, so it's not something that all

20   of these questions you are asking me, they don't stand

21   out in my mind because it wasn't anything that seemed

22   like harassment at all to anyone, including Justus.

23   Q.    What other jokes have you heard that were based

24   on national origin?

Glenn A. Ford

29

1    Q.    Have you ever heard Mr. Wagner refer to

2  Mr. Eapen as Osama bin Laden or OBL or OBL's brother?

3    A.    No.

4    Q.    Have you ever heard Mr. Wagner refer to

5  Mr. Eapen in any derogatory term?

6    A.    No.

7    Q.    Have you ever heard Mr. Wagner use profanities

8  in the workplace?

9    A.    No, not that I can recall.

10    Q.    Do you know Jim Dell?

11    A.    Yes, I do.

12    Q.    Was Jim Dell in that Desktop -- part of the

13  Desktop Computing section?

14    A.    Yes, he was.

15    Q.    And would Jim Dell be in the area in which you

16  sat on occasion?

17    A.    Yes.

18    Q.    Was he there on a daily basis or was he -- or

19  was it less frequently?

20    A.    Well, he was part of Desktop, so, I mean, when

21  he was at work, we all sat in a general vicinity of

22  each other.  I mean, if he was at work, he was there.

23    Q.    How close was Mr. Dell's, I guess, office or

24  cubicle from where you sat?

**W&F**

Glenn A. Ford

30

1    A.    Probably about 30 or 40 feet away.

2    Q.    And there would be occasions when Mr. Dell

3    would come out of his office to actually come by where

4    you were sitting; is that fair?

5    A.    Yeah.  Yes.

6    Q.    Would he do that on a daily basis or less

7    frequently?

8    A.    I don't recall.  I didn't work for Jim, so I

9    wouldn't remember if he did or if he didn't.

10   Q.    Did you ever hear Mr. Dell refer to Mr. Eapen

11   in any derogatory term?

12   A.    No.

13   Q.    Was Mr. Dell present at any point when jokes

14   were being told within the -- amongst yourselves in

15   Desktop Computing?

16   A.    I don't recall.

17   Q.    Do you recall Mr. Dell laughing at any of the

18   jokes that were told in Desktop Computing?

19   A.    I don't recall that.  I know he did not sit in

20   our general -- what we call the working area, where

21   you referred to as the ghetto.  I mean, he did not sit

22   in that area.  I think, you know, the managers have

23   their side.  He was -- he was a manager and he would

24   come in and out through there, but I couldn't tell you

Glenn A. Ford

42

1   anything related to the mortgage business?

2      A.    I am sorry.  I didn't understand the question.

3      Q.    Sure.  Prior to this incident where Mr. Eapen

4   searched for an interest rate for you, as you

5   testified to, prior to that, had Mr. Eapen approached

6   you at any time about getting you a mortgage or better

7   interest rate or any discussions regarding his

8   mortgage business?

9      A.    No.

10      Q.    And you had no conversations with Mr. Eapen

11   after that concerning mortgages or interest rates?

12      A.    I did not, that's correct.

13               MR. COOK:  Let's take five minutes.

14               (Recess taken.)

15   BY MR. COOK:

16      Q.    Did there come a time when Mr. Eapen was

17   working on the night shift or the third shift?

18      A.    Yes.

19      Q.    And did you ever work the night shift or the

20   third shift?

21      A.    No.  When I first started, I worked from three

22   p.m. to midnight, but that was before Justus.  I don't

23   know if you are asking if I was where he was, and I

24   was not.

James J. Micek

1

```
 1              IN THE UNITED STATES DISTRICT COURT
 2                 FOR THE DISTRICT OF DELAWARE
 3
 4
    EQUAL EMPLOYMENT OPPORTUNITY    )
 5  COMMISSION,                     )
                                    )   Civil Action No.
 6              Plaintiff,          )   04-CV-425-SLR
                                    )
 7  v.                             )
                                    )
 8  MBNA AMERICA BANK, N.A., a      )
    subsidiary of MBNA Corporation,)
 9                                  )
                Defendant.          )
10
                Deposition of JAMES J. MICEK pursuant to
11  notice at the law offices of YOUNG CONAWAY STARGATT &
    TAYLOR, 1000 West Street, Wilmington, Delaware,
12  beginning at 9:10 a.m. on Wednesday, July 19, 2005,
    before Renee A. Meyers, Registered Professional
13  Reporter and Notary Public.
14  APPEARANCES:
15              TERRENCE R. COOK, ESQ.
                U.S. EQUAL EMPLOYMENT OPPORTUNITY
16              COMMISSION
                  21 South Fifth Street
17                The Bourse, Suite 400
                  Philadelphia, Pennsylvania  19106-2515
18                for the Plaintiffs,
19              SHELDON N. SANDLER, ESQ.
                YOUNG CONAWAY STARGATT & TAYLOR
20                1000 West Street, 17th Floor
                  Wilmington, Delaware  19899
21                for the Defendant.
22  ALSO PRESENT:  Launice Sills, Esq.
23                      WILCOX & FETZER
        1330 King Street - Wilmington, Delaware 19801
24                      (302) 655-0477
```

James J. Micek

17

1    get along.

2        Q.    What was the nature of the problem between

3    engineering and operations?

4        A.    Lack of clarity in terms of ownership and roles

5    and responsibilities.

6        Q.    This is what Miss Ross told you?

7        A.    Correct.

8        Q.    Anything else besides the lack of clarity in

9    terms of ownership or responsibilities that you

10   discussed with Miss Ross about the problems between

11   engineering and operations that you recall?

12       A.    That was the principal issue.  That was the

13   principal issue.

14       Q.    You discussed problems about specific

15   individuals.

16             What specific individuals do you recall

17   discussing with Miss Ross and the problems they may

18   have had?

19       A.    Well, again, we discussed every individual in

20   the organization.  The one specific concern she

21   registered during the transition was a challenge

22   between Jim Dell and Justus Eapen.

23       Q.    What did she tell you about that?

24       A.    That they had a challenging time communicating

James J. Micek

18

1    with one another.

2       Q.   Did she give you any examples?

3       A.   Not specific examples.  The concern was more

4    about just not having enough work to do on the third

5    shift and Jim Dell primarily not addressing that,

6    being able to address that.

7       Q.   Anything else you recall Miss Ross shared with

8    you about the problem between Jim Dell and Justus

9    Eapen?

10      A.   The other specific item that was being looked

11   into at the time was a complaint or a concern

12   registered about just sleeping during his third shift,

13   which was communicated to Personnel for review.

14      Q.   And what did she tell you about that incident?

15      A.   She had informed me that Jim Dell came in one

16   evening, during a third shift, and discovered that

17   Justus was sleep at his desk.  He notified Bellverie

18   of the occurrence to get guidance as to what to do.

19      Q.   So, where did the problem arise?  Did she tell

20   you where the problem arose?

21      A.   I am not sure what you mean by your question.

22      Q.   Well, so, she told you how Mr. Dell came in and

23   saw Mr. Eapen sleeping at his desk; correct?

24      A.   Correct.

James J. Micek

21

1   progress, concerns.

2      Q.    Did Mr. Dell ever express to you problems with

3   joking amongst the employees in Desktop Computing?

4      A.    No.

5      Q.    And you also met with Mr. Eapen during this

6   transition period; correct?

7      A.    Correct.

8      Q.    Do you recall when you met with Mr. Eapen?

9      A.    Middle of June of 2002.

10     Q.    What was discussed on your meeting with

11  Mr. Eapen?

12     A.    We discussed a number of things.  Justus did

13  register some concerns he had about the organization,

14  and then, specifically, his -- his job.  No. 1, he

15  felt that there was a lack of communications, minimal

16  communications occurring.

17     Q.    Okay.

18     A.    He felt as if he was not challenged with the

19  work that he was being assigned and that he was not

20  assigned enough work.  He did communicate that he felt

21  Jim Dell was a really good guy but he was not a good

22  manager.

23     Q.    Anything else that you recall?

24     A.    And that, specifically, Jim Dell was not a good

# ARTICLES OF INCORPORATION FOR A STOCK CORPORATION

**FIRST:** The undersigned _____ JUSTUS DANIEL EAPEN _____

whose address is _____ 106 WAKEFIELD DRIVE, BEL AIR, MARYLAND 21014 _____

_____, being at least eighteen years of age, do(es) hereby form a corporation under the laws of the State of Maryland.

**SECOND:** The name of the corporation is _____ EAPEN CORPORATION _____

**THIRD:** The purposes for which the corporation is formed are as follows: _____
ENGAGE IN AND DO ANY AND ALL LAWFULL BUSINESS FOR WHICH CORPORATIONS MAY BE ORGANIZED.

**FOURTH:** The street address of the principal office of the corporation in Maryland is _____
106 WAKEFIELD DRIVE, BEL AIR, MARYLAND 21014

**FIFTH:** The name of the resident agent of the corporation in Maryland is _____
JUSTUS D. EAPEN

whose address is _____ 106 WAKEFIELD DRIVE, BEL AIR, MARYLAND 21014 _____

**SIXTH:** The corporation has authority to issue ____ 5000 ____ shares at $ ____ NO ____ par value per share.

**SEVENTH:** The number of directors of the corporation shall be ____ 1 ____ which number may be increased or decreased pursuant to the bylaws of the corporation, and so long as there are less than three (3) stockholders, the number of directors may be less than three (3) but not less than the number of stockholders, and the name(s) of the director(s) who shall act until the first meeting or until their successors are duly chosen and qualified is/are ____ JUSTUS D. EAPEN.
JUSTUS D. EAPEN

IN WITNESS WHEREOF, I have signed these articles and acknowledge the same to be my act.

I hereby consent to my designation in this document as resident agent for this corporation.

**SIGNATURE(S) OF INCORPORATOR(S):**

**SIGNATURE OF RESIDENT AGENT LISTED IN FIFTH:**

**RETURN TO:**
JUSTUS D. EAPEN
106 WAKEFIELD DRIVE
BEL AIR, MARYLAND 21014

CUST ID:0000775475
WORK ORDER:0000530037
DATE:12-17-2001 01:36 PM
AMT. PAID:$40.00

2001 DEC 17 A 11:50

D289

DEPOSITION
EXHIBIT
Eapen-7
PRU××IP 4-4-05
PENGAD 800-631-6989

B-2    B-00268