IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

EQUAL EMPLOYMENT OPPORTUNITY        )
COMMISSION,                          )
                                     )
    Plaintiff,                       )
                                     )    C.A. No.04-CV-425 SLR
            v.                       )
                                     )
MBNA AMERICA BANK, N.A.,             )
                                     )
    Defendant.                       )


**DEFENDANT MBNA'S REPLY BRIEF
IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**


YOUNG CONAWAY STARGATT & TAYLOR, LLP


Sheldon N. Sandler, Esquire (No. 245)
Margaret M. DiBianca, Esquire (No. 4539)
The Brandywine Building, 17th Floor
1000 West Street
P.O. Box 391
Wilmington, Delaware  19899-0391
Telephone: (302) 571-6673, 571-5008
Facsimile: (302) 576-3330, 576-3476
Email:  ssandler@ycst.com, mdibianca@ycst.com
Attorneys for Defendant


DATED: January 9, 2006

## **TABLE OF CONTENTS**

**Page**

TABLE OF CONTENTS ................................................................................................... i

TABLE OF AUTHORITIES ........................................................................................... ii

ARGUMENT .................................................................................................................. 1

I.    THE EEOC HAS FAILED TO SHOW THAT EAPEN'S
      TERMINATION CONSTITUTED RETALIATION. ............................................ 2

      A.    The EEOC Has Failed to Show that MBNA's Stated Reasons for
            Terminating Eapen Were Pretextual. ..................................................... 2

      B.    The EEOC Has Failed to Show a Pattern of Antagonism that Would
            Support a Finding of Retaliation. ........................................................... 8

II.   THE EEOC HAS FAILED TO SHOW THAT ANY ALLEGED
      NATIONAL ORIGIN HARASSMENT WAS SEVERE OR PERVASIVE. ......... 11

      A.    The Friendly Banter Was Neither Pervasive Nor Severe. ..................... 12

      B.    The Remarks Were Not Physically Threatening or Humiliating, But
            Mere Offensive Utterances. ................................................................. 13

      C.    The Joking Did Not Unreasonably Interfere With Eapen's
            Work Performance. .............................................................................. 14

      D.    The EEOC Exaggerates Certain Joking References, Which the
            Record Does Not Support as Constituting Harassment. ...................... 15

      E.    The Faragher/Ellerth Defense Bars this Action Because Eapen Failed
            to Utilize Any of MBNA's Preventive or Corrective Opportunities. .... 17

CONCLUSION .............................................................................................................. 20

DB01:1949943.1                                    009626.1038

## TABLE OF AUTHORITIES

Page

**Cases**

*Aman v. Cort Furniture Rental Corp.,*
85 F.3d 1074 (3d Cir. 1996)...................................................................................17

*Barrett v. The Applied Radiant Energy Corp,*
240 F.3d 262 (4th Cir. 2001)............................................................................18, 19

*Bass v. NYNEX,*
2004 U.S. Dist. LEXIS 17378,
(S.D.N.Y. Sept. 1, 2004).........................................................................................7

*Bhella v. Eng.,*
No. 02-2416, 2004 U.S. App. LEXIS 2341,
(4th Cir. Feb. 14, 2004).........................................................................................13

*Burlington Indus. v. Ellerth,*
524, U.S. 742 (1998)..............................................................................................17

*Burton v. MBNA,*
C.A. No. 03-915-GMS,
2005 U.S. Dist. LEXIS 12154
(D. Del. June 22, 2005)....................................................................................2, 7, 8

*Carter v. Greenspan,*
304 F. Supp. 2d 13 (D.D.C. 2004)...........................................................................9

*Cortes v. Univ. of Med. & Dentistry of N.J.,*
391 F. Supp. 2d 298 (D.N.J. 2005).........................................................................17

*Country Floors v. P'ship of Gepner & Ford,*
930 F.2d 1056 (3d Cir. 1991)...................................................................................1

*EEOC v. Rite Aid Corporation,*
C.A. No. 03-CV-777-GMS,
2005 U.S. Dist. LEXIS 32898
(D. Del. Dec. 12, 2005)............................................................................................1

*Faragher v. City of Boca Raton,*
524 U.S. 775 (1998).........................................................................................12, 17

*Frenberg v. Methodist Hosp.,*
357 F.3d 787 (8th Cir. 2004).....................................................................................7

*Fuentes v. Perskie,*
32 F.3d 759 (3d Cir. 1994).........................................................................................4

ii

009626.1038

*Gans v. Mundy,*
   762 F.2d 338, 341 (3d Cir. 1985)............................................................................................1

*Hardage v. CBS Broad. Inc.,*
   427 F.3d 1177 (9th Cir. 2005)...........................................................................................18

*Harris v. Forklift Sys.,*
   510 U.S. 17 (1993)......................................................................................................11, 14

*McPherson v. City of Waukegan,*
   379 F.3d 430 (7th Cir. 2004)..............................................................................................18

*Nat'l R.R. Passenger Corp. v. Morgan,*
   536 U.S. 101 (2002)...........................................................................................................13

*Oncale v. Sundowner Offshore Serv., Inc.,*
   523 U.S. 75 (1998)......................................................................................................11, 12

*Preston v. Bell Atl. Network Servs., Inc.,*
   C.A. No. 96-3107,
   1997 U.S. Dist. LEXIS 358,
   (E.D. Pa. Jan. 16, 1997) ....................................................................................................19

*Reyes v. Hosp. San Pablo del Este,*
   389 F. Supp. 2d 205 (D.P.R. 2005).....................................................................................9

*Robinson v. City of Pittsburgh,*
   120 F.3d 1286 (3d Cir. 1997)..............................................................................................7

DB01:1949943 1

009626.1038

## ARGUMENT

In its Answering Brief, the EEOC asserts that Eapen's testimony must be considered true for summary judgment purposes. Answering Brief ("AB") AB35. The EEOC's position is too simplistic. A plaintiff must do more than rely "upon bare assertions, conclusory allegations or suspicions." *Gans v. Mundy*, 762 F.2d 338, 341 (3d Cir. 1985). If the plaintiff's evidence is a mere scintilla or is "not significantly probative" the court may grant summary judgment. *Country Floors v. P'ship of Gepner & Ford*, 930 F.2d 1056, 1061-62 (3d Cir. 1991). In this case, virtually nothing in the record supports Eapen's bald assertions, which explains why the EEOC would like all of Eapen's statements to be taken as true without further scrutiny.[1]

Judge Sleet's more nuanced approach in *EEOC v. Rite Aid Corporation*, C.A. No. 03-CV-777-GMS, 2005 U.S. Dist. LEXIS 32898 (D. Del. Dec. 12, 2005), should be followed here. There, Judge Sleet noted that a fact is "material" if it affects the outcome of the suit, *id.* at *2, and an issue is "genuine" if "a reasonable jury could possibly find in favor of the non-moving party on that issue." *Id.* Using that framework, Judge Sleet assessed the evidence presented. He did not, as the EEOC asks the Court to do here, throw up his hands and

---

[1] In fact, many of the statements in the EEOC's brief are unsupported by the record. Footnotes 3-7 do not even cite the record. And when the record is cited, the references often inaccurately represent the actual text. For example, on page 7 of the Brief, the EEOC cites to appendix pages B209, 261-62 to support its statement that Jim Dell "sat in close proximity" to the DTC employees, but the citations do not support that statement. Pages 260-61 state that Dell "did not sit in that area." Instead, he sat with the managers "about 30 or 40 feet away." B209 states that Dell "was part of Desktop Computing" but the jokes were not made "in front of him."

And on page 6 of its Answering Brief, the EEOC states, "Justus Eapen was never invited to any of these social events" and cites to appendix pages B30-33 and 256-258 as support. The cited appendix pages, however, do not even mention Eapen.

Another instance occurs on page 8 of the brief when the EEOC writes that "Wresneski and Liddle also used the phrase [ghetto] with the same frequency," citing pages B69-70 of the Appendix. Appendix page B70 actually supports an entirely different conclusion. On B70, when Sung Byun was asked if Mr. Liddle used the phrase, his response was, "I don't recollect."

On page 17 of its Brief, the EEOC cites "B89" in support of its statement that Eapen "probably had the passwords for everyone in [the test] environment. B89, however, is merely the front page of Mr. Wegner's deposition transcript.

1

conclude that there was a "material dispute of fact" simply because the charging party made allegations that no reasonable jury would believe.

As Judge Sleet pointed out, summary judgment depends on "the strength of the plaintiff's *prima facie* case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case . . . ." *Id.* at *8. When the evidence in this case is assessed to determine if the EEOC has proven retaliation or national origin harassment, the conclusion must be that the EEOC has neither made out a *prima facie* case of retaliation, proven that the reasons for termination were pretextual, nor presented credible evidence of a hostile environment.

## I.   THE EEOC HAS FAILED TO SHOW THAT EAPEN'S TERMINATION CONSTITUTED RETALIATION.

Retaliation is commonly shown by the use of two evidentiary scenarios, either an "inconsistent explanation of its actions," *i.e.*, by proving pretext or by an "intervening pattern of antagonism by the defendant." *Burton v. MBNA*, C.A. No. 03-915-GMS, 2005 U.S. Dist. LEXIS 12154, at *17 (D. Del. June 22, 2005). Here, MBNA concluded that Eapen had committed two serious policy violations by engaging in a conflicting outside business and by violating the Security prohibition on password-sharing. Taken together, these serious violations constituted grounds for termination. The EEOC has presented no evidence suggesting that this conclusion was reached in retaliation for Eapen engaging in protected activity. In fact, at the time the termination decision was made, Eapen had not engaged in any protected activity, as discussed below.

### A.   The EEOC Has Failed to Show that MBNA's Stated Reasons for Terminating Eapen Were Pretextual.

#### 1.   MBNA Acted Consistently and Without a Retaliatory Motive in Concluding that Eapen Had Violated the Conflict of Interest Policy.

The EEOC makes the absurd claim that Eapen created "Eapen Corporation" only to protect the name "Eapen" in case he wanted to use it later. AB13. The name "Eapen Corporation" is hardly one that public relations types would scramble to lock up, and there is no record evidence that there are hordes of other people named "Eapen" who might also be interested in creating an eponymous corporation. When one contrasts the EEOC's weak

2

rationale with all of the business activity in which Eapen engaged relating to Eapen Corporation and his related website, Eapen.net, while employed by MBNA, it was certainly reasonable to conclude that Eapen knowingly violated the Conflict of Interest policy and was attempting to hide his true motives from MBNA. C13-14.

The EEOC also claims Eapen went to the trouble of acquiring a real estate license solely to save a commission in case he bought a home. AB13. This also makes no sense. If Eapen were to buy a home, the seller, not the buyer, would pay the commission, an arrangement that is so well-established it can be the subject of judicial notice. And if Eapen was selling his home, he could do so without a license and thus avoid paying a commission.

The EEOC points out that Eapen said his website, Eapen.net, never became "functional," AB14, but numerous people testified not only that they had viewed his website, but also that Eapen himself had directed them to it.

The record is replete with evidence from his co-workers that Eapen's purpose was to engage in a mortgage and real estate business with his wife, who was employed by a direct competitor of MBNA, Wells Fargo. Bridget Williams said Eapen told her he had a mortgage business, that it was a family business and that his wife was involved. C240-41. Richard Wresneski and Sung Byun also knew it was a "family business." C347-48; C103-04. Eapen admitted he promoted his wife's mortgage business in social settings, C189-90; 191; 192; C44, including MBNA's corporate picnic on its property. *Id.* Byun said Eapen told him to look for a mortgage rate through his website. C98-99; 103-04. Interestingly, Byun said he decided not to do so because he thought it might be a conflict of interest. C104-05. Eapen also told Byun he had approached other employees about his mortgage business. C105-06.

Glenn Ford, who was buying a home, had obtained a mortgage quote and asked Eapen about rates. Eapen came back a few minutes later and said he could not do any better than the rate Ford had already been quoted. C210-12; 214-15. Ford said both he and John Hartnett were looking for mortgages at the time, and both of them had looked at Eapen's website. C212-13. Wresneski also asked Eapen for a mortgage rate, and Eapen said he would look into it. Eapen did not say he could not do it. C347-48; 350. Thomas Liddle was also aware of

3

Eapen's business (Eapen told him he "mortgaged homes.") C231. Eapen also asked Liddle how to make his supposedly non-functional website more colorful, since website management was Liddle's area of expertise. C231-32.

Eapen also admitted he used MBNA equipment for his business during working time, such as when he used an MBNA telephone to communicate with GoDaddy.com, a company with which Eapen had a business relationship. C320-23; C43-44.

Significantly, when asked if he was planning to use his real estate license to assist his wife in her mortgage business, Eapen said that directing people to his wife for a mortgage would be a conflict of interest, as the EEOC admits. AB13.

MBNA concluded that Eapen's real estate-related activity was really designed to complement his wife's business activities as a mortgage broker for a competitor. MBNA's conclusion that Eapen had violated its Conflict of Interest Policy because he was "employed as a broker, dealer or agent in the field of . . . home equity or second mortgage transactions" and was "[s]haring a home with or having an immediate family member who is employed by . . . a recognized competitor of MBNA in any of its lines of business," and had failed to report the situation to the listed MBNA officers, was reasonable and consistent with its Policy. C315-16; C4; C2-3.

Moreover, as the Third Circuit has pointed out, the question is not whether MBNA was wrong in its conclusion, but whether the action it took was pretextual. *See Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994) (finding that the issue is whether the employer's motive was discriminatory, not whether the employer "is wise, shrewd, prudent, or competent."). In view of the fact that Eapen had not engaged in any protected activity before the decision to terminate was made, as well as Eapen's disingenuous responses to Richard Kilmon's questions at the Personnel interview and the other record testimony undercutting the EEOC's claim, no reasonable jury could conclude that the reason given for terminating him was a pretext for retaliation.

4

009626.1038

### 2. MBNA Acted Consistently and Without a Retaliatory Motive In Concluding That Eapen Had Violated Its Security Policy.

MBNA concluded that Eapen violated its Security Policy prohibiting password-sharing. Contrary to what the EEOC seems to be claiming, password sharing was "very rare" at MBNA. C67. Wegner said at his deposition that there was no password sharing. C290-92. So did Kennedy, Liddle, Ford and Chacko. C261-62; C225; 226; C206-07; C144-145. And several people expressly stated that sharing personal passwords was not done in the testing environment any more than in the production environment. C72-74; C235. The language of the Security Policy makes no distinction between the testing and production environments. C75.

The EEOC claims Dell said password sharing in the testing environment was acceptable, AB17, which both Dell and Micek denied. C134-35; 136; C114-15. Significantly, Eapen admitted that if he had shared his password in the production environment, that would have violated the password-sharing policy. C45. He acknowledged that in the production environment, sharing passwords poses the risk that a person could change files using someone else's password. C46.

Eapen also admitted that if this occurred in the production environment, not only the person who gave out the password but also the person who used it violated the policy. C47-48. That admission destroys the EEOC's attempt to claim that only the person who gives out the password, and not the one who asks for and uses it, violates the policy. Renee Cuffee-Williams of MBNA Personnel was closely questioned about the Password-sharing policy and confirmed repeatedly that it was the general understanding at MBNA that both the owner of the password and the person requesting and using the password were liable when a password was shared. C303-12; 317-18; 324-25; C186-87. The Information Security Guidelines, which Eapen had received, state clearly that "[p]asswords must remain confidential" and proscribe logging in "for another person." C1.

Eapen admitted that he withheld information about his password sharing from Dell at the time of the incident. In his email later that morning, Eapen said he "called Jim Dell, but overlooked to discuss my account," offering the lame excuse that he did not think his use of

5

another employee's password was "significant." C20. Eapen also admitted that when Security personnel contacted him, he did not want to talk on the phone while senior managers were in the room, because he did not want them to know he was using Jason Campbell's password. C49; C19. The inference is clear that Eapen knew he had been caught committing a serious security violation. C21; C1.

At the Personnel interview, Eapen admitted that he should have known better than to ask for another employee's password because he was more experienced than Campbell. At no time during that interview did Eapen claim that only the person who gave out his password violated the policy, not the person who asked for and used the password. C326. Clearly Eapen knew that what he had done was wrong.

The EEOC claims that Dell shared his password in the testing environment, AB17, and the production environment. AB19. According to Bridget Williams, in 2001 or 2002, Dell asked her for her production environment password on one occasion. C236-38. Eapen's vague testimony that Dell had shared his password in the testing environment is far from clear. AB19.

Importantly, none of the decisionmakers involved in this case were aware of any password sharing, including the instances of password sharing to which the EEOC points. C134. Williams did not tell anyone else that Dell had asked her for her password. C239. Byun said he shared his password once, with co-worker Bill Kennedy, but management did not know about it. C68-69. And if Eapen did share his password with Dell, he never told anyone else about it. C70-71; C239. Thus, the decisionmakers were not aware of any exception to the password-sharing prohibition, and the language and practice is clear. Based on Eapen's own comments and conduct, MBNA's conclusion that Eapen had committed a serious violation of its Security Policy was reasonable. The EEOC has not proved that MBNA's reasons for terminating Eapen were so inconsistent that an inference of retaliation can be drawn.

6

### 3. The EEOC Has Failed to Prove the Requisite Causal Link.

The EEOC cannot establish the requisite causal link needed to prove retaliation, because the decision to terminate Eapen was made before any protected activity occurred. The recommendation to terminate Eapen for his two policy violations was made on either January 21 or January 22, 2003. C313-14. By February 9, the dismissal document was being circulated for signing. C22. The alleged instances of protected activity occurred later. Eapen sent a bizarre email mentioning discrimination on February 21, C23, and the EEOC sent MBNA a notice, dated March 14, 2003, of the Charge of Discrimination, which would have been received by MBNA even later. C24. Clearly, the termination decision was made before MBNA had notice of any protected activity. Thus, no causal link has been established. *Frenberg v. Methodist Hosp.*, 357 F.3d 787 (8th Cir. 2004) (no causal connection where employer presented evidence of performance issues both before and after employee made complaints).

Even assuming, *arguendo*, that MBNA had somehow known of the protected activity before making its decision, timing alone is insufficient to establish the requisite causal link. Contrary to the selective reference made to *Burton* in the EEOC's brief, AB41, the *Burton* decision holds that, in order for "timing alone" to be sufficient, such timing must be "unusually suggestive." 2005 U.S. Dist. LEXIS 12154, at *21 (citing *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1302 (3d Cir. 1997)). There is certainly nothing "unusually suggestive" about this situation, where there had been an ongoing investigation of two serious policy violations and where notice of the protected activity was not received until after the termination decision had been made.

The EEOC also says Eapen had complained previously to Bellverie Ross, Jim Micek and Ernie Marra. AB39-40. But his "complaints" were about his unhappiness with various aspects of his job, which do not qualify as protected activity.[2] *Bass v. NYNEX,* 2004 U.S. Dist. LEXIS 17378, *21-*23 (S.D.N.Y. Sept. 1, 2004) (no protected activity where plaintiff

---

[2] Of course, the complaints to Ross and Micek were alleged to have been made many months before Eapen was terminated, so the EEOC's reliance on "timing" is misplaced with respect to them.

7

said he had been treated "unfairly" but did not allege race discrimination). Specifically, in her memo to Micek about her staff, Ross said nothing about Dell discriminating against Eapen or about Eapen making complaints of discrimination. C18. Rather she said he was "not happy with his situation," "needs more work" and "there are issues with Justus and Jim Dell." C18. Nor did she accuse Dell of discriminating, instead criticizing his managerial skills while complimenting his substantive knowledge ("He is a task manager more than a people manager," "has a technical background that brings a lot to the table" and is "a subject matter expert." "Jim's only other weakness is in his writing skills.") C18..

Eapen did complain about discrimination to Marra in late January 2003, C169-70, but his complaint was vague and did not mention any specific derogatory remarks. C171-72. Further, Eapen pointedly asked Marra not to take any further action, saying he was just "venting," C169-71; 173; 175; 180, thereby preventing MBNA from further investigation. *Hardage v. CBS Broadcasting, Inc.,* 2006 U.S. App. LEXIS 276, at *20 (9th Cir. Jan. 6, 2006).

### B. The EEOC Has Failed to Show a Pattern of Antagonism that Would Support a Finding of Retaliation.

#### 1. Eapen Was Not Subjected to Antagonism in the Past.

The EEOC attempts to pick and choose its best evidence. This Court recently rejected such an attempt. "[T]he court . . . has a duty to prevent [the plaintiff] from 'cherry picking' the best evidence in an effort to distort the record." *Burton,* 2005 U.S. Dist. LEXIS 12154, at *24. Eapen said he was treated fairly by Micek until January 2003, C60-62, and he chose voluntarily to remain in Desk Top Computing ("DTC") in mid-2002, C60, even after having been presented with an opportunity to transfer to another area. Eapen also received a substantial pay raise and a promotion to officer in June 2002 for which Dell was at least partly responsible. Dell also gave him an "excellent" review in October 2002, which Eapen viewed as more favorable than he expected. C51-52. *See id.* at *24-*25.

The EEOC says Eapen was never invited to social events. AB6. But Wegner said the poker nights in which some employees participated were open to everyone. C296-97. Byun, a Korean, was invited to social events. C331-32. And Kennedy went to a Baltimore Orioles

8

game with Eapen. C263. Wresneski observed that Eapen lived in Baltimore and had a family,
C331, so it is not surprising that he remained there rather than driving back to Delaware to
socialize after working the night shift. Wresneski was not asked if Eapen was invited to social
events. C328-30. Moreover, even if Eapen's allegation that he was excluded from social
events were true, that is not sufficient evidence of retaliation. *See e.g., Carter v. Greenspan*,
304 F. Supp. 2d 13, 29 (D.D.C. 2004) (holding that "shunning or ostracism by co-workers or
supervisors is insufficient to sustain a retaliation claim"); *Reyes v. Hosp. San Pablo del Este*,
389 F. Supp. 2d 205, 213 (D.P.R. 2005) ("rudeness or ostracism, standing alone" is
insufficient to support a claim of harassment).

### 2. Non-Indians Were Not Treated More Favorably.

During his deposition, Sung Byun testified that Bill Davis, who had been a senior
manager in the DTC area, yelled at him. When the EEOC attorney asked the loaded leading
question whether Davis had not yelled at white employees, Byun answered "oh, no he yelled
at everybody." C87. Two non-Indian employees, Kennedy and Wresneski, were disciplined
by being placed on a final warning for putting MP3 files on an office computer. This was not
as serious an offense as Eapen's violation, C256-60; C16; C12; C15, and was not combined
with a second policy violation. Nevertheless, Wresneski felt he did not get "a fair shake" from
Micek, C346, and complained. Micek looked into it but left the discipline in place. C127-29.
Another non-Indian DTC employee, Thomas Liddle, was denied incentive bonuses and
promotions for two years, after hanging up on a customer. C229-30.

There were no other known password violations as serious as Eapen's. *Cf.* C17. Of
course, Campbell's violation was limited to giving out his password—he did not use another
person's password to make changes in the computer system, and his conduct during the
investigation was straightforward, in contrast to Eapen's lack of candor. When Cuffee-
Williams met with Campbell, he immediately admitted the violation and explained that when
Eapen called him, he had been "half-asleep." C302. He said the same thing when he met with
Marra. C165.

Eapen's violation was more egregious. He obtained the password, used it to log on and then attempted to make changes in the computer system. And, unlike Campbell, Eapen was not forthcoming about what he had done. C319-20. He said the policy was stupid and because of that he insisted he had done nothing wrong. C166-67. Significantly, Eapen did not claim discrimination the first time he met with Marra. C168.

Non-Indian Caucasians were also disciplined, including being terminated, for violating the Conflict of Interest policy. Opening Brief ("OB")34-35; C5-8; C9-11. A non-Indian husband and wife were both terminated because the husband had a conflict of interest. OB 35. The record shows that non-Indians were not treated more favorably, thereby supporting the conclusion that no pattern of antagonism existed.

### 3. There Was No Pattern of Antagonism Against Indians or Other Protected Categories of Persons.

No pattern of antagonism has been proven. MBNA harbored no anti-Indian animus toward Eapen or anyone else. Twenty-five percent of the persons employed on the Christiana campus of MBNA are Indian. C158-59. Plainly, there has been no discrimination in hiring. Chacko, an Indian manager in DTC, denied saying she had been discriminated against because of her Indian national origin. C151.

Bridget Williams, an African-American employee, testified that on one occasion, Dell refused to let her go to an educational course. C253-54. When she raised the issue with Dell's superior, Micek, the latter immediately signed off on the document granting her permission to attend the course. C248-49; 250-51; 253-54. Williams believed this to be poor management by Dell, but did not indicate that there was any discriminatory motive. C250-51. Chacko, Williams' supervisor, said that Williams never complained to her about discrimination. C153-54.[3]

---

[3] The EEOC says Marra treated Williams' alleged race discrimination complaint as "a joke." AB12. Williams did not say she complained about race. In discussing Dell's refusal to sign an authorization for her to attend a course, she said she did not recall if it was due to "race or sex or whether it was just the things he was doing." C252; C185.

10

Eapen was unhappy about having to attend morning meetings after his shift ended, but Dell asked both Campbell, a non-Indian, and Eapen, an Indian, to remain after their shifts to attend the morning meetings. C118-19.

And, while he was the DTC Manager, Dell recommended two people for promotion, Eapen, an Indian, and Bridget Williams, an African-American. C41-42. The two people he socialized with outside of work most often were Sung Byun, a Korean, and George Taylor, an African-American. C116-17; 119. No inference of discriminatory animus can be drawn from Dell's conduct and there is no evidence of a pattern of antagonism directed toward Indians or other protected categories of persons by MBNA. Therefore, summary judgment for Defendant should be granted on the EEOC's retaliation claim.

## II. THE EEOC HAS FAILED TO SHOW THAT ANY ALLEGED NATIONAL ORIGIN HARASSMENT WAS SEVERE OR PERVASIVE.

In evaluating whether alleged harassment in a work environment is so severe or pervasive that it constitutes a hostile environment, the court may look to objective factors such as: (1) the frequency; (2) the severity; (3) whether it is physically threatening or humiliating (rather than an offensive utterance), (4) whether it unreasonably interferes with the employee's work performance; and (5) the effect on the employee's psychological well-being. *See Harris v. Forklift Sys.*, 510 U.S. 17, 23 (1993). No single factor, however, is required or dispositive. *See id.* As the Court stated, "the real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed." *Oncale v. Sundowner Offshore Serv., Inc.*, 523 U.S. 75, 81-82 (1998). When all the facts and circumstances surrounding Eapen's claims of harassment are considered, no reasonable person could find them "severe or pervasive" as is required.

The EEOC has packaged together every comment Eapen claimed was made over a long period of time in an attempt to make the whole greater than the sum of its parts. There is no dispute that a joking atmosphere existed in DTC. AB6-7. Where there is divergence is the EEOC's effort to transform the bantering remarks and pranks of a group of friends, which all

11

participants (except, belatedly, Eapen) said were welcomed, into a hostile environment. The Supreme Court has stressed that "'simple teasing,' offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). The EEOC has attempted to substitute a lack of "civility" for the requisite proof of a hostile environment. *Oncale*, 523 U.S. at 81-2. OB18-19.

### A. The Friendly Banter Was Neither Pervasive Nor Severe.

Sung Byun, a Korean, said he did not view the jokes as unwanted harassment. C84. He stated, correctly, that a remark was not harassment if it was welcomed. C95-96. His friend Bill Kennedy agreed. C279-80; 282-83. Byun gave a clear explanation that what was taking place was simply bantering among friends. C100-02. He also explained that the joking was based primarily on performance, not national origin, though there were occasional references to people's national origin. C88-89; 100-01; C293. Byun testified that Eapen was not regarded as a good performer among the "worker bees," and that he was not "a technical guru." C97-98; C289. As a result, he might have been subjected to some jokes because of his mistakes.[4]

Bridget Williams, who is a Minister, C234; 241, sat nearby and said they "joked a lot" in DTC, but not about ethnicity. C244. In fact, she could only recall one instance of ethnic joking, when she overheard Bill Kennedy make a comment to Sung Byun about being Asian. Williams had the impression that Byun was "a little annoyed" because his "tone changed," though she did not actually see the exchange. C243-44.

Chacko, an Indian manager, echoed the others' comments that unprofessional "kidding around" took place, but not racial comments. C152. Pranks were played, usually by the five young males who were social friends. C343-44; C264-65; C242-43; C227-28. They would play jokes on each other by doing minor things to each other's computers, such as taping their

---

[4] Byun made the point that he and some others would go to Best Buy or Circuit City when new software became available, but not Eapen, who was more interested in financial matters, C97-98, as evidenced by his dilettantism in obtaining various licenses, from real estate and financial advisor to truck driver. C37-40; 59.

12

network cables, C227-28; C265, or taking a mouse ball out of a computer's mouse. This prank was played on Wresneski, who said it was "harmless." C344-45.

At one point, Eapen complained that someone took his computer monitor, AB11, a device Eapen had initially taken for himself. AB29. Ford recalled that someone had also taken another employee's monitor. C216-17 Such "harmless" "kidding around" does not rise to the level required for pervasive or severe harassment.[5]

### B. The Remarks Were Not Physically Threatening or Humiliating, But Mere Offensive Utterances.

The EEOC points to testimony from Eapen that an employee named Richard Todd called Eapen a "sand nigger" shortly after 9/11. AB7; AB36. In fact, Todd's employment with MBNA ended on May 24, 1999, before Eapen was hired on February 28, 2000. C33-34; C36. Any comments Todd made to Eapen had to have occurred while Eapen was a contractor, and were made long before 9/11. Eapen himself, in a letter to the EEOC, said "[a]s I understand it, Rick Todd, who referred to me as Sand Nigger, is no longer with MBNA." C27; C56. Therefore, the alleged comment can not be considered in this case.[6] The EEOC also says Eapen was called a "nigger" but there is absolutely no evidence to support that bald assertion. Not one person testified to hearing that word used at MBNA.

The EEOC makes the baseless claim that "sand nigger" and "nigger" were accepted terms used in DTC. AB7. In fact, the opposite was true. Eapen himself admitted that Dell had told Todd not to use that language. C56. Other DTC employees never heard those words

---

[5] Dell said he had taken the monitor back from Eapen because it was a server monitor, which was needed elsewhere, as they were short on those kinds of monitors. Eapen's monitor was replaced. C111; C112-13.

[6] The EEOC's citation of *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002) is far off the mark for several reasons. First, as mentioned, the remark in question was made **before Eapen became employed.** Second, as anticipated by the Supreme Court, laches applies here and bars a suit where the plaintiff "unreasonably delays filing a suit and as a result harms the defendant." Failing to raise the issue in 1999 or at such earlier time as it occurred, which Eapen could have done as a contractor, prevented MBNA from taking action to put a stop to the use of the offending phrase. Waiting four years or more to raise the issue requires that laches be invoked to bar this unfair claim. *Bhella v. Eng.*, No. 02-2416, 2004 U.S. App. LEXIS 2341 (4th Cir. Feb. 14, 2004) (holding that, because ethnic slurs were made a year before the alleged harassment, such comments "were of little probative value on [plaintiff's] hostile environment claim.").

13

used at all. C339; C276-77; C246-47. The only other testimony that the phrase "sand nigger" may have been used was by Byun, who "guessed" that Eapen had been called that phrase "once or twice." C85. Because of the speculative nature of a "guess," that testimony should carry no weight. Byun testified that he never heard Eapen called a "nigger." C85. Chacko denied hearing any of the allegedly harassing words, C147-50, except "BP" (but she could not remember where she heard that phrase, C148) and "ghetto," which she described as meaning the area in the building where there were smaller cubicles. C150.

These limited allegations (a speculative "guess" and a comment which could not be placed into context), do not rise to the level of physically threatening or humiliating. At most, they can be construed as mere offensive utterances, insufficient to allow any reasonable juror to conclude that the alleged harassment was severe or pervasive. *Harris*, 510 U.S. at 23.

Additionally, the incident involving the disabled mailroom clerk cannot be construed as a "physically threatening" incident. The EEOC, again exaggerating, says Eapen was "almost" attacked by a disabled employee. AB7. The incident occurred in 2001 or 2002, C54, and Eapen did not report it or complain about it. C53-55. Bridget Williams heard the disabled employee, Rob Dunphy, say Osama Bin Laden had been caught and someone said "no, he's over there," referring to Eapen. She does not recall anything more than that. C244-45. Byun was also there, but does not know who made the comment. C84. None of those present testified that Eapen was "almost attacked." Indeed, Ford said that Eapen referred to himself as "OBL's" brother or cousin, C195-97, so the joking remark can certainly be seen as nothing more than an invited wisecrack, with no discriminatory motivation. None of the instances alleged by the EEOC, including the incident with the mailroom clerk, can be construed as "physically threatening."

## C. The Joking Did Not Unreasonably Interfere With Eapen's Work Performance.

While the EEOC claims the joking interfered with Eapen's work performance, AB36, Eapen's conduct belies that allegation. Significantly, in mid-2002, Eapen told Micek he had a job opportunity in MBNA's Technology department, but he had decided on his own to stay in

14

DTC, C125; 138-39, which certainly suggests that there was no harassment taking place at that time. Eapen said that being called "Sleepin' Eapen" never bothered him. C50. Eapen also assisted his co-workers with mortgages, which is inconsistent with his claim that these individuals were harassing him.

Eapen moved to the night shift when the DTC was in Christiana III, C348-49, in March 2002. AB10. After that, his contact with the alleged harassers was minimal. Ford occasionally saw him for a one hour period when Ford came in early, and they became friendly. C216. There is no evidence that Ford harassed Eapen during that hour overlap. Kennedy said he did not see Eapen regularly because Eapen worked the night shift. C281; 284-85. Eapen complained that he felt "isolated" on the night shift. AB10. It seems self-evident that an employee who was "isolated" from his co-workers, could not have been harassed by them.

Eapen says people would say "Good morning OBL" when he left. AB11. But "OBL" was used in a joking way; and Eapen never asked them to stop using that phrase, which he had used himself. C351; C195-97. So, if others called him "OBL" as the EEOC claims, it was because he invited that cognomen through his own actions. Indeed, Ford testified that Eapen joked more than anybody else, but according to Ford, it was not harassment, just friendly kidding. C200-01.

Others confirmed that before he went on the night shift, Eapen participated in the joking. C96. Eapen called Wresneski a "Polack" in "a jocular manner." C349-50. And Eapen confirmed that he made repeated references to the Sikhs who worked in the same building cutting off their beards after 9/11. C57-58; C96-97; C220-21; 222-23. Based on this evidence, any joking that occurred cannot be said to have unreasonably interfered with Eapen's work performance.

### D. The EEOC Exaggerates Certain Joking References, Which the Record Does Not Support as Constituting Harassment.

During the course of this litigation, the EEOC developed a list of words and phrases about which it questioned numerous people. It has insisted on setting out each one in its brief

15

despite the fact that the record provides virtually no support that anyone heard any of those words or phrases used in an unwelcome context in the DTC workplace. AB8

### 1. The "A" team and the "White" team.

Byun explained the evolution of that phrase. C82. He said it was an inside joke among a few friends. C82-83. It had started as simply a designation of two teams of DTC employees, an "A" and a "B" team. As a joke, Byun and his friend Kennedy began using "A" for "Asian" and "W" for "white." C267-68. Wegner had heard the references but did not know what they meant. C294-95. Co-worker Williams had not heard the phrase used at all. C247. Subsequently, an Indian intern, Mark Shiwpal, coined the term "BP" or "Brown People," as a spin off of the "A" and "W" teams, because he wanted to have his own "team." C274-76; 286-87. Management was not aware of that usage. Byun said Chacko may have asked about it and the team members "just chuckled." C83. Bellverie Ross, whom Micek replaced, was not aware that the phrase was used. C83.

### 2. Dot-head.

Byun said that Kennedy had used the phrase "dot-head," which referred to Indians, C81, but not in Eapen's presence. Kennedy was not in the same area as Eapen; he was 50 feet away in a large cubicle. C271. No other person testified that they heard the phrase used at all.

### 3. The Ghetto.

Wresneski said he coined that phrase. C339-41. The reference to a "ghetto," was started as kidding between George Taylor, an African-American, and Byun, a Korean. C93-95. Byun would joke with Taylor that the cubicles were not "his ghetto," and others picked up the usage. C90-91. Byun explained that the use of "the ghetto" came to refer to the different-sized cubicles of the "rank and file" employees and the managers. C92-93; C295; C269-70; C198-99.

### 4. Other Ethnic References.

Kennedy and Byun, who were friends, kidded each other about their national origins. C273. Byun called Kennedy a "red neck" and "Whitey." C266-67; C94-95; C273.

The EEOC claims the phrase "rice bowl" was used, but this was denied by everyone who was questioned. C337-38; C272-73. It appears that the EEOC has confused the admitted

16

use of the phrase "rice burner." Wresneski and Byun stated that the phrase had been used to refer to Japanese cars. C338; C79-80.

Byun never heard Eapen called Saddam Hussein or Saddam Hussein's brother, C89, nor did anyone else, although the EEOC methodically asked every witness about those words and phrases. Byun also kidded Taylor about black people shooting their guns sideways. C200. This was intended as joking among friends, not harassment. C205; 208-10.

One time, Wresneski apologized to Saad Abuwi, an African-American, after learning he was upset about a comment Wresneski had made about a movie. C333-36. Chacko had reported Abuwi's complaint to Ross, who said she would handle it. C155-57.

The EEOC fails to present the requisite proof of two elements of its *prima facie* case. Instead, it incorrectly asserts that MBNA has conceded that Eapen suffered national origin discrimination, which would detrimentally affect a reasonable person of the same national origin. AB24-25. MBNA has made no such concession and the burden rests with EEOC to prove both elements. *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1081 (3d Cir. 1996) (internal citations omitted) (holding that plaintiff has the burden to prove, "by the totality of the circumstances, the existence of a hostile or abusive environment which is severe enough to affect the psychological stability of a minority employee."); *Cortes v. Univ. of Med. & Dentistry of N.J.*, 391 F. Supp. 2d 298 (D.N.J. 2005) (isolated incidents are insufficient to prove a hostile environment claim or to invoke the continuing violation doctrine).

### E. The Faragher/Ellerth Defense Bars this Action Because Eapen Failed to Utilize Any of MBNA's Preventive or Corrective Opportunities.

The Supreme Court has declared that an employer is not liable for a hostile work environment when it exercised reasonable care to prevent and/or promptly correct any harassing behavior, and the employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to otherwise avoid the complained-of injury. *Faragher*, 524 U.S. at 807-08; *Burlington Indus. v. Ellerth*, 524, U.S. 742, 765 (1998). The EEOC "cannot withstand summary judgment without presenting evidence" that Eapen gave MBNA "enough information to make a reasonable employer think there was some

17

probability that []he was being . . . harassed." *McPherson v. City of Waukegan*, 379 F.3d 430, 441 n.7 (7th Cir. 2004); *Barrett v. Applied Radiant Energy Corp.*, 240 F.3d 262, 267-69 (4th Cir. 2001).

There can be no material factual dispute that MBNA took reasonable steps to prevent harassment by implementation and dissemination of its anti-harassment policy. *See Ellerth*, 524 U.S. at 765 (as a matter of law, employer meets its duty to take preventive measures by adoption and dissemination of policy). Numerous people testified about receiving periodic anti-harassment training. C64-66; C141-42; C299-01; C108-09; C194; C278; C137.

Additionally, there can be no material factual dispute that MBNA took reasonable corrective measures. *See id.* Dave Armstrong, the head of Engineering, said to "knock off" the "BP" comment on the one occasion that he overheard it. C86. Micek and another manager, either Davis or Yates, also cautioned DTC employees. Micek addressed the pranks; and the other discussion was about being too loud. C342. When Eapen complained about his mouse ball being removed, Dell told the co-workers "no more jokes." C110.

Eapen did complain to Marra about discrimination, AB12, but he told Marra that he was just venting and asked that Marra not further pursue his complaint. C173-77; 178-84. Just this month, on a nearly identical set of facts, the Ninth Circuit ruled that, where an employee complained of harassment, but excluded specifics of the alleged contact, told the supervisor that he wanted to "handle it by [him]self" and asked that the complaint not be further investigated, the employer's inaction "was both prompt and reasonable as a matter of law." *Hardage*, 2006 U.S. App. LEXIS 276, at *19-21. As was the case in *Hardage*, Eapen did not mention any specific derogatory remarks, and requested that no further action be taken. Therefore, MBNA's response was both prompt and reasonable under the second prong of the defense.

Finally, there can be no material factual dispute that Eapen unreasonably failed to make use of MBNA's preventative or corrective opportunities. The only time Eapen complained was to Marra, when he specifically asked Marra not to investigate. "By specifically requesting the company not make use of its remedial and preventative

18

procedures," Eapen unreasonably failed to make use of MBNA's corrective opportunities as a matter of law. *Id.* At 25.

The EEOC says Eapen stopped complaining to avoid being labeled a "complainer." AB12. Eapen's failure to utilize MBNA's complaint procedures, such as "the Company's EEO Hotline or Human Resources," is fatal to the EEOC's claim. *Preston v. Bell Atl. Network Servs., Inc.*, C.A. No. 96-3107, 1997 U.S. Dist. LEXIS 358, *28, *13 (E.D. Pa. Jan. 16, 1997) (finding for employer where employee stopped complaining to her supervisor because he began to socialize with her harasser); *Barrett*, 240 F.3d at 267-69. Also, Eapen willingly chose to remain in DTC and turned down a job offer in another department, thereby failing to avoid the complained-of actions.

Further, the record is replete with evidence that Eapen never complained about harassment. C202; C161-62. For example, Ross's notes to Micek about Eapen at the time of the transition indicate that Dell and Eapen had a problem communicating, but make no mention of national origin harassment. C18; C121-22. The EEOC says Eapen complained to Micek during his 2002 one-on-ones, but there is no documentation of this claim. Eapen did not complain about discrimination, only about not having enough work, about communication problems with Dell and general problems between Operations and Engineering, which Micek addressed.

Eapen complained about other things to Ford, who considered him a friend, but never mentioned the supposed remarks that are claimed to have created a hostile environment. C203-04; 218-19. Eapen never told anyone else that Dell was discriminating against him because of his national origin, only that he did not enjoy his job. C76-77; C89a-b; C163-64. Eapen and Byun discussed work-related frustrations but never talked about harassment. C78; 100. Eapen never complained to Chacko about discrimination or harassment, C142-43; 146, only that he was bored on the night shift and that Dell was not giving him enough work. C146; C123.

Eapen undoubtedly complained about his job, as many employees do. At no time, however, did Eapen complain about perceived national origin harassment until it was clear

19

that he would be terminated for violating MBNA policies and, even then, insisted that his

complaint not be investigated. Therefore, Eapen unreasonably failed to take advantage of any

of the numerous opportunities provided by MBNA to complain about, to correct, or to

otherwise avoid the behavior he now alleges constituted harassment. Thus, the

Faragher/Ellerth affirmative defense bars Plaintiff's claim.

## CONCLUSION

The EEOC has failed to prove its retaliation and hostile environment claims, and

therefore, summary judgment should be granted to Defendant.

Respectfully submitted,

YOUNG CONAWAY STARGATT & TAYLOR, LLP


Sheldon N. Sandler, Esquire (No. 245)
Margaret M. DiBianca, Esquire (No. 4539)
The Brandywine Building, 17th Floor
1000 West Street
P.O. Box 391, Wilmington, Delaware  19899-0391
Telephone: (302) 571-6673, 571-5008
Facsimile: (302) 576-3330, 576-3476
Email:  ssandler@ycst.com, mdibianca@ycst.com
Attorneys for Defendant


DATED:  January 9, 2006

DB01:1949943.1                                                              009626.1038

**CERTIFICATE OF SERVICE**

I hereby certify that on January 9, 2006, I electronically filed a true and correct copy of foregoing **Defendant MBNA's Reply Brief In Support Of Its Motion For Summary Judgment** with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for viewing and downloading to the following counsel of record:

> Rudolph Contreras
> Assistant U.S. Attorney, Chief Civil Division
> U.S. Department of Justice
> 1007 Orange Street, Suite 700
> P.O. Box 2046
> Wilmington, DE 19899-2046

I further certify that on January 9, 2006, I caused a copy of **Defendant MBNA's Reply Brief In Support Of Its Motion For Summary Judgment** to be served by hand-delivery on the following counsel of record:

> Rudolph Contreras, Esquire
> Assistant U.S. Attorney, Chief Civil Division
> U.S. Department of Justice
> 1007 Orange Street, Suite 700
> P.O. Box 2046
> Wilmington, DE 19899-2046

I further certify that on January 9, 2006, I served the foregoing **Defendant MBNA's Reply Brief In Support Of Its Motion For Summary Judgment** on the following non-registered participants in the manner indicated below:

> Terrence R. Cook, Esquire **(By First Class Mail)**
> U.S. Equal Employment Opportunity Commission
> Philadelphia District Office
> 21 South Fifth Street
> The Bourse, Suite 400
> Philadelphia, PA 19106-2515

YOUNG CONAWAY STARGATT & TAYLOR, LLP

Sheldon N. Sandler, Esquire (No. 0245)
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware 19899-0391
Telephone: (302) 571-6673
Facsimile: (302) 576-3330
Email: ssandler@ycst.com
Attorneys for Defendant

Dated: January 9, 2006