IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | ) ) ) | |
| Plaintiff, | ) ) ) | C.A. No.04-CV-425 SLR |
| v. | ) ) | |
| MBNA AMERICA BANK, N.A., | ) ) | |
| Defendant. | ) | |

**APPENDIX TO DEFENDANT MBNA'S REPLY BRIEF
IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

YOUNG CONAWAY STARGATT & TAYLOR, LLP

Sheldon N. Sandler, Esquire (No. 245)
Margaret M. DiBianca, Esquire (No. 4539)
The Brandywine Building, 17th Floor
1000 West Street
P.O. Box 391
Wilmington, Delaware  19899-0391
Telephone: (302) 571-6673, 571-5008
Facsimile: (302) 576-3330, 576-3476
Email:  ssandler@ycst.com, mdibianca@ycst.com
Attorneys for Defendant

DATED: January 9, 2006

009626 1038

## TABLE OF CONTENTS

Page

MBNA Information Security Guidelines
signed by Mr. Eapen on February 28, 2000 ....................................................................C1

MBNA Conflict of Interest Policy ................................................................................C2

MBNA Personnel Policy on Outside Employment............................................................C4

Jay Coombs Dismissal Documents
dated December 1999......................................................................................................C5

Nancy Coombs Dismissal Documents
dated December 1999......................................................................................................C9

William Kennedy Corrective Action Cover Sheet
dated November 23, 2001 .............................................................................................C12

Eapen Corporation Corporate Charter Approval Sheet
dated December 17, 2001...............................................................................................C13

Eapen Corporation Articles of Incorporation for a Stock Corporation
dated December 17, 2001...............................................................................................C14

William Kennedy Corrective Action Report
dated January 3, 2002....................................................................................................C15

Richard A. Wresneski Corrective Action Report
dated January 8, 2002....................................................................................................C16

Personnel Note re: Peter Wise and Lisa Manis ................................................................C17

Excerpt from Bellverie Ross Transition Document
dated June 19, 2002.......................................................................................................C18

Eapen email re: UAT DMZ Servers
dated January 8, 2003....................................................................................................C19

Dell email to Eapen re: UAT DMZ Servers
dated January 9, 2003....................................................................................................C20

Report from Information Security.....................................................................................C21

Eapen Dismissal Signature Coversheet
dated February 9, 2003...................................................................................................C22

009626 1038

## TABLE OF CONTENTS (CONT'D)

**Page**

Eapen email to Dell re: My Employment at MBNA
Dated February 21, 2003.............................................................................C23

Notice of Charge of Discrimination
dated March 14, 2003.................................................................................C24

Eapen letter to Hawthorne dated December 5, 2003.....................................C25

Sills letter to Hawthorne dated April 8, 2004 ..............................................C33

Excerpts from the Deposition Transcript of Justus Daniel Eapen
dated April 4, 2005....................................................................................C35

Excerpts from the Deposition Transcript of Sung Byun
dated July 18, 2005 ...................................................................................C63

Excerpts from the Deposition Transcript of James A. Dell, Jr.
dated July 19, 2005 ...................................................................................C107

Excerpts from the Deposition Transcript of James J. Micek
dated July 19, 2005 ...................................................................................C120

Excerpts from the Deposition Transcript of Neela B. Chacko
dated July 20, 2005 ...................................................................................C140

Excerpts from the Deposition Transcript of Ernesto E. Marra
dated July 21, 2005 ...................................................................................C160

Excerpts from the Deposition Transcript of Richard T. Kilmon
dated July 21, 2005 ...................................................................................C188

Excerpts from the Deposition Transcript of Glenn A. Ford
dated August 1, 2005 .................................................................................C193

Excerpts from the Deposition Transcript of Thomas W. Liddle, Jr.
dated August 1, 2005 .................................................................................C224

Excerpts from the Deposition Transcript of Bridget C. Williams
dated August 2, 2005 .................................................................................C233

Excerpts from the Deposition Transcript of William F. Kennedy
dated August 2, 2005 .................................................................................C255

009626 1038

# TABLE OF CONTENTS (CONT'D)

**Page**

Excerpts from the Deposition Transcript of Richard Lee Wegner, Jr.
dated October 6, 2005 ..................................................................................................C288

Excerpts from the Deposition Transcript of Renee Cuffee-Williams
Dated October 6, 2003 ..................................................................................................C298

Excerpts from the Deposition Transcript of Richard A. Wresneski
dated October 12, 2005 ..................................................................................................C327

iii

## MBNA America
### Information Security Guidelines

Your position with MBNA may give you access to information regarded by MBNA as confidential. Defined broadly, confidential or proprietary corporate information is any information that gives MBNA an advantage over its competitors. MBNA views this information as a corporate asset and, as with any asset, misuse may damage the company. The following guidelines, along with MBNA's Personnel Policies and the Guide to Employment and Benefits, outline your responsibility for the protection of confidential corporate information. If you have any question at all relating to the confidential or proprietary nature of information at MBNA, you should assume that it is confidential and proprietary unless advised otherwise by your manager. Any questions relating to these guidelines or confidential and proprietary information should be directed to your manager. Please read these guidelines carefully.

- MBNA's computer, electronic, and telephone systems and all communications and information stored, transmitted, received, or contained in these systems are MBNA property and are to be used solely for job-related purposes. To ensure proper use of MBNA's communications systems, the company may monitor their use from time to time. Misuse of these systems may result in disciplinary action, up to and including dismissal.

- User IDs and passwords are used to establish accountability for activity performed on MBNA computer systems, and all actions performed are the full responsibility of the person who has been assigned that user ID. People are not to share their personal user ID or password or use their user ID or password to log in to MBNA computer systems for another person. Passwords must remain confidential and should not include information that can be easily guessed.

- All people must log off of MBNA computer systems when leaving the work area for an extended period of time (e.g., at the end of a business day). A password-locked screen-saver must be invoked when leaving the work area in all other instances.

- People are prohibited from processing or approving any transaction to their own personal or business card account or the accounts of friends or relatives.

- Corporate information is to be used for the performance of company business and must remain confidential. This information should be provided on a "need-to-know" basis and stored in a secured location when not in use.

- In the absence of a written contract stating otherwise, all software developed on MBNA computer systems is the property of MBNA America and/or its subsidiaries.

- Copying of licensed software for unauthorized purposes is prohibited. People are prohibited from operating any personally owned PC hardware or software on company premises.

- Managers must notify Information Security in advance of any departmental transfer or change in access requirements. Appropriate access request forms must be approved and submitted to Information Security to facilitate any change in access.

You are required to notify Information Security immediately if unauthorized use of user IDs or passwords is detected. Information Security should also be contacted if unauthorized access to our corporate systems or noncompliance with the above requirements is suspected.

I have read the above Information Security Guidelines and acknowledge that MBNA expects me to adhere to them. I understand that failure to comply with these guidelines may result in disciplinary action, up to and including immediate dismissal, and that MBNA reserves the right to take legal action to remedy any damage that may result from noncompliance with these guidelines.

Name (print): _Justus D. Eapen_      SSN: _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_

Department: _Desktop Computing_      Maiden Name: _____
(if changed while at MBNA)

Signature: _____      Date: _02-28-00_

Revised 08/29/95

**D24**

**C1**

the contents, should be referred to MBNA's Corporate Communications department. Confidential business information should not be discussed outside, or even within, the company except as needed in connection with company business. Questions regarding the handling of confidential information should be addressed to your manager or the Ethics Office.

### Conflict of Interest

MBNA people are expected to conduct their business and outside activities in a manner that avoids *actual or perceived conflicts* with the interests of MBNA or its Customers. Conflicts of interest arise when personal business and outside activities influence, or may be perceived to influence, a person's decisions or judgment in his or her work at MBNA. Potential conflicts are most likely to arise in dealings with Customers, vendors, and other third parties in outside activities, and in situations involving non-MBNA employment. Some examples of situations where a conflict of interest may occur or be perceived include the following:

- Participating in business ventures with Customers or vendors.

- Soliciting or accepting gifts, favors, or anything of value from Customers or vendors. (The policy allows acceptance of gifts up to a value of $100 for commonly recognized events, such as birthdays, holidays, promotions, weddings, etc.)

- Performing duties similar to your MBNA duties for another organization of similar interest.

- Holding an outside job or engaging in outside business that conflicts with your work performance or duties at MBNA.

In general, any activity, association, or relationship that creates an actual or perceived risk that confidential MBNA information may be compromised, such as the following, should be avoided:

- Being employed by or providing services to another credit card issuer.

3

D2070

**C2**

- Being employed as a broker, dealer, or agent in the field of insurance, securities transactions, corporate and consumer finance transactions, home equity/second mortgage transactions, or any other field in which MBNA conducts business.

- Engaging in any employment or activity that involves giving advice or exercising judgment based on information acquired primarily from employment at MBNA.

- Engaging in any outside employment or activity that implies the company's sponsorship or support.

Also, it may appear to be a conflict of interest if you share a home (or have some other close personal or business relationship) with an individual who is employed by or provides core services to a competitor of MBNA in its major business lines, including credit cards, insurance, or consumer finance. ("Competitor" is defined as any of the commonly recognized top-20 companies in any of MBNA's major business lines.)

You are obligated to report situations that could constitute or appear to constitute conflicts of interest to your manager or the Ethics Office. MBNA people involved in conflicts of interest could face immediate dismissal and possible criminal prosecution.

### Insider Trading

MBNA people frequently have access to critical business information before it is disclosed to the public. This information could affect the price of MBNA stock or investors' decisions to buy, sell, or hold stock. Using information about the company or its Customers for personal gain through buying or selling securities, or disclosing the information to others (including family members and others living in the same household), constitutes "insider trading." Insider trading will result in immediate dismissal and possibly criminal prosecution.

As a general rule, to avoid suspicion of insider trading, MBNA people should not engage in trading from the time they become aware of inside information until the third business day following public release of the information.

4

**C3**

D2071

# Personnel Policy
# MBNA Corporation

| Section | | Policy Number | Page |
|---|---|---|---|
| PERFORMANCE/CONDUCT | | 606 | 8 of 13 |
| Subject | | Effective Date | |
| STATEMENT OF ETHICS & RESPONSIBILITY | | AUGUST 2003 | |
| Applies To | | Approved by | |
| ALL PEOPLE OF MBNA CORPORATION (UNITED STATES ONLY) | | | |

be obtained through the bank's CEO or the directors of Facility Management, Community Relations, or their designees.

## 3. Outside Employment

MBNA people should not engage in any outside employment or provide outside services that conflict with the interests of MBNA. In general, the following situations should be avoided:

- Any activity, association, or relationship that creates an actual or perceived risk that confidential MBNA information may be compromised such as being employed by or providing services to any other credit card issuer
- Being employed as a broker, dealer, or agent in the field of insurance, securities transactions, corporate and consumer finance transactions, home equity or second mortgage transactions or any other field in which MBNA conducts business
- Sharing a home with or having an immediate family member who is employed by or provides services to a recognized competitor of MBNA in any of its lines of business
- Any employment or activity that conflicts with a person's time or ability to perform his or her MBNA job
- Any employment or activity that involves giving advice or exercising judgment based on company information acquired primarily from employment at MBNA
- Any outside employment or activity that implies the company's sponsorship or support

All people employed by MBNA have the obligation to report situations that could constitute or appear to constitute conflicts of interest to their managers, the Ethics Officer, or the Ethics Advisor. The determination of whether a particular situation constitutes a conflict of interest will be made by the Ethics Officer in conjunction with the manager and the Director of Personnel and will involve consideration of the MBNA person's position, the frequency of the interaction giving rise to the potential conflict of interest, and the overall best interests of the company. If a conflict of interest is determined to exist because of a personal or business relationship, the MBNA person, at the discretion of the Director of Personnel, may be asked to remedy the situation through acceptance of a less sensitive position, resignation, or another suggested action. If the person does not remedy the situation when asked to do so, he or she may be dismissed.

## 4. Illegal and Other Improper Payments

D229

# CORRECTIVE ACTION REPORT



| Date: | 12/15/99 | Id Number: | 00383 | Name: | Jay W. Combs |
|---|---|---|---|---|---|
| Status/Grade: | FT / AVP | DOH: | 10/13/87 | Job Title: | Account Executive |
| Cost Center: | 4033 | Department: | BDOA | Manager Name/Ext: | Brenda Kelly |

**Corrective Action Status:**
_____ First Warning        _____ Final Warning        __X__ Dismissal

Date of Previous Action(s):  None

**Documentation:**

Jay is being dismissed for misconduct according to Personnel Policy 601.  More specifically for theft of Customer related information.

*IN NO WAY DO I ACKNOWLEDGE THIS AS FACT.*

_Jz W. Cone_                    12/10/99                    _Bri Gimbt_                    12/15/99
Individual's signature          Date                        Director of Central Personnel          Date

D480

C5

# APPROVAL FOR RECOMMENDATION OF DISMISSAL

## *JAY W. COMBS*

Business Area Signature

_Ken Boehl_

12 / 15 / 99
Date

Ken Boehl
Vice Chairman

Personnel and Law Signature

_____
Kathie Catanzarite, EVP
People Relations Director

_____
Date

_Omar McNeill_

12/15/99
Date

Omar McNeill, EVP
Employment Counsel

_Brian Gimlett_

12/15/99
Date

Brian Gimlett, SEVP
Director of Central Employment

_Terri Murphy_

12/17/99
Date

Terri Murphy, SEVP
Director of Personnel

_Charles C. Krulak_

12/19/99
Date

Charles C. Krulak
Senior Vice Chairman

D481

C6



# PERSONNEL CONSULTATION

**Name:** Jay Combs.

**Date:** _____

**Department:** _____

**Division:** _____

**Call Received From:** _____

**Ext:** _____

**Call Taken By:** _____

**Location:** _____

**Contacts:** _____

**Issue:** Specially theft of Customer related information

FBI

CC                              5 inditments.

Selling MBNA Cust
Info to the 4 other (Nc
me

Cash & checks for pymt  over 2 yrs.

Acct Exec 11        AVP
00383  Jay Combs        FT
10/13/87  DOH              1
CC: 4033

No hard Evidence

D482

C7

D484

# DISMISSAL SUMMARY

Name: _____ Nancy Combs _____

Date of Hire: _____ 4/14/86 _____

Department/Cost Center: _____ Authorizations/903 _____

Manager: _____ John Pedicone _____

Location: _____ Wilmington _____

Last Performance Appraisal: _____ 3.00 _____

Administrative Leave: _____ 12/15/99 _____

**Reason for Dismissal:**

Because Nancy may have a conflict of interest due to the recent investigation of a member of her household, she is being dismissed in the best interest of MBNA.

**Previous Performance/Conduct Corrective Action(s):**

NA

**Previous Absence/Tardiness Notice(s):**

NA

**D486**

**C9**

# APPROVAL FOR RECOMMENDATION OF DISMISSAL

*Nancy Combs*

**Business Area Signatures**

_on vacation_ _____

Edward Matthews
Director of Risk
_____
Date

_Diane Sievering SEVP_
Division President
12/21/99
Date

**Personnel and Law Signatures**

_Kathie Catanzarite_
Kathie Catanzarite, EVP
...ple Relations Director
12/20/99
Date

_See attached_
Omar McNeill, FVP
Employment Counsel
_____
Date

_on VAP_
Brian Gimlett, SEVP
Director of Central Employment
_____
Date

_See KFB on Corrective Action_
Terri Murphy, SEVP
Director of Personnel
_____
Date

_Not required per T. Murphy._
Charles C. Krulak
Senior Vice Chairman
_____
Date

_Dismissal authorized_
_by Ken Baehl, Vice Chairman._

D487

**C10**

Submitted by [Catherine Willey]

Name [COMBS,NANCY LEE]    People ID [00379]    Last 4 Digits SSN [5011]

Current Address [221 WEST HIGH ST, ELKTON, MD, 21921]

New Address [n/a]

Home Phone [(301)392-5667]

Hire Date [04/14/1986]    Last Day of Service [12/14/1999]    Emp End Date [12/29/1999]

Hrs Unused Vac [ ]

Department Name [AUTHORIZATIONS - VOICE]

Cost Center [0903]

Location [DEER3]

Job Title [RISK CONTROL SERVICES REP  II]    Grade/Officer [218/]

Job Status [PART TIME]

Name of Manager [John Pedicone]

| | | |
|---|---|---|
| Exit Intvw Conducted [No] | 2 Wk Notice Accepted [N/A] | Corp Invstgns [yes] |
| MBNA Chk/Sav [Yes] | Joint [No] | Joint w/MBNA Person [No] |
| Cost Center Card [No] | MBNA Cellular [No] | CMS Login [No] |
| MBNA Calling Card [No] | MBNA Laptop [No] | |
| MBNA Pager [No] | PIN Number [ ] | EMail [No] |
| Phone Ext [n/a] | Audix [Yes] | |
| Home Modem [No] | Service Observe [No] | |
| MBNA Daycare [No] | Prepaid Education [No] | Tuition Debt [No] |
| Login (Info Sec use only) [ ] | Special Notes [ ] | |

C11

D491

## CORRECTIVE ACTION COVER SHEET
### FOR

__William Kennedy__


**DATE FORWARDED TO LEGAL:**    __11/20/01__

LEGAL REVIEW OF THE FINAL WARNING FOR CONDUCT:

_Laurice P Sills_                                    11/23/01

**Brooke Bashore-Smith, SVP**                    Date
**or Laurice Sills, FVP**
**Employment Counsel**


Revised: 9/01


D533

# CORPORATE CHARTER APPROVAL SHEET
## ** KEEP WITH DOCUMENT **

DOCUMENT CODE ___ 02    BUSINESS CODE 03

\# _____

Close _____    Stock _____    Nonstock _____

P.A. _____    Religious _____

Merging (Transferor) _____

_____

_____

_____

Surviving (Transferee) _____

_____

_____

_____

```
1000351986484339

ID # D06595086 ACK # 1000351986484339
LIBER: B00327 FOLIO: 1599 PAGES: 0002
EAPEN CORPORATION

12/17/2001   AT 11:50 A NO # 0000530097
```

New Name _____

_____

_____

_____

### FEES REMITTED

| | |
|---|---|
| Base Fee: | 20 |
| Org. & Cap. Fee: | 20 |
| Expedite Fee: | _____ |
| Penalty: | _____ |
| State Recordation Tax: | _____ |
| State Transfer Tax: | _____ |
| _____ Certified Copies | |
| Copy Fee: | _____ |
| _____ Certificates | |
| Certificate of Status Fee: | _____ |
| Personal Property Filings: | _____ |
| Other: | _____ |
| **TOTAL FEES:** | **40** |

_____ Change of Name
_____ Change of Principal Office
_____ Change of Resident Agent
_____ Change of Resident Agent Address
_____ Resignation of Resident Agent
_____ Designation of Resident Agent
        and Resident Agent's Address
_____ Change of Business Code

Adoption of Assumed Name _____

_____

Other Change(s) _____

_____

_____

_____

Credit Card _____    Check _____    Cash _____

Code _____

_____ Documents on _____ Checks

Attention: _____

Approved By: _____ ly

Keyed By: _____

COMMENT(S): _____

Mail to Address:
Justus D Eapen
106 Wakefield Drive
Bel Air, MD 21014

D293

C13

# ARTICLES OF INCORPORATION FOR A STOCK CORPORATION

**FIRST:** The undersigned _____ JUSTUS DANIEL EAPEN

whose address is _____ 106 WAKEFIELD DRIVE, BEL AIR, MARYLAND 21014

_____, being at least eighteen years of age, do(es) hereby form a corporation under the laws of the State of Maryland.

**SECOND:** The name of the corporation is _____ EAPEN CORPORATION

**THIRD:** The purposes for which the corporation is formed are as follows: _____
ENGAGE IN AND DO ANY AND ALL LAWFULL BUSINESS FOR WHICH CORPORATIONS MAY BE ORGANIZED.

**FOURTH:** The street address of the principal office of the corporation in Maryland is _____
106 WAKEFIELD DRIVE, BEL AIR, MARYLAND 21014

**FIFTH:** The name of the resident agent of the corporation in Maryland is _____
JUSTUS D. EAPEN

whose address is _____ 106 WAKEFIELD DRIVE, BEL AIR, MARYLAND 21014

**SIXTH:** The corporation has authority to issue _____ 5000 _____ shares at $_____ NO _____ par value per share.

**SEVENTH:** The number of directors of the corporation shall be _____ 1 _____ which number may be increased or decreased pursuant to the bylaws of the corporation, and so long as there are less than three (3) stockholders, the number of directors may be less than three (3) but not less than the number of stockholders, and the name(s) of the director(s) who shall act until the first meeting or until their successors are duly chosen and qualified is/are _____ JUSTUS D. EAPEN

JUSTUS D. EAPEN

IN WITNESS WHEREOF, I have signed these articles and acknowledge the same to be my act.

I hereby consent to my designation in this document as resident agent for this corporation.

**SIGNATURE(S) OF INCORPORATOR(S):**

**SIGNATURE OF RESIDENT AGENT LISTED IN FIFTH:**

**RETURN TO:**
JUSTUS D. EAPEN
106 WAKEFIELD DRIVE
BEL AIR, MARYLAND 21014

CUST ID:0000775475
WORK ORDER:0000530097
DATE:12-17-2001 01:38 PM
AMT. PAID:$40.00

2001 DEC 17 A 11:50

D294

C14



# CORRECTIVE ACTION REPORT

| Date: | 11/20/01 | Id Number: | 01111 | Name: | William Kennedy |
|---|---|---|---|---|---|
| Status/Grade: | FT/406 | DOH: | 11/28/88 | Job Title: | Sr. LAN Administrator |
| Cost Center: | 5753 | Department: | Desktop Computing Services | Manager Name/ID: | Bellverie Ross/77812 |

**Corrective Action Status:**
_____ First Warning    __X__ Final Warning    _____ Dismissal
Date of Previous Action(s):

**Documentation:**
William is being placed on Final Warning for misconduct according to Personnel Policy 601. More specifically, he maintained unauthorized, inappropriate, and sexually explicit non-business related MP3 sound waves on an MBNA shared drive.

On 11/6/01, Personnel was contacted by Information Security and advised that a routine systems audit had revealed that a shared drive had been identified on the "C" drive that provided access to a computer identified as "Bigdaddy" which contained inappropriate, sexually explicit, and unauthorized files. An investigation into the matter disclosed that the machine identified as "Bigdaddy" was assigned to William Kennedy of Desktop Computing. It was also determined that the files known as MP3 sound waves were sent to "Bigdaddy" by a coworker of William's through an open share drive that allows access to William's computer, and is to be used to move MBNA business related files.

On 11/18/01, Personnel met with William Kennedy concerning this matter. He said that he had the shared drive opened for over a year for the purpose of moving information from his files to those of coworkers in Desktop Computing. William went on to say that the shared drive should have been closed immediately after the information had been transferred, but that he left open. He said that a coworker who has the ability to write to his "C" drive sent several MP3 sound waves to his computer which is named "Bigdaddy". William indicated that the coworker would tell him that he was mailing the waves to his computer for his enjoyment. William said he knew that he was not permitted to receive the MP3s or to store them on the shared drive.

As a result of his misconduct, William is being placed on Final Warning. William has been reeducated on MBNA Policy 601, and MBNA Information Security Guidelines.

This Final Warning will remain active for two years. Any further incidents of misconduct or below standard performance during this timeframe may result in dismissal. In addition, William is not eligible to job post for six months.

**Individual's Comments Regarding Corrective Action:**


_William J. Kennedy_ 1-3-02        _Dan (1/19/0)_ _[signature]_ 1/3/02
Signature                Date                Personnel                Date

                                            _[signature]_        12/19/0
                                            DM or                Date
                                            Director (final/dismissal)


Revised: 9/01

D535

MAR-07-2002 THU 01:51 PM CCIV PERSONNEL MBNA    FAX NO. 302 457 4088    P. 19



# CORRECTIVE ACTION REPORT

| Date: | 11/16/01 | Id Number: | 68572 | Name: | | Richard A. Wresneski |
|---|---|---|---|---|---|---|
| Status/Grade: | FT/406 | DOH: | 3/29/99 | Job Title: | | Systems Engineer |
| Cost Center: | 5753 | Department: | Desktop Computing | Manager Name /ID: | | Bellverie Ross/ |

**Corrective Action Status:**

_____ First Warning    __X__ Final Warning    _____ Dismissal

Date of Previous Action(s):

**Documentation:**

Richard is being placed on Final Warning for misconduct according to Personnel Policy 601.  More specifically, he downloaded unauthorized software containing non-business and sexually explicit related MP3 sound waves to an MBNA computer, placed them on an MBNA shared drive, and forwarded them to other MBNA computers without authorization in violation of MBNA Policies and Information Security Guidelines.

On 11/6/01, Personnel was contacted by Information Security and advised that a routine systems audit had revealed that a shared drive had been identified on the "C" drive that provided access to a computer identified as "Bigdaddy" which contained inappropriate, sexually explicit, and unauthorized files.  An investigation into the matter disclosed that the machine identified as "Bigdaddy" was assigned to Bill Kennedy of Desktop Computing.  It was also determined that the files known as MP3 sound waves were sent to Bigdaddy by Richard Wresneski through an open share drive that is to be used to move MBNA business related files.

On 11/13/01, Personnel met with Richard Wresneski concerning this matter.  Richard said that he made personal CDs containing MP3s on his personal computer at home and brought them to work where he downloaded them onto the shared drive.  Richard said that he sent them to Bill Kennedy's machine, which is named "Bigdaddy", upon Bill's request.  Richard said he knew that he was not supposed to make CDs at home, bring them in to work, and send the contents of the CDs out over the MBNA system.

As a result of his misconduct, Richard is being placed on Final Warning.  Richard has been reeducated on MBNA Policy 601, and MBNA Information Security Guidelines.

This Final Warning will remain active for two years.  Any further incidents of misconduct or below standard performance during this timeframe may result in dismissal.  In addition, Richard is not eligible to job post for six months.

**Individual's Comments Regarding Corrective Action:**

Signature _____  Date 1-8-02

Personnel _____  Date 1/8/02

DM or Director (final/dismissal) _____  Date 12/18/01

Revised: 9/01

D539

explained that we had some more research to do regarding this situation and we would get back to her with an outcome.

**Personnel Note:**
Peter Wise & Lisa Manis met with Joan to discuss Jennifer's allegations. Joan said she has never let Jennifer use her login to do anything. Joan said she has used Tracy Craig's login at the front desk to key applications into Resumix or to schedule interviews. Joan agreed it was the wrong thing to do and is clear going forward that whomever is logged in at the front desk needs to either lock their workstation or log out of the computer.

Revised 2/7/02

C17

D550

for a new job. This has subsided a little since I had a one-on-one with him in April. He is the Hyperion lead and has a good understanding of that environment. He is also working on Aviation. He can do more and has an absenteeism issue that needs to be watched. He needs to expand his options and move out of just doing Hyperion. This is the same attitude I have referenced under Glenn Ford.

- Jason Campbell: He is new to the PSN team and works in the evenings. He needs direct supervision. Night staff also needs to come up to speed on all of the technologies.
- Justus Eapen: Justus works the evening shifts and is currently not happy with his situation. He needs more work to do. Coordinating evening work is a matter that needs to be addressed. I suggest that this report into one manager vs. two with the upcoming of GTS. There is currently not enough work or people don't want to give it up to the evening shift, siting they are uncomfortable with doing so. There are issues with Justus and Jim Dell that must be resolved. (Suggestion may be to put Justus on Connie's team). He would do well there.

  *G SCHANGE B* (handwritten)

- Bridget Williams: Bridget is a good worker and will take on any additional work that you ask her to even if it is not within her job description. For over a year, she did all of the nightly walkthroughs for the department. She is extremely conscientious about her work. She works from 12-9 in order to act as the transition person to the evening shifts. Jim Dell relies on her significantly. She is really the person doing all of the administrative functions in his area. Additionally, she has attended several education courses, but these are not the requirements for promotion. Her manager, Jim Dell, did not discuss those with her.

  *HIRED TO DO TECHNICAL PRETTY SOLID* (handwritten, left margin)

- Connie Carlisle: Connie is probably one of the best people managers in the group. She is also very conscientious about her work and follows through with everything. She and her team have stepped up to the plate to take on more than just the management of Exchange. She should be credited with getting Exchange to a stable state and for getting it working on the EMC solution.
- Neela Chacko: Neela has come along way. She is a good people manager and has the best knowledge of education, promotion and people practices in the group. Neela does need technical direction, but does have technical abilities even though this was thought not to be the case. She has writing skills and is the only VP in my area. Rich Wegner's team should move to report to her. Rich needs direction and lacks skills in managing people.
- James T. Dell: Jim has been managing the PSN/PeopleNet Team for the last year and a half. He is a task manager more than a people manager. He also has a technical background that brings a lot to the table. Recently, Jim's attitude was affected by his inability to be promoted on his time frame. This affected his performance. He was finally promoted in April. Things have changed somewhat. Jim needs to focus on people management. He also has to learn to follow up more effectively. Jim's only other weakness is in his writing skills. I have recommended to him several times that he take a writing class. Justus and Bridget wrote the PSN documentation. He has been asked several times to document PeopleNet, but this has not occurred as well. I attribute this to Jim's lack of writing skills. He simply avoids it. Jim does not need any technical direction, but requires close management due to the nature of the environment. Also, even though we have hired others, his knowledge of the environment and his overall background in the technologies, makes him a subject matter expert and somewhat of a single point of failure.

  *VERY STRONG COMMUNICATION PROBLEMS PEOPLE TYPO* (handwritten, left margin)

- Greg Seman: Greg has a vast amount of technical knowledge. He is proficient with NT, Citrix, and SQL. Technically, he is the most well rounded staff member on the team. He is also proficient with the Accelio/Jetforms product and it would be key in my new role to have him on the team because of this. Greg also has an Internet background. Greg does not want to manage people and prefers remaining on the technical path. Greg was promoted to AVP. Last year, he was awarded the finance sector's highest award for his dedication to them. This award is similar to the Hallmark Award.

  *HALLMARK? AWARD? NOMINEE?* (handwritten, left margin)

- Richard Wegner: Rich needs direction and lacks skills in managing people. He also is not a driver and requires constant attention. He has great technical skills and hardware background. He is extremely proficient with Exchange and NT. ~~He should report to Neela Chacko in order to have direction.~~ He also needs to enhance his writing skills and follow up

## O'Neill, John P (Info Sec)

**From:** Eapen, Justus
**Sent:** Wednesday, January 08, 2003 3:48 AM
**To:** Schulz, Dave; Dell, Jim; Campbell, Jason; O'Neill, John P (Info Sec)
**Subject:** UAT DMZ Servers inlcuding 03T and 05T

Around 10:45 PM as part of the Audit readiness preparation (such as checking IDD, Dumpsec reports, ITA, NAV etc.), I attempted to log on to the UAT DMZ servers last night.

I was unable to logon using my account or the default admin account. I paged Jason and with his permission logged on as Jcampbe4/Jcampbell and proceeded to reset my account. However, upon logging on with my ID on the MMS boxes, I realized that the machine policy was preventing me from gaining administrative access. I proceeded to delete my account and recreate one hoping the policy will not be applied to the new account. However, this was not the case. We need to look into this to determine the root cause.

At this point, I called Jim Dell, but overlooked to discuss my account thinking it was not significant and I could fix it on my own.

After I got off the phone with Jim Dell, I recognized that certain required information from a Deerfield server got truncated and I went back to collect this. While I was in Deerfield, John Oneill and Dave Schulz paged me to find out what I was doing to the DMZ environment. I explained to them that my account was not functional, so I deleted and recreated my ID.

I also reiterated that I need to talk to Jim before being at liberty to discuss the matter further. Command Center had told me certain senior manager was in the room and I did not want to explain using Jason's ID on a conference call that was being listened to by all in the Command Center.

Dave, John and I agreed that I will refrain from further accessing the box for the rest of the night. So I left those servers logged on, but locked.

At this point, I paged Jim Dell and Jason Campbell and updated them about what happened. Further, Jim and I agreed that if there are further questions regarding this matter, he will be the primary contact.

Regards,

D514

**Marra, Ernesto**

| | |
|---|---|
| **From:** | Dell, Jim |
| **Sent:** | Thursday, January 09, 2003 8:13 AM |
| **To:** | Eapen, Justus |
| **Cc:** | Marra, Ernesto; Dell, Jim |
| **Subject:** | RE: UAT DMZ Servers inlcuding 03T and 05T |

Justus,
In response to this mornings occurrence of ITA alerting Information Security concerning accounts being deleted:

(1) NEVER use another individuals account to access a system. This policy is not new to anyone and is considered an unacceptable practice. In an emergency I am to be contacted to determine if the need is viable to use the Admin account of which I will drive into MBNA and personally hand you the password to be used. No ID and password information should ever be transferred over the phone line or via email. Person to person, face to face only.

-----Original Message-----

| | |
|---|---|
| **From:** | Eapen, Justus |
| **Sent:** | Wednesday, January 08, 2003 3:48 AM |
| **To:** | Schulz, Dave; Dell, Jim; Campbell, Jason; O'Neill, John P (Info Sec) |
| **Subject:** | UAT DMZ Servers Inlcuding 03T and 05T |

Around 10:45 PM as part of the Audit readiness preparation (such as checking IDD, Dumpsec reports, ITA, NAV etc.), I attempted to log on to the UAT DMZ servers last night.

I was unable to logon using my account or the default admin account.  I paged Jason and with his permission logged on as Jcampbe4/Jcampbell and proceeded to reset my account.  However, upon logging on with my ID on the MMS boxes, I realized that the machine policy was preventing me from gaining administrative access.  I proceeded to delete my account and recreate one hoping the policy will not be applied to the new account.  However, this was not the case.  We need to look into this to determine the root cause.

At this point, I called Jim Dell, but overlooked to discuss my account thinking it was not significant and I could fix it on my own.

After I got off the phone with Jim Dell, I recognized that certain required information from a Deerfield server got truncated and I went back to collect this.  While I was in Deerfield, John Oneill and Dave Schulz paged me to find out what I was doing to the DMZ environment.  I explained to them that my account was not functional, so I deleted and recreated my ID.

I also reiterated that I need to talk to Jim before being at liberty to discuss the matter further.  Command Center had told me certain senior manager was in the room and I did not want to explain using Jason's ID on a conference call that was being listened to by all in the Command Center.

Dave, John and I agreed that I will refrain from further accessing the box for the rest of the night.  So I left those servers logged on, but locked.

At this point, I paged Jim Dell and Jason Campbell and updated them about what happened.  Further, Jim and I agreed that if there are further questions regarding this matter, he will be the primary contact.

Regards,

D527

The outcome of this alert resulted in a meeting with DTC management. It was determined that Justice Eapen used Jason Campbell's administrator account to make changes on DMZ servers without change management. Justice called Jason and used his account because he was locked out of his account and he could not remember the administrator's account. The way that the event occurred is that Dave Schulz and John O'Neil received 23 pages from the dmz servers stating that changes were being made. At 11:11 pm the first page came in. The last page came in at 11:22 pm. John O'Neil dialed into MBNA to view the SQL output. It was determined that Jason and Justice appeared to be in work making changes. Dave and I conferenced into MBNA and got Justice on the phone. The responses that we received were not the correct responses. We determined that Jason was not at work. At this point Dave and John O'Neil stated that Justice was to do no more work on the servers. Justice stated that he was making changes for an Audit walkthrough that was occurring the next day. Dave and John stated no more changes. Due to the multiple Information Security violations. DTC management turned this over to Personnel for review.

**C21**

D493

## DRD – Signature Coversheet

Date: 2/9/03

Description of signature item: Dismissal

Dismissal for: Justus Eapen

Person's name requesting signature: Tamika Sainten

Person's name and telephone extension delivering signature item(s): Tamika Sainten / 75588

How would you like this item returned to you?

    Phone: _____X_____       Extension: <u>75588_____</u>

    Mail: _____          Mailstop: <u>original document to MS 2216</u>

    Fax: _____           Fax No.: _____

## *Note:*

- ***This cover sheet must accompany signature items***

Revised 2/7/02

D127

**C22**

**Justus Daniel Eapen**

| | |
|---|---|
| **From:** | "Justus Daniel Eapen" <eapen@eapen.net> |
| **To:** | "Dell, Jim" <Jim.Dell@MBNA.COM> |
| **Cc:** | <Jim.Micek@mbna.com>; "Chacko, Neela" <Neela.Chacko@mbna.com>; <Renee.CuffeeWilliams@mbna.com>; <Doug.Denton@mbna.com>; <Anne_Butler@MBNA.COM> |
| **Sent:** | Friday, February 21, 2003 12:23 PM |
| **Subject:** | My employment at MBNA. |

Dear Mr. Jim Dell:

This communication is to specifically address the password sharing incident that lead to the recent abhorrent interrogation by personnel department during my tenure working as a direct report to you.

I am convinced that the task assigned to me during the night of the alleged incident is a direct result of your desire to frame me and sabotage my career with MBNA. In your unrelenting efforts to derail my enthusiasm and esteemed regard for MBNA, you continued to embezzle the job satisfaction and job ownership at every opportunity for nearly two years that culminated in this setup.

Further, I have reliable validation to conclude all other unrelated personnel investigations are also a direct or circumlocutory effort on your part to cease my career at MBNA, due your practiced and calculated effort exclusively based on my Race and or National Origin, both a violation of the federal statutes as well as MBNA Policies.

It is unfortunate that individuals such as yourself are allowed such atrocious and consistent exercise in a manner contradictory to published MBNA precepts. However, that should not be reason for me to accept a Last & Final Warning-or any other form of disciplinary action.

I respectfully request that you do whatever it takes to correct or remove any derogatory record pertaining to matters discussed herewith as your actions have caused too much emotional and physical impairment requiring extensive rehabilitation.

Sincerely,

Justus

3/5/2003
0000000160

**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

| PERSON FILING CHARGE |
|---|
| Eapen, Justus D |

THIS PERSON (check one)

[X] CLAIMS TO BE AGGRIEVED

[ ] IS FILING ON BEHALF OF ANOTHER

Ms. Lysandra Baynard
Director Of Affirmative Action
MBNA-America
1000 Samossett Drive
Wilmington, DE 19884

| DATE OF ALLEGED VIOLATION | |
|---|---|
| Earliest | Most Recent |
| 03/02/2000 | 01/21/2003 |

PLACE OF ALLEGED VIOLATION

Wilmington, DE

CHARGE NUMBER

170A300836

## NOTICE OF CHARGE OF DISCRIMINATION
*(See EEOC "Rules and Regulations" before completing this Form)*

You are hereby notified that a charge of employment discrimination has been filed against your organization under:

[X] TITLE VII OF THE CIVIL RIGHTS ACT OF 1964

[ ] THE AGE DISCRIMINATION IN EMPLOYMENT ACT OF 1967

[ ] THE AMERICANS WITH DISABILITIES ACT

[ ] THE EQUAL PAY ACT (29 U.S.C. SECT. 206(d)) investigation will be conducted concurrently with our investigation of this charge.

The boxes checked below apply to your organization:

1. [ ] No action is required on your part at this time.

2. [X] Please submit by __04/14/03__ a statement of your position with respect to the allegation(s) contained in this charge, with copies of any supporting documentation. This material will be made a part of the file and will be considered at the time that we investigate this charge. Your prompt response to this request will make it easier to conduct and conclude our investigation of this charge.

3. [X] Please respond fully by __04/14/03__ to the attached request for information which pertains to the allegations contained in this charge. Such information will be made a part of the file and will be considered by the Commission during the course of its investigation of the charge.

For further inquiry on this matter, please use the charge number shown above. Your position statement, your response to our request for information, or any inquiry you may have should be directed to:

Philadelphia District Office
21 S. Fifth Street
Suite 400
Philadelphia, PA  19106-2515

__Alfred L. Harris, Enforcement Mgr.__
*(Commission Representative)*

__(215) 440-2812__
*(Telephone Number)*

[X] Enclosure: Copy of Charge

BASIS OF DISCRIMINATION

[ ] RACE    [ ] COLOR    [ ] SEX    [ ] RELIGION    [X] NAT. ORIGIN    [ ] AGE    [ ] DISABILITY    [ ] RETALIATION    [ ] OTHER

CIRCUMSTANCES OF ALLEGED VIOLATION

See enclosed Form 5, Charge of Discrimination.                    D158

| DATE | TYPED NAME/TITLE OF AUTHORIZED EEOC OFFICIAL | SIGNATURE |
|---|---|---|
| 03/14/2003 | Marie M. Tomasso<br>Director | *Marie M. Tomasso* |

RESPONDENT'S COPY

EEOC FORM 131 (Rev. 06/92)                    **C24**

Justus D. Eapen
141 W. Heather Road
Bel Air, MD 21014


December 05, 2003


Ms. Evangaline Draper Hawthorne
Investigator
U. S. Equal Employment Opportunity Commission
Philadelphia District Office
Fax Transmission to: 215-440-2604

Re:     Charge No. 170A300836
        Eapen v. MBNA America

Dear Ms. Hawthorne:

I have reviewed the communication received from your office dated November 24, 2003.

I maintain that MBNA America, Desktop Computing is conducive to discreet discrimination against all people of color, not necessarily just my national origin. All people of color who worked in that area during my affiliation with MBNA would testify to this effect. Nearly all of them are also witness to the disparage treatment I received at MBNA.   These people include:

Bellverie Ross, Senior Vice President
Neela Chacko, Vice President
Vikas Amin, Personal Banking officer (609-274-1169  or  917.327.9254)
Ernest Tully
Bridgette Williams
David Ings

Attached herewith is a decision by the Delaware Department of Labor where the determination was made that I was terminated without cause.  The document is self explanatory.

I am also elaborating some of the circumstances that will discredit Jim Dell's contention that there were no disparage treatment.

You indicate that evidence shows that I earned two consecutive "Excellent" performance assessments with and increased rating in 2002 (3.48) over 2001 (3.30)...

*FACT: Annual pay raise I received at 2002/2003 as percentage of my base pay vs. annual pay raise received as a percentage of pay during the same period by*

**C25**

0000000185

*other individuals with similar performance reviews would also prove unfair treatment.*

*My 2002 Bonus which is directly related to the performance review was substantially less than 2001 as a percentage of my salary. The bonus is based on direct recommendation by my then supervisor, Jim Dell. While MBNA could claim that this is a result of across the board decrease in Bonus amounts paid out, the amount I received as percentage of base salary against comparative performance reviews within the same department will provide proof that I did not receive comparative percentage of Bonus Dollars.*

*Jim Dell had no choice but to offer fair review despite his consistent efforts to do otherwise because 100% of the responsibilities assigned to his area were successfully executed with substantial contribution from me. His superiors, other department personnel and colleagues knew the tasks assigned to our area cannot be performed without my technical expertise and superior performance and anything less than "Excellent" is equivalent to self-incrimination and would have solidified my case against him*

Evidence indicates that in June 2002, Mr. Dell recommended your promotion…

*FACT: While on paper MBNA could show that Mr. Dell recommended my promotion as procedurally required, other Supervisors (such as Neela Chacko and Bellverie Ross) would verify that Jim Dell unequivocally and publicly (such as in meetings) objected to my promotion. In fact, <u>Jim Dell recommended against</u> my promotion.*

*Bill Davies, then Executive Vice President of Desktop Computing called me into his office in or around October 2000 and advised that he wants Bellverie Ross, then Senior Vice President to file the paper work for my promotion due my outstanding performance however, I lacked an approved "Masterpiece" idea (Ideas that significantly improve existing business processes within MBNA outside of my immediate responsibilities). Subsequently, I earned nearly a dozen approved Masterpieces by which time Jim Dell became my supervisor and my promotion was delayed by nearly two years.*

*Upon earning my first Masterpiece, I adviced Mr. Bill Davis that I have earned the approved Masterpiece and he personally took me to Bellverie Ross's office to advice her that I had earned the required Masterpiece.*

*However, by the time <u>Bill Davis had left the Desktop Computing area, Jim Dell had managed to change his views about me to the point that Bill Davis considered me a marginal employee</u> (Well before October 2002 when Jim Dell indicates to you that he noticed a drop in performance).*

**C26**

2

*When asked by Mr. Tom Thomaides, Senior Executive Vice President to identify marginal performers, Bill Davis identified me among one of the only two marginal performers in the area well before June 2002 (when I was allegedly recommended by Jim Dell for a promotion). This is documented in some fashion as Bellverie Ross, brought up this issue and advised me to watch out for possible action.*

Respondent denies that I was subjected to disparage treatment or derogatory name calling...

*FACT: If you interviewed any random employee in Desktop Computing area who shared the nearby cubicles to me (Glenn Ford, Rich Wresneski, John Hartnett) and asked them what OBL meant or who was referred to Osama Bin Laden's brother, you will get your proof.*

*As I understand it, Rick Todd, who referred to me as Sand Nigger, is no longer with MBNA.*

Mr. Dell indicates that in October of 2002, he began to notice a decline in my work performance...

*FACT: Around the end of the first half of 2003, Jim Micek, Executive Vice President replaced Bill Davis. This change was partly due complains that Desktop Computing was plagued with disparage treatment of minorities.*

*After my initial meeting with Jim Micek, it was crystal clear to him of the disparage treatment by Jim Dell. In October 2002 Jim Micek announced organizational changes where I no longer will be reporting to Jim Dell as of January 2003. This prompted Jim Dell to suddenly notice the performance issues.*

*However, Jim Dell failed to discuss this directly with me, but continued to fabricate different stories. He also received a new ear that was receptive to his theories. Eresto Marra was hired from outside MBNA as Jim Dell's direct manager. Unaware of the existing conspiracies Ernesto Marra was open to Jim Dell's accusations*

*This allowed Jim Dell to extend his persecutions to a physical level including forcing me to stay overtime nearly every single day despite the fact that I had already worked 14 hours at night. He organized daily morning meetings that lasted around 09:00AM, though my shift ended at 08:00AM. Considering I had 2 hour drive home and back, and my shift began at about 06:00PM, the extended days were grueling to say the least allowing me only 4 day time hours to sleep.*

*The way Jim Dell set up my work was so gruesome, that at one point, I collapsed in a Server Room in Deerfield and was taken to the Nurses Office and was transported home by another MBNA employee, Gregg Seman.*

**C27**

3

*Further, if Jim Dell noticed a decline in my performance, why did he give me an "Excellent" 2002 year end performance review? Or is it that he suddenly noticed a performance issue immediately after signing the review and knowing he no longer will be my supervisor?*

*He went even further by reporting to my, "to be supervisor" fabricated stories about my performance.*

Mr. Dell states that he also discovered me sleeping at my desk during work hours and reported this to Ernesto Marra...

*FACT: This conspiracy was reported to Bellverie Ross in early 2002 well before Ernesto Marra was hired and before Jim Dell purportedly recommended me for a promotion and my 2002 performance review.*

*I worked two 13 and one 14 hour shift and was allowed two one hour lunch and two 15 minutes breaks. I left notes on the White Board (as agreed with Jim Dell until he asked that I report my whereabouts to Kenneth **** in Distributed Operations). The night of the alleged accusation, the White Board clearly indicated that I was on lunch break. This matter was discussed with Bellverie Ross, then Senior Vice President and Jim Dell was chastised. Documentation exists with Belleverie Ross to this effect and may be obtained by calling her at MBNA.*

*If Jim Dell brought this up with Ernesto Marra, it is quite disturbing that he failed to note this on my 2002 year end performance appraisal.*

Jim Dell contends that thereafter he began to hear discussions about my involvement in non MBNA business matter...

*FACT: I worked as a contract consultant at MBNA for nearly 3 years prior to becoming an employee in February 2000. All involved at MBNA was aware of all about me including the alleged EAPEN.NET website prior to my hire.*

*My wife was also a former MBNA employee and MBNA knew her too, prior to me being hired by MBNA.*

*The website is a Financial Portal much like Yahoo Finance, but on a smaller scale. It's not a mortgage bank or real estate broker. The website was noted on my resume. Bellverie Ross, then Senior Vice President consulted the MBNA ethics hotline for conflicts of interest prior to me being hired as an employee. Ethics officer(s) approved my hiring.*

- *"EAPEN" is a federally registered trademark of Tracey L. Kelley.*
- *The author of the content of the site is Tracey L. Kelley as indicated on the website.*

**C28**

4

- The site is registered by Tracey L. Kelley
- Tracey is an employee of Wells Fargo Home Mortgage Corporation, a nationwide lender.
- Tracey is not self-employed or a Mortgage Broker as alleged by MBNA.

I have never been licensed as a Mortgage Banker or Broker. I have never solicited such business. Doing so would be a crime.

Jim Dell asked me on numerous occasions to solicit MBNA employees on behalf of my wife for Mortgage business. He specifically asked that I solicit Chad Yates, a Vice President at MBNA, Jenniffer Goldberg and Bellverie Ross when they were buying homes. These incidents took place well before October 2002.

Jim Dell was aware of my involvement in Real Estate. He approved my schedule change to accommodate my attending Real Estate Classes in January 2002. However, I do not practice Real Estate Brokerage services other than owning my own Real Estate like most Americans does.

Jim Dell, when employed as my peer until March 2001, solicited hosting of my wife's website on his servers. He also criticized certain files that were part of the website in January 2002. He continues to have his own website much like many technology employees at MBNA.

_The only evidence Rich Killmon was able to produce that Eapen Corporation engaged in the Mortgage Banking business or any business for that matter was a testimony by an unknown entrepreneur from **Hong Kong**. MBNA failed to produce one single evidence from the United States of America that can validate any conflict of interest between Justus Eapen and MBNA._

So Jim Dell's contention and subsequent reporting to Rich Killmon was another conspiracy to get me terminated rather than a new found discovery. Jim Dell learned that MBNA was aggressively terminating employees for cause to meet new budget requirements and prevent layoffs. Jim Dell creatively exploited this opportunity and Rich Killmon failed to do a proper investigation to clear my name.

Violating Information Security Guidelines...

FACT: Jim Dell manipulated the environment to frame me. Jason Campbell whose password was shared continues to work for MBNA.

MBNA alleges that proper method to gain access to an environment where a user is locked out is to contact Information security to reset the password. However, not once, prior to the alleged incident will MBNA be able to show evidence that Information

**C29**

5

*Security Department provided such services to the TEST environment where the alleged incident occurred.*

*In fact, Information Security personnel do not have sufficient access to the TEST environment to reset my ID as certain policy that I created as Domain Administrator would have prevented them from doing so.*

*Moreover, no one including Information Security can access the independent, stand alone TEST environment as they are not networked to the standard MBNA network. So Information Security was involved for a SINGLE and ONLY reason. Jim Dell wanted to ensure I was fired before I started reporting a new supervisor and will be acknowledged as an outstanding employee. This would have looked bad on him when he had managed to get me characterized as a marginal employee.*

*I built the TEST environment. I created, used, tested and recommended nearly all existing policies and procedures in the TEST environment. I created the User IDs, passwords, policies and tested them for all individuals who have access to the TEST environment including Information Security and Corporate Investigation personnel.*

*Any changes to the regular environment must be approved thru Corporate Change Management operations. Any change is discussed and its impact clarified to all affected areas prior to approval. The entire process is managed by a Knowledge Management system known as "Service Center".*

*However, you will fail to find any such Change Management Requests for the TEST environment for over two years except the most recent months leading to the alleged incident. During the previous couple of months Jim Dell used people new to the environment such as Jason Campbell and Dan Weir to make certain changes to the environment. Apparently some of these changes were fashioned to implicate me knowing the existing practices full well.*

*The night of the alleged incident took place, Jim Dell dictated and I typed up an email to Ernesto Marra and Information Security acknowledging the use of a co-workers password and assure me that this was done to pacify Management and I have nothing to worry. This email clearly indicates Jim Dell's knowledge of the incident as it happened whereas as he claims that I failed to advice him of the use of co-workers password.*

*Subsequently Ernesto Marra called me to his office and ordered exactly what I should say in the meetings with Rich Killmon and Renee Cuffee-Williams. I was assured even on the morning of January 21, 2003 that as long as I say what I have been dictated to pacify personnel, my job would be safe.*

*I was told by Jim Dell, Ernesto Marra and Jim Micek that as long as I admit wrong doing and assure there will not be a reoccurrence of the same nature, they will convey to Information Security and personnel. So every word that I said to Rich Killmon and Renee-Cuffee Williams was based on their order and promise.*

**C30**

6

0000000190

*Plus, if Jason Campbell had reason to believe that it's a violation, he would not have shared the password. Period! But Jim Dell and Ernesto Marra dictated the same confession for Jason Campbell and protected his Job, prior to my interrogation by personnel, implicating me even further.*

*However, after the meeting with Rich Killmon and Renee Cuffee Williams, I did not feel my job was safe. Rich Killmon was overwhelming and coercive in every sentence he used during the meeting. He made it clear that he wanted me to leave or I will be fired.*

*After this meeting I met with Ernesto Marra and explained to him that it appeared their strategy may have back fired. During this time Ernesto Marra suggested that I should take legal action as he have reason to believe the whole incident is a clever attempt to get me fired. This is when I called EEOC for the first time.*

- *Jim Dell caused the TEST Environment to report Domain Access matters to Information Security (despite no such reporting was in existence for over 2 years). He then conveniently failed to notify me of such change in reporting.*

- *Jim Dell manipulated people new to the environment, namely Ernesto Marra and Jason Campbell to help an investigation that should have never happened, to proceed without making all the facts available to all involved and put me at a disadvantage by timing the investigation in a manner conducive to my termination.*

- *Jim Dell knew Senior Management was under pressure to reduce labor cost and exploited this opportunity with a convoluted, but high visibility opportunity to get me terminated.*

- *Rich Killmon under pressure to cause attrition, failed to do a proper investigation.*

- *Jason Campbell, the employee who shared the password or the so called co-conspirator of the alleged security violation continues to work for MBNA.*

- *I was simply performing my duties as a Domain Administrator which includes testing deleting, adding, creating user names and passwords as well creating and recommending new policies and procedures.*

- *If I did not perform exactly what I did on January 7, 2003, on hundreds of prior occasions, MBNA will not have information security guidelines specific for the Demilitarized Zone (DMZ). The TEST environment simulated the DMZ environment.*

**C31**

- *If I had not created, used and tested Information Security personnel's and Corporate Investigations personnel's ID in the test environment, they would not have had access to the DMZ environment.*

- *All my actions were within acceptable proper conduct within the TEST environment.*

- *All my actions would have been a violation of MBNA security guidelines outside of the TEST environment.*

Every single MBNA statement within this allegation is a manifestation of Jim Dell's manipulation of the environment and subsequent framing me to violate Information Security Guidelines.

Should you have any questions, please contact me at 410.459.0808.

Sincerely,

cc: file

Attachments: 4 Pages (Decision of the Appeal Board on Appeal

**C32**

0000000192



www.MBNA.com

MBNA America Bank, N A

Wilmington, Delaware 19884

(302) 453-9930

Launice P Sills
First Vice President
Law

April 8, 2004

Ms. Evangeline Draper Hawthorne
Equal Employment Opportunity Commission
Philadelphia District Office
21 S. Fifth Street
Suite 400
Philadelphia, PA 19106-2515

VIA FACSIMILE AND US MAIL

RE:  **Justus Eapen v. MBNA America Bank, N.A. (Charge 170A300836)**

Dear Ms. Hawthorne:

In response to your request for additional information, MBNA submits the following responses:

1) All people employed by MBNA have the obligation to report situations that could constitute or appear to constitute conflicts of interest as set for in MBNA Personnel Policy 606 (attached to our original position statement). MBNA does not make inquiry of the people of MBNA regarding their outside activities unless and until a potential conflict is brought to the attention of MBNA. With respect to Mr. Dell, MBNA has no record in its Ethics Office or Personnel Department of any notification of, or inquiry regarding, ownership of a website by Mr. Dell which could constitute or be perceived as a conflict of interest or interference with his work at MBNA.

2) Neither Tom Liddle nor John Hartnett received Windows 2000 education (Exhibit 2A).

3) Mr. Micek did not totally reorganize the DTC Department in 2002; he did make three people moves including two managers to allow for more efficient business operations. Jim Dell and Rich Wegner were both moved to individual contributor roles and replaced. In addition, Ernie Marra was hired an assumed many of the functions previously handled by Belverie Ross.

0000000255

4) Mr. Davis was given another assignment within the Technology Sector in part due to business needs for a stronger manager to more effectively address the expanding department, opportunities for improvement, personality challenges within the group and Mr. Davis request for another opportunity

5) MBNA has no record of having employed a Sa'eed Abuwi, or an Ernest Tully. Although Franklin Towns and Vikas Amim were formerly employed, it is not the policy of MBNA to provide personal information for current or former people

6) MBNA does not have a copy of Mr. Eapen's resume on file[1].

7) Ms. Williams attended SANS Security Essentials on September 28, 2002. Ms. Williams was the only attendee from the Desktop Department

8) Yes, see above response

9) Richard Todd, a white male and former Sr. Systems Administrator, was dismissed on May 24, 1999 by MBNA following discovery that he did not meet FDIC Section 19 requirements[2].

10) Richard Wresneski was placed on a two year Final Warning on November 8, 2002 for downloading unauthorized software containing inappropriate, non-business related MP3 sound waves to an MBNA computer in violation of MBNA 's Information Security Guidelines.

11) Tom Liddle was placed on a 2 year final Warning on May 16, 2002 for disconnecting and inappropriately transferring calls while performing TACS participation. In 2002, Mr. Liddle did have issues regarding office security related to his workspace[3].

I hope that this information will be sufficient to allow you to conclude your investigation. If you need additional information, please contact me at (302) 432-3767.

Sincerely,

Launice P. Sills
First Vice President and Counsel

---

[1] At the time of hire, Mr. Eapen had worked in DTC as a contractor since May 1997. It is unknown whether he ever submitted a resume to MBNA

[2] MBNA has provided the requested information but maintains that the employment circumstances and tenure of Mr. Todd has no relevance to the issues asserted in Mr. Eapen's charge, pre-date the earliest date of alleged discrimination by Mr. Eapen and are time barred pursuant to Title VII.

[3] For your information, Office Security differs from Information Security Guidelines and is addressed departmentally In 2002, the DTC department addressed this matter through re-education and Mr. Liddle's performance evaluation (Exhibit 2B)

**C34**

0000000256

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

EQUAL EMPLOYMENT OPPORTUNITY    )
COMMISSION,                     )
                                )
          Plaintiff,            )
                                )
v.                              )    Civil Action No.
                                )    04-CV-425 SLR
MBNA AMERICA BANK, N.A., a      )
subsidiary of MBNA             )
CORPORATION,                    )
                                )
          Defendant.            )

        Deposition of JUSTUS DANIEL EAPEN taken
pursuant to notice at the law offices of Young, Conaway,
Stargatt & Taylor, LLP, The Brandywine Building,
1000 West Street, 17th Floor, Wilmington, Delaware,
beginning at 10:00 a.m. on Monday, April 4, 2005, before
Robert Wayne Wilcox, Jr., Registered Professional
Reporter and Notary Public.

APPEARANCES:

          TERRENCE R. COOK, ESQ.
          U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
            21 South Fifth Street
            The Bourse - Suite 400
            Philadelphia, Pennsylvania  19106
            for the Plaintiff,

          SHELDON N. SANDLER, ESQ.
          YOUNG, CONAWAY, STARGATT & TAYLOR, LLP
            The Brandywine Building
            1000 West Street - 17th Floor
            Wilmington, Delaware  19801
            for the Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
                    WILCOX & FETZER
   1330 King Street - Wilmington, Delaware 19801
                    (302) 655-0477



**WILCOX & FETZER LTD.**

1      Q.    According to my records, you began as an employee

2    of MBNA February 28th, 2000.  Does that sound right?

3      A.    Correct.

4      Q.    Okay.  How did you come to get that?

5            I understand you were a contractor, but just

6    tell me about how that transition went.

7      A.    Well, I believe I -- to the best of my knowledge,

8    I was the longest running contractor in the area that I

9    was working -- they did not use contractors like that --

10   and was asked to take different jobs at different times.

11   But nothing that panned out in a -- every time that we

12   discussed opportunities, I think my income as a

13   contractor was more than my income as a -- if I were to

14   work over there.

15           It came to a point one time one of the

16   managers told me that I need to take a job as an employee

17   or, you know, my contract will possibly come to an end in

18   the next, you know, several weeks.  And at that time I --

19   Chad Yates called me and told me that -- to apply for

20   this job.  He was in that department.  I applied and they

21   offered me a job.  And I accepted.

22     Q.    Okay.  Would that job bring you more income or

23   less income or the same income as what you were earning

24   as a contractor?

**W&F**

**C36**

1    like that probably for like years so that I could -- I

2    would say probably I had it for two or three years.

3        Q.    Starting what year?

4        A.    It could be 2000.

5        Q.    Okay.  Do you hold a real estate license?

6        A.    I do have a real estate license.

7        Q.    When did you get your real estate license?

8        A.    I believe it is in 2001 when I was reporting to

9    Jim Dell.  After I started reporting to him.

10       Q.    What did you use that license for?

11       A.    I have really not used it for commercial

12   purposes.  I referred a friend of mine to a builder.  I

13   got -- yeah.  Just once.  I referred a friend of mine to

14   a builder.

15       Q.    When was that?

16       A.    I don't recall the date, but I did get a check

17   for that last year.  Sometime during the last quarter of

18   last year, if my memory is correct.  Of 2004.

19       Q.    What did you have to do in order to get the real

20   estate license?

21       A.    Simply have to attend a course, take a test, pay

22   $195, I believe, and you're licensed.

23       Q.    How long was the course?

24       A.    I think four days or eight days, part-time.

1       Q.    At night?

2       A.    No.   During the day.

3       Q.    During the day.

4             Okay.   Because you were working nights?

5       A.    No.   At that time I was working during the day.

6  So I took time off from work and got permission from Jim

7  Dell specifically to take that class.   He accommodated me

8  actually with that.

9       Q.    What was your expectation in getting that real

10  estate license?   What were your plans?

11      A.    Well, to me it's a great investment, because for

12  $195 you get a license that you could use when you buy

13  your house.   If you buy a half-a-million-dollar house,

14  you get the three percent.   Because you're a realtor, you

15  can keep that three percent, or you could lawfully earn

16  that three percent.   So I thought, if I do buy a home,

17  that would be a great investment of $195 to earn

18  thousands of dollars.

19      Q.    Does your wife have a real estate license?

20      A.    No, she does not.

21      Q.    Has she ever had one?

22      A.    No, she's never had one.

23      Q.    What did she do?

24      A.    She's a mortgage banker.

1    Q.    Mortgage banker?

2    A.    Right.

3    Q.    So, in theory, if you made a sale of a house to

4    someone --

5    A.    Mm-hmm.

6    Q.    -- you could arrange to get the mortgage through

7    your wife.

8              Is that --

9    A.    Well, that I perceive would be a conflict of

10   interest.  You know, you arrange a sale of a house, and

11   then your wife do the mortgage.  I don't know if you

12   really want to do that.

13   Q.    Why would that be a conflict of interest?

14   Wouldn't that just facilitate the ability to get the

15   house?

16   A.    I believe, if I'm a real estate agent selling the

17   house, what I think I should be doing -- the best thing

18   for the client.  So should I be, you know, having my

19   wife, you know, give them a mortgage too so my wife can

20   earn an income?  I would think that the client would

21   perceive a conflict of interest there.

22   Q.    So that wasn't your plan?

23   A.    No, that wasn't my plan.

24   Q.    Okay.  Does a real estate agent work for a

1   broker?

2       A.    Yes.  They do work for a broker.

3       Q.    In your case did you have a relationship with a

4   broker?

5       A.    With Long & Foster.

6       Q.    Okay.  That's a sizable company?

7       A.    Absolutely.

8       Q.    Who in particular at Long & Foster did you make

9   this arrangement with?

10      A.    I don't recall the name -- whoever the manager is

11  of the nearest -- I believe her first name was Janet.  I

12  know her first name is Janet.  I forgot the last name.

13      Q.    Where was she located?

14      A.    In Bel Air.

15      Q.    When did you make that arrangement?

16      A.    When I took the class in 2001.

17      Q.    Did you take the class before you had that

18  arrangement or did you make the arrangement first?

19      A.    During the class.

20      Q.    How did you hook up with her?

21      A.    I must have called.  If my memory is correct, I

22  think I must have seen an advertisement at Long & Foster.

23  There was free classes.  And I think I called her -- and

24  I think they must have transferred me to her or something

1    Incorporated?

2      A.    I don't specifically recall asking for permission

3    because I didn't really perceive any conflict of

4    interest.  But I'm sure Jim Dell knew.

5      Q.    What did he know?

6      A.    I had talked to him about it, because during that

7    time I had taken my test to register for investment

8    advisor and I took time off.  And I remember having

9    conversations with him about Eapen Corporation.  So I'm

10   sure I did.

11     Q.    What about Eapen Corporation?  What conversations

12   did you have with him about Eapen Corporation?

13     A.    I don't recall the specifics, but -- I don't

14   really recall the specifics.

15     Q.    By the way, in 2003 you were still employed by

16   MBNA for several months, weren't you?

17     A.    Yes.  For three months, I believe.

18     Q.    So you would have received income from MBNA,

19   wouldn't you?

20     A.    Yes.  I did.

21     Q.    But you said before you didn't have any income in

22   2003.

23     A.    Well, then, I'm wrong.

24     Q.    Did you submit an income tax return?

1    A.    Still I did not submit an income tax return for

2    2003.

3    Q.    Did you ever talk to any employee at MBNA about

4    mortgages?

5    A.    I'm sure I spoke to numerous employees about

6    mortgages just like I would talk to anyone about

7    mortgages.

8    Q.    Did you ever offer to help people at MBNA to get

9    mortgages?

10   A.    Can you elaborate how I would be helping them?

11   Can you be more specific?

12   Q.    Sure.

13          By helping them to get the lowest interest

14   rates on their mortgage.

15   A.    I'm afraid that you have to be even more

16   specific.  Are you saying -- are you leading me if I

17   solicited MBNA business?  Is that what you're getting?

18   Q.    Yes.

19   A.    No.  I did not.

20   Q.    Did you offer to help people at MBNA to get

21   mortgages with your wife?

22   A.    If you specifically ask me --

23   Q.    Go ahead.

24   A.    If you specifically --

1     A.    Right.  As long as I don't repeat it and I admit
2    that I was wrong instead of trying to justify what I did.
3    So admit that I am wrong, tell him that I would not
4    repeat it and apologize for, you know, doing it, and
5    everything will be okay.

6     Q.    Well, in point of fact, didn't you deny
7    wrongdoing and try to justify what you were doing?

8     A.    Well, only after -- well, during the meeting --
9    after the meeting -- when the meeting progressed, I
10   realized that Richard Kilmon's intentions were different.
11   So I was forced to advocate for myself, you know, things,
12   because I had already lied, because what I did in my mind
13   was not wrong in the environment that I did.  Right?  So
14   I am admitting guilt without being guilty.

15            So I'm -- so all the conversation that I had
16   is trying to justify myself because Richard Kilmon is
17   putting words in my mouth or like coercing me to say
18   statements in a certain fashion.  He wants to hear an
19   answer.  So the question will be, you know, phrased in a
20   way -- the answer would come out in a certain way.  So
21   that's what happened for the rest of that meeting.

22    Q.    Was one of the things that was discussed at the
23   meeting your use of phone numbers that were not work
24   related?

1        A.    I'm sure I must have used MBNA phones for

2    non-work related, but I did not consider anything

3    abusive, because if nobody told me that I am not to use

4    MBNA phones for anything but business purposes -- so if I

5    used a phone for something else -- I must have used it.

6    I'm sure I did.  But nothing that could be considered

7    abusive by anyone for any purpose.

8        Q.    Was one of the numbers that was discussed for a

9    company called Godaddy.com?

10       A.    I'm sure it could have been.

11       Q.    Was that a company that the Eapen Corporation or

12   Eapen.net did business with?

13       A.    I'm sure Eapen.net is registered through

14   Godaddy.com.

15       Q.    Okay.  Did you also tell Rich Kilmon that you

16   gave out your wife's cards to generate business for her?

17       A.    I don't specifically recall saying that I handed

18   out my wife's cards.  But the question was phrased in a

19   way -- and I recall talking to him that -- if I was in a

20   social setting and if the conversation came up, I'm sure,

21   you know, I could -- you know, I do -- I would promote my

22   wife's business, yes.

23       Q.    Did you also tell Rich Kilmon that the website

24   for Eapen.net was not readily accessible or the website

```
 1        A.    Yes, sir.  I still have it.

 2        Q.    Do you have other e-mail addresses?

 3        A.    Yes.  I have.

 4        Q.    How many?

 5        A.    Probably -- I'm not sure exactly how many, but

 6   one that I use is Justus@eapen.net.

 7                   MR. SANDLER:  Let me hand you Eapen 2.

 8                   MR. COOK:  The Security Guidelines?

 9                   THE WITNESS:  Right.

10   BY MR. SANDLER:

11        Q.    Looking at the third paragraph, that says that

12   people are not to share their personal user ID or

13   password or use their user ID or password to log into

14   MBNA computer systems for another person.  Correct?

15        A.    That is correct.

16        Q.    Okay.  Isn't that exactly what you did?

17        A.    In the production environment, that is correct.

18   I did it in a test environment.  If I did not do that in

19   the test environment at that time, MBNA would not have a

20   production environment like that, because there's no way

21   to test it.

22        Q.    Are there separate test passwords that can be

23   used?

24        A.    Yes, there is.  Yeah.
```

1    A.    Correct.

2    Q.    Okay.   Is there a risk if people use other

3    people's password?

4    A.    In that environment?

5    Q.    No.   Just generally.

6    A.    In production environment, absolutely.

7    Q.    What's the risk?

8    A.    I could pretend to be Jason and cause much damage

9    to MBNA systems, and Jason would be in trouble.

10   Q.    You could change files?

11   A.    Absolutely.

12   Q.    Did you know anyone else's passwords besides

13   Jason Campbell's?

14   A.    In this test environment?

15   Q.    Yes.

16   A.    I set up that environment, so I probably created

17   the passwords for everybody in that specific environment.

18   I probably even knew the password for information

19   security people in that environment.

20   Q.    Do you have a different password for the non-test

21   environment?

22   A.    Yes, we do.

23   Q.    Okay.   Are you saying the password that Jason

24   Campbell gave you was not his regular password?

1    A.    No.   Absolutely not.   It was for the test
2    environment.
3    Q.    Did Jim Dell tell you that sharing passwords was
4    acceptable?
5    A.    In the test environment, always.
6    Q.    Did he tell you that?
7    A.    Yes, he did.
8    Q.    Okay.
9    A.    I have done it with him.
10   Q.    You've used his password?
11   A.    Yes.   He has.
12   Q.    He's used yours or you've used his?
13   A.    No.   He's never used mine, because I don't think
14   there was any reason for him to or -- I don't recall
15   sharing my password with anyone.   Because there is a
16   difference in MBNA -- you know, the way that I understood
17   it, if you give your password, then you were at fault.   I
18   mean, you could ask me for your password all day long.
19   As long as I don't give it to you, there's no wrongdoing.
20   Q.    Right.
21   A.    But if I give it to you, then I'm at fault.   So I
22   should be the one not disclosing my password.
23   Q.    So Jason Campbell was at fault here and you
24   weren't.   Is that what you're saying?

1      A.    I did not say that.  I said, if in an environment

2    someone discloses a password, the person who discloses

3    the password is the one who violated the policy.

4      Q.    Okay.

5      A.    But if I used his password in the production

6    environment, then I'm violating the policy too, because

7    that's what it says right here.

8      Q.    So let me see if I understand this.

9              The password that you used --

10     A.    Yes.

11     Q.    -- initially didn't work in January of this

12   incident.

13     A.    The night that I was using my password on that

14   system it did not work.  I don't recall the exact

15   scenario.  Either it did not work or it did not give me

16   the functionality that it should have had to perform my

17   job that night.  So something changed in that environment

18   without my knowledge or without having proper

19   documentation.  If there were documentation, then I would

20   know when something changed.

21     Q.    Since your password didn't work, that's when you

22   called up Jason Campbell?

23     A.    I believe after trying the administrative

24   account, as well as generic accounts, is when I called

```
1      Q.   Okay.  It says, "Command center had told me
2   certain senior manager was in the room..."
3      A.   Yeah.  I think I was talking to them.  Yeah.  I
4   think in Deerfield there was -- someone else probably was
5   in Deerfield.  So I probably did not specifically say,
6   you know, that I was using -- hey, I borrowed Jason's ID
7   and I was using Jason's ID.  I told them Jason wasn't
8   there.
9      Q.   Right.
10      A.   And I probably did not like, you know, advertise
11   that I was using Jason's ID.
12      Q.   That's because you were concerned about people
13   overhearing it?
14      A.   Possibly, yes.  That's what I'm saying there.
15   That's correct.  That's correct.  Because if people
16   didn't realize what I was doing and I was working in the
17   test environment, it could be construed as, you know, I
18   was using somebody's password, because Deerfield is a
19   production environment.
20      Q.   Then the next sentence is consistent with what
21   you were told in the other document.  They told you don't
22   do any more work on it.  Right?
23      A.   That's what I'm saying here.  Like I mentioned
24   while I was talking about this document -- if my memory
```

1    Q.    Okay.

2    A.    And I think he created that because when I was

3    working in problem management he heard that I slept on

4    the job.  I was told specifically by Peter Liberatore

5    that everybody in the command center used to sleep at

6    night during their break sitting right at the command

7    center.  So people knew that, you know, the people who

8    worked in the command center made a practice of sleeping.

9    So like Jim Dell, you know, when I transferred to desktop

10   computing, he assumed, you know, that's what I was doing.

11   Q.    Okay.  Did you have a nickname that referred to

12   your sleeping?

13   A.    Yes.  Sleepin' Eapen.

14   Q.    Who called you that?

15   A.    Desktop computing.

16   Q.    Was that just sort of a kidding name?

17   A.    Well, that is, I assume, a kidding name.  It

18   never bothered me.

19   Q.    What did you usually do during your breaks?

20   A.    What do I usually do?

21   Q.    During these breaks that you mentioned that

22   you --

23   A.    Sometimes you go outside, you know, talk to

24   people.  Sometimes we go to the restaurant, you know, and

1    the person and talk about their evaluation?

2       A.    Yes.  Yes, we do.

3       Q.    Did you talk about that sentence?

4       A.    No.  When I got this evaluation, I was thinking

5    that he was going to give me an unsatisfactory

6    evaluation.  So I was surprised to see an excellent.  So

7    I just signed it and said, "Thank you."  That's it.

8       Q.    Why did you think you were going to get an

9    unsatisfactory?

10      A.    Because my relationship with personal experience

11   with him is that he was always dissatisfied with me.

12      Q.    On the third page of the evaluation --

13      A.    Yes, sir.

14      Q.    -- under Opportunities for Improvement, about a

15   third of the way down, there is a sentence:  "He needs to

16   ensure that all issues are reported to management in a

17   timely manner and to improve communications when changes

18   have been completed on schedule."

19               Do you see that?

20      A.    Correct.  I see that.

21      Q.    Did you take note of that?  Did you talk to him

22   about that?

23      A.    I did not.  Like I said, I was expecting an

24   unsatisfactory review.  When I got an excellent review, I

1    thought it was more than I could ask for.  So anything

2    that he said I was satisfied with it.  So I did not talk

3    about it.

4        Q.    All right.  You're claiming in this case that

5    Mr. Dell was discriminating against you based on your

6    national origin.  Correct?

7        A.    Absolutely.  That is my conviction.

8        Q.    What's your evidence of that?

9        A.    I think some of these are evidence right here.

10       Q.    You're pointing to some documents?

11       A.    Yes.  These documents.  Like not taking ownership

12   for problems.  This e-mail that I was discussing to you,

13   he should have been honest about it instead of saying,

14   you know --

15       Q.    But what does that have to do with your national

16   origin?

17       A.    It's not just one of this.  This is hundreds of

18   incidents.

19       Q.    Well, does that necessarily mean that it's your

20   national origin that's driving at the situation?

21             Maybe he just didn't like you.

22       A.    Well, if he just didn't like me, then some of the

23   things that happened over the -- why does he call me

24   Osama Bin Laden?

W&F

C52

Justus Daniel Eapen

1   learning disabled individual, I really don't think that

2   he has the ability to comprehend, you know, that I am or

3   am not Osama Bin Laden's brother.  All I know is he

4   thinks I have something to do with Osama Bin Laden.

5        Q.   But, I mean, as far as the incident is concerned,

6   he didn't continue to try to do anything to you, did he?

7        A.   Because I would not go in his presence if I

8   possibly could.  I don't remember being that close to him

9   ever again.

10       Q.   I'm talking about that day.

11            Did he not make any further effort to get to

12  you?

13       A.   I left immediately, so I -- he did not try to.

14       Q.   Nothing else happened after that.  Correct?

15       A.   Correct.

16       Q.   Did you see him after that?

17       A.   I do not remember seeing him in close proximity.

18  Or if I saw him, I avoided him.

19       Q.   After this incident did you report what happened

20  to anybody?

21       A.   I do not specifically recall going to somebody

22  saying, hey, this learning disabled person, you know, was

23  about to attack me because of this.  But the entire

24  desktop computing was there, so it's not like a secret.

1    And I stopped complaining, because if I -- it came to a

2    point where the more I complained I'm known as a

3    complainer.  And Jim Dell specifically told me that if

4    I'm complaining too much it just makes me look stupid.

5    So stop complaining.

6        Q.    Did you tell Ernie Marra about the incident?

7        A.    About that incident?  He was not working there at

8    that time.

9        Q.    When was it?

10       A.    I would say it was in 2002 sometime or maybe late

11   2001.

12       Q.    Okay.  But did you later tell Ernie Marra about

13   the incident?

14       A.    I don't recall discussing that specific incident

15   with Ernest Marra, no.  That is not to say I did not, but

16   I do not recall discussing that with him.

17       Q.    If I can refresh your recollection, do you recall

18   him asking you if you wanted him to do something about

19   that and your saying, no, don't bother?

20              MR. COOK:  We're referencing the incident

21   with the mailroom clerk?

22              MR. SANDLER:  Correct.

23       A.    Did Ernest Marra ask me if he wants -- I want him

24   to do anything about it?

1    Q.    Yes.

2    A.    I never recall having any conversation with

3    Ernest Marra about that incident.

4    Q.    All right.  Did you report the incident to the

5    Affirmative Action Office?

6    A.    No, I did not.

7    Q.    Was there an instance when you were called a

8    "sand nigger"?

9    A.    Yes, there was.

10   Q.    Was that one time or more than one time?

11   A.    I think that particular gentleman used that term

12   three or four times, and he also used the term "nigger"

13   once.

14   Q.    Who was that gentleman?

15   A.    His last name is Todd, first name is, I think,

16   Rich.

17   Q.    Okay.  When did that occur?

18   A.    That should have been shortly after 9/11.

19   Q.    What was your response to that?

20   A.    At that time I did not know what "sand nigger"

21   meant.  So when he referred to me as a "sand nigger," I

22   did not do anything, because I did not understand what

23   that meant until he used the term "nigger" and I

24   consulted with someone else, you know, what "sand nigger"

1    and "nigger" -- why is he referring to me as a "sand

2    nigger" is when I realized it's a derogatory term.

3        Q.    Who did you consult with?

4        A.    My wife.

5        Q.    Did you talk with any of your supervisors or

6    superiors about incidents involving ethnic slurs or

7    jokes?

8        A.    I have, yes.  My managers, Jim Dell.  And, in

9    fact, to the best of my knowledge, they had conversations

10   with this individual about not, you know, using those

11   terms so casually.  And I think at one time maybe them

12   calling me a brown person kind of decreased to an extent,

13   but, you know, then it came back up.  Everyone

14   participated in it.  And it was fun for everybody except

15   me.

16       Q.    Did Mr. Todd stop using that phrase to you?

17       A.    Todd was not at MBNA very long.  He left shortly

18   after the incident.

19       Q.    Okay.  Was he fired?

20       A.    That could be a possibility that he was fired.  I

21   am not privy to that information.

22       Q.    Was there a fair amount of joking or kidding

23   around among the desktop computing employees?

24       A.    I guess, for people who participate in it, it is

```
 1    the first time that word registers in my brain.
 2        Q.    Were there some Sikhs that worked at MBNA?
 3        A.    I'm sure there's Sikhs that worked at MBNA.
 4        Q.    Were there some that worked on the floor below
 5    you?
 6        A.    Probably.
 7        Q.    In Christiana IV?
 8        A.    I'm sure there's multiple one.
 9        Q.    After 9/11 did you make remarks about some of the
10    Sikh employees -- kidding remarks?
11        A.    Not that I recall.
12        Q.    Okay.  Did you kid saying that the Sikh should
13    shave off his beard or remove his turban to avoid being
14    implicated as somebody involved?
15        A.    I remember having a discussion about one of the
16    Sikhs shaved and removed his turban.  I remember having a
17    conversation about it.
18        Q.    With whom?
19        A.    I don't recall exactly who I was talking to, but
20    I remember having a conversation that he has removed his
21    turban and his beard, yes.
22        Q.    Was that sort of a comment of the irony of it
23    after 9/11 -- that he was doing it in response to 9/11?
24        A.    I don't know if it was the irony or, you know, he
```

**W&F**

**C57**

1    looked much more handsome.  So I don't know which one it

2    was.

3        Q.    Was it after 9/11?

4        A.    I'm sure it was after 9/11 that he shaved.

5        Q.    Did you know somebody named Greg Seman?

6        A.    Yes.  I know Greg Seman.

7        Q.    Did people sometimes kid Greg Seman?

8        A.    I don't think so.  He was pretty tough.

9        Q.    Did they kid him about his shoes?

10       A.    I don't know anything about his shoes.  Never

11   paid attention.

12       Q.    Okay.  Do you recall somebody buying Greg Seman

13   some shoes?

14       A.    No idea about it.

15       Q.    How about Bill Kennedy?  Did some people kid Bill

16   Kennedy?

17       A.    That he eats well.

18       Q.    Did they kid him about being Canadian?

19       A.    I have no idea.  I didn't know he was Canadian.

20       Q.    The EEOC has claimed in this case that Bellverie

21   Ross sent a letter to Douglas Denton about your

22   complaints.

23       A.    Quite possibly.

24       Q.    Do you know anything about that?

1      Q.    When was that?

2      A.    That was in the '80s, I think.  Late '80s.

3      Q.    Are you a certified financial planner?

4      A.    Again, I finished the course work, but I -- you

5   need three years' experience to be in the field of -- as

6   a practicing planner in order to be using the CFP

7   credentials.  I never pursued that as a career.

8      Q.    Is that about the same time that you obtained

9   your CDL driver's license?

10     A.    No.  I think CDL was maybe after that.

11     Q.    After that.

12           Okay.  About when did you get the CDL?

13     A.    I will be guessing if I give you a date.

14     Q.    Well, best estimate.

15     A.    I would say late -- early '90s.  I think early

16   '90s.

17     Q.    Did you ever drive a truck after you got that CDL

18   until this recent job that you described?

19     A.    Did I ever really drive a truck?  Not really

20   drive a truck, no.

21     Q.    Did you continue to keep your CDL license --

22     A.    Yes.

23     Q.    -- active?

24     A.    Yes, sir.

1    A.    I had confidence in Jim Micek until I had

2    conversation, you know, with this password incident where

3    he told me that I needed to say what he needed to hear.

4    I thought he is a man of character.  Tell the truth and

5    take whatever ramifications that come along with it,

6    which was not what he wanted me to do.  So I lost

7    confidence in him.

8    Q.    I think you said before you had a chance to leave

9    desktop computing.

10    A.    Yes, I did.

11    Q.    When was that?

12    A.    That was even before I was promoted.  As Jim

13    Micek was taking over the desktop computing environment,

14    during that transitional stage, I had an offer from

15    Telecommunications to accept a different position in that

16    department.  And since I spoke to Jim Micek and I felt

17    confident that he will, you know, put stop to, you know,

18    these kind of stuff that was going on, I thought I would

19    remain and make something out of my job rather than leave

20    with a bad reputation.

21    Q.    How did the offer come to you from

22    Telecommunications?  Is that something you posted for, or

23    did someone contact you?

24    A.    I don't think that I may have like, you know,

**W&F**

**C60**

1   posted, per se.  I think that is the procedure at MBNA.

2   But a lot of times if you know the people, you know, you

3   can talk to them.  I had worked at MBNA for so many years

4   that I had built up a relationship with people in

5   Telecommunications.  And I think I spoke to John Young.

6   And there's two John Youngs each reporting to one another

7   at that time, I think.  The John Youngs decided I would

8   be a good fit for their department and told me it is my

9   job, just talk to Jim Micek and, you know, just

10  transition.

11      Q.   Well, when things didn't get better, did you try

12  to leave?

13      A.   Up until January -- up until this incident, I had

14  faith that Jim Micek will, you know, change things.  He

15  multiple times told me it's just a matter of time.  So

16  when we had casual conversation, he said things are going

17  to get better.  You know, it's just a matter of time.

18  Just give me more time.  So he assured me things were

19  going to change.  So I believed him.

20      Q.   Did things change before that time?

21      A.   Did things change after that?

22      Q.   No.  Before.

23           It was a matter of some months.  Did you see

24  improvement?

Justus Daniel Eapen

```
 1       A.    There was no improvement other than there was a

 2   $10,000 difference in my salary because he gave me a big

 3   raise, I guess, to bring me -- you know, that was an

 4   improvement.  Other than that, the environment did not

 5   change.

 6       Q.    All right.  Is there anything else you want to

 7   add, or have we covered all the discriminatory

 8   allegations?

 9       A.    Unless you want to know something specific, I

10   think, you know, I have told you, you know, what's in my

11   heart.

12                 MR. SANDLER:  Okay.  Nothing further.

13                 (The deposition concluded at 4:15 p.m. this

14   same day.)

15                         - - - - -

16

17

18

19

20

21

22

23

24
```