1

<pre>
 1                 IN THE UNITED STATES DISTRICT COURT
 2                   FOR THE DISTRICT OF DELAWARE
 3
 4
    EQUAL EMPLOYMENT OPPORTUNITY    )
 5  COMMISSION,                     )
                                    )    Civil Action No.
 6               Plaintiff,         )    04-CV-425-SLR
                                    )
 7  v.                              )
                                    )
 8  MBNA AMERICA BANK, N.A., a      )
    subsidiary of MBNA Corporation,)
 9                                  )
                 Defendant.         )
10
                 Deposition of SUNG BYUN taken pursuant to
11  notice at the law offices of YOUNG CONAWAY STARGATT &
    TAYLOR, 1000 West Street, Wilmington, Delaware,
12  beginning at 10:05 a.m. a.m. on Monday, July 18, 2005,
    before Renee A. Meyers, Registered Professional
13  Reporter and Notary Public.
14  APPEARANCES:
15               TERRENCE R. COOK, ESQ.
                 U.S. EQUAL EMPLOYMENT OPPORTUNITY
16               COMMISSION
                   21 South Fifth Street
17                 The Bourse, Suite 400
                   Philadelphia, Pennsylvania  19106-2515
18                 for the Plaintiffs,
19               SHELDON N. SANDLER, ESQ.
                 YOUNG CONAWAY STARGATT & TAYLOR
20                 1000 West Street, 17th Floor
                   Wilmington, Delaware  19899
21                 for the Defendant.
22  ALSO PRESENT:  Launice Sills, Esq.
23                       WILCOX & FETZER
        1330 King Street - Wilmington, Delaware 19801
24                      (302) 655-0477
</pre>

1    BY MR. COOK:

2      Q.    Thank you.

3            So, you believe, for the two-year period,

4    he reported to Mr. Marra?

5      A.    Probably one year or less.

6      Q.    And then after that, he reported to?

7      A.    Don Nadayne.

8      Q.    And who did you report to after Mr. Futty?

9      A.    He is my current manager.  Oh, there was -- I

10   reported to -- during my transition from operations to

11   engineering, I reported to Mike Iniccarri for six

12   months.  It's -- I would have to write it down.

13     Q.    That's okay.  We will get it from you after you

14   are done, the proper spelling.

15            For about a six-month period when you were

16   transitioning from a senior PC specialist to systems

17   engineer, you reported to Mike?

18     A.    That's correct, Iniccarri.

19     Q.    What time frame was that that you made the

20   switch from systems specialist to systems engineer?

21     A.    That's when -- that's when we started to become

22   from DTC to DLS, so that was about a year-and-a-half

23   ago.

24     Q.    During your time at MBNA, have you received any

1   training on harassment or discrimination in the

2   workplace?

3      A.   Yes, I have.

4      Q.   When was the last time you received any

5   training on discrimination or harassment in the

6   workplace?

7      A.   It may have been about a year ago.

8      Q.   And before that, when was the last time you

9   were trained?

10     A.   Probably another year.

11     Q.   Did you have annual training on issues of

12  discrimination and harassment since you have been

13  employed by MBNA?

14     A.   We had annual education on, like, policies,

15  procedures.  We also had full day sessions on

16  inclusiveness.  We also had other education on, you

17  know, sensitivity education.  So, I would say I had

18  quite a few education on those -- that topic.

19     Q.   And based on your training, what was your

20  understanding of MBNA's harassment policy?

21     A.   Basically, no -- you know, zero tolerance.  I

22  like the education.  It -- it focused on accepting

23  differences.

24     Q.   Did you have an understanding of what conduct

**W&F**

**C65**

1    constituted harassment?

2    A.    Yes.

3    Q.    What's your understanding of what type of

4    conduct would constitute harassment under MBNA's

5    policies?

6    A.    Such as, like, certain advancements, unwanted

7    advancements, I guess, from a man to a woman or vice

8    versa.  Also promotions or recognitions based on race,

9    age, sex, and different differences.

10   Q.    Anything else you recall about your training

11   about what conduct would be prohibited by MBNA's

12   harassment policy?

13   A.    No.  That's -- that's the main topics.

14   Q.    Now, with respect to the Desktop Computing

15   department or what it's now called today, do you

16   recall or do you know if, amongst the employees,

17   passwords have ever been shared or exchanged for any

18   kind of purpose?

19   A.    What kind of passwords?

20   Q.    What kind of passwords exist at MBNA?

21   A.    Oh, I am sorry, passwords.

22   Q.    Passwords, yes.

23   A.    In the beginning of Desktop Computing, we were

24   in the process of creating policies and procedures.

12

1  development of the infrastructure?

2   A.   You were not allowed to share any personal

3  information.  I mean, it's like, Why would you share a

4  password where they can, you know, log in and e-mail,

5  you know, using your account?  You didn't want things

6  like that.  So we did not, in practice, share

7  passwords, personal passwords.

8   Q.   Are you aware of any situation in which any

9  employee shared a personal password with another

10  employee during your tenure at MBNA?

11   A.   Yes.

12   Q.   And are you aware of more than one incident

13  where employees exchanged personal passwords?

14   A.   Yes.

15   Q.   Was it something that was done frequently?

16   A.   No.

17   Q.   How would you characterize the exchanging or

18  sharing of passwords, personal passwords during your

19  tenure at MBNA?  Infrequent?  Regular?  How would you

20  describe it?

21   A.   Very rare.

22   Q.   And are you aware of any particular

23  circumstances in which a password was shared, personal

24  password?

1    A.    Yes.

2    Q.    And can you give me the time frame in which

3    this password sharing incident took place?

4    A.    This was when I was working for Bellverie Ross

5    and Neela Chacko probably three to four years ago.  I

6    lived in Cherry Hill, New Jersey, which is about an

7    hour away, and Bill Kennedy lived five minutes away,

8    and I believe either I was logged into that server or

9    some, you know, some production issue failed and he

10   needed, you know, either to unlock, you know, take --

11   because I was logged in, he needed to unlock me out of

12   that server, so that's when I gave him my password.

13   It was probably like two, three in the morning.

14   Q.    Did Mr. Kennedy call you at your residence to

15   ask for the password?

16   A.    Yes.

17   Q.    And how did you communicate your password to

18   Mr. Kennedy?  Was it verbally over the phone?

19   A.    It was verbally over the phone.

20   Q.    And at the time that you gave Mr. Kennedy your

21   password, were you aware of any written policy of MBNA

22   that prohibited sharing of passwords?

23   A.    Yes.

24   Q.    And as a result of sharing your password with

Sung Byuh

16

1    Mr. Kennedy, were you disciplined in any manner?

2    A.    No.

3    Q.    At the time, you said you reported to Neela

4    Chacko who reported to Bellverie Ross; is that

5    correct?

6    A.    That's correct.

7    Q.    Were they aware of the password sharing

8    incident?

9    A.    No.

10   Q.    Was any management aware of the password

11   sharing incident?

12   A.    No.

13   Q.    Are you aware of any other password sharing

14   incident besides the two you testified to?

15   A.    No.

16   Q.    So, it's your testimony that in the six years

17   you worked for MBNA, the only two instances in which

18   you were aware of personal passwords being shared was

19   the incident between Mr. Eapen and Mr. Campbell;

20   correct?

21   A.    Correct.

22   Q.    And the incident between yourself and

23   Mr. Kennedy; is that correct?

24   A.    Correct.  And that's personal passwords.

1    A.    Right.  Only once.

2    Q.    Are you aware of any instances where employees

3    shared the administrative account password?

4    A.    In the beginning, yes.

5    Q.    What about after this period three years ago

6    when it became confidential?

7    A.    No.  There was -- there was no way.

8    Q.    And you said, in the beginning, yes.

9          How frequently was it done in the

10   beginning that people would share the administrator

11   account password?

12   A.    It was rare in terms of frequency, but if you

13   needed access or if you wanted to be -- if you --

14   yeah, it was rare.

15   Q.    And did you know Jim Dell?

16   A.    Yes, very well.

17   Q.    Mr. Dell is a personal friend?

18   A.    Mm-hmm.

19   Q.    Is that yes?

20   A.    Yes.

21   Q.    Do you socialize with Mr. Dell outside of the

22   office?

23   A.    Yes.

24   Q.    Do you do that on a regular basis?

1    A.    We did.

2    Q.    And have you ever known Mr. Dell to either

3    share his personal password or request someone else's

4    personal password?

5    A.    No.

6    Q.    Did you ever know Mr. Dell to either share the

7    administrator account password or to request access to

8    the administrator account password?

9    A.    No.

10    Q.    When did you first meet Mr. Dell?

11    A.    Probably four to five years ago when he

12    transferred from Dallas to Desktop Computing.

13    Q.    When you first met him, it was in the context

14    of your employment at MBNA?

15    A.    Correct.

16    Q.    And you mentioned that you do socialize with

17    Mr. Dell on occasion.

18            Can you describe the nature of the social

19    contact you had with Mr. Dell?

20    A.    He expressed interest in scuba diving, and that

21    was something that I always wanted to do, so based on

22    that common interest, we started to take certification

23    courses together and also just hang out.

24    Q.    Have you ever been scuba diving with Mr. Dell?

Sung Byun

23

1  server in a test area, you couldn't communicate with

2  the production server and the production area.

3    Q.    Is the production environment the real

4  environment that actually operates the systems of

5  MBNA?

6    A.    Correct.  That's where majority of -- that's

7  where we service all the internal customers, internal

8  employees.

9    Q.    Within the context of the testing environment,

10  to your knowledge, are passwords shared or exchanged

11  within that context?

12    A.    Yeah.  Again, in the development process, yes.

13  Now, no.

14            MR. SANDLER:  Just for the record, you

15  didn't ask about personal -- you just said "passwords"

16  in general.  Do you want to make a distinction there?

17            MR. COOK:  Thank you, Sheldon.

18  BY MR. COOK:

19    Q.    Again, within the context of the testing

20  environment, were personal passwords shared in that

21  environment?

22    A.    No.  Not that I am -- not to my knowledge.

23    Q.    And were there administrative account passwords

24  within the testing environment?

Sung Byun

24

1    A.    Correct, service accounts and administrative

2    accounts.

3    Q.    So, there were service accounts, administrative

4    accounts --

5    A.    Administrative -- administrator account.

6    Q.    Administrator accounts within the testing

7    environment?

8    A.    Correct.

9    Q.    And did the service accounts have passwords as

10   well?

11   A.    Of course.

12   Q.    Would the service account passwords, were they

13   confidential?

14   A.    Yes.

15   Q.    To your knowledge, were they shared amongst

16   employees of Desktop Computing in the testing

17   environment?

18   A.    Yes.

19   Q.    And was the practice that that was done

20   frequently?  Infrequently?  How would you characterize

21   that?

22   A.    For the service account, it was shared, you

23   know, moderately.  For the administrator account, it

24   was shared very, very, very rarely.  And we are

1  talking about in the context of the testing

2  environment.

3    Q.  This is correct.  And it's your testimony that

4  you are not aware of any situation in which personal

5  passwords were exchanged within the testing

6  environment?

7    A.  That's correct.  I mean, there is no need.  If

8  you have the administrative password or if you have a

9  service account password, which, in most cases, they

10  are in the domain admin. group, I mean, there is no --

11  there is no need to, really.  You have full access.

12    Q.  Earlier you testified about a process in which

13  the administrative or administrator account password,

14  that, once it's used, all the systems are reset and

15  another envelope is produced with a new password;

16  correct?

17    A.  Right.

18    Q.  Are you aware of any documents that would show

19  when those changes were made, when those password

20  changes were made?

21    A.  Like a log?

22    Q.  Yes.

23    A.  No.  I am not aware of, you know, like a

24  documented log process, but I am sure there -- you

Sang Byun

26

1    know, it exists.

2    Q.    And with respect to MBNA's policy on sharing

3    passwords, first of all, are you aware of a policy

4    that prevents the sharing of passwords at MBNA?

5    A.    Yes.

6    Q.    And, to your knowledge, does a password make a

7    distinction between a testing environment and a

8    production environment with respect to passwords?

9    A.    No.

10   Q.    When did you first meet Justus Eapen?

11   A.    Justus Eapen, probably three-and-a-half years

12   ago.

13   Q.    And in what context did you meet Mr. Eapen?

14   A.    He was brought into the Desktop Computing from

15   the user support area.

16   Q.    Prior to Mr. Eapen being brought into Desktop

17   Computing from the user support area, had you had any

18   contact with Mr. Eapen prior to that time?

19   A.    No.

20   Q.    Did you know Mr. Eapen prior to that time?

21   A.    No.

22   Q.    And did you and Mr. Eapen work on any projects

23   together?

24   A.    No.

1   situated?

2   A.    Not like phone conversations.  But, you know,

3   if he spoke, you know, a little bit more than a normal

4   voice, yes, a lit bit louder than a normal voice, yes.

5   Q.    Do you recall speaking with an investigator

6   from the EEOC about Mr. Eapen's allegations about

7   harassment and discrimination at MBNA?

8   A.    Yes.

9   Q.    And did Mr. Eapen tell you about the problems

10  he was having at MBNA with respect to --

11  A.    Yes.

12  Q.    -- issues of harassment?

13  A.    Yes.  Towards the -- towards the end.

14  Q.    And what did Mr. Eapen tell you?  What do you

15  recall about your conversations with Mr. Eapen about

16  issues of harassment?

17  A.    That he said that he did not enjoy his job and

18  he said that he -- his relationship with Jim Dell was

19  getting pretty bad.

20  Q.    Did he ever tell you he thought he was being

21  harassed because of his national origin?

22  A.    No, not to my recollection.

23  Q.    Did he ever tell you he thought he was being

24  discriminated against because of his national origin?

1  A.    I am trying to think back three years, four

2  years.

3     Q.    Sure.

4     A.    We did not have specific conversation about

5  discrimination.

6     Q.    Well, did you have general conversations in

7  which he expressed that he felt he was being treated

8  differently or treated worse than other employees

9  because of his national origin or his race?

10    A.    We did talk about where Asians or Blacks or,

11 you know, Indians, where we had to kind of prove

12 ourselves and work, you know, work harder to kind of

13 prove ourselves.  That's what we did talk about.

14    Q.    And did you ever express to Mr. Eapen that you

15 believe you weren't promoted because you were a

16 minority at MBNA?

17    A.    I shared with him some of my frustrations, not

18 necessarily being promoted, but more towards getting

19 recognitions or getting, you know, "at a boys" because

20 I wasn't, you know, I wasn't -- because I was a

21 minority.

22    Q.    You had a belief that you did all the work but

23 you didn't get recognition for the work that you did;

24 is that correct?

Sung Byun

30

1    A.    Correct.

2    Q.    Now, did you ever complain that you were being

3    mistreated because of your national origin?

4    A.    To him?

5    Q.    To anyone at MBNA.

6    A.    No.  I mean, I may have had side conversations

7    with, you know, someone like Justus Eapen or we had

8    also this person called -- I forget his name -- there

9    was an Indian guy that was hired for six months and he

10   left.

11   Q.    Vikas Amin?

12   A.    Vikas, yes.

13   Q.    And did Vikas Amin complain that he was being

14   discriminated against because of his national origin?

15   A.    Yes.

16   Q.    Did Mr. Eapen complain to you that he was being

17   discriminated against because of his national origin?

18   A.    He may have.  I don't recollect having that

19   kind of conversation, but we did discuss about some of

20   the frustrations that we were having.

21   Q.    The Desktop Computing section, give me an idea

22   of how large that was in terms of the number of

23   employees.

24   A.    Probably about 35 members.

32

1    Q.   For the record, sir, what's your national

2    origin?

3    A.   I am South Korean.

4    Q.   Was there anybody in particular that you heard

5    made the comment "rice bowls"?

6    A.   Any particular person?

7    Q.   Yeah.

8    A.   Yeah.

9    Q.   Do you recall the name?

10   A.   Rich Wresneski.

11   Q.   Is he a white male?

12   A.   Yes.

13   Q.   Anyone else?

14   A.   I mean, do you want the whole list or do you

15   want --

16   Q.   I want the name of everybody you recall making

17   a racial comment in Desktop Computing during your

18   employment.  And let me stop and let me rephrase.

19   Because right now I am specifically asking you about

20   the "rice bowls" comment.

21           Do you recall specifically who made that

22   comment?

23   A.   Oh, that was just Rich Wresneski.

24   Q.   And did you understand the "rice bowl" comment

W&F
C79

Sung Byun

33

1   to be a derogatory comment based on your national

2   origin?

3       A.    Yes.

4       Q.    And in what context did that comment come up?

5       A.    We are talking about, like, a Mustang muscle

6   car versus, like, a Japanese sports car, and they were

7   referring to the Japanese sports car as rice burners,

8   and then, you know, the "rice bowl" comment came up.

9       Q.    On how many occasions was the "rice bowl"

10  comment made?  Just an estimate, approximation?

11      A.    Five times until it was no longer funny.

12      Q.    And did you believe Richard Wresneski believed

13  that comment was funny?

14      A.    Yes.

15      Q.    And what led you to that belief?

16      A.    Because he would laugh or smirk.

17      Q.    And you made reference to the phrase "dot

18  head," and did you understand that to be a reference

19  to people of Indian national origin?

20      A.    Yes.

21      Q.    Who do you recall making a comment about dot

22  heads?

23      A.    There was a person called Sinibolla.  He is

24  probably not on our list.  I don't think he works for

Sung Byun

36

1    A.    Correct.

2    Q.    And with respect to Osama bin Laden, did those

3    comments start after the events of September 11th,

4    2001?

5    A.    Yes.

6    Q.    Prior to September 11th, 2001, did you hear any

7    employee make derogatory comments toward Justus Eapen

8    based on his national origin?

9    A.    Probably like dot head.

10    Q.    Did you hear anyone refer to Justus Eapen as

11    "BP," for brown people?  Have you heard that phrase in

12    the workplace?

13    A.    Yes.

14    Q.    And who have you heard make that comment?

15    A.    I guess that was from probably Bill Kennedy.

16    Q.    He is a white male?

17    A.    Yes.

18    Q.    And did anyone else refer to Mr. Eapen as BP?

19    A.    No, not to my recollection.

20    Q.    And did Mr. Kennedy refer to Mr. Eapen as BP on

21    a daily basis?

22    A.    Yeah.  He may have pushed it a little bit

23    longer than, you know, than to the point where, you

24    know, the funny aspect was no longer there.

**W&F**

**C81**

37

1   Q.   And did Bill Kennedy make remarks or refer to

2   an A team or a W team?

3   A.   Yes.

4   Q.   And what was your understanding of what the A

5   team was?

6   A.   A team started out as, you know, A team and B

7   team.  We were building servers, and, you know, we

8   wanted -- we had two teams building servers, and, you

9   know, it was kind of like a -- like a, you know, team

10  kind of competitiveness.  And, so, he started out with

11  an A team and a B team.  Then the A team became, you

12  know, the "A-team," "Mr. T," that whole "A-team" in

13  the '80s.  Then it start kind of went to, Oh, the A

14  team, as the Asian team.  Then, if the A team is the

15  Asian team, then we are the W team for the White team.

16  That's how it kind of evolved.

17  Q.   There was no black team?

18  A.   No.

19  Q.   So, "B" never had reference to black?  B was

20  just A and B for letters of the alphabet?

21  A.   Correct.

22  Q.   And was that the way that Bill's team were

23  commonly referred to, as the A team and the W team?

24  A.   No.  It was just more of an inside joke amongst

38

1   a few friends.

2   Q.   What time period, if you recall, was the use of

3   the A team or the W team used amongst the few friends

4   there in Desktop Computing?

5   A.   This is probably the Bellverie and the Neela

6   era.

7   Q.   And was Neela Chacko aware of the use of the A

8   team and W team in reference to the Asian and White

9   team?

10   A.   She may have heard the A team and she said,

11   "What's that"?  And we just -- probably just chuckled.

12   Q.   Do you know if Bellverie Ross was aware of the

13   A team and the W team and what that stood for?

14   A.   No.   I don't think it went that high.

15   Q.   Would you describe the atmosphere there as a

16   pretty, a joking atmosphere, playful atmosphere?

17   A.   Oh, very.

18   Q.   And the jokes included jokes of race and

19   religion or was it simply race or national origin?

20   A.   Just national origin.

21   Q.   And was Jim Dell in Desktop Computing present

22   when any of these comments were made?

23   A.   When these comments were made, he was part of

24   Desktop Computing but not in front of him.

Sung Byun

40

1  not a, you know, a blatant -- because I -- you know, I

2  am -- because I am, at that time, very sensitive to

3  that issue, and I would have, you know, recognized it.

4    Q.   And the reference to Mr. Eapen as Osama bin

5  Laden or OBL, things of that nature, did you know

6  whether or not comments of that nature violate MBNA's

7  harassment policy?

8    A.   At that time, because we were kind of

9  participating in the joking atmosphere of that

10  workplace, I didn't know it -- I didn't recognize it

11  as a harassment or unwanted, you know...

12    Q.   Now, do you recall an incident in which a mail

13  room clerk who was distributing mail was told that

14  Mr. Eapen was Osama bin Laden's brother?  Do you

15  recall an incident regarding that?

16    A.   Yes.

17    Q.   What do you recall about that incident?

18    A.   We have a mail boy who is -- who is, not

19  handicapped, but -- but who is a slow learner, and,

20  you know, he used to -- he started to develop -- you

21  know, deliver mail to our group.  And I remember one

22  of the guys saying that there is bin Laden's brother

23  over there in the corner, and he -- you know, he

24  became very furious.

Sung Byun

42

1    Q.    No?

2    A.    (Witness nods.)

3    Q.    You don't recall?

4    A.    No.

5    Q.    Did you ever hear Justus Eapen referred to as a

6    sand nigger?

7    A.    Yes.

8    Q.    How many times have you heard Mr. Eapen

9    referred to as a sand nigger?

10   A.    Probably once or twice.

11   Q.    By whom?

12   A.    Yeah, if I guess, I am taking a guess, but I

13   think it was kind of a little bit extreme, that, as a

14   joking, I thought that was a little bit extreme when I

15   heard it.

16   Q.    The person that referred to Mr. Eapen as a sand

17   nigger, does the last name Todd --

18   A.    Uh-uh.

19   Q.    -- refresh your recollection as to who it may

20   have been?

21   A.    No.

22   Q.    Did you ever hear anyone refer to Mr. Eapen as

23   a nigger?

24   A.    No.

1    Q.   And the joking that went on in Desktop

2    Computing, was that a phrase that was used at any

3    point in time?

4    A.   No.   That's pretty, you know, that's pretty out

5    of hand.

6    Q.   And did you, at any point, report any of these

7    comments that were made to Mr. Eapen to any management

8    official at MBNA?

9    A.   No.

10   Q.   To your knowledge, did any management official

11   at MBNA become aware of the use of these comments in

12   Desktop Computing?

13   A.   I remember those couple of instances where two

14   managers made some comment.

15   Q.   And which managers were those, if you recall?

16   A.   One manager was Dave Armstrong, he did overhear

17   the BP, brown people word, and said, "Knock it off."

18   And another person was Mike McDaniel -- no.   Mike --

19   Mike -- he is one of the managers.

20   Q.   Is Mike, the Mike we are referring to, is he

21   white or black?

22   A.   He is white.   I remember him making a comment

23   or reporting something especially when the mail boy

24   came around, it was the -- it was getting out of hand.

1    Q.    And did you share this with Neela Chacko, that

2    Mr. Davis would yell at you?

3    A.    Yeah.

4    Q.    And were you of the opinion that Mr. Davis

5    would yell at you but he would not yell at other white

6    employees?

7    A.    Oh, no.  He yelled at everybody.

8    Q.    To your knowledge, was Richard Wresneski ever

9    disciplined for making racial comments in the

10   workplace?

11   A.    I know he was disciplined, but I don't know for

12   what reasons.

13   Q.    Were you ever called derogatory comments by

14   anyone in Desktop Computing?

15   A.    Yeah.  Sure.

16   Q.    What kind of comments were made toward you?

17   A.    You know, things of, like rice, you know --

18   Q.    We know there was the rice bowl comment

19   reference?

20   A.    Mm-hmm.

21   Q.    And then just rice?

22   A.    Rice.  Let me see what else.  Boy, you know,

23   now I can't think of any of these things, but I had my

24   share.

Sung Byun

46

1    Q.    And the comments that were made toward you,

2   were they made on a regular basis?  On a daily basis?

3   Part of the atmosphere?

4    A.    It was a consistent basis, but we, you know,

5   for the record, you know, I made, you know, I made,

6   you know, my -- I made my share of jokes.

7    Q.    So people make jokes about --

8              MR. SANDLER:  Can you let him finish?

9   BY MR. COOK:

10    Q.    Were you done?

11    A.    No.

12    Q.    I am sorry.  I apologize.

13    A.    And the reason why, you know, a lot of -- I

14   participated in those jokes, for me, personally, was

15   that race played very minor -- minor role in my career

16   at MBNA, meaning, yes, it was there, no doubt about

17   it, but a lot of the -- if there was any prejudice,

18   the prejudice was based on performance rather than

19   race.  Meaning that the small percentage that I did

20   have to -- that there was a race, maybe, was that I

21   had to work extra hard, I had to prove myself, you

22   know.

23              There was, you know, there was doubt at

24   first.  Then you proved yourself and then you got the

**W&F**

1    rewards, where I guess if you were tall, good looking,

2    smart, Caucasian, they gave you the benefit of the

3    doubt and you had the rewards up front.  Then if you

4    failed in your performance, then they would take that

5    away from you.  But a lot of what I saw, especially in

6    the development stage of Desktop Computing, was there

7    was a lot of prejudice based on performance.  If you

8    didn't perform, you didn't, you know, you were pretty

9    much pushed aside because, like I say, it was very

10   highly competitive and there was a lot of, you know, a

11   lot of big projects and a lot of money, you know,

12   projects at stake.

13       Q.   Did you ever hear Mr. Eapen referred to as

14   Saddam Hussein?

15       A.   No.

16       Q.   Saddam Hussein's brother?

17       A.   No.

18       Q.   Did Jim Dell ever share with you any problems

19   that he was having with Justus Eapen's performance?

20       A.   Yes.

21       Q.   And what time frame did he share this with you?

22       A.   That was towards the later part of Justus

23   Eapen's career.

24       Q.   He was terminated in 2003.  Do you believe it

Sung Byun

48

1  was in the earlier part of 2003 or 2002 that Mr. Dell

2  told you about problems he had with Mr. Eapen's

3  performance?

4  A.    Probably the later part where -- maybe three or

5  four months before his termination.

6  Q.    And what do you recall Mr. Dell telling you

7  about Mr. Eapen's performance?

8  A.    He wasn't happy because the tasks that were

9  assigned to him didn't get done.

10  Q.    Anything else?

11  A.    Lack of communication.

12  Q.    Did Mr. Eapen ever share with you his belief

13  that Mr. Dell refused to communicate with him about

14  projects?

15  A.    Yes.

16  Q.    And what did Mr. Eapen tell you about that?

17  A.    He said that he -- that Jim Dell is withholding

18  information, that he's not giving him the right

19  information to complete his task; he is not giving all

20  the tools; he is setting up -- that he is giving, you

21  know, he can't meet his deadlines because it's

22  unreasonable deadlines and so forth.

23  Q.    And what time period did you recall Mr. Eapen

24  telling you about these problems?

49

1    A.    This was during that, you know, that three,

2    four months before his termination period.

3    Q.    Did he ever tell you that he thought Jim Dell

4    was withholding information or not giving him all the

5    tools because of his national origin?  Did he ever

6    communicate that to you?

7    A.    No.  Not because of his national origin.

8    Q.    Did Mr. Eapen ever tell you that he was going

9    to take action regarding what he felt to be harassment

10   or discrimination at MBNA?

11   A.    No.

12   Q.    Now, you mentioned, at some point, I guess, the

13   joking within Desktop Computing subsided; is that fair

14   to say?

15   A.    Yes.

16   Q.    What time period did you notice the joking

17   tailing off some?

18   A.    Oh, that was a distinct period.  When we moved

19   from Christiana building four, third floor, to

20   Christiana building three, second floor.

21   Q.    When was that?

22   A.    That was in the summer of probably 2003, 2003

23   or 2002.  I am sorry.  I don't know exactly the year.

24   Q.    Well, when you moved from Christiana four to

**W&F**

**C89b**

1    three, was Mr. Eapen still employed at that time?

2    A.    Yes.

3    Q.    Did you ever hear any comments, racial comments

4    toward African Americans in the workplace?

5    A.    No.    Oh -- oh, we had, in the beginning part of

6    that group, we had George Taylor sitting -- sitting

7    close to our -- our area, and we joked about -- he --

8    you know, he participated in some jokes that we were

9    joking about.

10    Q.    Is George Taylor African-American?

11    A.    Yes, he is.

12    Q.    Now, you say he participated in some jokes.

13                Were jokes made about Mr. Taylor's being

14    African-American, that you recall?

15    A.    Yeah.

16    Q.    And what kind of jokes do you recall being made

17    about Mr. Taylor being African-American?

18    A.    Like, you know, like this isn't -- I probably

19    said that this isn't like -- this isn't your ghetto or

20    something like that.

21    Q.    And in what context was that comment made?

22    A.    In a joking manner.

23    Q.    But what was it that precipitated that joke?

24    Was there any kind of conduct on Mr. Taylor's --

51

1    A.    No.

2    Q.    You got to let me finish.  Was there any

3    conduct on Mr. Taylor's part that precipitated that

4    joke?

5    A.    Probably he said something like, How come all

6    Koreans have cleaners, and we probably talked about

7    ghetto and things like that.

8    Q.    And the phrase, "This isn't your ghetto," was

9    that used on more than one occasion by you?

10   A.    Yes.

11   Q.    How many times did you make that comment to

12   Mr. Taylor or anybody else?

13   A.    That was made quite frequently -- quite

14   moderately.

15   Q.    More than ten times?

16   A.    Yeah.  Probably.

17   Q.    More than 20?

18   A.    Maybe.

19   Q.    More than 100?

20   A.    No.

21   Q.    Can you give me an approximation, somewhere

22   between 20 and 100?

23   A.    20 is a good number.

24   Q.    Anybody else use that comment?  Did

52

1    Mr. Wresneski or Mr. Liddle or anyone else pick up on

2    that comment and use that as well?

3    A.    Yes.

4    Q.    Did Mr. Wresneski use the comment?

5    A.    Yes.

6    Q.    Did Mr. Liddle use the comment?

7    A.    I don't recollect.

8    Q.    What about Richard Wagner, did he use the

9    comment?

10    A.    No.

11    Q.    Mike Broughton?

12    A.    No.

13    Q.    James Hartnett?

14    A.    No.

15    Q.    Bill Kennedy use the comment?

16    A.    Possibly, yes.

17    Q.    And did they also use it about 20 times a piece

18    or with what frequency?

19    A.    Yeah.  It was -- "the ghetto" became a

20    reference to our area where we, you know, it's kind of

21    like the -- the designated area for the technical

22    people who do the work.

23    Q.    It became that after -- over time?

24    A.    Yeah.  It just became -- because there is -- if

Sung Byun

53

1   I can just kind of say that there is -- there were two

2   groups of people, you know, within that area, which is

3   the managers and the, we called ourselves the worker

4   bees.  And the managers had the big cubes, which was

5   probably, like, bigger than the six-by-six that I

6   mentioned, probably maybe eight-by-eight, so they had

7   the bigger cubes, so they were situated on the one

8   side of the room and then the smaller cubes were

9   situated on the other side of the rooms.  And, so,

10  those smaller cubes, you know, we started to designate

11  that as the ghetto.

12      Q.   Prior to designating the smaller cubes as the

13  ghetto, when you made the reference to Mr. Taylor that

14  this isn't your ghetto, was that a comment based on

15  the cubical size or was it based on Mr. Taylor's

16  African-American national origin?

17      A.   At that time, probably, you know, to his origin

18  because, you know, he was joking about, you know, the

19  Asian -- Asian jokes.

20      Q.   And do you have a belief that African-Americans

21  reside in the ghetto?

22      A.   No.

23      Q.   So why would you make that type of comment,

24  sir?

Sung Byun

54

1   A.    It was in a joking, you know, joking manner.

2   Q.    Now, so, in addition to being the victim of

3   jokes, you, yourself, also participated in the joking;

4   is that fair to say?

5   A.    Yes.

6   Q.    Were there any jokes or comments made about any

7   other national origin or race?  As we talked about

8   comments made to Mr. Eapen, because he was Indian,

9   comments made to you, because you are South Korean,

10  and comments made to Mr. Taylor, because he is black.

11  Any other comments made to an employee based on their

12  national origin or race?

13  A.    No.

14  Q.    Were there comments made about females because

15  of their gender?

16  A.    No.  It was just based on who participated in

17  our -- in our joking aspect, and no female

18  participated in that.

19          MR. COOK:  Mr. Byun, I don't have any

20  other questions.  Thank you for your time.

21  Mr. Sandler may have some questions for you.

22          MR. SANDLER:  I have a few questions.

23  BY MR. SANDLER:

24  Q.    You mentioned earlier that the term "red neck"

1   was used in this joking back and forth comments.

2   A.    Right.

3   Q.    To whom was that directed?

4   A.    Bill Kennedy.

5   Q.    And who used that term?

6   A.    I did.

7   Q.    And what does it mean?

8   A.    I guess it would mean someone who is not --

9   good question.   Someone who is not -- not intelligent,

10  someone who is backwards in time.

11  Q.    Doesn't it usually refer to a low class white

12  person?

13  A.    Right.

14  Q.    In discussing the training that was received

15  and your understanding of what was and wasn't unlawful

16  harassment, I think you used the phrase, "unwanted."

17  In other words, if something was accepted or welcomed,

18  that wasn't perceived as harassment; correct?

19  A.    Of course.

20  Q.    And the kinds of back and forth comments that

21  were engaged in by these so-called worker bees in

22  Desktop Computing, is it correct to say that those

23  comments were welcomed or were not unwanted?

24  A.    Correct.   If I, you know, sense something that

1   was unwanted or sensitive, I mean, things like that,

2   you know, you know, I would have immediately stopped

3   because I -- I am very sensitive towards those things,

4   too.  So, if I felt that that were -- behind the

5   jokes, there were hostility or back stabbing or

6   certain things behind that -- those jokes, I would --

7   I would be very upset by it.  But there -- within the,

8   you know, what I call the worker bees, we did have a

9   good, you know, camaraderie of, you know, of younger

10  men, you know, just doing the work.

11      Q.    And kidding each other?

12      A.    Kidding each other, correct.

13      Q.    Did Mr. Eapen participate also in this back and

14  forth?

15      A.    Yes, he did.

16      Q.    Do you recall any comments that he made?

17      A.    No.  I don't really recall exactly what

18  comments he made, but he did, you know, he had his

19  share, too, in joking.

20      Q.    Did he say something about the "Seeks" wearing

21  beards and cutting off their beards?

22      A.    Wearing beards -- oh, yeah.  We did talk about

23  where, after the 9/11, a lot of the contractors who

24  happened to be, I believe, Indian or Pakistan origin,

1    did shave off their mustache and beard after the 9/11.

2    Q.    Mr. Eapen said that?

3    A.    Yeah.  We did make that observation.  He did

4    say that.  And they started, you know, wearing

5    American flags and so forth.

6    Q.    He made that comment?

7    A.    Yeah.  He made that observation.

8    Q.    Now, you also said that the focus, primarily,

9    was on performance, and if you performed well, you got

10   credit, and if you didn't perform well, you didn't get

11   credit?

12   A.    Correct.

13   Q.    How was Mr. Eapen as a performer?

14   A.    He was seen or perceived by, you know, the

15   worker bees as a person who is not technical that

16   wanted to be technical.

17   Q.    What does that mean?

18   A.    That means he is aspiring to be, you know, a

19   technical guru.

20   Q.    But did he do the things that were necessary to

21   achieve that goal?

22   A.    Not to, you know, the worker bees' recognition

23   that, you know, like, if a new -- at that time, it was

24   HDTV came out, we would all go to the Best Buy, you

58

1   know, for lunch and hang out and things like that, or

2   if there was new technology, new cell phones, we would

3   get the latest cell phone and show off to one another.

4   But Justus Eapen didn't participate in those things.

5       Q.   He didn't have the same level of interest as

6   some of the other people?

7       A.   Yeah.   That wasn't his motivating factor.   For

8   us, you know, to have the fastest computer or the

9   fastest lap top or the LCD screens or things like that

10  was our motivation.   For him, it wasn't really a -- he

11  wasn't really inspired by those things.

12      Q.   What seemed to motivate Mr. Eapen?

13      A.   He was motivated by finance, like, you know,

14  you know, making money.   He shared with me about his

15  -- his stockbroker or trader incident when he was

16  young, and he told me that those kind of things were

17  his interests.

18      Q.   Were you aware that he had a side business?

19      A.   Yes.

20      Q.   What was that side business?

21      A.   I believe it was a mortgage, like, refinancing

22  company, but he was under his wife's name.

23      Q.   And did he solicit you in any way for that

24  business?

1    A.    Yeah.  He said if you wanted to refinance, you

2    know, get the lower rate, you know, why don't you, you

3    know, put in your application through the web.

4    Q.    And how through the web?  How would you do

5    that?

6    A.    You just go to the website and then there is an

7    application form and you just type in your

8    information.

9    Q.    What website?

10   A.    There was a website that he made.  I don't

11   think, you know, from our point of view, we didn't

12   think that he designed the website.  He probably had

13   somebody else design it.

14            MR. SANDLER:  No further questions.

15   BY MR. COOK:

16   Q.    Mr. Young, just to follow-up on some of your

17   testimony, did you have any discussions with Mr. Eapen

18   to determine whether or not he welcomed being called

19   Osama bin Laden's brother and dot head and other

20   references to his national origin?

21   A.    He didn't tell me that he did not welcome it,

22   but, I mean, I do know that it's not -- you know, it's

23   not something that you look forward to, you know, you

24   come to work and you look forward to hearing those

1    things.

2                   And same with me, you know, I didn't want

3    to be heard as, you know, rice cooker, something like

4    that.  But we felt that that was part of being in,

5    just in the competitive, edgy group that we were in.

6    Q.   But you don't have any specific knowledge that

7    Justus Eapen welcomed that type of -- those type of

8    jokes or comments about his national origin?

9    A.   Correct.  He didn't come up to me and say, "Oh,

10   I love these jokes," or "These jokes are great," but

11   he didn't show any displeasure or depression or

12   frustration.  He showed me other frustrations with,

13   you know, either his manager or with Jim Dell or, you

14   know, maybe with his career, but he didn't share any

15   frustrations about the joking that was going on

16   because we thought it was, you know, just kind of

17   casual or just kind of like --

18   Q.   Did you complete your answer?

19   A.   Pardon?

20   Q.   Did you complete your answer?

21   A.   Yeah.

22   Q.   Now, you also made reference to you thought

23   that the prejudice was based more on performance than

24   it was on race; correct?

1    A.    Correct.

2    Q.    Did the level of joking toward Mr. Eapen have

3    anything to do with his performance?

4    A.    Yeah.  We did -- we did draw some connections.

5    You know, I remember us talking about that connection

6    where sometimes joking about it does -- does, you

7    know, play into your psychic.  Maybe I am not good

8    enough.  Maybe, you know -- we did talk about that.

9    But we also did talk about, you know, you know, being

10   a better person and not letting those things, you

11   know, interfere, but look at your career and your

12   accomplishments.

13   Q.    When you are talking about those things

14   interfering, you are talking about the comments and

15   the jokes?

16   A.    Yeah.  I think what -- like, even for me,

17   initially, like, when you don't know the group or the

18   dynamics or the joking or, you know, in what context

19   are they joking these things about, it did, I think

20   for me, kind of put me in a very isolated role.  But

21   as I started to be friends with the people that I was

22   working with, and after I understood that, you know,

23   that, you know, that we would watch each other's back,

24   we would help each other out, you know, I understood

1    that the joking wasn't based on hostility or based on

2    aggression or based on thinking less of you.

3    Q.    And based on your training, did you have an

4    understanding that joking, in reference to a person's

5    national origin or race, whether it was welcomed or

6    not, if it was unlawful behavior?

7    A.    I recognized it as a discrimination based on

8    your, you know, based on your national, you know,

9    based on your race and national origin, discrimination

10   in terms of, you know, your position, your career, you

11   know, your project, your, you know, your being

12   included in the group, those kind of things.  But in

13   terms of joking, at that time, we didn't really, like,

14   equate those things.  We were just, you know --

15   Q.    You didn't equate the joking with being illegal

16   behavior?

17   A.    Yes.

18   Q.    Did you recognize it as being unprofessional

19   behavior?

20   A.    Yes.  It wasn't professional.  But then we also

21   felt -- we didn't want it to be -- it was like an

22   underlying comment.  We didn't want our working

23   relationships amongst, you know, ten, 15 of us to be,

24   like, very formal.  You know, we wanted to be very

1   website.  You know, if you have any ideas, let me

2   know.

3          I was like, "Oh, wow, great, I will let

4   you know if anything is going on."  And then maybe a

5   week later, he brought me over and actually he showed

6   me the website.  When he, you know, first told me, I

7   didn't really, you know, believe, you know, what -- I

8   didn't know how extensive it was going to be.  But

9   when he showed me the website and, you know, with the

10  stock, looking at the stocks and all these things, I

11  was pretty impressed with the website.

12  Q.   And just so I am clear, there are two occasions

13  when you looked at the website, one when he was first

14  setting it up and then one a couple weeks later?

15  A.   Correct.

16  Q.   Were there any other times when you reviewed

17  his website or Mr. Eapen asked you to view his

18  website?

19  A.   No, twice.

20  Q.   And during the second time you viewed

21  Mr. Eapen's website, did he ask you to fill out an

22  application to refinance your mortgage?

23  A.   Yeah.  He asked me, but not like, Do it now.

24  He said, you know, If you are going to refinance your

66

1   home -- you know, it was more of a casual thing, you
2   know, if you are ever going to do it, why don't you
3   use my site.
4     Q.   It was in the context of, Let me look at some
5   interest rates for you, that type of thing?  Or was
6   it, My wife is a mortgage broker and you can get a
7   mortgage through her?
8     A.   It was more like that, the second part, just
9   more casual, My wife is a mortgage broker and I am
10  helping her after work.
11    Q.   Did you ever meet his wife?
12    A.   Yes.  She brought his baby -- his newborn baby
13  to work one day.
14    Q.   Did she talk to you about her business at that
15  time?
16    A.   No.
17    Q.   And were you aware of any policy at MBNA that
18  would prevent Mr. Eapen from participating in another
19  business while employed at MBNA?
20    A.   No.  There wasn't -- I am sure there was some
21  kind of, you know, when I first saw it, I thought that
22  there was some kind of maybe a conflict of interest,
23  but that's why I didn't, you know, after that, I --
24  after he showed me, I just -- I didn't, you know,

**W&F**

**C104**

67

1    really interact with him in, you know, with -- in that

2    manner of refinancing a home.

3    Q.   After Mr. Eapen assured you of what?  You said

4    after he assured you.

5              MR. SANDLER:  He said after he showed.

6              THE WITNESS:  After he showed me, yes.

7    BY MR. COOK:

8    Q.   You said you believed it may have been a

9    conflict of interest.

10             Did you tell anybody at MBNA that you

11   think Mr. Eapen has a business that's in conflict with

12   MBNA's business?

13   A.   No.

14   Q.   Did other employees in Desktop Computing have

15   side businesses that you were aware of?

16   A.   No.

17   Q.   Are you aware of any other employees that

18   Mr. Eapen approached about refinancing mortgages?

19   A.   Yes.

20   Q.   Who?

21   A.   I believe he approached Neela Chacko and some

22   other of his Indian friends in different departments.

23   Q.   Do you have any names?

24   A.   No.

68

1    Q.    And what makes you believe he approached Neela

2    Chacko?

3    A.    Because he told me.

4    Q.    And did he also tell you he approached the

5    other MBNA employees?

6    A.    Mm-hmm.

7              MR. SANDLER:  That's a yes?

8              THE WITNESS:  Yes.

9    BY MR. COOK:

10   Q.    Do you recall the time frame in which he told

11   you --

12   A.    This was all within this similar time period.

13   Q.    In the Jim Dell period?

14   A.    Mm-hmm.

15   Q.    What time frame was that, if you recall?

16   A.    That was like three months before we left, you

17   know, we left Christiana four.  So, once -- if we look

18   at MBNA records, I am sure we can find out exactly

19   when we moved out of there.

20             MR. COOK:  Thanks.  I don't have anything

21   else.

22             MR. SANDLER:  No further questions.

23             (The deposition was concluded at 12:00

24   p.m.)

1

```
 1              IN THE UNITED STATES DISTRICT COURT
 2                 FOR THE DISTRICT OF DELAWARE
 3
 4
    EQUAL EMPLOYMENT OPPORTUNITY    )
 5  COMMISSION,                     )
                                    )   Civil Action No.
 6              Plaintiff,          )   04-CV-425-SLR
                                    )
 7  v.                             )
                                    )
 8  MBNA AMERICA BANK, N.A., a      )
    subsidiary of MBNA Corporation,)
 9                                  )
                Defendant.          )
10
                Deposition of JAMES A. DELL, JR. Taken
11  pursuant to notice at the law offices of YOUNG CONAWAY
    STARGATT & TAYLOR, 1000 West Street, Wilmington,
12  Delaware, beginning at 9:00 a.m. on Tuesday, July 19,
    2005, before Renee A. Meyers, Registered Professional
13  Reporter and Notary Public.
14  APPEARANCES:
15              TERRENCE R. COOK, ESQ.
                U.S. EQUAL EMPLOYMENT OPPORTUNITY
16              COMMISSION
                   21 South Fifth Street
17                 The Bourse, Suite 400
                   Philadelphia, Pennsylvania  19106-2515
18                 for the Plaintiffs,
19              SHELDON N. SANDLER, ESQ.
                YOUNG CONAWAY STARGATT & TAYLOR
20                 1000 West Street, 17th Floor
                   Wilmington, Delaware  19899
21                 for the Defendant.
22  ALSO PRESENT:  Launice Sills, Esq.
23                      WILCOX & FETZER
       1330 King Street - Wilmington, Delaware 19801
24                      (302) 655-0477
```



James A. Dell

14

1  five people under your authority?

2  A.    Possibly started with three, grew to five.

3  Q.    During your tenure at MBNA, have you had any

4  training on issues of harassment or discrimination?

5  A.    Yes.

6  Q.    When was the last time you had training on

7  issues of harassment or discrimination?

8  A.    About a year ago.

9  Q.    What form of training did that take?  Was it a

10 lecture?  A video?  On-line?

11 A.    Full day lecture seminar.

12 Q.    Do you recall who conducted that?

13 A.    I do not.

14 Q.    Were there materials handed out?

15 A.    There was.

16 Q.    Did you retain those materials?

17 A.    I retained them for a period of time.

18 Q.    Do you have those today?

19 A.    I don't.

20 Q.    What happened to them?

21 A.    Discarded.

22 Q.    And when was the previous time you had training

23 at MBNA before a year ago on issues of harassment and

24 discrimination?

15

1    A.    2003.

2    Q.    What was the format of that training?

3    A.    Same.

4    Q.    Full day lecture?

5    A.    Mm-hmm.

6    Q.    And before that?

7    A.    I don't recall.

8    Q.    Give me your best estimate of the number of

9    trainings you have had while employed at MBNA on the

10   issues of harassment or discrimination?

11   A.    I'd say it has been a four to five full day

12   sessions.

13   Q.    Including the two you just testified to?

14   A.    Correct.

15   Q.    And did you retain any of the training

16   materials from any of those seminars?

17   A.    For a period of time.

18   Q.    Do you have those today?  Any of those

19   materials?

20   A.    I do not.

21   Q.    And based on your training, do you have an

22   understanding of what harassment is?

23   A.    Yes.

24   Q.    And what's your understanding of what



75

1    Q.    What about Tom Liddle, did he have Windows 2000

2  training?

3    A.    No.

4    Q.    What about Jason Campbell?

5    A.    No.

6    Q.    Do you recall an incident where Mr. Eapen

7  complained to you about employees tampering with his

8  computer equipment?

9    A.    About a mouse ball, yes.

10    Q.    Do you recall the time frame that he complained

11  to you about this?

12    A.    I don't.

13    Q.    And what was his complaint?

14    A.    Someone removed his mouse ball out of his

15  mouse.

16    Q.    And what did you do in response to his

17  complaint?

18    A.    I walked over to the individuals in the area,

19  and I said, "No more jokes."

20    Q.    Did you recover the mouse ball?

21    A.    I did not recover it personally.

22    Q.    Did you ever find out who took the mouse ball?

23    A.    I did not.

24    Q.    Did Mr. Eapen complain to you on more than one

76

1    occasion about employees tampering with his computer

2    equipment, taking his monitor, moving his keyboard,

3    things of that nature?

4    A.    Oh, taking his monitor.

5    Q.    Do you recall the time frame in which he

6    complained to you about someone taking his monitor?

7    A.    No.

8    Q.    Do you recall if it was before or after the

9    mouse ball incident?

10   A.    I don't recall.

11   Q.    And did you ever discover who took his monitor?

12   A.    Yes.

13   Q.    Who took it?

14   A.    That was me.

15   Q.    And what was the reason you took his monitor?

16   A.    The monitor that he got out of a test

17   environment was a server type monitor, not a standard

18   issued.  We were short on server type monitors, so

19   while Justus was on vacation, we replaced it.

20   Q.    Is there any paperwork or documents that would

21   exist to show that there was a transfer of monitors

22   from the server monitor to the standard issued

23   monitor?

24   A.    No.



C111

115

1    Q.    And did her having spoken to him, having told

2    him about this situation, did that affect the

3    relationship between you and Mr. Eapen?

4    A.    Oh, much so.

5    Q.    How so?

6    A.    I -- I guess he felt that he couldn't trust me

7    anymore, and -- because I did have a close

8    relationship with the people that report to me, and I

9    guess he felt that he was betrayed.

10    Q.    How was your relationship with Mr. Eapen before

11    that?

12    A.    Very good.  Actually came in several times, we

13    had dinner during my evening visits.  One time, I

14    recall I came in on a Harley and took him for coffee

15    and we had an open discussion about anything and

16    everything.

17    Q.    Regarding the issue of your replacing his

18    monitor, where had he gotten that monitor?

19    A.    He took that out of a test lab.

20    Q.    And was that done with your permission?

21    A.    No.

22    Q.    And you say that there was a need for

23    additional test monitors because you were short on

24    them; is that correct?

1    A.    Server monitors, yes.

2    Q.    I am sorry, server monitors?

3    A.    Yes.    That's what Justus had taken out of the

4  test lab, which, basically, that monitor consists of a

5  monitor and a keyboard combined which is designed to

6  be able to be U-fitted into a server cabinet within

7  the server racks.  Again, that's not a standard issue

8  desktop.

9    Q.    And when you took that monitor back, did you

10  provide him with something else?

11    A.    Yes.

12    Q.    What did you provide him with?

13    A.    A standard issue monitor, 15- to 17-inch

14  monitor.

15    Q.    Going back to the early part of your

16  deposition, you were questioned about the different --

17  the two different environments, the production

18  environment and the testing environment.  And I think

19  you said that if someone used someone else's password

20  in the testing environment, they couldn't do much

21  damage, basically, or something along those lines, you

22  couldn't do some damage in the testing environment; is

23  that what you meant?  Maybe I am misstating.

24    A.    The testing environment is designed to not

1   interact with production, for obvious reasons.

2   Testing new software, you don't know how it's going to

3   act on the network.  Someone using another person's

4   account in that environment is not necessarily related

5   to how the environment acts but it's that we can't

6   track related to whom was actually on the server at

7   that time performing whatever they were doing.

8   Deleting an account is against policy in the e-mail

9   drive zone, so if somebody else was using a different

10  account than his own, then, of course, suspect would

11  be against the person whose the account is associated

12  with.

13      Q.    And if someone shares their account with

14  somebody else, would that other person be able to use

15  that password in the production environment?

16      A.    Yes.

17      Q.    And, again, following up on what you just said,

18  would that mean that you would think that it was

19  someone else that was in the production environment

20  rather than the person who was actually the owner of

21  the password?

22      A.    That's correct.

23      Q.    And they could do whatever damage they wanted

24  without being able to track; is that correct?



C114

1    A.    That's correct.

2    Q.    And it's your understanding that sharing

3    passwords is prohibited both in the production and in

4    the testing environment; is that correct?

5    A.    That's correct.

6    Q.    You mentioned, by the way, I forget the

7    person's name, but who is your current supervisor,

8    manager?

9    A.    Arathi Jayaram.

10   Q.    What's his national origin?

11   A.    She.

12   Q.    She?

13   A.    Indian.

14   Q.    You were involved in Mr. Eapen's promotion; is

15   that correct?

16   A.    That's correct.

17   Q.    What is typically done when someone is

18   promoted?  Is it communicated, announced?

19   A.    Amongst the group, yes.  Celebration.

20   Q.    And were you planning to do with that with

21   Mr. Eapen's promotion?

22   A.    I was.

23   Q.    Did you discuss that with him?

24   A.    I did.

1  him at some point during his shift?

2   A.   Yes.

3   Q.   Did you take him on the Harley?

4   A.   I did.

5   Q.   And had you ever socialized with Mr. Eapen

6  outside the office outside of work hours?

7   A.   No.

8   Q.   Did you socialize outside of work hours with

9  other MBNA employees?

10  A.   No.  Well, excuse me.  None that reported to

11  me.

12  Q.   Well, other MBNA employees?

13  A.   Yeah, other people, sure.

14  Q.   I understand you are a scuba diver?

15  A.   I am.

16  Q.   And did you go scuba diving with Mr. Byun, Sung

17  Byun?

18  A.   I did.

19  Q.   Besides Mr. Byun, is there other MBNA employees

20  you socialize with outside the office?

21  A.   George Taylor.

22  Q.   What kind of activities did you engage in with

23  Mr. Taylor outside of the office?

24  A.   These would be happy hours.



James A. Dell

127

| 1 | Q. | Anyone else that you can think of? |

1    Q.    Anyone else that you can think of?

2    A.    Oh, other people --

3    Q.    Other MBNA employees?

4    A.    Ron Rodriguez, Tim Duffy, Joe Panchisin, Dan

5    Weir.

6    Q.    Dan Weir was on your team; correct?

7    A.    Yes.    I am just thinking about a baby shower we

8    did for him.    That's about my memory at this time.

9    Q.    Now, just with respect to the promotion issue

10    and the fact that Mr. Eapen didn't want it announced,

11    he didn't tell you why he didn't want it announced;

12    correct?

13    A.    He didn't.

14    Q.    And is there any MBNA policy that you are aware

15    of that requires that promotions be announced amongst

16    the employees?

17    A.    Not to my knowledge.

18    Q.    So, if, in fact, you had not announced it, the

19    promotion, as Mr. Eapen requested, based on your

20    knowledge today, you wouldn't have been in violation

21    of any MBNA policy by not announcing that; correct?

22    A.    That's correct.

23    Q.    You mentioned, in the context of Mr. Eapen's

24    e-mails that were unprofessional, that he didn't use

1   curse words or anything of that nature.

2              Let me ask you:  Within the context of the

3   work environment where you were at, did you hear curse

4   words exchanged between the employees under your

5   supervision?

6   A.    No.

7   Q.    Was that type of language used in the

8   workplace, to your knowledge?

9   A.    No.

10  Q.    Did you ever hear curse words by other MBNA

11  employees that were not under your direct supervision,

12  such as Richard Wagner or Mike Broughton or

13  individuals like that?

14  A.    No.

15  Q.    Did you hear them joking amongst each other

16  over anything?

17  A.    Well, there was laughter.  I don't necessarily

18  recall the particular subject or topic.

19              MR. COOK:  Thanks.  Nothing else.

20              MR. SHELDON:  A couple more.

21              MR. COOK:  Sure.

22  BY MR. SHELDON:

23  Q.    You said that Mr. Eapen was asked to stay for

24  the morning meetings.  On the days that Jason Campbell

James A. Dell

129

1   worked, did he also stay for the meetings?

2     A.   Yes.   I believe I gave them both a sense of

3   responsibility.

4     Q.   What is George Taylor's race?

5     A.   Black.

6     Q.   Is he the fellow that you go to happy hours

7   with?

8     A.   Yeah, and it's not a regular basis.  It's just

9   that George Taylor and I have worked together for

10  quite some time, well respected.

11    Q.   And you said that there was no policy violated

12  by not announcing -- if you hadn't announced

13  Mr. Eapen's promotion, but I think you said before

14  that there was a practice to announce it?

15    A.   It was.

16    Q.   And you said that the e-mails Mr. Eapen sent

17  out after he became estranged from you had, what, a

18  different tone than any previous e-mail; is that fair

19  to say?

20    A.   Yeah.

21    Q.   Let me just show you Exhibit 3, which is the

22  e-mail that he sent dated February 21st.

23          Is the tone of this e-mail similar to the

24  tone of e-mails he was sending?