James J. Micek

1

```
 1              IN THE UNITED STATES DISTRICT COURT
 2                 FOR THE DISTRICT OF DELAWARE
 3
 4
    EQUAL EMPLOYMENT OPPORTUNITY    )
 5  COMMISSION,                     )
                                    )   Civil Action No.
 6              Plaintiff,          )   04-CV-425-SLR
                                    )
 7  v.                              )
                                    )
 8  MBNA AMERICA BANK, N.A., a      )
    subsidiary of MBNA Corporation,)
 9                                  )
                Defendant.          )
10
                Deposition of JAMES J. MICEK pursuant to
11  notice at the law offices of YOUNG CONAWAY STARGATT &
    TAYLOR, 1000 West Street, Wilmington, Delaware,
12  beginning at 9:10 a.m. on Wednesday, July 19, 2005,
    before Renee A. Meyers, Registered Professional
13  Reporter and Notary Public.
14  APPEARANCES:
15               TERRENCE R. COOK, ESQ.
                 U.S. EQUAL EMPLOYMENT OPPORTUNITY
16               COMMISSION
                   21 South Fifth Street
17                 The Bourse, Suite 400
                   Philadelphia, Pennsylvania  19106-2515
18                 for the Plaintiffs,
19               SHELDON N. SANDLER, ESQ.
                 YOUNG CONAWAY STARGATT & TAYLOR
20                 1000 West Street, 17th Floor
                   Wilmington, Delaware  19899
21                 for the Defendant.
22  ALSO PRESENT:  Launice Sills, Esq.
23                      WILCOX & FETZER
        1330 King Street - Wilmington, Delaware 19801
24                   (302) 655-0477
```

W&F
C120

James J. Micek

17

1   get along.

2     Q.   What was the nature of the problem between

3   engineering and operations?

4     A.   Lack of clarity in terms of ownership and roles

5   and responsibilities.

6     Q.   This is what Miss Ross told you?

7     A.   Correct.

8     Q.   Anything else besides the lack of clarity in

9   terms of ownership or responsibilities that you

10  discussed with Miss Ross about the problems between

11  engineering and operations that you recall?

12    A.   That was the principal issue.  That was the

13  principal issue.

14    Q.   You discussed problems about specific

15  individuals.

16         What specific individuals do you recall

17  discussing with Miss Ross and the problems they may

18  have had?

19    A.   Well, again, we discussed every individual in

20  the organization.  The one specific concern she

21  registered during the transition was a challenge

22  between Jim Dell and Justus Eapen.

23    Q.   What did she tell you about that?

24    A.   That they had a challenging time communicating

James J. Micek

18

1  with one another.

2  Q.   Did she give you any examples?

3  A.   Not specific examples.  The concern was more

4  about just not having enough work to do on the third

5  shift and Jim Dell primarily not addressing that,

6  being able to address that.

7  Q.   Anything else you recall Miss Ross shared with

8  you about the problem between Jim Dell and Justus

9  Eapen?

10  A.   The other specific item that was being looked

11  into at the time was a complaint or a concern

12  registered about just sleeping during his third shift,

13  which was communicated to Personnel for review.

14  Q.   And what did she tell you about that incident?

15  A.   She had informed me that Jim Dell came in one

16  evening, during a third shift, and discovered that

17  Justus was sleep at his desk.  He notified Bellverie

18  of the occurrence to get guidance as to what to do.

19  Q.   So, where did the problem arise?  Did she tell

20  you where the problem arose?

21  A.   I am not sure what you mean by your question.

22  Q.   Well, so, she told you how Mr. Dell came in and

23  saw Mr. Eapen sleeping at his desk; correct?

24  A.   Correct.

James J. Micek

20

1    those conversations took place.

2    Q.    Did Mr. Dell tell you that his relationship

3    with Mr. Eapen changed after this event?  Did he

4    discuss that?

5    A.    There was an -- it wasn't stated directly, but

6    there was definitely some sort of indication that

7    communications was -- was stressed following that.

8    Q.    What did he tell you to lead you to the

9    conclusion that the relationship was stressed after

10   this incident?

11   A.    What did he tell me?  I don't -- honestly, I do

12   not recall.

13   Q.    And did you discuss with Mr. Dell, during the

14   meeting, the lack of work that Mr. Eapen complained

15   about?

16   A.    Yes.

17   Q.    And what was Mr. Dell's explanation for that?

18   A.    Well, two points.  One is that he felt he did

19   provide Justus with work to do.  He did feel that

20   there was an opportunity for more work to be assigned

21   during the third shift.

22   Q.    And what else did you discuss with Mr. Dell

23   during your meeting during this transition period?

24   A.    The other individuals on the team, projects in

21

1   progress, concerns.

2   Q.    Did Mr. Dell ever express to you problems with

3   joking amongst the employees in Desktop Computing?

4   A.    No.

5   Q.    And you also met with Mr. Eapen during this

6   transition period; correct?

7   A.    Correct.

8   Q.    Do you recall when you met with Mr. Eapen?

9   A.    Middle of June of 2002.

10   Q.    What was discussed on your meeting with

11   Mr. Eapen?

12   A.    We discussed a number of things.  Justus did

13   register some concerns he had about the organization,

14   and then, specifically, his -- his job.  No. 1, he

15   felt that there was a lack of communications, minimal

16   communications occurring.

17   Q.    Okay.

18   A.    He felt as if he was not challenged with the

19   work that he was being assigned and that he was not

20   assigned enough work.  He did communicate that he felt

21   Jim Dell was a really good guy but he was not a good

22   manager.

23   Q.    Anything else that you recall?

24   A.    And that, specifically, Jim Dell was not a good

James J. Micek

22

1    communicator.

2    Q.    Anything else you recall discussing with

3    Mr. Eapen during your meeting during this transition?

4    A.    Yes.  He also informed me that he had expressed

5    interest in a new opportunity in telecommunications at

6    MBNA.

7    Q.    Anything else you recall?

8    A.    And that they had expressed interest in

9    offering him an opportunity, a job opportunity, and he

10   had told me that he had decided to not accept that job

11   and remain behind in Desktop Computing, principally,

12   because of his knowledge of me and our previous work

13   experience with one another, and he decided to stay in

14   the department.

15   Q.    Did Mr. Eapen raise to you any complaints of

16   discrimination or harassment based on his race or

17   national origin?

18   A.    No.

19   Q.    Now, with respect to the lack of communication

20   that Mr. Eapen raised to you, is that a lack of

21   communication between himself and Mr. Dell or did it

22   involve other people within the group?

23   A.    Twofold.  Specifically, between himself and Jim

24   Dell and the broader context of the lack of

James J. Micek

23

1  communication centers about the earlier point with

2  confusion between operations and engineering.

3    Q.    Did Mr. Eapen share with you that he felt

4  Mr. Dell did not respond to his e-mails?

5    A.    He did, yes.

6    Q.    And did Mr. Eapen share with you his belief

7  that there was a period of time that Mr. Dell would

8  not talk to him at all about business related matters?

9    A.    My recollection was that it was infrequent, but

10  that there was, on occasion, communications.

11    Q.    Do you recall whether you met with Mr. Eapen

12  before you met with Mr. Dell, or do you have an idea

13  of who you met with first?

14    A.    Let me think that one through for a second.

15        I don't know definitively.  Normally, I

16  meet with managers before individuals is my normal

17  approach, but I couldn't tell you definitively.  I'd

18  have to check my records.

19    Q.    And on these, I guess, one-on-ones you had with

20  everybody within the operations, did you take notes?

21    A.    Yes.

22    Q.    Did you retain those notes?

23    A.    Yes.

24    Q.    Do you still have those notes today?

James J. Micek

35

1   A.    Yes.

2   Q.    And what was that?

3   A.    It was my understanding it was inappropriate

4   downloading of files onto MBNA computer systems and

5   sharing of those files.

6   Q.    Did these files contain adult materials?

7   A.    That was my understanding, yes.

8   Q.    And what about Richard Wresneski, do you

9   understand the nature of his conduct?

10   A.    I believe it was the same incident.

11   Q.    And what about Bill Kennedy?

12   A.    Again, the same incident.

13   Q.    So, essentially, one of these individuals

14   downloaded some adult materials and then shared it

15   with other people within the group; correct?

16   A.    That's my understanding, yes.

17   Q.    Besides these three individuals you testified

18   to, are there any other individuals within Desktop

19   Computing or operations that you recall discussing

20   with Miss Ross who may have been on a discipline or

21   some type of corrective action?

22   A.    Not to my recollection, no.

23   Q.    Did you have any discussions with Mr. Liddle,

24   Mr. Wresneski, or Mr. Kennedy concerning this

36

1    discipline?

2    A.    The only conversation I had with -- on that

3    topic was Rich Wresneski.

4    Q.    Is this part of a one-on-one during the

5    transition or at some other point in time?

6    A.    This was a meeting -- Rich came to meet with me

7    on that topic.

8    Q.    He came voluntarily?

9    A.    Voluntarily.

10   Q.    You didn't solicit him for anything?

11   A.    No.

12   Q.    What did Mr. Wresneski tell you when he met

13   with you concerning this issue?

14   A.    He told me of the fact that he was on

15   corrective action.  He felt that he shouldn't have

16   been, and he was requesting my support to get that

17   removed.

18   Q.    Did he tell you why he believed he should not

19   have been on corrective action?

20   A.    He didn't get into the details of it, no.

21   Q.    And did you ask him why he believed he should

22   not be on corrective action?  Besides him making the

23   statement, did you ask him why he held that belief?

24   A.    No.

James J. Micek

37

1    Q.   And did you take any steps to look into the

2    situation to see whether or not Mr. Wresneski was

3    properly put on a corrective action plan?

4    A.   I did review it with Personnel, I believe, to

5    understand the circumstances.

6    Q.   Was there anybody in particular in Personnel

7    you contacted to review the situation?

8    A.   It may have been Tamika Sainten or Renee

9    Cuffee-Williams.

10   Q.   And did they provide you with the file?  Did

11   they give you any verbal report as to what happened?

12   A.   No.  We had just had a very quick discussion,

13   and they informed me what -- because, again, I wasn't

14   given the specifics of what occurred, so, based on

15   request, I just made a quick inquiry.  They felt that

16   the disciplinary action that was taken was warranted

17   and I left it at that.

18   Q.   You didn't make a request of Miss Sainten or

19   Miss Cuffee-Williams to have the corrective action

20   removed from Mr. Wresneski's file?

21   A.   No.

22   Q.   Did you have any follow-up discussions with

23   Mr. Wresneski concerning your meeting with Personnel?

24   A.   I -- not -- I did have a follow-up conversation

James J. Micek

52

1    Q.   Do you recall him crying at all or shedding any

2    tears during this meeting?

3    A.   I don't recall tears.  I recall, you know,

4    potentially glassy eyes, but I don't -- there was not

5    an outburst of tears.

6    Q.   The first entry says, "Occurrence over DTC

7    management."

8              I take that to mean Desktop Computing

9    management?

10   A.   Correct.

11   Q.   And did he share any concerns about Desktop

12   Computing management that you haven't already

13   testified to today?

14   A.   No.

15   Q.   It also says, "Jim Dell, 'good guy, not a good

16   manager.'  Can't, doesn't communicate well."

17             Did I read that correctly?

18   A.   Correct.

19   Q.   And was there anything else said about the

20   "good guy, not a good manager" comment other than what

21   you have already testified to?

22   A.   No.

23   Q.   And you also note that he -- there is no

24   meaningful work, no challenges, not enough work, and

James J. Micek

53

1  you have already testified to that; correct?

2   A.    Correct.

3   Q.    What's the next line say?

4   A.    "Not growing as a technician."

5   Q.    And what do you recall discussing with

6  Mr. Eapen about that?

7   A.    He felt, as a result of not having meaningful,

8  challenging work, or enough work, that it didn't

9  provide him with the opportunity to improve his

10  technical skills.

11   Q.    And did Mr. Eapen tell you there were other

12  people within the Operations Group that were getting

13  the growing or getting the technical experience to

14  grow as a technician?  Did he compare himself to other

15  employees in this regard?

16   A.    In this conversation -- in this meeting, I

17  don't believe we had that dialogue.  It was more about

18  his concern about where he stood relative to his

19  position.

20   Q.    And in other discussions you may have had with

21  Mr. Eapen, did he ever compare himself to another

22  Operations Group employee, as an example, how he was

23  not growing in comparison to that other person?

24   A.    Not to my knowledge, or recollection.

James J. Micek

54

1    Q.    The next line, I believe, says, "Poster for
2    Telecom position, command center.  Other areas
3    interested in."
4    A.    Yes.
5    Q.    And the last line, the last two lines, what
6    does that say?
7    A.    "He decided to stay in Desktop now that I'm
8    here, based on past experiences."
9    Q.    And these are all your notes from your
10   one-on-one meeting with Mr. Eapen on or about June
11   11th of 2002?
12   A.    Correct.  Yes.
13   Q.    And the e-mail that's on 1850, what's the
14   substance of this e-mail?  Can you tell me what
15   discussions you had with Jim Dell concerning this
16   e-mail?
17   A.    Well, the conversations, actually, occurred
18   before the e-mail, but based on the concerns for night
19   shift, not having enough work to do and meaningful
20   work to do, what I asked Jim to do was to work with
21   the other managers in Desktop Computing and identify
22   work that could be off-loaded from the first shift and
23   moved onto second and third shift.
24   Q.    Dave Armstrong was one of those managers?

James J. Micek

55

1   A.    Dave Armstrong headed up engineering, so we --

2   we, basically, looked for work across the entire

3   organization, which can be off-loaded onto second or

4   third shift.

5   Q.    And your handwritten note says, "This was

6   focused on moving work to the night shift to address

7   Justus' concern about workload"?

8   A.    Correct.

9   Q.    And when you say "this was focused on," was

10  that the e-mail or the effort?

11  A.    Well, this e-mail was -- the effort was, in

12  part, to address Justus' concern as well as the other

13  night shift individuals, and the e-mail was Jim

14  confirming back to me that there was work underway to

15  identify and move workload onto those shifts.

16  Q.    Besides Mr. Eapen and Mr. Campbell, were there

17  other employees in Desktop Computing that worked that

18  third shift or that night shift that you are aware of?

19  A.    At the initial point of my joining the team, it

20  was just those two individuals.  We did have a person,

21  Bridget Williams, that worked from 12:00 to 9:00,

22  which was a quasi -- it wasn't a second or third

23  shift, per se, but it was a quasi off shift schedule.

24  And we later hired a third individual, Brian Villegas,

James J. Micek

60

1    discussions with Mr. Eapen about any problems or

2    frustration he was having with his job or the

3    individuals he was working with?

4    A.    No.

5    Q.    So, then, in 2002 was the first time you had

6    supervisory or management authority over Mr. Eapen?

7    A.    Correct.

8    Q.    Within the context of Desktop Computing, are

9    you aware of both the testing environment and a

10   production environment that exists for Desktop

11   Computing?

12   A.    Yes.

13   Q.    And, to your knowledge, in both the testing and

14   the production environment, do employees have

15   passwords to access the servers or the computers in

16   both of those environments?

17   A.    Yes.

18   Q.    To your knowledge, are you aware of any

19   incident where employees shared passwords within the

20   testing environment?

21   A.    Other than the incident involved with Justus,

22   no.

23   Q.    Is that a practice within the testing

24   environment, to exchange or share passwords?

1    A.    No, not to my knowledge.  It's against policy.

2    Q.    And how were you made aware of the incident

3    involving Mr. Eapen and sharing his password?

4    A.    My best recollection is that I was informed by

5    Ernie Marra that he had been contacted by Information

6    Security, who -- whose responsibility it is to monitor

7    inappropriate activity in our environment.  So, they

8    made contact that they felt that they saw something

9    inappropriate, and that they would inform Personnel to

10   conduct an investigation.

11   Q.    When did Mr. Marra contact you in relation to

12   this password sharing incident with Mr. Eapen?

13   A.    The morning of the incident.  The incident

14   occurred 2:00 or 3:00 in the morning.  Upon my arrival

15   that day, Ernie Marra informed me that he had been

16   contacted by Information Security.  I don't know the

17   specific date.  I don't recall.

18   Q.    What do you recall Mr. Marra telling you other

19   than he has been contacted by Information Security?

20   A.    Provide me -- I think he provided me with a

21   little bit of what Information Security told him,

22   that, you know, a system alarm went off, Information

23   Security reacted to it, made a phone call to

24   understand what was going on, and, based on what they



1  Other than we probably spoke about that that's against

2  policy.

3      Q.    And what's your understanding of MBNA's policy

4  with respect to sharing passwords?  What is the

5  prohibited activity, as far as you know?

6      A.    There is to be no sharing of any password for

7  any systems at MBNA.

8      Q.    Besides asking you questions as to who has

9  authority to reset passwords that would trip an alarm,

10 what other things did you discuss with Miss Williams

11 during that meeting?

12     A.    Specifically, that we also spoke about the --

13 there was also another investigation underway with

14 Justus relative to a potential conflict of interest.

15     Q.    And that would be concerning an outside

16 business interest?

17     A.    Correct, which was being conducted by Rich

18 Kilmon.

19     Q.    So, Mr. Kilmon conducted the investigation into

20 the outside business issue, as far as you know, and

21 Miss Williams conducted the investigation into the

22 password issue?

23     A.    Correct.

24     Q.    Now, focusing on the password issue, was there

1   first message.

2       Q.    And do you recall any discussions you had with

3   Mr. Marra concerning this e-mail or the contents of

4   this e-mail other than what you have testified to?

5       A.    The only discussion we had was to not respond

6   to this and to forward it to Information Security --

7   not Information Security, sorry, to Personnel.

8       Q.    And that would be to Miss Cuffee-Williams?

9       A.    Yes.  I believe so.

10      Q.    And, in fact, was this forwarded to

11  Miss Cuffee-Williams?

12      A.    I believe so.  I can't confirm or deny it.  I

13  would believe so, yes.

14      Q.    During your tenure at MBNA, have you had

15  training on issues of harassment and discrimination?

16      A.    Yes.

17      Q.    And when was the last time you recall having

18  any training on harassment or discrimination?

19      A.    The last education was in 2004, there was a

20  class, I believe it was in -- called "Managing

21  Difficult Work Scenarios or Situations," so that would

22  have been in 2004.  Prior to that, education classes,

23  themselves, 2001, 2002, as well.

24      Q.    Based on your training, did you have an



1    A.   But not -- it was not stated, nor did I

2   interpret it, as a complaint regarding discrimination.

3    Q.   Who raised that, Mr. Ings' concerns to you?

4   Did Mr. Ings talk to you directly or was that through

5   Miss Ross?

6    A.   More than likely, with David Ings, not with

7   Bellverie Ross.  I do not recall having that

8   conversation with Bellverie at all.

9    Q.   Did you ever receive any complaints on behalf

10   of Bridget Williams that she believed she was being

11   treated differently because of her race or gender?

12    A.   No.

13    Q.   And during your time as executive vice

14   president of Desktop Computing, have you ever received

15   any complaints of discrimination or harassment for any

16   -- on any basis?

17    A.   No.

18         MR. COOK:  Thank you for your time,

19   Mr. Micek.  I don't have any further questions.

20   Mr. Sandler may have some.

21         MR. SANDLER:  Just one.

22   BY MR. SHELDON:

23    Q.   You testified that when you had your one-on-one

24   with Justus Eapen in June of 2002 --

1    A.    Two.

2    Q.    --  he told you that he had been talking to

3    people from the technology area; is that right?

4    A.    In technology and the telecommunications area

5    of technology.

6    Q.    And did you attempt to persuade him not to

7    transfer from Desktop Computing?

8    A.    No.

9    Q.    Did he volunteer to you that he had decided on

10   his own not to transfer?

11   A.    Yes.

12              MR. SANDLER:  Nothing further.

13              MR. COOK:  Thank you.

14              (The deposition was concluded at 11:55

15   a.m.)

16                     - - - - -

17

18

19

20

21

22

23

24

Neela B. Chacko

1

```
 1          IN THE UNITED STATES DISTRICT COURT
 2            FOR THE DISTRICT OF DELAWARE
 3
 4
    EQUAL EMPLOYMENT OPPORTUNITY    )
 5  COMMISSION,                     )
                                    )    Civil Action No.
 6            Plaintiff,            )    04-CV-425-SLR
                                    )
 7  v.                              )
                                    )
 8  MBNA AMERICA BANK, N.A., a      )
    subsidiary of MBNA Corporation,)
 9                                  )
              Defendant.            )
10
                Deposition of NEELA B. CHACKO taken
11- pursuant to notice at the law offices of YOUNG CONAWAY
    STARGATT & TAYLOR, 1000 West Street, Wilmington,
12  Delaware, beginning at 1:05 p.m. on Wednesday, July
    20, 2005, before Renee A. Meyers, Registered
13  Professional Reporter and Notary Public.
14  APPEARANCES:
15            TERRENCE R. COOK, ESQ.
              U.S. EQUAL EMPLOYMENT OPPORTUNITY
16            COMMISSION
                 21 South Fifth Street
17               The Bourse, Suite 400
                 Philadelphia, Pennsylvania  19106-2515
18               for the Plaintiffs,
19            SHELDON N. SANDLER, ESQ.
              YOUNG CONAWAY STARGATT & TAYLOR
20               1000 West Street, 17th Floor
                 Wilmington, Delaware  19899
21               for the Defendant.
22  ALSO PRESENT:  Launice Sills, Esq.
23                 WILCOX & FETZER
       1330 King Street - Wilmington, Delaware 19801
24                 (302) 655-0477
```



C140



1    different division?

2    A.    Yeah.

3    Q.    Is that Distributed Systems?

4    A.    Yes.

5    Q.    What was Mr. Dell's position when he reported

6    to you in 2000?

7    A.    He was a Perimeter Security Network analyst,

8    and he was senior officer, I believe.

9    Q.    During your tenure at MBNA, have you had any

10   training on the issues of discrimination or

11   harassment?

12   A.    Yes, I did.

13   Q.    When was the last time you had that training?

14   A.    I cannot remember.

15   Q.    Has it been within the past year?

16   A.    I really cannot remember.

17   Q.    Do you recall on how many occasions you had

18   training on issues of discrimination or harassment

19   since you have been employed by MBNA?

20   A.    At least three or four.

21   Q.    And do you have an understanding of what

22   harassment is as a result of your training?

23   A.    Yes, I do.

24   Q.    Can you tell me what that is?

1    A.    It's unreasonable behavior towards, targeted

2    towards, you know, anybody, you know, different origin

3    or gender or any of that stuff.  Any person, actually.

4    Q.    Do you have an understanding of what

5    discrimination is as being different from harassment?

6    A.    Yes, I do.

7    Q.    And what's your definition of discrimination?

8    A.    Discrimination is separating somebody from --

9    or treating somebody separate, differently than others

10   because of their race, origin, gender.

11   Q.    When did you first meet Justus Eapen?

12   A.    When I joined MBNA in 2000.

13   Q.    How was your relationship with Mr. Eapen?

14   A.    Very good.

15   Q.    Did Mr. Eapen ever share with you concerns he

16   had or problems he had while employed at MBNA?

17   A.    Not -- not officially and not while he was

18   working for me.

19   Q.    When you say "not officially," what do you

20   mean?

21   A.    It would be like, I think right before he left

22   the company or he was terminated or whatever -- I had

23   no clue what happened at that time -- if I would see

24   him in the hallway, you know, How are you doing?  And

12

1    he would say, Oh, I am not doing that well; things

2    aren't that great, that kind of answer.  I didn't

3    probe beyond that too much.

4        Q.    So, during the time period, the three-month

5    time period in 2000, which he reported to you, he made

6    no complaints of discrimination or harassment to you?

7        A.    No.

8        Q.    When he did complain to you later on in his

9    employment, did he complain to you about issues of

10   race or national origin discrimination or harassment?

11       A.    No.  I remember one incident where he

12   complained about his -- he was on vacation and he came

13   back and his monitor was gone.  And I did report that

14   to my manager.

15       Q.    Did he tell you who took the monitor?

16       A.    No.

17       Q.    Any other incidents that Mr. Eapen complained

18   to you about officially or unofficially?

19       A.    I don't remember -- if it comes, I will let you

20   know.

21       Q.    Once that three-month period in 2000 was over

22   and you no longer supervised Mr. Eapen, how frequently

23   would you see Mr. Eapen on an average week?

24       A.    He worked nights, so once in two weeks or maybe

Neela B. Chacko

14

1    of passwords amongst employees within the context of

2    the testing environment?

3    A.    Not on personal accounts.

4    Q.    My understanding is that there were personal

5    accounts, there were service accounts, and then there

6    were administrator accounts; is that correct?

7    A.    Yes.

8    Q.    Were there any other accounts that you know of

9    that would have passwords?

10   A.    No.

11   Q.    So you don't know of any instance where

12   individuals shared personal passwords.

13             Are you aware of any instance where

14   employees would share service account passwords in the

15   testing environment?

16   A.    No.

17   Q.    Are you aware of any situation in which

18   employees would share administrator account passwords

19   within the testing environment?

20   A.    Not -- no, not in the testing environment.

21   Q.    Are you aware of any instance where employees

22   exchanged passwords in the production environment,

23   personal passwords?

24   A.    No.



Neela B. Chacko

15

1   Q.   Are you aware of any situation where employees

2   shared service passwords within the production

3   environment?

4   A.   No.

5   Q.   What about administrator account passwords

6   within the production environment?

7   A.   The only instance I have come across is a

8   desktop, like when you put in new desktops, new

9   account -- computers on a desk, I was given a password

10  when I was taking a lap top home for my bank -- for my

11  office use, that if I had any problems or if I had to

12  change something, I was given the password of the

13  administrator account to -- if I need to service that,

14  if I need to do anything with the computer.

15  Q.   Other than what you have just testified to, are

16  you aware of any situation in which employees have

17  exchanged passwords for any reason?

18  A.   No.

19  Q.   Did anybody ever report to you that, at any

20  time during your employment at MBNA, that someone had

21  requested a password from them?

22  A.   No.

23  Q.   Going back to your conversations with Mr. Eapen

24  about problems he may have had at MBNA, did he ever

Neela B. Chacko

16

1   share with you any problems he was having with James

2   Dell?

3       A.    Only in the hallway conversations I have had

4   towards the end.

5       Q.    Do you recall the nature of the problems that

6   Mr. Eapen may have had with Mr. Dell?

7       A.    He seemed to feel that Mr. Dell was picking on

8   him.

9       Q.    Did he tell you why he believed Mr. Dell was

10  picking on him?

11      A.    He mentioned that he wasn't being included in

12  the meetings and he wasn't getting any work, there was

13  no work there for him at night.  Things of that

14  nature.  He was bored at night.

15      Q.    Did Mr. Eapen ever tell you that he believed

16  that Mr. Dell was picking on him based on his race or

17  national origin?

18      A.    No.  He didn't mention that.

19      Q.    Did Mr. Eapen ever relay to you that other

20  members of Desktop Computing would call him derogatory

21  names based on his race or national origin?

22      A.    No.

23      Q.    Did Mr. Eapen ever tell you that employees

24  would call him Osama bin Laden or Osama bin Laden's

17

 1 | brother?

 2 |  A.    No.

 3 |  Q.    Or OBL?

 4 |  A.    No.  I never heard that.

 5 |  Q.    Did you ever hear Mr. Eapen -- or did Mr. Eapen

 6 | ever tell you that he was referred to as Sadam

 7 | Hussein?

 8 |  A.    No.

 9 |  Q.    Or Sadam Hussein's brother?

10 |  A.    No.

11 |  Q.    Did Mr. Eapen ever tell you that he was

12 | referred to as a sand nigger?

13 |  A.    No.

14 |  Q.    Did Mr. Eapen ever tell you he was referred to

15 | as a nigger?

16 |  A.    No.

17 |  Q.    Did Mr. Eapen ever tell you he was referred to

18 | as BP, for brown people?

19 |  A.    No.

20 |  Q.    Have you ever --

21 |  A.    I have heard those terms around, like -- not

22 | being called, but, you know, in conversation with

23 | other people, I might have -- what is BP?  Brown

24 | people.  But I have never heard anybody calling

1    anybody else or anybody complaining that they have

2    been called that.

3    Q.   So, you have heard the comment or the phrase

4    "BP," but you didn't understand that it meant brown

5    people?

6    A.   No.  I think somebody came in and asked, one of

7    the Indians somewhere, I can't recall exactly where,

8    and said, you know, Have you heard, like, they call

9    brown people BP sometimes?  And I said, "No, I haven't

10   heard that."

11   Q.   Do you recall who told you that?

12   A.   No, I cannot.  It might have been Justus.  I

13   don't know.  It may have been Justus.  I can't

14   remember.

15   Q.   So another employee told you about the BP

16   comment.

17              Have you personally heard --

18              MR. SANDLER:  Objection to that

19   characterization.  She didn't say it was an employee.

20   BY MR. COOK:

21   Q.   The person who told you, was it somebody off

22   the street?

23   A.   I cannot recall who told me, but I remember

24   that conversation that:  Did you know that there was a

Neela B. Chacko

1    term called brown people and sometimes it's referred

2    to as BP?  And I said, "Yes."  I cannot remember where

3    it came from.

4    Q.    And do you have a recollection of the person

5    that told you that, whether they were an MBNA employee

6    or not?

7    A.    I cannot remember.

8    Q.    Besides hearing this BP comment from somebody,

9    have you ever heard it yourself within the workplace

10   at MBNA?

11   A.    No, I have not.

12   Q.    Did Mr. Eapen ever complain to you or tell you

13   that employees referred to him as a dot head?

14   A.    No.

15   Q.    Have you ever heard any complaints about the

16   use of the term "rice" or "rice bowl" directed towards

17   a Korean employee?

18   A.    No.

19   Q.    Did Sung Byun ever make any complaints to you

20   about people calling him rice or rice bowl?

21   A.    No.

22   Q.    Have you ever heard of the operations section

23   of Desktop Computing referred to as the ghetto?

24   A.    Ghetto?  I -- I think I have heard it

1    mentioned, like, for example, Rich Wresneski or Glen

2    or somebody will, you know, come to see us and then

3    say, "Okay, I am going to go back to my desk in the

4    ghetto," or something like that, they mentioned.

5    Q.    You said Rich or who --

6    A.    One of those guys who sit -- all of them would

7    sit there, like Rich Wresneski.  I can't remember who

8    said it, but I think they would like, as a joke,

9    mention, Okay, you guys have bigger cubes, we have

10   smaller cubes, so we are going to go back and sit in

11   our little cubes, and they call it the ghetto area.

12   Q.    Have you heard that phrase more than one time?

13   A.    I cannot recall.

14   Q.    Have you heard of the term or section of

15   Desktop Computing referred to as the A team or the W

16   team, the "A team" for Asian team and "W team" for

17   white team?

18   A.    No.

19   Q.    And are you aware of an incident in which a

20   mail room clerk was advised that Mr. Eapen was Osama

21   bin Laden's brother and then the mail room clerk

22   attempted to attack Mr. Eapen?

23   A.    I only read it in the newspaper.  That was the

24   first I heard of it.

1    decision-making processes, and, you know, I mentioned

2    a person's name.  And I said, you know, there was a

3    problem in the application that I support and I wasn't

4    included in resolving that.  So, that's what I

5    mentioned to her.

6      Q.    And did you tell Miss Ross that you thought the

7    reason you were being undermined and your work

8    overlooked was because of your national origin?

9      A.    I don't recall saying that.  I said I don't

10   know what the reason is, but I feel I am, you know, I

11   am not being included and being overlooked.

12     Q.    And who was the individual that you thought

13   undermined your authority?

14     A.    Chad Yates.

15     Q.    And did you also complain to Miss Ross or

16   anyone else that Chad Yates -- did you also complain

17   to Thomas Thomaides that you thought that Mr. Yates

18   was undermining your authority?

19     A.    Yes, I did.

20     Q.    Did you tell Mr. Thomaides that you thought he

21   was undermining your authority because of your

22   national origin?

23     A.    No, I did not.

24     Q.    And, at some point in time, did you report to



Neela B. Chacko

29

1    A.    No, I did not hear that.

2    Q.    And did you tell the EEOC investigator that you

3    saw employees being teased by Glen Ford?

4    A.    Yes, I have.

5    Q.    And did you also tell the EEOC investigator

6    that you saw employees being teased by John Hartnett?

7    A.    Yes.

8    Q.    Do you recall what type of teasing you

9    witnessed from Glen Ford?

10   A.    It was -- it was just joking around.  Nothing

11   racial.  Nothing -- no profanity, just laughing and a

12   lot of kidding around.  Sometimes I won't even hear

13   what it is, but I would hear Glen say something,

14   everybody laughing, and I don't exactly know what,

15   exactly, the content of the details were, and nobody

16   complained to me, so I couldn't bring it up.

17   Q.    Well, what about John Hartnett, did you witness

18   him teasing employees and what did you see?

19   A.    No.  The same thing.  Just sort of laughing

20   or -- you know, like just -- I mean, he would be just

21   in somebody's cube and he would say something and

22   everybody would start laughing and he would walk away.

23   Q.    Now, have you always been an officer of MBNA

24   since you started in 2000?

W&F
C152

30

1    A.    Yes.

2    Q.    As a manager, was it your understanding that

3    you can only address issues of harassment or

4    discrimination if someone complained about it to you?

5    A.    No.    If I saw something that constituted

6    harassment, I am supposed to report it.

7    Q.    So, with respect to the teasing that you saw by

8    Glen Ford and John Hartnett, you did not believe that

9    to be racially based or based on someone's national

10   origin; is that correct?

11   A.    Right.

12   Q.    And did you also hear of teasing to Sung Byun

13   because he lives with his mother?

14   A.    Yes, I did.

15   Q.    Did you ever express to anyone at MBNA you

16   thought you were being treated differently because of

17   your gender?

18   A.    I cannot remember if I did or not.

19   Q.    Do you recall if you told the EEOC investigator

20   that you had issues at MBNA because of your gender?

21   A.    No, I don't remember.

22   Q.    Do you remember Bridget Williams?

23   A.    Yes.

24   Q.    Did she ever report to you in any function?



C153

1    A.   No.

2    Q.   Did she ever complain to you about race or sex

3    discrimination within MBNA?

4    A.   No.

5    Q.   Now, do you know Justus Eapen's wife?

6    A.   Yes, I do.

7    Q.   Tracy Eapen?

8    A.   Yes, I do.

9    Q.   Now, were you aware if Justus Eapen had an

10   outside business while he was employed at MBNA?

11   A.   No.  Because it was -- I knew he had a

12   business, but it was -- I knew it as his wife's

13   business.

14   Q.   And what type of business was that?

15   A.   Mortgage.  She used to be a mortgage broker.

16   Q.   How did you first meet Miss Eapen?

17   A.   I invited my team to my wedding in 2000,

18   November, and that's how I met all the spouses.

19   Q.   And that was in November of --

20   A.   2000.

21   Q.   And that was a non-MBNA related event?

22   A.   Yes.

23   Q.   And when was the next time you met Miss Eapen?

24   A.   I think I met her next at the corn boil, the

1    Justus, "I am talking with Tracy," and he replied, "I

2    don't get involved, it's her business"; do you recall

3    telling them that?

4      A.    I cannot recall.  It was a while ago.

5      Q.    And, to your knowledge, has Mr. Eapen ever

6    assisted anybody else at MBNA or anybody at MBNA in

7    obtaining a mortgage?

8      A.    Not to my knowledge.

9      Q.    To your knowledge, had you aware if Mr. Eapen

10   ever assisted anyone in refinancing their mortgage

11   while he was employed at MBNA?

12     A.    No.

13     Q.    Did any employee ever complain to you that

14   Mr. Eapen was soliciting business from them?

15     A.    No.

16     Q.    Have you ever received a complaint, while you

17   have been employed at MBNA, concerning the language or

18   any racially -- racial or national origin comment made

19   by Richard Wresneski?

20     A.    There was one letter from Sa'eed Abuwi -- I

21   believe his name was Sa'eed Abuwi -- a letter that was

22   sent to me and Bellverie and a couple of other people

23   about some comment that Rich Wresneski had said.  I

24   didn't quite -- I don't quite recall what exactly it

Neela B. Chacko

36

1   said.

2    Q.   At the time that letter was sent to you, were

3   you Mr. Wresneski's manager or supervisor?

4    A.   Yes, I was.

5    Q.   And did you address that issue with

6   Mr. Wresneski?

7    A.   Yeah.  I was -- I had a meeting with my

8   manager, Bellverie Ross, who was also included in

9   that, and she asked me to not proceed -- not do

10   anything with it.  She said she was going to take care

11   of it.

12   Q.   To your knowledge, did Miss Ross speak with

13   Mr. Wresneski concerning the contents of Mr. Abuwi's

14   e-mail?

15   A.   I do not know because she didn't share that

16   with me.

17   Q.   And do you recall anything about the nature of

18   the comment Mr. Wresneski made that Mr. Abuwi

19   complained about?

20   A.   Not really.  It was something about a panther

21   or something.  I don't know.  Some group.  I am not --

22   I wasn't familiar with the context.  Some movie or

23   something, which I hadn't seen, so I don't know.

24   Q.   Besides the letter from Mr. Abuwi, are you

Neela B. Chacko

1   aware of any other complaints made against Richard

2   Wresneski while you have been employed at MBNA?

3   A.   No.

4   Q.   Complaints based on racial or national origin

5   discrimination or harassment?

6   A.   No.

7   Q.   Are you aware of any complaints made against

8   Glen Ford based on race or national origin harassment?

9   A.   No.

10   Q.   Are you aware of any complaints against John

11   Hartnett?

12   A.   No.

13   Q.   Did you know Richard Wagner?

14   A.   Yes.

15   Q.   Are you aware of any complaints made against

16   Richard Wagner based on race or national origin

17   discrimination?

18   A.   No.

19   Q.   Do you know Thomas Liddle?

20   A.   Yes.

21   Q.   Are you aware of any complaints of

22   discrimination or harassment based on race or national

23   origin made against Thomas Liddle during your

24   employment at MBNA?

40

1    Q.   What was your officer position at that time?

2    A.   Vice president.

3    Q.   And what was the reason you were given the --

4    A.   The password?

5    Q.   -- password?

6    A.   In case I needed to install some software,

7    there was some problem, I needed -- or I needed to add

8    a -- I guess to do administrative kind of functions.

9    Q.   Do you still work at the Christiana campus?

10   A.   Yes.

11   Q.   Can you give me just a rough percentage, and I

12   understand that this is just a rough percentage, of

13   the number of Indian employees that work at the

14   Christiana campus?

15   A.   Probably point zero some percent, point zero.

16   Q.   Point zero?

17   A.   I would say there were -- in all of Christiana

18   campus?

19   Q.   Yes.  Yes.

20   A.   I am sorry.  I was just thinking of Christiana

21   Four.

22   Q.   No.

23   A.   In all four places, it's a high percent where I

24   am right now, which is Christiana One and Two.   I



C158

1   don't know, maybe, right now, it's about 25 percent, I

2   would say, is Indian.

3      Q.   On the whole campus?

4      A.   Yeah.

5      Q.   Early in your career at MBNA, when you were

6   reporting or working for Bellverie Ross, was there an

7   incident in which she accused you of falsifying your

8   employment application?

9      A.   Yes.

10     Q.   And was the accusation that you represented

11  that you had some experience that, supposedly, you

12  didn't have?

13     A.   Yes.

14     Q.   And I understand -- I am not getting into

15  whether that was right or wrong, but that's what she

16  said?

17     A.   Yes.

18     Q.   Did that accusation damage your reputation

19  within the community in which you worked, do you

20  think?

21     A.   I cannot speculate on that.  But I would think

22  that when it came out, people would have started

23  talking about that.

24     Q.   And were you personally hurt by that?

```
 1              IN THE UNITED STATES DISTRICT COURT
 2                 FOR THE DISTRICT OF DELAWARE
 3
 4
    EQUAL EMPLOYMENT OPPORTUNITY     )
 5  COMMISSION,                      )
                                     )    Civil Action No.
 6              Plaintiff,           )    04-CV-425-SLR
                                     )
 7  v.                               )
                                     )
 8  MBNA AMERICA BANK, N.A., a       )
    subsidiary of MBNA Corporation,)
 9                                   )
                Defendant.           )
10
11              Deposition of ERNESTO E. MARRA taken
    pursuant to notice at the law offices of YOUNG CONAWAY
12  STARGATT & TAYLOR, 1000 West Street, Wilmington,
    Delaware, beginning at 9:00 a.m. on Thursday, July 21,
13  2005, before Renee A. Meyers, Registered Professional
    Reporter and Notary Public.
14  APPEARANCES:
15              TERRENCE R. COOK, ESQ.
                U.S. EQUAL EMPLOYMENT OPPORTUNITY
16              COMMISSION
                  21 South Fifth Street
17                The Bourse, Suite 400
                  Philadelphia, Pennsylvania  19106-2515
18                for the Plaintiffs,
19              SHELDON N. SANDLER, ESQ.
                YOUNG CONAWAY STARGATT & TAYLOR
20                1000 West Street, 17th Floor
                  Wilmington, Delaware  19899
21                for the Defendant.
22  ALSO PRESENT:  Launice Sills, Esq.
23                     WILCOX & FETZER
       1330 King Street - Wilmington, Delaware 19801
24                    (302) 655-0477
```



W&F
C160



1     A.    No.    They were only on a very informal basis.

2   I wanted the people to feel comfortable expressing

3   their opinions.

4     Q.    You said you took notes when action was

5   required.

6              What type of action required you to take

7   notes?

8     A.    For example, if we wanted to look at a process

9   to see if we could improve on it, then different

10  people would take different aspects of the process to

11  look at it, to study it.

12    Q.    Anything else you recall taking notes on?

13    A.    Not anything specific in detail.

14    Q.    Were any Personnel problems brought up during

15  the group sessions, round tables?

16    A.    Only in general terms.  Not in any specific

17  environment down to the individual.  If there were

18  anything at the group level, so to speak.

19    Q.    During these group meetings, did anyone ever

20  raise a concern of issues of discrimination or

21  harassment?

22    A.    No.

23    Q.    Would that be the type of issue that would

24  warrant a note if it was raised in that forum?

```
 1    A.    Correct.  Yes.

 2    Q.    Did Mr. Micek attend these group meetings?

 3    A.    Not all of them.  He did attend some of them.

 4    Q.    You also mentioned that you had one-on-one

 5  meetings as well?

 6    A.    Correct.

 7    Q.    And did you have one-on-ones with Justus Eapen?

 8    A.    Yes.

 9    Q.    And did you have one-on-ones with all the staff

10  underneath your supervision?

11    A.    My direct reports, we had one-on-ones on a

12  weekly basis.

13    Q.    And did you also have one-on-ones with the

14  people that reported to your direct reports?

15    A.    Yes, but not an a weekly basis.

16    Q.    How many one-on-ones do you recall having with

17  Justus Eapen?

18    A.    I will probably say, because of his schedule,

19  we both made other arrangements, I would probably say

20  three to four, somewhere around there, that number.

21    Q.    And would you take notes during these

22  one-on-one meetings you had with Mr. Eapen?

23    A.    Only if there was action that was required.  I

24  wanted the one-on-ones to be an open forum to acquire
```

1    complaints to you concerning Jim Dell?

2    A.    Not that I recall.

3    Q.    From August, 2002, to January, '03, did

4    Mr. Eapen make any complaints to you about working on

5    the night shift?

6    A.    No.  He liked working the night shift.

7    Q.    Did Mr. Eapen ever share with you that he felt

8    isolated working on the night shift?

9    A.    He shared that he would like if there were

10   other people working night shift with him.

11   Q.    Did he use the word "isolated" or that he felt

12   alone or anything like that, that you recall?

13   A.    I am not sure that he used the word "isolated."

14   I would seem to remember that he did talk, at times,

15   he was -- he had a feeling of being alone on the floor

16   all by himself with no one else occupying the cubes.

17   Q.    Between August of '02 and January of '03, did

18   Mr. Eapen relate to you that he did not have enough

19   work to do while on the night shift?

20   A.    He related to me that he did not feel that he

21   was challenged enough with his work.

22   Q.    And do you know what he meant when he said he

23   was not challenged?

24   A.    There was a lot of work to do, but it was



1  routine type work.

2    Q.   Did Mr. Eapen relate to you that the work he

3  was supposed to do only took a few minutes and he sat

4  around bored for the rest of the night?

5    A.   No.   There was a lot of work to do.  He was

6  responsible for a very critical aspect of our

7  operations -- Server Operations Team.

8    Q.   And between August of '02, and January of '03,

9  did Mr. Eapen complain to you that other employees

10  were using derogatory comments toward him based on his

11  race or national origin?

12    A.   No, sir.

13    Q.   Between August of '02, and January of '03, did

14  any employee complain to you about the language being

15  used amongst the employees in Desktop Computing?

16    A.   I had one incident of one individual -- I

17  cannot recall exactly the situation -- where, without

18  names, there were some jokes or a joke, at least a

19  joke that was said of a questionable nature, and this

20  was immediately addressed because MBNA has zero

21  tolerance.  So we immediately addressed it to the

22  entire group.

23             I have no clue who actually was involved

24  because the individual did not -- but in order to put

1  Justus and explain the gravity of what had happened,
2  the violations that they had committed, and then go
3  from there in terms of the explanation to both of
4  them.
5  Q.    And did you meet with Mr. Campbell or Mr. Eapen
6  on that day?
7  A.    With -- I believe I met with Jason first
8  because he was on the evening shift.
9  Q.    And this was a one-on-one?
10 A.    Yes.
11 Q.    And what did Mr. Campbell tell you about the
12 incident?
13 A.    I initiated the conversation explaining to him
14 the MBNA policy about password sharing, the possible
15 consequences.  He was extremely apologetic.  He
16 immediately acknowledged that he realized that what he
17 had done was wrong, that it was a lapse in judgment on
18 his part, and on multiple occasions, multiple times,
19 assured me that it would never happen again.
20            (EEOC Exhibit No. 7 entitled "MBNA America
21 Information Security Guidelines" was marked for
22 identification.)
23 BY MR. COOK:
24 Q.    Mr. Marra, you have been handed a copy of

1  Justus was on night shift, so I requested that I come

2  in early and that he would meet me in my office.

3     Q.    And this was a one-on-one?

4     A.    Yes.

5     Q.    And what did you discuss with Mr. Eapen?

6     A.    The -- I had, basically, the same conversation

7  with him that I had with Jason.  The reaction was

8  different.

9     Q.    You spoke about the consequences of his

10  conduct?

11    A.    We spoke about consequences, we spoke about the

12  policy, and what had transpired.

13    Q.    Now, you said his response was different.  How

14  so?

15    A.    In his words, the policy was stupid; that he

16  had not committed anything that was, in his mind,

17  questionable; that because he was in a DMZ test lab,

18  he could not do any damage; therefore, the policy

19  should not apply.

20    Q.    What else do you recall Mr. Eapen telling you

21  about his thoughts about the policy or his violation

22  of the policy?

23    A.    The biggest thing that I remember from the

24  conversation was his position that he felt that, since

1   the policy really wasn't a good policy, that he did

2   not feel that he had done anything wrong.  He

3   emphasized that on multiple occasions during our

4   conversations.

5      Q.    Now, this took place in a DMZ test lab;

6   correct?

7      A.    Correct.

8      Q.    This was part of the Desktop Computing testing

9   environment?

10     A.    Actually, part of the PSN, Perimeter Security

11  Network.  It's a very critical way we protect our

12  customers' information.

13     Q.    And within PSN, is there both a testing

14  environment and production environment?

15     A.    Yes.

16     Q.    And this violation occurred in the testing

17  environment?

18     A.    Yes.

19     Q.    And what would be the potential harm to MBNA of

20  sharing a password within the testing environment?

21     A.    In technical terms, although it was a test

22  environment, it has the same potential as a production

23  environment if whatever change was made in the test

24  environment is promulgated to the production

1    A.    Between an hour and an hour and a half.

2    Q.    And during this meeting, did Mr. Eapen share

3  with you that he thought Jim Dell had set him up for

4  this password sharing incident?

5    A.    Not in this particular one-on-one.

6    Q.    Did he share that with you on another occasion?

7    A.    Yeah.

8    Q.    During this particular one-on-one, did

9  Mr. Eapen share with you his belief that he had been

10 discriminated against or harassed while employed at

11 MBNA at any point in time?

12   A.    No, not in this particular one-on-one.  This

13 one-on-one was, basically, we discussed, at great

14 length, the incident, and his reaction to the

15 incident, itself.

16   Q.    And did you also advise Mr. Eapen, during that

17 meeting, the consequences of his conduct in terms of

18 possible discipline?

19   A.    I advised the same things with him that I did

20 with Jason Campbell.

21   Q.    After you met with Mr. Dell, Mr. Campbell, and

22 Mr. Eapen, what was the next thing you did with

23 respect to the password sharing incident?

24   A.    The next meeting I had was with Jim Micek when

53

1    Q.    Did you advise Mr. Eapen to admit that he was

2    wrong to Personnel?

3    A.    No.  I told him to relay the truth and be

4    honest and not to hold any information back.

5    Q.    After January of '03, did you receive any

6    complaint from Justus Eapen regarding discrimination

7    or harassment based on his race or national origin?

8    A.    We had a meeting in the course of which he

9    indicated that he felt discriminated against.

10    Q.    Do you recall the time frame of the meeting you

11    had with Mr. Eapen in which he shared this

12    information?

13    A.    I can't give you the exact time frame, but it

14    was after all of this incident occurred and he wasn't

15    quite happy with the results of what the Personnel

16    action would be, that were being done, his meetings

17    with Personnel and so on and so forth.  He actually

18    asked me if I could see him for a couple minutes, and

19    the purpose of the meeting, as he put it, was to vent.

20    He didn't want anything -- just wanted to talk to me

21    to vent his feelings with someone, and I gave him that

22    opportunity.

23    Q.    Do you recall whether this meeting you had

24    where Mr. Eapen vented was in January of '03?

W&F
C169

1    A.    It was after the incident.

2    Q.    But you don't have a specific recollection of

3    whether -- was it in the month of January or February

4    or some other month?

5    A.    I seem to recall that it was probably more

6    towards, like, the end, last couple weeks in January.

7    Q.    And this was a one-on-one with Mr. Eapen?

8    A.    Yeah.   It was, again, one of those impromptu,

9    he had just got off his shift type deal, and he asked

10   me if I could see him for a couple minutes.

11   Q.    Now, he indicated to you that he felt

12   discriminated against.

13             Did he give you any --

14   A.    No details.

15   Q.    He gave you no details about what he believed

16   was -- how he was discriminated against, rather?

17   A.    Correct.   It was just a general statement.   And

18   when I informed him the MBNA policy was zero tolerance

19   and if he felt that people discriminated against him,

20   to inform us of this, identify the individual so they

21   would do something about it, he said he was not

22   interested in that, he was just there to vent.   So, he

23   provided no details.

24   Q.    And did he tell you that he felt discriminated

1  against based on his race or national origin?

2  A.    No.

3  Q.    He just used the term "discriminated against"?

4  A.    Correct.

5  Q.    Did you ask him for any examples for how he

6  felt he was discriminated against?

7  A.    Multiple occasions during the meeting, I

8  attempted to get him to commit to a specific event,

9  specific name, something that I could exercise a

10 policy and bring that policy against, and he did not

11 provide not a name, not an event, not anything that

12 was specific enough.  He just said he wanted to vent

13 and that he felt frustrated.

14 Q.    What did he express frustration with?

15 A.    Nothing specific.

16 Q.    Did he express frustration concerning the lack

17 of assignments he was getting during the night shift?

18 A.    No.

19 Q.    Did he express any frustration about

20 communication issues that he had with Mr. Dell?

21 A.    In this particular meeting, yes.

22 Q.    Did he express frustration during this meeting

23 about feeling isolated because he worked the night

24 shift?

1    A.    No.

2    Q.    Did he express frustration during this meeting

3    that he believed Jim Dell was trying to get him fired?

4    A.    No.

5    Q.    Did he express concern at this meeting

6    regarding any comments that employees, derogatory

7    comments employees were calling him based on his race

8    or national origin?

9    A.    No.

10   Q.    That was a no?

11   A.    That's correct.

12   Q.    Now, he did discuss communication issues with

13   you or problems he was having with communicating with

14   Mr. Dell?

15   A.    No.  His statement was only that he felt that

16   communication was not optimal.

17   Q.    Communication with whom?

18   A.    With Jim Dell.

19   Q.    Did he give you any examples?

20   A.    No.

21   Q.    Did Mr. Eapen relate to you his belief that Jim

22   Dell did not respond to his e-mails?

23   A.    No.

24   Q.    Did Mr. Eapen relate to you his belief that

1    on the verge of tears or anything, that you observed?

2    A.    I would characterize it as that, yes.

3    Q.    And was there anything else discussed in this

4    meeting that you haven't already told me about that

5    you can recall?

6    A.    The only thing that stuck in my mind was that,

7    at the end of the meeting, when we were done, he shook

8    my hand, he told me that he really appreciated the

9    opportunity to vent, and that he really appreciated

10   the fact that there was a sense of privacy that we

11   had, that what he told me would not leave my office.

12              He indicated he enjoyed working for the

13   team, that things had gotten better, and then he left.

14   Q.    Based on this venting session with Mr. Eapen,

15   do you believe he had raised a complaint of

16   discrimination or harassment?

17   A.    No.    I was -- again, I -- I was emphatic about

18   trying to find out more, and I told him, during the

19   meeting, that it was necessary for him to step up --

20   when he made those kind of statements, he needed to

21   provide me with all the information, and he said that

22   it was not that kind of a meeting.

23   Q.    But he did tell you he felt discriminated

24   against; he just didn't provide detail; correct?

1    A.    Correct.

2    Q.    Based on the fact that he told you he felt

3    discriminated against, did you have an obligation,

4    under MBNA's harassment policy, to elevate that

5    complaint to either your manager or to Personnel?

6    A.    In the environment that we have, I did, without

7    an external environment, because I didn't want to

8    break the bond of the trust that Justus and I had

9    established, that he could feel comfortable coming

10   into my office and talk to me about things, that I

11   would not break that trust.

12                I inquired about things throughout the

13   one-on-ones and throughout staff meetings to ascertain

14   whether there was a feeling, and there was no grounds,

15   no one came up and said, No, I think he is right or he

16   is wrong.  But, again, the meeting that he requested

17   was one of privacy, close the door, and what we say --

18   and, again, had he provided me with a formal complaint

19   or some sort of information, then it would have gone

20   forward.

21   Q.    So, you didn't relate to Mr. Micek anything

22   Mr. Eapen told you during this venting session; is

23   that correct?

24   A.    Correct.

1    Q.    Based on your knowledge of the harassment

2    policy at MBNA, can you tell me what constitutes a

3    formal complaint of discrimination or harassment?

4    A.    Anyone walks in the office and says, "I have an

5    issue; I feel that" -- at that point, it becomes

6    formal.  When Justus walked into my office, his first

7    statement was, "This is between you and I.  I do not

8    want this to go" -- and he went into the privacy

9    things.  So, it was our building a trust, working

10   relationship with each other.  And, again, he did not

11   provide anything but just the statement.

12   Q.    Based on your knowledge of the policy, is it

13   enough for a person to say that they were

14   discriminated against in order to invoke the

15   procedures under the policy?

16   A.    I need to answer the question in two parts.

17   Q.    Sure.

18   A.    If someone says, "I feel discriminated

19   against," then yes.  In the case with Justus, he

20   specifically stated that he did not want anything

21   other than to vent.

22           I asked him repeatedly to move this into

23   the other aspect, to make this something that I could

24   do something about.

1      Q.    Now, so, I take it from your testimony that

2    Mr. Eapen telling you he was discriminated against was

3    enough to trigger the procedures set forth in the MBNA

4    harassment policy, but you made the decision not to

5    invoke those procedures because Mr. Eapen asked you to

6    keep it confidential?

7      A.    I am not quite sure I --

8      Q.    We will go over it again.

9            The original question was:  Was

10   Mr. Eapen's complaint, that he was discriminated

11   against, a complaint of discrimination or harassment

12   under MBNA's policy, as you understood it?

13     A.    No.  Because the only thing that he stated to

14   me is, "I have been discriminated against," without

15   any details, without anything else to corroborate,

16   without anything that we could go about and

17   investigate.  There was no substance other than, "I

18   have been discriminated against."  So, there was

19   nothing for me, as a manager, to go out and say, Okay,

20   give me the details and I can do the initial stages of

21   the process and then go through the MBNA policy and

22   turn it over to the right people.  There was nothing

23   other than a statement that I think was made in

24   frustration.

1    Q.    And then you say it was made in frustration

2    based on what?

3    A.    I think that the emotional state that he was

4    in.

5    Q.    And what was that emotional state?

6    A.    Throughout the meeting, he was very emotional,

7    as I stated earlier.

8    Q.    So, I am correct that you did not view

9    Mr. Eapen telling you he felt discriminated against to

10   be a complaint of discrimination under MBNA's

11   harassment policy?

12   A.    In this context, correct.

13   Q.    And the context being that he did not provide

14   you details as to why he believed he was discriminated

15   against?

16   A.    That and the fact that he was very specific

17   about the meeting being one where he wanted me to

18   respect his privacy.

19   Q.    Are you familiar with the harassment policy at

20   MBNA, Mr. Marra?

21   A.    Yes.

22               MR. COOK:  Let's mark that.

23               (EEOC Exhibit No. 8 entitled "Personnel

24   Policy MBNA Corporation" was marked for



C177

64

1    A.    It does not state that.

2    Q.    And can you show me anywhere in the policy

3    where it says that the details of the discrimination

4    or harassment have to be shared in order for it to be

5    an adequate report of discrimination or harassment?

6    A.    You have to determine that it is harassment

7    first.

8    Q.    And that's a decision that the person receiving

9    the complaint has to make; is that what you are

10   telling me?

11   A.    I have reviewed this, and throughout the

12   meeting, this is what I referenced with Justus.

13   Q.    So, because you didn't believe it to be a

14   complaint of discrimination or harassment, that was

15   your decision to make underneath this policy; is that

16   what you are telling me?

17   A.    No.    I acted on the request that Justus made to

18   keep that confidential in our private meeting, that

19   there was not -- he did not come in to complain.

20   Q.    If Mr. Eapen had provided you detail of his --

21   why he believed he was discriminated against, would

22   that have changed your opinion as to whether or not

23   you needed to report that to someone higher than

24   yourself?

65

1      A.    If he felt that he had been discriminated

2  against and provided the details of what had

3  transpired, then yes, and there would have been a

4  complaint more so than just venting.

5      Q.    So, if Mr. Eapen comes to you and says, "The

6  employees in my section call me Osama bin Laden, they

7  call me dot head or sand nigger, but I am just

8  venting, I don't want you to tell anybody," would you

9  have an obligation, under the policy, to report that

10  to someone higher than yourself?

11      A.    Yes.

12      Q.    So, am I correct that it's not so much that

13  Mr. Eapen asked you to keep your meeting private, that

14  you did not report this to someone higher than

15  yourself, it's because you did not believe this to be

16  a complaint of discrimination?

17      A.    Incorrect.  It's not --

18      Q.    So why didn't you --

19              MR. SANDLER:  Were you finished?

20              MR. COOK:  I believe he said it was

21  incorrect.

22              THE WITNESS:  Incorrect.

23              MR. SANDLER:  I thought you started to say

24  something else.

```
 1    BY MR. COOK:

 2      Q.   Did I cut you off?

 3      A.   No.   That's fine.

 4      Q.   I want the record to be clear.  I don't want to

 5    cut you off if you wanted more to add.

 6               Tell me again why you didn't elevate

 7    Mr. Eapen's telling you that he felt discriminated

 8    against to Mr. Micek or personnel or another level?

 9      A.   Combination of three factors.  Factor No. 1,

10    when we initiated the meeting, he asked that this

11    meeting, it was a venting, it was a -- based on our

12    trust that we had developed during our working

13    relationship that he felt, and that it was just a

14    venting.  Two, that he did not want any action taken

15    based on the fact it was something we should keep

16    between us so that he could vent, feel free to vent.

17    Three, when he identified the fact, he made the

18    statement that he felt discriminated, it was just a

19    statement.  He did not want to get into anything else.

20    So, it was a combination of all these factors.

21               Had he come in on a normal day and said,

22    "I'd like to talk to you for a second; I feel

23    discriminated against," then I would go to the next

24    stage.
```

1    Q.    The policy and the reporting procedure doesn't

2    state anywhere that if the employee is simply venting,

3    as opposed to making a complaint of harassment or

4    discrimination, that you don't have to report it, does

5    it?

6    A.    It does not address that.

7    Q.    Did you view your actions of not elevating this

8    to Mr. Micek or Personnel or anybody else to be

9    violative of the harassment policy at MBNA?

10   A.    No.

11   Q.    You were a manager at that time; correct?

12   A.    Yes.

13   Q.    And in the first paragraph, it says, "Managers

14   are expected to immediately notify Personnel of any

15   harassment complaint"; correct?

16   A.    Correct.

17   Q.    You didn't do that; correct?

18   A.    Which paragraph are you referring to, sir?

19   Q.    I am in numbered paragraph D, it's the first

20   paragraph under D, the last sentence, "Managers are

21   expected to immediately notify Personnel of any

22   harassment complaints"?

23   A.    He did not file a complaint, sir.  He did not

24   file a complaint.

68

1    Q.    How do you file a complaint at MBNA?

2    A.    We just -- just described it.  If you come into

3    the office and say, "I have a complaint; I have been

4    discriminated against," and you don't want to give me

5    all the details, I will act on your complaint alone.

6    Q.    Even if there are no details provided; right?

7    A.    Correct.  This was never stated as a complaint.

8    The policy is very clear about that portion.

9    Q.    Does the person have to say, "I am complaining

10   about discrimination or harassment," versus, "I am

11   just venting about discrimination or harassment," for

12   it to be considered as a complaint, as you understand

13   it?

14   A.    I need to understand exactly what it is you are

15   asking because I think we are mixed into two

16   environments.

17   Q.    Well, what I want to know was you said

18   Mr. Eapen did not make a complaint of discrimination

19   under the policy; is that correct?

20   A.    Correct.

21   Q.    And the reason he didn't make a complaint,

22   under the policy, is because he said he was just

23   venting; correct?

24   A.    No.  He stated -- he also stated he was not

**W&R**
**C182**

1  making a complaint.  I asked him, during our meeting,

2  I covered the importance that MBNA places on

3  preventing harassment at work at all levels.  That's

4  why I tried to ask him more details.  He did -- he

5  stated it was not a complaint, that he was just

6  venting.  It was very clear that he was not

7  complaining.

8   Q.   So, because he said it was not a complaint, you

9  did not feel an obligation to elevate this to

10 Mr. Micek, Personnel, or anybody else higher than

11 yourself?

12  A.   Because of that statement and because of the

13 fact that he had requested this be private, so, that's

14 why I indicated earlier that there is a combination,

15 more than just one factor.  I want to make sure that,

16 you know, in our discussion, I make myself very clear

17 about that particular aspect.

18  Q.   When Mr. Eapen told you he felt discriminated

19 against, did you take that seriously?

20  A.   Any -- anything that's to do with harassment,

21 we take very seriously.

22  Q.   Despite the request for confidentiality, you

23 understand you have an obligation, independent of what

24 the employee wants, to comply with MBNA's policies;

1   correct?

2   A.   Correct.

3   Q.   Such that if Mr. Eapen told you, "I feel

4   discriminated against; I am being excluded from

5   meetings because I am Indian, but please don't tell

6   anybody," you'd have an understanding that you would

7   have an obligation to report that anyway; correct?

8   A.   Correct.

9   Q.   If he said, "I am just venting and I don't view

10  this as a complaint, but you should know I am being

11  treated differently because I am Indian," would that

12  require you to report it to Personnel, Mr. Micek, or

13  someone else?

14  A.   Yes.

15       MR. SANDLER:   Objection to the form of the

16  question.   You can answer.

17       MR. COOK:   He's answered.   Thanks.

18  BY MR. COOK:

19  Q.   Did you review with Mr. Eapen, when he met with

20  you and he was venting, did you review the harassment

21  policy?

22  A.   Yes.

23  Q.   Did you have a copy of it present and did you

24  go over it with Mr. Eapen?

W&F
C184

84

1    investigator in connection with Mr. Eapen's charge of

2    discrimination?

3    A.    Yes, sir.

4    Q.    Do you recall when you met with that

5    investigator?

6    A.    Not the time, the exact time.

7    Q.    With respect to the password issue, do you

8    recall telling the EEOC investigator that you were

9    aware that others have committed this similar

10   violation but you weren't sure of their names?

11   A.    No.   I don't recall that statement, sir.

12   Q.    You don't recall telling the EEOC investigator

13   that others have violated or committed similar

14   violations to Mr. Eapen in the password sharing

15   incident?

16   A.    No, sir.   I don't recall that statement.

17   Q.    And you are aware that Mr. Eapen filed a charge

18   of discrimination in this case; correct?

19   A.    I was made aware, yes, sir.

20   Q.    Did you see a copy of the charge of

21   discrimination?

22   A.    No, sir.

23   Q.    How were you made aware that Mr. Eapen filed a

24   charge of discrimination with the EEOC?

1    said?

2    A.    I never made any such statement.

3    Q.    You said that, at the meeting, I guess the last

4    meeting you had with him, which was in the latter part

5    of January, he was emotional.

6          Did Mr. Eapen go out on disability leave

7    shortly after that?

8    A.    I believe that was the time when he stopped

9    coming to work, very shortly after that.

10   Q.    And from his demeanor at the meeting, did he

11   seem to have psychiatric problems at that time?

12          MR. COOK:  Objection to form.

13          MR. SANDLER:  You can answer.

14          THE WITNESS:  I thought that he -- he was

15   in the most emotional state that I had seen him, that

16   he had -- it was kind of he was trying to control his

17   emotions about some of the things he was talking

18   about.

19   BY MR. SANDLER:

20   Q.    Going back to some of the earlier testimony

21   about the password sharing and in which environment it

22   can take place, it was your testimony that the policy

23   prohibits sharing passwords in both the testing and

24   production environments; correct?

1    A.    The policy clearly states you cannot share your

2    password and I.D. at any time for any reason.

3    Q.    And even if the password is shared in the

4    context of a testing environment, the person who

5    obtains the password can use it in any environment;

6    correct?

7    A.    Right.  There are no variations between

8    passwords used in the test environment and passwords

9    used in the production environment, especially in this

10   case where the user I.D. and the password work

11   together.  Jason Campbell's personal I.D. was used.

12   Q.    So, if Mr. Eapen knew Jason Campbell's password

13   and he had obtained it in the context of a testing

14   environment situation, Mr. Eapen could still use that

15   password in the production environment; correct?

16   A.    Absolutely.

17   Q.    With regard to the card swiping, are there

18   locations at MBNA where the area where you swipe your

19   card is not necessarily connected with the door, so

20   that -- I mean, is it controlled manually in some

21   places by a security guard, for example?

22   A.    The facility that I am familiar with, there is

23   a guard and the bank swiper when you look in, into the

24   building, itself.  There are locations inside the