```
1              IN THE UNITED STATES DISTRICT COURT
2                 FOR THE DISTRICT OF DELAWARE
3
4
     EQUAL EMPLOYMENT OPPORTUNITY    )
5    COMMISSION,                     )
                                     )   Civil Action No.
6                   Plaintiff,       )   04-CV-425-SLR
                                     )
7    v.                              )
                                     )
8    MBNA AMERICA BANK, N.A., a      )
     subsidiary of MBNA Corporation,)
9                                    )
                    Defendant.       )
10
                    Deposition of RICHARD T. KILMON taken
11   pursuant to notice at the law offices of YOUNG CONAWAY
     STARGATT & TAYLOR, 1000 West Street, Wilmington,
12   Delaware, beginning at 12:35 p.m. on Thursday, July
     21, 2005, before Renee A. Meyers, Registered
13   Professional Reporter and Notary Public.
14   APPEARANCES:
15              TERRENCE R. COOK, ESQ.
                U.S. EQUAL EMPLOYMENT OPPORTUNITY
16              COMMISSION
                  21 South Fifth Street
17                The Bourse, Suite 400
                  Philadelphia, Pennsylvania  19106-2515
18                for the Plaintiffs,
19              SHELDON N. SANDLER, ESQ.
                YOUNG CONAWAY STARGATT & TAYLOR
20                1000 West Street, 17th Floor
                  Wilmington, Delaware  19899
21                for the Defendant.
22   ALSO PRESENT:  Launice Sills, Esq.
23                      WILCOX & FETZER
        1330 King Street - Wilmington, Delaware 19801
24                    (302) 655-0477
```



C188



Richard T. Kilmon

37

1    he, in fact, was involved with a personal business, if

2    he was involved with a mortgage business or a mortgage

3    brokerage business.  He said no, he was not.

4            I explained to him again the information

5    that we had, and then I asked him if he had ever

6    discussed mortgages with anybody that he worked with.

7    Initially, it was no, because he wasn't involved in

8    that.  And, at that point, that's when I brought up

9    the web site so he could see it.  I explained to him

10   that I had seen the web site also prior to doing that.

11   And then he said -- I asked him, "Is this your web

12   site?  Is this your address"?  There was an address on

13   there.  And he acknowledged that it was.

14           And then he made a comment similar to -- I

15   believe it was in regards to that I have a -- well, my

16   wife has a web site.  And, so, you know, at that

17   point, I just told him, Look, you know, here it is.

18   You know, if you are involved in it, let's talk about

19   it and let's get it cleared up.  Help me understand

20   about what your, you know, what your role is in it.

21   Q.    And what did Mr. Eapen tell you about his role

22   in the business?

23   A.    That he didn't have a role in the business,

24   that it was his wife's business, that she was a

38

1    mortgage broker.  And then he openly talked about he

2    saw the web site as -- he said he saw the web site as

3    something to generate leads and that he would go to

4    MBNA related social events with his wife and give out

5    business -- her business cards, for instance, at the

6    MBNA corn boil, which is held on MBNA property, to

7    foster her mortgage business, other social gatherings

8    with MBNA coworkers, and utilize that to help build

9    her business.

10   Q.    Did you have any discussion with Mr. Eapen

11   concerning the particular MBNA policy he may have

12   violated by engaging in an outside business?

13   A.    Yes, I did.

14   Q.    And did you ask Mr. Eapen if he was aware of

15   the policy?

16   A.    I don't know whether -- I don't recall whether

17   I did or not, sir.

18   Q.    Do you recall asking Mr. Eapen any hypothetical

19   questions regarding violations of that particular

20   policy?

21   A.    For instance?

22   Q.    For example, if, in fact, Mr. Eapen, you handed

23   out your wife's business card on MBNA property, would

24   you consider that a violation of this policy?  Did you

59

1   mortgage.

2          Is that violative of MBNA's conflict of

3   interest policy?

4   A.   No.

5   Q.   Now, she goes on further to tell you that she

6   first met Tracy at the MBNA company corn boil and that

7   Tracy gave her a business card in the event she ever

8   needed her services for mortgage shopping.

9          Was that conduct, by Tracy Eapen, in any

10  way violative of MBNA's policy on conflict of interest

11  as it relates to Mr. Eapen?

12  A.   Based upon that comment and what he told me the

13  purpose of giving those cards out to MBNA people to

14  generate leads for her at an MBNA company function, I

15  would say yes.

16  Q.   Did Miss Chacko tell you that she first met

17  Tracy Eapen at her wedding, at Miss Chacko's wedding?

18  A.   No.

19  Q.   She didn't mention that to you?

20  A.   I don't recall that.

21  Q.   Miss Chacko also stated that Mr. Eapen, Justus,

22  has told her of his web site, Eapen.Net, though she

23  never visited the site.

24          Do you see that?

108

1           At that point, we hadn't confirmed who

2    those peers were, but we had information indicating

3    that.  And then by his own admission, after that, he

4    opened up more and he talked about going to the corn

5    boils and using them to -- as a conduit, if you will,

6    for his wife's business.  He kept referring to it as

7    his wife's business, that it was she that had it, but

8    then he slipped up and he said it was his web site,

9    then he said, No, it was her web site.

10   Q.   And I recall you testifying before and saying

11   that, and I take it what you were saying was that he

12   first said -- he first referred to it as his web site

13   and then he said --

14   A.   No.  It was he said I had a web site, and then,

15   No, it's my wife's web site.

16   Q.   And that's a quote?

17   A.   Yeah, like that.

18   Q.   Let me ask you this:  Did you also -- I think

19   you said you also interviewed Jason Campbell; correct?

20   A.   I don't recall interviewing Jason, myself.  I

21   may have been present, but I just honestly don't have

22   a recollection of that.

23   Q.   Do you know or do you recall whether Jason

24   Campbell acted or reacted in the same way as Justus

1

```
 1            IN THE UNITED STATES DISTRICT COURT
 2              FOR THE DISTRICT OF DELAWARE
 3
 4
    EQUAL EMPLOYMENT OPPORTUNITY    )
 5  COMMISSION,                     )
                                    )        Civil Action No.
 6             Plaintiff,           )        04-CV-425-SLR
                                    )
 7  v.                              )
                                    )
 8  MBNA AMERICA BANK, N.A., a      )
    subsidiary of MBNA Corporation,)
 9                                  )
               Defendant.           )
10
11
```

Deposition of GLENN A. FORD taken pursuant to notice at the law offices of YOUNG CONAWAY STARGATT & TAYLOR, 1000 West Street, Wilmington, Delaware, beginning at 9:00 a.m. on Monday, August 1, 2005, before Renee A. Meyers, Registered Professional Reporter and Notary Public.

APPEARANCES:

                TERRENCE R. COOK, ESQ.
                U.S. EQUAL EMPLOYMENT OPPORTUNITY
                COMMISSION
                   21 South Fifth Street
                   The Bourse, Suite 400
                   Philadelphia, Pennsylvania  19106-2515
                   for the Plaintiffs,
                SHELDON N. SANDLER, ESQ.
                YOUNG CONAWAY STARGATT & TAYLOR
                   1000 West Street, 17th Floor
                   Wilmington, Delaware  19899
                   for the Defendant.

ALSO PRESENT:  Launice Sills, Esq.
                    WILCOX & FETZER
        1330 King Street - Wilmington, Delaware 19801
                    (302) 655-0477



C193



Glenn A. Ford

4

1   Q.   Have you ever been disciplined while you have

2   been employed by MBNA for any reason?

3   A.   No.

4   Q.   Have you had training from MBNA on issues of

5   harassment or discrimination?

6   A.   Yes.

7   Q.   When was the last time you had any training on

8   issues of harassment or discrimination while you were

9   employed at MBNA?

10  A.   I just went through a course actually the last

11  week of June, this year, which was a, what we call

12  officer development program, but in that class, it was

13  a five, actually, a four-day class.  They talked about

14  a lot of different issues, harassment being one that

15  we spent about half the day on.

16  Q.   Prior to this last week of June training you

17  just had, what was the last training you had before

18  that on issues of harassment or discrimination?

19  A.   I don't know the date.  I know I did take maybe

20  a one- or two-day class just on -- we call it -- the

21  names have changed.  I have taken many classes.  If I

22  had known, I could have brought my education profile,

23  but I know I have taken it, but I couldn't tell you

24  the dates.

1   A.    Janet Purnell.

2   Q.    And in 2000, when you reported to Chad Yates,

3   was this in the old building?

4   A.    Yes.  Yes, it was.

5   Q.    Was Mr. Yates seated in the area in which you

6   worked?

7   A.    Yeah.  He was -- he was probably about ten feet

8   away, maybe.

9   Q.    And was Miss Chacko seated in the area in which

10  you worked?

11  A.    Yes, she was.  She was probably a little

12  farther away.  She was probably about 30 or 40 feet

13  away, if you need that information, if that helps.

14  Q.    You said you never worked directly with

15  Mr. Eapen but you worked in the same section; correct?

16  A.    That's correct.

17  Q.    Do you know Mr. Eapen's national origin?

18  A.    I believe he is from India, and I say that

19  because he always used to talk about the town he was

20  from.  I am pretty sure it was India.

21  Q.    During your employment at MBNA, have you ever

22  heard of Mr. Eapen referred to as Osama bin Laden?

23  A.    Not to my knowledge.

24  Q.    So, your testimony is you have never heard



C195

1    anyone refer to Mr. Eapen as Osama bin Laden?

2    A.    Other than himself making jokes, I have never

3    heard of anyone calling him Osama bin Laden.

4    Q.    What do you mean by "himself making jokes"?

5    A.    Well, he would make jokes that he was Osama bin

6    Laden's either cousin or brother, and I don't remember

7    which one, because it didn't stand out as something

8    that was important, but he -- he made jokes about that

9    on multiple occasions.

10    Q.    You heard him make these jokes?

11    A.    Yes.

12    Q.    Did you consider them to be funny?

13    A.    No.  I don't think so.  I mean, not

14    necessarily.

15    Q.    Who was present when he made these jokes?

16    A.    I don't remember.

17    Q.    Anyone besides yourself?

18    A.    I would say yes because we were all together.

19    Justus and a whole bunch of us would be in the area.

20    I don't -- I can't tell you exactly who was there.

21    Q.    Can you give me the name of anyone that was in

22    that area that you think heard Mr. Eapen refer to

23    himself as Osama bin Laden's cousin or brother?

24    A.    John Hartnett, Rich Wresneski, Tom Liddle.  I

1    know all of us sat with him in the same general area.

2    Q.    In what context would Mr. Eapen refer to

3    himself as Osama bin Laden's cousin or brother?

4    A.    I don't recall that.

5    Q.    You don't recall anything about the context or

6    circumstances under which Mr. Eapen would refer to

7    himself as Osama bin Laden's cousin or brother?

8    A.    No.  It was a long time ago.

9    Q.    Have you ever heard Mr. Eapen referred to as

10   OBL, short for Osama bin Laden?

11   A.    I have not, no.

12   Q.    Have you ever heard Mr. Eapen referred to as

13   Osama bin Laden's brother besides --

14   A.    No, not besides him.

15   Q.    Have you ever heard Mr. Eapen referred to as BP

16   for brown people?

17   A.    Never.

18   Q.    Have you ever heard Mr. Eapen referred to as a

19   sand nigger?

20   A.    No.

21   Q.    Have you ever heard Mr. Eapen referred to as a

22   nigger?

23   A.    Absolutely not.

24   Q.    Have you ever heard Mr. Eapen referred to as

1   Sadam Hussein?

2   A.    No, not at all.

3   Q.    Or Sadam Hussein's brother?

4   A.    No.

5   Q.    Have you ever heard a section of the Desktop

6   Computing section referred to as the A team?

7   A.    No.

8   Q.    For Asian team?

9   A.    I have not heard that.

10  Q.    Or the W team for white team?

11  A.    No.  I never heard that either.

12  Q.    Are you aware of an incident in which a mail

13  room clerk was told that Mr. Eapen was Osama bin

14  Laden's brother and in which the mail room clerk

15  attempted to attack Mr. Eapen?

16  A.    No, I am not at all.

17  Q.    Not aware of that at all?

18  A.    No, not at all.  I would remember that.

19  Q.    Have you ever heard of the Desktop Computing

20  section referred to as the ghetto?

21  A.    No.

22  Q.    Have you ever used heard the term "ghetto"

23  within the context of Desktop Computing?

24  A.    Actually, I think I have -- I think that the --

1    there used to be a side -- all the managers' side and

2    then the rest of us were called workers.  I think that

3    I heard people joke about that as being the ghetto

4    cubes because our cubes were smaller.

5        Q.   Where the workers stayed?

6        A.   Yeah, where we all sat.  The managers had the

7    bigger cubes.

8        Q.   Who did you hear use that term?

9        A.   You know, I haven't heard it since you -- you

10   know, in years since you just said it, so I couldn't

11   tell you.  It's been a long time.

12       Q.   Have you ever referred to that area as the

13   ghetto?

14       A.   No.  Not to my knowledge.  I don't remember if

15   I did.

16       Q.   Have you ever heard Mr. Eapen referred to as a

17   dot head?

18       A.   No.

19       Q.   Do you know Sung Byun?

20       A.   Yes.

21       Q.   Have you ever heard Mr. Byun referred to as a

22   rice bowl or rice?

23       A.   No, I have not.

24       Q.   Have you ever referred to Mr. Eapen as Osama



1    Q.    What do you recall about joking about national

2    origin?

3    A.    There was one incident that I recall because it

4    was pretty funny that, you know -- it had other people

5    standing up and laughing, and there was a fellow,

6    George Taylor, who was -- and George was

7    African-American, and Sung and they mentioned

8    something about -- Sung mentioned something to George

9    about, you know, Why do you shoot your gun sideways?,

10   referring to, you know, George saying, Black people

11   don't shoot their guns correctly, or something of that

12   effect.

13                And it was -- that was the kind of

14   atmosphere that it was.  It was joking.  And when we

15   came in here, Justus, that was one of the questions

16   that I had, I was very confused because Justus joked

17   more than anybody.  And I don't recall because, again,

18   it wasn't something that felt or seemed like or was a

19   harassing environment, so it's not something that all

20   of these questions you are asking me, they don't stand

21   out in my mind because it wasn't anything that seemed

22   like harassment at all to anyone, including Justus.

23   Q.    What other jokes have you heard that were based

24   on national origin?

16

1   A.   I couldn't probably give you any specifics

2   because it's been so long.  That one just stood out in

3   my mind.  I don't know why.

4   Q.   Did you hear any jokes related to religion?

5   A.   No.  I don't think so.  Not that I can recall.

6   Q.   You say Mr. Eapen joked more than anybody; is

7   that your testimony?

8   A.   He joked as much as other people.  If I said he

9   joked more, that probably, you know, I wouldn't know

10  if that's correct or not, but he did joke as much as

11  other people.

12  Q.   Do you recall Mr. Eapen making jokes about

13  anyone's national origin or religion?

14  A.   I don't recall, no.

15  Q.   Do you recall any jokes that Mr. Eapen told?

16  A.   I don't recall any specifics.  I do remember,

17  on an occasion -- on one occasion where he sent a joke

18  e-mail that was of somewhat offense because he sent it

19  to a wrong person and that person was in the U.K., and

20  I remember distinctly him running over to our area

21  where we were sitting and trying to figure out how he

22  could recall the e-mail.

23          Obviously, I don't remember the e-mail or

24  what it even contained, but, I mean, I know it was

**W&F**
**C201**

19

1    A.    Yes.   I am sorry.

2    Q.    And what about Mr. Liddle, does he use

3    profanities within the office?

4    A.    No, not -- not to -- I think Rich did stand out

5    because, I mean, he said, you know, he used

6    profanities on the small bit of occasion.   That's not

7    something that's very common, so it stands out.

8    Q.    What about John Hartnett?

9    A.    No, not John.

10   Q.    Did you ever hear Mr. Eapen complain about the

11   names he was being called or complain about any issues

12   of national origin or religion while you were there?

13   A.    Never once.

14   Q.    Did any managers ever talk to the folks in

15   Desktop Computing about the joking that went on in

16   that section?

17   A.    I don't think they ever talked about the

18   joking.   I think the talk that I can remember was

19   about standing up, just in general, that there would

20   be times where people would just gather and stand and

21   talk.   That was brought up, but it was -- nothing, to

22   my knowledge, was ever brought up about joking.

23   Q.    Who do you recall speaking to the Desktop

24   employees about standing up?   Which manager?

W&F
C202

1    Q.   Was that a newspaper article referring to this

2    lawsuit?

3    A.   Yes, sir.

4    Q.   After you read the newspaper article, did you

5    speak with anyone in your section about the incident?

6    A.   I think -- I think everybody was asking:  Did

7    you see this?  Did you see that?  And I -- and there

8    was not one person that knew of that incident or that

9    remembered that incident or that -- or was a witness

10   to that incident.  At least the people I spoke to.  It

11   wasn't something that we went around and spoke to each

12   person and said, Hey, were you there?

13   Q.   What do you recall about the article?

14   A.   The part that I recall was, you know, I recall

15   the whole article.  Are you talking about the article

16   itself or this incident?

17   Q.   Let's talk about the whole article.  What do

18   you recall about the article in which this lawsuit was

19   referenced?

20   A.   Well, obviously, I recall Justus and, you know,

21   the names that he said that people were calling him.

22   And my first reaction, I wanted to call Justus because

23   Justus and I were friends and we talked even after he

24   left, and, to me, this was a complete shock because he

1    mentioned suing MBNA but he never mentioned any of

2    that stuff.  He mentioned completely different things.

3    So, to me, obviously, my first recollection of the

4    article was reading it and was just complete shock.

5        Q.    Tell me specifically what you recall, besides

6    Mr. Eapen's name and the names that he alleged he was

7    referred to.  Anything else you recall about the

8    article?

9        A.    No.

10       Q.    Do you recall what newspaper it was in?

11       A.    Yeah.  The News Journal.

12       Q.    Who did you discuss the article in The News

13   Journal with, which MBNA employees?

14       A.    Probably the -- just the people that was

15   sitting in that general vicinity.  It would be the

16   same people we talked about, Rich, Tom, and John.

17       Q.    Did you speak with Sung Byun about the article?

18       A.    I don't recall.  I don't remember talking to

19   him about it.

20       Q.    What was Mr. Wresneski's reaction to the

21   article?  First of all, do you know if he read the

22   article?

23       A.    I would assume did he.  I don't know.

24       Q.    You told him you read the article?



Glenn A. Ford

24

1    A.    None that -- you know, other than the one that

2    I mentioned, none that I could remember.  I don't

3    recall.

4    Q.    The one about the gun being held sideways?

5    A.    Yeah.  And even that wasn't, you know, a

6    harassment type joke, but it was of a racial nature, I

7    guess.

8    Q.    Do you know what a harassment type joke is?

9    A.    In my own opinion or -- you know, I don't know

10   the definition of a harassment type joke.

11   Q.    Well, let me ask you:  Based on the training

12   you had at MBNA, do you have an understanding of what

13   type of jokes are appropriate and inappropriate within

14   the work environment?

15   A.    I believe I -- to me, the difference in what I

16   guess I took out of the training is there is a

17   difference between inappropriate and harassment.

18   Q.    Can you give me an example?

19   A.    That would be an inappropriate joke because it

20   has no, you know -- it's inappropriate, but it's not

21   harassment.

22   Q.    And we are referring to the sideways gun

23   comment; correct?

24   A.    Correct.

26

1   Q.   If someone referred to Mr. Taylor, in a joke,

2  as a nigger and Mr. Taylor laughed at the joke and

3  didn't seem to oppose that statement, would that be

4  considered harassment, according to your

5  understanding?

6   A.   I don't have -- I can't answer that one because

7  I don't find that funny and I don't think that, with

8  my training and the way I was brought up, I think that

9  there is a line that shouldn't be crossed, and that,

10  to me, is not -- that's more than inappropriate.  And

11  I think it's -- common sense has to kick in at some

12  point.

13   Q.   Even if Mr. Taylor, himself, found it funny,

14  you would still think that would be harassment?

15   A.   I would find it to be harassment, yes.

16   Q.   Now, within the context of Desktop Computing,

17  have you known employees to exchange passwords for any

18  reason?

19   A.   No.

20   Q.   How many passwords do you have?

21   A.   Probably 50.

22   Q.   You have personal password numbers; correct?

23   A.   Do you mean are they my personal passwords?

24   Q.   Yes.



27

1    A.    Yes.

2    Q.    And there are service account password numbers

3    or passwords?

4    A.    Are there generic?

5    Q.    Yes.

6    A.    We have our own accounts and then there is some

7    service accounts or generic accounts.

8    Q.    And those generic accounts, are those

9    confidential passwords or is that generally acceptable

10   by everyone?

11   A.    No, they are confidential.

12   Q.    So, the set of service account passwords you

13   have may be different than the service account

14   passwords Mr. Wresneski and other individuals may

15   have?

16   A.    That's correct.

17   Q.    Have you ever known any employee to exchange

18   either their personal password or service account

19   password for any reason during your eight years of

20   employment at MBNA?

21   A.    One incident with Jason Campbell and Justus was

22   the only incident that I ever heard of.

23   Q.    That's the only situation in which you are

24   aware of any employees exchanging passwords; correct?

1   coming in and out of the bank, so that's something

2   that I proactively went out and I got the class

3   information and submitted it to our education

4   department, and I went to that.

5             Windows 2000, I think the whole

6   department, you know, when we were migrating to

7   Windows 2000, if you wanted education on Windows 2000,

8   I think that they offered it multiple times, you know,

9   internally and externally.  I actually went

10  externally.

11  Q.    What does that mean?

12  A.    Meaning they would have education in-house in

13  MBNA or you can go outside of MBNA.  I went someplace

14  up in Malvern, I think.

15  Q.    Going back to the harassment training, did you

16  have an understanding of what you, as an employee,

17  were to do if you heard any type of harassing comment

18  or something that you thought to be discriminatory in

19  nature?

20  A.    Yes.  You should report it to your manager.

21  Q.    And have you ever reported any incident of

22  harassment or discrimination to your manager?

23  A.    No.

24  Q.    The joke about the gun being held sideways, did

1   you understand that to be a joke of harassment or

2   discrimination against African-Americans?

3   A.   No.

4              MR. SANDLER:  Objection.

5              THE WITNESS:  I am sorry.

6              MR. SANDLER:  That's all right.

7   BY MR. COOK:

8   Q.   And with respect to that particular joke, did

9   Mr. Byun make comment to either African-Americans or

10  blacks within the context of that joke?

11  A.   No.

12  Q.   So, when Mr. Byun asked Mr. Taylor, Why do you

13  shoot your gun sideways?, what did you believe that to

14  mean?

15  A.   What I believed it to mean was that he was

16  referring to black people, but that was my opinion.

17  Q.   Did you ask Mr. Byun what he meant by that

18  comment?

19  A.   No, I did not.

20  Q.   If, in fact, you believed it was in reference

21  to black people, did you believe you had an obligation

22  to tell someone in, your manager, that Mr. Byun was

23  making comments about, Why do black people hold their

24  guns sideways?  Did you believe he had an obligation



35

1    to tell anybody about that?

2    A.    No.   Because I believed it was a waste of time

3    and not a harassment.

4    Q.    What do you mean "a waste of time"?

5    A.    It was a joke, and that was all I saw it to be.

6    And it wasn't a joke in a harassing manner at all.

7    Q.    And did you, at any point, learn that Mr. Eapen

8    had a side business or business on the side while he

9    was employed at MBNA?

10    A.    I was aware of that, yes.

11    Q.    And what did you know about the business?

12    A.    I knew that he had something to do with

13    mortgages.

14    Q.    And how did you know that?

15    A.    From Justus.

16    Q.    What did Justus tell you about mortgages?

17    A.    At the time that we moved and he was sitting

18    two or three feet from me, I was looking for a house,

19    I was in the market to buy my house at that time, and

20    he knew that, and I was shopping for interest rates.

21    I just knew because he was -- I think his business was

22    brought up, you know, brought to light because he

23    bought what we used to call the "Eapen estate."  He

24    brought in a pamphlet of his purchase -- a house that

Glenn A. Ford

36

1   he was getting ready to purchase or purchasing, and we

2   were all very curious, because we all made similar

3   money, as to how Justus could afford that.

4                   And then I guess that's when he brought up

5   his side business, that he does this, you know,

6   mortgages on the side.  And that's how we kind of came

7   to be aware of it.

8   Q.    Did you hear coworkers refer to that as Justus'

9   wife's business?

10  A.    No.  I have never heard that.

11  Q.    Did Mr. Eapen ever approach you about a

12  mortgage, about getting a mortgage through his

13  company?

14  A.    He did not approach me about getting a

15  mortgage.  I did tell him -- he asked me what my rate

16  was when I told him -- because I was rate shopping at

17  the time, and the only experience I had with him was

18  telling him what my rate was, and he said that he

19  couldn't do any better than that, that I had a good

20  deal.  And that was my only workings with him as far

21  as his mortgage business.

22  Q.    Did Mr. Eapen try to get a better rate for you?

23  A.    Not after that.  I mean, this was -- this was

24  one morning, early in the morning, I just remember

1  telling him what my rate was, and about five minutes

2  later, he said that that's a good rate, that you

3  should stay with that.  I don't know.  I think he

4  looked at his rates and saw what he could get and

5  realized that what I was getting was a good deal.

6     Q.   Do you know if he looked at his rates?

7     A.   I don't know if he called someone or looked at

8  his rates.  I don't remember.

9     Q.   When you say you think he looked at his rates,

10 you are speculating; is that correct?

11    A.   Well, that's correct because I don't remember

12 exactly what he did.  I just know that a couple

13 minutes later, he told me that he couldn't get a

14 better rate than that.

15    Q.   Were you aware that Mr. Eapen had a web site

16 Eapen.net?

17    A.   Yes.

18    Q.   Had you ever visited that web site?

19    A.   I believe I did, yes, just out of curiosity.

20    Q.   Are you aware of any other MBNA employees that

21 Mr. Eapen spoke to about his business or about

22 obtaining a mortgage?

23    A.   I don't know specifically -- actually, John

24 Hartnett, who I work with also, I think he was in the

1   same predicament, he was buying a house at the same

2   time, and I know that -- I remember John and I both

3   looked at Justus' web site because he had a lot of

4   mortgage calculators and different interest rate

5   calculators and things of that nature on there.

6            I know -- I am good friends with John and

7   we talk outside of work, too, so we were both looking

8   at a house at the same time, so I know John, for one,

9   was looking at his web site.  I know he had talked to

10  Justus.  I don't know the extent of the talks.

11  Q.    Do you recall being interviewed by Richard

12  Kilmon regarding Mr. Eapen's outside activities?

13  A.    Yes, I do.

14  Q.    And you gave him a statement at that time where

15  you answered questions that he posed to you?

16  A.    Yes.

17  Q.    I am going to show you what's been previously

18  marked as EEOC 11 for identification.  Do you want a

19  copy?  This is an internal memorandum, it's from Rich

20  Kilmon, it's to the file.  It's regarding an interview

21  he conducted of you.  It's dated 1/22/03.  And in the

22  second paragraph, Mr. Kilmon writes, "Glenn stated

23  that he was, quote, under the impression that Justus

24  had a mortgage business, end quote, and he had heard

1   coworkers refer to the business as Justus' wife's

2   business."

3          Do you see that?

4   A.    I do.

5   Q.    Did you tell Mr. Kilmon that?

6   A.    I don't recall that, but, obviously, I did.

7   Again, that was while ago.

8   Q.    Do you have a recollection of what coworkers

9   referred to that as Justus' wife's business?

10  A.    I don't even remember that, itself, so I

11  couldn't tell you who said that.

12  Q.    Now, did you ever observe Mr. Eapen working on

13  the business while he was -- during MBNA time?

14  A.    I don't know what your definition of "working

15  on his business" is.  I know my experience with Justus

16  and my experience is what I told you, and I don't know

17  anything else that he did or didn't do.  I mean, I do

18  know, that day, I remember the day about the interest

19  rates, and, you know, him either looking for or doing

20  something.  And, actually, in this, it says that I did

21  see him go on the Internet and search for a better

22  rate, and, of course, you know, if -- I was assuming

23  that anyway.  I just didn't remember because it's been

24  so long.  That was the extent of my experience with

40

1   him and his mortgage business.

2       Q.    Now, were you present when Mr. Eapen searched

3   the Internet in an attempt to identify a better

4   mortgage interest rate?

5       A.    That was the time where we sat with each other

6   or sat directly -- our cubes were open to each other,

7   so I was present in that manner.  I don't know if -- I

8   don't remember now if I, you know, pulled my chair

9   over to his desk.  I don't recall.

10      Q.    And can you tell me whether or not he was

11  looking for interest rates with his mortgage company

12  or another mortgage company?

13      A.    I don't know.  I don't recall.

14      Q.    And you also mentioned Mr. Hartnett was also in

15  the market to buy a new home; correct?

16      A.    That's correct.

17      Q.    And did you discuss mortgage interest rates

18  with Mr. Hartnett, or any other employee besides

19  Justus Eapen, as general conversation?

20      A.    As general conversation, with John Hartnett,

21  yes, sir, because we were friends outside of work and

22  we talked about mortgages.

23      Q.    During your interview with Mr. Kilmon -- do you

24  recall your interview with Mr. Kilmon?


C215

Glenn A. Ford

43

1    Q.    Do you recall what time frame that Mr. Eapen

2    worked that night shift?

3    A.    No, I don't.

4    Q.    When he worked the night shift, how often or

5    how frequently would you see Mr. Eapen?

6    A.    I would see him, when he was at work, we would

7    probably see each other every day.

8    Q.    There was some overlap?

9    A.    There was.  I came in earlier than everyone

10   else.  I normally came in between 6:30 and seven, and

11   Justus, if I recall correctly, I think he was there

12   until eight or nine.  And that's, actually, during

13   that period of time is when Justus and I became better

14   friends because we were pretty much the only two

15   people there at that time, from at least around the

16   7:00 area.

17   Q.    Part of the joking that went on in Desktop

18   Computing, did you ever know or know of anyone taking

19   other people's computer equipment as a joke?

20   A.    Taping?

21   Q.    Taking, physically taking or removing from the

22   desk area.

23   A.    Yeah.  Actually, I think I do remember at least

24   one occasion.


C216

44

1    Q.    What do you recall?

2    A.    That was -- someone took -- there was a nice

3    flat panel monitor that belonged to Brian McKeown, the

4    guy who sat in our area, and I think somebody swapped

5    it with a pretty old monitor because they wanted a new

6    monitor.  But that is the only time I can ever recall

7    someone taking somebody else's equipment.

8    Q.    Are you aware of a situation where someone took

9    Justus Eapen's mouse?

10   A.    No.

11   Q.    Mr. Ford, you seem to -- a lot of the questions

12   concerning issues of harassment and discrimination

13   concerning the jokes, I understand your recall is not

14   -- you weren't able to recall a lot of those

15   incidents.  If, in fact, there were conversations with

16   other employees, or, just with passage of time, that

17   you recall any incidents, any jokes of a derogatory

18   nature concerning national origin or religion, please

19   let Mr. Sandler know so he can relate those to me;

20   okay?

21   A.    Okay.

22         MR. COOK:  I don't have any further

23   questions.

24   BY MR. SANDLER:


C217

47

1    put the two together because, obviously, you need to

2    make a lot of money to have a house like that.

3    Q.   Now, I think you said that you were friendly

4    with Mr. Eapen; is that right?

5    A.   Well, I, to my -- I guess you could say I was

6    -- I talked to Justus even after he left MBNA, and I

7    don't think he even talked to anyone else.  He called

8    me on several occasions.  We were friends while he was

9    here and friends when he left.

10           So, I mean, up until I saw, you know,

11   until this whole thing, to be honest, obviously, I

12   haven't talked to him since then and I wish that I

13   could talk to him, but I don't know if that would be a

14   wise decision because I am curious as to some of the

15   accusations.  But in my opinion, we were friends.

16   Q.   You said you did speak to him after he left

17   MBNA?

18   A.   Yes.  Yes.

19   Q.   What did you speak about?

20   A.   We spoke on at least two occasions, that I know

21   of, and there is only one thing that stands out in my

22   mind, and that was when he left.  And I remember he

23   called me on my cell phone, or maybe I called him, I

24   don't remember which one it was, but we were talking

Glenn A. Ford

48

1  about -- he made a big deal that he wanted something

2  -- he didn't want people to be mad at him.  He said, I

3  don't want everybody to -- something about still

4  keeping his friends.  But it didn't make a lot of

5  sense because he had mentioned to me that he was going

6  after, you know, suing MBNA and he had made comments

7  that he was going to get MBNA for what he could, but

8  he never made mention -- mentioned anything about

9  harassment or about his nationality.

10              It was all about his interview with the

11  Personnel representative and how long they made him

12  stay, and he complained to me, over and over, about

13  how they made him stay.  You know, he worked the night

14  shift and then he had to go through this interview.

15  And that was, you know, the kind of stuff that we had

16  talked about.

17              I don't remember any other specifics, you

18  know, because, again, it was just a friend of mine

19  that had left, and, you know, he was trying to move

20  on.  I didn't see anything significant -- you know, I

21  didn't think anything like this would happen or I

22  would have remembered, obviously.

23              And I know he sent me an e-mail, too, and

24  it was something that had something to do with suing

49

1    MBNA or something of that nature because I actually

2    remember I had to give a copy of it to my manager's

3    manager.  I don't have a copy of it anymore.  I don't

4    even remember what it said.  But whatever it said, it

5    was significant enough to hand over to my management.

6    I don't know if you guys have a copy of that.  I don't

7    know if you do.  Ernie Marra is the person I gave a

8    copy to.  It was after he left the bank.

9            So, again, that may, you know, probably

10   recall more of the conversations that we had after he

11   left.  I just know I talked to him.  I wasn't sure

12   about exactly what.

13   Q.    Do you ever remember Mr. Eapen making jokes

14   about the Sikh contractors who worked at MBNA?

15   A.    Yeah.  There was one person in particular that

16   I remember after 9/11 -- well, before 9/11, he -- and,

17   actually, even maybe a month after 9/11, he had a

18   very, you know, very long beard and he wore a turban.

19   And, you know, where we were, there was a lot of

20   Indian people, but I think he was the only person

21   actually -- you know, I guess a Sikh, you know, I have

22   since learned has, you know, the different religions,

23   completely different.  And Justus was joking to us

24   about the fact that he got the guy to -- that it was

50

1    because of Justus that he shaved his beard and took

2    off his turban.  And Justus joked to us, you know,

3    kind of like, you know, it was a victory for Justus.

4    I am not sure why.  But I remember that specifically.

5    I don't remember the fellow's name because he didn't

6    work in our area.  But I do remember that.

7    Q.    Did Mr. Eapen ever comment or complain to you

8    or in your hearing about not getting enough training?

9    A.    No.  Not from a friendly level, like, just say,

10   Hey, I am not doing this, or either from a personal

11   level, but I didn't work directly with him so I

12   probably wouldn't hear him directly.  It's not

13   something he ever brought up, in my presence.

14             MR. SANDLER:  Nothing further.

15   BY MR. COOK:

16   Q.    Mr. Ford, with respect to Mr. Eapen's estate,

17   have you ever seen it besides photos?

18   A.    No, I have not.

19   Q.    Do you actually know whether he had purchased

20   it or he was interested in purchasing that estate?

21   A.    No.  And that's one thing that I do want to

22   clarify.  I am not sure because it was -- I know he

23   was interested in or he had just bought it or he was

24   buying it, but I don't know.  To my knowledge, he may

1    -- gosh, I think it was along the lines of, Don't talk

2    to him.  You know, I think it was something along

3    those lines.  Or if he sends you anymore e-mails, give

4    them to us.  Maybe something like that.  I had a very

5    brief conversation with him about it.  It was kind of

6    like, you know, and if I am not mistaken, he did say,

7    Don't talk about it amongst your peers.  It was

8    confidential, I believe.

9        Q.   And with respect to the comment or joke that

10   Mr. Eapen made after September 11th, you said he made

11   a comment or a joke about a Sikh?

12       A.   That's correct.

13       Q.   What do you recall about the joke or comment?

14       A.   I just remember that the -- the Sikh was very

15   -- he -- he stood out at MBNA because there was a lot

16   of people, you know, from the Middle East, but he was

17   the only one that I saw on a daily basis that had a

18   turban and a very long beard.  And I just remember

19   Justus joking that, because of him, meaning because of

20   Justus, you know, he -- the guy shaved his beard and

21   took off his turban.  That was the extent of what I

22   remember.

23       Q.   What was funny about what Mr. Eapen said or --

24   what made it a joke?

58

1    A.    I guess the fact that the -- I remember

2    distinctly Justus sitting in his chair laughing about

3    it.  I guess it was the fact that -- you know, you

4    will have to ask Justus because I don't know what made

5    it funny to him.  It wasn't necessarily funny to me.

6    I thought it was interesting that Justus, you know,

7    got this guy to take off his turban and Sikh.  I don't

8    know what the purpose is.  I don't know what the

9    purpose was.  It was definitely funny to Justus, for

10   whatever reason.

11   Q.    Were there other employees of Indian descent

12   that, after September 11th, changed their appearance

13   or grooming habits to look less Indian, besides this

14   particular Sikh?

15   A.    Not to my knowledge.

16          MR. SANDLER:  Let him finish before you

17   answer.

18          THE WITNESS:  I am sorry.

19          MR. SANDLER:  What was the question again?

20   BY MR. COOK:

21   Q.    Are you aware of any other employee of Indian

22   descent to change their appearance or grooming habits

23   after 9/11 to appear less Indian in their appearance

24   by taking off the turban or shaving the beards, things



```
 1            IN THE UNITED STATES DISTRICT COURT
 2              FOR THE DISTRICT OF DELAWARE
 3
 4
   EQUAL EMPLOYMENT OPPORTUNITY     )
 5 COMMISSION,                      )
                                    )   Civil Action No.
 6            Plaintiff,            )   04-CV-425-SLR
                                    )
 7 v.                               )
                                    )
 8 MBNA AMERICA BANK, N.A., a       )
   subsidiary of MBNA Corporation,)
 9                                  )
              Defendant.            )
10
11            Deposition of THOMAS W. LIDDLE, JR. taken
   pursuant to notice at the law offices of YOUNG CONAWAY
12 STARGATT & TAYLOR, 1000 West Street, Wilmington,
   Delaware, beginning at 10:30 a.m. on Monday, August 1,
13 2005, before Renee A. Meyers, Registered Professional
   Reporter and Notary Public.
14 APPEARANCES:
15            TERRENCE R. COOK, ESQ.
              U.S. EQUAL EMPLOYMENT OPPORTUNITY
16            COMMISSION
                21 South Fifth Street
17              The Bourse, Suite 400
                Philadelphia, Pennsylvania  19106-2515
18              for the Plaintiffs,
19            SHELDON N. SANDLER, ESQ.
              YOUNG CONAWAY STARGATT & TAYLOR
20              1000 West Street, 17th Floor
                Wilmington, Delaware  19899
21              for the Defendant.
22 ALSO PRESENT:  Launice Sills, Esq.
23                    WILCOX & FETZER
     1330 King Street - Wilmington, Delaware 19801
24                    (302) 655-0477
```



C224



1   Q.   What were your responsibilities as a PC

2  specialist two?

3   A.   As a PC specialist two?

4   Q.   Yes.

5   A.   I worked on operations of enterprise

6  applications, such as our corporate intranet site, and

7  a variety of other server applications.

8   Q.   Are the projects you worked on generally

9  individual projects or did they involve other MBNA

10  employees?

11   A.   Individual projects.

12   Q.   In the course of performing your duties, have

13  you ever shared your password with anyone?

14   A.   No.

15   Q.   Has anyone ever asked you for your password?

16   A.   No.

17   Q.   During your tenure at MBNA, are you aware of

18  any employees exchanging passwords for any purpose?

19   A.   No.

20   Q.   Do you know Jason Campbell?

21   A.   Yes, I do.

22   Q.   Do you know Justus Eapen?

23   A.   Yes, I do.

24   Q.   Are you aware of an incident where they



Thomas W. Liddle, Jr.

11

1    A.    What do you mean by "what context"?

2    Q.    Well, was it as part of a training?  Was it

3  casual conversation?  What context did Mr. Dell tell

4  you this information?

5    A.    To reemphasize that password sharing is not

6  allowed and it's strictly prohibited.

7    Q.    Was this part of a group meeting or was this

8  more of a one-on-one between yourself and Mr. Dell?

9    A.    One-on-one.

10    Q.    Besides this incident between Mr. Dell and -- I

11  am sorry, Mr. Campbell and Mr. Eapen, are you aware of

12  any other password sharing incident during your tenure

13  at MBNA?

14    A.    No.

15    Q.    Was it ever the practice, amongst employees, to

16  exchange passwords for any reason during your tenure

17  at MBNA?

18    A.    No.

19    Q.    When did you first meet Justus Eapen?

20    A.    When he started working for Jim Dell, I

21  believe.  We were on the same team.

22    Q.    Are you aware of Mr. Eapen's national origin?

23    A.    I don't know exactly what it is.

24    Q.    Do you have a general idea of what his national

13

1    Q.    How short of a period of time?

2    A.    Six months.  Six to eight months.

3    Q.    When you say close physical proximity, can you

4    give me an estimate on the feet or the yards, how far

5    away you were from Mr. Eapen?

6    A.    I'd say maybe about six feet.

7    Q.    And you folks worked in cubicles; is that

8    correct?

9    A.    Correct.

10   Q.    There has been testimony in this case that the

11   environment in the Desktop Computing section where you

12   sat, where Mr. Eapen sat, where Mr. Ford sat,

13   Mr. Wresneski, Mr. Hartnett, that there were a lot of

14   jokes going on in that area.

15              Do you agree with that statement?

16   A.    Yes.

17   Q.    Do you recall any of the jokes that were told

18   in that area at any time?

19   A.    I just remember Glenn and I playing practical

20   jokes on each other.

21   Q.    What type of practical jokes?

22   A.    Such as taping each other's phone so it would

23   be hard to hear somebody on the receiving end or hard

24   to talk.  We would tape each other's network cables so

W&F
C227

Case 1:04-cv-00425-SLR    Document 38-4    Filed 01/09/2006    Page 41 of 67
Thomas W. Liddle, Jr.

14

1    it would be a little difficult to troubleshoot what's

2    wrong with that person's PC.

3        Q.    Did you ever, as a practical joke, take

4    computer equipment or hide computer equipment from

5    Mr. Ford or anyone else?

6        A.    No.

7        Q.    Are you aware of anyone taking anyone's

8    computer equipment in Desktop Computing?

9        A.    No.

10       Q.    Are you aware of an incident when Mr. Eapen had

11   his mouse taken?

12       A.    No.

13       Q.    What other type of practical jokes would you

14   and Mr. Ford play upon each other?

15       A.    Those are basically it.

16       Q.    Is there anything else you can recall about the

17   practical jokes you played with Mr. Ford?

18       A.    No, that's it.

19       Q.    What other type of jokes did you hear within

20   Desktop Computing?

21       A.    I am not aware of any jokes he played on

22   anybody.  I am just aware of the jokes that him and I

23   played on each other.

24       Q.    During your tenure at MBNA and Desktop



Case 1:04-cv-00425-SLR   Document 38-4   Filed 01/09/2006   Page 42 of 67
Thomas W. Liddle, Jr.

27

1    Q.    What about Mr. Eapen?

2    A.    No, he was not.

3    Q.    Was he not invited?

4    A.    I don't know if he was invited or not to those.

5    Q.    Now, Mr. Hartnett, do you know his age?  Is he

6 around your age or older or younger?

7    A.    No.  He is older than I am.  He is 30 or older.

8    Q.    What about Mr. Wagner?

9    A.    30 or older.  I am not sure of his age.

10    Q.    What about Mr. Wresneski?

11    A.    30 or older, but I am not sure of what his age

12 is.

13    Q.    Mr. Liddle, have you ever been disciplined for

14 either your conduct or your performance while at MBNA?

15    A.    Yes.

16    Q.    What were you disciplined for?

17    A.    During a customer participation, I hung up on a

18 few customers inappropriately.

19    Q.    When was that in terms of the year?

20    A.    2001, I believe.

21    Q.    Did you get a written warning for that?

22    A.    No.  I got a verbal and a written warning.

23    Q.    Were you put on probation or anything like that

24 as part of the written warning?



C229

Case 1:04-cv-00425-SLR    Document 38-4    Filed 01/09/2006    Page 43 of 67
Thomas W. Liddle, Jr.

28

1    A.    Yes.   I was not allowed promotions for two

2    years or incentives for that quarter that the written

3    notice was applied.

4    Q.    Were there any other incidents of discipline,

5    either for performance or conduct, after 2001?

6    A.    Referring to me?

7    Q.    Referring to you, yes.

8    A.    No.

9    Q.    Were you aware of an incident when

10   Mr. Wresneski was written up for having adult

11   materials on his computer?

12   A.    I heard of the incident, yes.

13   Q.    You don't know who else was involved with that

14   incident besides Mr. Wresneski?

15   A.    No, I do not.

16   Q.    Did you ever speak with Mr. Wresneski about

17   that particular incident?

18   A.    He told me about it, that he was written up.

19   Q.    What did Mr. Wresneski tell you about that

20   write-up?

21   A.    That he was wrote up for sharing information or

22   for sharing files he shouldn't have.  He didn't go

23   into detail.

24   Q.    When did you learn that they were adult



36

1  A.   No.

2  Q.   Ever call him at home?

3  A.   No.

4  Q.   Ever exchange e-mails with him on a personal

5  level?

6  A.   No.

7  Q.   Were you aware at all whether Mr. Eapen had an

8  outside business other than his employment at MBNA?

9  A.   Yes.

10 Q.   What did you know?

11 A.   I knew that he bought -- or mortgaged homes, as

12 he referred to it.

13 Q.   And did you know the name of Mr. Eapen's

14 business?

15 A.   No.  I know he did have a web site, though.

16 Q.   Do you know the name of the web site?

17 A.   It was Eapen.net.

18 Q.   Had you visited the web site?

19 A.   No.  He showed it to me.

20 Q.   On how many occasions did Mr. Eapen show you

21 the web site, Eapen.net?

22 A.   Three or four times.

23 Q.   For what purpose?

24 A.   He was doing web design, and that was my area



Case 1:04-cv-00425-SLR    Document 38-4    Filed 01/09/2006    Page 45 of 67
Thomas W. Liddle, Jr.

37

1    of expertise, so he was asking how to do certain

2    things, how to make it a little bit more colorful.

3       Q.    And did you provide him with assistance in that

4    regard?

5       A.    Yes.

6       Q.    Did you ever visit the web site with Mr. Eapen

7    for the purpose of obtaining a mortgage interest rate

8    or a mortgage?

9       A.    No.

10      Q.    Did Mr. Eapen ever solicit from you or offer to

11   sell you a mortgage?

12      A.    No.

13      Q.    Did you ever hear Mr. Eapen refer to the

14   business as his wife's business?

15      A.    No.

16      Q.    Besides the three or four times in which

17   Mr. Eapen came to you for web design advice, are there

18   any other occasions in which he discussed this

19   mortgage business with you?

20      A.    No.   On a couple occasions, I asked him about

21   how mortgages work and mortgage prices and things like

22   that, but nothing pertaining to his business.   Just a

23   general knowledge.   He seemed pretty knowledgeable in

24   the area.

1

```
 1                IN  THE  UNITED  STATES  DISTRICT  COURT
 2                  FOR  THE  DISTRICT  OF  DELAWARE
 3
 4
    EQUAL EMPLOYMENT OPPORTUNITY     )
 5  COMMISSION,                      )
                                     )    Civil Action No.
 6              Plaintiff,           )    04-CV-425-SLR
                                     )
 7  v.                               )
                                     )
 8  MBNA AMERICA BANK, N.A., a       )
    subsidiary of MBNA Corporation,)
 9                                   )
                Defendant.           )
10
                Deposition of BRIDGET C. WILLIAMS pursuant
11  to notice at the law offices of YOUNG CONAWAY STARGATT
    & TAYLOR, 1000 West Street, Wilmington, Delaware,
12  beginning at 9:05 a.m. on Tuesday, August 2, 2005,
    before Renee A. Meyers, Registered Professional
13  Reporter and Notary Public.
14  APPEARANCES:
15              TERRENCE R. COOK, ESQ.
                U.S. EQUAL EMPLOYMENT OPPORTUNITY
16              COMMISSION
                  21 South Fifth Street
17                The Bourse, Suite 400
                  Philadelphia, Pennsylvania  19106-2515
18                for the Plaintiffs,
19              SHELDON N. SANDLER, ESQ.
                YOUNG CONAWAY STARGATT & TAYLOR
20                1000 West Street, 17th Floor
                  Wilmington, Delaware  19899
21                for the Defendant.
22  ALSO PRESENT:  Launice Sills, Esq.
23                      WILCOX & FETZER
       1330 King Street - Wilmington, Delaware 19801
24                    (302) 655-0477
```





C233

3

1    A.    A LAN administrator.

2    Q.    Who do you report to?

3    A.    Darren Knox.

4    Q.    How long have you been employed by MBNA?

5    A.    Four-and-a-half years.

6    Q.    Can you give me a summary of your educational

7    background after high school?

8    A.    One year of college and then, Hunter College of

9    Manhattan, and then a bible institute with my church.

10   Q.    Did either of those educational experiences

11   lead to degrees or diplomas?

12   A.    No.   The bible institute is a -- is not an

13   accredited Bachelor's degree.

14   Q.    What year did you attend the Hunter College of

15   Manhattan?

16   A.    '84.

17   Q.    And did you attend Hunter College immediately

18   after graduating from high school?

19   A.    Yes.

20   Q.    And when did you attend the bible institute?

21   A.    About three years ago.

22   Q.    And what did you do after you graduated in,

23   after the one year of college in Manhattan, in terms

24   of employment?   Did you have any employment after

12

1   individuals exchange passwords within the test

2   environment?

3   A.   Your own password or just passwords in general?

4   Q.   Well, let's see if we can break that down.

5   A.   Okay.

6   Q.   You had passwords that were personal to you?

7   A.   Yes.

8   Q.   That were confidential to you?

9   A.   Yes.

10   Q.   And were there also passwords within the test

11   environment that were generally known to all the

12   employees in Desktop Computing?

13   A.   Yes.

14   Q.   To your knowledge, what was the practice with

15   respect to the exchange of personal passwords within

16   the test environment?

17   A.   When you say "practice," you mean just --

18   Q.   What's your knowledge of the exchange of

19   personal passwords in the test environment?

20   A.   Personal passwords probably were not exchanged.

21   Q.   You say "probably not exchanged."

22          Are you aware of any instance where a

23   personal password was exchanged within the test

24   environment?

**W&F**
**C235**

13

1    A.    No, I am not.

2    Q.    Now, what about the production environment, are

3    you aware of any password, personal passwords being

4    exchanged amongst any MBNA employee in the production

5    environment?

6    A.    Yes.

7    Q.    What are you aware of?

8    A.    On one occasion -- are you talking about myself

9    or just in general?

10    Q.    Let's talk in general. Are you aware of any

11    instance in which an MBNA employee -- again, we are

12    not talking about you right now -- are you aware of

13    any instance in which an MBNA employee shared or

14    exchanged their password with someone else in the

15    production environment?

16    A.    No, I am not.

17    Q.    Are you personally aware of any instance in

18    which you shared your password or someone asked you

19    for your password?

20    A.    Yes.

21    Q.    Can you tell me about that?

22    A.    It was late one night, Jim Dell called me and

23    asked me -- told me that he was -- we were having a

24    production issue and he had went over to the DFO to

**W&F**
**C236**

Bridget C. Williams

14

1  get into the system and his account was locked out.

2  Q.   And what did Mr. Dell ask you?

3  A.   For my password so that he can get into the

4  system.

5  Q.   And did he ask you for your personal password?

6  A.   Yes.

7  Q.   And this was a phone call from Mr. Dell to

8  yourself; is that correct?

9  A.   Yes.

10  Q.   Was anybody else on the phone call?

11  A.   No.

12  Q.   And the explanation Mr. Dell gave you as to why

13  he needed your password is that he had been locked out

14  of his account?

15  A.   Yes.

16  Q.   Did he tell you why he was locked out of his

17  account?

18  A.   No.  He must have forgotten his password.

19  Q.   Do you know why he called you, as opposed to

20  another employee, for the password?

21  A.   No.

22  Q.   Did he tell you he had called anybody else to

23  ask them for their password?

24  A.   I don't remember.



15

1    Q.    Do you recall the time frame in which this

2    happened or what -- in terms of was it 2002?  2003?

3    What year it was?

4    A.    It was shortly after I had gotten there, so --

5    I don't think I had been there a year.

6    Q.    Sometime in 2001 or 2002?

7    A.    Yes.

8    Q.    And did you give Mr. Dell your password?

9    A.    Yes.

10   Q.    What else do you recall from that conversation

11   in which Mr. Dell called you sometime in 2001 or 2002

12   and asked you for your password?

13   A.    Nothing else.

14   Q.    How long was that conversation you had with

15   Mr. Dell?

16   A.    A couple minutes.

17   Q.    Did you have any other discussions with

18   Mr. Dell after that particular evening concerning the

19   exchange of passwords?

20   A.    No.

21   Q.    Did Mr. Dell ever advise you it was against

22   MBNA policy to share your password?

23   A.    No.

24   Q.    Were you ever disciplined for giving Mr. Dell

16

1   your password that evening?

2   A.   No.

3   Q.   And this was just, just to be clear, this

4   happened in the production environment?

5   A.   Yes.

6   Q.   Did you tell anyone else that Mr. Dell had

7   asked you for your password, any other MBNA employee?

8   A.   No.

9   Q.   Did Mr. Dell ask you to keep it confidential

10  that he was asking you for your password?

11  A.   No.

12  Q.   On any other occasion, besides this incident in

13  2001, 2002, did Mr. Dell ask you for a password?

14  A.   Not that I recall.

15  Q.   Did you have to change your password after

16  giving it to Mr. Dell?  Did you have to get a new

17  password?

18  A.   Yes.

19  Q.   And how do you change a password?  Is that

20  something you do as a PC specialist, or does someone

21  in Information Security have to change that for you?

22  A.   The system prompts you every 30 days to change

23  your password.

24  Q.   And, so, as a result of sharing your password



C239

18

1    Q.    And can you give me an estimate of how closely

2    you were seated to Justus Eapen in terms of feet or

3    yards, cubicles?

4    A.    The first time, about two rows over, as far as

5    cubicles went.  And the second time, he was right

6    across from me, one seat over.

7    Q.    When you say "the first time," what period of

8    time are we talking about, from the time you started

9    until a certain date?  Can you give me an idea?

10   A.    He moved his seat when he -- when he joined the

11   team, he got a new desk, so I am not exactly sure of

12   the time frame.

13   Q.    Did you know Mr. Eapen to have a mortgage

14   business while he was employed at MBNA?

15   A.    Yes.

16   Q.    And how did you know about that?

17   A.    Just by talking, conversating.

18   Q.    Talking with Mr. Eapen or talking with other

19   employees?

20   A.    Talking with him.

21   Q.    Did Mr. Eapen ever offer to get you a mortgage

22   or an interest rate or anything along those lines?

23   A.    No.

24   Q.    Did Mr. Eapen tell you that he and his wife



1  owned a business or that he owned the business or that

2  his wife owned the business?

3    A.   I am not exactly sure how he phrased it.  I

4  know that it was a family business, that his wife was

5  involved in it.  I am not exactly sure how I came

6  about that knowledge, but I know that, you know, just

7  in conversation.

8    Q.   And were you aware that Mr. Eapen had a web

9  site, Eapen.net?

10   A.   Yes.

11   Q.   How did you become aware of that?

12   A.   He was hosting my church's web site for a

13  period of time.

14   Q.   Hosting your church's web site?

15   A.   Yes.

16   Q.   What's the name of your church?

17   A.   Glorious Full Gospel Tabernacle Center.

18   Q.   That was the church that you went to the

19  non-accredited bible institute?

20   A.   Yes.

21   Q.   Are they in Wilmington?

22   A.   Yes.

23   Q.   Have you ever been to Eapen.net while you were

24  at MBNA, that web site?

Bridget C. Williams

1   A.    Yes.

2   Q.    And, specifically, around September of 2001, do

3   you recall if those individuals I just identified were

4   seated in the same general area in which you were?

5   A.    No, they weren't.

6   Q.    They were not?

7   A.    Uh-uh.

8   Q.    Do you know if those individuals were seated in

9   the same area as Justus Eapen during September of 2001

10  time frame?

11  A.    I am not sure.

12  Q.    The environment in the Desktop Computing

13  section has been described by other people that have

14  been deposed as a joking atmosphere.

15         Do you agree with that characterization?

16  A.    Yes.

17  Q.    And can you give me any examples of the type of

18  jokes that you heard or the type of joking that went

19  on in that area?

20  A.    Removing keyboards, messing with the access to

21  the systems, switching phones.

22  Q.    That's the type of practical jokes or pranks;

23  correct?

24  A.    Yes.

1    Q.   Anything else about the practical jokes or

2  pranks that you can recall that went on in Desktop

3  Computing that went on during your tenure at MBNA?

4    A.   Not really.  There were a lot going on.  They

5  were constantly doing things.

6    Q.   Now, were there verbal jokes about individuals,

7  race, national origin, sex, things like that, in the

8  Desktop Computing environment that you can recall?

9    A.   One instance.

10   Q.   What do you recall?

11   A.   Bill Kennedy and Sung Byun were joking around,

12 and Bill said something about Sung's ethnicity, and it

13 didn't go over too well.  And, so, they sort of went

14 their separate ways after that.

15   Q.   Did you hear this exchange between Mr. Kennedy

16 and Mr. Byun?

17   A.   I did.  I can't remember word-for-word what was

18 said.

19   Q.   You said that you believe he commented about

20 Mr. Byun's ethnicity.

21            What comment did Mr. Kennedy make that you

22 attributed to Mr. Byun's ethnicity?

23   A.   About him being Oriental, Korean, or something

24 of that nature.

Bridget C. Williams

23

1    Q.    Do you recall specifically what was said?

2    A.    No.

3    Q.    Do you recall it being a comment about Mr. Byun

4    being either Oriental or Korean?

5    A.    Yes.

6    Q.    Mr. Byun has testified that he has been

7    referred to as rice or rice bowl.

8              Does that sound like a comment that was

9    made by Mr. Kennedy to Mr. Byun?

10   A.    I really don't recall.

11   Q.    And you said it didn't go over well.

12             What gave you that impression?

13   A.    Sung was a little annoyed.

14   Q.    Did he tell you he was annoyed?

15   A.    No.  They were talking outside of my cube, so I

16   can hear it, and the tone changed.  It was obvious

17   that it wasn't the joking anymore.  And that's what

18   sort of made me, you know, take notice that something

19   was going on.

20   Q.    Did Mr. Kennedy and Mr. Byun often joke about

21   issues of ethnicity or things of that nature, that you

22   are aware of?

23   A.    Not that I am aware of.  They joked a lot.

24   Q.    Do you know if any manager or supervisor became

Bridget C. Williams

24

1   aware of the comment that Mr. Kennedy made to

2   Mr. Byun?

3     A.    I don't know.

4     Q.    Besides this particular exchange between

5   Mr. Kennedy and Mr. Byun, are you aware of any other

6   instance in which there were jokes about ethnicity,

7   national origin, race, religion, sex within the

8   Desktop Computing?

9     A.    Yes.

10    Q.    What do you recall?

11    A.    I was leaving out of the area, and one of the

12  mail room clerks, who was mentally challenged, was

13  coming in to deliver the mail, and there were a group

14  of them standing there and they were joking, telling

15  him that -- he had came in to say that we caught

16  bin Laden and they said, No, bin Laden is back there.

17    Q.    Do you know who they were referring to when

18  they said bin Laden was back there?

19    A.    They pointed in the back, but, you know --

20    Q.    Did you understand them to mean Mr. Eapen was

21  bin Laden?

22            MR. SANDLER:   Objection to form.   You can

23  answer the question.

24  BY MR. COOK:



1    really don't remember who they were.  I mean, you

2    know, shortly after that time, I probably could have

3    told you who they were, but I don't remember right now

4    who they were.

5        Q.    If, for any reason, your memory comes back

6    during the deposition, let me know.  After the

7    deposition, please let Mr. Sandler know.

8        A.    Okay.

9        Q.    Any other incidents in which reference was made

10   to a person's race, national origin, ethnicity,

11   gender, that you recall during your tenure at MBNA in

12   Desktop Computing?

13       A.    No, not really.

14       Q.    With respect to the individuals saying that

15   Osama bin Laden was back there, have you ever heard

16   any employee in Desktop Computing refer to Mr. Eapen

17   as Osama bin Laden or Osama bin Laden's brother?

18       A.    No.

19       Q.    Have you ever heard Mr. Eapen referred to as a

20   sand nigger or a nigger?

21       A.    No.

22       Q.    Have you ever heard of the term -- well, the

23   section in Desktop Computing where the employees sat,

24   have you ever heard that referred to as "the ghetto,"

1   or "a ghetto" by anyone?

2   A.   No.

3   Q.   There has been reference of groups within the

4   Desktop Computing section referred to as either the A

5   team for the Asian team or the W team for the white

6   team.

7             Have you heard of those designations

8   within Desktop Computing?

9   A.   No.

10  Q.   You are not aware of any instance in which

11  there was reference to an A team or a W team; is that

12  what you are telling me?

13  A.   Yes.

14  Q.   Now, going back to the practical jokes, the

15  removing of the keyboards, messing with access to the

16  system, switching the phones, do you recall any

17  specific individual that engaged in that type of

18  behavior?

19  A.   The majority of them did.  It was the -- the

20  standing practice.  Everyone was, you know, was

21  involved in some way.

22  Q.   Did you have items removed from your work area?

23  A.   No.  They didn't bother me.

24  Q.   How would you describe your relationship with

1    Q.    Now, did you also, at one time, have the belief

2    that Mr. Dell discriminated against you based on your

3    sex and/or race?

4    A.    Yes.

5    Q.    And what did you believe Mr. Dell did to

6    discriminate against you based on your sex or race?

7    A.    As my manager, the career path that I wanted to

8    take at MBNA, when I first got there, they give you a

9    chart and you can be technical or you can be a

10   manager, on the managerial path.  The first instance

11   when I got there and I told him that I wanted to be a

12   manager, and he was like, No, stay on the technical

13   side, and I did.

14          And, however, I realized later on that the

15   courses that I was signing up to take were not going

16   to advance my career in the technical end or even, you

17   know, getting promoted.  So, that was really the first

18   instance.

19          After that, I wanted to go to the security

20   course in New York and he wouldn't sign the paperwork

21   for it.

22   Q.    Did he tell you why?

23   A.    He didn't want to go into the authorization.

24   Q.    Was the security course related to your

1    technical advancement?

2    A.    Yes.

3    Q.    Do you recall name of that course?

4    A.    It's SANS General Security.

5    Q.    S-A-N-S General Security?

6    A.    Yes.

7    Q.    And was that an external training?

8    A.    Yes.

9    Q.    Were you aware if other members of Desktop

10   Computing were allowed to go to external training?

11   A.    Yes.

12   Q.    What other conduct by Mr. Dell did you believe

13   constituted discrimination or harassment against you

14   based on your race or sex?

15   A.    The golden opportunities, the new projects and

16   the high visible, I should say, opportunities.

17   Q.    Did he deny you from working on these high

18   profile or high visibility job opportunities?

19   A.    He just divied them out to everyone but --

20   Q.    Everyone but who?

21   A.    He divied them just to Dan Weir -- him and Dan

22   Weir were the ones who worked on all of those type of

23   projects.

24   Q.    Was Dan Weir, did he have the same job title as

37

1    A.    Are you talking about the security or in
2    general?
3    Q.    The security course in New York?
4    A.    It was -- it was in September.  I think it was
5    in 2002.
6    Q.    Now, when you complained to Mr. Micek about the
7    education, was it specifically about the security
8    course or were there other educational issues that you
9    also complained about?
10    A.    The security course, at that time, was -- the
11    time was running out to register, so I needed an
12    answer whether I was going to be able to go or not.
13    Q.    And when you spoke with Mr. Micek, did you tell
14    him that you believed Mr. Dell was discriminating
15    against you based on your race or gender?
16    A.    I am not exactly sure if we talked about race
17    and gender, but I did express how he was managing my
18    career.
19    Q.    Did you express to Mr. Micek your belief that
20    you were being treated differently in any respect?
21    A.    Yes.
22    Q.    What happened after your conversation with
23    Mr. Micek?  Was there any follow-up conversations you
24    had with Mr. Micek about the security course?

Bridget C. Williams

38

1    A.    He signed the form right there in his office.

2    Q.    So, you were able to take the course, but you

3    had to go beyond your supervisor to the next level of

4    management to get permission; is that correct?

5    A.    The next two levels, yes.

6    Q.    The next two levels.

7          Did you have any other conversations with

8    Mr. Dell concerning this security course in New York

9    after your conversation with Mr. Micek?

10   A.    No.

11   Q.    Do you know if Mr. Micek spoke with Mr. Dell

12   about Mr. Dell's refusal to sign the paperwork?

13   A.    I am sure he did.

14   Q.    But neither Mr. Micek nor Mr. Dell spoke with

15   you concerning this educational opportunity once

16   Mr. Micek signed the form; is that correct?

17   A.    Mm-hmm.

18   Q.    You have to answer verbally?

19   A.    Yes.

20   Q.    Now, explain to me your meeting with Mr. Marra

21   concerning the upgrading application and the access

22   you needed?

23   A.    After I was up against opposition with

24   Mr. Dell, I went into Mr. Marra's office -- I am not

43

1    Q.   As part of that discussion, did you raise at

2    any point that you thought you were being treated

3    differently by Mr. Dell because you were

4    African-American or female?

5    A.   It could have come up.

6    Q.   Do you have a recollection?

7    A.   I don't.

8    Q.   And did you speak with Miss Ross on more than

9    one occasion about your belief Mr. Dell treated you

10   differently because of your race and sex?

11   A.   I have talked to her a couple times about the

12   whole incident.  Whether, you know -- I don't recall

13   whether the conversation was based on race or sex or

14   whether it was just the things he was doing.

15   Q.   And did you complain to Mr. Marra on more than

16   one occasion about the treatment you received from

17   Mr. Dell that you believed was based on your race or

18   gender?

19   A.   No.  He moved shortly after that.

20   Q.   And did you complain to Mr. Micek on more than

21   one occasion concerning your belief that Mr. Dell's

22   conduct was based on your race or gender?

23   A.   One more time.  Did I?

24   Q.   Did you complain more than one time to

52

1    Q.    Do you know if Mr. Dell was calling you from an

2    MBNA phone or from his personal cell phone?

3    A.    I don't recall.

4            MR. COOK:    Thank you, Mrs. Williams, I

5    don't have any further questions for you.    Mr. Sandler

6    may have some.

7            MR. SANDLER:    Let's take a break.

8            (Recess taken.)

9    BY MR. SANDLER:

10   Q.    I just have a couple questions.

11           Talking first about the security course

12   that you mentioned, when that was in -- when you

13   initially talked to Jim Dell about that, did he

14   express interest in himself attending that course?

15   A.    Yes.

16   Q.    And, in fact, did you fill out an application

17   for Jim Dell, as well as for yourself?

18   A.    Yes.

19   Q.    And it's only later that he dragged his feet

20   about completing the process; is that correct?

21   A.    I would give him the application -- I gave it

22   to him several times to fill out, and when I followed

23   up and I asked him why it hasn't been signed is when I

24   realized that he was really dragging his feet.

53

1    Q.   Did he say anything about being concerned about

2    the expense involved or budgets involved in doing

3    that?

4    A.   No.  He just said that he didn't want to go and

5    get signatures.  He didn't want to justify it.

6    Q.   He didn't want to justify it?

7    A.   Mm-hmm.

8    Q.   For himself as well as for you?

9    A.   Yes.

10   Q.   And I think you said that you went to Jim Micek

11   and Jim Micek signed your authorization on the spot?

12   A.   Yes.

13   Q.   And you went to the conference in New York;

14   correct?

15   A.   Yes.

16   Q.   And how long was that conference?

17   A.   A week.

18   Q.   And about when was that?

19   A.   It was in September.

20   Q.   2002?

21   A.   It's possible.

22   Q.   That's what you said before.

23   A.   Yes.  I will have to look it up.  I am not

24   going to tell you yes and --

W&F
C254