```
1              IN THE UNITED STATES DISTRICT COURT
2                 FOR THE DISTRICT OF DELAWARE
3
4
   EQUAL EMPLOYMENT OPPORTUNITY    )
5  COMMISSION,                     )
                                   )       Civil Action No.
6             Plaintiff,           )       04-CV-425-SLR
                                   )
7  v.                              )
                                   )
8  MBNA AMERICA BANK, N.A., a      )
   subsidiary of MBNA Corporation,)
9                                  )
              Defendant.           )
10
               Deposition of WILLIAM F. KENNEDY pursuant
11 to notice at the law offices of YOUNG CONAWAY STARGATT
   & TAYLOR, 1000 West Street, Wilmington, Delaware,
12 beginning at 10:40 a.m. on Tuesday, August 2, 2005,
   before Renee A. Meyers, Registered Professional
13 Reporter and Notary Public.
14 APPEARANCES:
15             TERRENCE R. COOK, ESQ.
               U.S. EQUAL EMPLOYMENT OPPORTUNITY
16             COMMISSION
                  21 South Fifth Street
17                The Bourse, Suite 400
                  Philadelphia, Pennsylvania  19106-2515
18                for the Plaintiffs,
19             SHELDON N. SANDLER, ESQ.
               YOUNG CONAWAY STARGATT & TAYLOR
20                1000 West Street, 17th Floor
                  Wilmington, Delaware  19899
21                for the Defendant.
22 ALSO PRESENT:  Launice Sills, Esq.
23                     WILCOX & FETZER
      1330 King Street - Wilmington, Delaware 19801
24                  (302) 655-0477
```

COPY

8

1    A.    I -- my understanding is yes.  I did not listen

2   to them.

3    Q.    Where did you get the files from?

4    A.    A coworker.

5    Q.    Which coworker?

6    A.    Rich Wresneski.

7    Q.    And how did you get it from Mr. Wresneski?

8    A.    He placed them directly on my PC.

9    Q.    How did he do that?

10    A.    He has access to the -- he was also a LAN

11   administrator, so he has access to the hard drive on

12   the machine.

13    Q.    So, this wasn't done by e-mail?

14    A.    Correct.

15    Q.    Were you present when he placed it on your

16   computer?

17    A.    Was I present -- I don't know the exact time he

18   sent them there.

19    Q.    And did you have knowledge that he was going to

20   send you these MP 3 files before he did it?

21    A.    He did tell me that.

22    Q.    Did he tell you what the MP 3 files contained?

23    A.    Not specifically.  He just told me that they

24   were funny.

William F. Kennedy

9

1    Q.    What were on the MP 3 files?

2    A.    I didn't listen to them.

3    Q.    How long were they on your computer before you

4    were disciplined?

5    A.    I don't even know that time frame.

6    Q.    Is there a reason you did not listen to them?

7    A.    I didn't have the time or didn't make the time.

8    Q.    How is it that you were -- explain to me how

9    the discipline came about.

10   A.    I arrived at work, and my manager's manager,

11   Bellverie Ross, asked me to join her to go to

12   Christiana Center II building, and I assumed it was to

13   work on a computer over there.  And we walked directly

14   into Personnel, and I was sat down and the Personnel

15   officer told me I was there to face corrective action.

16   Q.    At this time, who was your manager?

17   A.    My manager was Neela Chacko.

18   Q.    Did you understand how Miss Chacko learned

19   about the MP 3 files on your computer?

20   A.    No.  She wasn't involved in the corrective

21   action at all.

22   Q.    Do you know how Miss Ross learned of the MP 3

23   files on your computer?

24   A.    No.

10

1    Q.    Are you aware of how any manager at MBNA or

2    Personnel, or the Personnel Department became aware of

3    these MP 3 files on your computer?

4    A.    I am sure whoever ran the investigation, they

5    gave the details to Richard Kilmon, K-i-l-m-o-n.  He

6    was the one that presented me with the details.

7    Q.    Did Mr. Wresneski often put MP 3 files directly

8    on your computer?

9    A.    No.

10    Q.    Was this the first time that he had put

11    anything on your computer?

12    A.    I believe this was the only time.

13    Q.    Did you have any conversations with

14    Mr. Wresneski after you were disciplined concerning

15    the MP 3 files?

16    A.    Yes.

17    Q.    Was this immediately after you were

18    disciplined?

19    A.    It was more than a year later.

20    Q.    What was discussed?

21    A.    We -- for the year, we did not talk, and it had

22    been made known to me that I had inadvertently

23    involved him -- not involved him, but because I, as I

24    told you, that he had put the files on, he received

11

1    corrective action as well.  So I -- I involved him,

2    and because of that, after a year, I apologized for

3    anything that may have happened.

4    Q.   Let me get this straight.  Mr. Wresneski put on

5    your computer an MP 3 file which he says is funny.

6    Somehow, a manager or Personnel at MBNA finds out

7    about it.  You are issued a corrective action.  As

8    part of the corrective action or investigation, you

9    tell them where you got the MP 3 file from?

10   A.   That's correct.

11   Q.   And that was from Mr. Wresneski?

12   A.   That's correct.

13   Q.   And he was upset with you for involving him in

14   this situation?

15   A.   He didn't say anything directly to me, but it

16   was knowledge that, when we would pass in the halls,

17   there was no eye contact and things of that nature.

18   Q.   And prior to this incident, did you have a

19   collegial relationship with Mr. Wresneski?

20   A.   A good working relationship.

21   Q.   A good working relationship?

22   A.   We were on separate teams, but --

23   Q.   Was there anyone else involved in this

24   particular MP 3 file sharing incident that you know

1  of?

2  A.    No.

3  Q.    Did Mr. Wresneski ever tell you what was on

4  those audio files?

5  A.    No.

6  Q.    Is that the only time you have been disciplined

7  while you have been employed at MBNA?

8  A.    Yes.

9  Q.    Were you ever disciplined at your job at First

10  Investors in Cherry Hill?

11  A.    No.

12  Q.    And what was the nature of the discipline?

13  A.    First and final notice.

14  Q.    First and final notice.  How long did that

15  last?

16  A.    Two years.

17  Q.    Did you know Mike Broughton?

18  A.    Yes.

19  Q.    He works in Desktop Computing with you?

20  A.    Desktop LAN Services.  He is part of the Server

21  Engineering Team.

22  Q.    Did you ever socialize with Mr. Broughton

23  outside of the office?

24  A.    I am sure once or twice in the last ten years.



1    environment," we are pretty much talking about the

2    same thing?

3    A.    It depends, because in the nature of my

4    business, working on servers, if we had new software,

5    we had an entire environment created in a separate

6    building that we would go to and work on.

7    Q.    What's that environment called?

8    A.    Test lab.  However, for other people, their

9    testing environment resides in the production world.

10    It's, you know, right next to the production

11    environment, and it's just -- the connectivity does

12    not plug into the production environment.  So for all

13    my testing, I was in a different building.

14    Q.    You were in the test lab?

15    A.    Yes.

16    Q.    And to access the computers in the test lab,

17    did you have a password?

18    A.    Yes.

19    Q.    This was a personal password that was

20    confidential to yourself?

21    A.    Yes.

22    Q.    Was that the same password you would use in the

23    production environment or the testing environment?

24    A.    No.

1    Q.    You had different passwords for each of those

2    different environments?

3    A.    It was only two.  One set of credentials in

4    test lab, one set of credentials outside of the test

5    lab.

6    Q.    At any point in time during your employment at

7    MBNA, were you aware of employees exchanging personal

8    passwords in the test lab or that testing environment

9    of which I spoke?

10   A.    No.

11   Q.    And with respect to the production environment,

12   are you aware of any instance in which employees

13   exchanged passwords in the production environment

14   during your employment at MBNA?

15   A.    Only as a result of this.

16   Q.    The lawsuit?

17   A.    Yes.

18   Q.    Were you made aware of the incident involving

19   Justus Eapen and Jason Campbell?

20   A.    Yes.

21   Q.    You had no personal knowledge of what went on

22   with respect to that password sharing incident?

23   A.    I do not.

24   Q.    Did you know Justus Eapen?

**W&F**
**C262**

21

1    A.   Yes.

2    Q.   Have you ever socialized outside of the office

3  with Justus Eapen?

4    A.   One time, he joined us for an Orioles game.

5    Q.   Do you recall when that was?

6    A.   No.

7    Q.   When you said "joined us," who else attended

8  the game?

9    A.   The department got tickets, and I believe it

10  was four people -- it was either four or six people,

11  but it was myself, Justus, Shay Zorich, Z-o-r-i-c-h,

12  Greg Seman, S-e-m-a-n.  I believe those were the four

13  that had tickets.

14    Q.   Do you consider Mr. Eapen to be more of a

15  colleague or a friend?

16    A.   I would say more of a colleague.

17    Q.   Were you aware of Mr. Eapen's national origin?

18    A.   Yes.

19    Q.   Do you know he was Indian?

20    A.   Yes.

21    Q.   Prior to September 11th, 2001, have you ever

22  heard Mr. Eapen referred to in a derogatory term based

23  on his national origin?

24    A.   No.

22

1    Q.    The Desktop Computing Department, that has been

2    referred to by other witnesses who have testified to

3    be a joking atmosphere.

4              Would you agree with that

5    characterization?

6    A.    I would.

7    Q.    What type of jokes or joking atmosphere have

8    you witnessed as an employee of Desktop Computing?

9    A.    I mean, general pranks as far as unplugging

10   someone's monitor to general verbal exchanges.

11   Q.    With respect to the pranks, there has been

12   testimony of people taking computer equipment from a

13   work area, changing monitors, things of that nature.

14             Have you ever witnessed anybody engaging

15   in those type of pranks?

16   A.    I would have to say yes, I am sure I have at

17   least seen one.

18   Q.    And can you tell me the name of anyone you saw

19   engaging in that type of conduct?

20   A.    I think I saw John Hartnett doing work on Glenn

21   Ford's PC.

22   Q.    Anything else?

23   A.    Not that I can recall.

24   Q.    Did you ever observe anyone tampering with the

23

1    computer equipment in Justus Eapen's work area?

2    A.   No.

3    Q.   Did you ever hear of anyone tampering with the

4    equipment in Justus Eapen's work area?

5    A.   No.

6    Q.   Did you ever hear that someone took Justus

7    Eapen's mouse from his area?

8    A.   No.

9    Q.   Besides the one incident where you observed

10   Mr. Hartnett doing something to Mr. Ford's work area,

11   are you aware of any other prank or instance involving

12   computer equipment?

13   A.   Not related to Justus.

14   Q.   Related to anyone?

15   A.   I think ten years ago, someone put tape on the

16   network connection of Tom Hayden's network connection.

17   Q.   What's Mr. Hayden's race?

18   A.   Caucasian.

19   Q.   Any other incidents or events of pranks in

20   Desktop Computing that you can now tell me about?

21   A.   No.

22   Q.   So the two incidents with Mr. Hartnett and

23   Mr. Ford and then the incident with Mr. Hayden about

24   ten years ago?

24

1    A.    Correct.  And I can actually add another

2    manager to my manager list.  His name is Rob Willard.

3    Q.    W-i-l-l-a-r-d?

4    A.    Yes.

5    Q.    Was that while you were a LAN administrator?

6    A.    That was back probably around '97, '98, and

7    that Tom Hayden reminded me of him.

8    Q.    You also spoke about verbal jokes in the

9    Desktop Computing area.

10              Are you able to tell me any of those

11   jokes?

12   A.    Only as it relates to me, the exchanges I would

13   have with Sung Byun.

14   Q.    What type of exchanges would you have with

15   Mr. Byun?

16   A.    Some of them were, you know, technical, and

17   some of them were, you know, as jokes, I guess they

18   had ethnicity attached to them.

19   Q.    Did Mr. Byun ever make jokes about your race or

20   national origin?

21   A.    Yes.

22   Q.    What type of jokes?

23   A.    He would call me red neck and whitey.

24   Q.    What else?

**W&F**
C266

25

1    A.    That's pretty much it.

2    Q.    Did Mr. Eapen ever call you red neck or whitey?

3    A.    No.

4    Q.    Did you ever hear him refer to any employee as

5    red neck or whitey?

6    A.    No.

7    Q.    What type of comments, if any, did you make

8    about Mr. Byun's race or national origin?

9    A.    It became, you know, I would classify him as

10   the A team.

11   Q.    What did the "A" stand for, was that for Asian?

12   A.    Initially, there was a competition going on

13   between four people in a race to build equipment.  My

14   -- I was working with John Golden and Sung was working

15   with Dave Ings.  And we were the A team, John and I

16   were the A team, and Sung and Dave were the B team

17   because we finished our equipment ahead of them.  And

18   it somehow evolved into, instead of team A being us,

19   team A evolved to being Sung, and I don't know who

20   exactly came up with the "A" for Asian, but that's

21   what it did stand for.

22   Q.    Was there a W team for the white team?

23   A.    Yes.

24   Q.    And you were a member of what was the A team



1   but became the W team?

2   A.    Yes.

3   Q.    Yourself and Mr. Golden?

4   A.    Yes.

5   Q.    Was that like with a joking phrase you guys

6   would say amongst yourself?

7   A.    Yes.   That was a competitive thing.   No

8   different than amateur and pro.   We were the pro team;

9   you were the amateur team.

10   Q.    Do you recall the time frame in which you had

11   this project that you were kind of competing on to get

12   developed?

13   A.    I don't know the exact time, but it was very

14   soon after John Golden was hired, so I don't know the

15   exact month and year, but this was one of John

16   Golden's first projects.

17   Q.    What was Mr. Golden's position, if you know?

18   A.    He is also a LAN administrator with MBNA.

19   Q.    Besides yourself and Mr. Golden and Mr. Byun,

20   were there other MBNA employees that were aware of the

21   use of this A team and W team amongst yourselves?

22   A.    Dave Ings.   He was on Sung's team.

23   Q.    Mr. Ings is African-American; is that correct?

24   A.    Yes.

1   Q.   Besides the four of you individuals, Mr. Ings,

2   Mr. Golden, Mr. Byun, and yourself, did the A team or

3   the W team reference any other MBNA employees?

4   A.   No.

5   Q.   And was this a phrase that was commonly known

6   within Desktop Computing, that the A team constituted

7   Mr. Byun and Mr. Ings and the W team constituted

8   yourself and Mr. Golden?

9   A.   I am -- I am not sure if other people were

10  told.   I mean, it was inside, between us, so --

11  Q.   There has been testimony in this case that the

12  area in which the employees of Desktop Computing sat,

13  the cubicles were a little smaller than the managers,

14  and that area became known as the ghetto.

15          Have you ever heard that area referred to

16  as the ghetto?

17  A.   I have heard that term, "the ghetto."

18  Q.   And did you hear it in context of that

19  particular area where the employees in Desktop

20  Computing sat or some other meaning?

21  A.   It was, in essence, every cube that was smaller

22  than a manager's cube.   So, out of a room of

23  approximately 200, we will say 180, between 170 and

24  180 qualified as the ghetto.

William F. Kennedy

28

1    Q.    And in what context have you heard that phrase

2    used in Desktop Computing?

3    A.    I don't understand the question as far as the

4    context.  Simply, you know, envy of a larger cube.

5    Q.    I understand where the term came from, but can

6    you give me examples of how it was used?  For example,

7    I am headed back to the ghetto or --

8    A.    Something as basic as, I am headed back to the

9    ghetto, or, I am sitting here in the ghetto.

10   Q.    Who came up with that phrase?

11   A.    I don't know.

12   Q.    Do you recall the time frame in which the term

13   "ghetto" was kind of used to refer to the Desktop

14   Computing section?

15   A.    It was probably as soon as we moved into that

16   area, generally.  We were in the neighboring building

17   and we all had larger cubes at that point, and then I

18   am sure that it came about when we moved to the

19   smaller cubes.

20   Q.    And help me out:  The old building was

21   Christiana?

22   A.    IV.

23   Q.    And then you moved to Christiana?

24   A.    III.


C270

29

1    Q.   So, it was after you moved to Christiana III

2    that reference was made to the cubicles?

3    A.   Correct.   Because in Christiana IV, we all had

4    large cubes.

5    Q.   And is there any particular employee you heard

6    referencing that area as the ghetto?

7    A.   None in particular.

8    Q.   And have you made reference to that area as the

9    ghetto yourself?

10   A.   No.

11   Q.   Have you heard Mr. Byun make reference to that

12   area as the ghetto?

13   A.   I don't believe so.

14   Q.   Mr. Byun has testified he has referred to that

15   areas as the ghetto.

16            Would that surprise you?

17   A.   I sit 50 foot away and I am in a different -- I

18   have a large cube, so I am not part of that.

19   Q.   But that Mr. Byun would use the term "ghetto"

20   in the workplace, is that something that surprises you

21   based on your knowledge of Mr. Byun and your

22   conversations with him?

23   A.   As far as my interaction, if he was saying that

24   to me, I wouldn't be surprised because that's the



C271

William F. Kennedy

1    relationship we had.  Have.  I said "have" instead of

2    "had."  We still have that relationship.

3      Q.   You don't have that relationship with Mr. Byun

4    today that you used to have?

5      A.   I do.  That's why I corrected myself.  Instead

6    of "had," I said "have."

7      Q.   Was there a time in which Mr. Byun was offended

8    by any of the jokes you told him about his race or

9    ethnicity?

10     A.   Not that I am aware of.

11     Q.   Was there a period of time in which you and

12   Mr. Byun did not speak on a regular basis because of a

13   joke that you told him?

14     A.   No.

15     Q.   Besides the reference to the A team and the W

16   team, were there any jokes that you told Mr. Byun or

17   any exchanges between yourself and Mr. Byun related to

18   his national origin?

19     A.   No.

20     Q.   Mr. Byun has testified that he has been called

21   rice or rice bowl in reference to his national origin.

22          Have you ever used those phrases in

23   connection with Mr. Byun?

24     A.   No, I have not.

31

1    Q.    Have you ever heard anybody refer to Mr. Byun
2    as rice or rice bowl?
3    A.    No.
4    Q.    Have you told me everything you can recall
5    about the nature of the jokes that you exchanged
6    between yourself and Mr. Byun?
7    A.    I mean, I don't know what else to say other
8    than, for instance, when it comes to technology, you
9    know, we have jokes that, you know, his relatives
10   built this technology.  It will be something in the
11   order of, you know, your brother built this PC; your
12   family built this PC.
13   Q.    Those would be comments you would make to
14   Mr. Byun based on his Korean national origin; correct?
15   A.    Yes.
16   Q.    That was like a joke told amongst each other on
17   a regular basis or a comment you would make on a
18   regular basis?
19   A.    Not on a regular basis, but it was always
20   between Sung and I.  It was not in the population by
21   any means.
22   Q.    After the events of September 11th, 2001, did
23   you ever hear Mr. Eapen referred to as Osama bin
24   Laden?

W&F
C273

32

1    A.    No.

2    Q.    By any employee?

3    A.    No.

4    Q.    Have you ever heard that phrase used in a

5    derogatory term in Desktop Computing?

6    A.    No.

7    Q.    Have you ever heard Mr. Eapen referred to as

8    OBL, short for Osama bin Laden?

9    A.    No, I have not.

10   Q.    Have you ever heard Mr. Eapen referred to as

11   Osama bin Laden's brother or cousin?

12   A.    No, I have not.  I mean, other than the

13   Delaware News Journal.

14   Q.    Other than the article that came out about the

15   lawsuit?

16   A.    Yes.  I have not heard other than the article.

17   Q.    Have you ever heard Mr. Eapen referred to as

18   BP, for brown people?

19   A.    No.

20   Q.    Have you ever heard any employee referred to as

21   BP, for brown people, within Desktop Computing?

22   A.    Yes.

23   Q.    Who?

24   A.    Mark Shiwpal.

33

1    Q.    Who is Mark Shiwpal?

2    A.    Mark Shiwpal was an intern for Desktop

3    Computing.

4    Q.    What's his national origin or race?

5    A.    I believe he is Indian.

6    Q.    Did he refer to someone as BP or was he

7    referred to as BP?

8    A.    He created the term because -- I imagine

9    because he would be someone that would have heard team

10   A or team W, and in an effort to join that, he came up

11   with his own team.  So he classified himself as BP.

12   Q.    And what do you base that on?  Was that with

13   conversations with Mr. Shiwpal?

14   A.    He -- he started -- he started his own team, a

15   one-man team.

16   Q.    And did Mr. Shiwpal tell you what "BP" stood

17   for?

18   A.    Yes.

19   Q.    And what did he tell you?

20   A.    Brown people.

21   Q.    And did he also tell this to the other people

22   on the A and W teams, Mr. Ings, Mr. Golden, or

23   Mr. Byun?

24   A.    I would say no, probably not.



C275

34

1    Q.   So, out of everybody on the A team and the W

2    team, he told you that he created a term to reference

3    himself as BP, for brown people?

4    A.   Yes.

5    Q.   Did anybody else pick up on the term "BP," for

6    brown people, and use it in any other manner besides

7    reference to Mr. Shiwpal?

8    A.   I believe Mark told other people that he, you

9    know, that's how he classified himself, as BP, but he

10   didn't call anyone else BP.

11   Q.   Besides Mr. Shiwpal, have you heard anybody

12   else use the term "BP" within Desktop Computing?

13   A.   No.

14   Q.   What summer was Mr. Shiwpal present at MBNA?

15   A.   I would have to say he is still employed at

16   MBNA.  He is a full-time employee.  But as an intern,

17   it would be between 2000, 2002, his junior and senior

18   years.

19   Q.   We are talking about the period of time after

20   September 11th, 2001, have you ever heard Mr. Eapen

21   referred to as a sand nigger?

22   A.   No.

23   Q.   Have you ever heard the term "sand nigger" used

24   towards anyone within Desktop Computing?

William F. Kennedy

35

1    A.    No, I have not.

2    Q.    Have you ever heard Mr. Eapen referred to as a

3    nigger?

4    A.    No.

5    Q.    Have you ever heard anyone use the phrase

6    "nigger" within Desktop Computing?

7    A.    No.

8    Q.    Have you ever heard Mr. Eapen referred to as

9    Sadam Hussein?

10   A.    No.

11   Q.    Have you ever heard anyone referred to as Sadam

12   Hussein within Desktop Computing?

13   A.    No, I have not.

14   Q.    And have you heard Mr. Eapen referred to as

15   Sadam Hussein's brother?

16   A.    No.

17   Q.    Have you ever heard that phrase used within

18   Desktop Computing?

19   A.    No.

20   Q.    Are you aware, Mr. Kennedy, of an incident in

21   which a mail room clerk, mentally disabled mail room

22   clerk was told that Mr. Eapen was Osama bin Laden's

23   brother?

24   A.    No.



C277

37

1    A.   I am sure I have, but very minor, maybe "damn."

2    Q.   How about Thomas Liddle?

3    A.   The same.

4    Q.   What about Richard Wagner?

5    A.   Probably not.

6    Q.   What about Mike Broughton, have you heard any

7    profanities in the workplace?

8    A.   Probably minor things.

9    Q.   Besides what you have testified to in terms of

10   the comments, the jokes that went on in that section,

11   are you aware of any other comment that was made by

12   anybody in Desktop Computing that you considered to be

13   based on someone's race or religion or national

14   origin?

15   A.   No.

16   Q.   And had you received training while you have

17   been employed at MBNA on issues of harassment and

18   discrimination?

19   A.   Yes.

20   Q.   In the 17 years you have been with MBNA, how

21   many times have you had training specifically on

22   issues of harassment or discrimination?

23   A.   Probably at least three times.

24   Q.   When was the last time you had any training on

1    want to change it to the language, maybe that will be

2    more helpful.

3                    (The reporter read back as requested.)

4    BY MR. COOK:

5        Q.    Do you understand the question?

6        A.    I do.

7        Q.    Can you answer that?

8        A.    I don't think so.  I don't think I can answer

9    that.

10       Q.    You don't think you can answer that?

11       A.    I think that -- I don't think it was

12   harassment, so if you are asking me if I think the

13   harassment was acceptable, I don't think it was

14   harassment, so I don't think that's the question.

15       Q.    Do you think that the language, the use of that

16   language, red neck or whitey, to be violative of

17   MBNA's harassment policy?

18       A.    I would say no based on the fact that it was

19   accepted by both Sung and I.

20       Q.    So, it was your understanding of MBNA's

21   harassment policy that if the language exchanged

22   between employees is acceptable to both employees, it

23   would not constitute harassment?

24       A.    I would agree with that.



C279

William F. Kennedy

40

1    Q.    For example, if you were having conversations

2  with David Ings -- you know Mr. Ings?

3    A.    I do.

4    Q.    He is African-American?

5    A.    Yes.

6    Q.    If you refer to Mr. Ings as a nigger and he

7  seemed to have no objections to that, do you believe

8  that language would constitute harassment under MBNA's

9  harassment policy?

10    A.    I would never talk to Dave Ings that way.  I

11  would never called him -- I have never called him a

12  name other than his association being on the team as

13  -- he is a very religious person and we even watch our

14  language around him.

15    Q.    Work with me a little bit just as a

16  hypothetical.  I am not saying that you would.  But I

17  am asking:  Under the scenario which I have proposed

18  to you --

19    A.    I believe that term is flagged for harassment.

20    Q.    Regardless of --

21    A.    There is no positive term, for that term, in

22  particular.

23    Q.    So, regardless of whether or not Mr. Ings was

24  offended by the comment or objected to it, you believe

**W&F**

C280

41

1  the use of that particular word would be a violation

2  of MBNA's harassment policy?

3    A.    I believe it would be a violation if we used it

4  without him asking us to use it.  If he wants us to

5  refer to him as that, I believe it's not harassment.

6  I think if we initiate it, using that term, I think

7  that's --

8    Q.    Did Mr. Eapen ever complain to you or tell you

9  his belief that he was being harassed or discriminated

10  against at MBNA?

11    A.    No.

12    Q.    How often did you and Mr. Eapen interact on a

13  regular basis?  And I understand it's been a long

14  time.  Just give me an average of twice a week?

15  Daily?

16    A.    Not even that.  Justus worked the night shift.

17  I was on the day shift.  For me to see him, to

18  physically see him, it would have to be an overnight

19  production issue.  So there would be no scheduled time

20  we would see each other.

21    Q.    Based on your training, the training you have

22  had at MBNA on issues of harassment and

23  discrimination, do you have an understanding what you

24  were to do if you believe someone was being subjected

42

1    to harassment or discrimination at MBNA?

2    A.    I do.

3    Q.    And what was your understanding?

4    A.    First, you go to your manager and then your

5    manager's manager and Personnel.  You have a couple

6    paths.

7    Q.    The reference that was made to the A team and

8    the W team within Desktop Computing, did you believe

9    those references to be harassment in any way?

10    A.    No.

11    Q.    References to the small cubicles being referred

12    to as the ghetto within Desktop Computing, did you

13    consider that to be harassment or discrimination in

14    any way?

15    A.    No.

16    Q.    The comments you made to Mr. Byun about his

17    relatives built the technology in which the computers

18    are based, did you believe that to be harassment in

19    any form?

20    A.    No.

21    Q.    Did you consider that to be unprofessional

22    conduct, and, that is, referencing Mr. Byun's relative

23    as building the technology in which the computers were

24    based?

**W&F**

C282

43

1    A.   I wouldn't say unprofessional.  I would say I

2  could have had better taste; however, it was an

3  exchange between us.  It was an accepted exchange

4  between us.

5    Q.   Did you believe that the reference to the

6  smaller cubicles as the ghetto, do you believe that

7  was professional behavior?

8    A.   I wasn't a part of that.  Do I believe someone

9  else thinks that the ghetto is unprofessional?

10    Q.   Yes.  Well, I know you weren't a part of it.

11  You testified that you weren't a part of it and I will

12  take your word for that.  But I am asking you:  Would

13  reference to a physical area within MBNA as a ghetto,

14  do you believe that to be a professional conduct or

15  unprofessional conduct?

16    A.   If I had a choice between the two, I would say

17  unprofessional conduct.

18    Q.   And the exchange between yourself and Mr. Byun

19  in terms of red neck and whitey and A team and W team,

20  do you consider that to be professional or

21  unprofessional behavior?

22    A.   If those are my two choices, I will say

23  unprofessional.

24    Q.   What other category would you put that in?

50

1    A.    Yes.  It was actually -- it may have been prior

2    to him joining Desktop Computing.  He was still in

3    Distributed Operations, User Support, I believe, when

4    we moved over to III.

5    Q.    And from what I think you have said today, your

6    desk or location was 50 feet or so away from some of

7    the other people about whom you have been asked?

8    A.    Yes, every one of them.

9    Q.    In addition to the distance between your

10   location and -- well, first of all, is that where --

11   did Justus Eapen sit with this other group?

12   A.    He was in the proximity of the other group.  I

13   would say the group, itself, is probably 50 feet from

14   me and Justus was probably 60 foot.  I don't think we

15   could be farther apart in the same room.

16   Q.    What were your hours?

17   A.    My hours were eight to five.

18   Q.    And what were his hours?

19   A.    His were night shift.  I imagine they were

20   roughly from four to 12 or six to six.  I don't know

21   -- I don't recall what their shift was.  They

22   alternated.

23   Q.    Assuming his hours were, say, seven to six, or

24   thereabouts, would there have been any overlap with

51

1    the times when you were in?

2      A.    Not unless it was an emergency.

3      Q.    So, the only time that you would see Justus

4    Eapen, if those hours are correct or approximately

5    correct, would be if you -- if you had to come in in

6    the evening or if he had to come in during the day?

7      A.    That's correct.

8      Q.    If you left your desk area for work purposes,

9    was there any other place in the complex that you

10   would go on a regular basis?

11     A.    The nature of my job was not to be at my desk.

12   It was to be in the data center, one story below, on

13   the first floor, working on the servers.

14     Q.    So, you weren't even on the same floor with

15   these other people a lot of the times?

16     A.    Correct.  My general course of business was one

17   floor below.

18     Q.    How old are you, by the way?

19     A.    Thirty-nine.

20     Q.    I think you said that you would characterize

21   your relationship with Mr. Eapen as that of a

22   colleague rather than friend.

23              Did you have a good relationship?

24     A.    Yes.

W&F
C285

William F. Kennedy

53

1    A.    Right.

2    Q.    I take it what you are saying is that after he

3    joined Desktop Computing, he communicated with you

4    less?

5    A.    There was less of a need because we worked in

6    different departments.  In user support, he worked the

7    Help Desk and he would page me because of my knowledge

8    of our entire environment.  I might not have the

9    answer to his question, but I could direct him.  In

10   the middle of the night, he could page me, and I would

11   say, Okay, you need to contact Connie Carlisle if it

12   was an e-mail issue.  I would give him a contact name

13   or things like that.

14         Once he joined Desktop Computing, he

15   joined on the Perimeter Network Exchange, the e-mail,

16   which is separate other than he could help me out by

17   being on site overnight with my --

18   Q.    You talked about the phrase that was used by an

19   Indian intern named Mark Shiwpal; is that his name?

20   A.    Yes.

21   Q.    And what was the phrase that he created to

22   refer to himself?

23   A.    Brown people, brown guy.  It was definitely

24   brown.

54

1    Q.    And how did that come about?

2    A.    He wanted to create a team of his own to, in

3    essence, compete with the rest of us because it was a

4    competition, like a team competition, and he wanted to

5    be a player of his own team.

6    Q.    And he was aware that the four of you had

7    divided up into two teams which you -- and you had

8    created names for yourselves?

9    A.    He was aware of that.

10   Q.    So, by the time he was there, the teams which

11   originally were the A team and the B team had become

12   the Asian team and the White team?

13   A.    They were never referred to as that.  It was

14   always the A team and the W team.

15   Q.    A team and the W team.

16            So, how did he refer to his team?

17   A.    He, just by himself, he would identify himself.

18   He didn't have any teammates.

19   Q.    Did he say he was brown guy?

20   A.    Yes.

21   Q.    Or brown people, or did he say BP or BG?

22   A.    He -- he used both terms, you know, BP, brown

23   people.  I think it started out with brown guy and

24   evolved into a team name for an individual.  So, I

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE


EQUAL EMPLOYMENT OPPORTUNITY  )
COMMISSION,                   )
                              )
        Plaintiff,            )
                              )
v.                            )    Civil Action No.
                              )     04-CV-425-SLR
MBNA AMERICA BANK, N.A., a    )
subsidiary of MBNA            )
Corporation,                  )
                              )
        Defendant.            )


        Deposition of RICHARD LEE WEGNER, JR., taken
pursuant to notice at the law offices of Young, Conaway,
Stargatt & Taylor LLP, 1000 West Street, 17th Floor,
Wilmington, Delaware, beginning at 9:50 a.m. on Thursday,
October 6, 2005, before Robert Wayne Wilcox, Jr.,
Registered Professional Reporter and Notary Public.

APPEARANCES:

        TERRENCE R. COOK, ESQ.
        UNITED STATES EQUAL EMPLOYMENT
        OPPORTUNITY COMMISSION
          The Bourse
          21 South Fifth Street - Suite 400
          Philadelphia, Pennsylvania  19106
          for the Plaintiff,

        SHELDON N. SANDLER, ESQ.
        YOUNG, CONAWAY, STARGATT & TAYLOR LLP
          1000 West Street - 17th Floor
          Wilmington, Delaware  19801
          for the Defendant.


--------------------------------------------------
                    WILCOX & FETZER
  1330 King Street - Wilmington, Delaware 19801
                    (302) 655-0477





1    Mr. Eapen's performance?

2        A.    Just having concerns that a number of things that

3    he had done weren't done accurately, things hadn't gotten

4    done.   I think it was more of a generalization.  I don't

5    know that I told her any specifics.  I mean, I --

6    actually, I did her tell her specifics -- some of the

7    things that had been done with issues why the mailboxes

8    hadn't gotten moved.

9                I take that back.  That wasn't even the --

10   there were some other instances where we had problems

11   with e-mail servers crashing.  And because that affected

12   users on those mailboxes and he was involved in it at the

13   time overnight, I had to tell her -- I had to explain to

14   her what was going on.  That type of thing.

15       Q.    So in addition to not moving the mailbox from one

16   server to another, are you telling me that there was an

17   instance where e-mail servers crashed and that was

18   Mr. Eapen's fault or responsibility?

19       A.    The server crashing was not his fault.  Him not

20   being able to fix it was the problem.

21       Q.    What other type of performance-related issues did

22   you have with Mr. Eapen besides the two you've told me

23   about?

24       A.    I don't recall any.  Those were a couple of the

1    A.    I don't recall who I heard the rumor from.

2    Q.    This rumor about the person leaving early from

3    work in exchange for doing something for Ms. Ross, was

4    this before or after the TACS listening incident?

5    A.    I don't recall.

6    Q.    Were you disciplined at all for any part of this

7    rumor that the person was allowed to leave early?

8    A.    No.  I did not -- it was just a rumor I heard.

9    Q.    Okay.  So we now have three incidents when you

10   were disciplined while you were employed at MBNA.  Are

11   you aware of any other time you were disciplined, either

12   verbally or written warnings, for any of your conduct or

13   performance while at MBNA?

14   A.    Not that I can think of at this time.  I don't

15   believe so.

16   Q.    Okay.  If you recall anything else during the

17   course of this deposition, let me know.

18   A.    Okay.

19   Q.    After this deposition, if you recall something

20   else, please let Mr. Sandler know, and he will notify me

21   of that.  Okay?

22   A.    Okay.

23   Q.    Now, during your time at MBNA, were you aware if

24   employees shared passwords for any purpose?

1    A.    No.

2    Q.    You're not aware?

3    A.    Not other than the one service account that I

4    told you about that a small group of people knew about.

5    No.   In fact, they changed the rules where even the

6    administrative passwords that could be changed were

7    changed on a monthly basis.   But sharing your own

8    personal e-mail or personal log-in account password was

9    completely prohibited.

10   Q.    You said there was a change in the rules.

11               Do you recall when in terms of time -- month

12   or year -- that this change occurred?

13   A.    No.   I don't exactly recall when that was done,

14   but it was -- it might have been -- it was probably like

15   in 2002.

16   Q.    Prior to the change in the rules, were you aware

17   of any personal passwords being exchanged amongst

18   employees for any purposes?

19   A.    No.

20   Q.    In either the testing or production environment?

21   A.    No.

22   Q.    Have you ever shared your password with any MBNA

23   employee?

24   A.    No.

1    Q.    Have you ever asked an MBNA employee for their

2    password?

3    A.    No.

4    Q.    Within MBNA, what campus were you on?

5    A.    Christiana.

6    Q.    In what particular building?

7    A.    Christiana Center.  Up until, I think it was,

8    July of 2002, we were in what we called CC-4, Christiana

9    Center 4.  And then after that it was CC-3, Christiana

10   Center 3.

11   Q.    When you were in CC-4, did you know Justus Eapen

12   during that time period?

13   A.    Yes.

14   Q.    Were you seated in the same general location as

15   Mr. Eapen?

16   A.    We all were, yes.

17   Q.    What about at CC-3?  Were you seated in the same

18   general location as Mr. Eapen?

19   A.    I don't recall where he was seated because I

20   don't remember exactly when he left MBNA.  But I don't

21   even recall him being over there in CC-3.

22   Q.    When do you recall first meeting Justus Eapen?

23   A.    I met the whole group at the same time when I

24   started working there in August.

1   the atmosphere of the environment?

2       A.    I would say hectic.  I mean, it was friendly in

3   the fact of, you know, people greeting me -- that type of

4   thing.  It was very cordial.  But the work environment,

5   the workload -- that type of thing -- was very hectic.

6       Q.    Some of the witnesses in this case, Mr. Wegner,

7   have described the desktop computing section as being a

8   joking section.  There were a lot of jokes going on in

9   desktop computing.  Do you agree with that statement?

10      A.    Joking?  I guess that's kind of a general way of

11  describing it.

12      Q.    You would agree that it was a joking atmosphere,

13  or would you have a different definition or different

14  label you want to put on the environment?

15      A.    I would say, yes, there were jokes made -- that

16  things were, you know, made light of.  If somebody made a

17  mistake, you know, people would joke about it just to try

18  to make things seem not as bad as what they were.  You

19  know, at the time when I first started working there, I

20  was kind of oblivious to it just because I was trying to

21  learn the environment.  My job was, more or less -- at

22  the time my job was in the test lab, and I was there most

23  of the time.

24      Q.    Is the test lab separate and apart from the area

**W&F**
**C293**

1       A.    No.

2       Q.    Have you ever heard that phrase at all within

3    MBNA?

4       A.    Brown people?

5       Q.    "BP" or brown people, either one.

6       A.    No.    That's actually new to me.    No.

7       Q.    Have you ever heard Mr. Eapen referred to as a

8    "sand nigger"?

9       A.    No.

10      Q.    Or a "nigger"?

11      A.    No.

12      Q.    Are you aware of the existence of an A team and a

13   W team within desktop computing -- A for Asian team and

14   W for white team?

15      A.    I heard the initials, but I didn't know what they

16   stood for.

17      Q.    So you've heard the reference to an A team and a

18   W team, but you didn't know that it referred to Asian or

19   white.    Is that what you're telling me?

20      A.    Yes.    I thought that had something to do with who

21   belonged to the team or somebody's last name or something

22   like that.

23      Q.    The reference to the A team or W team, was that

24   something that you heard on a regular basis or --

1   A.    No.  I wouldn't say I heard it on a regular

2   basis.  Maybe two or three times at most.

3   Q.    Do you have a recollection of who used that

4   reference to an A team or W team?

5   A.    No.

6   Q.    There has been testimony in this case that the

7   area of cubicles where Mr. Eapen, Mr. Wresneski, Mr. Ford

8   Mr. Liddle and some other of the other workers sat was

9   referred to as the "ghetto."  Have you heard that term

10  used within MBNA during your employment?

11  A.    I -- yes.  I did.

12  Q.    Did you understand the "ghetto" to be the area of

13  cubicles where those individuals sat?

14  A.    Yes.

15  Q.    Who did you hear use or refer to that area of

16  cubicles as the "ghetto"?

17  A.    I believe the people that sat in those -- that

18  area.

19  Q.    Did you sit in that area?

20  A.    No.

21  Q.    How many times, if you can approximate, have you

22  heard that area referred to as the "ghetto"?  Was it

23  something on a regular basis?

24  A.    No.  Just a few times.  Two, three times.

```
 1   because I drove on some grass, and also evading an
 2   officer.
 3      Q.   Okay.  With respect to the termination from that
 4   Farm & Fleet, you say that you put a 25-cent valve stem
 5   in a car and didn't charge for it?
 6      A.   Yes.
 7      Q.   Someone in authority determined that that was
 8   grounds for dismissal?
 9      A.   Correct.
10      Q.   Is that because any item that was not charged for
11   was regarded as something that you were giving away?
12      A.   Basically because it was a retail store.  If, you
13   know, a customer -- if it was put on a customer's car,
14   they had to be charged for it.
15      Q.   So it was just a policy violation?
16      A.   Basically, yeah.
17      Q.   Who was your successor in supervising Justus
18   Eapen?
19      A.   Jim Dell.
20      Q.   With regard to the poker nights that you talked
21   about, were they closed to anybody --
22      A.   No.
23      Q.   -- or were they open?
24      A.   They were open.  I may not have invited
```

1   everybody.  But one of things I said in my e-mail was

2   please invite others that you feel would want to attend.

3       Q.    Did some people attend and some people not attend

4   after a while?

5       A.    Yes.

6       Q.    In his charge of discrimination, Mr. Eapen says

7   that on two occasions you ordered him to delete log files

8   and to reboot the machine, and when the machine wouldn't

9   come back up, he was blamed.  Do you remember anything

10  like that happening?

11      A.    Yes.  I recall at least one of the instances.

12  The procedure that he took to try and resolve the issue

13  was exactly that -- deleting log files.  And that's how

14  it was fixed.  My recollection is that that's what fixed

15  the problem, not -- to me the description sounds

16  technically incorrect, because that's the resolution to

17  the problem.

18      Q.    So that his description suggested perhaps he

19  didn't know exactly what he was saying?

20      A.    Correct.  That was more of him being incompetent

21  and not being able to perform the job that he was asked

22  to do.  When problems like that did arise, I encouraged

23  him to look over our shoulders so that he could see what

24  was happening and learn from that.