IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

EQUAL EMPLOYMENT OPPORTUNITY   )
COMMISSION,                    )
                               )
          Plaintiff,           )
                               )
v.                             )   Civil Action No.
                               )   04-CV-425-SLR
MBNA AMERICA BANK, N.A., a     )
subsidiary of MBNA             )
Corporation,                   )
                               )
          Defendant.           )

          Deposition of RENEE CUFFEE-WILLIAMS taken
pursuant to notice at the law offices of Young, Conaway,
Stargatt & Taylor LLP, 1000 West Street, 17th Floor,
Wilmington, Delaware, beginning at 2:10 p.m. on Thursday,
October 6, 2005, before Robert Wayne Wilcox, Jr.,
Registered Professional Reporter and Notary Public.

APPEARANCES:

          TERRENCE R. COOK, ESQ.
          UNITED STATES EQUAL EMPLOYMENT
          OPPORTUNITY COMMISSION
            The Bourse
            21 South Fifth Street - Suite 400
            Philadelphia, Pennsylvania  19106
            for the Plaintiff,

          SHELDON N. SANDLER, ESQ.
          YOUNG, CONAWAY, STARGATT & TAYLOR LLP
            1000 West Street - 17th Floor
            Wilmington, Delaware  19801
            for the Defendant.


-------------------------------------------------------
                  WILCOX & FETZER
   1330 King Street - Wilmington, Delaware 19801
                  (302) 655-0477



C298



1   outside company that came in, and we went through the

2   investigation process.  That was in 2002 and also in 2004

3   with them.

4       Q.    Any other investigatory training that you've had

5   since you've been at MBNA?

6       A.    Not investigative things, but there's, you know,

7   constantly education going on with regard to policies and

8   procedures.

9       Q.    Now, the training that you had on MBNA's policies

10  and procedures, is that separate and different from the

11  training you had on how to investigate policy violations,

12  or was it part of the investigation training?

13      A.    You mean the --

14      Q.    The training that you received on MBNA's policies

15  and procedures, was that a separate training on exclusive

16  "These are our procedures," "These are our policies," or

17  was it part of the training you had on how to

18  investigate?

19      A.    The policies and procedures, that part was

20  different.  It was separate education.  And then the

21  investigative training by that one company was

22  specifically focusing on investigative techniques.

23      Q.    Okay.  When was the first time that you received

24  any training while at MBNA on their policies and

1   procedures?

2       A.    On MBNA's policies and procedures?

3       Q.    Yes.

4       A.    When I first started in 1999.

5       Q.    What was the format of that training?  Was it

6   half a day?  A couple of days?  What do you recall?

7       A.    No.  It was either two to three days.  I believe

8   it was three days.

9       Q.    What type of policies did you cover in this

10  training?

11      A.    We talked about Policy 601.  That is the

12  corrective action.  We talked about Policy 603, which was

13  harassment.  A lot of the 600 policies with regard to

14  ethics.  We talked about a lot of policies -- the 500

15  series about disability, FMLA, bereavement.  We primarily

16  covered all the policies.  There is a series from like

17  100 all the way up to 800.

18      Q.    Were these other MBNA employees conducting the

19  training?

20      A.    Yes.

21      Q.    Was this somebody from the law department, do you

22  know?

23      A.    I believe one piece of it.  Someone -- there was

24  representation from the legal area.

1    Q.    When was the next time you had any training on

2    MBNA's policies or procedures?

3    A.    I can't remember the specific date, but we

4    actually had some type of education every single year

5    since I've been there.

6    Q.    Was it always the two- to three-day format or was

7    it reduced in scope?

8    A.    No.   It was reduced.   Some were -- some may have

9    been half days.   For the most part they were all day --

10   one-day training.

11   Q.    Prior to assuming the personnel position in 1999,

12   had you had any experience investigating any type of

13   policy violations?

14   A.    No.   Not specifically.

15             MR. SANDLER:   Off the record.

16             (A brief discussion was held off the

17   record.)

18   BY MR. COOK:

19   Q.    Ms. Williams, I was inquiring as to any other

20   training on how to conduct an investigation prior to

21   1999.

22   A.    I wasn't in the role of personnel at that time.

23   I was only management.   So no.

24   Q.    Do you know Justus Eapen?

 1   trying to access the system and could not.  And he asked
 2   Jason for his password and User ID.  And Mr. Campbell
 3   said that he gave it to him.  He said that "It was a bad
 4   judgment on my part."  He said, "I was half asleep when
 5   he called."  He told me that he had to get this
 6   assignment done, that it was mandatory.  And that's the
 7   reason why he gave him his information.
 8       Q.   Was this a face-to-face meeting you had with
 9   Mr. Campbell?
10       A.   Yes, it was.
11       Q.   How long did the meeting last?
12       A.   Maybe an hour.
13       Q.   Who else was present during this meeting?
14       A.   No one but Jason and myself.
15       Q.   You took notes during this meeting?
16       A.   Yes.  I did.
17       Q.   Are those notes part of the file?
18       A.   Yes, it is.
19       Q.   Did you go over the information security
20   guidelines with Mr. Campbell during that meeting?
21       A.   Not specifically one by one, but I asked him
22   about them.
23       Q.   Asked him about his knowledge of those?
24       A.   Yes.  If he was aware of them specifically.

W&F
C302

1     A.    The ones we just mentioned?

2     Q.    Conflict of interest, tardiness and excessive use

3    of the telephone.

4     A.    Correct.

5     Q.    Now, with respect to the violation of the

6    information security guidelines, is there a particular

7    provision on this piece of paper Mr. Eapen violated by

8    obtaining Mr. Campbell's password and using it?

9     A.    Yes.

10    Q.    Can you direct me to that?

11    A.    Bullet No. 2.

12    Q.    Okay.  I'm going to read it into the record, and

13   then I'm going to ask you to identify if there's a

14   particular part of that bullet that you believe Mr. Eapen

15   violated.  It says:  "User IDs and passwords are used to

16   establish accountability for activity performed on MBNA

17   computer systems, and all actions performed are the full

18   responsibility of the person who has been assigned that

19   User ID.  People are not to share their personal User ID

20   or password or use their User ID or password to log into

21   MBNA computer systems for another person.  Passwords must

22   remain confidential and should not include information

23   that can be easily guessed."

24    A.    I would say that entire bullet.



1    Q.   Okay.  It says, "User IDs and passwords are used
2    to establish accountability..."  Correct?

3    A.   That's correct.

4    Q.   With respect to this particular incident, whose
5    User ID and password was used?

6    A.   Mr. Eapen used Mr. Campbell's.

7    Q.   It goes on further to say that "...all actions
8    performed are the full responsibility of the person who
9    has been assigned that User ID."  Correct?

10   A.   That's correct.

11   Q.   So in this situation, whatever happened on the
12   MBNA computer systems would be the full responsibility of
13   Jason Campbell because he was assigned that User ID.  Am
14   I correct?

15   A.   That's correct.

16   Q.   Okay.  As part of your investigation, besides the
17   act of trying to change, I guess, accounts or passwords,
18   was there any MBNA information that was taken off of the
19   computers or disclosed to anyone else while Mr. Eapen was
20   using Mr. Campbell's User ID and password?

21   A.   Not to my knowledge.

22   Q.   The second sentence says, "People are not to
23   share their personal User ID or password..."  Did I read
24   that correctly?


C304

1    A.    I'm sorry.  Can you read that again?

2    Q.    Sure.  I'm at the second sentence.  "People are

3    not to share their personal User ID or password..."

4    A.    Yes.

5    Q.    Okay.

6    A.    I see it.

7    Q.    As a result of your investigation, did you find

8    that Mr. Eapen had shared his personal User ID or

9    password with anyone?

10   A.    Not his personal one.

11   Q.    Okay.  The rest of that sentence reads:  "...or

12   use their User ID or password to log into MBNA computer

13   systems for another person."

14             As a result of your investigation, did you

15   find that Mr. Eapen used his User ID and his password to

16   log onto the system for another person?

17   A.    No.

18   Q.    "Passwords must remain confidential and should

19   not include information that can be easily guessed."

20             As a result of your investigation, did you

21   determine that Mr. Eapen's password contained information

22   that could be easily guessed?

23   A.    I wasn't aware of what the password was.

24   Q.    Okay.  So you never determined what password

C305

1    Mr. Eapen had at all.  Correct?

2       A.    Not his specific password, because, again, that

3    information is confidential.

4       Q.    Even to you as personnel?

5       A.    Even to me as personnel.  They are not to tell

6    me.

7       Q.    As a result of your investigation, did you

8    determine that Mr. Eapen had disclosed his password to

9    anyone?  In other words, that he did not keep his

10   password confidential.

11      A.    Not that I'm aware of.

12      Q.    So I'll ask you again:  What particular part of

13   this bullet did Mr. Eapen violate by asking Jason

14   Campbell for his password?

15              MR. SANDLER:  She has already testified that

16   he has violated the whole bullet.  So you're asking

17   something that has already been answered.  You can answer

18   again, if you like.

19      A.    Okay.  Those are my thoughts.  Again, I'm going

20   back to Bullet No. 2.

21      Q.    But you're not able to tell me, Ms. Williams, any

22   particular portion of that bullet that Mr. Eapen

23   violated.  We went through sentence by sentence, and I've

24   asked you to identify if, as a result of your

1   investigation, Mr. Eapen violated any particular sentence

2   within that bullet.  You are not able to tell me one

3   particular thing.  If you want to take a chance and read

4   it again and tell me what Mr. Eapen violated --

5       A.   Okay.

6       Q.   -- I'll give you the opportunity to do that.

7       A.   Okay.  Again, I still say Bullet No. 2.  Again,

8   primarily where I go -- not -- still the bullet.  But the

9   first one, again, where user IDs and passwords are used

10  to establish accountability.  The bottom line is

11  Mr. Eapen logged onto the system under someone else's

12  information.  That's my interpretation.

13      Q.   Okay.  As part of your policy and procedure

14  training, did you review this particular information

15  security guideline that we're discussing as EEOC 7?

16      A.   Yes.

17      Q.   As a result of your training and your review of

18  the document today, it's your testimony that Mr. Eapen

19  violated this particular bullet based on the fact that

20  there is accountability for the actions performed on the

21  system for the person who has been assigned that

22  particular User ID.  Is that your testimony?

23      A.   My testimony is he did violate this bullet.  In

24  addition, he violated Policy 601.  In addition, he

1   violated the policy -- Information Security Policy 30-P,

2   as well as the information security guidelines matrix

3   that we have that outline all the various issues.  That's

4   my testimony.

5        Q.   Okay.  Well, 601 is the policy we discussed

6   earlier.  You have that in front of you.  Right?

7        A.   That's correct.

8        Q.   Is that paragraph 19 you're referring to under

9   Section 8?

10       A.   That's correct.

11       Q.   Is there any other provision of this policy that

12  Mr. Eapen violated in your opinion?

13       A.   I'm sorry.  Can you ask that again?

14       Q.   Sure.

15            Is there any other numbered paragraph or

16  section of this exhibit that you believe Mr. Eapen

17  violated with respect to this password sharing incident?

18       A.   In terms of what I was investigating at the time,

19  it would be this specific bullet.

20       Q.   Okay.  You mentioned another policy -- 30-P?

21       A.   Yes.  That's an information security policy.

22       Q.   Is the language in 30-P different than the

23  language that's contained on EEOC 7?

24       A.   It's similar to it, but there is -- obviously,

1   that policy, I believe, is about four or five pages.

2   Don't quote me on that.  But it gives, you know, more

3   specific language.

4              MR. COOK:  Let's mark this for

5   identification.

6              (EEOC Deposition Exhibit No. 24 was marked

7   for identification.)

8   BY MR. COOK:

9      Q.  Ms. Williams, I'm handing you what's been marked

10  as EEOC 24 for identification.  These are documents that

11  were provided to me by MBNA recently.  If you look in the

12  back of the document -- and specifically in the bottom

13  right-hand corner are Bates stamped numbers beginning

14  with D2068 and running through 2069, a two-page

15  information security corrective action guideline.

16  Correct?

17     A.  Correct.

18     Q.  Is this the other document you were referring to

19  that there's a matrix that you use?

20     A.  That is correct.

21     Q.  Okay.  Did you review this particular matrix as

22  part of your investigation into the password sharing

23  incident?

24     A.  Yes, I did.

1    Q.   Take a minute.  If you can, point me to the

2    particular section of this matrix that you used to

3    determine the discipline that Mr. Eapen should receive

4    for this violation.

5    A.   Specifically in Section No. 3 --

6    Q.   Okay.

7    A.   -- No. 1.

8    Q.   That reads:  "Impersonating someone to obtain

9    system access, i.e., password reset."  Right?

10   A.   Yes.  That's correct.

11   Q.   Anything else?

12   A.   Yes.

13   Q.   What?

14   A.   No. 6 under -- No. 5, password violations.

15   Q.   Section 5.  Okay.

16   A.   "Sharing administrative or root level passwords

17   without an unauthorized exception."

18   Q.   What else?

19   A.   That's it.

20   Q.   Okay.  Now, this particular document, who has

21   access to this?

22   A.   The personnel generalists.

23   Q.   Would Mr. Eapen or Mr. Campbell have access to

24   this particular corrective action guideline?

W&F
C310

1    A.    No.

2    Q.    Based on what an employee would have access to,

3    how would an employee know that impersonating someone to

4    obtain system access would violate an MBNA policy or

5    procedure?

6    A.    Could you repeat that, please?

7    Q.    Sure.

8            Based on what's available to the employee,

9    which I understand at this point to be the information

10   security guideline --

11   A.    Correct.

12   Q.    -- which we discussed at EEOC 7 --

13   A.    Mm-hmm.

14   Q.    -- Policy 601 --

15   A.    Mm-hmm.

16   Q.    -- and the third policy, 30-B --

17   A.    30-P.

18   Q.    Is that available for employees as well?

19   A.    No.

20   Q.    So the policies that are available to employees

21   are the information security guideline --

22   A.    Correct.

23   Q.    -- and Policy 601.

24   A.    Correct.  Then the management also has education

Renee Cuffee-Williams

1    updating people constantly about not sharing passwords.

2        Q.    Based on the information security guidelines, is

3    there anywhere in this document in which an employee

4    would know that it's a violation to impersonate someone

5    to obtain system access?

6        A.    I go back to the second bullet.

7        Q.    Okay.  You rely on the second bullet to support

8    that?

9        A.    Yes.

10       Q.    Again, is there anywhere in this document where

11   sharing administrative or root level passwords without an

12   authorized exception where an employee would know that

13   that's a violation of an MBNA policy?

14       A.    I have to, again, defer back to Bullet No. 2

15   and/or possibly 3.  If someone leaves the work station

16   obviously unattended, someone could sit down.  If I

17   haven't logged off, you can come to my system and

18   start -- do whatever.  And it makes it look like I've now

19   done it.  Because, again, under my User ID, I'm

20   accountable, even if I walk away and you sit down and do

21   something.  Unless you admit it, it looks like I've done

22   it.

23       Q.    Go on to Section 5, No. 6:  Sharing

24   administrative or root level passwords without an

1    Q.    -- that you yourself and Mr. Kilmon had?

2    A.    Yes.

3    Q.    Was it the same day?

4    A.    I don't recall if it was the same day.  It may

5    have been.  Or the day after.  I know it was before we

6    had the conference call with the senior management.

7    Q.    Okay.  Tell me how that came up in the context of

8    the conversation between Mr. Kilmon and Mrs. Sainten that

9    Mr. Eapen should be fired.

10              What do you recall?

11   A.    Basically what happened was -- after the meeting

12   we went in to Ms. Sainten.  We talked about everything

13   that we had learned with regard to the password

14   violation, the conflict of interest, you know, the

15   tardiness -- pieces that we talked to him about -- and

16   talked about -- I talked about my piece with the password

17   violation.  Mr. Kilmon talked about his piece with regard

18   to conflict of interest and the tardiness.

19              And based on all of that -- of course, my

20   password violation piece of it would -- he would have

21   been placed at a -- placed on a final warning.  So,

22   again, the conflict of interest, which is a direct

23   violation of the policy -- we talked about the elevation

24   of that to the next level of dismissal.  So that's where

1    the recommendation -- how the recommendation came about.

2        Q.    Okay.  Who recommended termination first, if you

3    recall?  Did Ms. Sainten bring that up?  Did Mr. Kilmon

4    bring that up?

5        A.    I don't recall specifically who brought that up

6    first.  I know it was a part of the conversation,

7    because, again, after -- even after our discussion

8    Ms. Sainten has to elevate that to her boss.

9        Q.    Did anyone in that meeting object to terminating

10   Mr. Eapen?

11       A.    It -- I know that there were questions with

12   regard to whether this was something where he was going

13   to be dismissed or not dismissed.  So it wasn't, you

14   know, anything firm, because obviously that's not our

15   decision to make.  So really it was a recommendation.

16   But no one knew that that is exactly what would have been

17   done.

18       Q.    You don't recall when this meeting took place

19   between yourself, Ms. Sainten and Mr. Kilmon in which

20   dismissal was recommended for Mr. Eapen?

21       A.    Most likely, again -- I don't recall the exact

22   date.  I know it was after -- it was either on or

23   after -- and it wasn't a lot of time after that just

24   because of the sensitivity of this particular issue.

1    Mr. Eapen?

2        A.    To my knowledge, the recommendation that was made

3    by Mr. Kilmon with regard to the specifics of the

4    conflicts of interest -- my recollection is that it was

5    page 8 of 13, specifically Section No. 3.

6        Q.    That's entitled Outside Employment?

7        A.    Yes.

8        Q.    Do you further have knowledge of which bullet

9    point, if any, was used as a basis for terminating

10   Mr. Eapen?

11       A.    I believe, to my knowledge, it was Bullet Nos. 2

12   and 3.

13       Q.    "Being employed as a broker, dealer or agent in

14   the field of insurance, securities, transactions,

15   corporate and consumer finance transactions, home equity

16   or second mortgage transactions or any other field in

17   which MBNA conducts business."  Correct?

18       A.    That's what Bullet 2 says, yes.

19       Q.    Bullet 3 reads:  "Sharing a home with or having

20   an immediate family member who is employed by or provides

21   services to a recognized competitor of MBNA in any of its

22   lines of business."

23       A.    That's correct.  That's what it says.  And

24   also -- I'm sorry.

Renee Cuffee-Williams                          94

 1      Q.    Mm-hmm.

 2      A.    The bullet after it as well.

 3      Q.    Okay.  "Any employment or activity that conflicts

 4   with a person's time or ability to perform his or her

 5   MBNA job."

 6      A.    Yes.

 7      Q.    So your understanding is that those were the

 8   bases used by Mr. Kilmon in justifying his

 9   recommendation?

10      A.    Correct.

11      Q.    Did you speak with anyone else from information

12   security besides Jack Catanzarite regarding the password

13   sharing incident?

14      A.    Not to my knowledge.  Not that I can recall.

15      Q.    When did you learn that Mr. Eapen had been

16   terminated from MBNA?

17      A.    I believe that it may have been around the date

18   that the letter was sent out.

19      Q.    That would be around March 26th, 2003?

20      A.    Mm-hmm.

21      Q.    Is that a yes?

22      A.    Yes.  I'm sorry.

23      Q.    That's okay.

24            MR. COOK:  Thank you.  I don't have any

1   further questions.  Mr. Sandler may have some.

2                MR. SANDLER:  A few questions.

3                THE WITNESS:  Okay.

4   BY MR. SANDLER:

5     Q.   I'm going to first start with a little bit about

6   the information security guidelines.

7                Do you have your copy?

8     A.   Yes.

9     Q.   Focusing on the bullet point that you were

10  questioned at some length about, apparently, the EEOC

11  says that, if a person provides a password to some other

12  MBNA employee, the person who provides the password is

13  guilty of a violation but the person who asks for the

14  password, gets the password and uses the password is not

15  guilty of a violation.

16               Is that your understanding of MBNA's

17  policy --

18    A.   No.

19    Q.   -- or interpretation of this bullet?

20    A.   No.

21               MR. COOK:  Object to the form.  You can

22  answer.

23               MR. SANDLER:  You can answer.

24

**C317**

1   BY MR. SANDLER:

2       Q.   So your answer is no?

3       A.   The answer is no.

4       Q.   Okay.  What is your understanding of the bullet?

5       A.   My understanding of this bullet is that everyone

6   is held accountable.  No matter whether you give the

7   password or you use the password, everybody is held

8   accountable for giving that information, specifically

9   when you use someone else's information.

10              The example I used before -- myself --

11  Mr. Cook, if I give him, you know -- if I walk -- if he

12  leaves his terminal and I walk by, or vice versa -- not

13  vice versa.  But if he leaves his terminal, I walk by,

14  sit down, sign on, it looks as if Mr. Cook has done

15  everything.  He is accountable for anything that would

16  have been done on the system under his own ID.

17      Q.   Is training done of the people in security at

18  MBNA about sharing passwords?

19      A.   Yes.  To my knowledge, it is.

20      Q.   Okay.  Is it communicated that people are not

21  asked for passwords and not to use the passwords of

22  others?

23      A.   To my knowledge, yes.

24      Q.   Looking at Policy 601, which is looking at

W&F

C318

 1  Bates No. D1149 at the bottom right --

 2      A.    Okay.

 3              MR. COOK:    Sheldon, what exhibit number is

 4  that?

 5              THE WITNESS:    16.

 6              MR. SANDLER:    16.

 7              MR. COOK:    Okay.

 8  BY MR. SANDLER:

 9      Q.    Directing your attention to paragraph No. 13,

10  which refers to Inappropriate Conduct Relating to

11  Investigation, was that also something which was taken

12  into account in connection with Mr. Eapen's discipline?

13      A.    I'm not aware if it was.

14      Q.    Okay.  Was Mr. Eapen forthcoming and

15  straightforward and apparently honest in the

16  investigation which was conducted by you and Mr. Kilmon?

17              MR. COOK:    Objection to form.

18              MR. SANDLER:    You can answer.

19      A.    No.

20      Q.    In what way was he not?

21      A.    Again, as I had mentioned earlier about the

22  password situation, there were pieces where he said -- or

23  there was a time where he said he wasn't sure what he was

24  supposed to do.  Yet when we talked about was he aware of

1    the information security guidelines, was he aware that he
2    wasn't supposed to share the password, he said, you know,
3    "Yes, I was aware."  But at the same time he said, "I
4    wasn't sure about the process."
5             With the conflict of interest piece, he
6    continuously said in the beginning that it was -- he
7    didn't have a website.  It wasn't his website.  He wasn't
8    involved in it.  And then later when Mr. Kilmon pulled up
9    his website address on the system, then -- he then said,
10   "I was wrong, sir.  Yes, you're right."  Or something to
11   that effect.  It was a conflict of interest.
12   Q.    On Exhibit 24, directing your attention to
13   Section 8-1 of the guidelines which reads "Using MBNA
14   equipment for a business other than MBNA," in connection
15   with the portion of the investigation for which
16   Mr. Kilmon was responsible, was there any violation of
17   that provision?
18   A.    I'm sorry.  Can you ask that again, please?
19   Q.    In connection with the conflict of interest
20   investigation, was there a discussion of Mr. Eapen using
21   MBNA equipment for business other than MBNA?
22   A.    Yes.
23   Q.    Can you elaborate on that?
24   A.    Yes.  It was in reference to the phones.  And,

1    obviously, the phones are a piece of MBNA equipment that

2    Mr. Eapen did use to call one of the businesses with

3    regard to that business -- Eapen Corporation.

4        Q.    So he was using MBNA equipment, namely

5    telephones, during MBNA business hours to call companies

6    with which his personal company did business.  Is that

7    accurate?

8        A.    That's correct.  That's what I recall.

9        Q.    By the way, in connection with the packet of

10   documents -- Exhibit 24 -- is the last two pages of that

11   packet an excerpt from MBNA's policies relating to

12   conflict of interest?

13       A.    Yes.  This would have been taken from the MBNA

14   Guide to Employment & benefits.  That is a manual that

15   every employee receives with regard to anything that

16   they're going to be held accountable for -- how it

17   pertains to MBNA -- the benefits, conduct, dress, etc.

18   It's a whole slew of things.  Pension.

19       Q.    Now, I note that D2071, the last page of the

20   packet --

21       A.    Okay.

22       Q.    -- basically the conflict of interest for which

23   Mr. Eapen was held responsible are actually identified

24   there.

**W&F**

**C321**

```
 1                    Is that correct?
 2        A.    Yes.   That first bullet on D2071 and the
 3   paragraph underneath.
 4        Q.    Sharing a home with...
 5        A.    Oh, yes, yes.
 6        Q.    All right.  You mentioned that -- and this is a
 7   different subject --
 8        A.    Okay.
 9        Q.    -- you thought that Jim Micek might have said
10   that he had worked somewhere previously with Justus
11   Eapen.
12        A.    Yes.
13        Q.    Was it your recollection that he had worked
14   somewhere within MBNA with Mr. Eapen before or outside of
15   MBNA?
16        A.    My recollection is that he worked with him
17   outside of MBNA.
18        Q.    Do you have any more detailed recollection than
19   that?
20        A.    No, I don't.
21              MR. SANDLER:  Okay.  Nothing further.
22              MR. COOK:  A few follow-up.
23              THE WITNESS:  Okay.
24
```

1    BY MR. COOK:

2        Q.    Exhibit 24, D2069, Section 8, No. 1 --

3        A.    Mm-hmm.

4        Q.    -- using MBNA equipment for a business other than

5    MBNA -- your testimony is that Mr. Eapen used a telephone

6    to contact vendors for his personal business.

7                  Is that correct?

8        A.    That's correct.

9        Q.    You know this because Mr. Kilmon told you?

10       A.    No.  He -- when we -- when the three of us met,

11   Mr. Kilmon had a list of the calls -- all the phone

12   numbers.  And we went through them one by one.  It's in

13   my notes.  And that's when Justus said that he was -- I

14   think it might have been Godaddy and the www -- I think

15   it might have been Data Systems.  I think those were two

16   of the vendors where he identified that it would have

17   been for the business.

18       Q.    Okay.  Now, with respect to the information

19   security guidelines --

20       A.    Mm-hmm.

21       Q.    -- I hate to beat a dead horse, but it's a very

22   important issue in this case, because Mr. Eapen lost his

23   job in part because of the interpretation of this

24   particular provision.

1          When Mr. Sandler questioned you, you said it

2    was your understanding that, whether you request the

3    password or give a password, you violate the information

4    security guidelines for either action.  Correct?

5    A.    That's correct.

6    Q.    But this particular bullet that we've been

7    discussing at length, No. 2, makes no mention of

8    violating MBNA's information security guidelines by

9    asking for someone's password.  Does it?

10   A.    Again, going back, that's -- I stick to using --

11   or not stick to using -- but I stick to Bullet No. 2 in

12   that -- in looking at this, as well as the matrix and the

13   conduct policy, Policy 601, that was my basis for

14   recommending corrective action.

15          Individuals know this.  They know this

16   document.  They get this document.  They sign it.

17   Everyone is responsible, if they don't understand what

18   they read, to ask questions.  And to my knowledge, the

19   management has advised that -- and, again, this is, you

20   know, what they told me.  But this is something --

21   because it's come up in the past before -- within the

22   area to try to go out to everybody to say, hey, listen,

23   if you know -- if you're not sure about something, ask.

24   But you're not supposed to log onto people's, you know,

1   terminals and things like that.

2       Q.    What's come up in the past?  Sharing passwords?

3       A.    Sharing of passwords or just -- you know, anytime

4   that manager is made aware of a particular issue with

5   regard to information security violations -- they don't

6   specifically tell the people, well, Renee Cuffee-Williams

7   logged onto Mr. Cook's e-mail and did XYZ.  They go back

8   out and they re-educate the people to say we're serious

9   about the information security guidelines.  You're not to

10  log onto anyone's -- they give examples.  But that's

11  reoccurring information that they talk about.

12      Q.    Do you know how often this document is updated?

13      A.    I'm not sure.  I'm not sure.

14      Q.    Okay.  Again, my specific question to you -- and

15  I understand you had access to the matrix and 601 and

16  30-B or all the other policies.  Focusing solely on this

17  document, though, it doesn't say that you violate the

18  policy by asking someone for their password or from

19  soliciting a password, does it?

20      A.    Again, what you've explained, it doesn't.  But,

21  again, in my interpretation, that first sentence -- User

22  IDs and passwords are established -- used to establish

23  accountability for activity performed on MBNA systems.

24  My interpretation is that, again, it is a violation --

W&F
C325

1   and, again, what I know about the other policies.

2   Specifically, I didn't just use this document to make my

3   recommendation.

4       Q.    The document you did use -- the matrix --

5   Mr. Eapen did not have access to.  Correct?

6       A.    That's correct.

7              MR. COOK:  Okay.  Thank you.

8   BY MR. SANDLER:

9       Q.    Did Mr. Eapen, in the course of the conversation

10  at the interview, say, I thought it was only the people

11  who gave the password and not the people who accepted the

12  password who were violating the policy?

13      A.    No.  Not to my knowledge, he didn't.  I mean, he

14  admitted -- "I knew.  I shouldn't have done it."  He even

15  apologized.  He said, "I'm more experienced.  I shouldn't

16  have done it."  It was -- in our meeting it was an

17  admission, because you could tell from -- I mean,

18  initially where I started asking questions or started

19  questioning, immediately he said he knew he shouldn't

20  have done it.  And then just asking and probing more of

21  trying to find out his understanding, then he said, oh, I

22  didn't know if I should have done it or I wasn't aware of

23  certain things.  And then he went back to I shouldn't

24  have called him.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

```
EEOC,                           )
                                )
     Plaintiff,                 )
                                )
        v.                      )  C.A. No. 04-CV-425-SLR
                                )
MBNA AMERICA BANK, N.A.,        )
a subsidiary of MBNA            )
Corporation,                    )
                                )
        Defendant.              )
```

Deposition of RICHARD A. WRESNESKI taken pursuant to notice at the law offices of Young Conaway Stargatt & Taylor, LLP, The Brandywine Building, 17th Floor, 1000 West Street, Wilmington, Delaware, beginning at 1:40 p.m., on Wednesday, October 12, 2005, before Kimberly A. Hurley, Registered Merit Reporter and Notary Public.

APPEARANCES:

        TERRENCE R. COOK, ESQUIRE
        UNITED STATES EEOC
          21 South Fifth Street
          The Bourse - Suite 400
          Philadelphia, Pennsylvania 19106-2515
          for the Plaintiff

        SHELDON N. SANDLER, ESQUIRE
        YOUNG CONAWAY STARGATT & TAYLOR, LLP
          The Brandywine Building - 17th Floor
          1000 West Street
          Wilmington, Delaware 19801
          for the Defendant

ALSO PRESENT:

        LAUNICE P. SILLS
        MBNA

                WILCOX & FETZER
    1330 King Street - Wilmington, Delaware 19801
                (302) 655-0477



C327



```
 1   voice?

 2       A.    Not necessarily, unless I was a Little bit

 3   louder.

 4       Q.    Where was Mr. Eapen seated in relationship to

 5   your cubicle at Christiana 3?

 6       A.    My aisle, directly across on an angle.

 7   Diagonally across the aisle.

 8       Q.    Close enough that you can hear him and he can

 9   hear you?

10       A.    Absolutely.

11       Q.    Mr. Kennedy, where was he seated in relationship

12   to your cubicle?

13       A.    A few rows away, I believe.

14       Q.    Were you able to speak with Mr. Kennedy in

15   regular conversation with tones on --

16       A.    No.  I'd have to go over and walk to talk to

17   him.

18       Q.    How would you describe your relationship with

19   Glenn Ford?

20       A.    Friendly.

21       Q.    Do you consider Mr. Ford a friend?

22       A.    Yes.

23       Q.    Did you attend Mr. Ford's wedding?

24       A.    No.
```

1      Q.     Were you invited?

2      A.     No.

3      Q.     During your employment at MBNA, did you

4  socialize with Mr. Ford outside of the work environment?

5      A.     On occasion, yes.

6      Q.     There's been some testimony in this case about

7  poker games at various individuals' homes.  Have you

8  played poker with Mr. Ford?

9      A.     Absolutely.

10     Q.     How many times?

11     A.     Dozen or two.  Maybe more.

12     Q.     Whose home were the poker games normally held

13  at?

14     A.     Wagner.

15     Q.     There's also been some testimony in this case

16  about some of the employees in Desktop Computing playing

17  dodgeball or some other type of sporting event together.

18  Did you participate in any of those?

19     A.     Yes.

20     Q.     What in particular?

21     A.     Dodgeball, paintball, volleyball after work,

22  basketball after work.

23     Q.     Did you play any leagues with Mr. Ford in either

24  dodgeball or volleyball?

**W&F**

**C329**

```
 1        A.     The dodgeball was a one-time thing.  Basketball
 2   we played in a league, but it only lasted a couple weeks
 3   because our third left the team.
 4        Q.     How many times have you been paint-balling with
 5   Mr. Ford?
 6        A.     Less than a half dozen.
 7        Q.     Did you attend any happy hours with Mr. Ford
 8   after work?
 9        A.     He wasn't the one to really do happy hours that
10   often.
11        Q.     Is it your testimony you never attended a happy
12   hour with Mr. Ford?
13        A.     No.  I'm sure I have been in that setting.
14        Q.     How many times, if you could quantify it?
15        A.     Less than a half dozen times.
16        Q.     When was the last time you spoke to Glenn Ford?
17        A.     Monday.
18        Q.     Monday, October -- Columbus day?
19        A.     Yes.
20        Q.     Did Mr. Ford call you or did you call Mr. Ford?
21        A.     Glenn called me.
22        Q.     Was there any discussion about your testimony in
23   this case?
24        A.     No.
```

```
1        Q.    Did Mr. Hartnett attend the happy hours at

2   Tailgates?

3        A.    A few, but not many.

4        Q.    How would you describe your relationship with

5   Sung Byun?

6        A.    Friendly colleague.

7        Q.    Do you socialize with Mr. Byun outside of the

8   office?

9        A.    I have been to a couple of parties that he was

10  at and spoken to him since, yes.

11       Q.    Does Mr. Byun attend the poker games?

12       A.    No.

13       Q.    Do you know if he was invited to the poker

14  games?

15       A.    I believe he was.

16       Q.    Who normally invited people to the poker game,

17  was that Richard Wagner?

18       A.    There was Richard Wagner, it was Glenn Ford on

19  behalf of Rich.  It was a blanket invitation that went out

20  to everybody.

21       Q.    Was it a verbal invitation?

22       A.    It was both.  We wanted to keep it at a peer

23  level as opposed to management coming in.

24       Q.    Did Mr. Byun participate in any of the sporting
```

Richard A. Wresneski                    33

1    events that you recall?

2        A.    He was invited, but he never came out for

3    paintball.  I was the one that set those up.  I don't

4    recall -- I don't think he played dodgeball.  I don't

5    recall outside of that.

6        Q.    Did Mr. Byun attend any of the happy hours after

7    work?

8        A.    I believe he has.  I wasn't there when he did.

9        Q.    What was your relationship like with

10   Justus Eapen when you were employed at MBNA?

11       A.    Friendly.

12       Q.    Did you socialize outside the office with

13   Mr. Eapen?

14       A.    Talked to him on a couple of occasions outside

15   of the office.  Never really -- no happy hours or whatnot.

16   He lived in Baltimore.  He had a family.  That came first

17   for him.

18       Q.    How was your relationship with William Kennedy?

19       A.    Friendly yet rocky at times.

20       Q.    Did you socialize outside the office with

21   Mr. Kennedy?

22       A.    Happy hours.  Couple.

23       Q.    Did he attend the poker nights?

24       A.    I don't believe he ever has.

Richard A. Wresneski                              35

```
 1      A.     I don't know him that well outside of work, but
 2   as far as work goes, yes.
 3      Q.     What about Sung Byun, did you know him to be an
 4   honest person?
 5      A.     Sung is a saint.
 6      Q.     He's insane?
 7      A.     No.  He's a saint.
 8      Q.     I take it you believe he was honest, as well?
 9      A.     I would guarantee it.
10      Q.     During your employment at MBNA have you ever
11   been disciplined for any reason?
12      A.     Yes.
13      Q.     How many times have you been disciplined during
14   your employment at MBNA?
15      A.     Verbally once, written once.  Two separate
16   occasions.  Well, one each I should say.
17      Q.     You had one verbal warning and one written
18   warning?
19      A.     Yes, sir.
20      Q.     Let's talk about the verbal warning.  When do
21   you recall receiving that?
22      A.     I was in Christiana Center 4.  Myself and two
23   colleagues were throwing movie quotes out, and I stated
24   one that offended someone.  No intent on doing that;
```

Richard A. Wresneski                                    36

1   however, it did, and I apologized for it to him.

2       Q.    So the basis for the discipline was that you

3   quoted something from a movie that was offensive to

4   somebody?

5       A.    Yes.

6       Q.    What movie?

7       A.    *Forrest Gump*.

8       Q.    What did you quote?

9       A.    "Sorry I had a fight in the middle of your Black

10  Panther party."

11      Q.    To which MBNA employee did you make that

12  comment?

13      A.    I believe it was a contractor, but it was

14  Sa'yed Abuwi.  I didn't make it to him.  He overheard it.

15      Q.    What was the context of you making that

16  statement?  Was there discussion of movies?  Was there

17  discussion of Black Panthers?

18      A.    We were quoting *Forrest Gump*.  I feel I do a

19  pretty good impression of Forrest.  We were rolling quotes

20  off, and I rolled that at the wrong place, wrong time,

21  and, like I said, no intention of offending anyone.

22      Q.    When you said we were discussing the movie

23  *Forrest Gump*, who else was involved in that conversation,

24  if you recall?

**W&F**

**C334**

1      A.    I believe it was Greg Seaman and Drew Boyer.

2      Q.    Was Mr. Abuwi part of that conversation?

3      A.    No.  He was sitting at his desk and we were

4   walking by when he overheard the statement.

5      Q.    Did Mr. Abuwi say anything to you when you made

6   the statement?

7      A.    No.

8      Q.    Who gave you the verbal warning?

9      A.    Bill Davis.

10      Q.    What was Mr. Davis's title at the time he gave

11   you the warning?

12      A.    I believe he was the senior vice president and

13   head of Desktop Computing.

14      Q.    Were you given the verbal warning the same day

15   that you made the statement?

16      A.    No.  I believe it was the next day or the day

17   after.  It was a short time thereafter.

18      Q.    Were you asked to go to Mr. Davis's office?

19      A.    Yes.

20      Q.    What did Mr. Davis tell you as to why you were

21   there?

22      A.    He had asked what exactly -- what happened, and

23   I explained, and he explained that someone got offended,

24   which, frankly, surprised me.  It must have been the

Richard A. Wresneski                              38

1    context or something.  I don't understand to this day.  I

2    did apologize directly to Sa'yed and tried to make him

3    understand that it absolutely was not in the context that

4    he took it.

5        Q.    You said that you apologized to Mr. Abuwi.  Did

6    Mr. Davis instruct you to apologize?

7        A.    Absolutely not.

8        Q.    You did that on your own accord?

9        A.    Yes.  Multiple times.

10       Q.    Did Mr. Davis review MBNA's harassment policy

11   with you as part of your meeting?

12       A.    Not specifically.

13       Q.    Did he take out a policy and present you with a

14   copy?

15       A.    No.  He asked me to go ahead and refer to it, I

16   believe.

17       Q.    Besides yourself and Mr. Davis, who else

18   attended that meeting?

19       A.    I don't recall anybody else being in the room.

20       Q.    Nobody from Human Resources was present?

21       A.    No.  I mean, it was a nonformal verbal warning.

22   Nothing escalated.

23       Q.    Were there ever any written documents that

24   you're aware of concerning this incident between yourself

1    you can recall during your employment at MBNA other than

2    what you've testified to, which is that you heard nothing

3    derogatory and that questions were asked of you?

4        A.    No.

5        Q.    There's been testimony in this case that there

6    were some comments made based on national origin, and I'm

7    going to go over those with you, and tell me whether or

8    not any of these refresh your recollection.

9                 Do you recall making the comment or

10   referring to Sung Byun as a rice bowl or making a comment

11   about rice bowls to Sung Byun?

12       A.    Absolutely not.

13       Q.    Do you recall having a conversation with

14   Mr. Byun concerning Mustang muscle cars versus Japanese

15   sports cars?

16       A.    Sure.

17       Q.    Do you recall referring to Japanese sports cars

18   as rice burners?

19       A.    That's something I would have said, yes.

20       Q.    You don't recall referring to Mr. Byun as a rice

21   bowl?

22       A.    No.

23       Q.    Do you recall the term "rice bowl" coming up in

24   any context?

```
 1      A.      That's not even something I could think of.  No.

 2      Q.      The rice burner comment with reference to the

 3   Japanese sports cars, do you recall making that comment

 4   more than one time?

 5      A.      I'm sure.

 6      Q.      You're sure you said it more than one time?

 7      A.      Yes.

 8      Q.      Do you know how many times you made comments in

 9   reference to rice burners?

10      A.      I have no idea how many times.  A bunch of us

11   are fanatics at work.  I don't know how many times we talk

12   about different cars and.

13      Q.      I understand you're no longer employed by MBNA.

14   Correct?

15      A.      Correct.

16      Q.      You understand that nothing you say here today

17   can get you in any trouble with MBNA.  Do you understand

18   that?

19      A.      Correct.  I understand.  If I may comment along

20   the same lines, I'm not here because of my love of MBNA.

21   To use a word to describe my time there would be

22   tumultuous.

23      Q.      I appreciate that.

24      A.      It's not because of my love of MBNA.  I don't
```

Richard A. Wresneski                    71

1   refer to Mr. Eapen as OBL or Osama Bin Laden's brother?

2       A.      Specific people I can't remember who -- it was a

3   group.

4       Q.      Was it that group that sat there in Desktop

5   Computing?

6       A.      The group that sat there.  I don't know if it

7   expanded beyond those cubes or not, but I was there

8   sometimes, I wasn't there sometimes.

9       Q.      There's also been testimony in this case that

10  Mr. Eapen was referred to as BP, short for brown people.

11  Have you ever heard that comment during your employment at

12  MBNA?

13      A.      BP?  No.

14      Q.      There's been testimony in this case that

15  Mr. Eapen was referred to as a sand nigger.  Have you ever

16  heard that phrase used at MBNA?

17      A.      Absolutely not.  I'd, frankly, be surprised if

18  it was said in the office.

19      Q.      Why would you be surprised?

20      A.      I don't know.  I have a higher -- I think the

21  people that I work with have a better character than

22  saying something as dumb as that.

23      Q.      You understand that phrase to be offensive to

24  someone who's of Middle Eastern descent?

1      A.     Absolutely.

2      Q.     Have you ever heard Mr. Eapen referred to as a

3   nigger?

4      A.     No.

5      Q.     Have you ever heard that phrase in the workplace

6   during your employment at MBNA?

7      A.     No.

8      Q.     Have you ever heard Mr. Eapen referred to as

9   Saddam Hussein?

10     A.     No.

11     Q.     Or Saddam Hussein's brother?

12     A.     No.

13     Q.     There's been testimony in this case that the

14  cubicles in Desktop Computing where you sat and others sat

15  were referred to as the ghetto.  Have you heard that

16  phrase used in reference to Desktop Computing?

17     A.     I coined it.

18     Q.     What was the basis for your coining that area a

19  ghetto?

20     A.     The vice presidents and the people that made

21  more money sat on the opposite side of the room, and we

22  sat within the elbow joint of the cubicle farm away from

23  essentially the money of the organization.

24     Q.     Any other reasons you referred to it as ghetto?

1      A.     No.   Absolutely not.

2      Q.     Did that kind of catch on and everyone in that

3   area started referring to it as the ghetto, to your

4   knowledge?

5      A.     The general group around me, yeah.  People

6   outside of it probably were aware that we called it that.

7   It was not necessarily a high-light area.  It was a well

8   traffic area.  Just kind of set aside, like I said, from

9   money -- the money-makers, per se.

10     Q.     When did you coin that phrase, if you recall, in

11  terms of 2002, 2001?

12     A.     It was Christiana Center 4.  So it was before we

13  moved to 3.

14     Q.     Once you moved to 3, did the conditions change

15  such that you didn't refer to the area in which you sat as

16  a ghetto or did that carry over?

17     A.     No, it didn't carry.  Honestly, I'm curious why,

18  because management still sat in the one room and the

19  bigger cubes.  Maybe it was just spread out as opposed to

20  being surrounded by people in management.

21     Q.     So the same kind of system that existed in

22  Christiana 4 that led you to coin the phrase also existed

23  in Christiana 3, but you don't believe the phrase got

24  picked up once you moved?

1    group meeting?

2         A.    Like I said, it was either -- I'm sorry.  Let me

3    step back.  That was either Bill Davis or Chad Yates.  One

4    of the two.  Directly through management or through Bill.

5    I'm not sure exactly who.

6         Q.    There were two management officials that spoke

7    to the employees in Desktop Computing about joking.  One

8    we know to be Mr. Micek, and it was either Mr. Yates or

9    Mr. Davis?

10        A.    Yes.

11        Q.    We're referring to the times with Mr. Yates or

12   Mr. Davis, that was a group setting?

13        A.    It wasn't anything formal.  It was a stand up

14   and hey, I have been told you guys have to calm this down

15   a little bit, or something along those lines.

16        Q.    You said that was a reference to the pranks?

17        A.    Yeah.  The pranks specifically with Mr. Micek.

18   The other one, I believe it was a different context in

19   that it was more being loud or having too much fun, as

20   someone once put it.

21        Q.    Was there ever any discussion about

22   inappropriate comments being made in Desktop Computing

23   that Mr. Yates or Mr. Davis addressed?

24        A.    No.  Just mine.  The movie quote.

| | | |
|---|---|---|
| 1 | Q. | Just the movie quote? |
| 2 | A. | Yes. |
| 3 | Q. | What type of pranks were you talked to about? |
| 4 | A. | Moving things in cubicles, technical things like |

5  taking someone's network wire and putting a piece of

6  scotch tape over the end of it and plugging it back in

7  where they can't see it to troubleshoot the issue that

8  they're having.  Little programs that would open up your

9  CD drive whenever you did something, or a picture that

10 someone would have would be edited and put into a tropical

11 setting on a muscular body or something along those lines.

| | | |
|---|---|---|
| 12 | Q. | You participated in these pranks? |
| 13 | A. | Sure. |
| 14 | Q. | Who else participated in the pranks either with |

15 respect to taking the equipment or making the photos?

| | | |
|---|---|---|
| 16 | A. | I don't know anybody that wasn't. |
| 17 | Q. | So Mr. Ford was involved? |
| 18 | A. | Sure. |
| 19 | Q. | Mr. Little? |
| 20 | A. | Uh-huh. |
| 21 | Q. | Mr. Broughton? |
| 22 | A. | Sure. |
| 23 | Q. | Mr. Hartnett? |
| 24 | A. | Sure. |

Richard A. Wresneski                                    78

```
 1        Q.      Mr. Kennedy?

 2        A.      Uh-huh.

 3        Q.      Mr. Byun?

 4        A.      I believe only on one occasion.  I remember him

 5   participating, but only general basis.

 6        Q.      Mr. Eapen participated in the pranks?

 7        A.      Trying to think of specifics, and nothing is

 8   coming to mind right now.

 9        Q.      Was Mr. Eapen the subject of the prank?

10        A.      No.  It was usually kept within those five

11   cubes.

12        Q.      Mr. Hartnett, Mr. Little, Mr. Ford, and

13   Mr. Kennedy?

14        A.      And myself.

15        Q.      And yourself.

16        A.      Yes.  Some pretty ingenious things.

17        Q.      How frequently were the pranks being made?

18        A.      Not so often.  Quarterly.

19        Q.      Do you recall an incident in which Mr. Eapen's I

20   guess mouse ball was taken out of his cubicle, any

21   knowledge of that?

22        A.      It's been done.  I don't remember if it was

23   Justus specifically.  I have had it done to myself.

24        Q.      That's one of the types of pranks that were
```

1    played?

2        A.    Things are relatively harmless that you can fix

3    quickly.  We don't go out destroying someone's data or

4    work.  It was just along the lines of a minor nuisance.

5        Q.    When it happened to you, did you report it to

6    anybody?

7        A.    No.  I just got another mouse out of my drawer

8    or went in the back and got another mouse or I asked the

9    guys who had it.  Most of the times they would give it

10   right up.

11       Q.    Do you recall any prank that was played on

12   Justus Eapen by the group as you identified them during

13   your employment at MBNA?

14       A.    No, I don't.  I don't even recall the mouse

15   ball.

16       Q.    Have you ever used profanities in the workplace

17   during your employment at MBNA?

18       A.    Sure.

19       Q.    Have you ever used profanities in the presence

20   of Mr. Eapen?

21       A.    In the presence of just about anybody I have

22   worked with, yes.

23       Q.    What kind of profanities would you use?

24       A.    Carlin's list of impolite words.

```
 1       A.     Look over your shoulder.

 2       Q.     Was that a comment in reference to management or

 3   just the other employees that were in the section?

 4       A.     As far as?

 5       Q.     Looking over your shoulder.  I understand that

 6   to mean you've got to watch your back.

 7       A.     Management.

 8       Q.     You described your time at MBNA as kind of

 9   tumultuous.  Was there anything besides the one write-up

10   and the one counseling that made your employment

11   tumultuous?

12       A.     No.  I believe the write-up kind of continued

13   and I didn't get a fair shake from Micek afterwards.

14       Q.     Did you know Mr. Eapen to have another business

15   outside of MBNA?

16       A.     Yes.

17       Q.     What did you know?

18       A.     Insurance and real estate, Web site, eapen.net,

19   I believe.

20       Q.     You have been to the site?

21       A.     Oh, yeah.

22       Q.     How did you learn of the site?

23       A.     Talking with Justus.  He was proud of what he

24   was going through with the testing for the insurance and
```

1    the testing for the real estate -- or not real estate but

2    lending portion.

3        Q.    Did you obtain any financing of any type by

4    going to Mr. Eapen's Web site or going to eapen.net?

5        A.    No.  I asked him to throw together a rate for me

6    when I was looking for a new house, but I never followed

7    up on it.

8        Q.    Did Mr. Eapen ever provide you with a rate?

9        A.    No.

10       Q.    Do you know what steps Mr. Eapen's taken to

11   determine what rate you would get?

12       A.    No.  I'd call him and asked him to throw

13   something together for me, e-mail it over, and I never got

14   a response back.  Never really followed up on it.

15       Q.    Did Mr. Eapen tell you that he didn't get your

16   rate?

17       A.    He said he would look into it, something along

18   those lines.

19       Q.    When you say get you a rate, you're referring to

20   an interest rate for a mortgage?

21       A.    Yes.  Home financing.

22       Q.    Did he make any comments that he would check

23   with his wife about a rate?

24       A.    No.

1      Q.     You understand his wife to be in the mortgage
2   business?
3      A.     I was not aware.  I knew that it was a family
4   run business, but as to who had ownership and who ran, I
5   had no idea.
6      Q.     Mr. Eapen never solicited you for a mortgage; is
7   that correct?
8      A.     Not directly, no.
9      Q.     Or indirectly?
10     A.     I knew the site was there.  It was on me to go
11  look for it.
12              MR. COOK:  I don't have any other
13  questions.
14  BY MR. SANDLER:
15     Q.     I have a few questions.
16              First of all, did Mr. Eapen work the day
17  shift when you first started working with him?
18     A.     He worked the day shift, and somewhere along the
19  way he was moved to a nighttime shift where we were in
20  CC 3 at the time, as far as time lines go.  I had about
21  maybe an hour of time on the same schedule as him before
22  he left for the day.  Maybe a Little bit more.  I'm not
23  sure exactly.
24     Q.     Is that because you came in early?

1       A.    I was usually there at about 7:30.

2       Q.    Did you ever hear any of your coworkers comment

3   about the quality of Mr. Eapen's work?

4       A.    Yes.  Yes, I have.

5       Q.    What did they say?

6       A.    Basically he just wasn't getting things done

7   which led to speculation of do you have technical

8   knowledge, things like that.  I don't know -- I wasn't his

9   manager at the time.  So exactly how much he was getting

10  done, I don't know.

11      Q.    But you heard people say that he wasn't getting

12  things done?

13      A.    Yes.

14      Q.    You say there was speculation about his

15  technical knowledge.  What do you mean by that?

16      A.    Well, I mean, it was relatively median-line

17  technical work that was requested of him, and since it

18  wasn't getting done, they speculated that he might not

19  have knowledge of doing it, of the ability to do it.

20      Q.    Did you ever hear Mr. Eapen make any remarks

21  about people's national origin?

22      A.    Here and there.  Like I said, we joked around.

23  The way I see it, I'm an American, and we joked around

24  about different things.  He called me a Polack once in a

1    joking manner.   I call myself a Polack.   But I was born

2    here.

3         Q.      He did refer to you as a Polack?

4         A.      In a jocular manner, yes.

5         Q.      With regard to the mortgage request that you

6    made of Mr. Eapen, I think you testified that he said he

7    would get you a rate or something along those lines?

8         A.      I requested a rate, he said he would look into

9    it, and, like I said, I never followed up with I'm sure

10   the paperwork that would be required to do so.

11        Q.      Why did you ask him for a rate?

12        A.      I was shopping for rates.   I went through Wells

13   Fargo and a few others, and I figured I'd give Justus a

14   call to see if he was competitive.

15        Q.      He said he would look into it?

16        A.      Uh-huh.

17        Q.      Yes?

18        A.      Yes.

19        Q.      You didn't say I can't do that because you're an

20   employee of MBNA, or words to that effect?

21        A.      No.

22        Q.      You mentioned in connection with the discussion

23   with Rob, the mailroom person, that he would sometimes

24   talk about WWF.   Just to be clear, that's World Wrestling

1   Federation?

2       A.    Or WWE, World Wrestling Entertainment, as they

3   call it now.

4               MR. COOK:   I'm impressed.

5               THE WITNESS:   He would watch whatever

6   episode, I don't know what nights of the week, but he

7   always knew it was on the night before when Robert came up

8   because he was doing his thing.

9       Q.    In connection with the references to OBL or

10  OBL's brother, I think you used the word "jocular" when

11  you said that Mr. Eapen referred to you as a Polack, and

12  when Mr. Eapen was referred to as OBL, was the context

13  similar, as far as you were concerned?

14      A.    Yeah.   I mean, there was laughing, joking.

15  People chop on each other.   It's fun.   And that's the

16  context that it was in.

17      Q.    Did Mr. Eapen ever say in your presence or

18  directly to you that he was offended by the comments that

19  were being made to him?

20      A.    No, he did not.

21      Q.    Did he ever ask you or anyone else to stop

22  making those comments?

23      A.    No, he didn't.   He's a good person.   I like

24  Justus.

## CERTIFICATE OF SERVICE

I hereby certify that on January 9, 2006, I electronically filed a true and correct copy of foregoing **Appendix to Defendant MBNA's Reply Brief In Support Of Its Motion For Summary Judgment** with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for viewing and downloading to the following counsel of record:

> Rudolph Contreras
> Assistant U.S. Attorney, Chief Civil Division
> U.S. Department of Justice
> 1007 Orange Street, Suite 700
> P.O. Box 2046
> Wilmington, DE 19899-2046

I further certify that on January 9, 2006, I caused a copy of **Appendix to Defendant MBNA's Reply Brief In Support Of Its Motion For Summary Judgment** to be served by hand-delivery on the following counsel of record:

> Rudolph Contreras, Esquire
> Assistant U.S. Attorney, Chief Civil Division
> U.S. Department of Justice
> 1007 Orange Street, Suite 700
> P.O. Box 2046
> Wilmington, DE 19899-2046

I further certify that on January 9, 2006, I served the foregoing Defendant **Appendix to MBNA's Reply Brief In Support Of Its Motion For Summary Judgment** on the following non-registered participants in the manner indicated below:

> Terrence R. Cook, Esquire **(By First Class Mail)**
> U.S. Equal Employment Opportunity Commission
> Philadelphia District Office
> 21 South Fifth Street
> The Bourse, Suite 400
> Philadelphia, PA 19106-2515

> YOUNG CONAWAY STARGATT & TAYLOR, LLP
>
> _____
> Sheldon N. Sandler, Esquire (No. 0245)
> The Brandywine Building
> 1000 West Street, 17th Floor
> P.O. Box 391
> Wilmington, Delaware  19899-0391
> Telephone: (302) 571-6673
> Facsimile: (302) 576-3330
> Email:  ssandler@ycst.com
> Attorneys for Defendant

Dated:   January 9, 2006