IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

EQUAL EMPLOYMENT OPPORTUNITY )
COMMISSION,                   )
                             )
          Plaintiff,          )
                             )
     v.                       )   Civ. No. 04-425-SLR
                             )
MBNA AMERICA BANK, N.A., a    )
subsidiary of MBNA CORPORATION, )
                             )
          Defendant.          )

Rudolph Conteras, Esquire, United States Attorney's Office,
Wilmington, Delaware, and Terrence R. Cook, Esquire, United
States Equal Employment Opportunity Commission, Philadelphia,
Pennsylvania.  Counsel for Plaintiff.

Sheldon N. Sandler, Esquire and Margaret M. DiBianca, Esquire of
Young Conaway Stargatt & Taylor LLP, Wilmington, Delaware.
Counsel for Defendant.

**MEMORANDUM OPINION**

Dated: September 29, 2006
Wilmington, Delaware

ROBINSON, Chief Judge

## I.    INTRODUCTION

On June 23, 2004, the Equal Opportunity Commission (the "EEOC") filed a complaint against MBNA America Bank, N.A. ("MBNA") on behalf of Jutus Eapen ("Eapen") alleging employment discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000(e), et seq.) and Title I of the Civil Rights Act of 1999 (42 U.S.C. § 1981A).  (D.I. 1) The EEOC is an agency of the United States of America charged with the administration, interpretation, and enforcement of Title VII of the Civil Rights Act of 1964.  (D.I. 1 at ¶ 3)    Eapen is a resident of the State of Maryland.  (D.I. 36 at B152)    MBNA is a Delaware company with business operations in the State of Delaware and the City of Wilmington.  (D.I. 1 at ¶ 4)    The court has jurisdiction over the EEOC's federal civil rights claims pursuant to 28 U.S.C. §§ 1331, 1343(a)(3) and 1343(a)(4). Currently before the court is MBNA's motion for summary judgment. (D.I. 28)    Because genuine issues of material fact remain, the court denies defendant's motion.

## II.    BACKGROUND

Plaintiff is a native of India who moved to the United States in 1985.  (D.I. 36 at B002)  Plaintiff began working at MBNA as a contractor in 1997.  (D.I. 30 at A157-58)  Plaintiff was hired by MBNA on February 28, 2000 as a Senior PC Technician in the Desktop Computing Services Department.  (D.I. 1 at ¶7(a);

D.I. 30 at A013)  At that time, plaintiff signed a statement
acknowledging MBNA's Conflict of Interest Policy.[1]  (D.I. 30 at
A004)  That policy prohibits engaging in outside business, and
states that it may appear to be a conflict of interest to share a
home with an individual working for a MBNA competitor in any of
its major business lines.[2]  (Id. at A006-07)  Plaintiff also
signed a copy of MBNA's Information Security Guidelines on that

---

[1]The statement affirmed by plaintiff provides:

> Conflict of Interest:  MBNA policy restricts activities
> and relationships that create an actual or perceived
> conflict of interest with MBNA's business.  Such
> conflicts may affect a person's employment or continued
> employment at MBNA.  Failure to report potential
> conflicts may result in an offer not being made, an
> offer being rescinded, or corrective action, up to and
> including dismissal.

[2]Defendant's Conflict of Interest policy directs employees
to "report situations that could constitute or appear to
constitute conflicts of interest to your manager or the Ethics
Office."  (D.I. 30 at A007)  It further states that "MBNA people
involved in conflicts of interest could face immediate dismissal
and possible criminal prosecution."  (Id.)

date, which prohibits sharing computer user IDs and passwords.[3]
(Id. at A005)

At all times relevant to this case, plaintiff's wife was
employed as a mortgage broker for Wells Fargo Bank, a direct
competitor of MBNA.  (Id. at A186)  Plaintiff filed the Articles
of Incorporation for a business named "Eapen Corporation" in
2001, which named plaintiff as sole director of the corporation.
(Id. at A011)  Plaintiff also established a website, Eapen.net,
which contained financial information.  (Id. at A178, A227-28)
Eapen Corporation is not currently an active corporation, nor is
Eapen.net an active website.  (Id. at A190-91)

Plaintiff had several supervisors within the first year of
his employ.  (D.I. 29 at 3;  D.I. 34 at 6)  On or about March

_____

[3]The Information Security Guidelines provide:

> User IDs and passwords are used to establish
> accountability for activity performed on MBNA computer
> systems, and all actions performed are the full
> responsibility of the person who has been assigned that
> user ID.  People are not to share their personal user
> ID or password or use their user ID or password to log
> into MBNA computer systems for another person.

Additionally, the signatory line is proceeded by the
following statement:

> I have read the above Information Security Guidelines
> and acknowledge that MBNA expects me to adhere to them.
> I understand that failure to comply with these
> guidelines may result in disciplinary action, up to and
> including immediate dismissal, and that MBNA reserves
> the right to take legal action to remedy any damage
> that may result from noncompliance with these
> guidelines.

3

2001, plaintiff began reporting to James Dell, Assistant Vice President of MBNA's Desktop Computing Operations. (Id.) Mr. Dell remained plaintiff's supervisor throughout the remainder of plaintiff's employ with defendant. (D.I. 36 at B189)

Both parties acknowledge that the Desktop Computing department was widely known to have a "joking atmosphere" among its employees. (D.I. 34 at 6; D.I. 37 at 11) The record is replete with examples of derogatory comments made between various Desktop Computing employees and, for background, the court will focus on several corroborated accounts of such instances.

For example, the record contains several recounts of Indian employees, including plaintiff, being called "BP," short for "brown people." (D.I. 36 at B024, B040, B062) The term "dot head" was used on at least five occasions by plaintiff's coworkers as a reference to persons of Indian origin. (Id. at B059-60, B062) Plaintiff was also referred to as a "sand nigger" at least once in the workplace. (Id. at B027; D.I. 38 at C085)

Following the terrorist attacks of September 11, 2001, plaintiff was referred to as "Osama Bin Laden" or other variations such as "OBL" by coworkers. (D.I. 36 at B024, B060-62) Within a few months of September 11, 2001, several of plaintiff's coworkers witnessed an incident where a learning-disabled mailroom employee was told that plaintiff was Osama Bin Laden or Osama Bin Laden's brother. (Id. at B025, B063)

4

Desktop Computing employees engaged in other ethnically-charged banter in the workplace. One Caucasian employee referred to an Asian coworker as "rice bowl" or "rice" (Id. at B058-59, B066), whom himself referred to the Caucasian coworker as a "red neck" or "whitey." (Id. at B211-12; D.I. 38 at C266) The terms "'A' team" and "'W' team" were used to describe an "Asian team" and "white team" of employees (id. at B035-36, B208-09) The cubicle area where Desktop Computing employees were located was commonly called the "ghetto." (Id. at B036, B069-70, B096-97, B150)

In 2001, plaintiff was asked by Mr. Dell to switch from working day shifts to working a newly-created night shift, and plaintiff thereafter worked Friday, Saturday, and Sunday nights from 6:00 p.m. to 7:00 a.m. (D.I. 30 at A231) Plaintiff received a 15% pay differential for working the night shift. (D.I. 30 at A008) Plaintiff was recommended for a promotion in May 2002 and was promoted in June 2002 to the position of Systems Engineer. (Id. at A013-14)

On December 17, 2002, Mr. Dell spoke to Personnel regarding several issues related to plaintiff, including plaintiff's completion of assigned work, sleeping on the job, "tardiness issues," and a potential conflict of interest regarding Eapen Corporation and Eapen.net. (D.I. 30 at A143) Plaintiff was placed on a "First Warning of misconduct" after requesting and

5

using a coworker's password to log onto MBNA's computer server
system and change his level of system access on January 7, 2003,
in violation of the Information Security Guidelines.  (Id. at
A142)

Plaintiff sent an email to Mr. Dell on February 21, 2003
complaining of discrimination, and completed a formal complaint
with the EEOC on March 6, 2003.  (D.I. 36 at B154, B152-53)
Plaintiff was officially terminated on March 26, 2003.  (D.I. 29
at 14;  D.I. 34 at 20)

## III.  STANDARD OF REVIEW

A court shall grant summary judgment only if "the pleadings,
depositions, answers to interrogatories, and admissions on file,
together with the affidavits, if any, show that there is no
genuine issue as to any material fact and that the moving party
is entitled to judgment as a matter of law."  Fed. R. Civ. P.
56(c).  The moving party bears the burden of proving that no
genuine issue of material fact exists.  See Matsushita Elec.
Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 n.10 (1986).
"Facts that could alter the outcome are 'material,' and disputes
are 'genuine' if evidence exists from which a rational person
could conclude that the position of the person with the burden of
proof on the disputed issue is correct."  Horowitz v. Fed. Kemper
Life Assurance Co., 57 F.3d 300, 302 n.1 (3d Cir. 1995) (internal
citations omitted).  If the moving party has demonstrated an

6

absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e)). The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." Pa. Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995). The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). With respect to summary judgment in discrimination cases, the court's role is "to determine whether, upon reviewing all the facts and inferences to be drawn therefrom in the light most favorable to the plaintiff, there exists sufficient evidence to create a genuine issue of material fact as to whether the employer intentionally discriminated against the plaintiff." Revis v. Slocomb Indus., 814 F. Supp. 1209, 1215 (D. Del. 1993) (quoting Hankins v. Temple Univ., 829 F.2d 437, 440 (3d Cir. 1987)).

7

## IV.   DISCUSSION

Based on the facts discussed below, the court finds that defendant is not entitled to summary judgment on any of the counts in the complaint. Viewing the facts and inferences in a light most favorable to the plaintiff, defendant has failed to show that there is "[in]sufficient evidence to create a genuine issue of material fact as to whether the employer intentionally discriminated against the plaintiff." Revis, 814 F. Supp. at 1215. As such, defendant's motion for summary judgment is denied in full, for the reasons that follow.

Discrimination claims under Title VII are analyzed under the burden-shifting framework set forth by the United States Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).⁴ First, the plaintiff "must carry the initial burden under the statute of establishing a [prima facie] case of racial discrimination." Id. at 802. A plaintiff can accomplish this by

---

⁴While the factors enunciated in McDonnell Douglas dealt specifically with employment cases that ended in termination, the Third Circuit has recognized that

> the elements of a prima facie case depend on the facts of a particular case. Thus, a prima facie case cannot be established on a one-size-fits-all basis. In fact, the relevant question . . . is whether [the plaintiff] suffered some form of "adverse employment action" sufficient to evoke the protection of Title VII.

Jones v. Sch. Dist. of Philadelphia, 198 F.3d 403, 411 (3d Cir. 1999) (internal citations omitted). As such, "something less than a discharge could be an adverse employment action." Id.

8

proving that: (1) he is a member of a protected class; (2) he suffered some form of adverse employment action; and (3) this action occurred under circumstances that give rise to an inference of unlawful discrimination such as might occur when a similarly-situated person not of the protected class is treated differently. Boykins v. Lucent Techs., Inc., 78 F. Supp. 2d 402, 409 (E.D. Pa. 2000), aff'd, No. 00-1087, 2002 WL 402718 (3rd Cir. Feb. 4, 2002) (citing Jones v. Sch. Dist. of Philadelphia, 198 F.3d 403, 410 (3d Cir. 1999)); see also Berry v. E.I. DuPont de Nemours & Co., 625 F. Supp. 1364, 1377 (D. Del. 1985) ("A plaintiff may establish a [prima facie] case of discrimination by showing that other similarly-situated employees of a different race were treated differently from the plaintiff."). Once the plaintiff has established a prima facie case of racial discrimination, "the burden shifts to the [employer] 'to articulate some legitimate, nondiscriminatory reason for the employee's rejection.'" Jones, 198 F.3d at 410 (quoting McDonnell Douglas, 411 U.S. at 802). "Finally, should the [employer] carry this burden, the plaintiff then must have an opportunity to prove by preponderance of the evidence that the legitimate reasons offered by the [employer] were not its true reasons, but were a pretext for discrimination." Id. at 410 (citing Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 252-53 (1981)). Throughout the court's analysis, "[t]he ultimate

9

burden of persuading the trier of fact that the [employer] intentionally discriminated against the plaintiff remains at all times with the plaintiff." Id. (citing Burdine, 450 U.S. at 253) (first alteration in original).

Under the first step of the McDonnell Douglas test, plaintiff must establish a prima facie case of discrimination. As plaintiff was born in India, plaintiff is a member of a protected class. The proper standard for determining whether plaintiff has suffered an "adverse employment action" varies with the type of discrimination claim he is making. Therefore, the remaining two steps of the prima facie analysis will be divided into the two separate counts of plaintiff's allegations.

## A. Hostile Work Environment

To state a Title VII claim premised on a hostile work environment, plaintiff must demonstrate that: (1) he suffered intentional discrimination because of his race; (2) the discrimination was severe or pervasive;[5] (3) the discrimination detrimentally affected him; (4) the discrimination would detrimentally affect a reasonable person of the same national

---

[5]Although there has been some disagreement among courts in the Third Circuit as to whether it is proper to use the "pervasive and regular" standard enumerated in Andrews v. City of Philadelphia, 895 F.2d 1469 (3d Cir. 1990), see, e.g., Arasteh v. MBNA America Bank, N.A., 146 F. Supp. 2d 476, 494 & n.36 (D. Del. 2001), the United States Supreme Court recently utilized a "severe or pervasive" standard. Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 270 (2001).

origin in that position; and (5) the defendant is liable under a theory of respondeat superior. See Andrews v. City of Philadelphia, 895 F.2d 1469, 1482-83 (3d Cir. 1990). A prima facie showing, therefore, contains both a subjective standard (that plaintiff was in fact affected) and an objective standard (that a reasonable, similarly situated person from India would be affected). Id.

Plaintiff asserts that he was "subjected to a steady barrage of severe ethnic slurs" during his employment with defendant. (D.I. 34 at 26) Plaintiff claims that prior to September 11, 2001, his coworkers called him "sand nigger," "nigger," "brown person" or "BP," and "dot head." (D.I. 34 at 27) Following September 11, 2001, plaintiff claims he was called "brown person" or "BP," "Osama Bin Laden," "Osama Bin Laden's brother," "OBL," "Saddam Hussain," and "Saddam Hussain's brother" by both coworkers and Mr. Dell. (Id.; D.I. 36 at B024) Plaintiff asserts that he was "almost attacked" by a learning-disabled mailroom clerk after co-workers told the clerk plaintiff was "Osama Bin Laden's brother" (D.I. 34 at 7), and that plaintiff thereafter avoided the mailroom in fear that the clerk could not understand that it was a joke. (Id. at 8). One witness to the event corroborates plaintiff's story (id. at B063), and another recalls that the mail clerk said that Bin Laden was apprehended,

11

and someone stated "No, Bin Laden is back there." (D.I. 38 at C245)

Plaintiff claims that moving to the night shift did not eliminate the derogatory name-calling by day shift employees, as he was greeted with "Good Morning, OBL" upon their arrival. (D.I. 36 at B028) Plaintiff also claims that his work performance was "inexplicably closely monitored" once he was moved to the night shift (D.I. 34 at 30), and that Mr. Dell "refused to speak with him about projects and further withheld from him information necessary to complete his assigned projects," such as problems with the network environment. (Id. at 11; D.I. 36 at B022-23) Plaintiff asserts that he complained about discrimination and workplace harassment to several coworkers and supervisors (including Mr. Dell) on several occasions, but no remedial action was taken. (D.I. 1 at ¶8(b); D.I. 34 at 11-13, 40) Therefore, according to plaintiff, the totality of the circumstances of this case indicate that defendant allowed plaintiff "to be subjected to national origin harassment from his supervisor and co-workers that was both severe and pervasive." (D.I. 34 at 26)

Viewing the facts and related inferences in a light most favorable to plaintiff, the court finds that there remain genuine issues of material fact which would allow a jury to find that

12

plaintiff was subjected to a hostile work environment.

Defendant's motion for summary judgment on this count is denied.

## B. Retaliation

A plaintiff claiming retaliation must first establish a prima facie case under Title VII.[6]  In order to do so, he must demonstrate by a preponderance of the evidence that:  (1) he engaged in a protected activity;[7]  (2) the defendant took adverse employment action against him; and (3) a causal link exists between the protected activity and the adverse action.  See Kachmar v. Sungard Data Sys., Inc., 109 F.3d 173, 177 (3d Cir. 1999).  Once a plaintiff has established a prima facie case, the

_____

[6]The anti-retaliation section of Title VII provides:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he had made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3a.

[7]Title VII defines a "protected activity" as an instance when an employee has

> opposed any practice made an unlawful employment practice by this subchapter, or . . . has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a).

13

defendant gets the opportunity to set forth, through the introduction of admissible evidence, reasons for its actions that, if believed by the trier of fact, would support a finding that unlawful discrimination was not the motivating force behind the adverse employment action. See Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254-55 (1981). If the defendant successfully rebuts the plaintiff's prima facie showing, the presumption of discrimination drops from the case, and plaintiff must present sufficient evidence for a reasonable factfinder to conclude "that the proffered reason was not the true reason for the employment decision." Id. at 256; See also Bray v. Marriott Hotels, 110 F.3d 986, 990 (3d Cir. 1997).

The United States Supreme Court recently stated that "Title VII's substantive provision and its anti-retaliation provision are not coterminous. The scope of the anti-retaliation provision extends beyond workplace-related or employment-related retaliatory acts and harm." Burlington N. & Santa Fe Ry. Co. v. White, 126 S. Ct. 2405, 2414 (2006). Moreover,

[t]he anti-retaliation provision [of Title VII] protects an individual not from all retaliation, but from retaliation that produces an injury or harm. . . . In [the Court's] view, a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, "which in this context means it well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" Rochon v. Gonzales, 438 F.3d 1211, 1219 (D.C. Cir. 2006) (quoting Washington v. Ill. Dep't of Revenue, 420 F.3d 658, 662 (7th Cir. 2005)).

14

Id. at 2414-15. "[T]he standard is tied to the challenged retaliatory act, not the underlying conduct that forms the basis of the Title VII complaint." Id. at 2416.

## 1. Protected Activity

Protected activities include charges of discrimination or complaints about discriminatory employment practices. See Abramson v. William Paterson Coll. of N.J., 260 F.3d 265, 287-88 (3d Cir. 2001). It is uncontested that plaintiff engaged in protected activity when he complained of harassment in an email to Mr. Dell on February 21, 2003 and when he subsequently filed a Charge of Discrimination with the EEOC on March 6, 2003. (D.I. 29 at 25)

Defendant claims that plaintiff fails to establish a prima facie case of retaliation because he did not engage in protected activity until after the decision to terminate had been made. (Id. at 26) Defendant argues that an investigation into plaintiff's workplace conduct commenced on December 17, 2002, and continued in January 2003 when plaintiff impermissibly used a coworker's user ID and password. (Id. at 28-29) Defendant states that the decision to terminate plaintiff was contemporaneous with plaintiff's January 21, 2003 meeting with two members of the Personnel department. (Id. at 29) Plaintiff went on short-term disability leave on or about January 27, 2003. (D.I. 30 at A149-50) Defendant argues it was "simply waiting for

15

[plaintiff] to return from disability leave to effectuate the dismissal;" however, the evidence of record does not indicate that any decision to terminate plaintiff had been made as of the January 21, 2003 meeting.[8]  (D.I. 29 at 29;  D.I. 30 at A143-44; D.I. 36 at B251-52)

Plaintiff's February 21, 2003 email precedes the only evidence of record regarding the decision to terminate plaintiff by over a month.  The court finds that a reasonable jury could infer that plaintiff engaged in protected activities sufficiently prior to termination.

Though it is unnecessary to the survival of the plaintiff's claim in this respect, the court will briefly discuss plaintiff's arguments that plaintiff engaged in protected activities prior to February 21, 2003, when he complained about the harassing workplace environment and unfair treatment towards him to Desktop Computing supervisors Bellverie Ross, Ernesto Marra and Jim Micek.  (D.I. 34 at 40)  The record contains scant detail about

_____

[8]Although defendant states that plaintiff did not work again after January, 21, 2003, and "[t]he termination was approved and the dismissal became official on March 10, 2003" (D.I. 29 at 14), defendant fails to cite any evidence of record in support. Plaintiff sent the email to Mr. Dell on February 21, 2003, apparently while he was on leave.  The date plaintiff was due back from leave is unclear, though defendant states  that plaintiff's short term disability benefits expired on March 21, 2006.  (Id. at 14)  There is no indication of whether plaintiff returned to work on March 26, 2003 so as to justify defendant's claim that defendant was waiting for plaintiff to return from leave to terminate him.

16

the dates or exact nature of these communications. Mr. Marra, however, confirmed that he had a discussion with plaintiff where plaintiff "indicated that he felt discriminated against" in late January of 2003. (D.I. 36 at B221-22) Plaintiff asserts that he told Jim Micek that plaintiff "did not believe a non-Caucasian could have any job satisfaction or perform any meaningful work." (D.I. 34 at 13) Mr. Micek corroborates plaintiff's assertion to the extent that plaintiff met with him in June 2002 regarding workplace concerns. (D.I. 36 at B267). Viewed in the light most favorable to plaintiff, a reasonable jury could find that plaintiff engaged in protected activities prior to February 21, 2003.

## 2. Adverse Employment Action

The court finds that the termination of plaintiff on March 26, 2003 is sufficiently "materially adverse" so as to be considered retaliation. See Lex K. Larson, Employment Discrimination §34.04 (2004) (citing Robinson v. City of Pittsburgh, 120 F.3d 1286, 1302 (3d Cir. 1997)).

## 3. Causal Link

An inference of a causal link should be based on the evidence as a whole. Kacmar v. Sungard Data Systems, Inc., 109 F.3d 173, 177 (3d Cir. 1997). "[T]he mere fact that [an] adverse employment action occurs after a complaint will ordinarily be insufficient to satisfy plaintiff's burden of demonstrating a

17

causal link between the two events." Robinson, 120 F.3d at 1302. However, temporal proximity is some evidence of a causal link between two events. See, e.g., Kacmar, 109 F.3d at 177.

Plaintiff argues that the proximity between plaintiff's February 21, 2003 email complaint and/or filing of the Charge of Discrimination with the EEOC on March 6, 2003 and plaintiff's termination on March 26, 2003 is unusually suggestive of a retaliatory motive. (D.I. 34 at 41-42) Plaintiff also argues that the circumstantial evidence demonstrates that plaintiff was subject to a "pattern of antagonism" in the intervening period. (Id. at 42) As a specific example, plaintiff points to the fact that Mr. Dell reported to a Personnel department official on December 17, 2002 that plaintiff violated the Conflict of Interest policy. (Id.; D.I. 30 at A143) Plaintiff claims that this evidences a pattern of antagonism because Mr. Dell "was aware of the existence of Eapen Corporation since [plaintiff] reported to him, but only reported this alleged policy violation to MBNA after [plaintiff] complained." (D.I. 34 at 42)

Even viewing this inference in the light most favorable to plaintiff, Mr. Dell's actions of December 17, 2002 do not fall between plaintiff's February 21, 2003 and March 6, 2003 complaints and plaintiff's subsequent termination so as to evidence a cause-and-effect relationship. However, as discussed supra, a reasonable jury could find that plaintiff engaged in

18

protected activities prior to February 21, 2003. It is unclear
whether any additional protected activities could precede this
December 17, 2002 incident.

With regard to temporal proximity, defendant correctly notes
that the EEOC did not send notice of plaintiff's Charge of
Discrimination to defendant until March 14, 2003, which "would
have been received by MBNA even later." (D.I. 37 at 7; D.I. 38
at C024) The record does not indicate when defendant actually
received plaintiff's EEOC complaint. If defendant received it
prior to March 26, 2003, a reasonable jury could find the timing
between this protected activity and plaintiff's termination to be
suggestive of retaliation. See Jalil v. Avdel Corp., 873 F.2d
701, 708 (3d Cir. 1989) (causal link demonstrated where alleged
retaliatory action occurred two days after the plaintiff engaged
in protected activity).[9]

_____

[9]The court notes that the Third Circuit has limited the
applicability of Jalil to its facts:

> We believe that, if Jalil is to be interpreted as
> holding that timing alone can be sufficient [to
> establish causation], that holding must be confined to
> the unusually suggestive facts of Jalil. Thus, even if
> timing alone can prove causation where the discharge
> follows only two days after the complaint, the mere
> fact that the adverse employment action occurs after a
> complaint will ordinarily be insufficient to satisfy
> the plaintiff's burden of demonstrating a causal link
> between the two events.

Robinson, 120 F.3d at 1302; see also Weston, 251 F.3d at 431 n.5.
Nevertheless, the record in this case does not indicate whether
this case is factually analogous to Jalil.

19

The court declines to make the credibility determinations a jury should make with regard to plaintiff's proffered "pattern of antagonism," and finds that there are genuine issues of material fact regarding the proximity of these events that preclude the entry of a summary judgment in favor of defendant.

## 4. Defendant's Non-Discriminatory Reasons for Termination

Defendant has pointed to two non-discriminatory reasons for terminating plaintiff. As stated previously, human resources was advised in December of 2002 that plaintiff was operating a real estate and mortgage business under the name Eapen Corporation and under his Eapen.net website, in violation of defendant's Conflict of Interest policy. Further, plaintiff did not notify defendant during his employment that his wife was a mortgage broker for a competitor, also in violation of the Conflict of Interest policy. (D.I. 30 at A186) Secondly, plaintiff was investigated for obtaining and using a coworker's password on January 7, 2003 to gain access to defendant's computer server system and change his level of system access in violation of defendant's Information Security Guidelines.

As defendant has pointed to several non-discriminatory reasons for terminating plaintiff, the court turns next to whether plaintiff has demonstrated that any material issues of fact exist with respect to whether defendant's proffered explanations were a pretext for retaliation.

## 5. Plaintiff's Ability to Discredit Defendant's Non-Discriminatory Reasons for Termination as Pretextual

Plaintiff argues that he was fired for engaging in outside business activities when he, in fact, did not conduct such activities, and when others similarly situated were given the option of continuing their employment with defendant if they stopped their outside activities. (D.I. 34 at 45)  Plaintiff claims that Eapen Corporation did not engage in any business. (Id. at 13)  Further, the report of the "Ethics Inquiry" relating to plaintiff's outside business activities expressly recognizes that company policy provides that plaintiff "should be offered a choice of either continuing with the bank and dropping his personal business, or vice versa." (D.I. 36 at B181-82)  There is no indication that plaintiff was offered such an option, nor countervailing evidence regarding defendant's motives in the handling of plaintiff's inquiry.

Plaintiff also argues that other employees violated the policy against sharing passwords and were not disciplined.  The record demonstrates that plaintiff's supervisor, Mr. Dell, himself requested another employee's password when he was locked out of the server and used that employee's password to gain access to the system.  (D.I. 36 at B135-39)  If plaintiff's supervisor committed the same offense as plaintiff without consequence, a reasonable jury could readily discredit defendant's stated reason for terminating plaintiff.

21

Taking the facts and inferences in a light most favorable to plaintiff, the court finds that, while defendant has identified legitimate, non-discriminatory reasons for its actions, genuine issues of material fact exist which could allow a jury to find defendant's race-neutral explanations were a pretext for retaliation. Consequently, defendant's motion for summary judgment is denied with respect to plaintiff's retaliation claim.

## V. CONCLUSION

Based on the analysis above, defendant's motion for summary judgment (D.I. 28) is denied. An appropriate order shall issue.

22